# 25-817-CV

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

——— ►►◄◄ ———

ANNAMARIE TROMBETTA, ARTIST,

*Plaintiff-Appellant,*

*v.*

NORB NOVOCIN, MARIE NOVOCIN,
ESTATE AUCTIONS, INC., WORTHPOINT CORPORATION,

*Defendants-Appellees,*

WILLIAM SEIPPEL, WORTHPOINT.COM,
JASON PACKER, EMPLOYEE AT WORTHPOINT CORPORATION,

*Defendants.*

———————

*On Appeal from the United States District Court
for the Southern District of New York*

## SUPPLEMENTAL APPENDIX
## VOLUME 3 OF 12
## Pages SA465 to SA650

WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP
*Attorneys for Defendant-Appellee
WorthPoint Corporation*
150 East 42nd Street, 23rd Floor
New York, New York 10017
212-490-3000



## **Table of Contents**

**Page**

## **Volume 1**

Proposed Amended Complaint, dated January 17, 2020,
    with Exhibits ................................................................................ SA1

Plaintiff's Response in Opposition to Defendant's Motion to
    Dismiss Amended Complaint, dated February 21, 2020,
    with Exhibits ................................................................................ SA64

Opinion and Order of the Honorable Sarah L. Cave,
    dated March 19, 2020 ................................................................... SA112

Protective Order of the Honorable Sarah L. Cave,
    so-ordered on February 16, 2022 ................................................. SA126

Order of the Honorable Sarah L. Cave,
    so-ordered on December 8, 2022 ................................................. SA130

Order of the Honorable Sarah L. Cave,
    so-ordered on December 20, 2022 ............................................... SA131

Memorandum by Plaintiff in Support of Motion
    for Leave to File a Proposed Amended Complaint,
    dated December 23, 2022 ............................................................. SA134

Proposed Second Amended Complaint,
    dated December 23, 2022 ............................................................. SA216

Exhibits to Memorandum by Plaintiff in Support of Motion
    for Leave to File a Proposed Amended Complaint ...................... SA237

Order of the Honorable Sarah L. Cave,
    dated December 29, 2022 ............................................................. SA264

Order of the Honorable Sarah L. Cave,
    dated February 2, 2023 ................................................................. SA266

**Table of Contents**
**(Continued)**

**Page**

Defendant WorthPoint Corporation's Omnibus Motion
*in Limine* Concerning Experts, dated April 10, 2023 .................... SA268

Declaration of Jana S. Farmer in Support of Defendant's
Motion *in Limine*, dated April 7, 2023 ........................................ SA270

**Volume 2**

Exhibit A to Farmer Declaration -
Documented Communications from WorthPoint's
Counsel to Plaintiff .................................................................... SA273

Exhibit B to Farmer Declaration -
Expert Affidavit of Patrick O'Leary,
sworn to December 5, 2022, with Exhibits ............................ SA298

Exhibit C to Farmer Declaration -
Expert Disclosure and Expert Report of
Joseph V. Scelsa, dated February 16, 2023,
with Exhibits ........................................................................ SA327

Exhibit D to Farmer Declaration -
Transcript of Proceedings held before the
Honorable Sarah L. Cave on November 23, 2022 ................. SA390

Notice of Motion by Defendant WorthPoint Corporation
for Summary Judgment, dated April 17, 2023 ............................. SA458

Declaration of Jana S. Farmer in Support of Defendant's
Motion for Summary Judgment, dated April 17, 2023 ................. SA460

**Volume 3**

Exhibit A to Farmer Declaration -
Deposition Testimony of Annamarie Trombetta,
taken August 30, 2022 ............................................................. SA465
*(cont'd in Vol 4)*

**Table of Contents**
**(Continued)**

**Page**

**Volume 5**

Exhibit B to Farmer Declaration -
Deposition Testimony of Norb Novocin,
taken September 21, 2022 ....................................................... SA837

Exhibit C to Farmer Declaration -
Redacted Deposition Testimony of Willie Chu,
taken October 7, 2022 ............................................................ SA1084

**Volume 6**

Exhibit D to Farmer Declaration -
Redacted Deposition Testimony of Vanessa Koi-Ploski,
taken October 17, 2022, with Cover Letter ........................... SA1136

Exhibit E to Farmer Declaration -
Redacted Defendant WorthPoint Corporation's
Expert Disclosure Pursuant to FRCP Rule 26(a)(2)
of Jessie Stricchiola, dated January 19, 2023,
with Report and Exhibits ....................................................... SA1237

Exhibit F to Farmer Declaration -
Redacted Declaration of Jason Packer,
dated January 19, 2023, with Exhibits .................................. SA1280

Exhibit G to Farmer Declaration -
Declaration of William H. Seippel,
dated April 17, 2023, with Exhibits ...................................... SA1303

Exhibit H to Farmer Declaration -
Expert Affidavit of Patrick O'Leary,
sworn to December 5, 2022, with Exhibits ........................... SA1349

**Volume 7**

Exhibit I to Farmer Declaration -
Deposition Testimony of Patrick O'Leary,
taken February 28, 2023 ....................................................... SA1382

**Table of Contents**
**(Continued)**

**Page**

Exhibit J to Farmer Declaration -
Google Search Results, dated March 15, 2017 ..................... SA1654

Exhibit K to Farmer Declaration -
Screenshots of the WorthPoint Report ................................. SA1655

**Volume 8**

Exhibit L to Farmer Declaration -
Defendant WorthPoint's First Request for Production,
dated February 25, 2022 ......................................................... SA1661

Exhibit M to Farmer Declaration -
Plaintiff's Response to WorthPoint's First
Request for Production, dated April 22, 2022 ....................... SA1674

Exhibit N to Farmer Declaration -
WorthPoint's Post-Deposition Demands to Plaintiff,
dated October 6, 2022 ............................................................ SA1691

Exhibit O to Farmer Declaration -
Plaintiff's Response to WorthPoint's Post-Deposition
Demands, dated October 20, 2022, with Attachments .......... SA1701

Exhibit P to Farmer Declaration -
Deposition Testimony of Scott Goodwillie,
taken October 6, 2022, with Cover Letter ............................ SA1800

Rule 56.1 Statement of Material Facts by Defendant
WorthPoint, dated April 17, 2023 ................................. SA1884

Letter from Jana S. Farmer to the Honorable Sarah L. Cave,
dated May 9, 2023 ......................................................... SA1896

Exhibit A to Letter -
Email from Adam Bialek to Annamarie Trombetta,
dated January 18, 2022 ......................................................... SA1901

iv

**Table of Contents**
**(Continued)**

**Page**

Exhibit B to Letter -
WorthPoint's First Set of Interrogatories,
dated February 25, 2022 ........................................................ SA1903

Exhibit C to Letter -
Plaintiff's Third Response to WorthPoint's
Interrogatories, dated June 27, 2022 ..................................... SA1916

Exhibit D to Letter -
Various Email Correspondence,
dated July 19, 2022 through August 8, 2022 ......................... SA1926

Exhibit E to Letter -
Various Email Correspondence,
dated September 9, 2022 to September 12, 2022 ................... SA1935

Exhibit F to Letter -
Email from Annamarie Trombetta to Nicole Haimson,
*et al*., dated September 15, 2022 .......................................... SA1939

Exhibit G to Letter -
Various Email Correspondence,
dated September 15, 2022 to September 28, 2022 ................. SA1940

**Volume 9**

Exhibit H to Letter -
Post-Deadline Court Submissions
Regarding Expert Disclosure Issues ...................................... SA1943

Exhibit I to Letter -
Redacted Documents Relating to Dr. Joseph Scelsa's
Opinions and Qualifications ................................................... SA1952

Exhibit J to Letter -
Redacted Expert Report of Gayle Skluzacek,
dated February 21, 2023, with Attachments .......................... SA2016

**Table of Contents**
**(Continued)**

Page

Plaintiff's Opposition Response to Defendant WorthPoint's
Motion to Preclude and Proffer Plaintiff's Expert Witnesses,
dated May 19, 2023 ........................................................................ SA2051

Defendant WorthPoint's Response to Plaintiff's (Trombetta's)
First Set of Notice to Admit for Defendants [Sic] WorthPoint
Corporation, dated April 8, 2022 .................................................. SA2069

WorthPoint' s Responses and Objections to Plaintiff's
Request for the Production of Documents and Photos,
dated April 8, 2022 ........................................................................ SA2087

Defendant Worth Point's Responses and Objections to
Plaintiff's Request for the First Set of Interrogatories for
Defendants WorthPoint Corporation, dated April 8, 2022 ........... SA2115

Defendant Worth Point Corp.'s Response to Plaintiff's
Second Request for Admissions, dated July 13, 2022 .................. SA2132

Defendant WorthPoint Corp.'s Answers to Plaintiff's
Second Set of Interrogatories for Defendant WorthPoint
Corporation, dated July 1, 2022 .................................................... SA2146

Defendant WorthPoint Corp.'s Answers to Plaintiff's
Second Request for Production of Documents,
dated July 1, 2022 ........................................................................ SA2157

Defendant WorthPoint Corp.'s Responses to Plaintiff's
Third Request for Interrogatories, dated August 15, 2022 ........... SA2167

Defendant WorthPoint Corp.'s Responses and Objections
to Plaintiff's Third Request For Production of Documents,
dated August 15, 2022 .................................................................. SA2182

Defendant WorthPoint Corp.'s Responses and Objections
to Plaintiff's Fourth Request For Production of Documents,
dated October 11, 2022 ................................................................. SA2194

**Table of Contents**
**(Continued)**

**Page**

Exhibits to Plaintiff's Opposition Response to Defendant
    WorthPoint's Motion to Preclude and Proffer Plaintiff's
    Expert Witnesses ............................................................ SA2208

Exhibits to Plaintiff's Opposition Response to Defendant
    WorthPoint's Motion to Preclude and Proffer Plaintiff's
    Expert Witnesses ........................................................... SA2241

Declaration of Jana S. Farmer in Opposition to Plaintiff's
    Various Motions *in Limine* and Motions to Proffer,
    dated May 30, 2023 ........................................................ SA2264

        Exhibit A to Farmer Declaration -
        First Initial Disclosure of Defendant WorthPoint
        Corporation Pursuant to FRCP 26(A)(1),
        dated February 25, 2022 ........................................... SA2267

        Exhibit B to Farmer Declaration -
        Redacted Declaration of Jason Packer,
        dated January 19, 2023, with Exhibits ................................. SA2273

        Exhibit C to Farmer Declaration -
        Redacted Defendant WorthPoint Corporation's
        Expert Disclosure Pursuant to FRCP Rule 26(a)(2) of
        Jessie Stricchiola, dated January 19, 2023, with Exhibits ..... SA2296

        Exhibit D to Farmer Declaration -
        Email from Jana S. Farmer to Annamarie Trombetta,
        *et al*., dated October 11, 2022 ............................... SA2339

Plaintiff's Response to Defendants Estate Auctions Inc. and
    Norb and Marie Novocin's Motion for Summary Judgment,
    dated May 30, 2023 ........................................................ SA2340

Exhibits 1-12 of Plaintiff's Response to Defendants
    Estate Auctions Inc. and Norb and Marie Novocin's
    Motion for Summary Judgment ................................................ SA2372

**Table of Contents**
**(Continued)**

**Page**

Exhibits 13-21 of Plaintiff's Response to Defendants
Estate Auctions Inc. and Norb and Marie Novocin's
Motion for Summary Judgment ...................................................... SA2410

Exhibits 22-35 of Plaintiff's Response to Defendants
Estate Auctions Inc. and Norb and Marie Novocin's
Motion for Summary Judgment ...................................................... SA2445

**Volume 11**

Exhibits 36-38 of Plaintiff's Response to Defendants
Estate Auctions Inc. Motion for Summary Judgment .................. SA2482

Exhibit 41 of Plaintiff's Response to Defendants
Estate Auctions Inc. and Norb and Marie Novocin's
Motion for Summary Judgment ...................................................... SA2525

Exhibits 39-41 of Plaintiff's Response to Defendants
Estate Auctions Inc. Motion for Summary Judgement ................ SA2547

Letter from Annamarie Trombetta to the Honorable
Sarah L. Cave, dated June 1, 2023 ............................................... SA2582

Exhibit 1 to Letter -
Various Email Correspondence between Annamarie
Trombetta and Art Appraiser Gayle Skluzacek ..................... SA2584

Exhibit 2 to Letter -
Various Email Correspondence between
Annamarie Trombetta and Dr. Joseph Scelsa ........................ SA2596

Exhibit 3 to Letter -
Plaintiff's Communication with Defendants
for Witnesses ........................................................................ SA2618

Exhibit 4 to Letter -
Problems and Delays Caused by WorthPoint Defendants ..... SA2632

**Table of Contents**
**(Continued)**

**Page**

Exhibit 5 to Letter -
Plaintiff's Illness Beginning December 7, 2022
into Late January 2023 ........................................... SA2673

Exhibit 6 to Letter -
WorthPoint Attorneys 2023 Emailing Plaintiff
Requesting Expert Witness Depositions ............................... SA2676

Exhibit 7 to Letter -
Ebay Phone Call Transcript .................................... SA2682

Exhibit 8 to Letter -
List and Number by Month February to
December 2022 Plaintiff's Problems with Defendants ......... SA2708

Plaintiff's Response to Defendant WorthPoint Corporation's
Motion for Summary Judgment, dated June 7, 2023 ................... SA2721

**Volume 12**

Exhibits 1-9 to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2759

Exhibit 10 to Plaintiff's Response to Defendant WorthPoint
Corporation's Motion for Summary Judgment ............................ SA2792

Exhibits 12-18D to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2822

Exhibits 19A-24 to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2857

Exhibits 25A-27 to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2888

Exhibits 28-30D to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2922

**Table of Contents**
**(Continued)**

**Page**

Letter from Jana S. Farmer to the Honorable Sarah L. Cave,
    dated June 8, 2023 .......................................................... SA2947

Opinion and Order of the Honorable Sarah L. Cave,
    dated June 22, 2023 ....................................................... SA2949

Order of the Honorable Laura Taylor Swain, dated July 5, 2023 ....... SA2966

x

**SA465**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CIVIL CASE NO. 18-cv-00993-RA-SLC

------------------------------------x

ANNAMARIE TROMBETTA,

                    Plaintiff,

          -against-

NORB NOVOCIN, MARINE NOVOCIN, ESTATE

AUCTIONS, INC., AND WORTHPOINT

CORPORATION,

                    Defendants.

------------------------------------x


                    August 30, 2022

                    9:23 a.m.


          Videotaped deposition of ANNAMARIE

TROMBETTA, held at the offices of Wilson Elser

Moskowitz Edelman & Dicker, 150 East 42nd Street,

New York, New York, pursuant to Notice, before

Lynne D. Metz, a Shorthand Reporter and Notary

Public of the State of New York.

**SA466**

Page 2

A P P E A R A N C E S:


     DUFF LAW PLLC

     Attorneys for Defendants NORB NOVOCIN, MARIE

     NOVOCIN and ESTATE AUCTIONS, INC.

          43-10 Crescent Street

          Suite 1217

          New York, New York 11101

     BY:   ANDERSON J. DUFF, ESQ.




     WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

     Attorneys for Defendant WORTHPOINT

     CORPORATION

          150 East 42nd Street

          New York, New York 10017

     BY:   ADAM R. BIALEK, ESQ.

           JANA FARMER, ESQ.




     ALSO PRESENT:

          Phil Glauberson - Videographer

          Robert Schmidt

Page 3

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the officer before whom the within deposition was taken.

Page 4

MR. BIALEK: Mark this as Defendants' Exhibit 1, Notice of Deposition of Plaintiff Annamarie Trombetta.

(Defendants' Exhibit 1, Notice of Deposition of Plaintiff Annamarie Trombetta, marked for identification, as of this date.)

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:23 a.m. on 8/30/22. Please note that microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of Annamarie Trombetta in the matter of Annamarie Trombetta versus Norb Novocin, et al filed in the United States District Court, Southern District of New York, 18-cv-993-RA-SLC.

The location of the deposition is Wilson Elser, 150 East 42nd Street, New York, New York.

My name is Phil Glauberson

**SA469**

Page 5

A. Trombetta

representing Veritext and I am the videographer. The court reporter is Lynne Metz from Veritext. I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding please state them at the time of your appearance. Counsel and all present will now state their appearances and affiliations for the record beginning with the noticing attorney.

MR. BIALEK: Good morning Miss Trombetta. My name is Adam Bialek. I am with the law firm of Wilson Elser Moskowitz Edelman and Dicker LLP. We represent defendant Worthpoint Corporation. With me today to my left is Jana Farmer who I believe you are familiar with and diagonally across the table is Robert Schmidt from Worthpoint.

MR. SCHMIDT: Very nice to meet you.

THE WITNESS: Very nice to meet you.

MR. DUFF: My name is Anderson Duff

**SA470**

Page 6

A. Trombetta

and I am here representing Estate Auctions and Norb and Marie Novocin.

            MR. BIALEK:  Miss Metz, can you swear the witness in?

A N N A M A R I E  T R O M B E T T A,
called as a witness, having been first duly sworn
by the Notary Public (Lynne D. Metz), was examined
and testified as follows:

EXAMINATION BY
MR. BIALEK:

        Q.    You had a question?

        A.    Mr. Schmidt is from Worthpoint.
              What is your position?

        Q.    He is the general counsel.

        A.    So there are four attorneys?

        Q.    Correct.

              THE WITNESS:  You are a court reporter
        and not an attorney.

              THE COURT REPORTER:  Yes.

BY MR. BIALEK:

        Q.    Let me start with some ground rules.
As I said, I am Adam Bialek from Wilson Elser on

**SA471**

Page 7

A. Trombetta

behalf of Worthpoint Corporation. I will be asking you several questions today about your lawsuit, the facts that gave rise to the lawsuit and other related matters. If at any time you cannot hear me, please ask me to speak up. Normally that's not a problem for people, but if it is, please ask me and I will speak up.

If you cannot understand me or understand a question that I ask, please ask me to stop and rephrase it or explain it.

Is that understood?

A. Thank you, yes.

Q. As you see there is a court reporter here who is taking down everything that we say. So I would ask that all of your answers be verbal and not a nod of your head or a motion with your hands. In addition, verbal responses such as aha, maybe difficult for the court reporter to take down, so we ask they be formal responses.

A. Understood, thank you.

Q. I would also ask that you allow me to finish my question before you answer. I will try and allow you to finish your answer before I ask my next question because she can only take down

Page 8

A. Trombetta

one of us at a time.

Is it fair that if you understand and answer -- strike that. I am going to presume that if you answer a question you understood my question.

Is that fair?

A. That is fair.

MR. BIALEK: Can you please mark this as Defendants' Exhibit 1 and show it to the witness.

A. May I ask a question?

Q. Absolutely.

A. My question is: Do I have an opportunity to get a copy of today's deposition when it is complete?

Q. Yes, you will. Not only will you get an opportunity to get a copy, but you will be given a copy, asked to review the transcript and given an errata sheet for you to make any corrections if you deem --

A. Necessary.

Q. -- necessary, and to the extent that you don't make any corrections, we will presume that that's your testimony.

Page 9

A. Trombetta

In addition, this may be a long day. It is very warm outside. It could get a little warm in here. If at any time you need a break, please ask us and we would be happy to take a break. The one caveat I have is I would ask you to answer any open question that is on the table at that time before we take a break; okay?

A. That is very fair.

Q. Can you please show the witness what has been marked as Defendants' Exhibit 1.

I am showing you what has been marked as Defendants' Exhibit 1. It is a notice for deposition and ask if you recognize this document?

A. Yes, I do.

Q. What do you know this document to be?

A. The document is on page 1 the date and the time at Wilson Elser, 150 East 42nd Street for a deposition. Exhibit A hereinto is -- I'm going to have to get my glasses -- a listing from A through Q regarding several topics and the terms and the following meanings from page 2 to page 4.

On page 5 matters of examination, 5 and 6 matters of examination.

Q. And you are aware the deposition was

**SA474**

Page 10

A. Trombetta

supposed to start at 9 a.m.?

A.    I was aware and as I tried to explain I forgot my identification which would have precluded me from being able to come upstairs. Luckily I recognized this prior to getting on the subway, but it did delay my arrival.

Q.    I believe you gave an address of 175 East 96th Street, apartment 12R, New York, New York 10128 to the court reporter; is that correct?

A.    That is correct.

Q.    And that's your current address?

A.    That's my current address.

Q.    How long have you lived there?

A.    At apartment 12R since 2010.

Q.    You previously lived in the building in a different apartment?

A.    That is correct.

Q.    How long have you lived in the building?

A.    I can't say with certainty.  I would assume over 25 years.  I can't remember the year.

Q.    Do you have any other residences?

A.    No.

Q.    Have you had any other residences

Page 11

A. Trombetta

since 2015?

A.    No.

Q.    Do you own any other property?

A.    No.

Q.    Have you owned any other real property since 2015?

A.    No.

Q.    Did you lease any property since 2015?

A.    I need to object because I don't know how this relates to the lawsuit.

Q.    It is just normally I wouldn't be answering questions, but to put you at ease I am trying to figure out all of the locations that you have been present at that you might have documents that would be responsive to this case.

So were there any other properties that you leased, rented or stayed at for any length of time between 2015 and the present?

A.    No to most of your question. Occasionally stayed at friends or family's homes.

Q.    Anyplace longer than a month?

A.    I cannot say with certainty.

Q.    Are you presently employed?

A.    I am working on income producing

Page 12

A. Trombetta

projects.

Q.    Are you employed by anybody?

A.    I am self-employed at the moment due to this lawsuit.

MO        MR. BIALEK:  Move to strike it as not responsive.

Q.    When was the last time you were employed?

A.    I teach privately.

Q.    Is that through self employment or do you have an employer?

A.    In 2017 I took a group of people to Italy.  My employer was the man who owned the villa.

Q.    How many people did you take to Italy?

A.    I can't say with certainty.  Between eight and ten.  This is going back and it's an unexpected question.

Q.    How long had you been in Italy with this group?

A.    I believe it was a ten-day trip.

Q.    And you were teaching on this trip?

A.    Correct.

Q.    What were you teaching?

**SA477**

Page 13

A. Trombetta

A.   My profession.  How to draw.  How to paint en Plein Air.  That means outdoors.

Q.   Prior to -- withdrawn.

Since 2017 have you been employed by anybody?

A.   No.  Most of my income is derived from selling my art, exhibiting.  Sometimes writing articles.

Q.   Prior to 2017, when was the last time you were employed?

A.   I worked at a gallery.  I can't remember the year.  They have since gone out of business and they were in the thirties on 6th Avenue.

Q.   Was that since 2015?

A.   It may have been prior.

Q.   Was it since 2010?

A.   I don't believe so.

Q.   So somewhere between 2010 and 2017?

A.   No.  I think it may have been earlier. I am not clear because so many things have happened from last year to this year.

Q.   Is there anything preventing you from testifying today truthfully?

Page 14

A. Trombetta

A.    At times I have memory problems if I am under stress and I am currently in the company of one, two, three, four attorneys all because I did not paint an oil painting that was publicly on the Internet that was with my name and association and a signature that was not mine.  It is a lot. It is a lot to endure for a very clear cut mistake.

Q.    So when you are stressed that causes you to have memory issues; is that correct?

A.    That is correct.

Q.    And do those memory issues manifest by forgetting certain things?

A.    I would have -- with some degree of uncertainty and certainty.  For example, this morning I forgot my identification.

Q.    The memory problems that you manifest, are they related to forgetting things; yes or no?

A.    Can you rephrase the question?

Q.    Sure.

When you have stress you indicated that you have memory problems; correct?

A.    At times, yes.

Q.    And at times when you are stressed and

Page 15

A. Trombetta

you have these memory problems, are the problems associated with you forgetting things?

A.    At times I can't say with certainty, yes.

Q.    When you have stress and you have memory problems, are those problems also manifested where you remember things differently than they actually occurred?

A.    No.  With a degree of uncertainty. It's not -- I can't -- it's not a pattern.  I am not a robot.  I am a human being.  At times when I am under stress I do forget important things. Again, I reference the example today.

Q.    I understand that.

What I am trying to find out is when you have memory problems, is it just a matter of you forgetting things or do you misremember things that may have happened differently than you are remembering at the time you are asked the question?

A.    For the most part it is forgetting keys, identity, exact dates and times.  Sometimes it relates to numbers, but usually presently it is improved, but it happens.  It happens with

Page 16

A. Trombetta

everyone.

Q.    Do you forget facts?

A.    In general, I can't say with certainty.  It depends on the fact.

Q.    When you are not under stress, do you believe you have a good memory?

A.    This is correct.

Q.    So when you are not stressed you think you have a good memory; correct?

A.    That is correct.

Q.    We are going to try as best we can not to stress you today.  I am here to ask you questions not to trip you up or anything, but just to ask you questions; okay?

So again, if you need a break, if you need water, coffee or anything, whatever is going to help you feel at ease we will try and accomplish that; okay?

A.    You can try.  I can try to be calm.

Q.    Is there anything else that is preventing you from testifying truthfully today?

A.    To my knowledge, no.

Q.    Have you had any alcohol within the last 24 hours?

**SA481**

Page 17

A. Trombetta

A.    In general I don't drink.

Q.    But in the last 24 hours have you had any alcoholic beverages?

A.    I have not.

Q.    Within the last 24 hours have you had any illegal drugs?

A.    I don't partake in any illegal drugs and/or in general medication.

Q.    Within the last 24 hours have you taken any medications?

A.    No.

Q.    Are you prescribed any medications that you haven't taken in the last 24 hours?

A.    No.

Q.    Have you previously had a traumatic brain injury?

A.    In past years that is correct.

Q.    And when did you recover from that traumatic brain injury?

A.    The best way to answer that is it has improved depending on the extenuating circumstances.

Q.    What do you mean by that?

A.    I stated under stress and that in a

Page 18

A. Trombetta

general vague way is the best way to describe memory issues.

Q. When did you have your traumatic brain injury?

A. In 2003.

Q. And what kind of traumatic brain injury did you have?

A. I was on board the Staten Island Ferry.

Are you familiar with the accident?

Q. What accident?

A. In 2003 there was a highly publicized accident.

Q. With the Staten Island Ferry?

A. That is correct.

Q. I am aware of times where there have been crashes with the Staten Island Ferry.

You are referring to one of those?

A. There have been a few.

Q. So are you saying that in 2013 you were on the Staten Island Ferry when it had an accident?

A. No. I was not on the Staten Island Ferry in 2013.

**SA483**

Page 19

A. Trombetta

Q.    In 2003?

A.    Correct me if I am wrong, but I believe you stated 2013.

Q.    I think I said 2003, but in any event I am asking you now, were you on the Staten Island Ferry in 2003 when it had an accident?

A.    That is correct.

Q.    Were you injured in that accident?

A.    Yes.

Q.    Did you sustain a traumatic brain injury in that accident?

A.    When the boat hit the pier I went from one side to the other and my head on the left side I have a bald spot was hit traumatically.

Q.    And did that cause a traumatic brain injury?

A.    Yes.

Q.    And were you ever diagnosed with what medically you sustained?

A.    Yes.

Q.    And what was the diagnosis?

A.    Concussion.

Q.    Anything else?

A.    Memory problems.

Page 20

A. Trombetta

Q.    What kind of memory problems?

A.    I used to have what is known as an eidetic memory.  The most long standing noted effect is that before the crash, BC, numbers, phone numbers were duly computerized in my memory bank.  AD, after disaster, numbers at times need to be written down or looked at more than once.

Q.    At one point you had an eidetic memory and now you don't; is that correct?

A.    That is correct.

Q.    And sometimes you can mix up numbers; is that correct?

A.    It depends on the circumstances.  I can't say with certainty.

Q.    And do you keep files or records of things with important numbers and dates because you no longer have the eidetic memory?

A.    To that extreme I cannot say with certainty that that is true.

Q.    Why not?  What's the caveat?

A.    Can you rephrase the question?

MR. BIALEK:  Can you read back my question please?

(Record read.)

**SA485**

Page 21

A. Trombetta

MR. BIALEK: Can you read back her answer?

(Record read.)

Q. And I was asking you what was the caveat, why can't you say that with certainty?

A. Describe what kind of files you are referencing. That's a big umbrella.

Can you give an example? This morning I gave an example of my identification that I forgot.

Q. Do you have to write down things in order to remember them?

A. I can't say with certainty. At times if I have many things to do. That's the standard practice for every individual.

Q. Do you keep a calendar?

A. Yes.

Q. How long have you been keeping a calendar?

A. For many years.

Q. What do you put in your calendar?

A. Can you be more specific?

Q. Sure.

What kinds of things do you put in

Page 22

A. Trombetta

your calendar; appointments, things that you do?

    A.    Your initial question was do you keep calendars?

    Q.    And you said yes.

    A.    In my apartment I have calendars.

    Q.    Do you keep a daily calendar?  Do you understand what I am asking you?

    A.    I understand.  It depends on my schedule and what tasks or events are unfolding.

    Q.    How do you keep your schedule?

    A.    That's again, an umbrella question which covers a broad spectrum how do I keep my schedule.  Please rephrase that question.

    Q.    Do you have a daily planner?

    A.    I don't have a specific daily planner.

    Q.    Do you keep a log of everything that you do every day?

    A.    It depends on the set of circumstances.  I can't say with certainty.

    Q.    What kind of circumstances does it depend upon?

    A.    Asked and answered.

    Q.    What was asked and answered?  Do you remember the question I just asked you?

**SA487**

Page 23

A. Trombetta

A.      You asked me -- no.

MR. BIALEK:  Can you please read back the question.

(Record read.)

A.      With certainty, no.

Q.      Do you want me to go back and rephrase it?

A.      Let's try rephrasing it please.

Q.      Sure.

Do you keep a daily planner that logs in your activities that you have scheduled for a day?

A.      Again, asked and answered.  Repeat answer is it depends on the extenuating circumstances and what I am doing at that time.

Q.      And now I am going to ask you what extenuating circumstances or circumstances does it depend upon?

A.      It depends on the time of year.

Q.      Are there certain times of year where you keep a daily planner as opposed to other times of the year?

A.      With certainty there are times when I write things down and there are times when I don't

**SA488**

                                              Page 24

                        A. Trombetta

write things down.

        Q.    What triggers whether you write

something down versus you not writing something

down?

        A.    The extenuating circumstances that I

am dealing with within the day, the week, the

month.

        Q.    What kind of extenuating circumstances

would those be?

        A.    It pertains to what I am involved in

at that particular time.

        Q.    Would you say that the more stressful

activities there are the more you would keep a

daily planner?

        A.    I can't say with certainty, but it is

logical that I would do something like that.

        Q.    When you had your -- withdrawn.

              I believe you said you moved into your

apartment about a dozen years ago; is that

correct?

        A.    Which apartment?

        Q.    Your current apartment.

        A.    That is correct.

        Q.    Was that a stressful time?

Page 25

A. Trombetta

A.    It was.

Q.    Did you keep a daily planner during the time that you moved into your apartment?

A.    No.

Q.    Why not?

A.    I had -- it wasn't necessary.

Q.    So when you moved into the new apartment I presume you would have had to change your address on your license.

You would have had to change the electricity and things like that; correct?

A.    Asked and answered earlier.

Q.    I might be having memory problems now.

A.    I believe you --

Q.    I don't remember asking that question. I mean the transcript will say but you can answer again. Just because it was asked doesn't mean that you don't need to answer again.

A.    Mr. Bialek, you asked me to confirm if I had moved within my building from one apartment to another.

Q.    Right.

A.    And I answered that.

Q.    Correct.

Page 26

A. Trombetta

A.      Which you asked.

Q.      Right and I am saying when you moved from one apartment to another, did you need to change your address on anything?

A.      Only the apartment number.

Q.      Did you have to notify the electric company?

A.      Yes.

Q.      Did you have to notify the cable company?

A.      They are the same.

Q.      Did you have to notify your bank?

A.      No, actually strike that.  They are different.

Q.      Did you have to notify the cable company?

A.      I had to notify my carrier.

Q.      Did you have to notify your banks?

A.      I believe I did.

Q.      So there were a lot of these small little functions that you needed to change when you moved apartments; correct?

A.      That is correct.

Q.      But you didn't keep a daily planner at

Page 27

A. Trombetta

that point?

A.    At that point, to the best of my recollection, I did not keep a daily planner.

Q.    In 2015 when you first came across the listing for the painting that is at issue in this matter, did you keep a daily planner?

A.    Not a daily planner.  I did have many e-mails that I could look back upon.

Q.    But you didn't keep a record of what you did on each day; is that correct?

A.    Each and every day I can't say with certainty.

Q.    Since 2015 have you kept a daily planner?

A.    Asked and answered.

Q.    You can answer again.

A.    I don't want to answer again.

Q.    I would like you to answer again.

A.    Can you rephrase the question?

Q.    Since 2015 has there been any time where you kept a daily planner?

A.    I have from my receipts and my expenses a ledger.

Q.    Did you keep track of appointments?

Page 28

A. Trombetta

A.    Not in that ledger.

Q.    Did you keep track of appointments in anything else?

A.    Not in that ledger.

Q.    Did you keep track of appointments in anything else besides the ledger?

A.    To the best of my recollection, I can't say with certainty.

Q.    Do you have a physical daily planner that you keep?

A.    I have a ledger for my receipts and expenses.

Q.    But other than a ledger for your receipts and expenses, do you have like a physical book that you keep appointments in?

A.    At this particular time in 2022, no.

Q.    Did you have one in 2015?

A.    To the best of my recollection, I did not have a daily planner.  I had a ledger.

Q.    Since 2015 have you had a daily planner, a physical daily planner?

A.    To the best of my recollection, I have asked and answered that fully.

Q.    We will put aside your recollection

Page 29

A. Trombetta

regarding whether you answered that fully and I will ask you again.

Since 2015 to the present have you had a physical daily planner other than that ledger?

A. To the best of my recollection, I can't say with certainty.

Q. Did you do anything to prepare for your deposition here today?

A. Can you give me an example of a preparation?

Q. Did you review any documents?

A. At times I have been overwhelmed and unable to review the documents that I had hoped to.

Q. Did you review any documents in preparation for your deposition today?

A. I reviewed Exhibit 1.

Q. Other than Exhibit 1, have you reviewed any documents in preparation for your deposition today?

A. I have reviewed some documents.

Q. In preparation for your -- withdrawn.

What documents did you review in preparation for your deposition?

Page 30

A. Trombetta

A. In order for me to answer that I need to state this case began in February 2018. I am trying to think of the exact date. I believe it is the 5th. It is 2022.

Q. I am talking within the past few days, have you reviewed any documents specifically to prepare yourself for today's deposition?

A. I can't say with certainty but yes, I have reviewed documents.

Q. Why can't you say with certainty whether over the last couple of days you reviewed documents to prepare for your deposition?

A. I can't say with certainty because it is a broad question. It is a four-year lawsuit.

Q. Right. So today is your deposition. We are asking you questions about it, about your lawsuit and my question to you is whether over the past two days you have done any review of documents to prepare you for the questions that you would receive today?

A. In general I have reviewed some documents along with doing other responsibilities.

Q. And specific rather than general, in specific over the last two days, what documents

**SA495**

Page 31

A. Trombetta

did you review to prepare for today's deposition?

A. I can't say with certainty because there were so many things that I found and went over.

Q. What were those things?

A. I found a lot of documents. Whether I can state with certainty which ones I read cover to cover, that's something that I cannot do right here and now.

Q. How much time did you spend reviewing documents over the last two days to prepare for your deposition?

A. Not as much as I had hoped to.

Q. How much did you hope to?

A. I had hoped to read my amended complaint which I didn't have time to do. I had hoped to review some of my exhibits which I could not do fully.

Q. Was there a reason that you couldn't do that?

A. Yes. I had other responsibilities.

Q. What documents did you review, not documents that you wanted to review that you didn't, but what documents did you review to

Page 32

A. Trombetta

prepare for your deposition here today?

A.     The documents that were filed on the week of August 26th.  The week starting what, the 20th to the 26th or the 21st to the 26th.

Q.     So those were the only documents that you reviewed to prepare for your deposition?

A.     I was writing and filing documents.

Q.     Did you prepare -- withdrawn.

Did you speak with an attorney to prepare for your deposition?

A.     No.

Q.     Did you speak with any friends to prepare for your deposition?

A.     Friends, no.

Q.     Did you speak with anyone about preparing for your deposition?

A.     I mentioned -- people know that I had to go to the deposition.

Q.     Did anyone speak with you about how to answer questions?

A.     To the best of my recollection, no.

Q.     Did anybody go over objections that you can make at your deposition?

A.     No, to the best of my recollection

**SA497**

Page 33

A. Trombetta

today I have not objected to anything.

Q.    Did anybody speak with you about how best to answer certain questions at your deposition?

A.    No.

Q.    Did anyone speak with you about how to answer questions at your deposition?

A.    Asked and answered.

Q.    Did anyone speak with you about the term asked and answered?

A.    You can look these things -- I looked some of these things up online.

Q.    So did you do that in preparation for your deposition?

A.    Briefly.

Q.    Where did you look up these things?

A.    Asked and answered.

Q.    Where did you look up the responses that you are giving, the asked and answered, the best of my recollection, where did you look those things up?

A.    I stated online.

Q.    Online is a pretty big area.

Do you know where online?

Page 34

A. Trombetta

A.    Now you know how I feel when you ask your questions.  I am not trying to be -- I am just trying to help you to understand my position in relationship to some of your questions that you asked me.

Q.    I am just trying to get answers.  I am not trying to understand your position.

A.    And I am trying to give them.

Q.    What I would like is for you to tell me what websites you may have consulted --

A.    You know I cannot recall with certainty.  There are many things that I am currently looking up.

Q.    But you didn't speak to anybody about how to respond to questions at your deposition; correct?

A.    I have answered that as no.

Q.    Do you currently have a computer?

A.    I currently have a computer.

Q.    How many computers do you currently have?

A.    I have two.  One is old.

Q.    How old?

A.    I think it's over a decade.  I can't

Page 35

A. Trombetta

say with certainty how old.

Q. What kind of computer is that?

A. They are both computers are Mac.

Q. So you don't have a non-Mac computer?

A. This is correct.

Q. And the old computer you had since before 2015?

A. That is to the best of my recollection, yes.

Q. And the new Mac that you have you had since when?

A. I can't say with certainty the exact year.

Q. Was it since 2015?

A. It may have been before.

Q. Have you had any other computers since 2015 other than these two Macs?

A. In my personal possession I have two computers.

Q. In any other possession did you have other computers?

A. Can you please rephrase the question?

Q. Other than the two Mac computers, did you own any other computers since 2015?

Page 36

A. Trombetta

A.    Other than the two Mac computers I did not.  I do not own any other computers.

Q.    And you have not owned any; correct, since 2015?

A.    I own two Mac computers.

Q.    But since 2015 other than those two Mac computers, you didn't own any other computers; correct?

A.    I own two Mac computers.  Asked and answered.

Q.    I don't think that you are appreciating my question and this is why I will try to rephrase it.

You have explained that since 2015 you have owned two Mac computers; right?

A.    Prior to 2015 I had stated an older computer.

Q.    But currently since 2015 you have owned two Mac computers; correct?

A.    That is correct.

Q.    What I am asking you is other than those two Mac computers, did you own any other computers since 2015?

A.    I own two Mac computers.

Page 37

A. Trombetta

Q. I got that.

A. Asked and answered.

Q. I got that.

I am asking did you own any others besides those two since 2015?

A. I can call the Mac store and they would have that information which would mirror what I just told you Mr. Bialek.

Q. Not if you had a Dell or an HP or an Asus.

So I am trying to find out did you own any other computers since 2015 other than the two Mac computers?

A. Asked and answered.

Q. It hasn't been answered. I've asked it a number of times, but it has not been answered. So here is a pad of Post-its. If you tell me that you own that pad of Post-its and I ask you did you own any other Post-its and you say I owned this pad of Post-its it is not answering the question as to whether or not you owned a different set of Post-its.

Similarly with your computers I am asking in addition to those two Mac computers, did

**SA502**

Page 38

A. Trombetta

you own any other computers since 2015?

    A.    To the best of my recollection, no. It is just those two computers that I own.

    Q.    Other than computers that you owned, did you regularly use any other computers besides those two Mac computers since 2015?

    A.    Yes.

    Q.    What other computer did you use?

    A.    In the building where I live there is a business center.

    Q.    And you used the computer that's in that business center?

    A.    There are three computers currently.

    Q.    And has this changed since 2015?

    A.    To the best of my recollection, I can't say with certainty.  There have been -- I don't monitor the business center.

    Q.    How often have you used the business center computers since 2015?

    A.    I can't say with certainty, but I do use it often.

    Q.    When you say often, is this more than five times a month?

    A.    That's a generalization.  I can't say

Page 39

A. Trombetta

with certainty. It is not a pattern. It is a need and a use situation.

Q. What do you use the business center computers for?

A. At times to print out things from the Internet, from my e-mails. One or two computers given their capability to be connected to the printer is what I use the business center for.

Q. Have you had a printer in your apartment since 2015?

A. Sporadically, yes.

Q. What would make you use the business computers in the business center?

A. A variety of answers.

Q. Such as?

A. The need to print out information, documents, photos.

Q. Do they charge you for using the computers in the business center?

A. They do not.

Q. Are you charged for printing from the computers in the business center?

A. They do not.

Q. Did you use the business center

Page 40

A. Trombetta

computers in connection with this case?

A.    That is correct, I did.

Q.    Did you use your own personal computers in connection with this case?

A.    At times I did.

Q.    Are the business center computers all Macs?

A.    That is correct.

Q.    Have you ever used a non---

A.    Although I have to strike that.  I can't say with certainty whether all of them have always been Macs.  I am not in a position to give certainty to that response.

Q.    Did you ever use a non-Mac computer in conjunction with this case?

A.    I can't say with certainty.  I believe I may have gone to the public library to look up things and print out things.

Q.    Have you ever used a non-Mac computer during the events that gave rise to this lawsuit?

A.    My response is that is a big umbrella spanning seven years of time.  So to say with certainty I cannot.

Q.    Do you have any recollection of using

Page 41

A. Trombetta

a non-Mac computer during those seven years --

A.    Asked and answered.

Q.    -- relative to this case?

A.    Asked and answered.

Q.    No.  You said you had no recollection -- sorry.  You said you couldn't state with certainty and I am asking do you have any recollection of using a non-Mac computer in connection with this case or the events that gave rise to this case since 2015?

A.    I believe the court reporter has duly documented that I did say I may have used the New York Public Library computer.

Q.    Do you know whether the New York Public Library is a Mac or a non-Mac?

A.    I believe it is not.  I believe it is not.  I cannot say with certainty.

Q.    How often did you use the public library computers in connection with this case or the events that gave rise to this case?

A.    I cannot say with certainty.  I can say with certainty within a year not at all.

Q.    Within the last year?

A.    Within the last year I did not use a

Page 42

A. Trombetta

public computer.

Q. What about in 2017?

A. I cannot say with certainty yes or no.

Q. Other than the New York Public Library, your two Mac computers and the business center computers, did you use any other computers with respect to this case or the events that gave rise to this case?

A. I can't say with certainty. I may have used a friend's computer.

Q. Why do you say that you cannot say with certainty, but you may have used a friend's computer?

A. Again, this began in the year 2015. It is now 2022. I cannot say with certainty and remember with certainty where I was and which computers I used.

Q. Can you say with certainty that you remember all of the events that gave rise to this lawsuit?

A. I cannot say with certainty because it spans a seven-year period.

Q. So there are facts that you may not be able to say with certainty that occurred seven

Page 43

A. Trombetta

years ago; is that fair to say?

A. There are a variety, numerous facts over time that are coming to the surface that were either documented or undocumented.

So in answer to your question again, with certainty I can say that very few people, myself included, can remember a seven-year period of information.

Q. So is it fair to say that you may not be able to remember all the details of what occurred in 2015 with certainty?

A. I can't say with certainty. It depends on the facts that you are going to bring to my attention. I would assume and I don't want to assume so I am going to ask you to rephrase your question.

Q. Do you remember all of the events that occurred relative to this case in 2016 with certainty?

A. I cannot say with certainty that I remember all the events because I don't know what all the events are that you Mr. Bialek are referring to.

Q. Can you say with certainty that you

Page 44

                    A. Trombetta

recall all of the events that occurred in 2017
relative to this case or the events that gave rise
to this case?

A.    I lost my train of thought.  I may
need a bathroom break.

          MR. BIALEK:  Sure.

A.    That's why.

Q.    Can you answer the question before we
take a break?

A.    Yes.

          MR. BIALEK:  I'll rephrase it.

A.    I would like you to rephrase the
question.

Q.    Sure.

          Can you state with certainty that you
remember all of the facts that occurred in 2017
relative to this case with certainty?

A.    I cannot say with certainty because I
am a human being and I am subject to daily
changes.

Q.    Okay, we can take a break.

          THE VIDEOGRAPHER:  This will end media
     unit one.  Going off the record at 10:22 on
     8/30/22.

Page 45

A. Trombetta

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record at 10:32 8/30/22. This will begin media unit two.

BY MR. BIALEK:

Q. Miss Trombetta, since 2015 how many e-mail accounts have you used?

A. To the best of my knowledge, I can't say with certainty. I really can't say with certainty. The main one in 2015 was Yahoo.

Q. What was the e-mail?

A. My last name with the T-R-O-M-B-E-T-T-A-A-R-T at Yahoo.

Q. Trombettaart at Yahoo.com?

A. That is correct.

Q. Do you still use that?

A. Sporadically.

Q. And it is still active; correct?

A. I have the account. I don't use it very often.

Q. When did you stop using it?

A. Technically I have not stopped using it.

Q. When did you stop using it regularly?

Page 46

A. Trombetta

A.    In 2017.

Q.    What did you -- withdrawn.

Was there an e-mail account that you moved to in 2017?

A.    Yes.

Q.    What e-mail did you move to?

A.    The current e-mail A Trombetta art at G-mail.

Q.    When did you first set up that G-mail account?

A.    Asked and answered.

Q.    When did you first set up the A Trombetta art at G-mail.com account?

A.    To cooperate 2017.

Q.    So it was just a split, you stopped using the Yahoo regularly when you started using the G-mail?

A.    That I can't say with certainty. Around the time of 2017 there was a transference.

Q.    So I was just trying to get at, you didn't use the G-mail account regularly prior to 2017; did you?

A.    Can you rephrase that again?

Q.    Did you use the A Trombetta art at

**SA511**

Page 47

A. Trombetta

G-mail account prior to 2017?

A.     No.

Q.     Other than A Trombetta art at G-mail.com and Trombetta art at Yahoo.com, have you used any other e-mail accounts since 2015?

A.     Yes.

Q.     What other e-mail accounts have you used since 2015?

A.     Since 2015?

Q.     Correct.

A.     Give me a moment.  In 2015 I believe I only have the one e-mail for Yahoo.

Q.     After 2015 other than the A Trombetta art at G-mail.com, had you used any other e-mail accounts to the present?

A.     To the best of my recollection, no. There was only the one e-mail at Yahoo.

Q.     No, but since then, you said that you started using A Trombetta art at G-mail.com in 2017?

A.     I will say this, my website has an e-mail and this is one of those situations where details -- it is like an old computer.  The file won't upload upon immediate command.  It takes a

Page 48

A. Trombetta

while.

So to clearly answer your question again, there was the Yahoo account and there was the e-mail related to my website.

Q. And the G-mail?

A. The G-mail came into existence late in 2017.

Q. So the -- your website domain is Trombetta art.com?

A. That's correct.

Q. And the e-mail that you had there was Annamarie at Trombetta art.com; is that correct?

A. That is correct.

Q. Did you have any other e-mail through Trombetta art.com?

A. That's the one e-mail.

Q. And that was set up when you started your website?

A. That is correct.

Q. But you didn't use that regularly; is that fair to say?

A. I checked it regularly.

Q. But your outgoing e-mail was through Yahoo until 2017?

Page 49

A. Trombetta

A.    For the most part, yes.

Q.    When was your website set up?

A.    In the year 2003.

Q.    And did you have your Yahoo account back then?

A.    To the best of my recollection, the Yahoo account was opened I believe the same year.

Q.    Memory wise, would you say your memory today while we are going through the deposition is what your memory typically is or better or worse?

A.    Today I am finding that it is worse than it usually is.

Q.    Because you are under stress?

A.    That is correct.

Q.    So when you testify that is a stressful time for you?

A.    I never testify.  You characterized when I testify as a regular occurrence.

Q.    But you gave a deposition in the Staten Island Ferry case; is that correct?

A.    That was a long time ago.

Q.    And were you stressed at that time?

A.    The stress was an assortment of factors.

**SA514**

Page 50

A. Trombetta

Q. And when you gave your -- withdrawn.

Do you know when you gave that deposition in the Staten Island Ferry case?

A. You are asking me the year?

Q. Yes.

A. I cannot recall with certainty the year for that.

Q. Was your memory better then or it is now?

A. My memory was compromised for quite some time.

Q. So it is better now than it was then?

A. I can say with a certain degree, a certain degree of certainty it is improved.

Q. Other than the Staten Island Ferry case and today, have you ever been deposed?

A. I have not.

Q. Have you ever given testimony other than those two occasions?

A. To the best of my recollection, no.

Q. What e-mail do you currently use?

A. It depends on the situation.

Q. So you currently use the A Trombetta art at G-mail for certain things and Annamarie

Page 51

A. Trombetta

Trombetta art.com for certain things; is that correct?

A.    And I don't want to divulge.  I have another personal with friends.

Q.    So you have another e-mail account?

A.    That is correct.

Q.    So in addition to the Yahoo, the G-mail and the Trombetta art.com e-mails, you have another personal e-mail?

A.    I object to this question.

Q.    Okay, you can answer.

A.    I asked and answered.

Q.    So you have another personal e-mail?

A.    Asked and answered.

Q.    You can answer again.  We will get through it much quicker.

A.    You are asking me to --

Q.    I am asking you a yes or no question.

A.    Asked and answered.

Q.    Do you only have one other e-mail account other than Trombetta art.com, Yahoo.com and G-mail.com?

A.    I object to that question.

Q.    So we can do it either one or two

Page 52

A. Trombetta

ways.  I am asking you a simple yes or no question.  We can mark it for a ruling and we can go to the judge and ask the judge to compel you to answer and then bring you back at your expense or you can just answer it.  It is a simple question.

A.  One to two minutes ago I said I have a personal e-mail with my G-mail account.

Q.  So it is also a G-mail?

A.  Yes.

Q.  Other than that personal G-mail account, do you have any other e-mail accounts other than that personal G-mail account and the three e-mail accounts you identified at Trombetta art.com, Yahoo.com and G-mail.com, are there any other e-mail accounts that you have?

A.  I can't say with certainty.  I have things written down at home.  I don't know if I use them.

Q.  Do they all have some formulation of your name in them?

A.  To the best of my knowledge, yes.

Q.  Did you ever use this personal e-mail account in connection with either this case or the facts giving rise to this case or contacting

Page 53

A. Trombetta

people to discuss this case?

A. Can you rephrase the question and put a time frame on it because again, this is a broad umbrella of a question?

Q. That's fine. Since 2015 -- withdrawn.

This personal e-mail account at G-mail, when did you start that?

A. To the best of my recollection, I can't give you a specific date. I believe it is in 2017.

Q. Since 2015 and I will just take those two years as a possibility, since 2015 have you to today, have you used your personal G-mail account related to this case addressing facts giving rise to this case or communicating with others about this case?

A. In 2015?

Q. Since 2015.

A. Since 2015 I cannot answer this question. I have told you prior to this question in 2017 is when, to the best of my recollection, I opened up the G-mail accounts.

Q. I had brought it back to 2015 because I know that under stress sometimes your memory is

**SA518**

Page 54

A. Trombetta

different, but we will go with 2017.

Since 2017, have you used your personal G-mail account regarding this case, in connection with this case, regarding the facts giving rise to this case or communicating with others about this case or the facts giving rise to this case?

A. I am going to ask you to simplify this question.

Q. Sure.

Since you started this personal e-mail account, have you used it to communicate with anybody about this case?

A. At times yes, particularly the witnesses.

Q. Since you started this personal e-mail, have you used this personal e-mail --

A. Okay, I object based on the fact that I have answered several questions related to my e-mail accounts.

Q. And?

A. And how does this relate to the falsification of a painting that I did not create?

Q. So you just said that you've used this

**SA519**

Page 55

A. Trombetta

e-mail account to communicate regarding this case?

A.    Primarily.

Q.    So it is relevant.

A.    Primarily with the Worthpoint defendant, yes.  That was primarily with the Yahoo account.

Q.    I am talking about your personal G-mail account.  The one you haven't given us the name of yet.

That personal G-mail account that you haven't yet identified, I believe you just stated that you used it with respect to e-mails to witnesses in this case; is that correct?

A.    At times to contact them as you requested.

Q.    I didn't request that you use any specific e-mail, did I?

A.    You asked me to contact the witnesses.

Q.    I am not so certain I did, but I didn't ask you or instruct you which e-mail account to use; did I?

A.    This is correct.

Q.    The e-mail account that you used to contact witnesses regarding this case, what's the

Page 56

A. Trombetta

e-mail address for that?

        A.    To the best of my recollection, I can't remember.

        Q.    When was the last time you contacted a witness using that e-mail address?

        A.    I believe you asked me to contact Scott Goodwilly.

        Q.    When was that?

        A.    I can't say the day.

        Q.    So within the last week?

        A.    Possibly within the last two weeks to be certain.

        Q.    And you don't remember the e-mail address that you used to contact Scott Goodwilly?

        A.    I believe that's my personal e-mail.

        Q.    Do you know what that personal e-mail address is?

        A.    Yes.

        Q.    What is that personal e-mail address?

        A.    I object.  I had said earlier it is my personal e-mail.

        Q.    Are you refusing to answer the question?

        A.    I don't want on record my personal

Page 57

A. Trombetta

e-mail.

Q.    Are you refusing to answer the question?

A.    I am not refusing.  Let me, if I may, ask the question.

May I ask a question?

Q.    Sure.

A.    This is my personal private life.  I was swept into an Internet posting beyond my consent, control or knowledge and now I am subjected to giving out my personal e-mail.

Q.    You need to understand from my client's perspective, you are making claims against my client for personal damages.

A.    And you need to understand from my perspective that your client made claims against my name and my self-authorized biography and made false claims.

Q.    We will disagree.  We will agree to disagree with you on that, but to the extent that you are making claims of damages --

A.    The agreement --

Q.    You need to let me finish and then I will let you finish.

Page 58

A. Trombetta

To the extent that you are making claims personally against my client, they are entitled to answers that may involve personal things.

A. And I am entitled to answers that evolve metadata, but I am not getting it.

Q. You have the opportunity to question my client if you decide to do that. What I am asking now is questions about your claim and my client is entitled to get answers to the questions about your claim. This is a simple question.

What is the e-mail address that you were using to contact your witnesses?

A. Art of Annamarie.

Q. Art of Annamarie?

A. Correct.

Q. At G-mail?

A. That is correct.

Q. Other than Annamarie at Trombetta art.com, Trombetta art at Yahoo.com and A Trombetta art at G-mail.com and art of Annamarie at G-mail.com, have there been any other e-mail addresses that you have used in conjunction with your claims or the facts giving rise to the

Page 59

A. Trombetta

claims?

A.    Wait.  That's -- can you repeat the question?

MR. BIALEK:  Absolutely.

Q.    Other than the four e-mail addresses you have given us, that is Annamarie at Trombetta art.com, Trombetta art at Yahoo.com, A Trombetta art at G-mail.com and art of Annamarie at G-mail.com, so other than those four e-mail addresses, have you used any other e-mail addresses in conjunction with this claim or the facts giving rise to this claim?

A.    In conjunction with this claim to the best of my understanding no, I have not used other.

Q.    Did you ever create any fake -- withdrawn.

Did you ever create any other e-mail accounts to communicate with Worthpoint?

A.    No.

Q.    Never?

A.    To the best of my recollection, no.  I was directly communicating with them through the Yahoo account.

Page 60

A. Trombetta

Q.    Did you ever create any other e-mail accounts to communicate with the Novocins or EAI?

A.    No.

Q.    Never?

A.    To the best of my memory, I don't believe so.

Q.    Did you ever create any other e-mail accounts or use any other e-mail accounts to communicate with eBay regarding the claims at issue here?

A.    You are going back to 2015 and again, my memory is Trombetta art.

Q.    Did you use any other e-mail accounts to communicate with Worthpoint other than the four you have identified so far?

A.    I used Worthpoint's e-mail addresses to communicate with Worthpoint.

Q.    No.

Coming from you, did you use any other e-mail accounts to contact Worthpoint at any time?

A.    To the best of my -- I can't say with certainty.

You know what, I think I need to take a break.

Page 61

A. Trombetta

MR. BIALEK:  Not a problem.

A.    A walk and a break.

Q.    Okay.

THE VIDEOGRAPHER:  Going off the record at 10:56.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record at 11:14.

BY MR. BIALEK:

Q.    Miss Trombetta, can you tell me your highest level of education?

A.    College.

Q.    Did you complete it?

A.    I don't believe I finished my -- I can't remember.

Q.    Did you get a degree?

A.    I have a BA.

Q.    From where?

A.    Parsons.

Q.    Parsons School of Design?

A.    Yes.

Q.    When did you get that?

A.    In the eighties.  I can't remember. You are going back to, too far.

Page 62

A. Trombetta

Q.    That's okay.  If you don't remember when you graduated I am fine with that.

Did you attend a school before you went to Parsons?

A.    I attended several schools.  It says that in my biography I believe.

Q.    And if you saw your biography would that refresh your recollection?

A.    I believe in my biography, that was on Worthpoint's website without my consent, it said I began my formal training when I was in high school.

Q.    Where was that?

A.    Where was what?

Q.    Your high school.

A.    My high school location was in Staten Island.

Q.    Your formal training began at the Brooklyn Museum School of Art?

A.    That is correct.

Q.    And that is while you were in high school; is that correct?

A.    That is correct.

Q.    If I showed you your biography that

**SA527**

Page 63

A. Trombetta

would refresh your recollection --

A.    That is correct.

Q.    -- as to when that was?

A.    Yes.

MR. BIALEK:  I want to ask the court reporter if you can mark Plaintiff 119 to Plaintiff 127 as Defendants' Exhibit it.

(Defendants' Exhibit 2, a document Bates stamped Plaintiff 119 to Plaintiff 127, marked for identification, as of this date.)

Q.    I am showing you what has been marked as Defendants' Exhibit 2 and ask if you recognize this document?

A.    What page?

Q.    The whole document.

Do you recognize the document?

A.    Yes.  It is from my website.

Q.    And specifically the biography is on Plaintiff 000124; is that correct?

A.    That is correct.

Q.    And does that refresh your recollection as to when you attended the Brooklyn Museum School of Fine Arts?

Page 64

A. Trombetta

A.    Again, I said I began my formal training when I was in high school.

Q.    Do you recall when you went to high school?

A.    In the eighties.  I can't remember which year specifically I graduated.  It may have been 1981, to the best of my recollection.  It is in the eighties.

Q.    Did you graduate from the Brooklyn Museum School of Fine Arts?

A.    They didn't have a program.  It was continuing -- in other words, the Museum held classes in their old studios.

Q.    And that would have been after you graduated or before you graduated high school, while you were in high school?

A.    To the best of my recollection, it was while I was in high school.

Q.    And you graduated high school you said in 1981?

A.    I believe it was 1981.  I am embarrassed to say that I would have to look up certain dates and again, this has to do with numbers.

Page 65

A. Trombetta

Q.    Can you turn to page Plaintiff 000123, that's the artist information tab on your website; correct?

A.    That is hard to see even with these glasses.

Q.    Do you remember what's on your website?

A.    It is almost like asking me do you remember what's in your closet.  I know they are all my things, but to state each and every thing that's in my closet or on my website is a tall ask.  Again, I have conveyed the issue with memory particularly under stress.  Particularly when this whole situation is about a false Internet posting.

Q.    That's fair.  So on your artist admission information page you have something called education and exhibits exhibitions.

Do you see that in the upper right?

A.    I see that, yeah.

Q.    And then the first section is education.

A.    I literally cannot see.

Q.    It's okay.

Do you remember that you have an

Page 66

A. Trombetta

education section on your website?

A. Yes.

Q. And if the education on your website if that section said that you were at Brooklyn Museum School of Fine Arts in 1983, would that be accurate?

A. 1983, so I went from high school and sporadically on the weekends.

Q. So what does that mean 1983 Brooklyn Museum School of Fine Arts, is that the last time you attended there?

A. I don't know that it says -- oh, I see. Brooklyn Museum School of Fine Arts. Again, to clarify the Brooklyn Museum had classes in painting, drawing, sculpture. I believe even fashion illustration.

Q. But your website doesn't say from 1978 to 1983, it just says 1983; correct?

A. I believe that's the year that I left in 1983.

Q. And that would have been while you were in college?

A. I can't say with certainty whether I was still going to the Brooklyn Museum when I

Page 67

A. Trombetta

entered Parsons. I know that I went to Parsons when I was in high school.

Q. You went to college while you were in high school?

A. Again, continuing Ed classes.

Q. But you got a BA?

A. You know what, I would have to -- I cannot answer that with certainty today. I have to look up my --

Q. Diploma?

A. -- documents because I have gone to several different schools in several different countries.

Q. On your website it says that you were at Parsons School of Design it says 1986.

Would that have been the date of graduation?

A. That was the year -- so I think it was from 1983 to 1986.

Q. So you spent three years in Parsons?

A. Yes.

Q. And then in 1986 you went to the Ercole Alber Defois in France?

A. For a summer.

Page 68

A. Trombetta

Q.    And in 1987 you were at the Art Students League; is that correct?

A.    I was sporadically going to various schools at the same time and again, this is it is now 2022.  This is 40-years ago and I can say with certainty that I have gone to all the schools listed.

Q.    And somewhere you kept a record of all of this; correct?

A.    In my biography it doesn't give the years, but it does give the fact that I went to school and where.

For example, I was accepted to Parsons School of Design located in Manhattan.  That's in paragraph 5.

Q.    And you went to the New York Academy of Art in 1989?

A.    Actually, those dates, that date I don't -- I went before that.

Q.    So the dates are wrong on your website?

A.    No.  The dates might be just the year that I left from such and such.  I didn't put beginning and ending.  I just put a year.

A. Trombetta

Q.    So what does that year mean?

A.    That year might mean the year that I got my certificate.

Q.    Did you get a certificate from the New York Academy of Art?

A.    Yes, that I remember.

Q.    And the William Butler Yates Summer School in Sligo, Ireland, do you remember attending that?

A.    I attended the William Butler Yates summer school in Sligo, Ireland.

Q.    I apologize for the pronunciation.  I am not familiar with it.

A.    If the year is documented, then.

Q.    It says 1991.

A.    Yes.  Then that's probably.

Q.    And after that you attended the National Academy School of Fine Arts?

A.    That is correct.

Q.    How long did you go there?

A.    For a number of years.  I also work there part time.

Q.    And the year 1999 would be the year of what, the last time you were there?

Page 70

A. Trombetta

A.    Full time.  Full time and I can't remember the year that I started.

Q.    Other than the seven schools I just mentioned, did you have any other education regarding art, formal education?

A.    Formal education to the best of my knowledge, the seven schools is a lot.

Q.    This artist information page, do you know when it was created?

A.    The artist information page?

Q.    On your website.

A.    I believe it was 20 years ago.

Q.    Has it been updated since?

A.    The website was in the process of being updated when in 2015 I found this fake posting on the Internet and I literally put everything on hold.

Q.    So when was the last time the website was updated?

A.    Because of this incident I have been in a holding pattern.

Q.    But when was the last time the website was updated?

A.    In 2004.

**SA535**

Page 71

A. Trombetta

Q. That was the last time it was updated?

A. There was the inclusion of my solo exhibition at the Staten Island Museum.

Q. Was that the last time that this was updated?

A. If you go to my website, I am trying to find the first page. Exhibit 000121 new website for Annamarie Trombetta coming soon.

Q. When was that updated?

A. I believe it was -- I can't say with certainty. It is either prior to or after the commencement of this lawsuit.

Q. Has it been updated other than putting new website --

A. Not until the situation is resolved.

Q. So everything that's on the website was as of when?

A. I can't say everything.

Q. Was anything updated?

A. To the best of my recollection, I can't give you the details. That was updated. The inclusion, maybe some imagery was switched out.

Q. Can you go to page 000122?

Page 72

A. Trombetta

A.    I just said that.

Q.    That's the portfolio page; correct?

A.    This is the portfolio page.

Q.    Are any of these images?

A.    The DMCA was added after this incident occurred.

Q.    What do you mean?

A.    The posting of the false claim that I did a painting in the year 1972 for a painting named Man with Red Umbrella prompted me to contact the Digital Millennium Copyright Act website who in turn advised me to add to my website the logo. The logo is new DMCA.

Q.    Is that current on your website?

A.    It is currently on my website.

Q.    Where is it currently on your website?

A.    On each page it is in a different location.

Q.    Where is it on your portfolio?

A.    As exhibit 000122 illustrates, it is on the lower left-hand side.

Q.    And that's the way it is today; is that what you are telling me?

A.    It should be.

Page 73

A. Trombetta

Q.    And if it is not, does that mean that it was updated?

A.    What was updated?

Q.    If your current website does not have the DMCA logo on your portfolio page, would that mean it was updated?

A.    No.  If it is not there it could be a technical glitch.

Q.    Looking at the portfolio that's on that page, do you recall whether any of those image -- withdrawn.

Are all of the images on your portfolio pages works that you created?

A.    Yes.

Q.    Were any of these created after 2004?

A.    I can't answer that, to the best of my recollection.

Q.    Were any of these created after 2010?

A.    2010?

Q.    Mm-hmm.

A.    I can't answer with certainty.

Q.    Do any of them look like they were created by you after 2010?

A.    I would have to check when they were

**SA538**

Page 74

A. Trombetta

created to be -- because you are asking me to be specific. I would have to check.

Q. What would you check?

A. I would either check the object.

Q. Are you still in possession of all of these?

A. Not all of them.

Q. If you didn't check the object, how else would you check?

A. Possibly my ledger.

Q. The ledger of expenses?

A. Yes.

Q. Does your ledger also consist of a list of all of the works that you create?

A. Each one has a separate year.

Q. Each one of what?

A. Each one of the ledgers. It is not one ledger. I have been doing this for over 30 years.

Q. You have a separate ledger for each year?

A. It is safe to state that that is a fairly correct statement.

Q. Are each of these works contained

Page 75

A. Trombetta

within a ledger?

A.      I can't say with certainty.

Q.      So --

A.      Only because I am looking at this piece which is comprised of several separate pieces.  By this piece I mean the third one from the left.

Q.      On the top?

A.      On the top.

Q.      What do you mean it is comprised of separate pieces?

A.      It is your money.  Each piece is a hexagon of fruit.  The separate hexagons can be pulled together into various shapes.

Q.      So you don't know whether or not this was updated after 2009?

A.      There are certain things that were updated and for the most part it has been frozen since 2015 due to the misattribution of my words that are on my website in your client's ad verbatim.  My biography is verbatim.  The portion.

Q.      Let's look at your biography which is at Plaintiff 00124, okay.

Is this the current form of your

Page 76

A. Trombetta

biography?

A.    That is the current biography on my biography page of my website.

Q.    When was this created?

A.    This was created in 2003.

Q.    By whom?

A.    This is a self-authored biography.

Q.    Did anyone else participate in the creation of this biography?

A.    There was someone who edited, meaning clerical changes, possibly words but word for word from my brain to the paper to the website.

Q.    Did the editor other than providing little editing comments, did they participate in the preparation of the biography?

A.    No.  It is written in the first person.

Q.    So you had --

A.    Pros.

Q.    Did you also have somebody proofread it?

A.    The editor read and gave me clerical corrections, possibly changing a phrase or a word.

Q.    Anything else?

Page 77

A. Trombetta

A.    Nothing else.

Q.    Was there one person or more than one?

A.    One person.  I have submitted from 20 years or 20-some odd years ago the editor.

Q.    Is that Vanessa Ploski?

A.    No.  She was not the editor.

Q.    Who is Vanessa Ploski?

A.    Vanessa Ploski when I was writing this I read it to her.

Q.    So did she have any role whatsoever in the preparation of this biography?

A.    Other than listening?

Q.    Yes, other than listening.

A.    Since it was 20 years ago I can't say with certainty and you are asking me to answer for a person who is not here.  The best of my recollection was can you listen to this.

Q.    Did Andrew Ploski have any role in preparation of your biography?

A.    He did not, not at all.

Q.    And when they listened to it, did they provide you with any feedback?

A.    The purpose of me reading it to them is to get their verbal feedback.

Page 78

A. Trombetta

Q.    Had they proofread this?

A.    I read it to them.

Q.    But they didn't proofread the actual document?

A.    Proofreading as in correcting was for, reserved for a hired editor.

Q.    Who was that?

A.    I can't remember the name.  I submitted evidence.

Q.    And you don't remember the person who you edited?

A.    It is either Amy or Ellen.  I would have to review my evidence to -- there were two people.  One was coder for the website and the other is the editor.  I am confusing the name. Ellen and Amy.  I think Amy was the website coder. If you had those documents let's just be on the...

MR. BIALEK:  Can you please mark this as Defendants' 3.

(Defendants' Exhibit 3, invoice for Flat Black Freelance Editing, marked for identification, as of this date.)

Q.    Showing you what has been marked as Defendants' Exhibit 3 which appears to be an

Page 79

A. Trombetta

invoice for Flat Black Freelance Editing.

Does this refresh your recollection as to who the editor was of your biography?

A.    As stated earlier, I indicated the first name was somebody named Ellen.  This validates that the copyright editor was an Ellen Cimini and again, the date is from 2003.  Today is 2022.

Q.    Other than Ellen, did anybody else provide any copying, editing or proofreading?

A.    Asked, answered.

MR. BIALEK:  Can you please mark this as Defendants' 4.  It is Plaintiff 228.

(Defendants' Exhibit 4, a letter Bates stamped Plaintiff 000228, marked for identification, as of this date.)

Q.    I am showing you what has been marked as Defendants' Exhibit 4 and ask if you recognize this document?

A.    Yes.  Summer of 2003, yes.  It is a letter from Vanessa Ploski.  Proofread her biography that she had handwritten in her sketch book.  Yes, it was in the infancy stage.

Q.    So was she part of preparing your

Page 80

A. Trombetta

biography?

A.     I can say with somewhat uncertainty she did not write anything.  Rather she listened.  Proofread is her characterization.  I don't recall if I gave her my handwritten notes and she was able to read them.

Q.     Does that sound like something you would do?

A.     To the best of my recollection, I read it to her because when I write creatively it can be a little unlegible.

Q.     And did you also have her husband Andrew read it?

A.     To the best of my recollection, I cannot recall that detail.  So I am unable to answer with certainty.

Q.     Do you question whether her statement here is true?

A.     He was there.  I believe he heard.  I am not sure.  Again, this is 21 years ago.

Q.     Was there anybody else?  You said there was a coder; right?

A.     That was for the website.  I hired her and that was the end of that.

Page 81

A. Trombetta

Q.    Do you know her name?

A.    I think it is Amy Kirchman.  I am not sure.

Q.    And she had nothing to do with preparation of the biography; correct?

A.    That is correct.  It is a self-authored biography.

Q.    And this biography is from 2003?

A.    Started in 2003 and completed in 2003.

Q.    And has it been changed since?

A.    It has not been changed.  My biography has changed.  This biography has not.

Q.    So the biography that's been on your website since 2003 is the same biography as there is now?

A.    I answered this in parts with the statement that in 2015 when this false posting on the Internet came into being I was in the process of updating my biography and put a freeze on it.

Q.    So it never went live?

A.    I was in the process.  I had contracted someone and put down a deposit at the same time I found this false Internet posting.

Q.    And what's on the website is what was

Page 82

A. Trombetta

on in 2010?

A.    No.

Q.    Biography wise?

A.    Biography wise in 2010 this was what was on my website.

Q.    No changes at all?

A.    Asked and answered.

Q.    I just want to confirm there were no changes whatsoever?

A.    When it was uploaded the change was the addition of the DMCA, the copyright information on the bottom all works on this site are copyright vector Annamarie Trombetta all rights reserved.  That was there since 2003.

Q.    So the only thing that changed was the DMCA logo on the bottom?

A.    That was correct.

Q.    I want you to look at the first paragraph and it says in the last line of the first paragraph "Thus, I believe it is the nature of the artist and of nature itself to regenerate and manifest."

Do you see that?

A.    I do.

Page 83

A. Trombetta

Q. The next sentence says "All of the imagery in this catalog (tba) was either created en Plein Air or from the subject directly."

Do you see that?

A. I see it and also the whole world saw it in this fake Internet posting.

Q. What is TBA?

A. I believe that was to be announced.

Q. And that was in the 2003 version?

A. I can't say with certainty.

Q. Do you know when that would have been added?

A. I don't believe that was added. I believe that is the original because the catalog came out in 2003.

MR. BIALEK: Just for clarity sake, I am going to mark this as Defendants' 5 please. It is Plaintiff's 000294 through 296 although it's structured as 294, 296 and then 295.

(Defendants' Exhibit 5, a document Bates stamped Plaintiff's 000294 through 296, marked for identification, as of this date.)

Page 84

A. Trombetta

Q.    I think this is probably a little easier to read.

Am I correct?

A.    Yes.  I do see it there as well.  In this catalog TBA.

Q.    And this is how it was back in --

A.    2003.

Q.    -- 2003.

You saw the posting that you claim was on my client's website; correct?

A.    That is correct.

Q.    Do you know if that posting had this biography?  That's what your claim is; correct?

A.    That is correct.

Q.    And your claim is that you took it off -- they took it directly off of your website; correct?

A.    My claim is that they took it off my website in part.  Your claim or your evidence is the entire biography and I might add, that the website www.Worthpoint.com, the last sentence is cut off midpoint.  You would have to go to the actual ad which I don't have in front of me.

Q.    What were you reading from?

**SA549**

Page 85

A. Trombetta

A.    I am reading -- I didn't read anything.

MR. BIALEK:  Off the record for a moment.

THE VIDEOGRAPHER:  This will end media unit two.  Going off the record at 11:51 8/30/22.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record at 11:57 8/30/22.  This will begin media unit 3.

MR. BIALEK:  I have just given the court reporter four different documents to mark.  I would like to mark as Exhibit 6 what is titled Exhibit E2.  It is also marked confidential Plaintiff 000087.  In the middle of the page it says -- it is crossed out, but it says Exhibit K.

(Defendants' Exhibit 6, a document titled Exhibit E2 and also marked confidential Plaintiff 000087, marked for identification, as of this date.)

MR. BIALEK:  I would also like to mark as Defendants' 7 what's noted as Plaintiff

Page 86

A. Trombetta

000144 which appears to be a printout from the Worthpoint.com page regarding the 1972 original oil painting Man with Red Umbrella signed Annamarie Trombetta YQZ.

(Defendants' Exhibit 7, a printout from the Worthpoint.com page regarding the 1972 original oil painting Man with Red Umbrella signed Annamarie Trombetta YQZ Bates stamped Plaintiff 000144, marked for identification, as of this date.)

MR. BIALEK: I would like to mark as Defendants' Exhibit 8 Plaintiff 000069 and 000070, another document that appears to have come or been printed off the Worthpoint site.

(Defendants' Exhibit 8, a document Bates stamped Plaintiff 000069 and 000070 that appears to have come or been printed off the Worthpoint site, marked for identification, as of this date.)

MR. BIALEK: Finally, I would like to mark as Defendants' 9 another document which is written on it Exhibit E1 that is also marked confidential Plaintiff 000087 with a

**SA551**

Page 87

A. Trombetta

cross out in the middle of the page of Exhibit B.

(Defendants' Exhibit 9, a document Bates stamped confidential Plaintiff 000087, marked for identification, as of this date.)

Q. I would ask if the court reporter can give the plaintiff Defendants' Exhibit 6 please.

Miss Trombetta, I am showing you what has been marked as Defendants' Exhibit 6 and ask if you recognize this document?

A. I recognize this document, yes.

Q. What is this document?

A. This is in part the 1972 misattributed painting, original oil painting Man with Red Umbrella found by me on the Internet in the year 2015 and others. Others found it on the Internet of course.

Q. Do you know when you found it?

A. I believe it was August of 2015.

Q. How did you find it?

A. I found it, a friend of mine contacted me. I looked it up and read my biography and was shocked.

Q. So this was not found by you

Page 88

A. Trombetta

originally?

A.     It was found by someone who is no longer here, who has passed.

Q.     Who is that?

A.     His name was David Penna.

Q.     Who was David Penna?

A.     A fellow artist.  Again, he is deceased.

Q.     Do you know how he found it?

A.     On the Internet.

Q.     What was he doing on the Internet; it just appeared on his screen one day or did he do a search?

A.     You are asking me to make statements about someone who physically is no longer here.

Q.     So you don't know what he did to find it; correct?

A.     He called me up and he said do you know that there is a link on the Internet and when he brought it to my attention I read my biography and again, was in shock.  I did not do this painting.

Q.     Do you know when David Penna first contacted you?

Page 89

A. Trombetta

A.   I believe I just said August 2015.

Q.   Do you know when in August?

A.   I think it was the beginning of August.  Again, with the numbers if I read something that's been documented, I think it was the beginning of August.

Q.   Upon hearing this from him, what was the next thing that you did?

A.   Initially, I read the whole thing.

Q.   Did you go on the Internet and do a search?

A.   Of course.

Q.   So is that the first thing you did?

A.   That's one of the first things I did.

Q.   What was the first thing you did after hearing this from David?

A.   I read everything.  I went to the site.  I saw that there weren't any photos and I also saw that there was a photo of a signature and didn't know what to do.  Shortly afterwards I did contact the NYPD.

Q.   Did David have a printout when you first spoke with him?

A.   Did David have a printout?

**SA554**

Page 90

A. Trombetta

Q.   Correct.

A.   In 2015 this was on the Internet.

Q.   So did you speak with David in person or by phone?

A.   By phone.

Q.   And after you spoke with him -- withdrawn.

Did you look up on the Internet to find this listing while you were on the phone with David?

A.   That is correct.

Q.   And do you know what you searched for?

A.   I put in my name.

Q.   That was it?

A.   That was it.

Q.   Just Annamarie Trombetta?

A.   Correct.

Q.   And where did it show up?

A.   It showed up, to the best of my recollection, I cannot say with certainty, I believe it was on the first page of my credentials.

Q.   When you say credentials, what do you mean?

Page 91

A. Trombetta

A.    My website, my writeup for my 2015 exhibit on Central Park Imagery as well as the Italian American Museum Exhibition and website, that also hosted my Central Park Imagery.  So along with my legitimate credentials was this fake posting.

Q.    Let me back up.

When you were on the phone with David, did you do a search online?

A.    Asked and answered.

Q.    I am trying to lay a foundation.

You did a search online; correct?

A.    To the best of my recollection as this was seven years ago, I got a phone call from my friend.  He pointed this out to me something about eBay.  What?  I went to the computer.  I Googled.

Q.    I was going to get to that.

Did you type in a search on Google?

A.    I typed in Annamarie Trombetta.

Q.    On Google?

A.    On Google.

Q.    And you were using your Mac?

A.    I believe I was using my own old Mac. Again, you know you are asking me for details

Page 92

A. Trombetta

specific to an event that happened which was emotionally charged and seven years ago.

Q.    So you didn't use Safari?

A.    I can't remember the browser.

Q.    But you used Google?

A.    I opened up my computer like I do all the time and to the best of my recollection, Google is -- I don't know.  I may have used Bing. I am not sure.

Q.    But whatever results were returned; correct?

A.    Immediately.

Q.    And where in the results did you find this?

A.    Under Annamarie Trombetta.

Q.    And where in the search results -- I presume when you searched Annamarie Trombetta results were returned?

A.    I understand your question.  I have to answer respectfully to the best of my recollection I do not remember which --

Q.    Position.

A.    -- position.

Q.    That's fine.  I am trying to clarify.

Page 93

A. Trombetta

So you Googled it?

A.    I respect your -- my apologies.

Q.    Sorry.

So you Googled it and results came back but you don't know where within the results this returned; correct?

A.    Numerically is that your question?

Q.    Correct.

A.    Numerically I cannot state with certainty where it surfaced.

Q.    But you found this; am I correct?

A.    I found the fake listing under my name Annamarie Trombetta in the year 2015 in the month of August.

Q.    And is this how it appeared?

A.    Not in its entirety.  This is a one -- let's see if there is another page.  This is one page.  It is not in its entirety.  On the bottom it says page 2 of 7.

Q.    I was going to get to that.

Do you know where pages 1, 3, 4, 5 and 6 and 7 are?

A.    This was filed in the case April 24, 2019 pages 25 of 38.  This is one focused page.

**SA558**

Page 94

A. Trombetta

Perhaps if we go to that particular file which is, which says page 25 of 38, the rest of the pages are there. I believe that my evidence has been out of sync with the numerical page documents. I can't say that with certainty. What I can say with certainty is in part there are exact portions of the ad and in fact, if you get the visual you will find the visual, the type very small and the entire biography. This is a legible yet truncated version. This particular document. There should be another document, as I said, the visual with the entire biography found on the Worthpoint page.

Q. I agree there should be and I will tell you in a minute if it was filed or not, but in your document production I did not see page 1 or 3 through 7. So that's why I was asking whether or not this exists.

A. It might be in the pleading. That's why I referred to the date of the filing which is if you look.

Q. I see on the top where you are talking about document 22 filed 4/24/19?

A. That is correct.

Q. Page 25 of 38.

Page 95

A. Trombetta

You see the numbers at the top it says Man with Red Umbrella signed Annamarie Trombetta YQZ 12/1/2012; do you see that?

A.   Of course.

Q.   Do you know where that came from?

A.   I do now.

Q.   Where did it come from?

A.   YQZ is referenced.  If you read the last sentence "Welcome to Estate Auctions Inc.  We are your quality zone.  Search YQZ to see our other listings."

Q.   Did you print this in August of 2015?

A.   The date of the print is in the upper right-hand corner.  The date is 10 -- wait a minute 10/30/15 at 3:31 p.m.  Something like that.

Q.   Is that printed from your computer or was that printed from a website?

A.   I cannot say with certainty where and which computer was used in order to generate this printout.  This particular printout.

Q.   Did you save this when you found it in August of 2015?

A.   To the best of my recollection, I cannot remember.

Page 96

A. Trombetta

Q.   If you were to have saved it, how would you save it?

A.   Shift command 4 gives you a screenshot.

Q.   And then what would you have done with it?

A.   Saved it to the desktop.

Q.   So you don't know, but if you would have you would have done a screenshot, saved it to your desktop?

A.   Two things.  I would have printed it out exactly from the computer or potentially this I think is an expansion.  I don't know.  You are asking me for details for specific procedures and there are several documented printouts directly from a Google search.  There are several.

Q.   We will get into that, but this was a screenshot saved to your desktop and then printed in October of 2015?

A.   I don't know whether this is a screenshot or a direct portion.  It looks to me from where it says page 2 of 3 it's a direct printout from the Internet.  That page 2 of 7 indicates that it was not a screenshot.

Page 97

A. Trombetta

Q. This was a copy that was made from something else; correct?

A. This was a printout of seven pages. This is page 2 of 7.

Q. And do you know why it is folded over in the upper left-hand corner?

A. Because it was submitted in document, I can't see the document number.

Q. 22?

A. 22 filed on April 24, 2019 page 25 of 38.

Q. So this isn't an original the way it was printed out?

A. This is an original based on the page 2 of 7.

Q. And it was folded over?

A. Asked and answered, but I will reclarify. It was in a court filing.

Q. Did you make a copy of the court filing?

A. I believe this I can't say with certainty.

Q. So you don't know why it is folded over in the upper left-hand corner?

Page 98

A. Trombetta

A.    Of course I do.  I said this is a document from April 24, 2019.

Q.    Do you keep your documents stapled and filed away somewhere?

A.    For this case?

Q.    Correct.

A.    There are numerous documents.

Q.    You didn't copy this directly from the court filing; correct, in court?

A.    The document I can't say with certainty.  It's in the court filing is what I can say with certainty.

Q.    But the court filing was done electronically; correct?

A.    The court filing has an electronic date and number on it.

Q.    Does that indicate to you that it was done electronically?

A.    That indicates to me that it was filed on a particular date.

Q.    I am trying to figure out why there would be folded over paper.  The only time I can conceive there was folded-over paper is if it was stapled together and someone was making a copy of

Page 99

A. Trombetta

it?

A.    It was stapled together in a court filing.  It is part of -- it is page 25 of 38.

Q.    Was this your court filing?

A.    I would have to check the court filing to answer that correctly.

Q.    So when this was copied, you copied it directly from a folded-over court filing; right?

A.    I can't say with certainty.

Q.    And if you would have been the one to submit this, it would have been in your files with an original without the folded-over corner; correct?

A.    The best way to answer this question is to find April 24, 2019 and to go over those documents and see what preceded and continued.

Q.    And if the court filing didn't have a folded-over copy, what would that mean to you?

A.    It means that this is from my copy of my court filing.

Q.    Do you have an original that's full and complete?

A.    I would have to look for it.

RQ        MR. BIALEK:  We would request the

Page 100

A. Trombetta

original.  We would also request page 1 and 3 through 7 as it does not appear that they are contained necessarily within the court docket that way.

A.    Well, you are picking out one page.

Q.    I didn't pick out one page.  This is the page that was picked out.  I want the ones that include the rest of the document.

A.    There are to date 325 documents. There are several gaps in the numerical progression.

Q.    Would you have this saved on your computer?

A.    I have it printed out, but not saved on my -- I can't say with certainty because it is a court documented.

Q.    We'd asked not the court document but the original document that you then submitted to the court.

So before you submitted it to the court it had to exist; right?

A.    That is agreeable.

RQ        MR. BIALEK:  So what we would like is the original document before it was marked

Page 101

A. Trombetta

for the court in whatever form it appears. Whether it is electronic as stored on your computer or whether it was printed out and a copy of the full printout.

When you get the transcript there will be in the back a page that will have requests. So it will make it a lot easier.

A. What would make it easier is for your firm to confirm that I did not do this painting because I have already given to both clients my signature from 1972 which does not match.

Q. I do not believe that my client has made any representations that you made this painting or didn't make this painting.

A. Well --

Q. And if that is something you need we can talk about it off the record, but for purposes of today, I am trying it ask you questions about the documents that you produced and see if we can get the original version; okay?

A. Again, this is a period of seven years and many filings. 274 or 5 to be exact.

Q. Are you intending to use this document in proving your case?

Page 102

A. Trombetta

A.    I do.

Q.    Then we would request that we be provided with the full, complete original copy.

A.    And we would have to, we meaning you as well as I, review all the evidence and see if the numerical coordinates are already submitted.

MR. DUFF Can we go off the record for a moment?

MR. BIALEK:  Sure.

THE VIDEOGRAPHER:  Going off the record at 12:22.

(Discussion off the record.)

THE VIDEOGRAPHER:  We are back on the record at 12:23.

BY MR. BIALEK:

Q.    So while we were off the record you started to explain that you had lost some documents.

Can you explain?

A.    Let me state specifically that in August 2015 I found a false internet posting. From that point forward I consistently contacted eBay several times, also Worthpoint that informed me in order to do anything I had to contact eBay.

Page 103

A. Trombetta

For months I went to two different companies back and forth and I was given incorrect information by both parties.  At a pinnacle point in November of 2015 I directly spoke to then employee Anita Brooks who informed me verbally on the phone that I had to contact eBay and she requested that I stop calling her.  So I negotiated a deal and I said if you put in writing that I need to contact eBay and you solidify your stance on this issue I will then send that information to eBay because right now two different sources are telling me two contradictory things creating confusion and delays.

Q.   How does that have anything to do with --

A.   Can I finish?

Q.   -- with documents?  I'm sorry.  Go ahead.

A.   May I finish?

Q.   I didn't --

A.   I have been answering questions in the most detailed, what I think, respectful manner. So if I may continue.

Q.   Absolutely.

A. Trombetta

A.    So upon contacting eBay several times and recording with eBay on a phone call who went on to the Internet with me while I was on the phone and this is all duly documented in phone calls that I have given to your company for you to review.  The last and final eBay representative after a period of about 40 minutes told me that in his experience there was a link on Worthpoint that brought up the eBay page.  That doesn't necessarily mean that eBay had a connection to the Worthpoint website.  And I am paraphrasing now. It is not verbatim from the phone call.  I gave him the code on the Worthpoint website which 489 blah, blah, blah.  I can't say it verbatim.  I believe it might be on document Exhibit 7 and when he looked that up he said that is not an eBay number, meaning I asked him specifically what does that mean.  It means that eBay numbers are between ten and 12 digits.  I don't believe that this item was sold on eBay.  With that in writing and by phone I contacted Anita Brooks duly documented and submitted no more than two weeks ago in August of 2022 my phone recording with Anita Brooks was submitted to your law firm.  In that phone call

Page 105

A. Trombetta

dated January 22, 2016 I was telling Miss Brooks that I did not do the painting. That it was definitely on Worthpoint's website even though she denied this, I confirmed to her and I asked to speak with someone who could assist me and she was speaking over me. I told her this is my copyrighted original website and she said she had -- that that information, even though she was not aware of the information, she wrongfully said we have the right, we meaning Worthpoint, have the right to use it. Well, the phone call ended with her instructions to have me put things in writing on January 22nd. Submitted in my evidence are those e-mails to Anita and to Greg Watkins at the e-mail address support at Worthpoint.com and then there is another address which I can't remember verbatim. That was duly documented in my evidence.

To end and summarize everything, when the information that I requested to be removed ceased to be seen on the internet. Somewhere in the Spring or summer some original documents at that time, because I was under the influence that my negotiation and deletion was permanent, some of

Page 106

A. Trombetta

those documents I may have in the summer of 2016 been thrown out. Plain and simple. I do have to review and see if I have from page 2 to 7. I know that I did edit certain things because why keep this if it's done and over with in the year 2016.

Q. Do you know whether this document, Defendants' Exhibit 6, was saved to your computer?

A. Because it was filed, in part the answer is yes.

Q. Do you know if the complete document pages 1 through 7 were saved to your computer?

A. I do not believe it was saved to my computer. I believe that when I saw this I printed out seven pages on October 30, 2015. It was on the Internet duly documented in the phone conversations that I had brought to your attention with eBay, with Anita Brooks.

Q. So you believe that on October 30th of 2015 you printed out pages 1 through 7?

A. I don't believe. I know that this ad was on the Internet and that on this documented date of October, is it 30th, 30, 2015 all seven pages were printed out.

Q. So the indication on the bottom page 2

Page 107

A. Trombetta

of 7 doesn't indicate anything to you?

A.    Of course it does.

Q.    Ma does it indicate?

A.    It indicates there was a page 1 and a page 7 and in October of 2015, which was seven years ago, is when this was printed.

Q.    But you only have page 2?

A.    I have page 2, yes.

Q.    But you don't have page 1 or 3 through 7?

A.    Page 2 highlighted in yellow is the statement "All of the imagery in this catalog was either created en Plein Air or from the subject directly."

If I go to the biography on my web page and that is Plaintiff 000124.

Q.    What are you referring to?  You are referring to which exhibit?

A.    Exhibit Plaintiff website biography Plaintiff 000124.

Q.    Indicating on doc Exhibit 2 from today?

A.    No.  Yes.  Exhibit number 2 Plaintiff Bates stamped 000124 on the biography portion of

Page 108

A. Trombetta

my website page.  The first paragraph and the last sentence "All of the imagery in this catalog was either created en Plein Air or from the subject directly."  This is the same statement that is in the EAI Worthpoint description page which contains my personal biography, self-authored biography.

Q.    Is that why you highlighted that sentence?

A.    That is correct.

Q.    Now your biography starts out stating "The nature of an artist's life creativity and growth may be --

A.    Synonymously.

Q.    "Synonymously expressed in the image of an archetypal --

A.    May I?

Q.    Sure.

A.    Archetypal Tree.

Q.    An archetypal Tree.  That is also the same sentence that is in Defendants' Exhibit 6; correct?

A.    Sir, if you read this text it is verbatim from my --

Q.    But that's not what's --

Page 109

A. Trombetta

A.    Other than the TBA.

Q.    What is your explanation for the fact that the sentence "All the imagery in this catalog", that sentence, the highlighted sentence in Exhibit 6, doesn't have the TBA?

A.    Well, I answered your question with another question.  Why is -- this is by Annamarie Trombette with an E at the end in the description and on the top of the same page it says Trombetta.  Now what they did do correct is spell my name, my first name correctly Annamarie with a small M all in one word with an E at the end.

Q.    So I am going to go back to my question.  This isn't the same -- sorry.

Exhibit 6 doesn't have the same sentence that's contained in Exhibit 2; correct?

A.    Exhibit 6 is near exact.

Q.    But not exact; correct?

A.    Well, Trombetta is near exact, but not exact.  Trombette near exact, but not exact.

Q.    Sorry.

That's not from your website; correct?

A.    The spelling is not from my website.  The spelling is from whomever is the creator of

Page 110

A. Trombetta

this ad. Presumed to be Norb Novocin, but not confirmed.

Q. But the biography section that's contained on this description starts with "The nature of an artist's life."

Correct?

A. Say that again.

Q. The biography section of this description starts at "The nature of an artist's life."

A. "The nature of an artist's life" is exactly the same as "The nature of an artist's life" on my biography page of my website.

Q. Right, but the one line that you have highlighted here in yellow is not the same exact line that's contained within your website; correct?

A. It is the same except for the TBA.

Q. Correct.

So does this indicate to you that Worthpoint did not post what was exactly on your website?

A. Potato potato. It is a matter of simplistic deletion of TBA.

Page 111

A. Trombetta

Q. Do you have any proof that Worthpoint deleted TBA?

A. Do you have any proof that Worthpoint deleted TBA?

Q. I am asking you the question.

A. And I am answer you the question with a question.

Q. But that's not an answer.

A. It is my answer.

Q. So you have no evidence that Worthpoint deleted the TBA; correct?

A. I have evidence of a almost 99.7 minus TB and A, exact near reflection of that one sentence.

Q. Except --

A. If you could find another defect because I can and the defect is I would have to go to Exhibit number 7 which is right by my left-hand, right-hand side.

Q. Do you know if this biography is --

A. It is not this biography. It is my biography, excuse me.

Q. Your biography contains the TBA; correct?

Page 112

A. Trombetta

A.    Because there is a TBA that should not deter from the mirror reflection that is on, that was on the Worthpoint eBay 1972 ad.

Q.    Do you have a version without the TBA?

A.    What do you mean by version?

Q.    A version of your biography that doesn't have the TBA.

A.    I would have to check since the statement "All the imagery is from my catalog", I would have to check the catalog and that has been entered.

Q.    The version that was here --withdrawn.

Did you mark this confidential Plaintiff 000087?

A.    Did I mark this yes, I did.

Q.    Can you tell me what's confidential about this?

A.    The fact that it is from the court filing and it has Exhibit K and then has Exhibit E is somewhat confusing.

Q.    Why is it marked confidential?

A.    I can't say with certainty.  I think when I printed out all the labels I did it rather

Page 113

A. Trombetta

than cut confidential I just put it as a whole.

Q.    Are you arguing that this publicly filed document should be confidential?

A.    I am not arguing.

Q.    Are you claiming that this public document should be deemed confidential?

A.    That is a good question.  I gave you a good answer which was I, for the sake of uniformity, I put confidential next to Plaintiff.

Q.    So I need to explain this.  If you want this confidential you need to tell the court reporter so she can break this out as a confidential transcript?

A.    Well, it is a court document.

Q.    So then it is not confidential; correct?

A.    Well, since I didn't -- sometimes in the course of doing a plethora of work, an abundance of work, I already stated why it has confidential on it.

Q.    So we are not considering this confidential; correct?

A.    For the most part I would agree that the use of the word confidential is possibly used,

Page 114

A. Trombetta

used in the absence of time to save to delete the confidential.

MR. BIALEK:  I am going to show you what has been marked as Defendants' Exhibit 7 which is marked as Plaintiff 000144.

Q.    I am going to ask you what this document is.

First let me ask you, have you seen this document before?

A.    I have seen it more times than I can count.

Q.    And what is this document?

A.    This document is a printout of -- well, it is your Bates stamp from Worthpoint of my original printout from Thursday August 13th at 9:55 a.m. and in the -- it comes from www.worthpoint.com Worthopedia 1972 original oil painting man-red- and there is the number of 48924172.  I can't read it in its clarity.

This is original printout from Worthpoint's website on Thursday August 13th at 9:55 a.m. duly documented in the upper right-hand corner, duly documented.

Q.    Do you know what year that was from?

Page 115

A. Trombetta

A.   It says '15.  This is from August 2015.

Q.   Where does it say '15?

A.   I know that it is from August 13, 2015.

Q.   How do you know that?

A.   Because I printed it out.

Q.   Where did you print it out from?

A.   The Worthpoint website.

Q.   You printed it out on August 13, 2015?

A.   To be sure I would put in August 13 Thursday to see if the day was Thursday.

Q.   I will represent to you that August 13 in 2015 was a Thursday.

So does this indicate to you that you printed this out August 13, 2015?

A.   If in the year 2015 August 13th was on a Thursday, yes.

Q.   When did you print this out to give to us?

A.   I can't answer that question with certainty.

Q.   Was this a hard copy?

A.   This was a hard copy of the printout

Page 116

A. Trombetta

from the website.

Q.    Do you have it saved on your computer as a image?

A.    I would have to check my computer to see.  I believe, but I can't say with certainty that it is on the computer.

Q.    And do you see in the body of this, we will start where it says "Up in this auction."

Do you see that part of the page right in the middle "Up in this auction?

A.    Correct.  Yeah, I'm with you.

Q.    If you can go down about 12 lines it starts "lived/active:  New York."

Do you see that?

A.    Not only do I see it I know it by heart.

Q.    And you see the next sentence it starts "The nature of an artist's life"?

A.    That is the first line in my biography from my website.

Q.    And if you can go down a few more lines, about five lines it says "All of the imagery in this catalog was either created en Plein Air or from the subject directly."

Page 117

A. Trombetta

Do you see that?

A.    I see that.

Q.    And this was the ad that you had seen on August 13th -- sorry.  Withdrawn.

This was the listing that you had seen on August 13, 2015; correct?

A.    That is correct.

Q.    And you had seen this on Worthpoint's site?

A.    If you go to the upper left-hand side in the search window it says www.worthpoint.com worthopedia/1972 original-oil-painting-man-red with the same number.  Starts with a four ends with a two which indicates definitively this page was on Worthpoint's website.

May I interject and state that at the end, the very bottom which is the conclusion of my sentence.  I have to see it.  It begins with viewing and ends mid-sentence period of time dot dot dot and what is deleted in paragraph 4, the last sentence is "Viewing so many different cities and cultures in a concentrated period of time the Worthpoint ad has..." and my biography has the rest of the sentence which is "helped me to see

Page 118

A. Trombetta

the similarities as well as the differences on each quite clearly."

Q.    Why do you refer to this as an ad?

A.    What is it in your --

Q.    What do you understand an ad to be?

A.    It is an ad on your web -- on the Worthpoint website regarding a painting --

Q.    Would you --

A.    -- that I did not paint.

Q.    Would you agree that ad is short for advertisement; the word ad is an abbreviation of advertisement?

A.    It is an advertisement of a painting.

Q.    No.  Just in general the term ad, AD, is an abbreviation of the word advertisement; would you agree to that?

A.    I would not agree to that.

Q.    What is the difference between an ad and an advertisement?

A.    There are several different meanings. I would have to look up in a dictionary to be very precise, but an ad could be for the sale of something.  An ad is an abbreviation of advertisement.  What an advertisement could be

Page 119

A. Trombetta

used for is either for a sale of something, an announcement for something. Again, Webster knows better than I.

Q. You are talking about Miriam Webster Dictionary?

A. Correct.

Q. And if Miriam Webster defines ad as advertisement, would you agree to that?

A. It is an abbreviation of advertisement but advertisement could either be to announce something. Another definition could be to sell something.

Q. Isn't that the same definition of advertisement?

A. My time here today is not to debate.

Q. So let me ask you, what is your definition of the term ad?

A. For the sake of simplicity I have chosen the nomenclature for a two letter definition for this particular ad. It was an ad for a painting and within this ad you or your client added me --

Q. So an ad would be --

A. -- falsely.

Page 120

A. Trombetta

Q.    Sorry.  I didn't mean to cut you off.
Finish.

A.    I have nothing to do with this
painting period.  Whether there is a TBA, that
could be a deletion, willful deletion.  I do know
there is an E in my name where there should not be
an E.  So there are several flaws or incorrect
spellings within this.

How would you like to characterize it?
I do know with certainty that the last sentence
which there is room to finish because it ends with
three dots has been truncated, altered, mutilated.
I believe your personal selection to the three
adjectives, no nouns, that I have suggested
altered, mutilation.  Mutilation could be a noun
or a verb.

Q.    Is this document selling anything?

A.    In relationship to what are the
external circumstances that you are asking the
question.

Q.    I am trying to figure out why you
think this is an ad.

It is not selling anything; is it?

A.    It is an announcement for what was

Page 121

A. Trombetta

sold.

Q.    In 2012; correct?

A.    According to this document it states that the sale was in 2012.

Q.    So do you see where it says source?

A.    EBay is what I see, source eBay.

Q.    And do you see what it says under channel?

A.    Online auction.

Q.    Do you have any understanding as to where this page came from?

A.    Since I did not do the painting and I have no idea nor have I ever done business with eBay, I cannot answer that question.

Q.    You have no evidence as to where this came from; correct?

A.    I have what you have, a document in front of me with information.  Whether that information is correct based on the way my name is spelled, I would say no.  Based on the claim that this was done by New York artist Annamarie Trombetta, which is very succinct, there is only one of me in New York City who is an artist with that name.  So that directly points to one and

Page 122

A. Trombetta

only who is sitting here in front of you I did not do that painting in 1972.

So in answer to your question, the information has a lot of untrue, incorrect statements.

Q. Can you read what it says under channel online auction?

A. "Welcome to Estate Auctions Inc. We are one of two" and I'm reading --

Q. From the top.

A. Is that correct; did you want me to read that?

Q. Yes.

A. So off the record I am reading slow so you can type. "Welcome to Estate Auctions Inc., we are one of the top sellers of antiques, collections and quirky items on eBay. We have been selling since 1998 and all of our auctions start at 99 cents."

Q. Does this indicate to you as to where the source of this listing emanated from?

A. As I stated earlier, there are a lot of mistakes within this document. In answer directly to your question, it states that I did

Page 123

A. Trombetta

this painting.  I did not.  When I contacted eBay and was trying to find out about Estate Auctions Inc., they said they didn't have any information. This is a phone call in 2015.

Q.   This listing says the source is eBay; correct?

A.   This particular document says source eBay.

Q.   It doesn't say the source was Worthpoint; correct?

A.   It does give the Worthpoint logo and the Worthpoint website and it was on, I need to finish please, it was on the Worthpoint website.

Q.   Okay, but the source was from eBay; correct, it says that?

A.   We can agree that the source does say eBay.  What I cannot agree on is the correctness of any of this information based on my involvement which is incorrect, completely incorrect.  Based on the spelling in my name which is incorrect. Based on the fact that I would have been nine years old in 1972.

Q.   So you have no evidence that eBay had published this as is; correct?

Page 124

A. Trombetta

A.     You are asking me that question but you are not giving me a time frame.

Are you asking me that if I had evidence in and on Thursday August 13, 2015 when I printed this out?

Q.     I am saying sitting is here today, do you have any evidence whether or not this listing, this posting had come from eBay?

A.     Sitting here today there is a plethora of seven years worth of miscommunication and duplicitous responses.  I cannot say in complete certainty that this sale happened on eBay.

MR. BIALEK:  So again, can you read back my question please Lynne?

(Record read.)

A.     I can't say with certainty.

Q.     And sitting here today, do you have any evidence as to whether Estate Auctions was the author of this listing?

A.     Based on a phone call on January 10, 2017 straight from Mr. Novocin's words recorded in a phone call, he claims that this painting was sold on eBay.

Q.     Do you have any evidence as you sit

Page 125

A. Trombetta

here today whether this posting was crafted by Estate Auctions?

A.    There is a declaration dated July 2020, the date I can't give you verbatim, that is in the words of Norb Novocin that he gleaned my biography.  I can't remember the statements verbatim, but according to Norb Novocin you would have to read his declaration which according to court documents is subject to penalty of perjury.

MR. BIALEK:  Can you please mark this as Defendants' Exhibit 10 which is a Declaration of Norb Novocin in Support of Defendant's Motion For an Order Requiring Plaintiff to Post a Bond.

(Defendants' Exhibit 10, Declaration of Norb Novocin in Support of Defendant's Motion For an Order Requiring Plaintiff to Post a Bond, marked for identification, as of this date.)

Q.    I am showing you what has been marked as Defendants' Exhibit 10 and ask if you recognize this document.

A.    I was sent this document, that is correct.

Page 126

A. Trombetta

Q.    Do you recognize this document?

A.    I recognize this document.

Q.    Is this the document that you were just referring to a second ago as the declaration from Mr. Novocin?

A.    This is indeed that very document.

Q.    Can you tell us when this was filed?

A.    It was filed June 26th of 2020.

Q.    And can you see when it was signed?

A.    June 25th of 2020.

Q.    And do you see in the third paragraph, can you read that please?

A.    You want me to read?

Q.    Yes, please.

A.    "In 2012, Estate Auctions listed a painting on its eBay storefront that I (Norb Novocin) personally inspected.  The painting was signed on the front by quote A. Trombetta end quote and featured a description reading quote Annamarie Trombetta quote gifted end quote 1997, painted quote 1972 end quote in red along the back stretcher (the painting)."

Q.    And your understanding of this paragraph is what?  Withdrawn.

Page 127

A. Trombetta

What is your understanding of this paragraph?

A.    My understanding is that this is a complete false statement.

Q.    Do you understand that Estate Auctions claims that it listed a painting on its eBay storefront in 2012?

A.    I understand that my name was used incorrectly based on that dual A Trombetta, Annamarie Trombetta incorrectly used, I don't know what to think at this point.  You are trying to build something around a false statement.

Q.    Are you accusing Mr. Novocin of lying here?

A.    I am clarifying that A Trombetta, Annamarie Trombetta in the year 1972 and/or in the year 1977 did not paint in oil.

Q.    Do you refute the fact that Mr. Novocin is conceding that in 2012 Estate Auctions listed a painting on its eBay store front?

A.    It is his declaration.  If he is not here to validate or stand by his statement, I as a private person who had nothing to do with the composition and the declaration, cannot give you

Page 128

A. Trombetta

any answer --

Q.    Are you refusing --

A.    -- with certainty.  Am I refuting, of course I am.  That is my name.  That is my initial and last name and the dates listed are dates that I did not paint the painting was signed.

Q.    I am asking a different question.  It says "In 2012 Estate Auctions listed a painting on its eBay storefront."

Do you see that?

A.    I see it.  Asked and answered, number one.  I will further clarify since I had nothing to do with this painting and I know this to be a false statement, an incorrect statement, a statement that when I informed Mr. Novocin that I was not the artist, he refuted as a mistake.

Q.    All I am asking is whether or not in 2012 Estate Auctions listed a painting on its eBay storefront?  That's all I am limiting this question to.

Do you see that statement?

A.    I understand your point.  It is information.  Whether it is correct or not I cannot make a verifiable statement as to whether

Page 129

A. Trombetta

it is true or not.

Q. So you don't though whether or not in 2012 Estate Auctions listed a painting on its eBay store front?

A. I do not know if that statement that Estate Auctions Inc. listed a painting in that year 2012 on eBay. I do not know that to be verifiably true.

Q. Do you know whether Mr. Novocin inspected, personally inspected the painting?

A. I have never met Mr. Novocin. I cannot answer that question.

Q. Do you have any evidence that Mr. Novocin did not personally inspect the painting?

A. I can't say with certainty. I don't know this person. What I can say with certainty is that he claims my name is on it, this painting, when I say it and in those years I never painted in oil. I was nine-years old.

Q. When did you start painting in oil?

A. That had been asked and answered and we read it in my biography.

Q. I don't think I asked the question. When did you start painting in oil?

Page 130

A. Trombetta

Do you need to --

A.    I began my formal training -- no.  I am trying to point out to you that it states in my biography I began my formal training --

Q.    Did you paint in --

A.    -- in high school.  In answer to your question in high school.

Q.    That's when you started painting in oil?

A.    That is correct.

Q.    You never painted in oil before then?

A.    For the record, oil and oil paints are highly toxic.  For a child to paint in oil the atmosphere and the paints would have to be clearly and carefully monitored.  Some paints in oil have a warning on them.  That's how toxic they are.

Q.    When did you start painting in oil?

A.    Asked and answered.

Q.    In high school?

A.    Correct.

Q.    So that would have been somewhere in the late 1970s, early eighties?

A.    1980 I believe.  I need to take a bathroom break.

Page 131

A. Trombetta

MR. BIALEK:  Okay.

THE VIDEOGRAPHER:  This will end media unit three.  Going off the record at 1:13 8/30/22.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record at 1:28 8/30/22.  This will begin media unit four.

BY MR. BIALEK:

Q.    Going back to Defendants' Exhibit 10, I would like to ask you to look at paragraph 4 and read it to yourself.

A.    May I ask what page?  You are talking about, page 1?

Q.    Yes, paragraph 4.

You see it says "As was our typical practice, I conducted research to identify the artists who signed the painting"?

A.    Yes.

Q.    Do you have any evidence to prove that did not happen?

A.    I cannot say with certainty and that any of these statements are true.

Q.    Do you see that Mr. Novocin claimed

Page 132

A. Trombetta

that he used an online research tool known as askart.com?

A. I see it and can only confirm that I see it. Whether it is true or not I can not confirm.

Q. And you are familiar with askart.com?

A. I am familiar with askart.com, correct.

Q. And do you see in the next paragraph "When researching the painting I found only one artist whose name matched A Trombetta."

Do you see that in paragraph 5?

A. I see that, yes.

Q. Do you have any evidence to dispute Mr. Novocin's claim?

A. I have submitted in my evidence to other artists their names were Anita Trombetta and Anne, A-N-N-E, Trombetta.

Q. But you have no evidence to dispute that Mr. Novocin actually researched the painting; correct?

A. Other than his declaration since I have never done business or even met Mr. Novocin and since I never did this painting, there is

Page 133

A. Trombetta

suspect and question consistently throughout this whole case.  And I might add, the backbone of this case has to do with a lack of clarity, evidence other than the irrefutable fact that I artist Annamarie Trombetta did not do or paint Man with Red Umbrella original oil sold by eBay and Estate Auctions Inc. on the Worthpoint website www.worthpoint.com.

Q.    This painting wasn't sold on Worthpoint's site; correct?

A.    I can neither affirm nor deny.  All I can do is tell you with utmost sincerity and truth I did not do this painting.  All the other information is written, but not verifiably confirmed.

Q.    But you have no evidence that Worthpoint sold this painting on its site; correct?

A.    I have a questionable document. Whether it is true or not needs to be discovered.

Q.    What document do you have showing that Worthpoint sold this painting on its website?

A.    I have evidence submitted by Mr. Duff for a sale of allegedly on eBay.

**SA598**

Page 134

A. Trombetta

Q.    But eBay is not Worthpoint; correct?

A.    EBay is somehow related to Worthpoint.

Q.    What evidence --

A.    I can't tell you.  I cannot tell you.
I don't know the specifics.

Q.    What evidence do you have that eBay
and Worthpoint are related?

A.    I had a phone conversation with an
eBay employee that informed me the logo on
Worthpoint website once highlighted and clicked
went into eBay.

Q.    Did you ever try clicking through that
logo?

A.    Of course.  Not only did I try it is
duly recorded in the eBay phone call.

Q.    Did it go into eBay?

A.    The eBay representative was on the
Worthpoint website for this exact painting, the
1972 original oil painting "Man with Red Umbrella"
by Annamarie Trombetta and while he was on this
web page on the Internet in 2015 there was an eBay
logo and when clicked the page from Worthpoint.com
transformed and was hyperlinked to eBay.

Q.    So the eBay, you are talking about

Page 135

A. Trombetta

clicking on eBay's logo went to eBay's site;

correct?

A. On the Worthpoint website there was a hyperlinked eBay logo.

Q. And that went to eBay?

A. And that went to the eBay web page.

Q. But that didn't -- you didn't click on Worthpoint's logo and go to eBay; correct?

A. I think if I hit -- I think. When I hit the computer arrow it went back to Worthpoint's web page from eBay.

Q. I would expect that because you are going in reverse; right, that takes you back to the last place you were, but did you ever click on the Worthpoint logo on Worthpoint's site and be directed to eBay?

A. When I clicked onto the Worthpoint website the A Trombetta signature was enlarged.

Q. Isn't this document, Defendants' Exhibit 7, what you saw when you went to Worthpoint's site?

A. This document is from Worthpoint's website. It is one web page from the Worthpoint website in 2015 dated August 13th.

Page 136

A. Trombetta

Q.    This was the claimed listing that you are having an issue with; correct?

A.    This is the web page for the claimed listing for the 1972 original oil painting.

Q.    Where is this outside version of Annamarie Trombetta's name?

A.    You would have to get a videotaped camera to record the moving images and at that time I did not do that, but there is a hyperlink. What I did do was document that in the phone call from eBay.

Q.    That there is this massive Annamarie Trombetta name on Worthpoint's website?

A.    Can you rephrase that?

Q.    Yes.

You documented in your call with eBay that on Worthpoint's website there is this big Annamarie Trombetta.

What are you referring to?

A.    What are you referring to?

Q.    You just said a few minutes ago that the Worthpoint, when you clicked on the Worthpoint logo you went and you saw a huge Annamarie Trombetta?

Page 137

A. Trombetta

A.   On the upper left-hand side there are two arrows.

Do you see them?

Q.   Are you talking underneath the image that's on that page?

A.   I am talking an the upper left-hand side below Worthpoint.

Q.   So below the Worthpoint logo?

A.   Below the Worthpoint word and logo the image what seems to be A Trombetta and the smaller image, to my recollection, were hyperlinked and when they were clicked on an enlargement of the signature expanded with the copyrighted -- licensed by worthpoint.com.

Q.   And this explained to you that Worthpoint and eBay were somehow related?

A.   On the Worthpoint website it clearly states that Worthpoint is a licensing partner.  I can't remember verbatim.  You would have to actually show me.  I can make a statement in full accuracy without it in front of me.

Q.   Let me try and clear this up then.  I am going to step back and we will go through this methodically.

Page 138

A. Trombetta

Mr. Novocin from Estate Auctions admitted that he listed a painting on his eBay storefront in 2012; would you agree with that?

A. I don't agree with it but that's what the statement says.

Q. And would you agree that Mr. Novocin admitted that he claimed he conducted research to identify the artist who signed the painting?

A. I don't know. I don't agree. I only know that on document, in document 56 that was filed with the court.

Q. That's Defendants' Exhibit 10.

A. Filed on June 26, 2020 that Norb Novocin wrote in number 3, 4 and 5 statements that he did research on me Annamarie Trombetta. However, he never contacted me.

Q. But he claimed that he did research using askart.com; correct?

A. That is what the document says.

Q. And in paragraph 7 on page 2 of Exhibit 10 Mr. Novocin said "I used biological information about Plaintiff that I found on askart.com to ensure that the Estate Auction's Ebay listing for the painting was as accurate as

Page 139

A. Trombetta

possible."

Do you see that concession by him?  I am not asking whether you agree with it or not, but did you see that's what he claims?

A.   This is what he wrote.  This is what he claims in document 56.

Q.   And do you see that he then claimed that all of the information about the Plaintiff, meaning you, that he included in his eBay listing was gleaned from askart.com?  Do you see that?

A.   I read what you read.

Q.   Do you have any evidence to the contrary?

A.   How could I have evidence to a complete stranger's actions who is not present that I cannot question.

Q.   Do you have any evidence that Worthpoint had listed any painting on eBay in 2012?

A.   Can you repeat?

Q.   Do you have any evidence that Worthpoint listed a painting on eBay in 2012?

A.   This document is from 2015.  A big problem is why three years after this alleged sale

Page 140

A. Trombetta

was made was this on the Internet in 2015? If you can answer that question I would be most grateful.

Q. Do you understand what Worthpoint is?

A. In its entirety if you have an explanation I would appreciate one.

Q. Have you ever investigated what Worthpoint is?

A. I have in 2015 and beyond upon this false listing on the Internet that came up under Annamarie Trombetta, Annamarie Trombetta artist and 1972 original oil painting Man with Red Umbrella that had my credentials underneath hyperlinked to that painting. I did due diligence. It is a company that post sales from various auction houses to include, but not specify those auction houses, but to include eBay.

Q. Are you aware that Worthpoint is a resource for researching, valuing and antiques, art and vintage collectibles?

A. I question the level of expertise and accuracy and that opinion which I have is based on this one false listing.

So in answer to your question, I am aware of what they are proposing to be, yet

A. Trombetta

research is lacking in my case in particular. Accurate evidence or research or verifiable evidence.  Ergo therefore, whether this is a credible research --

Q.    Indicating Defendants' 7?

A.    -- in my opinion, it is not.

Q.    Defendants' Exhibit 7 clearly references a sale date of December 1, 2012; correct?

A.    Listed is a alleged sale date.

Q.    And the sources -- go ahead.

A.    I stress the word alleges.

Q.    And the source indicates eBay; correct?

A.    Asked and answered.

Q.    You can answer again.  You have to do it verbally.

A.    I responded asked and answered.

Q.    I know, but you can answer that question again if you think that it was asked before.

A.    The question was asked and answered before.

MR. BIALEK:  Can you please ask the

Page 142

A. Trombetta

question again?

(Record read.)

A.    Next to the source is the word eBay.

Q.    And you have no evidence to believe otherwise; correct?

A.    Because this is a false posting.  The lack of evidence is balanced by my verification and my evidence that I did not do this painting.

Q.    So your only evidence against Worthpoint or counter to the claim that it came from eBay, is because you think the whole posting is false; correct?

A.    I can't answer that in complete sincerity and certainty.  I will to ask you to please rephrase.

Q.    Sure.  I think this is a critical issue here and that's why I am trying to get an answer.  You have been shown Defendants' Exhibit 7 which clearly shows that the source was eBay or so it claims.

You are telling me that you can't confirm that's the case because there is other information in here that's false; is that what you are claiming?

Page 143

A. Trombetta

A.    I am going to answer this question with a metaphor.  If there were two cups of coffee on this table, the color if it was black would indicate that there is no milk.  If the color was carmel or light brown it would indicate there is milk.  Now the question is:  Is there sugar?  Has sugar been added to the coffee?  It is only in the experience of actually drinking the coffee that one could accurately state whether there was sugar in it.

Q.    You couldn't tell whether there is sugar in either one of them just by looking at it; correct?

A.    That was the metaphor.  I could not tell from -- the only thing I know to be true is that I didn't do this painting.  I didn't give consent for the biography to be included in this document.  I can tell you that this information was on Worthpoint for an extended amount of time. I can tell you that when I desperately tried to inform Worthpoint's staff that this information was incorrect, I was met with incorrect information and rerouted to contact eBay in order to remove this fraudulent posting, and upon

Page 144

A. Trombetta

several attempts that spanned a period of eight months, even when I contacted Worthpoint it still took a number of weeks in order to permanently remove.  No.  Wait let me retract that.  Strike that.  It took a series of weeks to have this listing removed from the Internet and in the course of six to eight months or six months maybe even four, who knows at this point, it resurfaced.

MO          MR. BIALEK:  Move to strike as nonresponsive.

Q.    Simple question.

Do you have any evidence that Worthpoint sold the painting?

A.    Do I have evidence that Worthpoint sold the painting?  I have the documents that you have.

Q.    Do you have any specific evidence that you can point to that Worthpoint sold the painting?

A.    I have evidence that underneath the signature Worthpoint copyrighted with a vector symbol, copyrighted work licensed by Worthpoint.

Q.    So I have asked you this question several times and you keep avoiding the answer.

Page 145

A. Trombetta

A.    No.  Rephrase the question and I will duly answer you.

Q.    Do you have any evidence that Worthpoint sold the painting in 2012 titled 1972 original oil painting Man with Red Umbrella?

A.    I have evidence from a phone call from Worthpoint's recording message going out that they do buy paintings and they do sell paintings.  I encourage you to listen to the evidence that was duly sent to you to August 2022.

Q.    Let me clear it up then.

Other than the recording of that phone conversation, do you have any evidence that Worthpoint sold the 1972 original oil painting?

A.    Other than Worthpoint's written documents that this was sold, me personally I do not.  Worthpoint is saying that this was sold, Worthpoint, on Worthpoint's website displayed, wrote, advertised, announced and purported under my name a sale of an original oil painting.  In other documents you will see that there is a numeric value assigned to this painting for $181.50.

Q.    You see that in this document?

Page 146

A. Trombetta

A.    Not in this document, in other documents.

Q.    Do you see anyplace in this document where Worthpoint allegedly sold this painting?

A.    There are multiple documents related to this one particular sale from the Worthpoint website.  In this particular document, which is prior to becoming a member to Worthpoint, Worthpoint sells memberships.

Q.    Simple question.

Are you claiming that Worthpoint sold this painting?

A.    I am claiming that Worthpoint advertised the sale of this painting and falsely distributed information with my name and my personal self-authored biography.

MO          MR. BIALEK:  Move to strike.

Q.    Are you claiming that Worthpoint sold the 1972 original oil painting Man with Red Umbrella painting?

A.    I am claiming that Worthpoint falsely advertised and included my name.

MO          MR. BIALEK:  Move to strike.

Q.    I am going to try to make this simple.

Page 147

A. Trombetta

I don't understand why you don't understand my question.  So if you don't understand my question let me know.  If you do understand it please answer.

Are you claiming that Worthpoint sold this painting, the 1972 original oil painting Man with Red Umbrella?

A.    I don't have a definite answer because I don't know the business practices of Worthpoint. I indicated that in a phone, recorded phone call it was a recording from Worthpoint that they do buy and sell paintings.  So whether this was bought and sold, I can't say.  What I can say is that I encourage you to listen to that phone recording.

Q.    Do you have any evidence that Worthpoint sold this painting the 1972 original oil painting Man with Red Umbrella?

A.    According to the ad the painting was sold.  According to the description it was allegedly sold by Estate Auctions Inc.  According to the facts of my life I did not do this painting.  Based on that A prioritized statement that I did not do this painting and this is a

**SA612**

Page 148

A. Trombetta

false description, I cannot say definitively what's going on because what was said about me was completely and utterly incorrect. It is devoid of integrity and accuracy.

Q. Are you claiming that Worthpoint sold the 1972 original oil painting Man with Red Umbrella?

A. My claims that are relevant.

Q. Can you please just answer my question?

A. Are my VARA claims, Visual Artist's Right to Act which prohibits the use of an artist's name, persona to a painting they did not do.

Secondly, direct copyright infringement.

Third, the Digital Millennium Copyright Act Section 1202 A, B, potentially C.

MO MR. BIALEK: Move to strike as nonresponsive.

Q. I am going to ask this one more time.

Are you claiming that Worthpoint sold the 1972 original oil painting Man with Red Umbrella; yes or no?

**SA613**

Page 149

A. Trombetta

A.    I cannot answer yes or no.

Q.    Are you claiming that Worthpoint created the biographical information that's contained in this posting?

A.    Again, I cannot say conclusively yes or no.  I can only state that the information is incorrect.  That's what I am claiming.

Q.    And looking at Exhibit 10 paragraph 7, do you see that Norb Novocin claimed that he used biographical information about you that he found on Ask Art; do you see that?

A.    I concede that I see that.

Q.    Do you see that Norb Novocin claimed that all of the information about the Plaintiff that he included in the eBay listing was gleaned from askart.com?

A.    I read what you read.

Q.    Do you have any evidence that Worthpoint changed the biographical information that was posted by Mr. Novocin?

A.    According to the evidence that you have recently produced in WP 00038, WP 00039, WP 00040 it is the codes of the ad and the full biography that differs significantly in size from

Page 150

A. Trombetta

what is on this document.  There are no three dots after the word time.

Q.    Is that the sole information that you are relying on or do you have any other evidence?

A.    I can't answer this question at this time with complete certainty.  I would have to review my evidence.

Q.    Do you know a Terry Mizner?

A.    I do know a Terry Mizner.

Q.    Who is Terry Mizner?

A.    She is a collector of mine from over 20 years ago.

Q.    Did you impersonate her in speaking with EAI?

A.    I did not.  I called EAI on January 10th.

Q.    2017?

A.    Of 2017, correct.  I introduced myself as the artist.  I mentioned Miss Mizner regarding an e-mail and I asked Mrs. Novocin if she could respond.

Q.    Did you claim to be Terry Mizner when communicating with EAI?

A.    I did not claim to be Terry Mizner

**SA615**

Page 151

A. Trombetta

when communicating with EAI.  As stated for the first and only time on January 10, 2017 I phoned and spoke with Marie Novocin regarding information on this painting of subject in this lawsuit, the 1972 Man with Red Umbrella allegedly signed Annamarie Trombetta.

Q.    You never indicated that you were Terry Mizner?

A.    Asked and answered.

Q.    No.  It was asked.  I don't think it was answered.

Did you ever indicate that you were Terry Mizner?

A.    For the first time I spoke to Marie Novocin on January 10, 2017 and introduced myself as Annamarie Trombetta, the artist somehow misattributed to this painting.

Q.    Did you ever communicate with EAI under the name Terry Mizner?

A.    I did not.

Q.    Do you know whether your friend Terry Mizner ever communicated with EAI?

A.    On or around April of 2020 I did call and try to jar her memory and she said that's

Page 152

A. Trombetta

years ago.  I don't remember.  I really don't.

This is a part of my actions and history.  I don't expect other individuals to -- it's feasible, plausible that she does not remember.

Q.   Did you ever create an e-mail address at mail.com?

A.   To my recollection, I would have to review my records.  I don't know.

Q.   Do you know what mail.com is?

A.   I would assume it is like G-mail.

Q.   Did you ever have an e-mail address serious collector at mail.com?

A.   I personally do not.

Q.   Do you know whether Terry Mizner had an e-mail address of serious collector at mail.com?

A.   I can't answer.

Q.   Did you ever provide Miss Mizner with any attachment, sorry, any documents regarding your claim?

A.   I would have to check my records.  I can't say for certainty right here and right now.

Q.   And you don't know whether or not Miss

SA617

Page 153

A. Trombetta

Mizner spoke with the Novocins on Thursday January 5, 2017 about this oil painting?

A.   I can't say.

Q.   Do you know where Miss Mizner is now?

A.   I need to say this off the record.

Q.   Why?

A.   She has a relative who is ill.

Q.   Do you know where she lives presently?

A.   I don't want to drag her into this.

Q.   I think that you probably have seen -- withdrawn.

You reviewed the documents that Mr. Duff provided from EAI; correct?

A.   I reviewed an e-mail that's allegedly from Terry Mizner that looks like a spam e-mail. So based on there are a couple of documents.  One it says Terry Mizner and it's looks likes a spam e-mail.

Q.   What do you mean a spam e-mail?

A.   It just says Terry Mizner with an unrecognizable e-mail address and one of those clickable links.

Q.   We will get to this right after our break, but before we do I want to finish up on

**SA618**

Page 154

A. Trombetta

Defendants' Exhibit 10.  Let's take the break now.

THE VIDEOGRAPHER:  This will end media unit four.  Going off the record at 2:07 8/30/22.

(Luncheon recess:  2:07 p.m.)

Page 155

A. Trombetta

A F T E R N O O N   S E S S I O N.

(2:46 p.m.)


A N N A M A R I E   T R O M B E T T A,

having been previously sworn, resumed the

stand and testified further as follows:


EXAMINATION (Cont'd)

BY MR. BIALEK:

THE VIDEOGRAPHER:  We are back on the
record at 2:47 8/30/22.  This will begin
media unit number five.

MR. BIALEK:  Can you mark Defendants'
Exhibit 8.  It is Plaintiff 000069 to
000070.

(Defendants' Exhibit 8, a document
Bates stamped Plaintiff 000069 to 000070,
marked for identification, as of this date.)

Q.    Showing you what has been marked as
Defendants' Exhibit 8 and ask if you recognize
this document?

A.    I do recognize the document.

Q.    And what is this document?

A.    I need to find my reading glasses.

Page 156

A. Trombetta

Hold on please. So it is two of something and it looks very similar to the other evidence and yes, this is the Worthpoint 3 of 7. So we have page 2 and 3 which is the text for the 1972 Man With Red Umbrella was attributed to Plaintiff Annamarie Trombetta. In the upper left-hand corner is a signature and the eBay Worthopedia logo.

Q.    Logos?

A.    Logos from the two companies.

Q.    Do you know where page 1 is?

A.    I would have to review my evidence to answer that question accurately.

Q.    Do you know where the pages 4, 5, 6 and 7 are?

A.    Same response. I would have to review my evidence.

RQ        MR. BIALEK: We would request copies of pages 1, 4, 5, 6 and 7.

Q.    Was this document saved on your computer?

A.    This document was printed out from the web page. Was it saved to my computer? This is uncertain. I have several documents related to this on my computer, this case.

Page 157

A. Trombetta

Q.    When are you claiming you came across this?

A.    The initial finding was August 2015.

Q.    And this specific document, are you claiming it was printed at a different time?

A.    That is correct.  There was repostings of this subsequent to my request to have this false listing permanently removed.

Q.    When was that?

A.    Through great effort I was able to after eight months get through to Anita Brooks who never responded to me and then through great effort phone calls, e-mails.  I eventually spoke to Webmaster for Worthpoint Greg Watkins on or around February 2nd or 3rd of 2016.

Q.    See on the bottom on the top right there is a date 5/7/17 11:18 a.m.?

A.    I do see that.

Q.    Do you know what that date is?

A.    That date is the date of the printout.

Q.    From where?

A.    From a computer.

Q.    Was it from your computer?

A.    I believe this was from the business

Page 158

A. Trombetta

center computer.

Q.   And was --

A.   Where I reside.

Q.   Are you claiming that this document was on the website as of 5/7/17?

A.   I am claiming that I found on May 7th this link on the Internet underneath either my name or -- yes, under my name.

Q.   From the computers at the business center?

A.   Either through the Google search or Bing.  I can't say for certain.

Q.   Why do you think this came from those computers?

A.   Because I remember being upstairs in the computer room doing work and I went onto my, either my Yahoo account and found an e-mail from Worthpoint dated April, I can't remember the exact date, possibly the 24th.  The date is in the e-mail 2017.  And upon seeing that e-mail there was a common pattern even though I only subscribed consistently for months from Worthpoint's e-mail listing, nevertheless, irregardless of the unsubscribed, I am repeating that twice, I kept

Page 159

A. Trombetta

getting e-mails.

Q.    What e-mail did you use for the unsubscribe?

A.    What e-mail?  On the page of my website contained within the e-mail from Worthpoint is an unsubscribe tab.  When I clicked on that what came up was a page and there were multiple choices.  I clicked on unsubscribe.

Q.    Do you know what e-mail you were using at the time?

A.    I would have to look at the evidence that I have set forth document by document because my e-mail is within -- whatever e-mail that Worthpoint sent to me is on that e-mail.

Q.    Do you have those e-mails?

A.    I believe I put them into evidence.

Q.    But you have them.  Whether you put them into evidence is a different story, but you believe you have them?

A.    You are asking me if I have the e-mails today --

Q.    In --

A.    -- in my e-mail accounts.  I am trying to be specific.

Page 160

A. Trombetta

Q.   Right.

A.   I believe some of them I do.  Others I did delete.

Q.   When did you delete them?

A.   You are asking me a question that's beyond the scope of my memory.

Q.   Are you aware -- withdrawn.

Did you delete them after this case began?

A.   Did I delete them after the case began.

Q.   In February of '18?

A.   I can't say succinctly.

Q.   Have you deleted any documents since this lawsuit began?

A.   That's an open question.  Define documents.

Q.   Anything related to this lawsuit, any communications, e-mails, documents, printouts from the web.

A.   To the best of my recollection, I can't say with certainty, but I do not think I deleted items related to this.

Q.   I am going to remind you that you are

Page 161

A. Trombetta

under an obligation not to delete anything related to this lawsuit.

A. I know that now. Again, I am a pro se litigant. So if I did -- I don't want to go on and on. I know now not to delete anything.

Q. Were you advised at the start of this lawsuit that you shouldn't delete anything?

A. No.

Who would advise me?

Q. You had counsel at the beginning; correct?

A. I went to the New York Legal Assistance Group.

Q. Prior to starting this lawsuit, you also served a demand letter; correct?

A. I did. That was simply for a settlement letter.

Q. And you were represented by Megan Noh?

A. That is correct.

Q. When you printed this it didn't have the label Plaintiff 000069; correct?

A. That is correct.

Q. You added that?

A. I added that because I believe it was

**SA626**

Page 162

A. Trombetta

requested of me to.

Q.    When did you do that?

A.    When I had to submit evidence upon request.

Q.    So where was this document in your files when you copied it and added in the Bates number?  Where did you find this; was it on your computer, was it on a hard copy printout or something else?

A.    It was printed out on that particular date.

Q.    It was printed out on May 7, 2017?

A.    Correct.

Q.    But this was just turned over recently.  I presume back in May 2017 you didn't add the Bates number; right?

A.    Of course not.

Q.    So I am asking when you added the Bates number, where did you get this document from?

A.    It was in a box of documents.

Q.    Was this part of the box of documents you found in late June?

A.    No.

**SA627**

Page 163

A. Trombetta

Q.    So it was in a different box of documents; correct?

A.    That is correct.

Q.    And you are aware -- withdrawn.  And you are certain -- withdrawn.

When did you find this document in that box of documents?

A.    I can't say with certainty a date.

Q.    Can you say with certainty though that it was originally printed out on May 7, 2017?

A.    I can say with certainty it was printed out on May 7, 2017 in response to an e-mail I received from Worthpoint which prompted me to go onto the Internet to see if this posting was still listed underneath my name.

Q.    Do you know what e-mail that was?

A.    Yes.

Q.    What e-mail was that?

A.    Asked and answered, but for the courtesy of this deposition, it was an e-mail, I am a visual person, with a big blue April something, maybe the 24th, 2017.  An e-mail was sent from eBay.  It should be in my evidence.  I know it is in mine.  Despite numerous unsubscribed

**SA628**

Page 164

A. Trombetta

requests to eBay using eBay's website, eBay continued to send me e-mails.

Q. Looking back at Defendants' Exhibit 8, under 1972 original oil painting Man With Red Umbrella, do you see it was, the source is listed as eBay?

A. That is correct.

Q. Do you see the sold date is December 1, 2012?

A. That is correct.

Q. And do you see the channel is online auction?

A. That is correct.

Q. And right under it it says welcome to Estate Auctions Inc.

Do you see that?

A. That is correct.

Q. So does that indicate to you that this was an Estate Auctions' listing?

A. Because of the nature of the incorrectness, I assumed nothing and contacted everyone and lost a great deal of time trying to figure out who put this on the Internet. More importantly, how do I get it off?

Page 165

A. Trombetta

MR. BIALEK: I would like to mark as Defendants' 9 the biography listed as confidential Plaintiff 000087 that says on it Exhibit E 1.

(Defendants' Exhibit 9, biography listed as confidential Plaintiff 000087, marked for identification, as of this date.)

Q. Can you please show the witness the exhibit? I am showing you what has been marked as Defendants' Exhibit 9 and ask if you recognize this document?

A. I recognize it. It is consistent with another document with the same date 4/24/2019 document 22.

Q. Can you pull up from your pile Defendants' Exhibit 6 as well?

Do you see that's also marked as confidential Plaintiff 000087?

A. One is marked A and the other is marked B.

Q. What does that mean, they are two different numbers?

A. It means that the same number is applied because of the subject matter to both

Page 166

A. Trombetta

documents.  One, to make a differentiation one is A which is my biography from my web page and B, is the eBay text.  The Worthpoint/eBay text from the 1972 Man With Red Umbrella.

Advertisements we haven't come to a decision on.

Q.    And Defendants' Exhibit 9 is the biography from your website; is that correct?

A.    Let me get it and confirm.

In part it is the first five paragraphs.

Q.    And you have a highlighted sentence; correct?

A.    As discussed I highlighted the sentence in other documents.

Q.    And the reason it is highlighted in this document is what?

A.    Is because written in my website is the sentence "All the imagery in this catalog was either created en Plein Air or from the subject directly."

Q.    You are reading from Defendants' Exhibit 9?

A.    Defendants' -- this is the

Page 167

A. Trombetta

plaintiff's.

Q. We just marked that as Defendants' Exhibit 9; do you see?

A. Yes.

Q. That's what you were just reading.

Did you skip a word?

A. It is not a word. It is a TBA.

Q. So that is missing -- withdrawn.

You have Defendants' Exhibit 9 that has that sentence "All of the imagery in this catalog (TBA) was either created en Plein Air or from the subject directly; right?

Now if you look at Defendants' Exhibit 6, which is what you purport to claim was posted on the Worthpoint site, that doesn't have the TBA; correct?

A. Whomever. I can only assume since I did not create the painting or the ad, but I did create the text, that whomever deleted the TBA. That's not -- that's highly plausible.

Q. Do you recall right before the break we were looking at Mr. Novocin's declaration and he said that he obtained all this information from Ask Art?

Page 168

A. Trombetta

A.    Yes, I did.

Q.    Did you ever look at Ask Art to see if the biography that they claimed had the TBA?

A.    I don't believe that the biography may have the TBA.

Q.    On the Ask Art site?

A.    I would have to check to answer conclusively and with accuracy.

Q.    Why don't we do that?

A.    Yes, why don't we.

MR. BIALEK:  Can we please mark this as Defendants' 11.  It is a printout from Ask Art on the wayback machine from August 20, 2010.

(Defendants' Exhibit 11, a printout from Ask Art on the wayback machine from August 20, 2010, marked for identification, as of this date.)

A.    And this is what you sent me.  The TBA is not on the Ask Art.

Q.    I haven't asked a question.

I am showing you what has been marked as Defendants' Exhibit 11 and ask if you have seen this document before?

Page 169

A. Trombetta

A.    I have not seen this document until August 29, 2022.

Q.    Yesterday?

A.    That is correct.

Q.    Do you recall ever seeing the Ask Art posting?

A.    I recall consenting to the Ask Art posting in the year 2015.

Q.    Did you have an Ask Art account?

A.    I never had an Ask Art account.

Q.    Did you upload your biography to Ask Art?

A.    Someone recommended my biography to be uploaded and I believe Ask Art did that.

Q.    Did you ever object to Ask Art posting your biography?

A.    I consented in 2015.

Q.    Were you aware that Ask Art had your biography on its website at least going back to 2010?

A.    I need to point out to defendant's counsel that I have a discrepancy with the evidence that you have produced.

Q.    Which is?

Page 170

A. Trombetta

A.    Which is I have blown up the code and the code number on my evidence for 2015 is absent my name.  Let me show you (indicating).

Q.    I understand.

A.    This doesn't have my name.

Q.    I get it.

A.    This code has my name and also has web archive with a code there.

So all I can say is there is a consistent pattern with both defendants to purport evidence which at times contradicts one another. This evidence contradicts the evidence that the plaintiff has produced based on this blown up.

Q.    Go ahead.  You can finish.  I am listening.

A.    This blown up code.

Secondly, the evidence that I have expanded says something about book references pre-2007.  Book references, yeah.  It says in the biography that I had a catalog.  So in yours under back to preview page it says book references Annamarie Trombetta and there is a zero.  I am talking about this (indicating).

Q.    I get it.

Page 171

A. Trombetta

A.    So if the biography states that I had a catalog, why is this information incorrect?

Q.    Couldn't tell you.

A.    I have been in that position regarding this 1972 ad for many years and to this day there are uncertainties that still exist.

Q.    So if this is actually on the web archive, are you refuting that this was up in August of 2010?

A.    I am refuting that this was up based on the differences in the code and the fact that I have produced e-mails from the person I gave consent to and I have produced evidence from an art appraiser who reviewed my artistic achievements in 2008 and 2009.

Q.    Back in 2010, did you live in New York?

A.    Yes.

Q.    So that's accurate; right?

A.    That is accurate.

Q.    Do you know what the magazine reference was?

A.    Fine Art Connoisseur.

Q.    Did you ever Ask Art where it obtained

Page 172

A. Trombetta

this from?

A.   I did several times.

Q.   What did they tell you?

A.   Each time it was a different answer which is the same conundrum as my inquires to eBay and Worthpoint.

Q.   And?

A.   And there were, depending on whom I spoke to, when I spoke to them, a series of contradictory forms of information.  It is very frustrating.  I know from my evidence and from the art appraiser that I had check a dated file that the Ask Art was not in that file.

Q.   Do you know whether or not this is the biography that Mr. Novocin had consulted from Ask Art?

A.   I have no idea.

Q.   If you look down at the end of the first paragraph, do you see the sentence all the imagery?

A.   Which page are you referring to?

Q.   The first page.  The first paragraph of the archive it says This Biography From the Archives of Ask Art.

Page 173

A. Trombetta

A.    All the imagery in this catalog.

Q.    Do you see the TBA in that sentence?

A.    I do not see the TBA.

Q.    So the fact that the biography entry that is in the eBay listing doesn't have a TBA and Mr. Novocin claims he got it from Ask Art, would this indicate to you that this is what he had taken?

A.    This indicates nothing conclusive, in my opinion.

Q.    But you have no evidence that Worthpoint purposely removed the TBA; correct?

A.    Sir, during discovery I asked your firm for several forms of evidence predominantly the metadata, the actual dated eBay/Worthpoint/worthopedia documents or ad and you have not produced them.  So if you don't have the evidence based on my evidence, based on my experiences of consistent, contradictory statements, I can affirm once again, I did not do the painting.  I did not grant any person, business, legal entity at any time the rights to license or use my self-authored biography.

Q.    But you have no evidence that

Page 174

A. Trombetta

Worthpoint took your biography from your website; correct?

A.    I have no proof that, conclusive proof that the painting was even sold because --

Q.    That's not what I am asking.  I am asking -- can you please read back the question?  It is a very simple question.

(Record read.)

A.    The evidence I have is what you are looking at.

Q.    This doesn't show that Worthpoint took your biography from your website; does it?

A.    It shows that my biography was on Worthpoint's website.

Q.    But it doesn't show that Worthpoint took the biography from your website; correct?

A.    It shows as I just stated and will reiterate, Worthpoint's website had my biography.

Q.    With the exception of the TBA?

A.    With many exceptions.  The exception that my name is spelled incorrectly.

Q.    Where is your name spelled incorrectly within the body of the biography?

A.    Description, this is by Annamarie

Page 175

A. Trombetta

Trombette.

Q.    Is that part of your biography?

A.    That is part of the Worthpoint ad.  So as far as the accuracy and the responsibility of the information on Worthpoint's website.

Q.    So that's the description from Estate Auctions; correct, that's not the biography that you are claiming was copied; correct?

A.    In Exhibit 8 of Defendants' Exhibits you have in the first paragraph home Worthopedia 1972 da, da, da signed Annamarie Trombetta.

Q.    Correct.

A.    Spelled correctly.  Then in bold type Annamarie Trombetta.  Then up at auction Annamarie Trombetta.

So what precedes the misspelling of my last name are one, two, three correct spellings within the same page and within close proximity. So I don't know why my name is misspelled --

Q.    This is --

A.    -- incorrectly when it is spelled correctly in three other places on the same page.

Q.    You never have typos in your writing, do you?

Page 176

A. Trombetta

A. Never. I say that facetiously.

Q. But this section, this sentence where you say this is by Annamarie Trombette with the E, that's not within your biography; correct?

A. Sir, you said and I need to correct you within this my text. It is not my text.

Q. Right.

A. It was composed allegedly by Estate Auctions Inc.

Q. Right, and?

A. Who managed to spell it correctly in three other places.

Q. But this wasn't taken by Worthpoint from your website; correct? You don't have on your website this is by Annamarie Trombette; correct?

A. I would assume it said Trombette.

Q. But whatever, that doesn't appear on your website.

A. I will point this out, why underneath it in the same way that it is spelled three times correctly it is spelled right underneath.

Q. I get it, but that's not even in your website; right, where it says Annamarie Trombetta

Page 177

A. Trombetta

gifted 1977, that's not in your website?

A. That's not in my website. That's the crux of this lawsuit.

Q. This was taken from an EAI entry not from your website; correct?

A. I can't even affirm that this was taken.

Q. It didn't come from your website; am I correct?

A. There we are in agreement. This particular description and the first few sentences is not from my website.

Q. And you have no evidence that Worthpoint intentionally or knowingly altered the biography from your website; is that fair to say?

A. What is fair to say is that I requested in discovery documents that were not produced.

Q. But you don't have any evidence that they took something from your website; correct?

A. I have asked, I have not received.

Q. I understand that.

Does your website track visitors?

A. I would have to call my domain host

Page 178

A. Trombetta

and make an inquiry.

Q. Have you done that over the last six years?

A. I cannot say that I have.

Q. Do you know whether there is any evidence that Worthpoint visited your website prior to February 2015 or August 2015?

A. I need to answer this in three particular ways. First and for most, since this occurred in 2015 it has been a nightmare in which like a horror movie the source of the chaos and confusion keeps coming back to life and has yet to be vanquished.

Secondly, I have e-mails from Worthpoint that were sent to my website.

Three, I never gave Worthpoint my e-mail address from my website. That is an important point.

Q. You have no record of Worthpoint being on your website in 2012; correct? Yes or no?

A. At present I do not.

Q. And you have no record of Worthpoint being on your website prior to August 13, 2015; is that correct; yes or no?

Page 179

A. Trombetta

A.    I have no record of doing a painting in 1972.

Q.    That's not my question.

A.    That's my response.

MR. BIALEK:  Can you please read back the question and can you please answer the question.

(Record read.)

A.    I have evidence that Worthpoint sent me e-mails.

Q.    Prior to August 13, 2015?

A.    I do not believe that I know with certainty the dates of those e-mails.  I will -- I can't say with certainty.

RQ        MR. BIALEK:  To the extent that you have any such e-mails from Worthpoint or any evidence that Worthpoint was on your website prior to August 13, 2015, we would call for production of those documents.

Q.    Do you have any evidence that Worthpoint knowingly or intentionally altered the document that it received that was posted on eBay?

A.    Could you repeat the question?

(Record read.)

Page 180

A. Trombetta

A. The document that was posted on eBay.

Q. The 1972 original oil painting Man With Red Umbrella listing that if you look at document Defendants' Exhibit 8 shows source eBay.

A. I need for you to rephrase the question. It just goes on.

Q. Look at document 8 please.

A. Got it.

Q. You see it says the source is eBay?

A. Agreed.

Q. And this is what you claim appeared on Worthpoint's site; correct?

A. Agreed.

Q. Do you have any evidence that Worthpoint knowingly or intentionally altered, removed, or modified any information that it obtained from its source eBay regarding this listing?

A. Again, I asked for metadata and computer data from Worthpoint and did not receive anything.

Q. So you have no other evidence; correct?

A. So conclusively without certainty the

**SA645**

Page 181

A. Trombetta

evidence that you are looking at is what I have.

Q.    And nothing more; correct?

A.    I say with uncertainty that I would have to review my evidence.

Q.    But you have no knowledge or evidence that Worthpoint knowingly or intentionally altered, modified or removed anything from the material it sourced from eBay; correct?

A.    I do have which was produced by myself and by the defendants an e-mail dated March 3, 2016 from a Jason Packer to Will Seippel, CEO of Worthpoint.

Q.    S-E-I-P-P-E-L.

MR. SCHMIDT:  S-E-I-P-P-E-L.

Q.    In January of 2016, do you recall asking Worthpoint to delete your listing?

A.    In January of 2016?

Q.    Correct.

A.    I e-mailed at support at Worthpoint and another e-mail and entered a fraudulent claim and received a ticket with a number from Worthpoint.  I never received any written or verbal response.

Q.    Do you recall ever asking Worthpoint

**SA646**

Page 182

A. Trombetta

to delete the listing for the 1972 oil painting Man With Red Umbrella?

Do you want me to repeat that?

A.    No.  In January 2016 as asked and was answered I through the phone verbally communicated to Worthpoint employee Anita Brooks that the 1972 original oil painting Man With Red Umbrella was misattributed to me.  I did not do this painting. That my biography was used.  Again, I have submitted this phone recording.  At the end for conclusion, near conclusion Miss Brooks advised me to write an e-mail and told me the e-mail to document my statements.  That was in January 2016. The specific date January 22nd.

Q.    Do you recall ever asking Worthpoint to remove the listing?

A.    Yes.  I have duly stated throughout the deposition and mentioned on February 3, 2016 speaking with then Webmaster Greg Watkins in a 18 minute conversation which was extremely detailed and informed him several times I was not the artist.  I would have been nine-years old.  He chuckled.  I asked him how he obtained this information.  I informed him that the ad said

**SA647**

Page 183

A. Trombetta

there were 12 photos. I did not see any photos.
If you listen to the recording it is all duly
documented.

Q. So you recall asking Worthpoint to
remove your, the listing; correct?

A. In February 20 -- on or around
February 2nd or 3, 2016 was the first direct
notification.

MR. BIALEK: Can you please mark this
as Defendants' 12.

(Defendants' Exhibit 12, a document
Bates stamped Plaintiff 000001 through
000003, marked for identification, as of
this date.)

Q. Which is marked Plaintiff 000001
through 000003.

Can you please hand it to the witness?

Miss Trombetta, I am asking you to
look at what has been marked as Defendants'
Exhibit 12 and ask if you have ever seen this
document before?

A. I produced that document that is the
plaintiff's evidence number one Google.

Q. If you can look at the third page

Page 184

A. Trombetta

where it says removed image of page still appearing.

A.    Hold on.

Q.    Did you do that?

A.    Only a website owner, only a website master as far as the URL is concerned.  For that particular website in this case www.Worthpoint.com can alter, change instantaneously I might add to upload or take down information from the website.

Q.    After Worthpoint removed that listing from its site, did you double check whether the URL that was appearing in their search results was exactly the same as the one that existed for that listing?

A.    I cannot say with certainty because again, we are spanning years and you are asking me to do something where the responsibility is on the shoulders or within the scope and responsibility of the website owner or the website webmaster.

MR. BIALEK:  Can you please mark this as Defendants' 13.

(Defendants' Exhibit 13, a document Bates stamped Plaintiff 000005, marked for identification, as of this date.)

Page 185

A. Trombetta

Q.    Can you please mark this as Defendants' Exhibit 13 which is marked Plaintiff 000005.

And Miss Trombetta, I would like you to look at this document.  Do you recall this document?

A.    I recall it because I produced it and sent it to you.

Q.    Did you try and remove the outdated content pursuant to this procedure that you notified us about?

A.    I need to answer that with a directive back to Defendants' Exhibit number 12.  Contact a web, a site webmaster.  If I may read.  "To remove content from a website you usually need to contact the webmaster, the person who owns the website."

Q.    And you did that; correct?

A.    Through great effort, through great effort sir, I say that again.  I was misinformed for months to the point that when I did speak to Gregory Watkins, the webmaster at Worthpoint who did not get back to me from January 22nd up until February 3rd which is a period of almost two weeks, I felt compelled to record the phone

Page 186

A. Trombetta

conversation due to the lack of response from Worthpoint and its employers.

MR. BIALEK: I would like you to mark as Exhibit 14 documents, a three-page document identified as Plaintiff 000016 through 000018A.

(Defendants' Exhibit 14, a three-page document Bates stamped Plaintiff 000016 through 000018A, marked for identification, as of this date.)

Q. Showing you what has been marked as Defendants' Exhibit 14 and ask if you have ever seen this document?

A. I have seen it. I have produced it.

Q. You see the date on it?

A. The date is -- yes.

Q. What date do you see there?

A. The date is Thursday November 26, 2015.

Q. Now this was a fairly urgent matter for you; correct?

A. It was urgent since its discovery.

Q. Is there a reason that you waited --

withdrawn.