# 25-817-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

❯❯❮❮

Annamarie Trombetta, Artist,

*Plaintiff-Appellant,*

*v.*

Norb Novocin, Marie Novocin,
Estate Auctions, Inc., WorthPoint Corporation,

*Defendants-Appellees,*

William Seippel, Worthpoint.com,
Jason Packer, Employee at Worthpoint Corporation,

*Defendants.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York*

## SUPPLEMENTAL APPENDIX
## VOLUME 5 OF 12
## Pages SA837 to SA1135

Wilson Elser Moskowitz Edelman
& Dicker LLP
*Attorneys for Defendant-Appellee
WorthPoint Corporation*
150 East 42nd Street, 23rd Floor
New York, New York 10017
212-490-3000



# **Table of Contents**

**Page**

## **Volume 1**

Proposed Amended Complaint, dated January 17, 2020,
with Exhibits ................................................................... SA1

Plaintiff's Response in Opposition to Defendant's Motion to
Dismiss Amended Complaint, dated February 21, 2020,
with Exhibits ................................................................... SA64

Opinion and Order of the Honorable Sarah L. Cave,
dated March 19, 2020 ...................................................... SA112

Protective Order of the Honorable Sarah L. Cave,
so-ordered on February 16, 2022 .................................... SA126

Order of the Honorable Sarah L. Cave,
so-ordered on December 8, 2022 .................................... SA130

Order of the Honorable Sarah L. Cave,
so-ordered on December 20, 2022 .................................. SA131

Memorandum by Plaintiff in Support of Motion
for Leave to File a Proposed Amended Complaint,
dated December 23, 2022 ................................................ SA134

Proposed Second Amended Complaint,
dated December 23, 2022 ................................................ SA216

Exhibits to Memorandum by Plaintiff in Support of Motion
for Leave to File a Proposed Amended Complaint ......... SA237

Order of the Honorable Sarah L. Cave,
dated December 29, 2022 ................................................ SA264

Order of the Honorable Sarah L. Cave,
dated February 2, 2023 .................................................... SA266

**Table of Contents**
**(Continued)**

<u>Page</u>

Defendant WorthPoint Corporation's Omnibus Motion
*in Limine* Concerning Experts, dated April 10, 2023 ..................... SA268

Declaration of Jana S. Farmer in Support of Defendant's
Motion *in Limine*, dated April 7, 2023 ......................................... SA270

**Volume 2**

Exhibit A to Farmer Declaration -
Documented Communications from WorthPoint's
Counsel to Plaintiff ..................................................................... SA273

Exhibit B to Farmer Declaration -
Expert Affidavit of Patrick O'Leary,
sworn to December 5, 2022, with Exhibits ............................. SA298

Exhibit C to Farmer Declaration -
Expert Disclosure and Expert Report of
Joseph V. Scelsa, dated February 16, 2023,
with Exhibits ........................................................................ SA327

Exhibit D to Farmer Declaration -
Transcript of Proceedings held before the
Honorable Sarah L. Cave on November 23, 2022 ................. SA390

Notice of Motion by Defendant WorthPoint Corporation
for Summary Judgment, dated April 17, 2023 ............................. SA458

Declaration of Jana S. Farmer in Support of Defendant's
Motion for Summary Judgment, dated April 17, 2023 ................. SA460

**Volume 3**

Exhibit A to Farmer Declaration -
Deposition Testimony of Annamarie Trombetta,
taken August 30, 2022 ............................................................ SA465
*(cont'd in Vol 4)*

ii

**Table of Contents**
**(Continued)**

**Page**

## Volume 5

Exhibit B to Farmer Declaration -
Deposition Testimony of Norb Novocin,
taken September 21, 2022 ....................................................... SA837

Exhibit C to Farmer Declaration -
Redacted Deposition Testimony of Willie Chu,
taken October 7, 2022 ............................................................ SA1084

## Volume 6

Exhibit D to Farmer Declaration -
Redacted Deposition Testimony of Vanessa Koi-Ploski,
taken October 17, 2022, with Cover Letter ........................... SA1136

Exhibit E to Farmer Declaration -
Redacted Defendant WorthPoint Corporation's
Expert Disclosure Pursuant to FRCP Rule 26(a)(2)
of Jessie Stricchiola, dated January 19, 2023,
with Report and Exhibits ....................................................... SA1237

Exhibit F to Farmer Declaration -
Redacted Declaration of Jason Packer,
dated January 19, 2023, with Exhibits .................................. SA1280

Exhibit G to Farmer Declaration -
Declaration of William H. Seippel,
dated April 17, 2023, with Exhibits ...................................... SA1303

Exhibit H to Farmer Declaration -
Expert Affidavit of Patrick O'Leary,
sworn to December 5, 2022, with Exhibits ........................... SA1349

## Volume 7

Exhibit I to Farmer Declaration -
Deposition Testimony of Patrick O'Leary,
taken February 28, 2023 ........................................................ SA1382

iii

**Table of Contents**
**(Continued)**

**Page**

Exhibit J to Farmer Declaration -
Google Search Results, dated March 15, 2017 ..................... SA1654

Exhibit K to Farmer Declaration -
Screenshots of the WorthPoint Report ................................ SA1655

**Volume 8**

Exhibit L to Farmer Declaration -
Defendant WorthPoint's First Request for Production,
dated February 25, 2022 ......................................................... SA1661

Exhibit M to Farmer Declaration -
Plaintiff's Response to WorthPoint's First
Request for Production, dated April 22, 2022 ....................... SA1674

Exhibit N to Farmer Declaration -
WorthPoint's Post-Deposition Demands to Plaintiff,
dated October 6, 2022 ............................................................ SA1691

Exhibit O to Farmer Declaration -
Plaintiff's Response to WorthPoint's Post-Deposition
Demands, dated October 20, 2022, with Attachments .......... SA1701

Exhibit P to Farmer Declaration -
Deposition Testimony of Scott Goodwillie,
taken October 6, 2022, with Cover Letter ............................ SA1800

Rule 56.1 Statement of Material Facts by Defendant
WorthPoint, dated April 17, 2023 ................................. SA1884

Letter from Jana S. Farmer to the Honorable Sarah L. Cave,
dated May 9, 2023 ......................................................... SA1896

Exhibit A to Letter -
Email from Adam Bialek to Annamarie Trombetta,
dated January 18, 2022 ......................................................... SA1901

iv

**Table of Contents**
**(Continued)**

**Page**

Exhibit B to Letter -
WorthPoint's First Set of Interrogatories,
dated February 25, 2022 ........................................................ SA1903

Exhibit C to Letter -
Plaintiff's Third Response to WorthPoint's
Interrogatories, dated June 27, 2022 ..................................... SA1916

Exhibit D to Letter -
Various Email Correspondence,
dated July 19, 2022 through August 8, 2022 ......................... SA1926

Exhibit E to Letter -
Various Email Correspondence,
dated September 9, 2022 to September 12, 2022 ................... SA1935

Exhibit F to Letter -
Email from Annamarie Trombetta to Nicole Haimson,
*et al*., dated September 15, 2022 ........................................... SA1939

Exhibit G to Letter -
Various Email Correspondence,
dated September 15, 2022 to September 28, 2022 ................. SA1940

**Volume 9**

Exhibit H to Letter -
Post-Deadline Court Submissions
Regarding Expert Disclosure Issues ...................................... SA1943

Exhibit I to Letter -
Redacted Documents Relating to Dr. Joseph Scelsa's
Opinions and Qualifications .................................................. SA1952

Exhibit J to Letter -
Redacted Expert Report of Gayle Skluzacek,
dated February 21, 2023, with Attachments .......................... SA2016

**Table of Contents**
**(Continued)**

                                                                        **Page**

Plaintiff's Opposition Response to Defendant WorthPoint's
    Motion to Preclude and Proffer Plaintiff's Expert Witnesses,
    dated May 19, 2023 ........................................................................  SA2051

Defendant WorthPoint's Response to Plaintiff's (Trombetta's)
    First Set of Notice to Admit for Defendants [Sic] WorthPoint
    Corporation, dated April 8, 2022 ...................................................  SA2069

WorthPoint' s Responses and Objections to Plaintiff's
    Request for the Production of Documents and Photos,
    dated April 8, 2022 ........................................................................  SA2087

Defendant Worth Point's Responses and Objections to
    Plaintiff's Request for the First Set of Interrogatories for
    Defendants WorthPoint Corporation, dated April 8, 2022 ...........  SA2115

Defendant Worth Point Corp.'s Response to Plaintiff's
    Second Request for Admissions, dated July 13, 2022 .................  SA2132

Defendant WorthPoint Corp.'s Answers to Plaintiff's
    Second Set of Interrogatories for Defendant WorthPoint
    Corporation, dated July 1, 2022 ...................................................  SA2146

Defendant WorthPoint Corp.'s Answers to Plaintiff's
    Second Request for Production of Documents,
    dated July 1, 2022 ........................................................................  SA2157

Defendant WorthPoint Corp.'s Responses to Plaintiff's
    Third Request for Interrogatories, dated August 15, 2022 ...........  SA2167

Defendant WorthPoint Corp.'s Responses and Objections
    to Plaintiff's Third Request For Production of Documents,
    dated August 15, 2022 ...................................................................  SA2182

Defendant WorthPoint Corp.'s Responses and Objections
    to Plaintiff's Fourth Request For Production of Documents,
    dated October 11, 2022 ...............................................................  SA2194

vi

**Table of Contents**
**(Continued)**

**Page**

**Volume 10**

Exhibits to Plaintiff's Opposition Response to Defendant
WorthPoint's Motion to Preclude and Proffer Plaintiff's
Expert Witnesses ............................................................. SA2208

Exhibits to Plaintiff's Opposition Response to Defendant
WorthPoint's Motion to Preclude and Proffer Plaintiff's
Expert Witnesses ............................................................. SA2241

Declaration of Jana S. Farmer in Opposition to Plaintiff's
Various Motions *in Limine* and Motions to Proffer,
dated May 30, 2023 ........................................................ SA2264

    Exhibit A to Farmer Declaration -
    First Initial Disclosure of Defendant WorthPoint
    Corporation Pursuant to FRCP 26(A)(1),
    dated February 25, 2022 .......................................... SA2267

    Exhibit B to Farmer Declaration -
    Redacted Declaration of Jason Packer,
    dated January 19, 2023, with Exhibits .................... SA2273

    Exhibit C to Farmer Declaration -
    Redacted Defendant WorthPoint Corporation's
    Expert Disclosure Pursuant to FRCP Rule 26(a)(2) of
    Jessie Stricchiola, dated January 19, 2023, with Exhibits ..... SA2296

    Exhibit D to Farmer Declaration -
    Email from Jana S. Farmer to Annamarie Trombetta,
    *et al*., dated October 11, 2022 .............................. SA2339

Plaintiff's Response to Defendants Estate Auctions Inc. and
Norb and Marie Novocin's Motion for Summary Judgment,
dated May 30, 2023 ........................................................ SA2340

Exhibits 1-12 of Plaintiff's Response to Defendants
Estate Auctions Inc. and Norb and Marie Novocin's
Motion for Summary Judgment .................................... SA2372

**Table of Contents**
**(Continued)**

**Page**

Exhibits 13-21 of Plaintiff's Response to Defendants
    Estate Auctions Inc. and Norb and Marie Novocin's
    Motion for Summary Judgment ..................................... SA2410

Exhibits 22-35 of Plaintiff's Response to Defendants
    Estate Auctions Inc. and Norb and Marie Novocin's
    Motion for Summary Judgment ..................................... SA2445

**Volume 11**

Exhibits 36-38 of Plaintiff's Response to Defendants
    Estate Auctions Inc. Motion for Summary Judgment .................. SA2482

Exhibit 41 of Plaintiff's Response to Defendants
    Estate Auctions Inc. and Norb and Marie Novocin's
    Motion for Summary Judgment ..................................... SA2525

Exhibits 39-41 of Plaintiff's Response to Defendants
    Estate Auctions Inc. Motion for Summary Judgement ................ SA2547

Letter from Annamarie Trombetta to the Honorable
    Sarah L. Cave, dated June 1, 2023 ............................... SA2582

       Exhibit 1 to Letter -
       Various Email Correspondence between Annamarie
       Trombetta and Art Appraiser Gayle Skluzacek ..................... SA2584

       Exhibit 2 to Letter -
       Various Email Correspondence between
       Annamarie Trombetta and Dr. Joseph Scelsa ...................... SA2596

       Exhibit 3 to Letter -
       Plaintiff's Communication with Defendants
       for Witnesses ......................................... SA2618

       Exhibit 4 to Letter -
       Problems and Delays Caused by WorthPoint Defendants ..... SA2632

**Table of Contents**
**(Continued)**

**Page**

     Exhibit 5 to Letter -
Plaintiff's Illness Beginning December 7, 2022
into Late January 2023 ........................................................... SA2673

     Exhibit 6 to Letter -
WorthPoint Attorneys 2023 Emailing Plaintiff
Requesting Expert Witness Depositions ............................... SA2676

     Exhibit 7 to Letter -
Ebay Phone Call Transcript .................................................... SA2682

     Exhibit 8 to Letter -
List and Number by Month February to
December 2022 Plaintiff's Problems with Defendants ......... SA2708

Plaintiff's Response to Defendant WorthPoint Corporation's
     Motion for Summary Judgment, dated June 7, 2023 ................... SA2721

**Volume 12**

Exhibits 1-9 to Plaintiff's Response to Defendant
     WorthPoint Corporation's Motion for Summary Judgment ......... SA2759

Exhibit 10 to Plaintiff's Response to Defendant WorthPoint
     Corporation's Motion for Summary Judgment ............................ SA2792

Exhibits 12-18D to Plaintiff's Response to Defendant
     WorthPoint Corporation's Motion for Summary Judgment ......... SA2822

Exhibits 19A-24 to Plaintiff's Response to Defendant
     WorthPoint Corporation's Motion for Summary Judgment ......... SA2857

Exhibits 25A-27 to Plaintiff's Response to Defendant
     WorthPoint Corporation's Motion for Summary Judgment ......... SA2888

Exhibits 28-30D to Plaintiff's Response to Defendant
     WorthPoint Corporation's Motion for Summary Judgment ......... SA2922

**Table of Contents**
**(Continued)**

**Page**

Letter from Jana S. Farmer to the Honorable Sarah L. Cave,
  dated June 8, 2023 ......................................................... SA2947

Opinion and Order of the Honorable Sarah L. Cave,
  dated June 22, 2023 ....................................................... SA2949

Order of the Honorable Laura Taylor Swain, dated July 5, 2023 ....... SA2966

x

**SA837**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

ANNAMARIE TROMBETTA,

                              PLAINTIFF,

            -against-      Case No:

                          18-cv-0993 -RA-SLC

NORB NOVOCIN, MARIE NOVOCIN, ESTATE

AUCTIONS, INC., WORTHPOINT CORPORATION,

WORTHPOINT.COM and JASON PECKER,

                              DEFENDANTS.

------------------------------------------X

                    DATE: September 21, 2022

                    TIME: 10:05 A.M.

            VIRTUAL EXAMINATION BEFORE TRIAL

of the Defendants, NORB NOVOCIN and ESTATE

AUCTIONS, INC., taken by the Respective

Parties, pursuant to a Notice and to the

Federal Rules of Civil Procedure, held at

the above date and time, before Marlene

Fitzgerald, a Notary Public of the State of

New York.

**SA838**

**Page 2**

A P P E A R A N C E S:

ANNAMARIE TROMBETTA
        Plaintiff Pro Se
        175 East 96th Street, 12-R
        New York, New York  10128


DUFF LAW, PLLC
        Attorneys for Defendants
        NORB NOVOCIN, MARIE NOVOCIN and
        ESTATE AUCTIONS, INC.
        4310 Crescent Street
        Long Island City, New York  11101
        BY: ANDERSON DUFF, ESQ.


WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER,
ESQS.
        Attorneys for Defendants
        WORTHPOINT CORPORATION,
        WORTHPOINT.COM and JASON PECKER
        150 East 42nd Street, 23rd Floor
        New York, New York 10017
        BY: JANA FARMER, ESQ.
        BY: ADAM BIALEK, ESQ.
        File #: 19701,00006

ALSO PRESENT:
        MARIE NOVOCIN
        ROBERT SCHMIDT

            *         *         *

**SA839**

**Page 3**

F E D E R A L     S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*     *     *     *

**SA840**

Page 4

N. NOVOCIN

N O R B   N O V O C I N, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MS. FARMER:

Q.    Please state your name for the record.

A.    Norbert William Novocin, Jr.

Q.    Where do you reside?

A.    ██████████████████

██  ████████████  ██████

MS. TROMBETTA:  I plaintiff, Annamarie Trombetta am requesting a copy of the September 21, 2022 deposition with Estate Auctions, Inc., Marie and Norb Novocin on Wednesday.

MS. FARMER:  If anybody has trouble hearing me, please raise your hand or speak up.  Wave at me. Because we are on Zoom today, we need to make sure that everybody is heard and sometimes if the video slows

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 5 of 247

Page 5

N. NOVOCIN

down, that might be an issue.  So at all times, if somebody with cannot hear me, please let me know.

Q.    Mr. Novocin, good morning. Thank you for being here today.

A.    Good morning.

Q.    My name is Jana Farmer.  I am an attorney with the law firm of Wilson, Elser, Moskowitz, Edelman & Dicker.  Our law firm represents defendant Worthpoint Corporation in the lawsuit that is brought by Annamarie Trombetta.  It is against Worthpoint Corporation, yourself, Marie Novocin and Estate Auctions, Inc.  I'm here today to ask you some questions in relation to this lawsuit.  Before we start, I will give you some instructions about how this proceeding works.  First I will ask you a question.  Have you ever been deposed before in a deposition that we are doing here today?

A.    I have been.

Q.    You have been?

A.    Yes.

Page 6

N. NOVOCIN

Q.    So you are probably familiar with how the deposition works, but I will just give you a refresher.  Miss Marlene Fitzgerald is here today.  She is our court reporter.  She will be writing down everything we say, so it is important for me to finish my question, pause and for you to answer, pause, so we don't talk over each other.  Otherwise Miss Marlene will absolutely hate us because it's difficult to type with two people talking.  Okay?

A.    Understood.

Q.    The other part is that we need to make certain that and especially is true for you, because you will be answering, to keep your answers verbal.  As humans, we sometimes nod our head or shake our head or we can sometimes say uh-huh or uh-uh in response to a question.  Again, Miss Marlene would not appreciate that because it is impossible to read on the transcript. Could you please keep your answers verbal?

A.    I will try to do that.  If I make a mistake, let me know and ask me to

**SA843**

```
                                            Page 7
                      N. NOVOCIN
repeat it.
     Q.     Absolutely.  We have five other
people in the room, so we will collectively
remind you.  We are also human, so
sometimes we forget and don't react.  We
will all do our best.  How is that?  We
want to keep the proceeding fair at all
times.  If I ask you a question and you do
not understand the question, I ask that you
please let me know.  I'll be happy to
rephrase it, break it down or otherwise
help make the question understandable to
you.  However, if you don't say anything
and you begin to answer, I'm going to
assume that you understood the question
because you answered it.  Is that fair?
     A.     That is fair.
     Q.     Finally, you have a right to
have a break in this deposition at any
point for any reason, with one exception.
If I just asked you a question, we ask that
you please answer the question first and
then you can go take a break.  Is that
okay?
```

Page 8

N. NOVOCIN

A.    Yes, it is.

Q.    Mr. Novocin, is there anything that prevents you from testifying truthfully today, such as medications; you didn't sleep last night; you are very tired, something like that?

A.    No, there's not.

Q.    I'm now going to ask you some background questions.  Mr. Novocin, what is your highest level of education?

A.    Some college.

Q.    Can you tell us which college did you attend?

A.    I attended Valley Forge Christian College in Phoenixville, Pennsylvania.  I also attended South Eastern Bible College in Lakeland, Florida. I also attended Jones College in Jacksonville, Florida.

Q.    Can you tell us what areas of study did you pursue in these colleges?

A.    In the two bible colleges, it was bible related areas.  In the Jones College, it was business related areas.

Case 1:18-cv-00993-LTS-SLC     Document 425-2     Filed 04/17/23     Page 9 of 247

Page 9

N. NOVOCIN

Q.    Have you ever taken any art history courses?

A.    No, I have not.

Q.    How about any other art related courses, for example, studio art or any others?

A.    My mother was a professional artist, all the way through my life.  I was trained on everything from macrame to Chinese ink block to water colors to oils. She chose something different every week. The one I hated the most was crumpled up tin foil in a pencil paper and with the crumpled up tin foil.  I was not the artist that she was.

Q.    So you have live training?

A.    Yes.

Q.    Just to be clear, do you have any formal training in college in art?

A.    No, I do not.

Q.    Have you ever taken any formal courses, maybe not in college, maybe somewhere else, in how to do art or attribution?

Page 10

N. NOVOCIN

A.   No, I was not.

Q.   At some point in your life, you have sold things on Ebay, correct?

A.   That's correct.

Q.   In order to do that, have you taken any courses, college, somewhere else, maybe even through your Ebay or some other organization on how to sell things on Ebay?

A.   I didn't know how to sell things on Ebay.  It was put on Ebay by Ebay University.  When I got there, I knew more what was going on that they did.  I was teaching courses in the back of the classroom.  They wanted practical stuff.  They were teaching them how to copy and paste, silly things.  I have not had any formal training, other than the one course from Ebay.

Q.   At some point in your life, have you come across an organization called askART?

A.   Yes, I have come across askART.  I have been using them steadily since 2001.

Q.   How did you come about to start

Page 11

N. NOVOCIN

using their service?

A.    In trying to research various paintings, drawings and so forth on line, came across it.  It was a subscription based company.  We actually signed up with them at that point and continued with them steadily through now.  Literally at one point when I had employees, they contacted me and said we were the biggest user of askART in the world, because the museums, galleries or anything else, we had more contact with them than anything else.  We are no longer the largest user of askART. It's just my wife and I now.

MS.  FARMER:  Marlene, my internet might have cut out for a bit.  After the word employees that Mr. Novocin just used, can you please read back to me the rest of his answer.

(Whereupon, the referred to answer was read back by the you Reporter).

Q.    Mr. Novocin, you mentioned that

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 12 of 247

Page 12

N. NOVOCIN

you had employees.  Just for the record, as part of which organization did you have employees, if any?

A.    Estate Auctions, Inc. had employees.  We had -- yeah, employees through the Estate Auctions, Inc.

Q.    Are you currently affiliated with this company?

A.    The Estate Auctions, Inc. was defunct in the end of 2002.

Q.    At the moment, are you employed in any capacity?

A.    I continue to work for myself for the company YQZ Inc., also selling on Ebay.

Q.    As part of your current experience, are you continuing selling, let's say art and collectibles on Ebay?

A.    Yes.

Q.    Is Estate Auctions, Inc. a company that you yourself established?

A.    Yes.

Q.    Was that together with your wife?

Page 13

N. NOVOCIN

A.    Yes.

Q.    Could you please tell us the full name of your wife.

A.    Marie Ellen Novocin.

Q.    When did you establish Estate Auctions, Inc.?

A.    Technically, we started selling on Ebay in October of 1998 under the name N-N-O-R-B.  Then Estate Auctions, Inc., we incorporated -- we changed the name from N-N-O-R-B to Estate Auctions, Inc. on August 29, 2001 and we incorporated in the State of Florida that very same day, August 29, 2001.  We had a Florida corporation until March 23, 2012 when we became Estate Auctions, Inc. under the State of Delaware. We stayed under Estate Auctions, Inc. as a corporation, subchapter S Corporation until the following year, July 15, 2013, when we changed the name to Estate Auctions LLC. We remained under that until the end of 2018 when we let it go defunct.

Q.    Thank you for that detailed answer.  You have an excellent memory to

**SA850**

Page 14

N. NOVOCIN

dates.  You mentioned that there were employees in Estate Auctions, Inc.  Can I ask you, in 2012, did you have any employees as part of Estate Auctions, Inc.?

A.    Yes, I did.

Q.    Do you recall how many?

A.    I am going to name them.  It's easier to count in my head.  There's myself, my wife Marie.  We had Mike Miller. We had a gentleman named Dave Humphrey.  We had a gentleman named Richard Thomas.

Q.    That's five?

A.    Yes.

Q.    Anybody else you can remember who worked for Estate Auctions, Inc. that year?

A.    We had our children working for us also, which would be Juda (phonetic) Novocin, Casey Novocin.  Both minors at that time.

Q.    Are they still minors?

A.    And our non-minor child at that time was Andy Novocin.  He was also working for us.

Page 15

N. NOVOCIN

Q.     Mr. Novocin, just to confirm, your children Juda and Casey, are they currently minors?

A.     No.

Q.     The reason I ask, if they were minors, we would redact their name on the transcript, but we don't do that for adult witnesses.

A.     Okay.

Q.     Just for the record, what was the nature of Estate Auctions Inc.'s business?

A.     I'll first give the funny answer.  We buy junk, we sell antiques.  We would go out to auctions and acquire items or take items on consignment and then we would sell them on Ebay.  We didn't sell them anywhere else on Ebay unless we couldn't get enough for it on Ebay.  Then we would send it off to live auction to recoup something we paid for it.

Q.     You just mentioned the phrase live auction.  Is that a brand name or are you referring to an auction that takes

Case 1:18-cv-00993-LTS-SLC  Document 425-2  Filed 04/17/23  Page 16 of 247

Page 16

N. NOVOCIN

place in real life?

A.    I'm referring to an auction that takes place in real life.

Q.    Were there any particular live auctions that you preferred to use?

A.    No.  We had a large number of different auctions.  I would say probably under ten, so I guess -- yeah, ten particular auctions or somewhere in there that we would use to acquire items.  Then to dispose them, we at that time, we were just using one auction to dispose them.

Q.    Mr. Novocin, prior to forming Estate Auctions, Inc., did you have any prior employment?

A.    Yes.

Q.    Was any of your prior employment in any way connected to art?

A.    No.

Q.    How about collectibles?

A.    No.

Q.    How about selling on Ebay?

A.    No.

Q.    If not employment, did you

Page 17

N. NOVOCIN

previously affiliate with any company that was selling art collectibles?

A.    No.

Q.    How did you and your wife decide to start Estate Auctions Inc.'s business?

A.    We were in a company that was a printing company and I separated from that company and it was six weeks before -- three weeks before Christmas, six weeks before our youngest child was born.  We had no income.  We were trying to figure out what in the world we are going to do.  We decided let's try this Ebay thing.  All we had left in the world was about $50.  We went out to yard sales with that $50 to see if we can buy enough stuff to resell it and make some money.  We made $500 on that 50.  We said okay, let's do this again.  So we started to do that and we have been doing Ebay ever since.

Q.    Once you started working with Ebay, did you have to get experience in how to research art and collectibles?

**SA854**

Page 18

N. NOVOCIN

A.     No.   I didn't have to get experience on that, but I have always been good at researching.

Q.     How did you get started in researching the background on let's say art work that you were putting up for sale on Ebay?

A.     I would start to look on line to see if I could find any information about an artist, a style.  Whether it be a sculpture, a painting, a drawing.  Find everything I could on it and just research what I could and come back with that.  Any tool I could use, I would use on line.

Q.     You were very proficient as an online researcher?

A.     That's correct.

Q.     I don't think I asked you before.  Did you have any formal training in online research?

A.     No formal training, but I did own a company at one time called RE Search Incorporated that did research for people. That was a number of years before that.

Page 19

N. NOVOCIN

Q.    As part of your affiliation with that company, did you need to learn how to do research on line?

A.    That was before the internet.

Q.    Then as part of your affiliation with that company, did you need to learn how to do research in general, the methodology, the typical principles of research, anything like that?

A.    Yes.

Q.    Once you started Estate Auctions, Inc., were you able to transition some of your skills that you acquired with RE Search Incorporated into your new endeavor?

A.    Yes.

Q.    Specifically for online search, were your experience essentially acquired from hands-on work when researching art and collectibles or did you pursue any additional courses of study in that or something else?

A.    It was from hands-on work.

Q.    We mentioned that you were

Page 20

N. NOVOCIN

using askART previously and that you joined them as a member. Were you paying them for membership, I assume?

A.    Yes.

Q.    Did askART offer any particular benefits to the members?

A.    It allowed us access to their database and seeing pictures that were of various artists that have sold. Finding out what pieces had sold that, biographies and any other information you could about the list of artists that they had included in their database.

Q.    So askART is essentially a database for artwork and artists, correct?

A.    Correct.

Q.    They list some of their previous sales prices for some of the artworks, for all of the artworks that they have, right?

A.    They do, for many artists.

Q.    In your experience, are there any artists that are not on askART?

A.    There are tons of artists that

Page 21

N. NOVOCIN

are not on askART.  Tons being a relative term.

Q.    So if an artist is not on askART, there is a possibility that an artist is practicing, but they didn't make it to askART, correct?

A.    Correct.

Q.    When you used to research artists and their artwork, would you limit yourself to askART or would you check other research, other resources?

A.    It depended on what I found on askART.  If I had enough information to put a listing on askART, that's all the further I would go.

Q.    You mentioned that askART contains biographies of artists?

A.    Quite often.  Not always.

Q.    If there was a biography of an artist on askART, would you go and research if there was a biography of the artist on any other research?

A.    No.  Can I rephrase that?

Q.    Yes, please.

Page 22

N. NOVOCIN

A.    Okay.   Not normally.   Sometimes when askART, they would have a biography and I would go -- I would to myself think this is not a good write-up, it obviously came from all sort of sources.   Then I would go out and look for something that sounded better.   It may come from Wikipedia, from another site and I would see if there was something else.   That happens periodically.   Not a lot, but periodically.

Q.    When you were offering items for sale on Ebay and if you could identify an author, an artist or a maker of the item, was it costly for you to include some makers, artists or authors and their biography in your listing?

A.    Yes.

Q.    When you joined the membership of askART, did you review the terms and conditions?

A.    No, but I did initially.   The thing on the bottom says I have read all your terms and conditions that you get with

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 23 of 247

Page 23

N. NOVOCIN

every web page.

Q.    As you sit here today, do you know whether or not you were required to ask anybody's permission or secure a license in order to, let's say, copy information from askART?

A.    No.

Q.    As you sit here today, were you under the impression that you were free to use the contents of the bios that appeared on askART in order to include them in listings?

A.    Yes.

Q.    Have you ever indicated on any of listings that a biography came or the information about the artists biography came from askART?

A.    Yes.  I do that on every listing that I try and get things from askART.  I tell where the biography came from.  If askART says where it came from, I include that also.  I always try to attribute.

Q.    Sir, do you know the company by

**SA860**

Page 24

N. NOVOCIN

the name Worthpoint?

A.    Yes.

Q.    Do you know what the nature of their business is?

A.    Yes.

Q.    Is that a similar organization to askART in terms of being a database for artwork, for possible art work?

A.    I see it more of a database for past sold things on Ebay and other auctions.

Q.    To your knowledge, does Worthpoint actually offer anything for sale?

A.    No.

Q.    Sorry to clarify.  You don't know or no, they don't offer?

A.    No.  I am not aware of them ever offering anything for sale.

Q.    Are you familiar with a painting titled "Man With a Red Umbrella", which was a 1972 oil, which I believe was sold on Ebay in 2012?

A.    I am.

Page 25

N. NOVOCIN

Q. Give me a second. I'm going to share may screen and show you the first exhibit of today.

MS. FARMER: Marlene, we will mark this Defendant's Exhibit 1 of today's date.

(Whereupon, the aforementioned document was deemed marked as Defendant's Exhibit 1 on this date, by the Reporter).

Q. Mr. Novocin, I'm showing you what's been marked as Defendant's Exhibit 1 of today's date. It is a four page pdf document. I currently have it zoomed in at 12.5 percent because it's very large. I will first scroll through the entire document so you can see the whole thing. That is the entire document. Mr. Novocin, would you like me to stay on this 12.5 percent resolution or should I magnify the document?

A. Fine. You can leave it.

Q. Mr. Novocin, is this the painting that you know to be titled "Man

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 26 of 247

Page 26

N. NOVOCIN

With a Red Umbrella, 1972 oil"?

A.    Yes.

Q.    Did Estate Auctions, Inc. sell this painting on Ebay?

A.    Yes.

Q.    Do you recall when the sale occurred?

A.    It was in 2012.  I think it was December, December 1st.  Something like that.

Q.    How did Estate Auctions, Inc. receive this painting or acquire this painting in order to sell it on Ebay?

A.    We were given the opportunity to clean out the attic of an antique mall in Chicago that was going under or trying to close under.  It was like a second or third contact that someone said, if you just come and get this stuff, you can sell it all.  This painting was in the attic. In checking with the person later on, it was something that was in one of the mall booths that the person did not pay their rent and therefore, the mall owner kept it

Page 27

N. NOVOCIN

all, stuck it all up in the attic, which is
where most in the stuff in that attic came
from.

Q.    You just mentioned the phrase
checking with the person later on.  Do you
recall the name of that person that you
checked with?

A.    Let's see.  I think I would
have probably referred with my wife --
conferred with my wife and that would have
been -- I can't think of anything, anyone
else that I would have.

Q.    When you were given the
opportunity to clean out the attic, were
the items that you looked in that attic
given to you as a gift; were they consigned
to you or was there some other arrangement
in price?

A.    They were consigned to me.

Q.    Did you have an arrangement to
pay any compensation to the consignee if
and when any of the items were sold?

A.    Yes, I did.

Q.    Do you recall whether or not

Page 28

N. NOVOCIN

this compensation arrangement was based on a per item basis or was it on a volume of sales or something else?

A.     Per item basis.

Q.     Was the compensation paid after the sale of Man With A Red Umbrella painting?

A.     Yes.

Q.     Do you have any records showing to whom the compensation was paid?

A.     No records.

Q.     We mentioned that the painting was sold likely in December, maybe December 1st of 2012.  Do you recall when did you first acquire possession of the painting?

A.     I'm not exactly sure.  Probably was in about two months prior to that.  It was wet and cold in Chicago when we were there.  So it wasn't summer, hot and steamy, so I'm guessing fall in Chicago.  I remember that.

Q.     When you first acquired possession of this painting, what condition was it in?

Page 29

N. NOVOCIN

A.    The same as when we sold it.  I didn't look at the condition and try to figure out what type of condition it was in.  We just put it in the truck and brought it back home.

Q.    I was more asking, do you recall what was the condition?  Was it in good condition; was it poor; was it damaged in any way or something else?

A.    It was in the same condition as when we sold it.  I know from when I wrote the description, that there was a tear in it and I noted that tear, but other than that, it was in a condition of a normal painting.

Q.    The images that are shown in Defendant's Exhibit 1, do you know who took these images?

A.    No, I do not.

Q.    Are you familiar with the contents of these bates stamps?

A.    Of what?

Q.    Of bates stamps, B-A-T-E-S.

A.    No.

**SA866**

Page 30

N. NOVOCIN

Q.     Just so that you know what I am talking about.  Give me one second.  Do you see this number EAI000054?

A.     Yes.

Q.     So in attorney language, that's what we refer to as bates stamps.  What it's usually used for is when a party in litigation produces any documents, we put stamps on it so that everybody in litigation knows which side produced it and number consecutively, so we are not missing that that side produced.

A.     Okay.

Q.     I will represent to you these documents are from the production that your attorney, Mr. Duff produced to the parties in this litigation.  Do you know as you sit here, and the caveat is, I'm not asking you about any conversations that you might have had with your attorney, Mr. Duff, do you know how Mr. Duff may have received these pictures?

A.     Oh, absolutely.

Q.     How did he get them?

**SA867**

Page 31

N. NOVOCIN

A.     I sent them to him.

Q.     Do you recall, how did you get these pictures?

A.     Yes.  The person who --

Q.     How?

A.     The person that we sold the painting to had since disbursed the painting, whether she sold it or gifted it to someone else.  I called her up and asked if she would be willing to take pictures of the photo, being as we had no more -- no longer had any photos of it.  She made arrangements to have that taken.  The reason I don't know who took the painting, the photos of it is I don't know who she gifted it to and I assume that's who took the photos because it's in her or his house.  So they took the pictures and the photos and they e-mailed them to the -- that person, the person who bought the painting from us and then they e-mailed them to us, they were in a large format and I reduced them down to a smaller size that was more susceptible to being able to

Page 32

N. NOVOCIN

e-mail to Mr. Duff and that's probably where the EAI came from us, Estate Auctions, Inc., 000054.  That's how we got them.  We reduced them and sent them onto Mr. Duff.

Q.    Mr. Novocin, do you recall the tear in the painting that you mentioned? Where on the painting was it located?

A.    It was located if I recall correctly, on the left-hand side just about even with the knee or something of that nature.

Q.    We are looking right now at the photograph on the painting and I have is magnified at 50 percent.  The screen is about the knee level of the tear depicted in the painting.  Mr. Novocin, can you see the tear in this image?

A.    No.

Q.    To your knowledge, was this painting ever restored?

A.    No, it was not.

Q.    Does the image or do the images in Defendant's Exhibit 1 fairly and

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 33 of 247

Page 33

N. NOVOCIN

accurately represent the condition of the painting as it was when you sold it?

A.    Yes.  It was probably reframed.

Q.    Mr. Novocin, when you say probably, I take it you are guessing, correct?

A.    That's correct.  I don't remember the frame, but when I asked him to take pictures of them, the painting, I then went back later and asked them to take pictures of the back of the painting.  The back of the painting at that time was covered in brown paper.  It was not covered in brown paper when we sold it, so therefore, my head says the reason they were covered in brown paper, they took it to a framer, they framed it.  They quite often will seal the back in brown paper when they frame it.

Q.    When you asked the purchaser of the painting to send you the pictures of the painting, did you also ask for the pictures of the back?

A.    Not initially, but I went back

Page 34

N. NOVOCIN

and asked them for pictures of the back again and they again cooperated and got me pictures of the back.

Q.   So you did receive the pictures of the back?

A.   Yes.

Q.   I'm going to now show you our next exhibit for today.

MS. FARMER:  Marlene, let's mark this exhibit as Exhibit 2 of today's date.

(Whereupon, the aforementioned photograph was deemed marked as Defendant's Exhibit 2 on this date, by the Reporter).

Q.   Mr. Novocin, I'm showing you a pdf document that consists of nine pages. It is currently shown at 25 percent.  I will first scroll through the entire document to let you see it in its entirety and I will then return to first page and you can tell me if you would like me to magnify any page further, Mr. Novocin.

A.   That's okay.

Page 35

N. NOVOCIN

Q.    Remember, we need to keep those answers verbal.  Mr. Novocin, did you have a chance to review the whole entire document with me just now briefly?

A.    Yes.

Q.    Are these the photographs of the back of the painting that you received from the purchase of the painting?

A.    That is.

Q.    As I just showed you the images, do you believe I'm missing any of the images that you may have received from the purchaser?

A.    I do not.

Q.    We are currently on the first page, and for the record, it does have a bates stamp number which is EAI000011.  Mr. Novocin, are you able to make out the writing that appears on the wooden frame pictures in this photograph?

A.    I can make out some of it.  It looks like it says, "Annamaria Trombetta, painted 1972".

Q.    When you had possession of the

Page 36

N. NOVOCIN

painting Man With a Red Umbrella, do you recall seeing this writing on the back of the painting?

A.   Yes.   For the record, it was on the stretcher.   Not the actual painting.

Q.   Mr. Novocin, I'm showing you page 2 of Exhibit 2, which is a different view of the back of the stretcher that we are discussing.   Do you see additional writing on this picture?

A.   Yes.

Q.   What does this additional writing say?

A.   The additional writing looks like it says, "Gifted 1977".

Q.   Gifted 1977?

A.   Yes.

Q.   Let us just review slowly the rest of the pictures to see if you notice any additional writing on any of those.   On page 3, do you see anything additional?

A.   No.

Q.   On page 4, anything additional?

A.   No.

Page 37

N. NOVOCIN

Q.   On page 5?

A.   No.

Q.   Page 6?

A.   No.

Q.   Page 7?

A.   No.

Q.   Page 8?

A.   No.

Q.   And page 9?

A.   No.

Q.   In fact, this seems to be just different views of the same writing, correct?

A.   Correct.

Q.   From your memory of the painting when you had possession of it, did the stretcher have any other writing on it?

A.   No.

Q.   From your experience, what is the importance of a writing being on the back of the stretcher as opposed to the painting itself, if any?

A.   It helps us to understand what the signature was on the front.  In other

Page 38

N. NOVOCIN

words, the signature on the front of the painting was a garbled and it was kind of hard to read, when you turn it over, it had printed out what it was and if it were up to me, I would make it almost a law that all the artists had to print out the actual name and so forth.  Because some artists pictures are so, so hard to read.  So this allowed us to be able to look up Trombetta, Annamarie.  This one says Maria.  I didn't remember it saying Maria, but that's how I looked it up.

MR. BIALEK:  Marlene, can you read back the beginning of his answer.

(Whereupon, the referred to answer was read back by the Reporter).

Q.    Mr. Novocin, in your practice of dealing with antiques, have you ever encountered any ratings or stamps or labels glued to the back of the painting?

A.    Yes.

Q.    In your experience, is there

Page 39

N. NOVOCIN

any difference in, meaning as far as where such writing, label or sticker or stamp is placed, let's say back in the painting on the stretcher?

A.   I'm not ignoring it.  Sometimes there will be a label that has to do with the actual framing of it or the actual manufacturer of the stretcher that would be on the stretcher.  Sometimes there would be information about the canvas itself.  If it's produced by the artist, it really doesn't matter too much if it's on the stretcher or the canvas, but it would be something where you would have to verify that it is from the artist.

Q.   If a gallery was involved in the marketing of the artwork, would it be typical for an artwork to have a gallery stamp label in the back?

A.   Sometimes.  Not always.

Q.   When you examined this painting, Man With a Red Umbrella, because of the writings and labels that were and were not there, did you have an impression

Page 40

N. NOVOCIN

this was not perhaps sold by a gallery?

A.    I would not have expected this to have been sold by a gallery.

Q.    Is it typical for a painting sold by a gallery to have handwritten notes on a stretcher?

A.    Sometimes it will have handwritten notes on a stretcher.  Normally handwritten notes on a stretcher is not put on by a gallery.  They are normally put on by the artist or someone prior to that. Maybe a previous owner.

Q.    As you sit here today, do you have knowledge on who exactly put this writing on the back of this particular painting?

A.    No, I do not.

Q.    If we go back to Exhibit 1 for a moment.  Mr. Novocin, you mentioned that there was a signature on the front of the painting.  I am currently showing you page 1, Exhibit 1.  I'm going to magnify it to 100 hundred percent and show you the bottom of the painting.  Do you see the bottom

Page 41

N. NOVOCIN

right-hand corner of this painting?

A.    Yes.

Q.    Does that appear to contain a signature?

A.    Yes.

Q.    Was this the signature that you testified earlier was difficult to make out?

A.    Yes.

Q.    Incidentally, just for the record, did you put any writing on that painting yourself?

A.    No.

Q.    To your knowledge, did anybody associated with Estate Auctions, Inc. put any writing on that painting?

A.    No.

Q.    When you examined this painting for the first time, did you make any notes about it for yourself?

A.    No.

Q.    When you put up this painting for sale on Ebay, did you yourself take any photographs of it in order to post it on

Page 42

N. NOVOCIN

Ebay?

A.    No.

Q.    Did somebody else at Estate Auctions, Inc. take such photographs?

A.    Yes.

Q.    Is Estate Auctions, Inc. currently in possession of any such photographs?

A.    No.

Q.    You mentioned that Estate Auctions, Inc. is currently a defunct entity; is that right?

A.    Correct.

Q.    That's a hypothetical.  If Estate Auctions, Inc. had records previously, where would they currently be kept, if at any location?

A.    We kept them on the cloud, which is a cloud for a server at a location outside of our own property.  We still keep records of photos and everything else on a server outside of our own property, but a few years ago, long after 2012, we were notified by a company that kept all of our

Page 43

N. NOVOCIN

records that we had grown too large and they were going to shut us down.  So we shut that server down and started a new one and in the process, lost all of the previous records we had on the cloud.  So we no longer had records to be able to go back and get and unfortunately, the cutoff for it was, like, two weeks after this went onto the cloud.  So it was like in 2012. The end of December is when that cutoff of us saving it went forward.

Q.    Do you remember whether or not the Estate Auctions, Inc. listing of this painting contained a close-up picture of the signature on this painting?

A.    It did.

Q.    Mr. Novocin, compared to the other items that you acquired from antique mall, was this painting, Man With A Red Umbrella a more valuable item, a less valuable item as others, somewhere in the middle, something else?

A.    It was run of the mill.  These things we sold from out of that auction

Case 1:18-cv-00993-LTS-SLC   Document 425-2   Filed 04/17/23   Page 44 of 247

Page 44

N. NOVOCIN

house -- not auction house, that antique mall sold anywhere from just a few dollars upwards to several thousand dollars.  This one sold at 181.  The way we sell on Ebay, we start everything at 99 cents and let it go.  We don't set a price on it.  The customers themselves bidding on it are the ones that actually drive the price.  I never know what things are going to sell at.

Q.    From your memory, there were other items from this antique mall that sold for several thousands, correct?

A.    There were some items that sold for several thousands.

Q.    I know you mentioned that you did not take the images for the Ebay listing, but do you know what camera was used to take the images?

A.    Probably not.  I am not sure if it's a current camera that we are using. We go through a lot of cameras.  We have literally have shot millions of photos and so cameras wear out and we change cameras

Case 1:18-cv-00993-LTS-SLC   Document 425-2   Filed 04/17/23   Page 45 of 247

Page 45

N. NOVOCIN

and the style of camera we use changes as necessary. I'm not sure which camera we were using at that time.

Q. As you sit here today, do you know if you are still in possession of the particular camera, even though you don't know which one, that may have taken these images?

A. I'm going to say no.

Q. As you sit here today, do you have knowledge whether or not you have the memory card or film that was used to take photographs of this painting?

A. No.

Q. I wanted to follow up with you on your pricing on Ebay. You mentioned that some of the items sold for several thousands, correct?

A. Correct.

Q. When you would look at the item, would you ever have an idea that it might be worth several thousands before it sold?

A. Sometimes.

Page 46

N. NOVOCIN

Q.    For such items, is it still your strategy to list them at a starting price of 99 cents?

A.    Yes.

Q.    So there's no exceptions, everything goes at 99 cents?

A.    Correct.

Q.    Do you ever pull any items down from Ebay if you were not, let's say, receiving the bids that you expected to receive?

A.    No.

MS. FARMER:  Miss Marlene, could you please mark this document as the one page pdf as Defendant's Exhibit 3 of today's date.

(Whereupon, the aforementioned photograph was deemed marked as Defendant's Exhibit 3 on this date, by the Reporter).

Q.    Mr. Novocin, I'm showing you what has been marked as Defendant's Exhibit 3 of today's date.  For the record, it is a one page pdf document with a bates stamp

Page 47

N. NOVOCIN

EAI000024.  I'm showing it to you at 150 percent and I have just scrolled from the top to the bottom of the document.  Mr. Novocin, my question to you is, does this image depict the signature that appeared on the painting Man With A Red Umbrella?

A.    Yes.

Q.    Is this one of the photographs that was included in Estate Auctions Ebay listing for that painting?

A.    Yes.

Q.    Sir, how do you know that?

A.    Because if there's anything that we have seen over and over is this signature.  It came off of Worthpoint.  It's the only signature or only picture that survived on Worthpoint.  Why, I don't know.  That's how we know.  It just was there.

Q.    Let me just follow up with you on that.  So as far as you know, you testified that Worthpoint doesn't sell any paintings, correct?

A.    Correct.

Page 48

N. NOVOCIN

Q.    Do you understand that after this painting was sold on Ebay, Worthpoint acquired information as far as the sale results for this painting; is that right?

A.    Correct.

Q.    Do you know Worthpoint to license the right to use the past Ebay sales results in order to post them on the database?

A.    I don't know anything about Worthpoint's licensing.

Q.    Do you know them to post information about past Ebay sales?

A.    Yes.

Q.    Incidentally, have you ever been a paid member of Worthpoint?

A.    Have I been paid by Worthpoint? No.

Q.    Have you been a paid member? Such as you were a member of askART, did you also join Worthpoint as a member?

A.    Yes.

Q.    Do you or your company remain a paid user of Worthpoint to this day?

Page 49

N. NOVOCIN

A.    Yes.

Q.    Do you see that there is an Ebay logo that's appearing in the bottom left-hand side corner of this exhibit?

A.    Yes.

Q.    Do you know why this logo is here?

A.    My assumption is that they got it off of Ebay.

Q.    In your experience doing Ebay sales, would Ebay typically place the logo on any photographs and upload it as part of the listing?

A.    I do not recall seeing their Ebay logo on photos that have been listed. I mean, I can look at mine right now to find out on a computer, but I don't recall them putting their logo or any photos that I have uploaded into a listing.

Q.    Do you know if they would add a banner or a footer to any images in order to add their logo?

A.    I'm not aware of them doing that.  Now, that's not to say that they

Page 50

N. NOVOCIN

might not, that they might do that when they are selling the information to a database service like Worthpoint. They may add it there so they acknowledge where it came from. As far as what I've seen on Ebay for the items that I sell, I don't ever recall seeing them add a footer onto it.

Q.    Have you as a paid member of Worthpoint previously seen a notation, copyrighted work licensed by Worthpoint on any of the images on Worthpoint's website?

A.    I haven't really looked for it, so not that I'm aware of. It maybe on all of them, but I have not really looked for it.

Q.    You mentioned in your earlier answer a few answers ago that this particular image with Ebay logo, the copyright notice, it came from Worthpoint. Do you mean that at some point after the Ebay sale, the information about this listing appeared on the website?

A.    Yes.

Page 51

N. NOVOCIN

Q.    Do you mean this image appeared on Worthpoint's website together with a listing of the painting Man With A Red Umbrella?

A.    Correct.

Q.    Have you ever personally seen the Worthpoint listing when it was up on Worthpoint's website?

A.    Can you rephrase that, please.

Q.    At some point the listing appeared on Worthpoint's website, correct?

A.    Correct.

Q.    Did you personally see it on Worthpoint's website as opposed to a printout or somebody sending you an e-mail on about that?  Did you personally go to Worthpoint's website and saw Man With A Red Umbrella on it?

A.    No.

Q.    So when we look at this image and you say it came from Worthpoint, are you going by the notation at the bottom of this document?

A.    I would go by -- I would say

**SA888**

Page 52

N. NOVOCIN

yes.

Q.     Again, this document shows the signature and I think you testified earlier that you did not find it legible when you first saw the painting, correct?

A.     Correct.

Q.     When you looked at the back of the stretcher and you saw the words Annamarie Trombetta that we discussed earlier, did it help you interpret what the signatures may have read?

A.     It certainly interpreted the last name.  I couldn't do anything for that first initial.

Q.     Taken together with the information on the bottom, how did you determine who may be the artist?

A.     You have to rephrase that.  I'm sorry.  You are going to have to rephrase that.  You got gunked [sic] up on the internet.

Q.     Actually, give me one second. I have someone mowing the lawn outside of my window.  I'm going to try to shut the

Page 53

N. NOVOCIN

window.

MR. DUFF:  Can we take a quick break.

(Whereupon, a short recess was taken).

Q.    Mr. Novocin, did you compose the Ebay listing for Man With a Red Umbrella?

A.    Yes.

Q.    Were you the one who determined that this painting was attributed to Annamarie Trombetta?

A.    Yes.

Q.    How did you research this particular painting and this particular attribution?

A.    Once I saw the name on the back, I went to askArt.  I put in the name Trombetta and Annamarie came up.  It's an unusual name.  I have never come across it before.  I did not -- I do not remember ever seeing Annamaria on the back of the painting, so I just assumed it was the same person.  Pulled up that person on askART.

Page 54

N. NOVOCIN

I saw it had a biography, but no record of any paintings ever been sold, which I'll just leave it that. There's no records of any painting been sold on secondary market. I grabbed the biography and used that in the listing. Because there was no records of any painting to be sold, I wanted people to be able to associate somebody of value to the painting and so I went out and found another artist on askART that had painted before with umbrellas. I said it's much in the style of and I mentioned that other person. So that way people can look it up and say, oh, it's like that person. They paint with umbrellas also. That way, people do some research on it. They see something of value and I'm willing to spend more money.

Q. You mentioned when you found Annamarie Trombetta's name on askART, that was not associated with any paintings on askART, correct?

A. That's correct. They had no listings and to this day, have no listings

Page 55

N. NOVOCIN

of any paintings have ever been sold on secondary market for Annamarie Trombetta.

Q.    Does askART necessarily receives any information about sales in the primary market?

A.    In other words, first hand, if Annamarie Trombetta sold directly to someone or if an artists sold directly to them?  No, normally they don't have that. They get their information from auction houses and so forth.

Q.    So to your knowledge, in the art market, the auction sales are usually public, correct?

A.    They are something that you can get information from.  They weren't always public, but the auction houses share it with said companies and so forth.  You can find records of when things sold.  Go ahead.

Q.    What I mean is, if you were to attend a public live auction, you would hear what the price that the item went for, right?

**SA892**

Page 56

N. NOVOCIN

A.    Correct.

Q.    If somebody wanted to contact the auction house about that price, they might be able to get that, correct?

A.    They might, yes.

Q.    The primary market, that sells from the artists directly, correct?

A.    Correct.

Q.    For that, it's usually much harder to get information as far as the prices, correct?

A.    I know of nowhere to get that, except directly from the artists.

Q.    So for an aggregate of sales prices, it's more common to have secondary market prices, correct?

A.    Correct.  In fact, until someone has sold something on secondary market, they are not really considered -- I know there's artists that will argue this and so forth.  They are not considered a listed artists.  They may be listed somewhere, but they are not selling on secondary market.  That's where you start

Page 57

N. NOVOCIN

to determine a value of something as secondary market, not the initial sale of the piece.  It's the secondary market that determines what that value is going to be ongoing.

Q.    When you just use the word considered, is there a particular group of individuals or companies that would consider the artists to be listed or not listed?

A.    That's an ongoing joke within the antique and art world.  You will have auctioneers that will say this person is listed and the people out in the audience will say yes, in the phonebook.  There's all sort of places where you can find artists listed or not listed and it all depends on who's doing the research, who is doing the finding on it and what they consider their sources.

Q.    So when you use the terms listed or not listed, you are then referring to the parlance in the auction and antique industry, correct?

Page 58

N. NOVOCIN

A.     Right.

Q.     Other than looking up this name on askART, did you do any further research into Annamarie Trombetta, perhaps another website?

A.     No.

Q.     Did you contact any artists in regard to that painting?

A.     No.

Q.     Was it your practice to ever contact artists in regard to any of the paintings that you may have sold?

A.     Yes.

Q.     Why did you not contact any artists in regard to this painting?

A.     There wasn't a need to.  There was no secondary market.  I couldn't find it anywhere on there.  I had a biography on it.  That's all the more I saw a need for doing it at this point.

Q.     Did you ever see the website of artist Annamarie Trombetta?

A.     To this day I have never been to that website.

**SA895**

Page 59

N. NOVOCIN

Q.    You mentioned that there was a biography of Miss Trombetta on askART.  At the time that you are doing this research, that's somewhere in late 2012, correct?

A.    Correct.

Q.    Do you recall whether or not you copied the entirety of the biography on askART to include any listing or something else?

A.    It happened entirely there.

Q.    Did you edit the biography in any way, shape or form?

A.    No.

Q.    In this listing, did you say that the biography was obtained from askART?

A.    Yes.

Q.    Earlier in the deposition you mentioned that if askART refers to a different source, you might also refer to the source that askART refers to.  So my question to you is, do you recall, did askART give a source of where they may have received the biography from?

Page 60

N. NOVOCIN

A.     Yes.

Q.     What did they say?

A.     They said they obtained it directly off of the artist's website.

Q.     Did you also include that as part of the listing?

A.     Yes.

Q.     You mentioned that since you personally did not go on the website, I assume you did not verify that was correct what askART said, correct?

A.     Correct.

Q.     Do you know if anybody else at Estate Auctions went on Annamarie Trombetta's website, if there was any, I'm not saying there was or wasn't, to check if the biography on the website matched the one on askART?

A.     No one here would have.

Q.     Besides trying to determine the artist for the artwork, are any additional criteria, if any, that you would look for in order to compose a listing for Ebay?

A.     When I compose a listing for

Page 61

N. NOVOCIN

Ebay, I do what I call finding a hook to hang my hat on. What story am I going to tell that's allows people to dig deeper into their wallet to spend more money. I have to make it interesting to people. People don't buy something with just a straight fact. In this case, when I looked on askART and there was no samples of other paintings there, I went out and found an artist that had value that I can refer it to, which is what I did within the listing. I did that prior to the biography. The biography is almost always added at the end of the listing as, here's the biography of the artist. So before that, I actually did that. So I'm looking for something to hang my hat on that will bring value to something.

Q. Since there was no listings with Annamarie Trombetta on askART, what was your view as far as value of mentioning Annamarie Trombetta's name as part of the listing?

A. Well, because it's already on

Page 62

N. NOVOCIN

the back of the thing.  You are trying to give as many factual information as possible.  So the name was there.  It's signed on the front.  You want to include those things.  People do tend to like to buy something that has a name associated with some way.  If you can find some information about that person, they like to know that.

Q.    Back when you posted the listing in 2012, did you know any of the prices for which artist Annamarie Trombetta may have previously sold any of her artwork?

A.    No.

Q.    Did you know whether or not artist Annamarie Trombetta was commercially successful at all?

A.    No.

Q.    Did you know whether or not that name had any recognition in the art market whatsoever?

A.    No.

Q.    So the reason you mentioned

**SA899**

Page 63

N. NOVOCIN

that name was because you found mention of it on the back of the canvas and you felt it was important to include as much information as possible in the listing, correct?

A.   Correct.

Q.   By the way, coming back to the antique mall for which this painting came, is antique mall the name of the company or are you describing it was a mall with antiques?

A.   I'm describing it as a mall with antiques.  Actually, it was a multi-story building in downtown Chicago. I'm guessing it probably had five or six stories in it.  The elevator was one of those old fashioned elevators that you actually had to slide up the wooden door in order to climb into the elevator.  It felt like it was just being hand cranked up to. That's what I had to take up the attic every time I went up.  It was quite the experience for me.  I'm not from the big city.  I thought that was kind of cool.  It

**SA900**

Page 64

N. NOVOCIN

was before it was filled it was different booths for the antique dealers in the area. I don't recall the name of it.  It was something along the name of Asia house, Asian house.  It is no longer in existence. The guy was trying to liquidate it and sell the building.  He had more value in the building than what his tenants were supplying him in renting mall space.

Q.   I assume you also don't recall the address of that building, correct?

A.   No, no.  No idea whatsoever.

Q.   On average, how long does it take you to compose a listing for an Ebay item?

A.   I shoot for under a half an hour.  If it has a lot of value, it may take as much as a whole day.  If it doesn't have a lot of value, it can get all the way down to fifteen minutes or so.  Half an hour is what we do.  We are all about doing a lot of listings.  We maxed out when we had our employees at 360 listings a week, so we have to move it through.  You don't

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 65 of 247

Page 65

N. NOVOCIN

have a lot of time to dwell on what is everything.  So you have to get all your research done, do it quickly and write the description quickly.

Q.    For this particular listing, do you recall how long it had taken you to compose this one?

A.    I would say it was a half an hour or less.

Q.    When you found Miss Trombetta's biography on askART, did you read it?

A.    No.

Q.    Did you happen to note when askART said that Miss Trombetta was born?

A.    Not at that time.

Q.    So I take it at some point you checked that, correct?

A.    Correct.  When this all came down, I certainly checked.

Q.    So you only checked after somebody contacted you about this painting?

A.    Yes.

Q.    That was also after it was sold, correct?

**SA902**

Page 66

N. NOVOCIN

A.    Correct.

Q.    When you received bids on this painting was sold, so I presume you received bids?

A.    Yes.

Q.    Do you recall whether or not you received any questions from bidders or potential bidders about it?

A.    I received no questions about it.

Q.    Did you ever have a discussions with the ultimate purchaser of this painting?

A.    Not until we were asking her -- informed her that we found out that Annamarie Trombetta did not paint it.  When we asked for copies of the painting when we informed her we were in a lawsuit.  That's when I had discussions with her.  During the time we actually sold it, we had no discussions with her.

Q.    Had you ever asked the purchaser at any point whether or not she bought it because of the name Annamarie

Page 67

N. NOVOCIN

Trombetta associated with the listing?

A.   Actually, I did ask her that. She said no.  She bought it because she liked the painting.

Q.   Did you ever offer to refund the money to her after you learned and informed her that the painting was not by Annamarie Trombetta?

A.   Actually, I even offered to buy it back from her for more and to have it out of there.  They said no, they were pleased with it.  They didn't want to be involved with anything.

Q.   So basically, the purchaser didn't care who the artist was, they just liked the piece; is that correct?

A.   That's correct.

Q.   At any point when you were researching this painting, did you think it might have been by any other artist, other than Annamarie Trombetta?

A.   No.

Q.   Do you recall how many bids did you receive on this painting?

Page 68

N. NOVOCIN

A.    No, I do not, but it starts at 99 cents.  It sold at $181 and things at that level are going up at increments about a dollar up to maybe 2 and 25 cents increment.  I'm going to say it had at least five -- it could have as many as forty.  I don't know.

Q.    On Ebay, is it customary for people to engage in automatic bidding, such as you would set a number that is your top number that you are willing to pay and the machine would automatically bid if somebody else beats your price?

A.    It is a common practice on Ebay.  I wish more people would do it.

Q.    I asked you about number of bids.  Do you know how many bidders were interested in this painting?

A.    No.

Q.    Do you know how long was the Ebay listing available for the bids?

A.    Yes.  It was ten days.  All of our auctions have ten days.

Q.    Do you have the offer to buy it

Page 69

N. NOVOCIN

now option on your listings?

A.   No.  I'm going to rephrase that.  We do buy it now every once in awhile.  I mean, it's literally like a blue moon.  We have sold almost I'm going to guess close to 400,000 items.  Probably have done less than ten buy it now out of all of them.  When I say no, there are exceptions, but they are very few and far between.

Q.   This painting was not sold as a buy it now option, correct?

A.   Correct.

Q.   Just for the record, did the identity of the artist play a role in the initial price that you set for this painting?

A.   No.  I set 99 cents on everything.

Q.   Again, this listing would have had no research, correct?

A.   Correct.

Q.   It would have had no minimums, correct?

Page 70

N. NOVOCIN

A.     Well, 99 cents, correct.

Q.     We mentioned sometimes you maybe sell through live auction.  Did you ever to try to sell this painting through live auction?

A.     No.  The ones that go to live auction are items we put on Ebay.  If we don't get a 99 cents bid, then it's not worth putting it up again and I go to live auction.

Q.     When you were researching this painting before putting it on Ebay, did you have any conversations with anyone about it?

A.     No.

Q.     You mentioned that you are sometimes or frequently offering up to 360 listings a week on Ebay.  Did I get that right?

A.     That was the maximum we ever went.

Q.     The week that this painting was sold, can you estimate how many listings did you have up at that time?

Page 71

N. NOVOCIN

A.    I am going to guess.  This is a guess.  I don't know, but I'm going to estimate about 60 listings.

Q.    Going back to the photographs that were included with the listing, do you recall how many photographs were included?

A.    I believe that we included a total of 18 photos.  They would always be 11 photos that would go to Ebay and they would put them up on the front.  We would include additional photos within the actual listing itself so that there would be more clarity.

Q.    Again, you no longer have possession of any of those pictures, correct?

A.    That is correct.  I have searched and searched and searched.

Q.    Do you still have a copy of the full Ebay listing before it was sold?

A.    My son was able to dig up the writing on the full Ebay listing.  I'm pretty sure it is the full listing, but I am not sure where he got it from.  My son

Page 72

N. NOVOCIN

is the computer guy.

Q.     Are you referring to the listing that appeared on the Worthpoint website or something else?

A.     I'm not sure -- yeah, I'm not sure if he got it off of Worthpoint or somewhere else.  I think he got it from somewhere else, because I don't see him going to Worthpoint to try to get something.

MS. FARMER:  Marlene, we are up to Exhibit 4.  I'm going to ask you to mark this document as Defendant's Exhibit 4, EAI000058 and 59 as Defendant's Exhibit 4 of today's date.

(Whereupon, the aforementioned document was deemed marked as Defendant's Exhibit 4 on this date, by the Reporter).

Q.     I'm going to put it at a hundred percent magnification.  Mr. Novocin, I'm showing you what has been marked as Defendant's Exhibit 4 of today's

Page 73

N. NOVOCIN

date.  It's a two-page pdf document with bates stamp ranging EAI000508 to 59.  I'm going to scroll to the bottom of the document so you can see the entire thing.  It is currently shown to you at a hundred percent of magnification.  Can I magnify it further for you to be able to see?

A.   No.  That's fine.  I have to take my glasses off to read.

Q.   If you want 125 percent, let me know if that's better.

A.   That's fine.

Q.   Mr. Novocin, when you mentioned that your son was able to dig up the listing, did you by any chance mean this document?

A.   No.

Q.   So you meant the full text of the listing?

A.   Yes.

Q.   Do you or your son or anybody at Estate Auctions, Inc. currently still have possession of that listing that your son was able to dig up?

Page 74

N. NOVOCIN

A.    I couldn't find it.  I e-mailed it to myself.

MS. FARMER:  To the extent not already produced, we will call for the production of the copy of the listing that your son was able to find.  We will make a request of Mr. Duff.

Q.    Mr. Novocin, this document, Defendant's Exhibit 4 that we are looking at, that appears to be an e-mail address to you, correct?

A.    Yes.

Q.    It appears to be from Ebay, EAI?

A.    Correct.

Q.    Is that the typical e-mail that you would receive from Ebay when one of your listings would sell?

A.    No.  Let me -- the one further down would be, yes, where it says, "Congratulations, your item sold", all of that would be a typical one that we had from Ebay, yes.

Page 75

N. NOVOCIN

Q.    I take it the top e-mail is for the earlier notification, correct?

A.    Correct.

Q.    Did you ask Ebay to be sent to you that sales notification from 2012?

A.    No.

Q.    How did you happen to get the January 10, 2017 e-mail?

A.    We would have gone through our old e-mails and got a copy of it from other old e-mails.  We don't throw e-mails away.

Q.    When it says Ebay, EAI, does that indicate it came from Ebay or some other company?

A.    It came from us, Estate Auctions Incorporated.

Q.    This is initially you forwarding your old e-mail to yourself?

A.    Correct.

Q.    To your knowledge, does your e-mail server, if they are familiar with somebody's e-mail address, do they brief it so the A sign is not visible?

A.    Yes.

Page 76

N. NOVOCIN

Q.    It would make sense that your e-mail system knows your other e-mail addresses, correct?

A.    Correct.

Q.    Now, the e-mail below it, December 1, 2012, it is from Ebay.com, correct?

A.    Correct.

Q.    You received that e-mail from Ebay at Ebay@Novocin.com, correct?

A.    Correct.

Q.    Was that the e-mail that you personally used, somebody else in your company or something else?

A.    One of the company e-mails yeah.

Q.    Who has access to these e-mails?

A.    The list of people that I gave you earlier all have access to that e-mail.

Q.    Are you by any chance still in possession of the original file for this e-mail?  Not the pdf, but the actual e-mail.

**SA913**

Page 77

N. NOVOCIN

A.    I don't know.  I would have to go and check.  I don't know if we still have that, if Ebay@Novocin.com goes back that far.

Q.    Do you see towards the bottom of this document, there appears to be a section that's a little bit cut off.  Do you see that?

A.    Yes.

Q.    I'm going to ask if you can go back and check if the original e-mail file, if you still have it, might have this information without being cut off.  If so, I would ask of you to please provide us with a copy that's not cut off.  Okay?

A.    That's okay.  I'm pretty sure we have a copy.  In fact, this one here might be a copy of it.  When you create pdfs, sometimes pdf cut it off.  I can get that.

MR. DUFF:  What's the part that's cut off?

(Whereupon, an off the record discussion was held).

Page 78

N. NOVOCIN

Q.    Mr. Novocin, does the domain Ebay@Novocin.com still exist?

A.    Yes.

Q.    Was there a server associated with this domain?

A.    Multiple.

Q.    Do these servers still exist?

A.    A lot of the servers that we had to switch, we lost all the previous photos on.  We switched it to a different server while keeping Novocin, but we didn't switch over the millions of photos that were on it.

Q.    When was Ebay@Novocin.com created?

A.    A long time ago.  I don't know.

Q.    Was it before top of the 2008 page, to your knowledge?

A.    Yes, it was before 2008, yes.

Q.    This document, Defendant's Exhibit 4, does it indicate to you the price for which the painting Man With A Red Umbrella was sold?

A.    Well, it's cut off, but yeah,

Case 1:18-cv-00993-LTS-SLC   Document 425-2   Filed 04/17/23   Page 79 of 247

Page 79

N. NOVOCIN

it says, "Sale price, 181.5".  I'm pretty sure it's 181.50.

Q.    It indicates the buyer is Nina something?

A.    Yes.

Q.    Does it indicate that the person who bought this painting resides in Reno?

A.    Reno, Nevada, yes.

Q.    To your knowledge, is that true, the purchaser was named Nina and she resides in Reno, Nevada?

A.    Yes.

Q.    Is that the person that you spoke to to try to get the photos of the painting?

A.    Yes.

Q.    When you were composing the listing for this painting, did you call Worthpoint to discuss that with them?

A.    I don't think I was a member of Worthpoint at that time.

Q.    Did Worthpoint have any input whatsoever to what you put into the listing

**SA916**

Page 80

N. NOVOCIN

for this painting?

A.    No.

Q.    Mr. Novocin, as you sit here today, do you remember roughly the contents of that listing, like the words that were used in the description?

A.    Roughly.

MS. FARMER:  Marlene, I'm now going to mark a document that's been marked confidential.  I ask you to please mark the portion of the transcript concerning the questioning about this document as confidential.  Please mark this three-page pdf as Defendant's Exhibit 5.

(Whereupon, the aforementioned document was deemed marked as Defendant's Exhibit 5 on this date, by the Reporter).

Q.    Mr. Novocin, I'm showing you a three-page document that was marked as Defendant's Exhibit 5 of today's date.  I realize that you will not be able to read it.  I'm going to show you it's three

Page 81

N. NOVOCIN

pages.  It is composed of text and some symbols.  The document has bates stamps at the bottom in the range of WP000038 through WP000040.  I will also represent to you that this document was produced in this litigation was by client, Worthpoint Corporation and we understand that this is text file that was generated as part of the download of the information from Ebay. Would you please take a look at page 1, starting from paragraph 3, wherein the second line there is a phrase, "Welcome to Estate Auctions, Inc.", et cetera, right?

A.   All I see is your pretty face.

MR. BIALEK:  You have to share your screen, Jana.

Q.   We have to do this again then. Mr. Novocin, can you see my screen now?

A.   Yes.

Q.   So let me just show you.  It's a three-page document.  That's the bates stamp that I was referring to.  If I can now direct your attention to the third paragraph where it says, "Welcome to Estate

Page 82

N. NOVOCIN

Auctions, Inc.!"  Do you see that?

A.    Yes.

Q.    If you read through this paragraph and if you would like, I'll show you any other paragraph in the document, can you tell me if you believe this is the text that you composed for the subject painting, a painting of the Man With A Red Umbrella?

A.    The initial text paragraph, there was a paragraph that goes in all of our listings, so that would have been this there.  Then up in this auction is one that would be composed for the actual listing.

Q.    Up in this auction and then it reads some symbols, "1972 original oil painting Man With A Red Umbrella, signed Annamarie Trombetta, New York licensed artist.  Shabby chic condition", et cetera. Are you referring to this language?

A.    Yes.

Q.    Now, reading this information, does this indicate to you this is the text for the Ebay listing that you composed?

**SA919**

Page 83

N. NOVOCIN

A.    Yes.

Q.    It mentioned that Annamarie Trombetta, New York listed artist.  Did you use that phrase in the Ebay listing?

A.    Yes.

Q.    What did you mean by New York listed artist?

A.    It means she's from New York and she is listed on one of the sites that I got information from.

Q.    Do you see where it says, "Shabby chic condition"?

A.    Yes.

Q.    Did you put that phrase in?

A.    Yes.

Q.    What does that mean to you?

A.    When I use shabby chic condition, that means there is a flaw of some type to the item that is being sold. I was using that for years on anything that has an issue.  In this case, it has a tear to it, therefore a shabby chic.  My clients when they say shabby chic, they know it's not pristine, it's not brand new.  It has

**SA920**

Page 84

N. NOVOCIN

an issue.

Q.    In fact you are explaining further down in the listing, we are calling it shabby chic as there is a tear in the canvas, about 5/8th's of an inch long in the man's knees, but still such a great painting, correct?

A.    Correct.

Q.    This is the basis for you calling it the shabby chic condition, right?

A.    Correct.

Q.    In the next sentence it looks like you are referring to Miss Trombetta's biography as being taken off of askART, correct?

A.    Correct.

Q.    You also referencing that askART received the biography or accrued the biography from her website, correct?

A.    Correct.

Q.    The language that follows the phrase website, specifically, "Annamarie Trombetta, 1963", close parentheses, et

**SA921**

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 85 of 247

Page 85

N. NOVOCIN

cetera, is that the text that you indicated you copied from askART?

A.    Correct.

Q.    The date 1963, was that also copied from askART?

A.    Yes.

Q.    Again, back when you composed this listing, you did not focus on the date of the artist, correct?

A.    I did not focus on it.

Q.    I'm going to show you the last page of this document.  Do you see at the very bottom the document has some code, right?

A.    Right.

Q.    In fact, it seems to read "jpeg" in some of the codes.  Do you see that?

A.    Yes.

Q.    Does it indicate to you that's probably images that were originally part of the listing?

A.    Yes.

Q.    Above the code, the last

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 86 of 247

Page 86

N. NOVOCIN

sentence in the document seems to be, "I thank them for their help and guidance in my life", period, and then there is a symbol "TR", close symbol.  Do you see that?

A.    Yes.

Q.    Was this also the last sentence of the listing that you had on Ebay?

A.    I don't know if it is, but if I can expand a second for this.  Our software that we use was custom written for us and we would put pictures in the middle of our descriptions and it would split the actual description, so it could very well be that is the last point that it is above the pictures and then that would be continued, the biography would be continued on the bottom underneath it and there is a chance that -- this is one of the things I have been thinking of, why there was paragraphs missing out of the biography when we copied the whole biography.  There was a chance that when Worthpoint grabbed it, it came to the codes for the pictures and it stopped

**SA923**

Page 87

N. NOVOCIN

grabbing any of the text.  There would be additional biography beneath it.

Q.    So in other words, you think that due to a software process, some of the text might have been cut off at some point?

A.    Correct.  In the actual listing on Ebay, the whole biography was there.

Q.    Then when something got downloaded, that might have been corrupted in the process of the download; is that right?

A.    That is correct.  In fact, to this day, if you go to any of my listings and they have a longer description, you will see that it cuts off at a certain point.  Then it will show pictures and then underneath the pictures, the rest of the listing is continued.

Q.    But just for the record, you did not intentionally cut out any of the paragraphs in the biography, correct?

A.    That's correct.

MS. FARMER:  Marlene, I will not question about Defendant's

Page 88

N. NOVOCIN

Exhibit 5 anymore, so we can mark the rest of the transcript as not confidential.

MR. BIALEK:  Can you set it up when there's two separate transcripts with the confidential from the rest of it.  If these transcripts are used in court, I am concerned that certain parties may forget to either seal it or redact it.  If we can set it up where you have a non-confidential transcript and then you have those confidential pages in a separate transcript, that would be great.

MS. FARMER:  Please mark the next document as Defendant's Exhibit 6.

(Whereupon, the aforementioned document was deemed marked as Defendant's Exhibit 6 for identification as of this date by the Reporter.)

Q.    Mr. Novocin, I'm showing you a one-page pdf document that was marked as

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 89 of 247

Page 89

N. NOVOCIN

Defendant's Exhibit 6 of today's date. This document has bates stamped plaintiff 0000144 at the very bottom.  I will represent to you that this document was produced in this litigation by plaintiff Annamarie Trombetta.  I am currently showing it to you at 150 percent magnification.  I am going to go to 200 percent.  Let me know if it's a little better for you to read.

A.    Okay.

Q.    Sorry.  I could not hear what you said.

A.    I can't read that.

Q.    Do you prefer to be 200 percent or 150 percent?  Let me know.

A.    200 percent, please.

Q.    Now, I have scrolled through to show you the entire document.  I'll represent to you I don't have a second page to this document.  Have you seen this document ever before?

A.    Right now?

Q.    Yes.

Page 90

N. NOVOCIN

A.     It seems to me this is one of the documents that has been submitted as an evidence in one of the dockets that -- of that 280 documents in the multiple pages on every one of the documents and the multiple evidence on that exhibit.  Exhibits that have been on all of those.  It seems this is one of those, but I don't know which one.

Q.     But prior to this litigation being commenced, have you ever seen this document?

A.     Prior to this litigation, no.

Q.     Prior to this litigation being commenced, have you ever gone to Worthpoint to see this listing, 1972 original oil painting, Man With A Red Umbrella?

A.     No.

Q.     Drawing your attention to the first full paragraph of text in this document.  Do you see the phrase "Welcome to Estate Auctions, Inc.!", and the rest of that paragraph?

A.     Yes.

Page 91

N. NOVOCIN

Q.    Is that the text again that you would typically put in all of your Estate Auctions, Inc. listings?

A.    Yes.

Q.    In the second full paragraph, do you see where it says, "Up in this auction", some symbols, "1972 original oil painting, Man With a Red Umbrella"?  Do you see that?

A.    Yes.

Q.    Is that that same listing that you composed for the subject painting back in 2012?

A.    Yes.

Q.    Drawing your attention to the last sentence of the document, do you see where it says, "Reviewing so many different cities and cultures in a", I think it -says?

A.    Concentrated.

Q.    "Concentrated period of time", dot, dot, dot.  Do you see that?

A.    Yes.

Q.    Does that sentence appear to be

Page 92

N. NOVOCIN

cut off?

A.    Yes.

Q.    Did your listing end with this sentence, to your knowledge?

A.    No.

Q.    I know you have not seen this document before litigation, but when you have seen it in litigation, have you ever seen the second page of the document perhaps?

A.    I do not recall.

Q.    As you sit here today, do you have any knowledge whether or not the information about this listing was or wasn't cut off on Worthpoint's website?

A.    I don't have any information about where it was cut off.

Q.    Again, we discussed really, it might have been cut off due to software issues during download, correct?

A.    Correct.

Q.    Have you ever read through the document that I'm showing to you once you received it as part of litigation?

**SA929**

Page 93

N. NOVOCIN

A.    I have read through that document or that verbal since then, yes.

Q.    Did it strike you during the times that you reviewed this document, whether or not anything was added to the text of that listing?

A.    I did not notice anything added.

Q.    Did you notice if Miss Trombetta's biography was altered in any way between the listing you composed and this document, other than being truncated?

A.    Other than it being truncated, I did not notice anything different, but I did not compare them side-by-side.

Q.    When you copied Miss Trombetta's biography from askART, did you happen to notice if there was any copyright notice saying that the biography was copyrighted by Miss Trombetta?

A.    I did not notice that.

Q.    Did you ever intentionally delete any such copyright notice?

A.    No.

Page 94

N. NOVOCIN

Q.    When you said that you copied the entire biography, how had the copyright notice, would you have also copied and included that if it was part of the text?

A.    If it was part of the text, yes.

Q.    Again, when you are composing the listing, it did not strike you that Miss Trombetta might have been very young, given her date of birth and the date that the painting was dated?

A.    No, it didn't.  If I had read that and noticed it, I would have laughed myself and gone up and further researched. I just didn't notice it.

Q.    Incidentally, wasn't there a title "Man With a Red Umbrella" written somewhere in the painting?

A.    No.

Q.    Did you come up with that title?

A.    Yes.

Q.    Once the painting was sold, did you ship it to the buyer?

Page 95

N. NOVOCIN

A.    One of my employees did.

Q.    Once you shipped it to the buyer, that was the last time that you had possession of the painting, correct?

A.    Correct.

Q.    Did anybody at Estate Auctions assist you in researching this painting?

A.    No.

Q.    Did anybody in Estate Auctions, Inc. assist you in writing the description for the auction listing?

A.    No.

Q.    Do you know the present whereabouts of the painting?  I know you mentioned your purchaser gifted or sold it to somebody else.  Do you know where it's physically located?

A.    No.

Q.    Did you have any communications with Annamarie Trombetta prior to this litigation being commenced at any other point?

A.    Prior to this litigation, yes.

Q.    Before the lawsuit, but at any

**SA932**

Page 96

N. NOVOCIN

point prior to, when was the first time that you communicated with her?

A.   I don't remember the exact date.  It was earlier we received a call. I'm not -- I'm pretty sure it was my wife who took the call asking to speak with the person who won the painting and somewhere along the line, I ended up being on the phone and I said I would be happy to check to see if they want to talk to you.  Now at that point I did not realize I was talking to Annamarie Trombetta.  I thought I was talking to someone named Teri Meissner.  I told them that I would check with the person.  If they wanted to talk to them, I would give them the information.  If not, I'm not free to give out the name or contact information of who bought the painting.  I checked with them.  They did not want to.  They said we love the painting, we want to keep it.  We don't want to talk to anybody about it.  I came back and said I was not going to give that painting -- the information to them.

Page 97

N. NOVOCIN

That's what I was told over and over, you must, you must, you have got to.  If you don't, I will sue you.  I said fine, get a lawyer, sue me.  I didn't realize that that actually would come to fruition.  A little while after that, we received a demand letter asking for a sum of money.  I think it was I believe 500 -- 8,000.  $8,000 and then we wouldn't be sued.  Give me $8,000 for damages.  I carried it to another attorney, not Mr. Duff.

Q.    Let me stop you for a second. Mr. Novocin, I never want to hear what you may have said to another attorney.

A.    That's fine.

Q.    That's attorney-client privilege.  I'm not allowed to ask you about that.  I just want to remind you.

A.    I'm sorry.  I'm rambling and I didn't need to be rambling.  That should give you enough information, I guess.

Q.    Let me follow up with you on a couple of things.

A.    Sure.

Page 98

N. NOVOCIN

Q.    You mentioned that you originally spoke with a person who represented herself to be Teri Meissner, correct?

A.    Correct.

Q.    Was this the person who first threatened to sue you?

A.    That's the person that said you have got to or I'll sue you.

Q.    Who did you understand Miss Meissner to be?  Was she a collector, an investigator or something like that?

A.    I don't have any idea who this person was.  None.  This is five years after we had sold something and long gone. I don't know why a person was even contacting me.

Q.    Was this person Teri Meissner threatening to sue you if you don't reveal the information about the buyer or if you don't let her speak to the buyer or something else?

A.    It was about -- yeah, having contact with the buyer.  That's what she

Page 99

N. NOVOCIN

wanted is contact with the buyer.

Q.   She was threatening to sue you if you did not provide that contact, correct?

A.   That's my remembrance.

Q.   During this conversation with Teri Meissner, do you recall if there was at any point any information given to you that the painting was not done by Annamarie Trombetta?

A.   No.

Q.   Was it your understanding that Teri Meissner was asking you to correct the attribution of the painting and maybe communicate to someone that this was not by Annamarie Trombetta?

A.   No.

Q.   So the sole inquiry from Teri Meissner, as you understood it, was let me speak to the buyer, right?

A.   Correct.

Q.   After this conversation with Teri Meissner, have you had any other interactions with a person named Teri

Page 100

N. NOVOCIN

Meissner?

A.    E-mails.

Q.    Did she call again, e-mails with Teri Meissner?

A.    Yes.

Q.    What was the sum and substance --

A.    I'm sorry.  There was at least -- I did what you asked me not to do.  I talked over you.  There was at least two phone calls that my wife took afterwards from Teri Meissner.

Q.    We will be speaking to your wife in a little bit this afternoon, so we will follow up with her on that.  Were you present for those discussions that your wife had with Miss Meissner?

A.    No.

Q.    Did you yourself have any further discussions with Miss Meissner after that initial call?

A.    No.

Q.    Did you have any written, such as e-mail or letter exchanges with Miss

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 101 of 247

Page 101

N. NOVOCIN

Meissner after that initial call?

A.    No.

Q.    At some point after your call with Teri Meissner, you mentioned you received a demand letter, correct?

A.    Correct.

Q.    From whom did you receive a demand letter?

A.    It was from an attorney by the last name of I believe Noh, N-O-H, and Annamarie Trombetta.  I should mention that after the call from Teri Meissner, when I looked at my phone, the phone showed that the call came from Annamarie Trombetta.  I went, wait a second.  That is the artist, but it was Teri Meissner who was identified on the phone.  So that's the only way I associated with Annamarie Trombetta is that's what my phone ID showed.

Q.    Do you believe that Miss Trombetta impersonated herself as Teri Meissner?

A.    That seems to be the probable thing that happened, yes.

Page 102

N. NOVOCIN

Q.    Is the basis of that the caller ID that you received on your phone?

A.    Yes.

Q.    Do you have any other information that might suggest that Miss Trombetta impersonated herself as Teri Meissner?

A.    No.

Q.    The letter from Attorney Noh, did it mention Teri Meissner at all?

A.    I don't believe it did.

Q.    Did Miss Noh represent that she was an attorney for Miss Trombetta?

A.    Yes.

Q.    Was this letter the first time that you were advised that the painting, Man With A Red Umbrella was allegedly incorrectly attributed to Miss Trombetta?

A.    That's correct.

Q.    Once you received this attorney letter, you said that you referred it to your attorneys, without mentioning the substance of the conversation to me?

A.    After I did that, I called an

Page 103

N. NOVOCIN

attorney, yes.

Q.    At some point after this letter, this litigation commenced?

A.    At some point after that letter, yes.

Q.    Between the time that you received this letter and the time that litigation commenced, did you have any personal conversations with Miss Trombetta?

A.    I do not believe so, no.

Q.    So to your knowledge, the only conversation that you had with Miss Trombetta was that call where the caller ID said Annamarie Trombetta, but the person on the phone said that they were Teri Meissner?

A.    Correct.

Q.    Have you had any e-mail exchanges with Annamarie Trombetta?

A.    I don't believe I did.

Q.    At some point, did Annamarie Trombetta report you to Better Business Bureau?

A.    Yes.

Page 104

N. NOVOCIN

Q.    Was that in connection with this painting?

A.    Yes.

Q.    What was the resolution of that complaint?

A.    We contacted Better Business Bureau. They looked into it completely. They came back and said we are a great company. In fact, we would like you to join and we don't have a problem with you putting our Better Business Bureau in every one of your auctions. I thought it was a pretty good result.

Q.    After the sale of this painting on Ebay, have you ever had any discussions with Worthpoint concerning this sale?

A.    Prior to this litigation, no.

Q.    Have you ever had any discussions with Worthpoint concerning the removal of this listing from the internet?

A.    Prior to this litigation, no.

Q.    You have been in touch with Worthpoint since this litigation commenced, correct?

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 105 of 247

Page 105

N. NOVOCIN

A.    Yes.

Q.    The sum and substance of your discussions with Worthpoint had to do with this litigation, correct?

A.    Correct.

Q.    I asked you if you ever saw the subject listing on Worthpoint's website and you previously testified no.  I'm now asking, are you aware whether or not anybody at Estate Auctions, Inc. ever saw the listing concerning this painting on Worthpoint's website, to your knowledge?

A.    No, they did not.

Q.    As you sit here today, do you know when the listing on Worthpoint's website concerning this painting that was we previously saw, when did it first get posted on Worthpoint's website?

A.    I have no idea.

Q.    Do you have any idea whether this listing was ever removed from Worthpoint's website?

A.    I have been assured that it has.  I have no idea.  I never checked.

Page 106

N. NOVOCIN

Q.   Other than what your lawyer told you, who told you that the listing was removed?  Was there any parties?

A.   After the litigation, it was Worthpoint that told me it had been removed.

Q.   Do you have any knowledge as far as when was this listing was removed?

A.   No, I do not.

Q.   Do you recall when did Worthpoint tell you it was removed?

A.   It was somewhere after the litigation.  I think it was maybe in the first phone call that I ever had with someone from Worthpoint.  That was it.  I don't know how exactly when.  This litigation has been going on forever, but it's been awhile.

Q.   I'll tell you this is a 2018 case.  Would that refresh your recollection that you may have had a discussion with Worthpoint at some point in 2018?

A.   I don't believe it would have been in 2018.  It probably was in -- I'm

**SA943**

Page 107

N. NOVOCIN

going to guess 2019, but I don't know.  I really don't know when.

Q.    Do you recall when you had this conversation with Worthpoint, did they tell you the date of the removal of the listing or did they just say it was removed?

A.    They said it was removed.  It was removed to such an extent that it can't be found again.  They went to a lot of trouble to remove it and make sure it was gone completely and they went above and beyond anything we have ever done before, is the way he put it.

Q.    Do you have knowledge as to whether or not this listing was ever reposted on Worthpoint's website?

A.    I don't have any knowledge of that.

Q.    Other than researching Miss Trombetta's biography for the sale of this painting back in 2012, are you familiar with the work of Annamarie Trombetta?

A.    No.

Q.    Subsequent to that sale, did

**SA944**

Page 108

N. NOVOCIN

you ever look up any of her other work?

A.    No.

Q.    After you were informed that Miss Trombetta denies being an artist who created this painting, did you ever learn who may have created this painting?

A.    No.

Q.    Again, for the record, did you ever hesitate in thinking that it was painted by Miss Trombetta back in 2012 when you were first researching this?

A.    No.  I always thought it was -- at that point it was her that painted it, at that point.

Q.    Since you have become aware that Miss Trombetta claims she did not create this painting, did she make any statements on line about you?

A.    Did she make any statements on line?

Q.    On line about you.

A.    I don't know if she's made any statements on line about me.

Q.    How about Estate Auctions,

**SA945**

Page 109

N. NOVOCIN

Inc.?

A.     I don't know if she's made any statements about Estate Auctions, Inc.  I honestly don't know what she's posted on line.

Q.     Besides reporting your company to Better Business Bureau, has Miss Trombetta ever reported your company to any other third-parties?

A.     Not that I'm aware of.

Q.     Did you ever capture a photo of the caller ID showing that you received a call from Annamarie Trombetta when the person said they were Teri Meissner?

A.     No, I did not.

Q.     Did you receive any e-mails from Teri Meissner?

A.     Yes.  Well, we did here.  It was not me personally.  I think it came from my wife.

Q.     Do you still have the e-mail address for that person?

A.     Yes, we do.

Q.     Can you tell me.

Page 110

N. NOVOCIN

A.    It is Seriouscollector@mail.com.

Q.    Did you ever send e-mails back to that address?

A.    I didn't.  I think my wife did.

Q.    Did you receive any bounced back messages?

A.    No, no bounce backs.

Q.    So to your knowledge, that was a functioning e-mail?

A.    Correct.

Q.    Did you ever research to the background of who may owned this e-mail, Seriouscollector@mail.com?

A.    No.

Q.    When you post information as part of listings on Ebay, do you expect your customers or people viewing listings to rely on your description?

A.    Yes.

Q.    Do you have any disclosures or disclaimers as part of your listings for customers to do their own research or not to fully rely on your description?

Page 111

N. NOVOCIN

A.    I do.  I would have to go and see what the verbiage.  I believe it's in our terms and conditions.  We have a whole bunch of terms and conditions at the bottom of our auctions.

Q.    So it's not going to be in the listing itself, it's going to be in the terms and conditions of your auction?

A.    Well, which is in every listing.  So every single listing will have that and it will just be at the bottom of the listing if you keep scrolling down.

Q.    Because every listing is subject to your terms and conditions, correct?

A.    Correct.

Q.    Do you still have a copy of the terms and conditions that Estate Auctions, Inc. may have used in 2012?

A.    No.  It would be close to what we are using now, but I don't know if the verbiage has changed or not.  I'll make tweaks on an ongoing basis.

Q.    Do you recall what portions of

**SA948**

Page 112

N. NOVOCIN

your terms and conditions have changed since 2012?

A.    No.  No, I don't.

Q.    You mentioned that Estate Auctions, Inc. is defunct.  Are the terms and conditions of Estate Auctions, Inc. would likely be somewhere on the internet?

A.    Yes.

Q.    Where would one go to find them?

A.    Probably in the bottom of YQZ Inc.  Any of our listing on Ebay, we use the same terms and conditions.

Q.    If YQZ as successor of the business is actually of Estate Auctions, Inc.?

A.    I would say in spirit.  When we went defunct and we filed a bankruptcy, the actual company had to go out and we started another company doing the exact same thing and followed the same -- that's what we have done for twenty some odd years.  We continued doing the same thing.

Q.    By the way, you mentioned

Page 113

N. NOVOCIN

earlier the company called RE Search.  Was that related to real estate research?

A.    It was primarily real estate research, so I did have the opportunity to research other things.  I found a lost family once for a girl that had leukemia, some other things like that.  That was way back in the early '80s, so way back.  I am an old guy.  Long before internet.

Q.    We spoke earlier about the mall in Chicago, Asian something.  I know you don't recall the name of the mall.  Do you recall the name of the person that you might have dealt with over there?

A.    Not the owner of the mall.  The gentleman that I dealt with is named Anthony Lee out of Toronto.  Toronto, Canada.

Q.    Thank you for that clarification.  I was just about to ask you.  Do you know why Mr. Lee from Toronto was dealing with issues concerning a mall in Chicago?

A.    He had one of the booths in the

**SA950**

Page 114

N. NOVOCIN

mall and he was a past customer of ours.

Q.    Was he the lead or the referral source for you in order to get connected to the folks in Chicago?

A.    He was a referral, yes.

Q.    Now, we discussed earlier that you had a server and that you had to give up some of the information as a result of the change of the server as a result in 2012; is that correct?

A.    It was a change later on in 2012 was kind of a cutoff when the old stuff got swiped away and the new stuff came on, yes.

Q.    So as a result of the server cutoff, you lost some data before 2012 and most of 2012, correct?

A.    Well, going all the way back, we had the data all the way back to 2001, so we lost ten years of data.  So it wasn't just that serendipitous we lost that.  We lost a bunch of data.

Q.    Did you ever keep any paper records with Estate Auctions, Inc.?

**SA951**

Page 115

N. NOVOCIN

A.    We do, but after awhile you throw it away because the amount of things that we sell.  When I say literally, 400,000 items, you don't keep paperwork on 400,000 items when you are a small mom and pop.  You keep it for a couple of years.  In case the IRS comes around, you have information for them.  It's usually about three, four years or stuff.  Not ten, twelve, fifteen years of stuff.

Q.    Back when you first received inquiries about this painting, did you ever check if you had any paper records concerning this painting?

A.    That's why we have the e-mails that we mailed back and forth to ourselves trying to get any information we could when we started to get inquiries about that.  That was in 2017 that we started to get those inquiries, so already five years after the fact.

Q.    So the answer is you could not located any physical documents, as opposed to electronic documents?

**SA952**

Page 116

N. NOVOCIN

A.    Correct, correct.

Q.    Did you ever keep any physical records on consignment, sales or payments for consignment fees in paper form?

A.    Not in paper form, no.

Q.    So those were electronic records, correct?

A.    Correct.

Q.    As far as any sort of information about consignment, sale and payments for a 2012 transaction, would those records have been lost also as part of the server cutoff?

A.    I don't think it would have been lost because of a server cutoff.  I think we just didn't have the paperwork on it.  We would write a check and say here's a check for what we had, what we sold, based on the spreadsheet we had at the time and write the check and then go on from there.  We do kind of an -- our accountant always tells -- it's weird.  We treat everything as a whole.  So consignment, if he consigns fifty items to us, we write one

Page 117

N. NOVOCIN

check for fifty items.  We don't write fifty different checks for each item separately.  The same with if we go to an auction house and I spend $3,000 at an auction house, we keep track of whether we made profit on that whole auction house, not each part individually.  A lot of places want to keep it on each part individually.

Q.    If you would write a check to someone for a consignment fee for multiple items, would that check come with some sort of accounting what those items were for?

A.    No.

Q.    Was that discussed verbally at the time the check was sent over?

A.    Yes.  We would -- they would know it's for the items they consigned to us.  We send one check for that whole group of consignment.  Normally up front is where we have a list of all the items we are going to sell for them.  Here's your check for all the items.

MS. FARMER:  If that's okay

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 118 of 247

Page 118

N. NOVOCIN

with you, I need to take a few minute break and use the restroom.

(Whereupon, a short recess was taken).

Q.    Mr. Novocin, did you ever tell Worthpoint to take down the listing, Man With A Red Umbrella from their website?

A.    No.

Q.    When you copied Miss Trombetta's biography from askART's website, did you have an understanding whether or not that work was copyrighted?

A.    No.

Q.    Again, you do not recall seeing any sort of information that this is a copyrighted work on askART's website, correct?

A.    Correct.

Q.    You did not intentionally to delete any such information when you copied the biography, correct?

A.    Correct.

Q.    You did not intend to infringe on Miss Trombetta's copyright, correct?

**SA955**

Page 119

N. NOVOCIN

A.    Correct.

Q.    You did not attend to assist otherwise in infringing on any copyright that Miss Trombetta holds; is that correct?

A.    That's correct.

MS. FARMER:  To the extent not already produced, I believe that they were, but covering our bases, I would call for the production of any demand letters that you may have received from attorney Megan Noh and for any e-mails that you have received from Miss Meissner.  Again, I believe that you have produced these documents, but if you could just confirm there is nothing else.

Q.    Mr. Novocin, as part of this litigation, did you at one point prepare a declaration that was submitted to the courts for purposes of this litigation?

A.    I believe I did.

Q.    Did you yourself write it or was it prepared under your guidance?

A.    I'm pretty sure I would have

Page 120

N. NOVOCIN

written it with the guidance of our attorney.

Q.    Again, I'm not asking you about anything that your attorney may have said to you.

A.    Right.

MS. FARMER:  Let's mark this as Exhibit 7.

(Whereupon, the aforementioned document was deemed marked as Defendant's Exhibit 7 on this date, by the Reporter).

MS. FARMER:  Can we please mark this title entitled "Declaration of Norb Novocin in support of defendant's motion for an order requiring plaintiff to post a bond", as Defendant's Exhibit 7 of today's date.

Q.    Mr. Novocin, I'm showing you what has been marked as Defendant's Exhibit 7 of today's date.  I am going to scroll through and show you.  This is a four-page document with a signature appearing on the

**SA957**

Page 121

N. NOVOCIN

last page.  It looks like there's also a date.  Mr. Novocin, do you recognize this document?  I can also go back to any page that you would like me to go to in order for you to adequately review it.

A.    No.  I recognize it.

Q.    Pardon?

A.    I recognize my signature.  That's for sure.

Q.    It is your signature?

A.    Yes.

Q.    If you go back to the front page of the document, is this the document that you recalled writing in connection with this litigation?

A.    Yes.

Q.    When you wrote this document, was everything in there accurate, to the best of your knowledge?

A.    To the best of my knowledge at that time.

Q.    To the extent that you have since found something different, did you ever seek to update this document?

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 122 of 247

Page 122

N. NOVOCIN

A.    I did not seek to update it. The only thing I see different is that her name is on the back of the thing reads Annamarie Trombetta and not Annamaria Trombetta.

Q.    You are referring to paragraph 3 of this document?

A.    Correct, correct.

Q.    Where it says, "Featured an inscription reading Annamarie Trombetta"?

A.    Yes.

Q.    That actually should be Annamaria?

A.    Correct.

Q.    You mentioned this is your signature.  Do you recall if you signed it electronic, in ink or something else?

A.    I signed it in ink, not electronic.

Q.    Do you see this number 2 and a bunch of dash signs and two dots after your signature?

A.    I do.

Q.    Do you know how did those

**SA959**

Page 123

N. NOVOCIN

symbols end up after your signature?

    A.    No worldly idea.

    Q.    When you saw this document, did it have these number and dots?

    A.    No.

    Q.    As you sit here today, do you know what these numbers signify?

    A.    No idea.

    Q.    Did you have a written consignment agreement concerning the items from that antique Asian mall in Chicago?

    A.    No.

        MS. FARMER:  With that, I will pass the witness to Miss Trombetta and Mr. Duff, if they wish to ask any questions with the reservation of right to follow up on the question. Miss Trombetta, would you like to ask some questions?

        MS. TROMBETTA:  I need to bring to everyone's attention plaintiffs evidence 000342.  It was sent last night.  I believe it might actually even be in other documents.  Just to

**SA960**

Page 124

N. NOVOCIN

make it relative, I am going to read from it and to confirm, it's askART's terms of service and internet privacy policy.

MS. FARMER:  Will we mark this as Exhibit 8 for today's date for the purposes of referencing it later?

MS. TROMBETTA:  Yes.

MS. FARMER:  How many pages is it?

MS. TROMBETTA:  I have one page.  It's titled plaintiff's evidence 000342.

MS. FARMER:  Thank you.  We also see one page on the screen.

(Whereupon, the aforementioned document was deemed marked as Exhibit 8 for identification as of this date by the Reporter.)

EXAMINATION BY

MS. TROMBETTA:

Q.    "License to use the site, askART grants you a non-exclusive, non-transferable limited right to access

Case 1:18-cv-00993-LTS-SLC   Document 425-2   Filed 04/17/23   Page 125 of 247

Page 125

N. NOVOCIN

use and display of the site and the materials there on for your personal use only provided that you comply fully with these terms and conditions of use.  You shall not interfere or attempt or attempt to interfere with the operation of the site in any way through any means or device, including but not limited to standing, lacking, uploaded computer viruses or time bombs or the needs expressively prohibited by any provision of these terms and conditions of use".  That's the right to use the site.  Underneath that is ownership, restrictions and trademark. This is geared to you, Mr. Novocin.

MR. DUFF:  Objection.  Is there a question in here?

Q.    "You may not modify, create, derivative works from participants in the transfer or sale of posts on the world or posts on the worldwide web or in any way exploit the site or any portion thereof for any public or commercial use without the expression written permission of askArt.

Page 126

N. NOVOCIN

You are responsible for complying with all applicable laws, rules and regulations regarding your use of any such downloaded contents.  In the event of any permitted copying, redistribution or publication of materials from the site, no changes in or deletions of author's attribution, trademark, legend or copyright notice shall be made".  That is from the askART website.

MR. DUFF:  I object to the form of the question.

MR. BIALEK:  I object to the form of the question.

MR. DUFF:  We join.

MS. TROMBETTA:  I am definitely at a loss because I have the pages that are bates stamped plaintiff's 000158, 000159.

MR. DUFF:  Objection.  Miss Trombetta, why are you talking about the bates stamps?  Are you asking my client a question?

MS. TROMBETTA:  I am asking him a question in relationship to the

**SA963**

Page 127

N. NOVOCIN

bates stamps documents that I have submitted that we have been going over all morning.

MR. DUFF:  What is the question?

Q.    The question is very clearly, did you, Mr. Novocin, take from askART my biography?

MR. DUFF:  Objection.  That's been asked and answered, but go ahead and answer the question.

A.    I took the biography off of askART, yes.

Q.    I just read to you that was not permissible.  Secondly --

MR. DUFF:  Objection.  It's just a statement.

MS. FARMER:  I join.

Q.    Did you write that askART got my biography from my website?

A.    You want to rephrase that question, please.

MR. DUFF:  Objection to the form.

Page 128

N. NOVOCIN

Q.    In your composed EAI Ebay listing, did you state that askART got my biography from my website?  Yes or no.

MR. DUFF:  Objection.  Asked and answered.

You can go ahead and answer the question, Norb.

A.    I copied exactly what was on askART.  What was on askART is that it said we got this from the artist's website. That's what I put down.

Q.    So my question to you is, did you know that that was not permissible?

MR. DUFF:  Object to the form of the question.  That's making a conclusion here.

Q.    Are you aware of the terms and conditions on the askART website?

A.    I just initial on the bottom when I first used askART.  I did not read it on the website.

Q.    Whether you read it or not, you initialed it.  My other question, how long have you been a member of askART?  Is it

Case 1:18-cv-00993-LTS-SLC   Document 425-2   Filed 04/17/23   Page 129 of 247

Page 129

N. NOVOCIN

one year, two years?  Do you know offhand how long you have been a member of askART?

A.    Yes, I do.  I have been a member of askART for twenty-one years.

Q.    So all throughout those years, have you ever taken a biography from another artist from askART?

A.    Yes.

MR. DUFF:  Objection.  Asked and answered.

Q.    When you looked up my biography, did you see any artist's signatures?

A.    No.

Q.    It was asked, but I will ask again.  Did you see any other examples of artwork attributed to Annamarie Trombetta?

A.    No.

MR. DUFF:  Object to the form of the question.

Q.    Just to clarify, you only saw my biography, correct?

A.    Correct.

Q.    Now, you had mentioned finding

Page 130

N. NOVOCIN

the painting in the submitted interrogatories, it only said an attic in a house.

MR. DUFF:  Object to the form of the question.

Q.    Did you find the painting in a house, as in a residence?

MR. DUFF:  Objection.  Asked and answered.

A.    It was in a building in Chicago.  In downtown Chicago.  A multi-story building in their attic.

MR. BIALEK:  Miss Trombetta, do you still want me to have this document up or are you finished with it?

MS. TROMBETTA:  That particular document, thank you, Mr. Bialek.  No, you can take that down.

Q.    When you looked at my biography --

MR. DUFF:  Objection.

MS. TROMBETTA:  You can object all you want.  I'll rephrase the

**SA967**

Page 131

N. NOVOCIN

question.

Q.    Did you see any prices on the askART website from my artwork?

A.    No.

Q.    Just to clarify, no prices, no signature, no artwork?

A.    Correct.

Q.    What was the primary reason for taking the biography allegedly from askART?

MR. DUFF:  Objection.  That's asked and answered.

Q.    I'm asking it again.

A.    Primary reason?

Q.    Yes.

A.    It was a biography background on who I believe the painting was by.

Q.    Now, in the ad it stated that there were 12 photos, correct?

A.    Yes.

Q.    You said earlier that there was 18 photos?

A.    I was going off memory and I was incorrect.

Q.    Can you, to the best of your

Page 132

N. NOVOCIN

knowledge, explain how your Ebay ad was then somehow transferred?

MR. DUFF:  Objection.  We have literally talked about this at length during Jana's questioning.

Go ahead and answer it again.

A.    I have no idea how it was transferred.

Q.    You have no idea?

A.    No.

Q.    That doesn't help either party, myself or the other defendants.

MS. FARMER:  That is not a question.  I object to the form of whatever that is.

MS. TROMBETTA:  That was a comment.  I have been dragged into this.

MR. DUFF:  It's your lawsuit. You filed this lawsuit.

MS. TROMBETTA:  Yes, and I needed to.

MR. DUFF:  Just don't say you got dragged into this.  That's not

Page 133

N. NOVOCIN

accurate.

Q.    Mr. Novocin, have you seen the evidence of my handwriting?

MR. DUFF:  Object to the form of the question.

Q.    Has Mr. Duff shown you samples of my handwriting that were submitted?

A.    I don't think so.

Q.    Let's go back in time.  Did you and I ever have any verbal conversations?

MR. DUFF:  Objection.  That's been asked and answered.

Go ahead, Norb.

A.    Yes.  It was the question and answers where you sent a recording saying go ahead and get an attorney and I'll sue you.  Yeah, we have had questions and answers.

Q.    That's not what you said earlier.  My question to you is, did we engage in a phone call on January 10th of 2017?

A.    I don't know what date, but there was a phone call where I called Teri

Case 1:18-cv-00993-LTS-SLC   Document 425-2   Filed 04/17/23   Page 134 of 247

Page 134

N. NOVOCIN

Meissner back and talked to her.

Q.   Sir, for the record, you are stating Teri Meissner, correct?

A.   That's who I thought I was calling.

Q.   Just for the record, now, since that time when you received a settlement letter from Megan Noh, was there a phone call from Megan Noh?

MR. DUFF:  Object to the form of the question.

A.   My wife took a phone call from Megan Noh.

Q.   Then I need to speak to your wife to ask any further questions, but you do recall a phone call?

A.   I do recall a phone call.

MR. DUFF:  I object to the form of the question.  Phone call with whom?

Q.   With Attorney Megan Noh.

A.   My wife received a phone call from Attorney Megan Noh.

Q.   Just for the record, she did

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 135 of 247

Page 135

N. NOVOCIN

receive a phone call.  Was it after or before the letter?

A.    It was after the letter.

MR. DUFF:  So you need to get Marie up here for you to ask questions, right?

MS. TROMBETTA:  No.  I'll wait. Will she be deposed by Worthpoint?

MS. FARMER:  Yes, Miss Trombetta.  What I was trying to say earlier when I didn't realize you were still speaking, Mrs. Novocin is scheduled to be deposed this afternoon.  Just as soon as you are completed with your questioning, we will move onto the deposition of Mrs. Novocin.

MS. TROMBETTA:  Thank you.

Q.    Did you only have the one Ebay receipt or was there more receipts from Ebay regarding the 2012 sale?

A.    We only received the receipts from Ebay.  Then the Paypal payment.  That was it.

Page 136

N. NOVOCIN

Q.    Have you produced the Paypal payment?

A.    Yeah.  Yes.

MS. TROMBETTA:  Plaintiff has not received the Paypal payment and would like production of that.

Q.    So as far as shipping information, it is a standard practice for Ebay to send out shipping receipts?  Do you have any?

A.    At that point Ebay was not in charge of shipping.  They didn't send out shipping receipts.  They never had -- at that point we shipped it ourselves directly and no, we do not have a receipt for the shipping.

Q.    Are you currently in bankruptcy?

A.    I am in bankruptcy.  Somebody has filed a thing to stop our bankruptcy, so we are still in bankruptcy.

Q.    Had you ever been in bankruptcy prior to this time?

A.    Yes.

Page 137

N. NOVOCIN

Q.   What year was that, please?

A.   1988.

Q.   Any other time between 1988 and 2019?

MR. DUFF:  Objection.  There's no relevance to this lawsuit here, these questions.  Zero relevance.

MS. TROMBETTA:  In your eyes, there's no relevance.  In my eyes, there are.

Q.   Can I ask you, why didn't you contact me in 2012?

MR. DUFF:  I object to the form of the question.

A.   There was no need to.  I already had all the information I needed.

Q.   Obviously, that information is incorrect.  That's a comment.

MR. DUFF:  I object to the comment.

MS. TROMBETTA:  You can object.

Q.   So you said earlier that you could not discern the signature on the front; is that correct?

Page 138

N. NOVOCIN

A.    That is correct.

Q.    So your write-up that landed on Worthpoint and you don't know how, that write-up has a spelling of Annamarie Trombetta multiple times?

MR. DUFF:  Objection.

Q.    Yes or no.

MR. DUFF:  I object to the form of the question.

Q.    Does your composed 1972 Man With A Red Umbrella have multiple spellings of Annamarie Trombetta within the write-up?

A.    They have multiple times that Annamarie Trombetta is written down.

Q.    At any time, is Anna and Marie separated?

A.    No.

Q.    At any time, is Annamaria written?

A.    No.

Q.    An obvious question.  Why is there a difference in the spelling within the ad and the signature in red on the back of the painting?

Page 139

N. NOVOCIN

A.    Often artists have a tendency to put the name down differently.  My mother was a professional artist.  She has her name at least seven different ways. Everywhere from Kathleen Carol Novocin to KC Man.  She signs her name different ways. When you go onto askART, it's not uncommon to have a spelling of something, especially something so close as Annamarie Trombetta, Annamarie spelled differently on askART, as the way the artist did.  It's not always exactly the same.

Q.    When you Googled Annamarie Trombetta, did you Google Annamarie Trombetta or Annamaria Trombetta?  Do you recall?

MS. FARMER:  Objection to form.

A.    I did not Google it.  I put in askART and I put in Trombetta.  When I put in Trombetta in the askART, the only thing that came up was Annamarie Trombetta.

Q.    So based on that one and only askART biography, that's your only form of reference?

Page 140

N. NOVOCIN

MR. DUFF: Object to the question.

Q.    Is the askART site your only form of confirmation for the identity of the artist?

A.    That's the only thing I used.

Q.    That's the only thing you used?

A.    Yes.

Q.    Have you ever at any time Googled A. Trombetta?

A.    Prior to the litigation, no.

Q.    Prior to litigation, okay. How long have you been a member of Worthpoint?

MR. DUFF: Objection. Asked and answered.

A.    I'm not a member of Worthpoint. I subscribe to Worthpoint's database and I have only been a member of subscribing to them -- I don't know. I really don't. Maybe seven years maybe.

Q.    Seven years?

A.    Maybe. I don't know.

Q.    Was that seven years prior to litigation or post?

Page 141

N. NOVOCIN

MR. DUFF:  Objection to the form of the question.

A.    It would have to be prior, Miss Trombetta, being as we have not been in litigation seven years.

Q.    Do you know the years?

A.    No.

Q.    The number of the year?

A.    No.

MR. DUFF:  He's already answered this.

MS. TROMBETTA:  The year that he was a member has not been answered.

A.    I don't know the year, Miss Trombetta.

Q.    I'm just clarifying with Mr. Duff that that question has not been answered.

MR. DUFF:  He said he didn't know.  That's the answer.

Q.    Do you know the current owner of the painting?

A.    No.

Page 142

N. NOVOCIN

Q.    The Man With A Red Umbrella?

A.    No.

Q.    You have submitted signatures in part.  Why have you not submitted the back of the painting, the full back of the painting?

MR. DUFF:  Objection to the form of the question.

Q.    Where is the signature on the back of the painting located?

A.    On the stretcher.

Q.    There's four sides to the stretcher, okay.

MR. DUFF:  Is there a question?

Q.    Question, if there's four sides to the stretcher bars, is it top, the right, the left or the bottom?

A.    Well, if I recall from when I had the painting here, I believe it was at the top.

Q.    Is there any way that you can produce the back view with the signature at the top of the painting?

MR. DUFF:  Objection.  We have

Page 143

N. NOVOCIN

produced photographs of the back of
this you have seen.

MS. TROMBETTA:  You have
produced photographs?

MR. DUFF:  The painting has not
been --

MS. TROMBETTA:  Focused photos
of the signature only.  There is no
proof that the signature is on the
back of the painting.

Q.    Can you produce the signature
in red that's on the back of the painting?

MR. DUFF:  The possession is
not within my client's possession,
custody or control.  He has no duty
to seek it out and produce some new
photograph that doesn't exist
already.

MS. TROMBETTA:  That's the
answer that I will give my witnesses.

MR. BIALEK:  Can you repeat
that.  Are you going to be
instructing your witnesses?

MS. TROMBETTA:  No.  I'm being

Page 144

N. NOVOCIN

a normal person and venting so much frustration.

Q.    What year did you find this painting?  I don't believe that was clarified?

A.    2012.

Q.    How long afterwards?

MR. DUFF:  Objection.  Asked and answered.

Go ahead.

Q.    You said it was October of 2012; is that correct?

A.    I said it was in 2012.  I wasn't sure when.  I said it was cold and wet in Chicago, so it wasn't summer.  It was sometime before December 1st, so I am guessing somewhere in the fall in Chicago.

MS. TROMBETTA:  I do have a visual and it was sent yesterday.

MS. FARMER:  Is it bates stamped?

MS. TROMBETTA:  It was bates stamped yesterday.

MR. DUFF:  You sent this

**SA981**

Page 145

N. NOVOCIN

yesterday?

MS. TROMBETTA:  It's in the filings.

MR. DUFF:  That was sent yesterday?

MS. FARMER:  Are you referring, Miss Trombetta, to the declaration of Mr. Novocin that I marked as Defendant's Exhibit 6 of today's date already?

MS. TROMBETTA:  No.  I am referring to a visual that I'm trying to find right here and now.

MS. FARMER:  We ask you that we still have to mark whatever you show to the witness, unless it was marked already.  I would help you by showing it on the little screen because you only have a printed version.  That's why I'm asking what bates stamped or what is the document called so we can pull up the same document.

MS. TROMBETTA:  I am just trying to find it.  It's in the

**SA982**

Page 146

N. NOVOCIN

document, the EAI ad.

Q.    How long have you been selling on Ebay?

MR. DUFF:  Objection.  We need to be able to see what you are talking about, Miss Trombetta.

MS. TROMBETTA:  It's bates stamped 000158.

MR. DUFF:  Can you show us the document.

Q.    I want to clarify and ask you that within the Estate Auctions Inc.'s 1972 Man With A Red Umbrella, you stated in writing --

MS. FARMER:  Hold on, Miss Trombetta, until the document is marked as an exhibit.  So just because you are holding it up, we cannot see it and it has not been marked.  We are not able to show it to the witness.  Was this a document you also e-mailed yesterday?

MS. TROMBETTA:  Within the documents that I e-mailed yesterday.

Page 147

N. NOVOCIN

Plaintiff's evidence 000338, if you bring that up.

THE WITNESS:  I think it's in one of the things today with the full description on there on Worthpoint. It's the opening paragraph where it says we have been selling on Ebay since 1998.

MS. FARMER:  I do have the document 338.  I'm going to share the screen.  It's appearing to be a different document from what I saw on the screen.

MS. TROMBETTA:  000338 in the upper right-hand corner.  Can you confirm it says Estate Auctions, Inc., YQZ Antiques?

MS. FARMER:  Estate Auctions, Inc., YQZ Antiques.  The third line says, "Estate Auctions, Inc., YQZ Antiques".  Let's mark this as Exhibit 8-A of today's date.

MS. TROMBETTA:  Again, the number for that is 000338.  Is that

**SA984**

Page 148

N. NOVOCIN

visual now?

MS. FARMER:  Yes, it's being showed.

(Whereupon, the aforementioned document was deemed marked as Exhibit 8-A for identification as of this date by the Reporter.)

Q.   My question is, does this document that appears to be your Estate Auctions, Inc.'s website, does that also say, "Top seller on Ebay since 1998, Norb Novocin has been on Ebay since 1998".  Do you confirm that?

A.   Yes, it does.

Q.   Let's go to document 000339, which is the one right after 338.

MS. FARMER:  Give me a second. It's opening.

(Whereupon, the aforementioned document was deemed marked as Exhibit 9 on this date, by the Reporter).

MR. BIALEK:  Marlene, I forwarded the e-mail from Miss Trombetta that has all the documents

Page 149

N. NOVOCIN

that were marked.  This as Exhibit 9?

MS. FARMER:  Exhibit 9, yes.

Q.    Can you confirm that the date is May 24, 2018, please.

A.    It is.

Q.    Now, can you also confirm that it says, "The Seaford based company has eight employees and generates up to one million in sales per year".  Can you confirm that.  Is that what it says?

A.    Yes.

Q.    Can you also confirm, "Novocin and his wife Marie first started selling on Ebay back in 1998"?

MR. DUFF:  I object to the form of the question.  Are you asking him to confirm that's what it says?

MS. TROMBETTA:  I'm asking if they have been selling since 1998.

Q.    Is this article correct?

A.    It is.

MS. TROMBETTA:  Next exhibit is plaintiff's exhibit 340.

(Whereupon, the aforementioned

**SA986**

Page 150

N. NOVOCIN

document was deemed marked as Exhibit 10 on this date, by the Reporter).

MR. BIALEK:  Marlene, can you please mark this as Exhibit 10.

Q.    There is a photo of you and your wife?

MR. DUFF:  Objection.

MS. TROMBETTA:  I'm just making a comment.  You don't have to object.

Q.    Can you confirm, please, that this is Ebay Main Street.  Is this an article in Ebay Main Street?

A.    Yes.

Q.    "Midway between watching the business in 1998, Norb and Marie became power sellers".  Is this a correct statement?

A.    It was at that time.

Q.    So just to clarify, on the last three exhibits it states that you had been selling from 1998 and just to clarify, in the 1972 write-up for the --

MS. TROMBETTA:  Hold on.  Let me retract that.

**SA987**

Page 151

N. NOVOCIN

Q.    In the Ebay sale, 1972 Man With A Red Umbrella that appeared on the Worthpoint's website, can you confirm if that you have been selling on Ebay since 1998?

A.    Yes.

Q.    So consistently, everything is 1998, yes?

A.    Yes.

MS. TROMBETTA:  So plaintiff brings up 000170.

(Whereupon, the aforementioned document was deemed marked as Exhibit 11 on this date, by the Reporter).

MS. TROMBETTA:  This is from the State of Delaware.

MS. FARMER:  This is not one of the documents you e-mailed to us yesterday, Miss Trombetta.

MR. BIALEK:  Was it given a different number?

MS. TROMBETTA:  Please indulge me.  It's plaintiffs 000170.

MS. FARMER:  Give me two

**SA988**

Page 152

N. NOVOCIN

minutes, because I need to need to extract that document from my files.

MR. BIALEK:  You are asking this be marked as Exhibit 11?

MS. TROMBETTA:  That's correct, Mr. Bialek.

MS. FARMER:  How many pages is it?

MS. TROMBETTA:  Just the one page.

(Whereupon, an off the record discussion was held).

MS. FARMER:  The exhibit on the screen, we are marking that as Exhibit 11 of today's date.  It has bate stamp plaintiff's 170.

Q.    The Delaware Incorporation states that, "I do hereby further certify --

MS. TROMBETTA:  I'm sorry. That's the wrong certification. Shall we strike this exhibit from the record, please.

MS. FARMER:  Strike Exhibit 11

**SA989**

Page 153

N. NOVOCIN

from the record.

MS. TROMBETTA:  I have two more exhibits.  It's actually Worthpoint's certification that we will mark as Exhibit 11.  Plaintiff's evidence 000346 we will mark as Defendant's Exhibit 11.

MS. FARMER:  Please mark this as Defendant's Exhibit 11.

MR. BIALEK:  Not defendant's. Just as Exhibit 11.

MS. FARMER:  Please mark it as Exhibit 11.

MS. TROMBETTA:  It's plaintiff's 11, 000346.

MR. BIALEK:  Exhibit 11 to the Norb Novocin deposition.

(Whereupon, the aforementioned document was deemed marked as Exhibit 11 for identification as of this date by the Reporter.)

MR. DUFF:  I'm going to object to the admission of this.

Q.    Mr. Novocin, has anyone ever

Page 154

N. NOVOCIN

accused you in writing of selling

counterfeit goods?

　　　　MR. DUFF:  Objection to the

relevance of this.

　　　　Go ahead, Norb.

Q.　　Yes or no.

A.　　Yes.

Q.　　Do you recognize this item?

A.　　No.

Q.　　Well, do you recognize the name

Wendy Martinez?

A.　　No.

Q.　　In 2016, a Wendy Martinez

states on your Facebook page that you are

selling counterfeit items on Ebay?

　　　　MR. DUFF:  Objection to form.

Q.　　On your Facebook page, did a

Wendy Martinez write that you were selling

counterfeit porcelain items?  Yes or no.

　　　　MR. DUFF:  Objection to form.

Q.　　Was your Facebook page noted to

be selling counterfeit items?

　　　　MR. DUFF:  Object to form.

Q.　　Have you ever knowingly sold

**SA991**

Page 155

N. NOVOCIN

counterfeit items?

A.    No.

Q.    When I contacted you on January 10th of 2017 and I informed you that I was not the artist --

MR. DUFF:  Objection.

Q.    -- why did you tell me to hire an attorney?

MR. DUFF:  Object to the form of the question.

Q.    Did you tell me to hire an attorney when we spoke on January 10th of 2017?

A.    Yes.

Q.    Why was that?

A.    Because you wanted me to give information out from someone who did not want the information given out of, a previous buyer of ours.  I said fine, I'll get an attorney.  I said that's fine, get an attorney, sue me.  That's why I did it. I was not going to give out information for someone who did not want it given out.

Q.    When I told you I was not the

**SA992**

Page 156

N. NOVOCIN

artist and that you used my name, did I ask you if you used my biography?

A.    I don't remember.

Q.    You know what, I may have the phone recording available.  Would you like to hear it?

MS. TROMBETTA:  I'm asking if I can be permitted to play the phone recording, Mr. Duff.  You want to allow that, so we can clarify this right here and now.

MR. DUFF:  Not really.  What are you asking?  Maybe I don't understand what you are asking.

MS. TROMBETTA:  I'm asking for the sake of clarity and to save more time, if you will permit me to play the phone recording between Norb Novocin and I.

MR. DUFF:  If you have a question that's relevant.  I can't really answer that question, until I know what you are planning to do with it.  If you are going to play it to

**SA993**

Page 157

N. NOVOCIN

play it, I don't see how that's

relevant.  If you have a question

that's related to it.  I'm not sure

why you need to play it right now.

MS. FARMER:  It sounds like

Miss Trombetta wants to mark an audio

recording.

MS. TROMBETTA:  Which I have

already submitted it.

MR. BIALEK:  Just to clarify,

is this the recording between Mr.

Novocin and Teri Meissner?

MS. TROMBETTA:  This is the

recording between Mr. Novocin and

myself.  Mr. Novocin spoke with me.

MR. BIALEK:  Was this the one

where he thought he was speaking with

Miss Meissner?

MS. TROMBETTA:  No.  I

identified myself to Marie Novocin

the night of January 10th.  This is

just like the painting, a

misattribution.

MS. FARMER:  Miss Trombetta, if

**SA994**

Page 158

N. NOVOCIN

you are going to ask the witness about a phone conversation that you had with his wife or him?

MS. TROMBETTA:  With him.  My intention is to have Mr. Novocin listen to the conversation, because apparently there is a great deal that he is not remembering.  May I play the recording.

MR. BIALEK:  It's your examination.

(Whereupon, the aforementioned recording was deemed marked as Exhibit 12 on this date, by the Reporter).

(Whereupon, a lunch break was taken".

Q.    I have sent you a copy of the recording which I am about to play right now.

(RECORDING PLAYED).

MR. DUFF:  I can hear every other word.  I do not hear anything playing.

**SA995**

Page 159

N. NOVOCIN

MS. FARMER:  Me neither.

MR. DUFF:  Objection.  I still don't hear anything playing.  Miss Trombetta, is there a question coming?

MS. TROMBETTA:  There is a question.

Q.    Mr. Novocin, who was that phone call with?

MR. DUFF:  Objection to the form, but Norb, if you think you can answer it, go.

A.    At this point I know it was you.

Q.    At this point you know it was me.  That phone call has been sent to all the attorneys in April of 2022 and was also sent --

MR. DUFF:  Please don't harass my client.

MS. TROMBETTA:  I am not harassing him.  I am trying to communicate that in February of 2019 before Worthpoint was involved, this

Page 160

N. NOVOCIN

phone call was sent to Judge Abrams

(phonetic).

MR. DUFF:  Do you have a

question?

MS. TROMBETTA:  I sent this to

Mr. Duff.

MR. DUFF:  Do you have a

question?

MS. TROMBETTA:  Yes.

Q.    Why did you tell me to hire an

attorney?

A.    Because I was not going to give

you the information on who bought the

painting so you can contact them.

Q.    During the phone conversation,

did I identify myself as the artist?

MR. DUFF:  Objection.  It

speaks for itself.  The recording

speaks for itself.

MS. TROMBETTA:  That's correct.

MR. DUFF:  I couldn't hear it.

So he couldn't here it either.  He's

not been able to answer the question.

MS. TROMBETTA:  You are

**SA997**

Page 161

N. NOVOCIN

assuming that he didn't hear it.

MR. DUFF:  There were portions we couldn't hear a single thing happening.  I will know that he didn't.  You were saying the recording was playing.  I couldn't hear it, which means nobody else could hear it.  I'm objecting.

A.    I could not hear it.

MS. TROMBETTA:  Did I send this to you in April?  Yes or no, Mr. Duff.

MR. DUFF:  I'm not testifying here.

Q.    Mr. Novocin?

A.    Yes.

Q.    Are you aware that I sent this to your attorney?

MR. DUFF:  Objection.

You can answer.

Q.    On April 2022.

A.    I was aware of this phone conversation.

Q.    Did you listen to this phone

**SA998**

Page 162

N. NOVOCIN

conversation prior to the deposition today on September 22, 2022?

A.   I believe I have had a phone conversation.

Q.   Are some of the statements that you made today during your deposition in direct contrast or in contradiction to the information stated today?

MR. DUFF:  Objection.

You can answer.

Q.   And in relationship to the phone call?

A.   No.

Q.   It's all consistent?

A.   Yes.

MS. TROMBETTA:  Getting back to the evidence, if you can indulge me, Ms. Farmer.

MS. FARMER:  Which document would you like to have on the screen?

MS. TROMBETTA:  The letter from Susan Goldstein, please, who is not a witness.

Q.   To circle back, Mr. Novocin, in

Page 163

N. NOVOCIN

September or August, September of 2017, did you receive a settlement letter?

A.    I received a demand letter from an attorney on your behalf.

Q.    Is that correct?  Are you confirming that?

A.    Yes, we did receive a demand letter.

Q.    Did that demand letter state that I lost a sale of artwork because of your post?

A.    I have no idea.  I just didn't want to serve a demand from you.

Q.    That's part of the problem. You have no idea?

A.    I am not required to follow up on every demand someone makes.

Q.    As a seller of items on Ebay, do you have a responsibilities for the accuracy of the information?  Yes or no.

A.    Yes.

MR. DUFF:  Object to the form.

MS. TROMBETTA:  Mark this as 13.

**SA1000**

Page 164

N. NOVOCIN

(Whereupon, the aforementioned document was deemed marked as Exhibit 13 on this date, by the Reporter).

Q. Were you responsible in the information that was described to the 1972 Man With A Red Umbrella?

MR. DUFF: Objection.

You can answer.

A. At every point at that point I was responsible. When I found out it may not have been done by you, I contacted the person and let them know. Every point along the way, I was totally above board on it.

Q. Why then did you ignore the settlement letter and not try and work this out before?

A. I was not going to give you $8,000 for a sale that happened five years ago and I did everything correct at that point and I'm willing to do everything correct at this point. That's just blackmail. I am sorry. I'm not going to do it.

Page 165

N. NOVOCIN

Q.    Blackmail?

A.    Yes.  You do this or I am going to sue you.  What do you call it?

Q.    Sir, you have made several contradictory statements today.

MR. DUFF:  If you have a question for my client, that's fine. If not, I guess I'm going to have to call the judge.  You are just badgering my client now.  If you have questions, please ask them and get this done so they can talk to Ms. Marie.

MS. TROMBETTA:  Ms. Farmer, could you please bring up the letter from Susan Goldstein, please.

MS. FARMER:  This will be Exhibit 13 of today's date.

Q.    Can everyone see it?

A.    Yes.

Q.    Mr. Novocin, what is the date on the upper left-hand side corner of this letter?

A.    March 4, 2019.

**SA1002**

Page 166

N. NOVOCIN

MR. DUFF:  Objection.

You can answer.  Go ahead.

Q.    Did you ever read this letter?

A.    I think I might have.  I'm not positive.

Q.    Do you recall that there was a loss of a sale for $8,500?

MR. DUFF:  Objection.

You can answer.

MS. TROMBETTA:  That's a legitimate question.  I'm asking him if he remembers the contents of the letter.

A.    I don't remember a loss of a sale of $8,500.

Q.    Do you remember if it stated that I had to openings in the year of 2015 at the Union League Club and also at the Italian American Museum?

A.    No.  I was not keeping track of your openings.

Q.    But you were keeping track of my biography; is that correct?

MR. DUFF:  Objection.

**SA1003**

Page 167

N. NOVOCIN

You can answer.

A.    I copied your biography.

Q.    Are you aware that askART does not permit you to copy the biography?

MR. DUFF:  Objection.

You can answer.

Q.    Does askART permit its subscribers to make secondary copies of the contents on their website?  Yes or no.

A.    I don't know.

Q.    That's why we are here today because you don't know.

MR. DUFF:  Objection.

MS. TROMBETTA:  I would like to pull up, Ms. Farmer, if you can cooperate with me, plaintiff's evidence 000349.  It was sent right between the break.

(Whereupon, the aforementioned document was deemed marked as Exhibit 14 on this date, by the Reporter).

MS. FARMER:  Please mark this document as Exhibit 14 of today's date.

Page 168

N. NOVOCIN

It does not have a bates stamp. Have you produced the document previously?

MS. TROMBETTA:  It the upper right-hand corner, it says 000349. Maybe I didn't scan it.  No.  I scanned it.

MR. DUFF:  The version that is showing right now that I see that's being shared on Zoom looks like the version.  Can you go down so I can see a date at the bottom.  That looks like the one I have.

MS. FARMER:  The document is titled.  It's titled "Plaintiff's evidence 349, Delaware EAI Incorporation, 2012 to 2017".  Page 1 pdf, the bates stamp, however, does not appear on document itself.

MS. TROMBETTA:  I probably in haste didn't scan it.  I probably adhered it afterwards.  I will send it to you right after the deposition.

Q.    My question, does the document

**SA1005**

Page 169

N. NOVOCIN

state that on the 23rd of April 2012 is when you incorporated, Mr. Novocin, for Estate Auctions, Inc.?

A.    That is when we had our second incorporation of Estate Auctions, Inc.  As we stated earlier, with Ms. Jana, we actually were incorporated in the State of Florida as of the 29th of August 2001 and we kept under Florida corporation up until April 23, 2012 when we incorporated in the State of Delaware.

Q.    So for the sake of simplicity, Estate Auctions, Inc., was that incorporated in Florida?

A.    Yes.

Q.    What are the years that it was incorporated in Florida?

MR. DUFF:  Objection.

You can answer.

A.    To reiterate, from August 29, 2001 through April 23, 2012.

Q.    On April 2012, did you apply for an incorporation in the State of Delaware?

Page 170

N. NOVOCIN

A.    That is correct.

Q.    Is it correct that on the 12th of October 2017, the incorporation failed due to lack of a registered, designated registered agent?

A.    That's what it says right there and I have no problem with that.

Q.    I just wanted to confirm that information.

MS. TROMBETTA:  Miss Farmer, can I ask you to please bring up plaintiff's evidence 000344.

A.    Of course we were incorporated, Inc.  LLC at the time.  Not incorporated.  LLC.  I guess I didn't --

Q.    You didn't what?

A.    I didn't mute myself.  Of course the date that you gave we were in business at Estate Auctions LLC, which we did one year after the 2012 date and 5/15/2013, that was in effect in the State of Delaware.  The other one went defunct in 2017 for lack of a registered agent because we were no longer using that.

Page 171

N. NOVOCIN

Q.   To ask you to stay on this particular subject.  October of 2012 is around the time that you found the 1972 Man With A Red Umbrella painting; is that not correct?

A.   That is correct.

Q.   So were you technically incorporated at that time?

A.   Yes.

Q.   Whereabouts were you incorporated?

A.   In the State of Delaware.

Q.   You were incorporated in the State of Delaware?

A.   Right.

Q.   Can you tell me specifically if your incorporation is consistent with the date of the finding of the Man With A Red Umbrella?

MR. DUFF:  Objection.

You can answer.  Also objection for vagueness.  I have no idea what you are asking.

MS. TROMBETTA:  I'll rephrase

Page 172

N. NOVOCIN

that.  There was a bit of hesitation.

Q.    When you found the 1972 Man With A Red Umbrella painting, were you incorporated in the State of Delaware?

A.    Yes, I was.

Q.    Were you incorporated when you made the sale of the painting?

A.    Yes, I was.

MS. TROMBETTA:  Duly noted. Let's go to plaintiff's evidence 000344, please.

MS. FARMER:  Please mark this as Exhibit 15.

(Whereupon, the aforementioned document was deemed marked as Exhibit 15 on this date, by the Reporter).

Q.    Can you see the document, Mr. Novocin?

A.    I can.

Q.    What does it say under R-E?

A.    "Trombetta versus Novocin, et. al.  18-cv-0993-RA-Settlement conference".

Q.    On April 22, 2019, were you via Zoom present at a settlement conference in

Page 173

N. NOVOCIN

the chambers of Judge Ronny Abrams?

A.    It was by phone.  Not by Zoom.

Q.    Were you present?

A.    I was present on a phone.

Q.    Was Mrs. Novocin present?

A.    Via phone.

Q.    Can you recall the offer that you made to the plaintiff on April of 2019?

A.    It was somewhere around, if I recall correctly and I may get this wrong, somewhere around $600.  No, no.  It was 150.  $150.

Q.    Actually, it was --

MR. DUFF:  Objection.

Q.    It was less than that.

A.    Okay.

Q.    Can I ask why you offered the $150, in your opinion?

MR. DUFF:  Objection.  This is getting close to asking for privileged information.

MS. TROMBETTA:  It's not privileged if I'm involved.  It was actually on the record.

**SA1010**

Page 174

N. NOVOCIN

MR. DUFF:  You are asking about why they made a settlement offer to you.  That's going to necessarily involve conversations that I had with them.  It doesn't matter that you were the end recipient.  If you want to ask a question about this letter or something else we sent to you, that's fine.  You can't ask about conversations.

MS. TROMBETTA:  I do want to ask a question about the settlement letter.

MR. DUFF:  Okay.  If you can ask one that doesn't go into privilege.

MR. BIALEK:  Was that settlement conference and the letter pursuant to FRE 408?

MR. DUFF:  No.  This is a settlement conference that we had in front of Judge Abrams, but yes, the amount, all of that would have been under Section 408, yes.

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 175 of 247

Page 175

N. NOVOCIN

Q.    Mr. Novocin, how many times did we try to settle this case?  Can you recall, from the very beginning, from 2017?

MR. DUFF:  Objection.

You can answer.

A.    It wasn't in 2017.  So there was no case there to try and settle.  From 2018 when you started this, I think -- I think only three times we had settlement things.

Q.    I just want that on the record. Thank you.  I am going to ask, why did you decide to post a bond for attorney's fees against me in 2020?

MR. DUFF:  Again, I'm going to object in that you are looking for, the answer is going to necessarily include privileged information.

MS. TROMBETTA:  Let's move onto, I have two more pieces of evidence and then we are going to end this session.  The other piece of evidence is EAI000010.

MS. FARMER:  This will be

**SA1012**

Page 176

N. NOVOCIN

marked as Exhibit 16.

(Whereupon, the aforementioned document was deemed marked as Exhibit 16 on this date, by the Reporter).

MS. TROMBETTA:  I sent it to you via the lunch break.

MS. FARMER:  I don't see it.

MS. TROMBETTA:  It says, "Teri Meissner".

MR. DUFF:  There is a document that just says, "Teri Meissner".

Q.    This is EAI's evidence.  Do you see this evidence, Mr. Novocin?

MR. BIALEK:  Exhibit 16, correct?

MS. FARMER:  Exhibit 16, yes.

A.    This is an e-mail from Teri Meissner.

Q.    Can you see it first?

A.    I see the top of it.  It says, "Message from Teri Meissner".  One message. So the girl in this text is someone you remember.

Q.    Can you read for me next to

Page 177

N. NOVOCIN

Teri Meissner, the e-mail address.

A.    It says idriss.linge@agencee,
A-G-E-N-C-E-E, cofin.com.,C-O-F-I-N.

Q.    What is the date of that,
please?

A.    March 23, 2022.

Q.    Is Teri Meissner, is her name
in the e-mail address?

A.    No.

Q.    In your opinion, do you think
this is a spam e-mail?

A.    I have no idea.

MR. DUFF:  Objection.

You can answer.

MS. FARMER:  Objection to form.

Q.    Let me just formulate a
question.  Earlier today you stated that
you spoke to Teri Meissner on the phone?

A.    Right.

Q.    Was it indeed Teri Meissner?

A.    I am informed now that it was
you.  You have informed me that it was you.

Q.    Do you think that there is a
possibility that this e-mail from March

**SA1014**

Page 178

N. NOVOCIN

22nd is not from Teri Meissner?

A.   I have no idea.  That's what I said.

Q.   Even though you have no idea, this is your evidence, sir.  Why did you submit this as evidence?

MR. DUFF:  Objection.

You can answer.

Q.   Can you tell me the relevance of your evidence EAI00010?

MR. BIALEK:  Objection as to the characterization of this as evidence.

MR. DUFF:  Yes, thank you.

Q.   This is labeled EAI00010.

MR. DUFF:  That's a bates number.

Q.   This bates number, what is the purpose of submitting this?

MR. DUFF:  It was responsive to your discovery requests.  If you want to talk about that, we can go off the record, but we don't need to do it right now.  There's nothing that Norb

**SA1015**

Page 179

N. NOVOCIN

is going to tell you.

Q.    Mr. Novocin, are you claiming this is from Teri Meissner?  Yes or no.

A.    I don't know who it's from.

MR. DUFF:  Objection.  Asked and answered.  He already told you this three times.

MS. TROMBETTA:  I just want to clarify it.

Q.    You don't know?

A.    I don't know.

MS. TROMBETTA:  The last and final piece of evidence from me today, is if you can bring it up, Miss Farmer, EAI000053.  It's dated April 26, 2022.

MS. FARMER:  This will be Exhibit 17 of today's date.

(Whereupon, the aforementioned document was deemed marked as Exhibit 17 on this date, by the Reporter).

Q.    Can you read it, Mr. Novocin, please.

A.    "Tuesday, March 2, 2021.  To

**SA1016**

Page 180

N. NOVOCIN

Norb@Novocin.com.  Dear Mr. Novocin, thank you for contacting askART.  The biography for Ms. Annamarie Trombetta has been listed on askART since 2008.  Our records show that you have been a subscriber of askART since 2001.  Best, Kris, askART".

Q.    Did you send an e-mail to askART for this response?

A.    No.  I called her on the phone.

Q.    Who is her, please?

A.    Kris at askArt.

Q.    You called Kris at askART?

A.    I called askART as a whole. Talked to them.  Told them what was going on with the current lawsuit, the litigation and said I need some help.  I have been with you a long time.  I need to find out when this happened and when this happened. They said oh, we don't normally do that, being as you have been with us for as long as you had, we will do some research on it and get back to you via e-mail.  This is their getting back with us.

MS. TROMBETTA:  I believe I am

Page 181

N. NOVOCIN

finished with my questions.  Thank you.

MS. FARMER:  Mr. Duff, do you have any follow-up questions?

MR. DUFF:  No, I don't.

CONTINUED EXAMINATION BY

MS. FARMER:

Q.    Mr. Novocin, I have follow-up questions.  Mr. Novocin, to your knowledge, was askART also made to publish Ms. Trombetta's biography?

A.    I would say so.

MS. FARMER:  I'm sorry.  I could not hear.  Marlene, can you read it back.

(Whereupon, the referred to answer was read back by the Reporter).

Q.    Mr. Novocin, did you ever have any discussions with askART during which any of askART representative told you it was okay to use artist's biography in your listings?

A.    No.

**SA1018**

Page 182

N. NOVOCIN

Q.    Did you have discussions with askART about this lawsuit?

A.    Yes.

Q.    Other than the fact that there was a lawsuit, what was the sum and substance of your discussion with them?

A.    It was about a painting that we had sold by Annamarie Trombetta and I used the biography, I need to know when the biography was on there.  I used it off their site.  I copied and pasted it off their site and I needed to find out when it was on their site.

Q.    In response to you stating that, did askART say anything to you?

A.    They said they would research it and get back to me.

Q.    Did they say to you that they did not agree with the practice of copying any text from their website and pasting that as part of your listings?

A.    No.

Q.    Did they object specifically to what was done in relation to the Ebay sale

**SA1019**

Page 183

N. NOVOCIN

for Ms. Trombetta, for the painting that was attributed to Ms. Trombetta?

A.    No.

Q.    Mr. Novocin, do you know whether or not askART knows that you used the artist's biography from their site for Ebay auction listings?

A.    I don't know definitively.  I would think they would, but I don't know definitively.

Q.    You said you would think they would.  What is the basis for you thinking that?

A.    Well, they have told me in the past I was their largest user.  They know I sell on Ebay.  They're following the things that going on.  Somewhere along the line, if they took the time to call me and let me know that I was their largest user, they would have done the research into us and see how we use their site.  That's why I would tend to think it is, but I don't definitively know that's the case.

Q.    You certainly specifically told

**SA1020**

Page 184

N. NOVOCIN

them that you used the biography matter for this one particular Ebay listing, correct?

        A.      Correct.

        Q.      They have never objected to your use of the artist's biography on your Ebay listings, correct?

        A.      That is correct.  Also attributed them on every time I do it.

        Q.      Have they ever said anything about your attribution?

        A.      No.

        Q.      Do you know whether they were aware that you were attributing the text to them every time you used the text?

        A.      I don't know.  I would tend to think they would, but I don't know.

        Q.      Again, you would tend to think they would because they singled you out as one of their top users and called you, et cetera?

        A.      Right.

        Q.      They have never objected to your practice of referring to askART in your Ebay listings, correct?

**SA1021**

Page 185

N. NOVOCIN

A.     That's correct.

MS. FARMER:  Thank you.

Ms. Trombetta, go ahead.  You said you had a question.

CONTINUED EXAMINATION BY

MS. TROMBETTA:

Q.     How much in your recollection do you use biographies from askART?

A.     I would say on a weekly basis. If I'm selling ten pieces of artwork and some of them are by listed artists, seven times.  I'm using it every single week. Sometimes 30, 40 times.  Sometimes only one or two, depending on how much artwork I have that are by listed artists.

Q.     Again, just to clarify, Kris from askART is indeed a female, not a male?

A.     It was a female that I talked to.  That was Kris.

Q.     They had no response, askART, when you informed them that there was a misattribution?

MR. DUFF:  Objection.

You can answer.

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 186 of 247

Page 186

N. NOVOCIN

A.    I didn't inform them there was a misattribution.

Q.    I believe earlier you stated that you wanted to know certain information.

MR. DUFF:  Objection.

You can answer.

Q.    Did you contact askART and specifically ask them about artist Annamarie Trombetta?

A.    I did call them.  I did contact them, but I asked about when the biography went up on your listing on askART.

Q.    Do you recall the phone number? Was it a 1-800 number or was it a 212?

A.    I don't have the phone number off the top of my head.  I would have to go back and research it again.  I know it was difficult to get because they are alike on them.  I may have actually gone into old e-mails to get a phone number.  It took awhile to trace it down.  I did get it.  I don't think it was an 800 number.

Q.    When you made this phone call,

Page 187

N. NOVOCIN

do you remember the year in which you made this phone call?

A.    Whatever is on the top of that one letter, it was within two weeks before that.

Q.    Two weeks, so in the year of 2022?

A.    Yes.

Q.    As far as ten years earlier in 2012, no?

A.    I didn't contact them in 2012.

Q.    There was another question that I had.  Are you aware of any prices on line for my artwork?

A.    No idea.

Q.    Are you aware that the size and the amount of the paintings that you sold is extremely detrimental to the value of my artwork?

MR. DUFF:  Objection.

You can answer.

Q.    Given the size and the amount of $181.50, in your opinion, do you think the value of that painting is low bid?

**SA1024**

Page 188

N. NOVOCIN

MS. FARMER:  Object to the form.

MR. DUFF:  Objection.

You can answer.

Q.    Is the Man With A Red Umbrella an inexpensive painting?

MR. DUFF:  Objection.

You can answer.

MS. FARMER:  Object to the form.

Q.    Paintings that are four feet high, what is the normal, in your opinion, for paintings of that size?

MS. FARMER:  Objection to form.

Ms. Trombetta, you keep asking the witness for his opinion.  He's here as a fact witness.  As such, he can only testify to what he has heard, seen, done and about facts.  When you are asking about opinions, that means that you are asking for an expert opinion.

MS. TROMBETTA:  Understood.  I got it.

Page 189

N. NOVOCIN

Q.    So to wrap this up, Mr. Novocin, to confirm, are you aware of the size and the value of my artwork?

A.    No.

MR. DUFF:  Objection.

Q.    So can you see this (indicating).

A.    I can see a white block there.

Q.    This canvas size is two inch by two inch.  Okay?

A.    Okay.

Q.    If I was to do a landscape, it would retail for $500.

MR. DUFF:  Objection.

You can answer.

Q.    Do you know the cost of a portrait by Annamarie Trombetta?

MR. DUFF:  He's already answered that he does not.  He said that multiple times.  Also, can you just describe what you are doing here.  I don't know if that made the transcript.  You are holding up something.

Page 190

N. NOVOCIN

MS. FARMER:  MS. TROMBETTA, you have to verbally say for the Court Reporter to express what you are showing.

MS. TROMBETTA:  I am showing a canvas the size of two inch by two inch.  I am asking Mr. Novocin what size was the 1972 Man With A Red Umbrella.

Q.    What size was it, to your recollection?

A.    It was big pic.  I think it was 48 inches by 18.  Something of that nature.

Q.    Can you tell me the amount that someone paid for that painting?

A.    $181.50.

Q.    Do you feel that the plaintiff has been damaged by the size and the low bid amount of the 1972 Man With A Red Umbrella?

MR. DUFF:  Objection as to form, but Norb, go ahead and answer if you can.

MR. BIALEK:  Objection.  Again,

Page 191

N. NOVOCIN

he's not here as an expert witness.

MS. TROMBETTA:  Understood.
Let's end this.

MR. DUFF:  I have no questions.
Unless Jana, do you have anything
following up after that?

MS. FARMER:  Yes, I do have one
question.  Actually, a couple of
questions.

CONTINUED EXAMINATION BY

MS. FARMER:

Q.    Mr. Novocin, when you post
listings on Ebay, do you understand that
you are governed by Ebay's service
conditions?

A.    I do.

Q.    Have you ever reviewed the
service conditions?

A.    Periodically.  Not often.  It's
a lot.

Q.    When you publish something on
Ebay, as part of Ebay's terms and
conditions, do you give Ebay the right to
basically display your listing?

**SA1028**

Page 192

N. NOVOCIN

A.    I would say yes.

Q.    Do you know whether or not you also as part of publishing on Ebay, give Ebay the right to repost the contents of the previous listing?

A.    I know that they do it, so I can infer that they have that right to do it.

Q.    To your knowledge, were there any qualifications or limitations to the license that you give to Ebay as part of publishing listings through them?

A.    Rephrase that, please, Jana.

Q.    Is there any limitation that you can only do it for certain purposes; for example, is there any restriction that Ebay cannot re-license the information that you post to somebody to use for research purposes?

A.    I do not give any restrictions to Ebay about the information off listings that I put up.  They put a lot of restriction on me, not vice versa.

Q.    Does Ebay also require you to

**SA1029**

Case 1:18-cv-00993-LTS-SLC    Document 425-2    Filed 04/17/23    Page 193 of 247

Page 193

N. NOVOCIN

make certain that everything in your listing is correct and to the best of your knowledge?

A.    They scrutinize what we do. They have also let us know that because of the level we were at at one point, they had extra scrutiny to what we do, because other people look at us as an example all these years.  They don't want someone to think that someone who is at the level that we are is getting away with things from leeway.  They give us extra scrutiny, not less.

Q.    They do require you to do things correctly and make certain that everything in your listing is correct?

A.    Yes.

Q.    And they double check, correct?

A.    Yes.

Q.    It looks like you didn't finish your answer.  Please continue.

A.    If I do get something wrong and they find out that it's wrong, they will notify me if it can be changed.  If not,

Page 194

N. NOVOCIN

they will pull the listing.

Q.    When you post something on Ebay as part of their terms, do they also require you to make sure that you have authorization to post whatever it is that you are posting?

A.    They ask us to, yes.

Q.    If they don't think you did it correctly and they see it, they will usually come up and either take down the listing or tell you to fix it, correct?

A.    Correct.

Q.    As far as you know, was Ebay permitted to license the specific listing to Worthpoint?

A.    As far as I know, yes.

MS. FARMER:    I have nothing further.    Mr. Novocin, thank you so much for your time.

CONTINUED EXAMINATION BY

MS. TROMBETTA:

Q.    I have a few questions in relationship to that.    Mr. Novocin, if you don't have a business agreement with

Page 195

N. NOVOCIN

Worthpoint, how do you know if Ebay has the right to license the material to Worthpoint?

A.    As I said before, I see that they do send that information to there, so I infer that they must have an agreement. Otherwise, someone is just snatching it off of Ebay and putting it on there.

Q.    So you're assuming there is an agreement; is that correct?

A.    I infer it, yes.

Q.    Can you ask you why a painting that was sold in 2012 was on the internet in 2015?  Is that something that you can answer?

A.    I can give opinions on why it was on there, but I cannot say definitively.  I am not a programmer, nor a computer person.

Q.    Are most of your sales that you sell on Ebay, do they surface onto the internet?

A.    Most of my -- most of my sales are on the internet at some point.  A lot

Page 196

N. NOVOCIN

of them are on Worthpoint.  If you do a search on Worthpoint for the three letters YQZ in their search zone, you will find tens of thousands of our listings that have come over to Worthpoint, because literally we sold so many things on Ebay, it's hard for them not to get our stuff.

Q.    Do you know the bridge between Estate Auctions, Inc. and Worthpoint, who is the source of the download for your sales?

MR. DUFF:  Objection.

You can answer.  You can answer the question.

MS. FARMER:  Join.

Q.    Do you know how your sales on Ebay transfer over to other websites to include Worthpoint?

MR. DUFF:  Objection.

You can answer.

A.    No.

Q.    Again, to rephrase it, there is a three-year gap between the sale of the 1972 painting, Man With A Red Umbrella.

**SA1033**

Page 197

N. NOVOCIN

Can you give any information as to why this post was on the internet in the year 2015?

MR. DUFF:  Objection.

MS. TROMBETTA:  I have no further questions.

CONTINUED EXAMINATION BY

MS. FARMER:

Q.    Mr. Novocin, regardless of whether there was an agreement between Ebay or Worthpoint, you had no issue with Ebay giving this listing to Worthpoint, correct?

A.    No.

MS. FARMER:  Thank you.  No further questions.  Thank you so much for your time and patience today. You are done.

(Whereupon, at 3:32 P.M., the Examination of this witness was concluded.)

(Whereupon, at 5:15 P.M., the Examination of this witness was re-open).

CONTINUED EXAMINATION BY

MS. TROMBETTA:

Case 1:18-cv-00993-LTS-SLC   Document 425-2   Filed 04/17/23   Page 198 of 247

Page 198

N. NOVOCIN

Q.     To the best of your knowledge, did Estate Auctions, did you have insurance for your company?

A.     No.

Q.     Not at any time did you have insurance for your company?

A.     Correct.

Q.     What is the date of the ending of Estate Auctions?

MR. DUFF:  Objection.

A.     We have three different Estate Auctions, Inc.  Estate Auctions, Inc. In Florida started in 2001 and ended in 2012. Estate Auctions in Delaware started April 23, 2012 until it went defunct.  We stopped using it in July of 2013 when we started Estate Auctions LLC.  That started on July 15, 2013 and went until July -- January 11, 2019.

Q.     So can you tell me very simply and very specifically, which Estate Auctions, Inc. was the Estate Auctions during the sale of the 2012, 1972 painting?

MR. DUFF:  Objection.

Page 199

N. NOVOCIN

A.    Estate Auctions LLC started on April 23, 2012 and ran through July of 2013.

Q.    July of 2013?

A.    So it was -- so Estate Auctions was only in existence for one year before we started a different company and started operating with that company name.  We let Estate Auctions, Inc. go defunct.  We didn't do anything to end it.  We just let it go defunct and Estate Auctions only had from April to July, April 2012 to July 2013, correct.

Q.    That was the time period for the sale?

A.    Correct.

Q.    I needed to clarify that. Again, at no time there was insurance with your business?

A.    That is correct.

Q.    With any of the three different Estate Auctions, Inc., there was never any insurance?

A.    Correct.

Page 200

N. NOVOCIN

Q.    What about for YQZ?

A.    YQZ started on January 11, 2019 and it is still operating today.

Q.    Do you have insurance on that?

A.    Why is that relevant?

Q.    I'm asking.

A.    I'm saying, why do you need to know?

Q.    Because I am inquisitive.  Do you have insurance?

A.    It's none of your business right now.  That's not it.  That's a different entity from everything else.  That's something this is not about --

Q.    You don't want to reveal whether you have insurance?

MR. DUFF:  We are objecting to that question.

MS. TROMBETTA:  Other than that, that is it.

THE WITNESS:  Thank you.

(Whereupon, at 5:18 P.M., the Examination of this witness was concluded.)

**SA1037**

Page 201

N. NOVOCIN

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_____
NORB NOVOCIN

Subscribed and sworn to before me this _____ day of _____ 20____.

_____
NOTARY PUBLIC

**SA1038**

Page 202

N. NOVOCIN

E X H I B I T S

DEFENDANT'S EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Painting front | 25 |
| EXHIBIT 2 | Painting back | 34 |
| EXHIBIT 3 | Signature close-up | 46 |
| EXHIBIT 4 | Ebay receipt | 72 |
| EXHIBIT 5 | Confidential | 80 |
| EXHIBIT 6 | Worthpoint listing | 88 |
| EXHIBIT 7 | Norb Novocin declaration | 120 |

Page 203

N. NOVOCIN

PLAINTIFF PRO SE EXHIBITS


EXHIBIT      EXHIBIT                          PAGE

NUMBER      DESCRIPTION

EXHIBIT 8      000342                          124

EXHIBIT 8-A    000338                          148

EXHIBIT 9      000339                          148

EXHIBIT 10     000340                          149

EXHIBIT 11     000346                          151

EXHIBIT 12     Recording                       158

EXHIBIT 13     Lost sale                       163

EXHIBIT 14     000349                          167

EXHIBIT 15     000344                          172

EXHIBIT 16     Teri Meissner document    175

EXHIBIT 17     EAI00053                        179


   (Exhibits retained by Court Reporter.)


                  I N D E X


EXAMINATION BY                                PAGE

MS. FARMER                  4, 181, 191, 197

MS. TROMBETTA          124, 185, 194, 197

**SA1040**

Page 204

N. NOVOCIN

INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS          PAGE

To the extent not already produced, we will call for the production of the copy of the listing that your son was able to find.          74

If you can go back and check if the original e-mail file, if you still have it, might have this information without being cut off.    77

The production of any demand letters that you may have received from attorney Megan Noh and for any e-mails that you have received from Ms. Meissner.          119

Production of the Paypal payment.    136

QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

Page 205

N. NOVOCIN

C E R T I F I C A T E

STATE OF NEW YORK        )

                        :  SS.:

COUNTY OF QUEENS         )


  I, MARLENE FITZGERALD, a Notary Public
for and within the State of New York, do
hereby certify:

  That the witness whose examination is
hereinbefore set forth was duly sworn and
that such examination is a true record of
the testimony given by that witness.

  I further certify that I am not related
to any of the parties to this action by
blood or by marriage and that I am in no
way interested in the outcome of this
matter.

  IN WITNESS WHEREOF, I have hereunto set
my hand this 30th day of September, 2022.




                    *Marlene Fitzgerald*

      MARLENE FITZGERALD

**SA1042**

Page 206

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Trombetta v. Novocin
DATE OF DEPOSITION: 9/21/2022
NAME OF DEPONENT: Norb Novocin

PAGE    LINE (S)        CHANGE              REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                                    _____
                                    Norb Novocin

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____          _____
(NOTARY PUBLIC)                 MY COMMISSION EXPIRES:

**[& - 2013]**                                                                   Page 1

| & |
| --- |

**&**   2:12 3:9 5:10

| 0 |
| --- |

**0000144**   89:4
**000054**   32:4
**000158**   126:19 146:9
**000159**   126:19
**000170**   151:12 151:24
**000338**   147:2,15 147:25 203:7
**000339**   148:16 203:8
**000340**   203:9
**000342**   123:23 124:14 203:6
**000344**   170:13 172:12 203:14
**000346**   153:7,16 203:10
**000349**   167:18 168:6 203:13
**0993**   1:6 172:23

| 1 |
| --- |

**1**   3:9 25:6,10,13 29:18 32:25 40:19,23,23 76:7 81:11 168:18 202:8
**1-800**   186:16
**10**   75:9 150:3,5 203:9
**100**   40:24
**10017**   2:15
**10128**   2:5

**10:05**   1:13
**10th**   133:22 155:5,13 157:22
**11**   71:10 151:15 152:5,16,25 153:6,8,10,12,14 153:16,17,21 198:19 200:3 203:10
**11101**   2:10
**119**   204:16
**12**   2:5 131:19 158:15 203:11
**12.5**   25:16,20
**120**   202:14
**12221**   4:12
**124**   203:6,24
**125**   73:11
**12th**   170:3
**13**   163:25 164:4 165:19 203:12
**136**   204:17
**14**   167:22,24 203:13
**148**   203:7,8
**149**   203:9
**15**   13:20 172:14 172:17 198:19 203:14
**150**   2:15 47:2 89:8,17 173:13 173:13,19
**151**   203:10
**158**   203:11
**16**   176:2,5,15,17 203:15
**163**   203:12

**167**   203:13
**17**   179:19,22 203:16
**170**   152:17
**172**   203:14
**175**   2:5 203:15
**179**   203:16
**18**   1:6 71:9 131:22 172:23 190:14
**181**   44:5 68:3 203:23
**181.5**   79:2
**181.50**   187:24
**181.50.**   79:3 190:17
**185**   203:24
**191**   203:23
**194**   203:24
**1963**   84:25 85:5
**197**   203:23,24
**19701,00006**   2:17
**1972**   24:23 26:2 35:24 82:17 90:17 91:8 138:11 146:13 150:23 151:2 164:6 171:4 172:3 190:9,20 196:25 198:24
**1977**   36:16,17
**1988**   137:3,4
**19973**   4:13
**1998**   13:9 147:9 148:12,13 149:15,20 150:16,22 151:6

151:9
**1st**   26:10 28:15 144:17

| 2 |
| --- |

**2**   34:11,15 36:8,8 68:5 122:21 179:25 202:9
**20**   201:19 206:22
**200**   89:9,16,18
**2001**   10:24 13:13 13:15 114:20 169:9,22 180:7 198:14
**2002**   12:11
**2008**   78:18,20 180:5
**2012**   13:16 14:4 24:24 26:9 28:15 42:24 43:10 59:5 62:12 75:6 76:7 91:14 107:22 108:11 111:20 112:3 114:11,13 114:17,18 116:12 135:22 137:13 144:7,13 144:14 168:18 169:2,11,22,23 170:21 171:3 187:11,12 195:14 198:14 198:16,24 199:3 199:13
**2013**   13:20 198:17,19 199:4 199:5,14

**[2015 - acquired]**                                                    Page 2

**2015**  166:18 195:15 197:3
**2016**  154:14
**2017**  75:9 115:20 133:23 155:5,14 163:2 168:18 170:4,24 175:4,7
**2018**  13:23 106:20,23,25 149:5 175:9
**2019**  107:2 137:5 159:24 165:25 172:24 173:9 198:20 200:3
**2020**  175:15
**2021**  179:25
**2022**  1:12 4:16 159:18 161:22 162:3 177:7 179:17 187:8 205:20
**21**  1:12 4:16
**212**  186:16
**22**  162:3 172:24
**22nd**  178:2
**23**  13:16 169:11 169:22 177:7 198:16 199:3
**23rd**  2:15 169:2
**24**  149:5
**24344**  205:23
**25**  34:19 68:5 202:8
**26**  179:17
**280**  90:5
**29**  13:13,15 169:21

**29th**  169:9

**3**

**3**  36:22 46:17,20 46:24 81:12 122:8 202:10
**3,000**  117:5
**30**  3:8 185:14
**30th**  205:20
**338**  147:11 148:17
**34**  202:9
**340**  149:24
**349**  168:17
**360**  64:24 70:18
**3:32**  197:18

**4**

**4**  36:24 72:13,15 72:16,20,25 74:11 78:22 165:25 202:11 203:23
**40**  185:14
**400,000**  69:7 115:5,6
**408**  174:20,25
**42nd**  2:15
**4310**  2:9
**46**  202:10
**48**  190:14

**5**

**5**  37:2 80:16,19 80:23 88:2 202:12
**5/15/2013**  170:22
**5/8th's**  84:6

**50**  17:16,17,19 32:16
**500**  17:19 97:9 189:14
**59**  72:15 73:3
**5:15**  197:21
**5:18**  200:23

**6**

**6**  37:4 88:18,21 89:2 145:10 202:13
**60**  71:4
**600**  173:12

**7**

**7**  37:6 120:9,12 120:19,23 202:14
**72**  202:11
**74**  204:7
**77**  204:11

**8**

**8**  37:8 124:7,19 147:23 148:7 203:6,7
**8,000**  97:9,9,10 164:20
**8,500**  166:8,16
**80**  202:12
**800**  186:24
**80s**  113:9
**88**  202:13

**9**

**9**  37:10 148:22 149:2,3 203:8
**9/21/2022**  206:3

**96th**  2:5
**99**  44:6 46:4,7 68:3 69:19 70:2 70:9

**a**

**a.m.**  1:13
**able**  19:13 31:25 35:19 38:10 43:7 54:9 56:5 71:22 73:8,15,25 74:7 80:24 146:6,21 160:24 204:7
**abrams**  160:2 173:2 174:23
**absolutely**  6:11 7:3 30:24
**access**  20:8 76:18,21 124:25
**accountant**  116:22
**accounting**  117:14
**accrued**  84:20
**accuracy**  163:21
**accurate**  121:19 133:2
**accurately**  33:2
**accused**  154:2
**acknowledge**  50:5
**acquire**  15:16 16:11 26:13 28:16
**acquired**  19:14 19:19 28:23 43:19 48:4

**SA1045**

**[action - apparently]** Page 3

| | | | |
|---|---|---|---|
| **action** 205:15 | 148:5,20 149:25 | **anderson** 2:10 | 166:3,10 167:2,7 |
| **actual** 36:6 38:7 | 151:13 153:19 | **andy** 14:24 | 169:20 171:22 |
| 39:8,8 71:12 | 158:13 164:2 | **anna** 138:16 | 175:6,18 177:15 |
| 76:24 82:15 | 167:20 172:15 | **annamaria** | 178:9 181:18 |
| 86:14 87:7 | 176:3 179:20 | 35:23 53:23 | 185:25 186:8 |
| 112:20 | **afternoon** | 122:5,14 138:19 | 187:22 188:5,9 |
| **ad** 131:18 132:2 | 100:15 135:15 | 139:16 | 189:16 190:23 |
| 138:24 146:2 | **agencee** 177:3 | **annamarie** 1:3 | 193:22 195:16 |
| **adam** 2:16 | **agent** 170:6,24 | 2:4 4:15 5:13 | 196:14,14,21 |
| **add** 49:21,23 | **aggregate** 56:15 | 38:11 52:10 | **answered** 7:17 |
| 50:5,8 | **ago** 42:24 50:19 | 53:13,20 54:21 | 127:11 128:6 |
| **added** 61:14 | 78:17 164:21 | 55:3,8 58:5,23 | 129:11 130:10 |
| 93:6,9 | **agree** 182:20 | 60:15 61:21,23 | 131:12 133:13 |
| **additional** 19:22 | **agreed** 3:3,10 | 62:13,18 66:17 | 140:16 141:12 |
| 36:10,13,15,21 | **agreement** | 66:25 67:9,22 | 141:15,20 |
| 36:22,24 60:22 | 123:11 194:25 | 82:19 83:3 | 144:10 179:7 |
| 71:12 87:3 | 195:7,11 197:10 | 84:24 89:7 | 189:20 |
| **address** 64:12 | **ahead** 55:21 | 95:21 96:13 | **answering** 6:16 |
| 74:12 75:23 | 127:11 128:7 | 99:10,17 101:12 | **answers** 6:17,23 |
| 109:23 110:5 | 132:7 133:14,17 | 101:15,19 | 35:3 50:19 |
| 177:2,9 | 144:11 154:6 | 103:15,20,22 | 133:16,19 |
| **addresses** 76:4 | 166:3 185:4 | 107:23 109:14 | **anthony** 113:18 |
| **adequately** | 190:23 | 122:5,11 129:18 | **antique** 26:16 |
| 121:6 | **al** 172:23 | 138:5,13,15 | 43:19 44:2,13 |
| **adhered** 168:23 | **alike** 186:20 | 139:10,11,14,15 | 57:13,25 63:9,10 |
| **administer** 3:6 | **allegedly** 102:18 | 139:22 180:4 | 64:3 123:12 |
| **admission** | 131:10 | 182:9 186:11 | **antiques** 15:15 |
| 153:24 | **allow** 156:11 | 189:18 | 38:21 63:12,14 |
| **adult** 15:8 | **allowed** 20:8 | **answer** 6:9 7:15 | 147:18,20,22 |
| **advised** 102:17 | 38:10 97:18 | 7:23 11:21,23 | **anybody** 4:20 |
| **affiliate** 17:2 | **allows** 61:4 | 13:25 15:15 | 14:15 41:15 |
| **affiliated** 12:8 | **altered** 93:11 | 38:16,18 50:19 | 60:14 73:22 |
| **affiliation** 19:2,7 | **american** 166:20 | 115:23 127:12 | 95:7,10 96:23 |
| **aforementioned** | **amount** 115:3 | 128:7 132:7 | 105:11 |
| 25:8 34:13 | 174:24 187:18 | 141:22 143:21 | **anybody's** 23:5 |
| 46:18 72:18 | 187:23 190:15 | 156:23 159:13 | **anymore** 88:2 |
| 80:17 88:19 | 190:20 | 160:24 161:21 | **apparently** |
| 120:10 124:17 | | 162:11 164:9 | 158:8 |

**[appear - attic]**                                                    Page 4

**appear** 41:4
    91:25 168:20
**appeared** 23:11
    47:6 50:24 51:2
    51:12 72:4
    151:3
**appearing** 49:4
    120:25 147:12
**appears** 35:20
    74:12,15 77:7
    148:10
**applicable** 126:3
**apply** 169:23
**appreciate** 6:21
**april** 159:18
    161:12,22 169:2
    169:11,22,23
    172:24 173:9
    179:17 198:15
    199:3,13,13
**area** 64:3
**areas** 8:21,24,25
**argue** 56:21
**arrangement**
    27:18,21 28:2
**arrangements**
    31:14
**art** 9:2,5,6,20,24
    12:19 16:19
    17:3,25 18:6
    19:20 24:9
    55:14 57:13
    62:22
**article** 149:21
    150:13
**artist** 9:9,15
    18:11 21:4,6,21
    21:22 22:15

39:12,16 40:12
52:18 54:11
58:23 60:22
61:11,16 62:13
62:18 67:16,21
69:16 82:20
83:4,8 85:10
101:16 108:5
129:8 139:4,12
140:6 155:6
156:2 160:17
186:10
**artist's** 60:5
    128:11 129:13
    181:23 183:7
    184:6
**artists** 20:10,13
    20:16,22,24,25
    21:10,18 22:17
    23:17 38:7,8
    55:9 56:8,14,21
    56:23 57:10,18
    58:8,12,16 139:2
    185:12,16
**artwork** 20:16
    21:10 24:9
    39:18,19 60:22
    62:15 129:18
    131:4,7 163:11
    185:11,15
    187:15,20 189:4
**artworks** 20:20
    20:20
**asia** 64:5
**asian** 64:6
    113:12 123:12
**askart** 10:22,23
    11:11,14 20:2,6

20:15,24 21:2,5
21:7,11,14,15,17
21:21 22:3,21
23:7,12,18,21,22
24:8 48:21
53:19,25 54:11
54:21,23 55:4
58:4 59:3,9,17
59:20,22,24
60:12,19 61:9,21
65:12,15 84:16
84:20 85:3,6
93:18 124:24
125:25 126:10
127:8,14,20
128:3,10,10,19
128:21,25 129:3
129:5,8 131:4,10
139:8,11,20,21
139:24 140:4
167:4,8 180:3,5
180:6,7,9,12,13
180:14 181:11
181:21,22 182:3
182:16 183:6
184:24 185:9,18
185:21 186:9,14
**askart's** 118:11
    118:17 124:3
**asked** 7:22 18:19
    31:10 33:9,11,21
    34:2 66:18,23
    68:17 100:10
    105:7 127:11
    128:5 129:10,16
    130:9 131:12
    133:13 140:15
    144:9 179:6

186:13
**asking** 29:7
    30:19 66:15
    96:7 97:8 99:14
    105:10 120:4
    126:22,24
    131:13 145:21
    149:17,19 152:4
    156:8,14,15,16
    166:12 171:24
    173:21 174:2
    188:16,21,22
    190:8 200:7
**assist** 95:8,11
    119:3
**associate** 54:9
**associated** 41:16
    54:22 62:7 67:2
    78:5 101:19
**assume** 7:16
    20:4 31:17
    60:11 64:11
**assumed** 53:24
**assuming** 161:2
    195:10
**assumption** 49:9
**assured** 105:24
**attempt** 125:6,6
**attend** 8:14
    55:23 119:3
**attended** 8:15,17
    8:19
**attention** 81:24
    90:20 91:16
    123:22
**attic** 26:16,21
    27:2,3,15,16
    63:22 130:3,13

**[attorney - bates]**                                                    Page 5

**attorney**  5:9
30:6,17,21 97:12
97:15,17 101:10
102:10,14,21
103:2 119:12
120:3,5 133:17
134:22,24 155:9
155:13,21,22
160:12 161:19
163:5 204:14
**attorney's**
175:14
**attorneys**  2:8,13
102:23 159:18
**attribute**  23:24
**attributed**  53:12
102:19 129:18
183:3 184:9
**attributing**
184:14
**attribution**  9:25
53:17 99:15
126:8 184:11
**auction**  15:21,24
15:25 16:3,13
43:25 44:2
55:11,14,18,23
56:4 57:24 70:4
70:6,8,11 82:14
82:16 91:8
95:12 111:9
117:5,6,7 183:8
**auctioneers**
57:14
**auctions**  1:8,18
2:9 4:17 5:15
12:5,7,10,21
13:7,10,12,17,18

13:21 14:3,5,16
15:12,16 16:6,8
16:10,15 17:6
19:13 24:12
26:4,12 32:4
41:16 42:5,7,12
42:16 43:14
47:10 60:15
68:24 73:23
75:17 81:14
82:2 90:23 91:4
95:7,10 104:13
105:11 108:25
109:4 111:6,19
112:6,7,16
114:25 146:13
147:17,19,21
148:11 169:4,6
169:14 170:20
196:10 198:3,10
198:13,13,15,18
198:23,23 199:2
199:6,10,12,23
**audience**  57:15
**audio**  157:7
**august**  13:13,14
163:2 169:9,21
**author**  22:15
**author's**  126:8
**authorization**
194:6
**authorized**  3:6
**authors**  22:17
**automatic**  68:10
**automatically**
68:13
**available**  68:22
156:6

**average**  64:14
**aware**  24:19
49:24 50:15
105:10 108:16
109:11 128:18
161:18,23 167:4
184:14 187:14
187:17 189:3
**awhile**  69:5
106:19 115:2
186:23

**b**

**b**  4:2 13:10,12
29:24 202:2
**back**  10:14
11:20,23 18:14
29:6 33:11,12,13
33:19,24,25 34:2
34:4,6 35:8 36:3
36:9 37:22
38:15,18,23 39:4
39:20 40:16,19
43:8 52:8 53:19
53:23 62:2,11
63:3,8 67:11
71:5 77:4,12
85:8 91:13
96:24 104:9
107:22 108:11
110:4,8 113:9,9
114:19,20
115:12,17 121:4
121:13 122:4
133:10 134:2
138:24 142:6,6
142:11,23 143:2
143:11,13

149:15 162:17
162:25 180:23
180:24 181:16
181:18 182:18
186:19 202:9
204:8
**background**
8:10 18:6
110:14 131:16
**backs**  110:9
**badgering**
165:11
**bankruptcy**
112:19 136:19
136:20,21,22,23
**banner**  49:22
**bars**  142:17
**based**  11:6 28:2
116:20 139:23
149:8
**bases**  119:9
**basically**  67:15
191:25
**basis**  28:3,5
84:10 102:2
111:24 183:13
185:10
**bate**  152:17
**bates**  29:22,24
30:7 35:18
46:25 73:3 81:3
81:22 89:3
126:18,22 127:2
144:21,23
145:21 146:8
168:2,19 178:17
178:19

**[beats - call]**                                                        Page 6

**beats** 68:14
**beginning** 38:15
  175:4
**behalf** 163:5
**believe** 24:23
  35:12 71:8 82:7
  97:9 101:11,21
  102:12 103:11
  103:21 106:24
  111:3 119:8,14
  119:22 123:24
  131:17 142:20
  144:5 162:4
  180:25 186:4
**beneath** 87:3
**benefits** 20:7
**best** 7:7 121:20
  121:21 131:25
  180:7 193:3
  198:2
**better** 22:8
  73:12 89:11
  103:23 104:7,12
  109:8
**beyond** 107:13
**bialek** 2:16
  38:14 81:16
  88:5 126:13
  130:14,19
  143:22 148:23
  150:4 151:21
  152:4,7 153:11
  153:17 157:11
  157:17 158:11
  174:18 176:15
  178:12 190:25
**bible** 8:18,23,24

**bid** 68:13 70:9
  187:25 190:20
**bidders** 66:8,9
  68:18
**bidding** 44:8
  68:10
**bids** 46:11 66:3
  66:5 67:24
  68:18,22
**big** 63:24 190:13
**biggest** 11:10
**biographies**
  20:11 21:18
  185:9
**biography** 21:20
  21:22 22:3,18
  23:16,17,21 54:2
  54:6 58:19 59:3
  59:8,12,16,25
  60:18 61:13,14
  61:15 65:12
  84:16,20,21
  86:18,22,23 87:3
  87:8,22 93:11,18
  93:20 94:3
  107:21 118:11
  118:22 127:9,13
  127:21 128:4
  129:7,13,23
  130:22 131:10
  131:16 139:24
  156:3 166:24
  167:3,5 180:3
  181:12,23
  182:10,11 183:7
  184:2,6 186:13
**bios** 23:11

**birth** 94:11
**bit** 11:18 77:8
  100:15 172:2
**blackmail**
  164:24 165:2
**block** 9:11 189:9
**blood** 205:16
**blue** 69:5
**board** 164:14
**bombs** 125:11
**bond** 120:18
  175:14
**booths** 26:24
  64:3 113:25
**born** 17:12
  65:15
**bottom** 22:24
  40:24,25 47:4
  49:4 51:23
  52:17 73:4 77:6
  81:4 85:14
  86:19 89:4
  111:5,12 112:12
  128:20 142:18
  168:13
**bought** 31:21
  66:25 67:4 79:8
  96:19 160:14
**bounce** 110:9
**bounced** 110:7
**brand** 15:24
  83:25
**break** 7:12,20,24
  53:4 118:3
  158:17 167:19
  176:7
**bridge** 196:9

**brief** 75:23
**briefly** 35:5
**bring** 61:18
  123:21 147:3
  165:16 170:12
  179:15
**brings** 151:12
**brought** 5:12
  29:6
**brown** 33:14,15
  33:17,19
**building** 63:15
  64:8,9,12 130:11
  130:13
**bunch** 111:5
  114:23 122:22
**bureau** 103:24
  104:8,12 109:8
**business** 8:25
  15:13 17:7 24:5
  103:23 104:7,12
  109:8 112:16
  150:16 170:20
  194:25 199:20
  200:12
**buy** 15:15 17:18
  61:7 62:7 67:10
  68:25 69:4,8,13
**buyer** 79:4 94:25
  95:4 98:21,22,25
  99:2,21 155:20

**c**

**c** 2:2 4:2 177:4,4
  201:2 205:2,2
**call** 61:2 74:5
  79:20 96:5,7
  100:4,22 101:2,4

**[call - collector]**                                                                            Page 7

101:13,15
103:14 106:15
109:14 119:10
133:22,25
134:10,13,17,18
134:20,23 135:2
159:10,17 160:2
162:13 165:4,10
183:19 186:12
186:25 187:3
204:5
**called** 4:2 10:21
18:23 31:10
102:25 113:2
133:25 145:22
180:10,13,14
184:20
**caller** 102:2
103:14 109:13
**calling** 84:4,11
134:6
**calls** 100:12
**camera** 44:19,22
45:2,3,7
**cameras** 44:23
44:25,25
**canada** 113:19
**canvas** 39:11,14
63:3 84:6
189:10 190:7
**capacity** 12:13
**capture** 109:12
**card** 45:13
**care** 67:16
**carol** 139:6
**carried** 97:11
**case** 1:6 61:8
83:22 106:21

115:8 175:3,8
183:24 206:2
**casey** 14:20 15:3
**caveat** 30:19
**cents** 44:6 46:4,7
68:3,5 69:19
70:2,9
**certain** 6:15
87:16 88:9
186:5 192:16
193:2,16
**certainly** 52:13
65:20 183:25
**certification** 3:4
152:22 153:5
**certify** 152:20
201:4,8 205:9,14
**cetera** 81:14
82:20 85:2
184:21
**chambers** 173:2
**chance** 35:4
73:16 76:22
86:19,23
**change** 44:25
114:10,12 206:5
**changed** 13:11
13:21 111:23
112:2 193:25
**changes** 45:2
126:7
**characterization**
178:13
**charge** 136:13
**check** 21:11
60:17 77:3,12
96:10,15 115:14
116:18,19,21

117:2,11,13,17
117:20,23
193:19 204:8
**checked** 27:8
65:18,20,21
96:20 105:25
**checking** 26:22
27:6
**checks** 117:3
**chic** 82:20 83:13
83:18,23,24 84:5
84:11
**chicago** 26:17
28:19,21 63:15
113:12,24 114:5
123:12 130:12
130:12 144:16
144:18
**child** 14:23
17:12
**children** 14:18
15:3
**chinese** 9:11
**chose** 9:12
**christian** 8:16
**christmas** 17:11
**circle** 162:25
**cities** 91:19
**city** 2:10 63:25
**civil** 1:20
**claiming** 179:3
**claims** 108:17
**clarification**
113:21
**clarified** 144:6
**clarify** 24:17
129:22 131:6
146:12 150:20

150:22 156:11
157:11 179:10
185:17 199:18
**clarifying**
141:18
**clarity** 71:14
156:17
**classroom** 10:15
**clean** 26:16
27:15
**clear** 9:19
**clearly** 127:7
**client** 81:7 97:17
126:23 159:21
165:8,11
**client's** 143:15
**clients** 83:23
**climb** 63:20
**close** 26:18
43:15 69:7
84:25 86:5
111:21 139:10
173:21 202:10
**cloud** 42:19,20
43:6,10
**club** 166:19
**code** 85:14,25
**codes** 85:18
86:25
**cofin.com.** 177:4
**cold** 28:19
144:15
**collectibles**
12:19 16:21
17:3,25 19:21
**collectively** 7:4
**collector** 98:12

**[college - contents]**                                                      Page 8

**college**  8:12,13
  8:16,18,19,25
  9:20,23 10:7
**colleges**  8:22,23
**colors**  9:11
**come**  10:21,23
  10:25 18:14
  22:8 26:20
  53:21 94:21
  97:6 117:13
  194:11 196:6
**comes**  115:8
**coming**  63:8
  159:6
**commenced**
  90:12,16 95:22
  103:4,9 104:24
**comment**  132:18
  137:19,21
  150:10
**commercial**
  125:24
**commercially**
  62:18
**commission**
  206:25
**common**  56:16
  68:15
**communicate**
  99:16 159:24
**communicated**
  96:3
**communications**
  95:20
**companies**  55:19
  57:9
**company**  11:6
  12:9,15,22 17:2

17:8,9,10 18:23
  19:3,7 23:25
  42:25 48:24
  63:10 75:15
  76:15,16 104:10
  109:7,9 112:20
  112:21 113:2
  149:8 198:4,7
  199:8,9
**compare**  93:16
**compared**  43:18
**compensation**
  27:22 28:2,6,11
**complaint**  104:6
**completed**
  135:16
**completely**
  104:8 107:12
**comply**  125:4
**complying**  126:2
**compose**  53:7
  60:24,25 64:15
  65:8
**composed**  81:2
  82:8,15,25 85:8
  91:13 93:12
  128:2 138:11
**composing**  79:19
  94:8
**computer**  49:18
  72:2 125:10
  195:20
**concentrated**
  91:21,22
**concerned**  88:9
**concerning**
  80:13 104:17,20
  105:12,17

113:23 115:15
  123:11
**concluded**
  197:20 200:25
**conclusion**
  128:17
**condition**  28:24
  29:3,4,8,9,11,15
  33:2 82:20
  83:13,19 84:11
**conditions**  22:22
  22:25 111:4,5,9
  111:15,19 112:2
  112:7,14 125:5
  125:13 128:19
  191:16,19,24
**conference**
  172:23,25
  174:19,22
**conferred**  27:11
**confidential**
  80:11,14 88:4,7
  88:12,14 202:12
**confirm**  15:2
  119:16 124:3
  147:17 148:14
  149:4,7,11,13,18
  150:11 151:4
  170:9 189:3
**confirmation**
  140:5
**confirming**
  163:7
**congratulations**
  74:23
**connected**  16:19
  114:4

**connection**
  104:2 121:15
**consecutively**
  30:12
**consider**  57:10
  57:21
**considered**
  56:20,22 57:8
**consigned**  27:17
  27:20 117:19
**consignee**  27:22
**consignment**
  15:17 116:4,5,11
  116:24 117:12
  117:21 123:11
**consigns**  116:25
**consistent**
  162:15 171:18
**consistently**
  151:8
**consists**  34:18
**contact**  11:13
  26:19 56:3 58:8
  58:12,15 96:19
  98:25 99:2,4
  137:13 160:15
  186:9,12 187:12
**contacted**  11:9
  65:22 104:7
  155:4 164:12
**contacting**  98:18
  180:3
**contain**  41:4
**contained**  43:15
**contains**  21:18
**contents**  23:11
  29:22 80:5
  126:5 166:13

**[contents - currently]**                                                    Page 9

167:10 192:5
**continue**  12:14
 193:22
**continued**  11:7
 86:17,18 87:19
 112:24 181:7
 185:6 191:11
 194:21 197:7,24
**continuing**  12:18
**contradiction**
 162:8
**contradictory**
 165:6
**contrast**  162:8
**control**  143:16
**conversation**
 99:7,23 102:24
 103:13 107:5
 158:3,7 160:16
 161:24 162:2,5
**conversations**
 30:20 70:14
 103:10 133:11
 174:5,11
**cool**  63:25
**cooperate**
 167:17
**cooperated**  34:3
**copied**  59:8 85:3
 85:6 86:22
 93:17 94:2,4
 118:10,21 128:9
 167:3 182:12
**copies**  66:18
 167:9
**copy**  3:7,9 4:16
 10:16 23:6
 71:20 74:6

75:11 77:16,18
 77:19 111:18
 158:19 167:5
 204:6
**copying**  126:6
 182:20
**copyright**  50:21
 93:19,24 94:3
 118:25 119:4
 126:9
**copyrighted**
 50:12 93:21
 118:13,17
**corner**  41:2 49:5
 147:16 165:23
 168:6
**corporation**  1:8
 2:14 5:12,14
 13:15,19,19 81:8
 169:10
**correct**  10:4,5
 18:18 20:16,17
 21:7,8 33:7,8
 37:14,15 42:14
 44:14 45:19,20
 46:8 47:24,25
 48:6 51:6,12,13
 52:6,7 54:23,24
 55:15 56:2,5,8,9
 56:12,17,18
 57:25 59:5,6
 60:11,12,13 63:6
 63:7 64:12
 65:18,19,25 66:2
 67:17,18 69:13
 69:14,22,23,25
 70:2 71:17,18
 74:13,17 75:3,4

75:20 76:4,5,8,9
 76:11,12 84:8,9
 84:13,17,18,21
 84:22 85:4,10
 87:7,13,22,23
 92:21,22 95:5,6
 98:5,6 99:5,14
 99:22 101:6,7
 102:20 103:18
 104:25 105:5,6
 110:12 111:16
 111:17 114:11
 114:18 116:2,2,8
 116:9 118:18,19
 118:22,23,25
 119:2,5,6 122:9
 122:9,15 129:23
 129:24 131:8,19
 134:4 137:25
 138:2 144:13
 149:21 150:17
 152:6 160:21
 163:6 164:21,23
 166:24 170:2,3
 171:6,7 176:16
 184:3,4,7,8,25
 185:2 193:3,17
 193:19 194:12
 194:13 195:11
 197:12 198:8
 199:14,17,21,25
 201:9
**correctly**  32:11
 173:11 193:16
 194:10
**corrupted**  87:10
**cost**  189:17

**costly**  22:16
**counsel**  3:3,9
**count**  14:9
**counterfeit**
 154:3,16,20,23
 155:2
**county**  205:5
**couple**  97:24
 115:7 191:9
**course**  10:18
 170:14,19
**courses**  9:3,6,23
 10:7,14 19:22
**court**  1:2 3:7 6:5
 88:9 190:3
 203:18
**courts**  119:21
**covered**  33:14
 33:14,17
**covering**  119:9
**cranked**  63:21
**create**  77:19
 108:18 125:19
**created**  78:16
 108:6,7
**crescent**  2:9
**criteria**  60:23
**crumpled**  9:13
 9:15
**cultures**  91:19
**current**  12:17
 44:22 141:23
 180:16
**currently**  12:8
 15:4 25:15
 34:19 35:16
 40:22 42:8,12,17
 73:6,23 89:7

**[currently - describing]**                                                    Page 10

136:18
**custody**  143:16
**custom**  86:12
**customary**  68:9
**customer**  114:2
**customers**  44:8
  110:19,24
**cut**  11:17 77:8
  77:14,16,20,23
  78:25 87:6,21
  92:2,16,18,20
  204:11
**cutoff**  43:8,11
  114:13,17
  116:14,16
**cuts**  87:16
**cv**  1:6 172:23

**d**

**d**  3:2 201:2
  203:20
**damaged**  29:9
  190:19
**damages**  97:11
**dash**  122:22
**data**  114:17,20
  114:21,23
**database**  20:9,14
  20:16 24:8,10
  48:10 50:4
  140:18
**date**  1:12,21
  25:7,10,14 34:12
  34:15 46:17,20
  46:24 72:17,20
  73:2 80:19,23
  85:5,9 88:22
  89:2 94:11,11

96:5 107:6
120:12,20,23
121:3 124:7,19
133:24 145:10
147:23 148:8,22
149:4 150:3
151:15 152:16
153:21 158:15
164:4 165:19,22
167:22,25
168:13 170:19
170:21 171:19
172:17 176:5
177:5 179:19,22
198:9 206:3
**dated**  94:12
  179:16
**dates**  14:2
**dave**  14:11
**day**  13:14 48:25
  54:25 58:24
  64:19 87:14
  201:19 205:20
  206:22
**days**  3:8 68:23
  68:24
**deal**  158:8
**dealers**  64:3
**dealing**  38:21
  113:23
**dealt**  113:15,17
**dear**  180:2
**december**  26:10
  26:10 28:14,14
  43:11 76:7
  144:17
**decide**  17:6
  175:14

**decided**  17:15
**declaration**
  119:20 120:15
  145:8 202:14
**deemed**  25:9
  34:14 46:19
  72:19 80:18
  88:20 120:11
  124:18 148:6,21
  150:2 151:14
  153:20 158:14
  164:3 167:21
  172:16 176:4
  179:21
**deeper**  61:4
**defendant**  5:11
**defendant's**  25:6
  25:10,13 29:18
  32:25 34:15
  46:16,20,23
  72:14,16,20,25
  74:11 78:21
  80:16,19,23
  87:25 88:17,21
  89:2 120:12,17
  120:19,22
  145:10 153:7,10
  153:11 202:4
**defendants**  1:10
  1:17 2:8,13
  132:13
**definitely**  126:16
**definitively**
  183:9,11,24
  195:19
**defunct**  12:11
  13:23 42:12
  112:6,19 170:23

198:16 199:10
199:12
**delaware**  4:13
  13:17 151:17
  152:18 168:17
  169:12,25
  170:23 171:13
  171:15 172:5
  198:15
**delete**  93:24
  118:21
**deletions**  126:8
**demand**  97:7
  101:6,9 119:10
  163:4,8,10,14,18
  204:12
**denies**  108:5
**depended**  21:13
**depending**
  185:15
**depends**  57:19
**depict**  47:6
**depicted**  32:17
**deponent**  206:3
**deposed**  5:20
  135:9,14
**deposition**  3:4,5
  3:7 4:17 5:21
  6:3 7:20 59:19
  135:17 153:18
  162:2,7 168:24
  206:3
**derivative**
  125:20
**describe**  189:22
**described**  164:6
**describing**  63:11
  63:13

**SA1053**

**[description - duff]**                                Page 11

| | | | |
|---|---|---|---|
| **description** 29:13 65:5 80:7 86:15 87:15 95:11 110:20,25 147:6 202:7 203:5 | **directly** 55:8,9 56:8,14 60:5 136:15 | 81:3,6,22 82:6 85:13,14 86:2 88:17,20,25 89:3 89:5,20,22,23 | **dollar** 68:5 |
| | **disbursed** 31:8 | 90:13,22 91:17 | **dollars** 44:3,4 |
| **descriptions** 86:14 | **discern** 137:24 | 92:8,10,24 93:3 | **domain** 78:2,6 |
| | **disclaimers** 110:23 | 93:5,13 120:11 | **door** 63:19 |
| **designated** 170:5 | **disclosures** 110:22 | 120:25 121:4,14 121:14,18,25 | **dot** 91:23,23,23 |
| **detailed** 13:24 | | | **dots** 122:22 123:5 |
| **determine** 52:18 57:2 60:21 | **discovery** 178:22 | 122:8 123:4 124:18 130:16 | **double** 193:19 |
| | **discuss** 79:21 | 130:19 145:22 | **download** 81:10 87:11 92:21 196:11 |
| **determined** 53:11 | **discussed** 52:10 92:19 114:7 117:16 | 145:23 146:2,11 146:17,22 147:11,13 148:6 | **downloaded** 87:10 126:4 |
| **determines** 57:5 | **discussing** 36:10 | 148:10,16,21 | **downtown** 63:15 130:12 |
| **detrimental** 187:19 | **discussion** 77:25 106:22 152:13 182:7 | 150:2 151:14 152:3 153:20 162:20 164:3 | **dragged** 132:18 132:25 |
| **device** 125:8 | | 167:21,24 168:3 | **drawing** 18:12 90:20 91:16 |
| **dicker** 2:12 5:10 | **discussions** 66:12,20,22 100:17,21 104:16,20 105:4 181:21 182:2 | 168:15,20,25 172:16,18 176:4 176:11 179:21 203:15 | **drawings** 11:4 |
| **difference** 39:2 138:23 | | | **drive** 44:9 |
| **different** 9:12 16:8 36:8 37:13 59:21 64:2 78:11 91:18 93:15 117:3 121:24 122:3 139:5,7 147:13 151:22 198:12 199:8,22 200:14 | **display** 125:2 191:25 | **documents** 30:9 30:16 90:3,5,6 115:24,25 119:15 123:25 127:2 146:25 148:25 151:19 204:2,3 | **due** 87:5 92:20 170:5 |
| | **dispose** 16:12,13 | | **duff** 2:7,10 30:17 30:21,22 32:2,6 53:3 74:9 77:22 97:12 123:16 125:17 126:11 126:15,20 127:5 127:10,17,24 128:5,15 129:10 129:20 130:5,9 130:23 131:11 132:4,20,24 133:5,7,12 134:11,19 135:5 137:6,14,20 138:7,9 140:2,15 |
| | **district** 1:2,2 | | |
| | **dockets** 90:4 | | |
| | **document** 25:9 25:15,18,19,22 34:18,21 35:5 46:15,25 47:4 51:24 52:3 72:14,19 73:2,5 73:17 74:10 77:7 78:21 80:10,14,18,22 | **doing** 5:21 17:21 49:11,24 57:19 57:20 58:21 59:4 64:22 112:21,24 189:22 | |
| **differently** 139:3 139:11 | | | |
| **difficult** 6:11 41:8 186:20 | | | |
| **dig** 61:4 71:22 73:15,25 | | | |
| **direct** 81:24 162:8 | | | |

**[duff - employment]**                                                    Page 12

141:2,11,19,21
142:8,15,25
143:6,14 144:9
144:25 145:5
146:5,10 149:16
150:8 153:23
154:4,17,21,24
155:7,10 156:10
156:13,21
158:23 159:3,11
159:20 160:4,7,8
160:18,22 161:3
161:13,14,20
162:10 163:23
164:8 165:7
166:2,9,25 167:6
167:14 168:9
169:19 171:21
173:15,20 174:2
174:15,21 175:5
175:16 176:11
177:14 178:8,15
178:17,21 179:6
181:4,6 185:24
186:7 187:21
188:4,8 189:6,15
189:19 190:22
191:5 196:13,20
197:4 198:11,25
200:18
**duly**  4:3 172:10
    201:5 205:11
**duty**  143:16
**dwell**  65:2

**e**

**e**  2:2,2 3:2,2
    29:24 31:20,22

32:2 51:16 74:2
74:12,18 75:2,9
75:11,12,12,19
75:22,23 76:3,3
76:6,10,13,16,19
76:21,24,25
77:12 100:3,4,25
103:19 109:17
109:22 110:4,11
110:14 115:16
119:13 146:23
146:25 148:24
151:19 172:21
176:18 177:2,4,4
177:4,9,12,25
180:8,23 186:22
201:2 202:2
203:20 204:9,15
205:2,2
**eai**  32:3 74:16
    75:13 128:2
    146:2 168:17
**eai's**  176:13
**eai000010**
    175:24
**eai000011**  35:18
**eai000024**  47:2
**eai000053**
    179:16
**eai000054**  30:4
**eai000058**  72:15
**eai00010**  178:11
    178:16
**eai000508**  73:3
**eai00053**  203:16
**earlier**  41:8
    50:18 52:4,11
    59:19 75:3

76:21 96:5
113:2,11 114:7
131:21 133:21
135:12 137:23
169:7 177:18
186:4 187:10
**early**  113:9
**easier**  14:9
**east**  2:5,15
**eastern**  8:18
**ebay**  10:4,8,9,11
    10:11,11,19
    12:16,19 13:9
    15:18,19,20
    16:23 17:15,22
    17:24 18:8
    22:14 24:11,24
    26:5,14 41:24
    42:2 44:5,18
    45:17 46:10
    47:10 48:3,8,14
    49:4,10,11,12,16
    50:7,20,23 53:8
    60:24 61:2
    64:15 68:9,16,22
    70:8,13,19 71:10
    71:21,23 74:15
    74:19,25 75:5,13
    75:14 76:11,11
    77:4 78:3,15
    81:10 82:25
    83:5 86:9 87:8
    104:16 110:18
    112:13 128:2
    132:2 135:20,22
    135:24 136:10
    136:12 146:4
    147:8 148:12,13

149:15 150:12
150:13 151:2,5
154:16 163:19
182:25 183:8,17
184:3,7,25
191:14,23,24
192:4,5,12,18,22
192:25 194:3,14
195:2,9,22 196:7
196:18 197:10
197:11 202:11
**ebay's**  191:15,23
**ebay.com**  76:7
**edelman**  2:12
    5:10
**edit**  59:12
**education**  8:11
**effect**  3:6,8
    170:22
**eight**  149:9
**either**  88:10
    132:12 160:23
    194:11
**electronic**
    115:25 116:7
    122:18,20
**elevator**  63:17
    63:20
**elevators**  63:18
**ellen**  13:5
**elser**  2:12 5:10
**employed**  12:12
**employees**  11:9
    11:18 12:2,4,6,6
    14:3,5 64:24
    95:2 149:9
**employment**
    16:16,19,25

[encountered - expression]                                    Page 13

encountered 38:22
endeavor 19:16
ended 96:9 198:14
engage 68:10 133:22
entire 25:17,19 34:20 35:4 73:5 89:20 94:3
entirely 59:11
entirety 34:21 59:8
entitled 120:15
entity 42:13 200:14
errata 206:1
especially 6:15 139:9
esq 2:10,16,16
esqs 2:13
essentially 19:19 20:15
establish 13:6
established 12:22
estate 1:8,17 2:9 4:17 5:15 12:5,7 12:10,21 13:6,10 13:12,16,18,21 14:3,5,16 15:12 16:15 17:6 19:12 26:4,12 32:3 41:16 42:4 42:7,11,16 43:14 47:10 60:15 73:23 75:16 81:14,25 90:23

91:3 95:7,10 105:11 108:25 109:4 111:19 112:5,7,16 113:3 113:4 114:25 146:13 147:17 147:19,21 148:10 169:4,6 169:14 170:20 196:10 198:3,10 198:12,13,15,18 198:22,23 199:2 199:6,10,12,23
estimate 70:24 71:4
et 81:14 82:20 84:25 172:22 184:20
event 126:5
everybody 4:24 30:10
everyone's 123:22
evidence 90:4,7 123:23 124:14 133:4 147:2 153:6 162:18 167:18 168:17 170:13 172:11 175:22,24 176:13,14 178:6 178:7,11,14 179:14
exact 96:4 112:21
exactly 28:17 40:15 106:17 128:9 139:13

examination 1:16 4:6 124:21 158:12 181:7 185:6 191:11 194:21 197:7,19 197:22,24 200:24 203:22 205:10,12
examined 4:5 39:22 41:19
example 9:6 192:17 193:9
examples 129:17
excellent 13:25
exception 7:21
exceptions 46:6 69:10
exchanges 100:25 103:20
exclusive 124:24
exhibit 25:4,6,10 25:13 29:18 32:25 34:9,11,11 34:15 36:8 40:19,23 46:17 46:20,23 49:5 72:13,15,16,20 72:25 74:11 78:22 80:16,19 80:23 88:2,17,21 89:2 90:7 120:9 120:12,19,22 124:7,18 145:10 146:18 147:23 148:6,21 149:2,3 149:23,24 150:2 150:5 151:14 152:5,14,16,23

152:25 153:6,8 153:10,12,14,17 153:20 158:15 164:3 165:19 167:21,24 172:14,16 176:2 176:4,15,17 179:19,21 202:6 202:6,8,9,10,11 202:12,13,14 203:4,4,6,7,8,9 203:10,11,12,13 203:14,15,16
exhibits 90:7 150:21 153:4 202:4 203:2,18
exist 78:3,8 143:18
existence 64:6 199:7
expand 86:11
expect 110:18
expected 40:3 46:11
experience 12:18 17:24 18:3 19:19 20:23 37:20 38:25 49:11 63:24
expert 188:22 191:2
expires 206:25
explain 132:2
explaining 84:3
exploit 125:23
express 190:4
expression 125:25

**[expressively - follow]**                                    Page 14

**expressively** 125:11
**extent** 74:4 107:9 119:7 121:23 204:4
**extra** 193:8,13
**extract** 152:3
**extremely** 187:19
**eyes** 137:9,10

**f**

**f** 3:2 177:4 205:2
**face** 81:15
**facebook** 154:15 154:18,22
**fact** 37:12 56:18 61:8 77:18 84:3 85:17 87:13 104:10 115:22 182:5 188:18
**facts** 188:20
**factual** 62:3
**failed** 170:4
**fair** 7:8,17,18
**fairly** 32:25
**fall** 28:21 144:18
**familiar** 6:2 24:21 29:21 75:22 107:22
**family** 113:7
**far** 39:2 47:22 48:4 50:6 56:11 61:22 69:10 77:5 106:9 116:10 136:8 187:10 194:14 194:17

**farmer** 2:16 4:7 4:20 5:8 11:16 25:5 34:10 46:14 72:12 74:4 80:9 87:24 88:16 117:25 119:7 120:8,14 123:14 124:6,10 124:15 127:19 132:14 135:10 139:18 144:21 145:7,15 146:16 147:10,19 148:3 148:18 149:3 151:18,25 152:8 152:14,25 153:9 153:13 157:6,25 159:2 162:19,20 165:15,18 167:16,23 168:15 170:11 172:13 175:25 176:8,17 177:16 179:16,18 181:4 181:8,14 185:3 188:2,10,15 190:2 191:8,12 194:18 196:16 197:8,14 203:23
**fashioned** 63:18
**featured** 122:10
**february** 159:24
**federal** 1:20
**fee** 117:12
**feel** 190:18
**fees** 116:5 175:14

**feet** 188:12
**felt** 63:3,20
**female** 185:18 185:19
**fifteen** 64:21 115:11
**fifty** 116:25 117:2,3
**figure** 17:13 29:4
**file** 2:17 76:23 77:12 81:9 204:9
**filed** 112:19 132:21 136:21
**files** 152:3
**filing** 3:4
**filings** 145:4
**filled** 64:2
**film** 45:13
**final** 179:14
**finally** 7:19
**find** 18:10,12 49:18 52:5 55:20 57:17 58:18 62:8 74:2 74:8 112:10 130:7 144:4 145:14,25 180:18 182:13 193:24 196:4 204:7
**finding** 20:10 57:20 61:2 129:25 171:19
**fine** 25:23 73:9 73:13 97:4,16 155:20,21 165:8

174:10
**finish** 6:8 193:21
**finished** 130:16 181:2
**firm** 5:9,11
**first** 4:3 5:19 7:23 15:14 25:3 25:17 28:16,23 34:20,22 35:16 41:20 52:6,15 55:7 90:21 96:2 98:7 102:16 105:18 106:15 108:12 115:12 128:21 149:14 176:20 201:5
**fitzgerald** 1:22 6:5 205:7,24
**five** 7:3 14:13 63:16 68:7 98:15 115:21 164:20
**fix** 194:12
**flaw** 83:19
**floor** 2:15
**florida** 8:18,20 13:14,15 169:9 169:10,15,18 198:14
**focus** 85:9,11
**focused** 143:8
**foil** 9:14,15
**folks** 114:5
**follow** 45:16 47:21 97:23 100:16 123:18 163:17 181:5,9

**[followed - go]**                                                      Page 15

**followed**  112:22
**following**  13:20
  183:17 191:7
**follows**  4:5 84:23
**footer**  49:22
  50:8
**force**  3:8
**foregoing**  201:8
**forever**  106:18
**forge**  8:15
**forget**  7:6 88:10
**form**  3:11 59:13
  116:5,6 126:11
  126:14 127:25
  128:15 129:20
  130:5 132:15
  133:5 134:11,19
  137:14 138:9
  139:18,24 140:5
  141:3 142:9
  149:16 154:17
  154:21,24
  155:10 159:12
  163:23 177:16
  188:3,11,15
  190:23
**formal**  9:20,22
  10:18 18:20,22
**format**  31:23
**forming**  16:14
**formulate**
  177:17
**forth**  11:4 38:8
  55:12,19 56:22
  115:17 205:11
**forty**  68:8
**forward**  43:12

**forwarded**
  148:24
**forwarding**
  75:19
**found**  21:13
  54:10,20 61:10
  63:2 65:11
  66:16 107:10
  113:6 121:24
  164:11 171:4
  172:3
**four**  25:14
  115:10 120:24
  142:13,16
  188:12
**frame**  33:9,20
  35:20
**framed**  33:18
**framer**  33:18
**framing**  39:8
**fre**  174:20
**free**  23:10 96:18
**frequently**  70:18
**front**  37:25 38:2
  40:21 62:5
  71:11 117:21
  121:13 137:25
  174:23 202:8
**fruition**  97:6
**frustration**
  144:3
**full**  13:4 71:21
  71:23,24 73:19
  90:21 91:6
  142:6 147:5
**fully**  110:25
  125:4

**functioning**
  110:11
**funny**  15:14
**furnace**  4:12
**further**  3:10
  21:15 34:24
  58:4 73:8 74:21
  84:4 94:15
  100:21 134:16
  152:19 194:19
  197:6,15 201:8
  205:14

**g**

**g**  177:4
**galleries**  11:12
**gallery**  39:17,19
  40:2,4,6,11
**gap**  196:24
**garbled**  38:3
**geared**  125:16
**general**  19:8
**generated**  81:9
**generates**  149:9
**gentleman**  14:11
  14:12 113:17
**getting**  162:17
  173:21 180:24
  193:12
**gift**  27:17
**gifted**  31:9,17
  36:16,17 95:16
**girl**  113:7 176:23
**give**  5:18 6:4
  15:14 25:2 30:3
  52:23 59:24
  62:3 96:17,18,24
  97:10,22 114:8

  143:21 148:18
  151:25 155:17
  155:23 160:13
  164:19 191:24
  192:4,12,21
  193:13 195:17
  197:2
**given**  26:15
  27:14,17 94:11
  99:9 151:21
  155:19,24
  187:23 201:10
  205:13
**giving**  197:12
**glasses**  73:10
**glued**  38:23
**go**  7:24 13:23
  15:16 21:16,21
  22:4,7 40:19
  43:7 44:7,23
  51:17,25 55:20
  60:10 70:7,10
  71:10 77:3,11
  87:14 89:9
  111:2 112:10,20
  116:21 117:4
  121:4,5,13
  127:11 128:7
  132:7 133:10,14
  133:17 139:8
  144:11 148:16
  154:6 159:13
  166:3 168:12
  172:11 174:16
  178:23 185:4
  186:18 190:23
  199:10,12 204:8

**[goes - idea]**                                                            Page 16

**goes** 46:7 77:4 82:12
**going** 7:15 8:9 10:13 14:8 17:14 25:2 26:17 34:8 40:23 43:3 44:10 45:10 51:23 52:20,25 57:5 61:3 68:4,6 69:3,6 71:2,3,5 72:10,13,22 73:4 77:11 80:10,25 85:12 89:9 96:24 106:18 107:2 111:7,8 114:19 117:23 120:23 124:2 127:3 131:23 143:23 147:11 153:23 155:23 156:25 158:2 160:13 164:19 164:24 165:3,9 174:4 175:13,16 175:18,22 179:2 180:15 183:18
**goldstein** 162:23 165:17
**good** 5:5,7 18:4 22:5 29:9 104:14
**goods** 154:3
**google** 139:15,19
**googled** 139:14 140:11
**governed** 191:15

**grabbed** 54:6 86:24
**grabbing** 87:2
**grants** 124:24
**great** 84:7 88:15 104:9 158:8
**group** 57:8 117:20
**grown** 43:2
**guess** 16:9 69:7 71:2,3 97:22 107:2 165:9 170:16
**guessing** 28:21 33:6 63:16 144:18
**guidance** 86:3 119:24 120:2
**gunked** 52:21
**guy** 64:7 72:2 113:10

### h

**h** 101:11 202:2
**half** 64:17,21 65:9
**hand** 4:22 32:11 41:2 49:5 55:7 63:21 147:16 165:23 168:6 205:20
**hands** 19:20,24
**handwriting** 133:4,8
**handwritten** 40:6,9,10
**hang** 61:3,17

**happen** 65:14 75:8 93:19
**happened** 59:11 101:25 164:20 180:19,19
**happening** 161:5
**happens** 22:11
**happy** 7:11 96:10
**harass** 159:20
**harassing** 159:23
**hard** 38:4,9 196:7
**harder** 56:11
**haste** 168:22
**hat** 61:3,18
**hate** 6:11
**hated** 9:13
**head** 6:18,18 14:9 33:16 186:18
**hear** 5:4 55:24 89:13 97:14 156:7 158:23,24 159:4 160:22 161:2,4,8,9,10 181:15
**heard** 4:24 188:19
**hearing** 4:21
**held** 1:20 77:25 152:13
**help** 7:13 52:11 86:3 132:12 145:18 180:17
**helps** 37:24

**hereinbefore** 201:11 205:11
**hereunto** 205:19
**hesitate** 108:10
**hesitation** 172:2
**high** 188:13
**highest** 8:11
**hire** 155:8,12 160:11
**history** 9:3
**hold** 146:16 150:24
**holding** 146:19 189:24
**holds** 119:5
**home** 29:6
**honestly** 109:5
**hook** 61:2
**hot** 28:20
**hour** 64:18,22 65:10
**house** 31:19 44:2 44:2 56:4 64:5,6 117:5,6,7 130:4 130:8
**houses** 55:12,18
**huh** 6:19
**human** 7:5
**humans** 6:17
**humphrey** 14:11
**hundred** 40:24 72:23 73:6
**hypothetical** 42:15

### i

**idea** 45:22 64:13 98:14 105:20,21

**[idea - interactions]**                                                      Page 17

105:25 123:3,9
132:8,10 163:13
163:16 171:23
177:13 178:3,5
187:16
**identification**
88:22 124:19
148:7 153:21
**identified** 101:17
157:21
**identify** 22:14
160:17
**identity** 69:16
140:5
**idriss.linge**
177:3
**ignore** 164:16
**ignoring** 39:6
**image** 32:19,24
47:6 50:20 51:2
51:21
**images** 29:17,19
32:24 35:12,13
44:18,20 45:9
49:22 50:13
85:22
**impersonated**
101:22 102:7
**importance**
37:21
**important** 6:7
63:4
**impossible** 6:22
**impression**
23:10 39:25
**inc.'s** 15:12 17:6
146:13 148:11

**inch** 84:6 189:10
189:11 190:7,8
**inches** 190:14
**incidentally**
41:11 48:16
94:17
**include** 22:16
23:12,23 59:9
60:6 62:5 63:4
71:12 175:19
196:19
**included** 20:13
47:10 71:6,7,8
94:5
**including** 125:9
**income** 17:13
**incorporated**
13:11,13 18:24
19:15 75:17
169:3,8,11,15,18
170:14,15 171:9
171:12,14 172:5
172:7
**incorporation**
152:18 168:18
169:6,24 170:4
171:18
**incorrect** 131:24
137:19
**incorrectly**
102:19
**increment** 68:6
**increments** 68:4
**indicate** 75:14
78:22 79:7
82:24 85:21
**indicated** 23:15
85:2

**indicates** 79:4
**indicating** 189:8
**individually**
117:8,10
**individuals** 57:9
**indulge** 151:23
162:18
**industry** 57:25
**inexpensive**
188:7
**infer** 192:8
195:7,12
**inform** 186:2
**information**
18:10 20:12
21:14 23:7,17
39:11 48:4,14
50:3,23 52:17
55:5,11,17 56:11
62:3,9 63:5
77:14 81:10
82:23 83:11
92:15,17 96:17
96:19,25 97:22
98:21 99:9
102:6 110:17
114:9 115:9,18
116:11 118:16
118:21 136:9
137:17,18
155:18,19,23
160:14 162:9
163:21 164:6
170:10 173:22
175:19 186:6
192:18,22 195:6
197:2 204:2,3,11

**informed** 66:16
66:19 67:8
108:4 155:5
177:22,23
185:22
**infringe** 118:24
**infringing** 119:4
**initial** 52:15 57:3
69:17 82:11
100:22 101:2
128:20
**initialed** 128:24
**initially** 22:23
33:25 75:18
**ink** 9:11 122:18
122:19
**input** 79:24
**inquiries** 115:13
115:19,21
**inquiry** 99:19
**inquisitive**
200:10
**inscription**
122:11
**instructing**
143:24
**instructions** 5:18
**insurance** 198:3
198:7 199:19,24
200:5,11,17
**intend** 118:24
**intention** 158:6
**intentionally**
87:21 93:23
118:20
**interactions**
99:25

**[interested - kris]**                                        Page 18

**interested** 68:19
205:17
**interesting** 61:6
**interfere** 125:6,7
**internet** 11:17
19:5 52:22
104:21 112:8
113:10 124:4
195:14,23,25
197:3
**interpret** 52:11
**interpreted**
52:13
**interrogatories**
130:3
**investigator**
98:13
**involve** 174:5
**involved** 39:17
67:14 159:25
173:24
**irs** 115:8
**island** 2:10
**issue** 5:2 83:22
84:2 197:11
**issues** 92:21
113:23
**italian** 166:20
**item** 22:16 28:3
28:5 43:21,22
45:22 55:24
64:16 74:23
83:20 117:3
154:9
**items** 15:16,17
16:11 22:13
27:16,23 43:19
44:13,15 45:18

46:2,9 50:7 69:7
70:8 115:5,6
116:25 117:2,13
117:14,19,22,24
123:11 154:16
154:20,23 155:2
163:19

**j**

**jacksonville** 8:20
**jana** 2:16 5:8
81:17 169:7
191:6 192:14
**jana's** 132:6
**january** 75:9
133:22 155:4,13
157:22 198:19
200:3
**jason** 1:9 2:14
**join** 48:22
104:11 126:15
127:19 196:16
**joined** 20:2
22:20
**joke** 57:12
**jones** 8:19,24
**jpeg** 85:18
**jr** 4:10
**juda** 14:19 15:3
**judge** 3:7 160:2
165:10 173:2
174:23
**july** 13:20
198:17,18,19
199:3,5,13,13
**junk** 15:15

**k**

**kathleen** 139:6
**kc** 139:7
**keep** 6:17,23 7:8
35:2 42:21
96:22 111:13
114:24 115:5,7
116:3 117:6,9
188:16
**keeping** 78:12
166:21,23
**kept** 26:25 42:18
42:19,25 169:10
**kind** 38:3 63:25
114:13 116:22
**knee** 32:12,17
**knees** 84:7
**knew** 10:12
**know** 5:4 6:25
7:11 10:10 23:4
23:25 24:4,18
25:25 29:12,18
30:2,18,22 31:15
31:16 44:10,17
44:19 45:6,8
47:13,19,19,22
48:7,11,13 49:7
49:21 56:13,21
60:14 62:10,12
62:17,21 68:8,18
68:21 71:3
73:12 77:2,3
78:17 83:24
86:10 89:10,17
90:9 92:7 95:14
95:15,17 98:17
105:16 106:17
107:2,3 108:23

109:3,5 111:22
113:12,22
117:19 122:25
123:8 128:14
129:2 133:24
138:4 140:20,23
141:7,16,22,23
156:5,24 159:14
159:16 161:5
164:13 167:11
167:13 179:5,11
179:12 182:10
183:5,9,10,16,20
183:24 184:13
184:16,17 186:5
186:19 189:17
189:23 192:3,7
193:6 194:14,17
195:2 196:9,17
200:9
**knowingly**
154:25
**knowledge** 24:13
32:21 40:15
41:15 45:12
55:13 75:21
78:19 79:11
92:5,14 103:12
105:13 106:8
107:15,18
110:10 121:20
121:21 132:2
181:10 192:10
193:4 198:2
**knows** 30:11
76:3 183:6
**kris** 180:7,12,13
185:17,20

**[l - litigation]**                                    Page 19

**l**

**l**  3:2,2 201:2
**label**  39:3,7,20
**labeled**  178:16
**labels**  38:22
  39:24
**lack**  170:5,24
**lacking**  125:10
**lakeland**  8:18
**landed**  138:3
**landscape**
  189:13
**language**  30:6
  82:21 84:23
**large**  16:7 25:16
  31:23 43:2
**largest**  11:14
  183:16,20
**late**  59:5
**laughed**  94:14
**law**  2:7 5:9,11
  38:6
**lawn**  52:24
**laws**  126:3
**lawsuit**  5:12,17
  66:19 95:25
  132:20,21 137:7
  180:16 182:3,6
**lawyer**  97:5
  106:2
**lead**  114:3
**league**  166:19
**learn**  19:3,8
  108:6
**learned**  67:7
**leave**  25:23 54:4
**lee**  113:18,22

**leeway**  193:13
**left**  17:16 32:11
  49:5 142:18
  165:23
**legend**  126:9
**legible**  52:5
**legitimate**
  166:12
**length**  132:5
**letter**  97:8
  100:25 101:6,9
  102:10,16,22
  103:4,6,8 134:9
  135:3,4 162:22
  163:3,4,9,10
  164:17 165:16
  165:24 166:4,14
  174:8,14,19
  187:5
**letters**  119:11
  196:3 204:13
**leukemia**  113:7
**level**  8:11 32:17
  68:4 193:7,11
**license**  23:6 48:8
  124:23 192:12
  192:18 194:15
  195:3
**licensed**  50:12
  82:19
**licensing**  48:12
**life**  9:9 10:3,20
  16:2,4 86:4
**liked**  67:5,17
**limit**  21:10
**limitation**
  192:15

**limitations**
  192:11
**limited**  124:25
  125:9
**line**  11:4 18:9,15
  19:4 81:13 96:9
  108:19,21,22,24
  109:6 147:20
  183:18 187:14
  204:22 206:5
**liquidate**  64:7
**list**  20:13,18
  46:3 76:20
  117:22
**listed**  49:16
  56:23,23 57:10
  57:11,15,18,18
  57:23,23 83:4,8
  83:10 180:4
  185:12,16
**listen**  158:7
  161:25
**listing**  21:15
  22:18 23:20
  43:14 44:19
  47:11 49:14,20
  50:24 51:4,8,11
  53:8 54:7 59:9
  59:15 60:7,24,25
  61:12,15,24
  62:12 63:5
  64:15 65:6 67:2
  68:22 69:21
  71:6,13,21,23,24
  72:4 73:16,20,24
  74:7 79:20,25
  80:6 82:15,25
  83:5 84:4 85:9

  85:23 86:9 87:7
  87:19 90:17
  91:12 92:4,15
  93:7,12 94:9
  95:12 104:21
  105:8,12,16,22
  106:3,9 107:6,16
  111:8,11,11,13
  111:14 112:13
  118:7 128:3
  184:3 186:14
  191:25 192:6
  193:3,17 194:2
  194:12,15
  197:12 202:13
  204:6
**listings**  23:13,16
  54:25,25 61:20
  64:23,24 69:2
  70:19,24 71:4
  74:20 82:13
  87:14 91:4
  110:18,19,23
  181:24 182:22
  183:8 184:7,25
  191:14 192:13
  192:22 196:5
**literally**  11:8
  44:24 69:5
  115:4 132:5
  196:6
**litigation**  30:9
  30:11,18 81:7
  89:6 90:11,14,15
  92:8,9,25 95:22
  95:24 103:4,9
  104:18,22,24
  105:5 106:5,14

**[litigation - marked]**                                                    Page 20

106:18 119:19
119:21 121:16
140:12,13,25
141:6 180:16
**little** 77:8 89:10
97:6 100:15
145:19
**live** 9:17 15:21
15:24 16:5
55:23 70:4,6,7
70:10
**llc** 13:21 170:15
170:16,20
198:18 199:2
206:1
**located** 32:9,10
95:18 115:24
142:11
**location** 42:18
42:20
**logo** 49:4,7,12,16
49:19,23 50:20
**long** 2:10 42:24
64:14 65:7
68:21 78:17
84:6 98:16
113:10 128:24
129:3 140:14
144:8 146:3
180:18,21
**longer** 11:14
31:13 43:7 64:6
71:15 87:15
170:25
**look** 18:9 22:7
29:3 38:10
45:21 49:17
51:21 54:14

60:23 81:11
108:2 193:9
**looked** 27:16
38:13 50:14,16
52:8 61:8
101:14 104:8
129:12 130:21
**looking** 32:14
58:3 61:17
74:11 175:17
**looks** 35:23
36:15 84:14
121:2 168:11,13
193:21
**loss** 126:17
166:8,15
**lost** 43:5 78:10
113:6 114:17,21
114:22,23
116:13,16
163:11 203:12
**lot** 22:11 44:23
64:18,20,23 65:2
78:9 107:10
117:8 191:21
192:23 195:25
**love** 96:21
**low** 187:25
190:19
**lunch** 158:17
176:7

**m**

**machine** 68:13
**macrame** 9:10
**magnification**
72:23 73:7 89:9

**magnified** 32:16
**magnify** 25:21
34:24 40:23
73:7
**mail** 32:2 51:16
74:12,18 75:2,9
75:19,22,23 76:3
76:3,6,10,13,21
76:24,25 77:12
100:25 103:19
109:22 110:11
110:14 148:24
176:18 177:2,9
177:12,25 180:8
180:23 204:9
**mail.com** 110:15
**mail.com.** 110:3
**mailed** 31:20,22
74:2 115:17
146:23,25
151:19
**mails** 75:11,12
75:12 76:16,19
100:3,4 109:17
110:4 115:16
119:13 186:22
204:15
**main** 150:12,13
**maker** 22:15
**makers** 22:17
**making** 128:16
150:9
**male** 185:18
**mall** 26:16,23,25
43:20 44:3,13
63:9,10,11,13
64:10 113:11,13
113:16,23 114:2

123:12
**man** 24:22 25:25
28:7 36:2 39:23
43:20 47:7 51:4
51:18 53:8
78:23 82:9,18
90:18 91:9
94:18 102:18
118:7 138:11
139:7 142:2
146:14 151:2
164:7 171:4,19
172:3 188:6
190:9,20 196:25
**man's** 84:7
**manufacturer**
39:9
**march** 13:16
165:25 177:7,25
179:25
**maria** 38:11,12
**marie** 1:8 2:8,19
4:18 5:14 13:5
14:10 135:6
138:16 149:14
150:16 157:21
165:14
**mark** 25:6 34:11
46:15 72:14
80:10,12,15 88:2
88:16 120:8,14
124:6 145:16
147:22 150:5
153:5,7,9,13
157:7 163:24
167:23 172:13
**marked** 25:9,13
34:14 46:19,23

**[marked - museum]**                                                    Page 21

72:19,25 80:11
80:18,22 88:20
88:25 120:11,22
124:18 145:9,17
146:18,21 148:6
148:21 149:2
150:2 151:14
152:5 153:20
158:14 164:3
167:21 172:16
176:2,4 179:21
204:21
**market**  54:5
55:3,6,14 56:7
56:17,20,25 57:3
57:4 58:18
62:23
**marketing**  39:18
**marking**  152:15
**marlene**  1:21 6:4
6:10,21 11:16
25:5 34:10
38:14 46:14
72:12 80:9
87:24 148:23
150:4 181:15
205:7,24
**marriage**  205:16
**martinez**  154:12
154:14,19
**matched**  60:18
**material**  195:3
**materials**  125:3
126:7
**matter**  39:13
174:6 184:2
205:18

**maxed**  64:23
**maximum**  70:21
**mean**  49:17
50:22 51:2
55:22 69:5
73:16 83:7,17
**meaning**  39:2
**means**  83:9,19
125:8 161:8
188:21
**meant**  73:19
**medications**  8:5
**megan**  119:12
134:9,10,14,22
134:24 204:14
**meissner**  96:14
98:4,12,19 99:8
99:14,20,24
100:2,5,13,18,21
101:2,5,13,17,23
102:8,11 103:17
109:15,18
119:14 134:2,4
157:13,19
176:10,12,19,22
177:2,8,19,21
178:2 179:4
203:15 204:16
**member**  20:3
48:17,20,21,22
50:10 79:22
128:25 129:3,5
140:14,17,19
141:14
**members**  20:7
**membership**
20:4 22:20

**memory**  13:25
37:16 44:12
45:13 131:23
**mention**  63:2
101:12 102:11
**mentioned**  11:25
14:2 15:23
19:25 21:17
27:5 28:13 32:8
40:20 42:11
44:17 45:17
50:18 54:13,20
59:2,20 60:9
62:25 70:3,17
73:14 83:3
95:16 98:2
101:5 112:5,25
122:16 129:25
**mentioning**
61:22 102:23
**message**  176:22
176:22
**messages**  110:8
**methodology**
19:9
**middle**  43:23
86:13
**midway**  150:15
**mike**  14:10
**mill**  43:24
**miller**  14:10
**million**  149:10
**millions**  44:24
78:13
**mine**  49:17
**minimums**  69:24
**minor**  14:23

**minors**  14:20,22
15:4,7
**minute**  118:2
**minutes**  64:21
152:2
**misattribution**
157:24 185:23
186:3
**missing**  30:12
35:12 86:22
**mistake**  6:25
**modify**  125:19
**mom**  115:6
**moment**  12:12
40:20
**money**  17:19
54:19 61:5 67:7
97:8
**months**  28:18
**moon**  69:6
**morning**  5:5,7
127:4
**moskowitz**  2:12
5:10
**mother**  9:8
139:4
**motion**  120:17
**move**  64:25
135:17 175:20
**mowing**  52:24
**multi**  63:15
130:13
**multiple**  78:7
90:5,6 117:12
138:6,12,14
189:21
**museum**  166:20

[museums - noh]                                                                          Page 22

**museums** 11:11
**mute** 170:18

**n**

**n** 2:2 3:2 4:1,2,2
4:2 5:1 6:1 7:1
8:1 9:1 10:1
11:1 12:1 13:1
13:10,10,12,12
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1

101:1,11 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1

177:1,4,4 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1
193:1 194:1
195:1 196:1
197:1 198:1
199:1 200:1
201:1,2 202:1
203:1,20 204:1
205:1
**name** 4:8 5:8
13:4,9,11,21
14:8 15:7,24
24:2 27:7 38:8
52:14 53:18,19
53:21 54:21
58:3 61:23 62:4
62:7,22 63:2,10
64:4,5 66:25
96:18 101:11
113:13,14 122:4
139:3,5,7 154:11
156:2 177:8
199:9 206:2,3
**named** 14:11,12
79:12 96:14
99:25 113:17
**nature** 15:12
24:4 32:13
190:14
**necessarily** 55:4
174:4 175:18

**necessary** 45:3
**need** 4:23 6:14
19:3,7 35:2
58:17,20 97:21
118:2 123:21
134:15 135:5
137:16 146:5
152:2,2 157:5
178:24 180:17
180:18 182:10
200:8
**needed** 132:23
137:17 182:13
199:18
**needs** 125:11
**neither** 159:2
**nevada** 79:10,13
**never** 44:10
53:21 58:24
97:14 105:25
136:14 184:5,23
199:23
**new** 1:2,23 2:5,5
2:10,15,15 4:4
19:15 43:4
82:19 83:4,7,9
83:25 114:14
143:17 205:4,8
206:1
**night** 8:6 123:24
157:22
**nina** 79:4,12
**nine** 34:18
**nod** 6:18
**noh** 101:11
102:10,13
119:12 134:9,10
134:14,22,24

**[noh - number]**                                                                 Page 23

204:14
**non**  14:23 88:12
 124:24,25
**norb**  1:8,17 2:8
 4:18 120:16
 128:8 133:14
 148:12 150:16
 153:18 154:6
 156:19 159:12
 178:25 180:2
 190:23 201:15
 202:14 206:3,21
**norbert**  4:10
**normal**  29:15
 144:2 188:13
**normally**  22:2
 40:9,11 55:10
 117:21 180:20
**notary**  1:22 4:4
 201:22 205:7
 206:25
**notation**  50:11
 51:23
**note**  65:14
**noted**  29:14
 154:22 172:10
**notes**  40:6,9,10
 41:20
**notice**  1:19
 36:20 50:21
 93:8,10,15,19,20
 93:22,24 94:4,16
 126:9
**noticed**  94:14
**notification**  75:3
 75:6
**notified**  42:25

**notify**  193:25
**novocin**  1:8,8,17
 2:8,8,19 4:1,10
 4:18 5:1,5,15
 6:1 7:1 8:1,3,10
 9:1 10:1 11:1,19
 11:25 12:1 13:1
 13:5 14:1,20,20
 14:24 15:1,2
 16:1,14 17:1
 18:1 19:1 20:1
 21:1 22:1 23:1
 24:1 25:1,12,19
 25:24 26:1 27:1
 28:1 29:1 30:1
 31:1 32:1,7,18
 33:1,5 34:1,17
 34:24 35:1,3,19
 36:1,7 37:1 38:1
 38:20 39:1 40:1
 40:20 41:1 42:1
 43:1,18 44:1
 45:1 46:1,22
 47:1,5 48:1 49:1
 50:1 51:1 52:1
 53:1,7 54:1 55:1
 56:1 57:1 58:1
 59:1 60:1 61:1
 62:1 63:1 64:1
 65:1 66:1 67:1
 68:1 69:1 70:1
 71:1 72:1,24
 73:1,14 74:1,10
 75:1 76:1 77:1
 78:1,2,12 79:1
 80:1,4,21 81:1
 81:19 82:1 83:1
 84:1 85:1 86:1

87:1 88:1,24
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
97:14 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1,6 119:1,18
120:1,16,21
121:1,3 122:1
123:1 124:1
125:1,16 126:1
127:1,8 128:1
129:1 130:1
131:1 132:1
133:1,3 134:1
135:1,13,18
136:1 137:1
138:1 139:1,6
140:1 141:1
142:1 143:1
144:1 145:1,9
146:1 147:1
148:1,13 149:1
149:13 150:1
151:1 152:1
153:1,18,25
154:1 155:1
156:1,20 157:1
157:13,15,16,21
158:1,6 159:1,9

160:1 161:1,16
162:1,25 163:1
164:1 165:1,22
166:1 167:1
168:1 169:1,3
170:1 171:1
172:1,19,22
173:1,6 174:1
175:1,2 176:1,14
177:1 178:1
179:1,3,23 180:1
180:2 181:1,9,10
181:20 182:1
183:1,5 184:1
185:1 186:1
187:1 188:1
189:1,3 190:1,8
191:1,13 192:1
193:1 194:1,19
194:24 195:1
196:1 197:1,9
198:1 199:1
200:1 201:1,15
202:1,14 203:1
204:1 205:1
206:2,3,21
**novocin.com**
 76:11 77:4 78:3
 78:15
**novocin.com.**
 180:2
**number**  16:7
 18:25 30:4,12
 35:18 68:11,12
 68:17 122:21
 123:5 141:9
 147:25 151:22
 178:18,19

**[number - page]**                                                      Page 24

186:15,16,17,22 186:24 202:7 203:5

**numbers**  123:8

**o**

**o**  3:2 4:2,2,2 13:10,12 101:11 177:4 201:2

**oath**  3:6

**object**  126:11,13 128:15 129:20 130:5,24 132:15 133:5 134:11,19 137:14,20,22 138:9 140:2 149:16 150:10 153:23 154:24 155:10 163:23 175:17 182:24 188:2,10

**objected**  184:5 184:23

**objecting**  161:9 200:18

**objection**  125:17 126:20 127:10 127:17,24 128:5 129:10 130:9,23 131:11 132:4 133:12 137:6 138:7 139:18 140:15 141:2 142:8,25 144:9 146:5 150:8 154:4,17,21 155:7 159:3,11 160:18 161:20

162:10 164:8 166:2,9,25 167:6 167:14 169:19 171:21,22 173:15,20 175:5 177:14,16 178:8 178:12 179:6 185:24 186:7 187:21 188:4,8 188:15 189:6,15 190:22,25 196:13,20 197:4 198:11,25

**objections**  3:11

**obtained**  59:16 60:4

**obvious**  138:22

**obviously**  22:5 137:18

**occurred**  26:8

**october**  13:9 144:12 170:4 171:3

**odd**  112:23

**offer**  20:6 24:14 24:18 67:6 68:25 173:8 174:3

**offered**  67:10 173:18

**offering**  22:13 24:20 70:18

**offhand**  129:2

**oh**  30:24 54:15 180:20

**oil**  24:23 26:2 82:17 90:17 91:8

**oils**  9:11

**okay**  6:12 7:25 15:10 17:20 22:2 30:14 34:25 77:16,17 89:12 117:25 140:13 142:14 173:17 174:15 181:23 189:11 189:12

**old**  4:12 63:18 75:11,12,19 113:10 114:13 186:21

**once**  17:23 19:12 53:18 69:4 92:24 94:24 95:3 102:21 113:7

**ones**  44:9 70:7

**ongoing**  57:6,12 111:24

**online**  18:17,21 19:18

**open**  197:23

**opening**  147:7 148:19

**openings**  166:18 166:22

**operating**  199:9 200:4

**operation**  125:7

**opinion**  173:19 177:11 187:24 188:13,17,23

**opinions**  188:21 195:17

**opportunity** 26:15 27:15 113:5

**opposed**  37:22 51:15 115:24

**option**  69:2,13

**order**  10:6 23:6 23:12 26:14 41:25 48:9 49:22 60:24 63:20 114:4 120:17 121:5

**organization** 10:9,21 12:3 24:7

**original**  3:5,9 76:23 77:12 82:17 90:17 91:8 204:9

**originally**  85:22 98:3

**outcome**  205:17

**outside**  42:21,23 52:24

**owned**  110:14

**owner**  26:25 40:13 113:16 141:23

**ownership** 125:15

**p**

**p**  2:2,2 3:2

**p.m.**  197:18,21 200:23

**page**  23:2 25:14 34:22,24 35:17 36:8,22,24 37:2

**[page - people]**                                                            Page 25

37:4,6,8,10
40:22 46:16,25
73:2 78:19
80:15,22 81:11
81:22 85:13
88:25 89:21
92:10 120:24
121:2,4,14
124:13,16
152:11 154:15
154:18,22
168:18 202:6
203:4,22 204:3
204:22 206:5
**pages** 34:18 81:2
  88:14 90:5
  124:10 126:17
  152:8
**paid** 15:22 28:6
  28:11 48:17,18
  48:20,25 50:10
  190:16
**paint** 54:16
  66:17
**painted** 35:24
  54:11 108:11,14
**painting** 18:12
  24:22 25:25
  26:5,13,14,21
  28:8,13,16,24
  29:16 31:8,9,15
  31:22 32:8,9,15
  32:18,22 33:3,10
  33:12,13,22,23
  35:8,9 36:2,4,6
  37:17,23 38:3,23
  39:4,23 40:5,17
  40:22,25 41:2,13

41:17,19,23
43:15,16,20
45:14 47:7,11
48:3,5 51:4 52:6
53:12,16,24 54:5
54:8,10 58:9,16
63:9 65:22 66:4
66:14,18 67:5,8
67:20,25 68:19
69:12,18 70:5,13
70:23 78:23
79:8,17,20 80:2
82:9,9,18 84:8
90:18 91:9,13
94:12,19,24 95:5
95:8,15 96:8,20
96:22,25 99:10
99:15 102:17
104:3,15 105:12
105:17 107:22
108:6,7,18
115:13,15 130:2
130:7 131:17
138:25 141:24
142:6,7,11,20,24
143:6,11,13
144:5 157:23
160:15 171:5
172:4,8 182:8
183:2 187:25
188:7 190:16
195:13 196:25
198:24 202:8,9
**paintings** 11:4
  47:24 54:3,22
  55:2 58:13
  61:10 187:18
  188:12,14

**paper** 9:14 33:14
  33:15,17,19
  114:24 115:14
  116:5,6
**paperwork**
  115:5 116:17
**paragraph** 81:12
  81:25 82:5,6,11
  82:12 90:21,24
  91:6 122:7
  147:7
**paragraphs**
  86:21 87:22
**pardon** 121:8
**parentheses**
  84:25
**parlance** 57:24
**part** 6:14 12:3
  12:17 14:5 19:2
  19:6 49:13 60:7
  61:23 77:22
  81:9 85:22
  92:25 94:5,6
  110:18,23
  116:13 117:8,9
  119:18 142:5
  163:15 182:22
  191:23 192:4,12
  194:4
**participants**
  125:20
**particular** 16:5
  16:10 20:6
  40:16 45:7
  50:20 53:16,16
  57:8 65:6
  130:18 171:3
  184:3

**parties** 1:19 3:4
  30:17 88:10
  106:4 109:10
  205:15
**party** 30:8
  132:12
**pass** 123:15
**paste** 10:17
**pasted** 182:12
**pasting** 182:21
**patience** 197:16
**pause** 6:8,9
**pay** 26:24 27:22
  68:12
**paying** 20:3
**payment** 135:24
  136:3,6 204:17
**payments** 116:4
  116:12
**paypal** 135:24
  136:2,6 204:17
**pdf** 25:14 34:18
  46:16,25 73:2
  76:24 77:20
  80:15 88:25
  168:19
**pdfs** 77:20
**pecker** 1:9 2:14
**pencil** 9:14
**pennsylvania**
  8:17
**people** 6:12 7:4
  18:24 54:8,14,17
  57:15 61:4,6,7
  62:6 68:10,16
  76:20 110:19
  193:9

**[percent - point]**                                                    Page 26

**percent**  25:16,21
  32:16 34:19
  40:24 47:3
  72:23 73:7,11
  89:8,10,16,17,18
**period**  86:4
  91:22 199:15
**periodically**
  22:11,12 191:20
**permissible**
  127:16 128:14
**permission**  23:5
  125:25
**permit**  156:18
  167:5,8
**permitted**  126:5
  156:9 194:15
**person**  26:22,24
  27:6,7 31:5,7,21
  31:21 53:25,25
  54:14,15 57:14
  62:9 79:8,15
  96:8,16 98:3,7,9
  98:15,17,19
  99:25 103:15
  109:15,23
  113:14 144:2
  164:13 195:20
**personal**  103:10
  125:3
**personally**  51:7
  51:14,17 60:10
  76:14 109:20
**phoenixville**
  8:16
**phone**  96:10
  100:12 101:14
  101:14,18,20

102:3 103:16
106:15 133:22
133:25 134:9,13
134:17,18,20,23
135:2 156:6,9,19
158:3 159:9,17
160:2,16 161:23
161:25 162:4,13
173:3,5,7 177:19
180:10 186:15
186:17,22,25
187:3
**phonebook**
  57:16
**phonetic**  14:19
  160:3
**photo**  31:12
  109:12 150:6
**photograph**
  32:15 34:14
  35:21 46:19
  143:18
**photographs**
  35:7 41:25 42:5
  42:9 45:14 47:9
  49:13 71:5,7
  143:2,5
**photos**  31:13,16
  31:18,20 42:22
  44:24 49:16,19
  71:9,10,12 78:11
  78:13 79:16
  131:19,22 143:8
**phrase**  15:23
  27:5 81:13 83:5
  83:15 84:24
  90:22

**physical**  115:24
  116:3
**physically**  95:18
**pic**  190:13
**picture**  36:11
  43:15 47:17
**pictures**  20:9
  30:23 31:4,11,19
  33:10,12,22,24
  34:2,4,5 35:21
  36:20 38:9
  71:16 86:13,17
  86:25 87:17,18
**piece**  57:4 67:17
  175:23 179:14
**pieces**  20:11
  175:21 185:11
**place**  16:2,4
  49:12 201:11
**placed**  39:4
**places**  57:17
  117:9
**plaintiff**  1:4 2:4
  4:14 89:3,6
  120:18 136:5
  151:11 173:9
  190:18 203:2
**plaintiff's**
  124:13 126:18
  147:2 149:24
  152:17 153:6,16
  167:17 168:16
  170:13 172:11
**plaintiffs**  123:22
  151:24
**planning**  156:24
**play**  69:16 156:9
  156:18,25 157:2

157:5 158:9,20
**played**  158:22
**playing**  158:25
  159:4 161:7
**please**  4:8,21 5:4
  6:23 7:11,23
  11:19 13:3
  21:25 46:15
  51:10 77:15
  80:12,15 81:11
  88:16 89:18
  120:14 127:23
  137:2 149:5
  150:5,11 151:23
  152:24 153:9,13
  159:20 162:23
  165:12,16,17
  167:23 170:12
  172:12,13 177:6
  179:24 180:11
  192:14 193:22
**pleased**  67:13
**pllc**  2:7
**point**  7:21 10:3
  10:20 11:7,9
  50:22 51:11
  58:21 65:17
  66:24 67:19
  86:16 87:6,17
  95:23 96:2,12
  99:9 101:4
  103:3,5,22
  106:23 108:14
  108:15 119:19
  136:12,15
  159:14,16
  164:10,10,13,22
  164:23 193:7

**[point - publishing]**                                              Page 27

195:25
**policy** 124:5
**poor** 29:9
**pop** 115:7
**porcelain** 154:20
**portion** 80:12
  125:23
**portions** 111:25
  161:3
**portrait** 189:18
**positive** 166:6
**possession** 28:16
  28:24 35:25
  37:17 42:8 45:6
  71:16 73:24
  76:23 95:5
  143:14,15
**possibility** 21:5
  177:25
**possible** 24:9
  62:4 63:5
**post** 41:25 48:9
  48:13 110:17
  120:18 140:25
  163:12 175:14
  191:13 192:19
  194:3,6 197:3
**posted** 62:11
  105:19 109:5
**posting** 194:7
**posts** 125:21,22
**potential** 66:9
**power** 150:17
**practical** 10:15
**practice** 38:20
  58:11 68:15
  136:9 182:20
  184:24

**practicing** 21:6
**prefer** 89:16
**preferred** 16:6
**prepare** 119:19
**prepared** 119:24
**present** 2:18
  95:14 100:17
  172:25 173:4,5,6
**presume** 66:4
**pretty** 71:24
  77:17 79:2
  81:15 96:6
  104:14 119:25
**prevents** 8:4
**previous** 20:19
  40:13 43:6
  78:10 155:20
  192:6
**previously** 17:2
  20:2 42:17
  50:11 62:14
  105:9,18 168:4
**price** 27:19 44:7
  44:9 46:4 55:24
  56:4 68:14
  69:17 78:23
  79:2
**prices** 20:19
  56:12,16,17
  62:13 131:3,6
  187:14
**pricing** 45:17
**primarily** 113:4
**primary** 55:6
  56:7 131:9,14
**principles** 19:9
**print** 38:7

**printed** 38:5
  145:20
**printing** 17:9
**printout** 51:16
**prior** 16:14,16
  16:18 28:18
  40:12 61:13
  90:11,14,15
  95:21,24 96:2
  104:18,22
  136:24 140:12
  140:13,24 141:4
  162:2
**pristine** 83:25
**privacy** 124:4
**privilege** 97:18
  174:17
**privileged**
  173:22,24
  175:19
**pro** 2:4 203:2
**probable** 101:24
**probably** 6:2
  16:8 27:10
  28:17 32:2 33:4
  33:6 44:21
  63:16 69:7
  85:22 106:25
  112:12 168:21
  168:22
**problem** 104:11
  163:15 170:8
**procedure** 1:20
**proceeding** 5:19
  7:8
**process** 43:5
  87:5,11

**produce** 142:23
  143:12,17
**produced** 30:11
  30:13,17 39:12
  74:5 81:6 89:6
  119:8,15 136:2
  143:2,5 168:3
  204:4
**produces** 30:9
**production**
  30:16 74:6
  119:10 136:7
  204:5,12,17
**professional** 9:8
  139:4
**proficient** 18:16
**profit** 117:7
**programmer**
  195:19
**prohibited**
  125:11
**proof** 143:10
**property** 42:21
  42:23
**provide** 77:15
  99:4
**provided** 125:4
**provision** 125:12
**public** 1:22 4:4
  55:15,18,23
  125:24 201:22
  205:7 206:25
**publication**
  126:6
**publish** 181:11
  191:22
**publishing** 192:4
  192:13

**[pull - received]**                                                                      Page 28

**pull**  46:9 145:23
  167:16 194:2
**pulled**  53:25
**purchase**  35:9
**purchaser**  33:21
  35:14 66:13,24
  67:15 79:12
  95:16
**purpose**  178:20
**purposes**  119:21
  124:8 192:16,20
**pursuant**  1:19
  174:20
**pursue**  8:22
  19:21
**put**  10:11 21:14
  29:5 30:9 40:10
  40:11,15 41:12
  41:16,23 53:19
  70:8 71:11
  72:22 79:25
  83:15 86:13
  91:3 107:14
  128:12 139:3,19
  139:20,20
  192:23,23
**putting**  18:7
  49:19 70:10,13
  104:12 195:9

**q**

**qualifications**
  192:11
**queens**  205:5
**question**  5:20
  6:8,20 7:9,10,13
  7:16,22,23 47:5
  59:23 87:25

123:18 125:18
126:12,14,23,25
127:6,7,12,23
128:8,13,16,24
129:21 130:6
131:2 132:15
133:6,15,21
134:12,20
137:15 138:10
138:22 140:3
141:3,19 142:9
142:15,16 148:9
149:17 155:11
156:22,23 157:3
159:5,8 160:5,9
160:24 165:8
166:12 168:25
174:8,13 177:18
185:5 187:13
191:9 196:15
200:19 204:22
**questioning**
  80:13 132:6
  135:16
**questions**  5:16
  8:10 66:8,10
  123:17,20
  133:18 134:16
  135:7 137:8
  165:12 181:2,5
  181:10 191:5,10
  194:23 197:6,15
  204:21
**quick**  53:3
**quickly**  65:4,5
**quite**  21:19
  33:18 63:23

**r**

**r**  2:2,5 3:2 4:2
  13:10,12 172:21
  201:2 205:2
**ra**  1:6 172:23
**raise**  4:21
**rambling**  97:20
  97:21
**ran**  199:3
**range**  81:4
**ranging**  73:3
**ratings**  38:22
**react**  7:6
**read**  6:22 11:20
  11:23 22:24
  38:4,9,15,18
  52:12 65:12
  73:10 80:24
  82:4 85:17
  89:11,15 92:23
  93:2 94:13
  124:2 127:15
  128:21,23 166:4
  176:25 179:23
  181:16,18
**reading**  82:23
  122:11
**reads**  82:17
  122:4
**real**  16:2,4 113:3
  113:4
**realize**  80:24
  96:12 97:5
  135:12
**really**  39:12
  50:14,16 56:20
  92:19 107:3
  140:20 156:13

156:23
**reason**  7:21 15:6
  31:15 33:16
  62:25 131:9,14
  206:5
**recall**  14:7 26:7
  27:7,25 28:15
  29:8 31:3 32:7
  32:10 36:3
  49:15,18 50:8
  59:7,23 64:4,11
  65:7 66:7 67:24
  71:7 92:12 99:8
  106:11 107:4
  111:25 113:13
  113:14 118:15
  122:17 134:17
  134:18 139:17
  142:19 166:7
  173:8,11 175:4
  186:15
**recalled**  121:15
**receipt**  135:21
  136:16 202:11
**receipts**  135:21
  135:23 136:10
  136:14
**receive**  26:13
  34:5 46:12
  67:25 74:19
  101:8 109:17
  110:7 135:2
  163:3,8
**received**  30:22
  35:8,13 59:25
  66:3,5,8,10
  76:10 84:20
  92:25 96:5 97:7

[received - reporter]                                                                Page 29

101:6 102:3,21
103:8 109:13
115:12 119:11
119:13 134:8,23
135:23 136:6
163:4 204:13,15
**receives** 55:5
**receiving** 46:11
**recess** 53:5
118:4
**recipient** 174:7
**recognition**
62:22
**recognize** 121:3
121:7,9 154:9,11
**recollection**
106:21 185:8
190:12
**record** 4:9 12:2
15:11 35:17
36:5 41:12
46:24 54:2
69:15 77:24
87:20 108:9
134:3,7,25
152:12,24 153:2
173:25 175:12
178:24 205:12
**recording**
133:16 156:6,10
156:19 157:8,12
157:15 158:10
158:14,20,22
160:19 161:7
203:11
**records** 28:10,12
42:16,22 43:2,6
43:7 54:4,7

55:20 114:25
115:14 116:4,8
116:13 180:5
**recoup** 15:22
**red** 24:22 26:2
28:7 36:2 39:23
43:20 47:7 51:4
51:18 53:8
78:23 82:9,18
90:18 91:9
94:18 102:18
118:8 138:12,24
142:2 143:13
146:14 151:3
164:7 171:5,19
172:4 188:6
190:9,20 196:25
**redact** 15:7
88:11
**redistribution**
126:6
**reduced** 31:24
32:5
**refer** 30:7 59:21
61:11
**reference** 139:25
**referencing**
84:19 124:8
**referral** 114:3,6
**referred** 11:22
27:10 38:17
102:22 181:17
**referring** 15:25
16:3 57:24 72:3
81:23 82:21
84:15 122:7
145:7,13 184:24

**refers** 59:20,22
**reframed** 33:4
**refresh** 106:21
**refresher** 6:4
**refund** 67:6
**regard** 58:9,12
58:16
**regarding** 126:4
135:22
**regardless** 197:9
**registered** 170:5
170:6,24
**regulations**
126:3
**reiterate** 169:21
**related** 8:24,25
9:5 113:3 157:4
205:14
**relation** 5:16
182:25
**relationship**
126:25 162:12
194:24
**relative** 21:2
124:2
**relevance** 137:7
137:8,10 154:5
178:10
**relevant** 156:22
157:3 200:6
**rely** 110:20,25
**remain** 48:24
**remained** 13:22
**remember** 14:15
28:22 33:9 35:2
38:12 43:13
53:22 80:5 96:4
156:4 166:15,17

176:24 187:2
**remembering**
158:9
**remembers**
166:13
**remembrance**
99:6
**remind** 7:5
97:19
**removal** 104:21
107:6
**remove** 107:11
**removed** 105:22
106:4,7,9,12
107:7,8,9
**reno** 79:9,10,13
**rent** 26:25
**renting** 64:10
**repeat** 7:2
143:22
**rephrase** 7:12
21:24 51:10
52:19,20 69:3
127:22 130:25
171:25 192:14
196:23
**report** 103:23
**reported** 109:9
**reporter** 6:6
11:24 25:11
34:16 38:19
46:21 72:21
80:20 88:23
120:13 124:20
148:8,22 150:3
151:15 153:22
158:16 164:4
167:22 172:17

**SA1072**

**[reporter - saving]**                                                    Page 30

176:5 179:22 181:19 190:4 203:18
**reporting** 109:7 206:1
**repost** 192:5
**reposted** 107:17
**represent** 30:15 33:2 81:5 89:5 89:21 102:13
**representative** 181:22
**represented** 98:4
**represents** 5:11
**request** 74:8
**requested** 204:2
**requesting** 4:15
**requests** 178:22
**require** 192:25 193:15 194:5
**required** 23:4 163:17
**requiring** 120:18
**research** 11:3 17:25 18:13,21 18:24 19:4,8,10 21:9,12,21,23 53:15 54:17 57:19 58:4 59:4 65:4 69:22 110:13,24 113:3 113:5,6 180:22 182:17 183:21 186:19 192:19
**researched** 94:15
**researcher** 18:17

**researching** 18:4 18:6 19:20 67:20 70:12 95:8 107:20 108:12
**resell** 17:18
**reservation** 123:17
**reserved** 3:11
**reside** 4:11
**residence** 130:8
**resides** 79:8,13
**resolution** 25:21 104:5
**resources** 21:12
**respective** 1:18 3:3
**response** 6:20 180:9 182:15 185:21
**responsibilities** 163:20
**responsible** 126:2 164:5,11
**responsive** 178:21
**rest** 11:20 36:20 87:18 88:3,7 90:23
**restored** 32:22
**restriction** 192:17,24
**restrictions** 125:15 192:21
**restroom** 118:3
**result** 104:14 114:9,10,16

**results** 48:5,9
**retail** 189:14
**retained** 203:18
**retract** 150:25
**return** 34:22
**reveal** 98:20 200:16
**review** 22:21 35:4 36:19 121:6
**reviewed** 93:5 191:18
**reviewing** 91:18
**richard** 14:12
**right** 7:19 20:21 32:14 41:2 42:13 48:5,8 49:17 55:25 58:2 70:20 81:14 84:12 85:15,16 87:12 89:24 99:21 120:7 123:18 124:25 125:13 135:7 142:18 145:14 147:16 148:17 156:12 157:5 158:20 167:18 168:6,10 168:24 170:7 171:16 177:20 178:25 184:22 191:24 192:5,8 195:3 200:13
**road** 4:12
**robert** 2:19
**role** 69:16

**ronny** 173:2
**room** 7:4
**roughly** 80:5,8
**rules** 1:20 126:3
**rulings** 204:21
**run** 43:24

**s**

**s** 2:2 3:2,2 13:19 29:24 202:2 206:5
**sake** 156:17 169:13
**sale** 18:7 22:14 24:15,20 26:7 28:7 41:24 48:4 50:23 57:3 79:2 104:15,17 107:21,25 116:11 125:21 135:22 151:2 163:11 164:20 166:8,16 172:8 182:25 196:24 198:24 199:16 203:12
**sales** 17:17 20:19 28:4 48:9,14 49:12 55:5,14 56:15 75:6 116:4 149:10 195:21,24 196:12,17
**samples** 61:9 133:7
**save** 156:17
**saving** 43:12

**SA1073**

**[saw - server]**                                              Page 31

**saw** 51:18 52:6,9 53:18 54:2 58:20 105:7,11 105:18 123:4 129:22 147:13

**saying** 38:12 60:17 93:20 133:16 161:6 200:8

**says** 22:24 23:22 33:16 35:23 36:16 38:11 74:22 75:13 79:2 81:25 83:12 91:7,18,20 122:10 147:8,17 147:21 149:8,11 149:18 168:6 170:7 176:9,12 176:21 177:3

**scan** 168:7,22

**scanned** 168:8

**scheduled** 135:14

**schmidt** 2:19

**screen** 25:3 32:16 81:17,19 124:16 145:19 147:12,14 152:15 162:21

**scroll** 25:17 34:20 73:4 120:23

**scrolled** 47:3 89:19

**scrolling** 111:13

**scrutinize** 193:5

**scrutiny** 193:8 193:13

**sculpture** 18:12

**se** 2:4 203:2

**seaford** 4:13 149:8

**seal** 33:19 88:10

**sealing** 3:4

**search** 18:23 19:15,18 113:2 196:3,4

**searched** 71:19 71:19,19

**second** 25:2 26:18 30:3 52:23 81:13 86:11 89:21 91:6 92:10 97:13 101:16 148:18 169:5

**secondary** 54:5 55:3 56:16,19,25 57:3,4 58:18 167:9

**secondly** 127:16

**section** 77:8 174:25

**secure** 23:5

**see** 17:17 18:10 22:10 24:10 25:18 27:9 30:4 32:18 34:21 36:10,20,22 40:25 49:3 51:14 54:17 58:22 72:9 73:5 73:8 77:6,9 81:15,19 82:2

83:12 85:13,18 86:5 87:16 90:17,22 91:7,10 91:17,23 96:11 111:3 122:3,21 124:16 129:13 129:17 131:3 146:6,20 157:2 165:20 168:10 168:13 172:18 176:8,14,20,21 183:22 189:7,9 194:10 195:5

**seeing** 20:9 36:3 49:15 50:8 53:23 118:15

**seek** 121:25 122:2 143:17

**seen** 47:15 50:6 50:11 51:7 89:22 90:12 92:7,9,10 133:3 143:3 188:20

**sell** 10:9,10 15:15,18,18 26:4 26:14,20 44:5,10 47:23 50:7 64:7 70:4,5 74:20 115:4 117:23 183:17 195:22

**seller** 148:12 163:19

**sellers** 150:17

**selling** 12:15,18 13:8 16:23 17:3 50:3 56:24 146:3 147:8 149:14,20

150:22 151:5 154:2,16,19,23 185:11

**sells** 56:7

**send** 15:21 33:22 110:4 117:20 136:10,13 161:11 168:23 180:8 195:6

**sending** 51:16

**sense** 76:2

**sent** 31:2 32:5 75:5 117:17 123:23 133:16 144:20,25 145:5 158:19 159:17 159:19 160:2,6 161:18 167:18 174:9 176:6

**sentence** 84:14 86:2,8 91:17,25 92:5

**separate** 88:6,14

**separated** 17:9 138:17

**separately** 117:4

**september** 1:12 4:16 162:3 163:2,2 205:20

**serendipitous** 114:22

**seriouscollector** 110:3,15

**serve** 163:14

**server** 42:20,23 43:4 75:22 78:5 78:12 114:8,10 114:16 116:14

**[server - somebody's]**                                                     Page 32

116:16
**servers** 78:8,9
**service** 3:8 11:2
  50:4 124:4
  191:15,19
**session** 175:23
**set** 44:7 68:11
  69:17,19 88:5,11
  205:11,19
**settle** 175:3,8
**settlement** 134:8
  163:3 164:17
  172:23,25 174:3
  174:13,19,22
  175:10
**seven** 139:5
  140:21,22,24
  141:6 185:12
**shabby** 82:20
  83:13,18,23,24
  84:5,11
**shake** 6:18
**shape** 59:13
**share** 25:3 55:18
  81:16 147:11
**shared** 168:11
**sheet** 206:1
**ship** 94:25
**shipped** 95:3
  136:15
**shipping** 136:8
  136:10,13,14,17
**shoot** 64:17
**short** 53:5 118:4
**shot** 44:24
**show** 25:3 34:8
  40:24 80:25
  81:21 82:5

85:12 87:17
89:20 120:24
145:16 146:10
146:21 180:5
**showed** 35:11
  101:14,20 148:4
**showing** 25:12
  28:10 34:17
  36:7 40:22
  46:22 47:2
  72:24 80:21
  88:24 89:8
  92:24 109:13
  120:21 145:18
  168:10 190:5,6
**shown** 29:17
  34:19 73:6
  133:7
**shows** 52:3
**shut** 43:3,4
  52:25
**sic** 52:21
**side** 30:11,13
  32:11 49:5
  93:16,16 165:23
**sides** 142:13,16
**sign** 75:24
**signature** 37:25
  38:2 40:21 41:5
  41:7 43:16 47:6
  47:16,17 52:4
  120:25 121:9,11
  122:17,23 123:2
  131:7 137:24
  138:24 142:10
  142:23 143:9,10
  143:12 202:10
  205:23

**signatures** 52:12
  129:14 142:4
**signed** 3:5,6,8
  11:6 62:5 82:18
  122:17,19
**signify** 123:8
**signs** 122:22
  139:7
**silly** 10:17
**similar** 24:7
**simplicity**
  169:13
**simply** 198:21
**single** 111:11
  161:4 185:13
**singled** 184:19
**sir** 23:25 47:13
  134:3 165:5
  178:6
**sit** 23:3,9 30:18
  40:14 45:5,11
  80:4 92:13
  105:15 123:7
**site** 22:9 124:23
  125:2,7,14,23
  126:7 140:4
  182:12,13,14
  183:7,22
**sites** 83:10
**six** 17:10,11
  63:16
**size** 31:24
  187:17,23
  188:14 189:4,10
  190:7,9,11,19
**skills** 19:14
**slc** 1:6

**sleep** 8:6
**slide** 63:19
**slowly** 36:19
**slows** 4:25
**small** 115:6
**smaller** 31:24
**snatching** 195:8
**software** 86:11
  87:5 92:20
**sold** 10:4 20:10
  20:11 24:11,24
  27:23 28:14
  29:2,12 31:7,9
  33:3,15 40:2,4,6
  43:25 44:3,5,14
  44:15 45:18,24
  48:3 54:3,5,8
  55:2,8,9,20
  56:19 58:13
  62:14 65:25
  66:4,21 68:3
  69:6,12 70:24
  71:21 74:23
  78:24 83:20
  94:24 95:16
  98:16 116:19
  154:25 182:9
  187:18 195:14
  196:7
**sole** 99:19
**somebody** 5:3
  42:4 51:16 54:9
  56:3 65:22
  68:13 76:14
  95:17 136:20
  192:19
**somebody's**
  75:23

**SA1075**

**[son - subscribed]**                                                Page 33

**son** 71:22,25 73:15,22,25 74:7 204:7
**soon** 135:15
**sorry** 24:17 52:20 89:13 97:20 100:9 152:21 164:24 181:14
**sort** 22:6 57:17 116:10 117:13 118:16
**sounded** 22:8
**sounds** 157:6
**source** 59:21,22 59:24 114:4 196:11
**sources** 22:6 57:21
**south** 8:17
**southern** 1:2
**space** 64:10
**spam** 177:12
**speak** 4:22 96:7 98:22 99:21 134:15
**speaking** 100:14 135:13 157:18
**speaks** 160:19 160:20
**specific** 194:15
**specifically** 19:18 84:24 171:17 182:24 183:25 186:10 198:22
**specified** 201:11

**spelled** 139:11
**spelling** 138:5,23 139:9
**spellings** 138:12
**spend** 54:18 61:5 117:5
**spirit** 112:18
**split** 86:14
**spoke** 79:16 98:3 113:11 155:13 157:16 177:19
**spreadsheet** 116:20
**ss** 205:4
**stamp** 35:18 39:3,20 46:25 73:3 81:23 152:17 168:2,19
**stamped** 89:3 126:18 144:22 144:24 145:21 146:9
**stamps** 29:22,24 30:7,10 38:22 81:3 126:22 127:2
**standard** 136:9
**standing** 125:9
**start** 5:17 10:25 17:6 18:9 44:6 56:25
**started** 13:8 17:21,23 18:5 19:12 43:4 112:20 115:19 115:20 149:14 175:9 198:14,15 198:17,18 199:2

199:8,8 200:3
**starting** 46:3 81:12
**starts** 68:2
**state** 1:22 4:4,8 13:14,17 128:3 151:17 163:10 169:2,8,12,24 170:22 171:13 171:15 172:5 205:4,8
**stated** 131:18 146:14 162:9 166:17 169:7 177:18 186:4
**statement** 127:18 150:18
**statements** 108:19,20,24 109:4 162:6 165:6
**states** 1:2 150:21 152:19 154:15
**stating** 134:4 182:15
**stay** 25:20 171:2
**stayed** 13:18
**steadily** 10:24 11:8
**steamy** 28:21
**sticker** 39:3
**stipulated** 3:3,10
**stop** 97:13 136:21
**stopped** 86:25 198:16
**stories** 63:17

**story** 61:3 63:15 130:13
**straight** 61:8
**strategy** 46:3
**street** 2:5,9,15 150:12,13
**stretcher** 36:6,9 37:18,22 39:5,9 39:10,14 40:7,9 40:10 52:9 142:12,14,17
**strike** 93:4 94:9 152:23,25
**stuck** 27:2
**studio** 9:6
**study** 8:22 19:22
**stuff** 10:15 17:18 26:20 27:3 114:14,14 115:10,11 196:8
**style** 18:11 45:2 54:13
**subchapter** 13:19
**subject** 82:8 91:13 105:8 111:15 171:3
**submit** 178:7
**submitted** 90:3 119:20 127:3 130:2 133:8 142:4,5 157:10
**submitting** 178:20
**subscribe** 140:18
**subscribed** 201:18 206:22

**[subscriber - thank]**                                      Page 34

**subscriber**  180:6
**subscribers**
  167:9
**subscribing**
  140:19
**subscription**
  11:5
**subsequent**
  107:25
**substance**  100:7
  102:24 105:3
  182:7
**successful**  62:19
**successor**  112:15
**sue**  97:4,5 98:8
  98:10,20 99:3
  133:17 155:22
  165:4
**sued**  97:10
**suggest**  102:6
**sum**  97:8 100:7
  105:3 182:6
**summer**  28:20
  144:16
**supplying**  64:10
**support**  120:16
**sure**  4:24 28:17
  44:21 45:3
  71:24,25 72:6,7
  77:17 79:3 96:6
  97:25 107:11
  119:25 121:10
  144:15 157:4
  194:5
**surface**  195:22
**survived**  47:18
**susan**  162:23
  165:17

**susceptible**
  31:25
**swiped**  114:14
**switch**  78:10,13
**switched**  78:11
**sworn**  3:5 4:3
  201:5,18 205:11
  206:22
**symbol**  86:5,5
**symbols**  81:3
  82:17 91:8
  123:2
**system**  76:3

**t**

**t**  3:2,2 29:24
  201:2 202:2
  205:2,2
**take**  7:24 15:17
  31:11 33:6,10,11
  41:24 42:5
  44:18,20 45:13
  53:3 63:22
  64:15,19 65:17
  73:10 75:2
  81:11 118:2,7
  127:8 130:20
  194:11
**taken**  1:18 9:2
  9:22 10:7 31:14
  45:8 52:16 53:6
  65:7 84:16
  118:5 129:7
  158:18
**takes**  15:25 16:4
**talk**  6:9 96:11,16
  96:23 165:13
  178:23

**talked**  100:11
  132:5 134:2
  180:15 185:19
**talking**  6:12 30:3
  96:12,14 126:21
  146:7
**teaching**  10:14
  10:16
**tear**  29:13,14
  32:8,17,19 83:22
  84:5
**technically**  13:8
  171:8
**tell**  8:13,21 13:3
  23:21 34:23
  61:4 82:7
  106:12,20 107:5
  109:25 118:6
  155:8,12 160:11
  171:17 178:10
  179:2 190:15
  194:12 198:21
**tells**  116:23
**ten**  16:9,9 68:23
  68:24 69:8
  114:21 115:10
  185:11 187:10
**tenants**  64:9
**tend**  62:6 183:23
  184:16,18
**tendency**  139:2
**tens**  196:5
**teri**  96:14 98:4
  98:19 99:8,14,19
  99:24,25 100:5
  100:13 101:5,13
  101:17,22 102:7
  102:11 103:16

  109:15,18
  133:25 134:4
  157:13 176:9,12
  176:18,22 177:2
  177:8,19,21
  178:2 179:4
  203:15
**term**  21:3
**terms**  22:21,25
  24:8 57:22
  111:4,5,9,15,19
  112:2,6,14 124:4
  125:5,12 128:18
  191:23 194:4
**testified**  4:5 41:8
  47:23 52:4
  105:9
**testify**  188:19
  201:5
**testifying**  8:4
  161:14
**testimony**  201:6
  201:10 205:13
**text**  73:19 81:2,9
  82:8,11,24 85:2
  87:2,6 90:21
  91:2 93:7 94:5,6
  176:23 182:21
  184:14,15
**thank**  5:6 13:24
  86:3 113:20
  124:15 130:19
  135:19 175:13
  178:15 180:2
  181:2 185:3
  194:19 197:14
  197:15 200:22

[thereof - transferred]                                           Page 35

**thereof** 125:23
**thing** 17:15
  22:24 25:18
  62:2 73:5
  101:25 112:21
  112:24 122:3,4
  136:21 139:21
  140:7,8 161:4
**things** 10:4,9,11
  10:17 23:20
  24:11 43:25
  44:10 55:20
  62:6 68:3 86:20
  97:24 113:6,8
  115:3 147:5
  175:11 183:17
  193:12,16 196:7
**think** 18:19 22:4
  26:9 27:9,12
  52:4 67:20 72:8
  79:22 87:4
  91:19 97:8
  106:14 109:20
  110:6 116:15,17
  133:9 147:4
  159:12 166:5
  175:9,10 177:11
  177:24 183:10
  183:12,23
  184:17,18
  186:24 187:24
  190:13 193:10
  194:9
**thinking** 86:21
  108:10 183:13
**third** 26:19
  81:24 109:10
  147:20

**thomas** 14:12
**thought** 63:25
  96:13 104:13
  108:13 134:5
  157:18
**thousand** 44:4
**thousands** 44:14
  44:16 45:19,23
  196:5
**threatened** 98:8
**threatening**
  98:20 99:3
**three** 17:11
  80:15,22,25
  81:22 115:10
  150:21 175:10
  179:8 196:3,24
  198:12 199:22
**throw** 75:12
  115:3
**time** 1:13,21
  3:11 14:21,24
  16:12 18:23
  33:13 41:20
  45:4 59:4 63:23
  65:2,16 66:21
  70:25 78:17
  79:23 91:22
  95:4 96:2
  102:16 103:7,8
  116:20 117:17
  121:22 125:10
  133:10 134:8
  136:24 137:4
  138:16,19
  140:10 150:19
  156:18 170:15
  171:4,9 180:18

  183:19 184:9,15
  194:20 197:16
  198:6 199:15,19
  201:10
**times** 5:3 7:9
  93:5 138:6,14
  175:2,10 179:8
  185:13,14
  189:21
**tin** 9:14,15
**tired** 8:7
**title** 94:18,22
  120:15
**titled** 24:22
  25:25 124:13
  168:16,16
**today** 4:23 5:6
  5:16,22 6:5 8:5
  23:3,9 25:4 34:9
  40:14 45:5,11
  80:5 92:13
  105:15 123:7
  147:5 162:2,7,9
  165:6 167:12
  177:18 179:15
  197:16 200:4
**today's** 25:7,14
  34:12 46:17,24
  72:16,25 80:23
  89:2 120:19,23
  124:7 145:10
  147:23 152:16
  165:19 167:24
  179:19
**told** 96:15 97:2
  106:3,3,6 155:25
  179:7 180:15
  181:22 183:15

  183:25
**tons** 20:25 21:2
**tool** 18:15
**top** 47:4 68:11
  75:2 78:18
  142:17,21,24
  148:12 176:21
  184:20 186:18
  187:4
**toronto** 113:18
  113:18,22
**total** 71:9
**totally** 164:14
**touch** 104:23
**tr** 86:5
**trace** 186:23
**track** 117:6
  166:21,23
**trademark**
  125:15 126:9
**trained** 9:10
**training** 9:17,20
  10:18 18:20,22
**transaction**
  116:12
**transcript** 6:22
  15:8 80:13 88:3
  88:13,15 189:24
  201:9,9
**transcripts** 88:6
  88:8
**transfer** 125:21
  196:18
**transferable**
  124:25
**transferred**
  132:3,9

**SA1078**

**[transition - understood]**                                     Page 36

| | | | |
|---|---|---|---|
| **transition** 19:13 | 145:8,12,24 | **truck** 29:5 | **typically** 49:12 |
| **treat** 116:23 | 146:7,8,17,24 | **true** 6:15 79:12 | 91:3 |
| **trial** 1:16 3:11 | 147:15,24 | 201:9 205:12 | **u** |
| **trombetta** 1:3 | 148:25 149:19 | **truncated** 93:13 | |
| 2:4 4:14,15 5:13 | 149:23 150:9,24 | 93:14 | **u** 3:2 |
| 35:23 38:10 | 151:11,16,20,23 | **truth** 201:5 | **uh** 6:19,19,19 |
| 52:10 53:13,20 | 152:6,10,21 | **truthfully** 8:5 | **ultimate** 66:13 |
| 55:3,8 58:5,23 | 153:3,15 156:8 | **try** 6:24 17:15 | **umbrella** 24:22 |
| 59:3 61:21 | 156:16 157:7,9 | 23:20,23 29:3 | 26:2 28:7 36:2 |
| 62:13,18 65:15 | 157:14,20,25 | 52:25 70:5 | 39:23 43:21 |
| 66:17 67:2,9,22 | 158:5 159:5,7,22 | 72:10 79:16 | 47:7 51:5,19 |
| 82:19 83:4 | 160:6,10,21,25 | 164:17 175:3,8 | 53:9 78:24 |
| 84:25 89:7 | 161:11 162:17 | **trying** 11:3 | 82:10,18 90:18 |
| 93:21 94:10 | 162:22 163:24 | 17:13 26:17 | 91:9 94:18 |
| 95:21 96:13 | 165:15 166:11 | 60:21 62:2 64:7 | 102:18 118:8 |
| 99:11,17 101:12 | 167:15 168:5,21 | 115:18 135:11 | 138:12 142:2 |
| 101:15,19,22 | 170:11 171:25 | 145:13,25 | 146:14 151:3 |
| 102:7,14,19 | 172:10,22 | 159:23 | 164:7 171:5,20 |
| 103:10,14,15,20 | 173:23 174:12 | **tuesday** 179:25 | 172:4 188:6 |
| 103:23 107:23 | 175:20 176:6,9 | **turn** 38:4 | 190:10,21 |
| 108:5,11,17 | 179:9,13 180:4 | **tweaks** 111:24 | 196:25 |
| 109:9,14 119:5 | 180:25 182:9 | **twelve** 115:11 | **umbrellas** 54:12 |
| 122:5,6,11 | 183:2,3 185:4,7 | **twenty** 112:23 | 54:16 |
| 123:15,19,21 | 186:11 188:16 | 129:5 | **uncommon** |
| 124:9,12,22 | 188:24 189:18 | **two** 6:12 8:23 | 139:8 |
| 126:16,21,24 | 190:2,6 191:3 | 28:18 43:9 73:2 | **underneath** |
| 129:18 130:14 | 194:22 197:5,25 | 88:6 100:11 | 86:19 87:18 |
| 130:18,24 | 200:20 203:24 | 122:22 129:2 | 125:14 |
| 132:17,22 135:8 | 206:2 | 151:25 153:3 | **understand** 7:10 |
| 135:11,19 136:5 | **trombetta's** | 175:21 185:15 | 37:24 48:2 81:8 |
| 137:9,22 138:6 | 54:21 60:16 | 187:5,7 189:10 | 98:11 156:15 |
| 138:13,15 | 61:23 65:11 | 189:11 190:7,7 | 191:14 |
| 139:10,15,16,16 | 84:15 93:11,18 | **type** 6:12 29:4 | **understandable** |
| 139:20,21,22 | 107:21 118:11 | 83:20 | 7:13 |
| 140:11 141:5,13 | 118:25 181:12 | **typical** 19:9 | **understanding** |
| 141:17 143:4,8 | **trouble** 4:21 | 39:19 40:5 | 99:13 118:12 |
| 143:20,25 | 107:11 | 74:18,24 | **understood** 6:13 |
| 144:19,23 145:3 | | | 7:16 99:20 |

[understood - went]                                                          Page 37

188:24 191:3
**unfortunately** 43:8
**union** 166:19
**united** 1:2
**university** 10:12
**unsigned** 3:7
**unusual** 53:21
**update** 121:25 122:2
**upload** 49:13
**uploaded** 49:20 125:10
**upper** 147:16 165:23 168:5
**upwards** 44:4
**use** 16:6,11 18:15,15 23:11 45:2 48:8 57:7 57:22 83:5,18 86:12 112:13 118:3 124:23 125:2,3,5,13,14 125:24 126:4 181:23 183:22 184:6 185:9 192:19
**user** 11:10,14 48:25 183:16,20
**users** 184:20
**usually** 30:8 55:14 56:10 115:9 194:11

**v**

**v** 4:2 206:2
**vagueness** 171:23

**valley** 8:15
**valuable** 43:21 43:22
**value** 54:9,18 57:2,5 61:11,18 61:22 64:8,18,20 187:19,25 189:4
**various** 11:3 20:10
**venting** 144:2
**verbal** 6:17,23 35:3 93:3 133:11
**verbally** 117:16 190:3
**verbiage** 111:3 111:23
**verify** 39:15 60:11
**veritext** 206:1
**versa** 192:24
**version** 145:20 168:9,12
**versus** 172:22
**vice** 192:24
**video** 4:25
**view** 36:9 61:22 142:23
**viewing** 110:19
**views** 37:13
**virtual** 1:16
**viruses** 125:10
**visible** 75:24
**visual** 144:20 145:13 148:2
**volume** 28:3

**w**

**wait** 101:16 135:8
**waived** 3:5
**wallet** 61:5
**want** 7:8 62:5 67:13 73:11 96:11,21,22,23 97:14,19 117:9 127:22 130:15 130:25 146:12 155:19,24 156:10 163:14 174:7,12 175:12 178:22 179:9 193:10 200:16
**wanted** 10:15 45:16 54:8 56:3 96:16 99:2 155:17 170:9 186:5
**wants** 157:7
**watching** 150:15
**water** 9:11
**wave** 4:22
**way** 9:9 16:19 29:10 44:5 54:14,16 59:13 62:8 63:8 64:20 93:12 101:18 107:14 112:25 113:8,9 114:19 114:20 125:8,22 139:12 142:22 164:14 205:17
**ways** 139:5,7
**wear** 44:25

**web** 23:2 125:22
**website** 50:13,24 51:3,9,12,15,18 58:6,22,25 60:5 60:10,16,18 72:5 84:21,24 92:16 105:8,13,17,19 105:23 107:17 118:8,12,17 126:10 127:21 128:4,11,19,22 131:4 148:11 151:4 167:10 182:21
**websites** 196:18
**wednesday** 4:19
**week** 9:12 64:24 70:19,23 185:13
**weekly** 185:10
**weeks** 17:10,11 17:11 43:9 187:5,7
**weird** 116:23
**welcome** 81:13 81:25 90:22
**wendy** 154:12,14 154:19
**went** 17:17 33:11,25 43:9,12 53:19 54:10 55:24 60:15 61:10 63:23 70:22 101:16 107:10,12 112:19 170:23 186:14 198:16 198:19

**[wet - york]**                                                                                    Page 38

wet  28:19 144:16
whatsoever
  62:23 64:13
  79:25
whereabouts
  95:15 171:11
whereof  205:19
white  189:9
wife  11:15 12:25
  13:4 14:10 17:5
  27:10,11 96:6
  100:12,15,18
  109:21 110:6
  134:13,16,23
  149:14 150:7
  158:4
wikipedia  22:9
william  4:10
willing  31:11
  54:18 68:12
  164:22
wilson  2:12 5:9
window  52:25
  53:2
wish  68:16
  123:16
witness  3:5,8,9
  4:3 123:15
  145:17 146:22
  147:4 158:2
  162:24 188:17
  188:18 191:2
  197:19,22
  200:22,24
  205:10,13,19
witnesses  15:9
  143:21,24

won  96:8
wooden  35:20
  63:19
word  11:18 57:7
  158:24
words  38:2 52:9
  55:7 80:6 87:4
work  12:14 18:7
  19:20,24 24:9
  50:12 107:23
  108:2 118:13,17
  164:17
worked  14:16
working  14:18
  14:24 17:23
works  5:19 6:3
  125:20
world  11:11
  17:14,16 57:13
  125:21
worldly  123:3
worldwide
  125:22
worth  45:23
  70:10
worthpoint  1:8
  2:14 5:11,14
  24:2,14 47:16,18
  47:23 48:3,7,17
  48:18,22,25 50:4
  50:11,12,21 51:8
  51:22 72:4,7,10
  79:21,23,24 81:7
  86:24 90:16
  104:17,20,24
  105:4 106:6,12
  106:16,23 107:5
  118:7 135:9

138:4 140:14,17
  147:6 159:25
  194:16 195:2,4
  196:2,3,6,10,19
  197:11,12
  202:13
worthpoint's
  48:12 50:13
  51:3,9,12,15,18
  92:16 105:8,13
  105:16,19,23
  107:17 140:18
  151:4 153:4
worthpoint.com
  1:9 2:14
wp000038  81:4
wp000040  81:5
wrap  189:2
write  22:5 65:4
  116:18,21,25
  117:2,11 119:23
  127:20 138:3,5
  138:13 150:23
  154:19
writing  6:6
  35:20 36:3,11,14
  36:15,21 37:13
  37:18,21 39:3
  40:16 41:12,17
  71:23 95:11
  121:15 146:15
  154:2
writings  39:24
written  86:12
  94:18 100:24
  120:2 123:10
  125:25 138:15
  138:20

wrong  152:22
  173:11 193:23
  193:24
wrote  29:12
  121:18

**x**

x  1:3,10 202:2
  203:20

**y**

yard  17:17
yeah  12:6 16:9
  72:6 76:17
  78:25 98:24
  133:18 136:4
year  13:20 14:17
  129:2 137:2
  141:9,13,16
  144:4 149:10
  166:18 170:21
  187:2,7 196:24
  197:3 199:7
years  18:25
  42:24 83:21
  98:15 112:23
  114:21 115:7,10
  115:11,21 129:2
  129:5,6 140:21
  140:22,24 141:6
  141:7 164:20
  169:17 187:10
  193:10
yesterday
  144:20,24 145:2
  145:6 146:23,25
  151:20
york  1:2,23 2:5,5
  2:10,15,15 4:4

**[york - zoomed]**                                        Page 39

82:19 83:4,7,9
205:4,8 206:1
**young**   94:10
**youngest**   17:12
**yqz**   12:15 112:12
112:15 147:18
147:20,21 196:4
200:2,3

**z**

**zero**   137:8
**zone**   196:4
**zoom**   4:23
168:11 172:25
173:3
**zoomed**   25:15

**SA1082**

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**SA1084**

Certified Original

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

ANNAMARIE TROMBETTA,

                        Plaintiff,

                                    Index No.:              -

against -                           18-cv-00993-RA-SLC

NORB NOVOCIN, MARIE NOVOCIN,

ESTATE AUCTIONS, INC. and

WORTHPOINT CORPORATION,

                        Defendants.

- - - - - - - - - - - - - - - - - - X

                    (VIA VIRTUAL PROCEEDING)

                    October 7, 2022

                    12:05 P.M.

        DEPOSITION of WILLIE CHU, the non-party

herein, taken by the Defendants herein, pursuant to

Rule 45 of the Federal Rules of Civil Procedure,

held at the above-mentioned time and place, before

Anita M. Cummo, a Notary Public of the State of New

York.

Page 2

A P P E A R A N C E S :

ANNAMARIE TROMBETTA, Plaintiff Pro Se
    175 East 96th Street, Apartment 12R
    New York, New York 10128


WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
Attorneys for Defendant WorthPoint Corporation
    1133 Westchester Avenue
    White Plains, New York 10604

BY:   JANA S. FARMER, ESQ.
      ADAM R. BIALEK, ESQ.
      File No.: 19701.00006


HOGAN DUFF, LLP
Attorneys for Defendants Novocin and Estate
Auctions, Inc.,
    43-10 Crescent Street, Suite 1217
    Long Island City, New York 11101
BY:   ANDERSON JOSIAH DUFF, ESQ.

Case 1:18-cv-00993-LTS-SLC     Document 425-3     Filed 04/17/23     Page 3 of 52

Page 3

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

*     *     *

Page 4

WILLIE CHU

W-I-L-L-I-E   C-H-U, having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

MS. FARMER:  Good afternoon, Mr. Chu.  My name is Jana Farmer and I represent WorthPoint Corporation, a defendant in this matter.  We also have here Mr. Anderson Duff who is the attorney for Mr. and Mrs. Novocin as well as, Estate Auctions, Inc. who are the other defendants. Also, I have Anita Cummo, who is our court reporter from Veritext.  She is going to be taking down everything that we say today.

You're here today as a nonparty witness.  You were designated by Miss Trombetta as one of her witnesses.

(Discussion held off the record.)

EXAMINATION BY
MS. FARMER:

Q.   Please state your full name for the record.

**SA1088**

Page 5

WILLIE CHU

A.     Willie Chu.

Q.     What is your present home address?

**Redaction**

Q     Mr. Chu, have you received a subpoena?

A     Yes.

Q     Have you received a fee of $40 that was paid with that subpoena?

A     Yes.

Q     Mr. Chu, is William Chu your full, legal name?

A     Yes.

Q     Your address that you gave us, is that your business address or something else?

A     It's my home and business.

Q     Can you describe what is the nature of your business, briefly?

A     I do photography, videography, and I do some computer work. I've done websites before, and, yeah, that's about it.

Q     As far as some computer work, for how long have you been in that profession?

A     Oh, God. At least ten years, if

Case 1:18-cv-00993-LTS-SLC    Document 425-3    Filed 04/17/23    Page 6 of 52

Page 6

WILLIE CHU

more.  Mostly on Mackintosh not Windows, but.

MS. FARMER:  I'm sorry to ask you this question.

Q    Is there anything that would prevent you from testifying truthfully today such as illness, medication or anything like that?

A    No.  But how long is this going to take because I blocked out this time and I have to get back to work?

MS. FARMER:  I understand.  We'll to get you through this as quickly as possible.  I would estimate not more than an hour for my own questioning.  Mr. Duff is here.  He can also ask you a few questions.  But it has not been too long for the other witnesses, at least.

THE WITNESS:  Okay.

Q    Mr. Chu, with respect to computer services that you provide, what sort of training do you have in that, any college degrees, any courses or anything like that?

A    No, I'm self-taught.

Q    Do you have any particular

Page 7

WILLIE CHU

experience working with Google?

A    In what respect?

Q    Perhaps search engine optimization?

A    No, I don't, not for that, but.

Q    In your professional capacity working with computers, have had to interact with Google, in any, way shape or form?

A    Google is basically a search engine; correct?

Q    Yes, and a company.

A    Other than search engine optimization, I don't do that. However, I realize that certain items that are posted on there may or may not be true and, as far as trying to remove unwanted or false information, you have to contact whoever is the host of or administrator of whatever company that does that or whoever posts that information.

Q    Prior to this case, have you had experience contacting Google to remove any sort of information?

A    Back in my letter that I submitted, that was submitted back, I think it's January of 2016, as well as 2017, I contacted -- it's not

Page 8

WILLIE CHU

Google, specifically. It's a company that's related to Google. It was -- it was -- at the time, it was a G Suite. They provided business e-mails for the people, and I contact them because I wanted to know how something can be removed. But even though I knew the answer, I just wanted to hear it from them. You can't. You can't remove it unless you contact the owner or the host of the website.

MS. FARMER: My question was slightly different.

Q    Before this case involving Miss Trombetta, and before you contacted G Suite in January 2016 and January 2017, have you had any experience contacting Google or any of their companies just as G Suite?

A    No. No, I have not prior to that.

Q    Have you had any prior interaction with Google, other than using their search engine, prior to 2016?

A    No.

Q    You mentioned that you knew that in order to have something removed, you needed to contact the owner of the website or the host of

Page 9

WILLIE CHU

the website; correct?

A    Correct.

Q    How did you find that out before 2016?

A    Well, firstly, that's common sense. You can't just readily go in and remove something. But I contacted G Suite just to confirm that and that's what they said.

Q    Again, to confirm, you first contacted G Suite in connection with this case and that was around January of 2016; correct?

A    Yes.

MS. FARMER:  Mr. Chu, you mentioned a letter in connection with this case. So, we actually have a copy of that.  I'm going to share my screen and show you a copy of that letter.  Ms. Court Reporter, for the purposes of today, we will mark this as Defendant's Exhibit 1 of today's date.

(Whereupon, at this time, the above-mentioned Letter was marked by the reporter as Defendant's Exhibit

Page 10

WILLIE CHU

1, for identification, as of this date.)

MS. FARMER:  Mr. Chu, is this large enough?  Should I magnify it?

THE WITNESS:  No, that's good.  I can see.

MS. FARMER:  I'll go up to a hundred percent.

Q    First of all, is this a one-page letter?

A    Yes.

MS. FARMER:  It's Bates-stamped Plaintiff's 000305.  This is called a Bates-stamp.  It's just a numbering system that we use in litigation to keep track of the documents and pages that various people produce.  Miss Trombetta, the plaintiff, produced this letter to us.

Q    Did you have a chance to visually look at the letter and familiarize yourself with it?

A    Yes.  Actually, I have a copy in

**SA1094**

Page 11

WILLIE CHU

front of me.

Q    Mr. Chu, is that your signature at the bottom of the document?

A    Yes.

Q    Do you recall preparing this letter yourself?

A    Yes.

MS. FARMER:  If you don't mind, I will magnify, and I wanted to follow up with you on what you said in that letter.

Q    You said that "In January of 2016 and again in 2017, I was contacted by artist AnnaMarie Trombetta;" is that accurate?

A    Yes.

Q    When did you first meet Miss Trombetta?

A    Oh, God, I don't know.  About 20 years ago.

Q    How did you meet?

A    She got a referral from someone to contact me to do a video of her.

Q    Have you done a video for her?

A    Yes.

Page 12

WILLIE CHU

Q    Since you first met, did you keep up the acquaintance?

A    Yes.  She's a good friend of mine.

Q    How often on average do you speak to her in a month?

A    I don't know.  At least once a month.

Q    Was January of 2016 the first time that she contacted you about this problem with a painting that she found on the Internet?

A    Yes.

Q    You mentioned that Miss Trombetta is an artist.

Are you familiar with her artistic work?

A    Yes.

Q    Are you yourself in the market, sir?

Are you a collector?

A    No, I'm not a patron.  I'm not a patron.

Q    Have you ever purchased any of her works?

A    Have I ever purchased what?

Q    Have you ever bought any of Miss

SA1096

Page 13

WILLIE CHU

Trombetta's works?

A        I have not.  However, she has gifted me some work.

Q        When Miss Trombetta contacted you in January of 2016, what did she say to you about this painting that she found?

A        Well, it looked kind of sketchy to me because it was on a website with all kind of misleading information, as well as a biography that was copied from somewhere, and I think some of the information was incorrect.  I mean, it's been a long time so I can't be specific about that.  As a matter of fact, I think it was on the WorthPoint website that showed a painting that she did not paint because it specified that the painting was done in 1972.  But, as you know or you should know, in 1972 she was only nine years old.  So, she couldn't have -- she didn't start painting then.

Q        When Miss Trombetta first spoke with you about this painting, was that on the phone, by e-mail, in person or something else?

A        By phone.

Q        Did she share the link to the

Page 14

WILLIE CHU

listing with you?

A    She did.

Q    How did that come?

Was it a PDF or was it an actual link that you click on?

A    I think it was a screen shot maybe.

MS. FARMER:  I'm going to now show you an exhibit that was previously marked at somebody else's deposition.  For the record, it is a --

THE WITNESS:  Could you make it smaller?  It's too big.

MS. FARMER:  I absolutely will. Give me a second to read the title. This is Exhibit 6 from Norb Novocin's deposition of September 21st, 2022.

Q    How is that, Mr. Chu?

Is that convenient for you?

A    A little smaller.

Q    Is that good?

A    Yes.  I get the full thing.  Now I can't read it, but yeah.

Page 15

WILLIE CHU

MS. FARMER: I'm showing that this is a one-page document. It has Bates-stamp Plaintiff 000144, which means it was produced to us by Miss Trombetta. This looks to be a screen shot. If I magnifying it, it has a date of Thursday, August 13th.

THE WITNESS: Of what year?

MS. FARMER: It doesn't show the year. But if we go to a calendar, I can represent to you that August 13th is --

THE WITNESS: I don't know. Is that relevant?

MS. FARMER: Actually, let me remind you that since it's a deposition, we need to wait for each other to finish speaking because otherwise the court reporter, who is taking down everything that we say, is going to be very mad at us. I'll represent that August 13th of 2015 was also a Thursday.

Q    Mr. Chu, is this the document with

Page 16

WILLIE CHU

the link to the website that you said Miss Trombetta sent to you back in 2016?

A    Yes.

Q    You mentioned that you thought that this document looked sketchy?

A    Yes.

MS. FARMER:    And some of the information was incorrect.    One of the things that you specified was that the painting was done in 1972, and you said that Miss Trombetta could not have done it because she would have been nine.

Q    My question is, is there anything else in this document that you remember seeing that was inaccurate?

A    Her signature.

Q    Are you referring to the image of the signature that's in this photograph on the left-hand side of the image?

A    Yes.    Yes, I am.

Q    Prior to January of 2016, had you seen Miss Trombetta's signature?

A    Yes, on her paintings.

**SA1100**

Page 17

WILLIE CHU

Q    You know that to be different from this one; correct?

A    Yes, because she doesn't sign it A Trombetta.  She spells out her name.

Q    How about the handwriting?

Is that also different, in your opinion?

A    Yes.  Yeah, it looks different. Yes, it looks different to me.

Q    This document has only one image and it's the image of the blown-up signature.

A    Right.

Q    Have you seen any other images of this painting, at any point?

A    No.

Q    Was this the only image that Miss Trombetta sent to you?

A    As far as I can recall.

Q    Have you independently gone to WorthPoint.com's website to look for this listing?

A    I think maybe at the time I did. However, it never showed the full painting, so I don't know what I'm supposed to be looking at.

Page 18

WILLIE CHU

Q    When you say "maybe at the time," are you referring to January of 2016?

A    Yes.

Q    After January of 2016, did you ever go back and look again?

A    I did not.

MS. FARMER:  I promise you I'm going as fast as I can, and I'll get you out of here as fast as possible, if you could just let me finish the questions.

Q    Mr. Chu, have you done any business yourself with WorthPoint Corporation?

A    No.

Q    Have you ever subscribed to WorthPoint.com?

A    No.

Q    As you sit here today, do you know what this company does?

A    I guess they sell artwork.

MS. FARMER:  We don't want you to get.  You're a fact witness and that means you need to tell us only what you know, only what you remember.

Page 19

WILLIE CHU

THE WITNESS:    Okay.

Q        Do you see how in this document it says "Source eBay?"

A        Yes.

Q        Does that mean anything to you?

A        No.

Q        Do you know whether or not you were looking at the listing of a painting for sale or a listing of an already-sold painting on WorthPoint, when Miss Trombetta first sent it to you?

A        Well, at the top here where it says "Sold for" and "Source eBay" and "Sold date," so obviously it was sold.

Q        Do you understand this document to be an record of a past sale?

A        Yeah.

Q        In the document that Miss Trombetta sent to you, was a price indicated?

A        I recall something under $200.

Q        Do you recall reading it on the document or do you recall Miss Trombetta telling you what the price was?

A        I don't recall.

Page 20

WILLIE CHU

Q    Have you ever spoken to WorthPoint about this particular listing?

A    No.

Q    Do you see where it also says in the first line of this description "Welcome to Estate Auctions, Inc?"

Do you see that?

A    Yes.

Q    Do you know who Estate Auctions, Inc. is?

A    No.

Q    Have you ever spoken to anybody at Estate Auctions, Inc.?

A    No.

Q    Do you know who Mr. Norb Novocin is?

A    No.

Q    About Ms. Marie Novocin?

A    No.

Q    Do you know a gentleman by the name of William Seitel?

A    No.

Q    Once you saw this listing and spoke to Miss Trombetta, what did you do next?

A    What did I do next?

Page 21

WILLIE CHU

Q      Yes.

A      Well, we -- I believe she called, as well as I did.  We called G Suite which is, I guess, part of Google to find out if they could give us some advice on how to remove that listing.  They basically just said to me, which I knew already, that you can only contact the administrator of the website.

Q      Did Miss Trombetta retain you as a consultant for this matter, as a client or did you assist her as a friend?

A      I was doing it as a friend.  I mean, yes, she consulted me, and I, you know, helped her as best I could.

Q      Going back to this letter Exhibit 1 of today's date, the third paragraph begins with a sentence "AnnaMarie and I simultaneously contacted Google and G Suite separately."

Could you please explain this?

Did you and Miss Trombetta call on the same line together?

A      No.  We called separately.

Q      But you called around the same time; correct?

Page 22

WILLIE CHU

A      Yes.

Q      When you contacted Google, was it by phone call, by e-mail or by something else?

A      It was a phone call.

Q      What did Google specifically say to you?

A      Well, actually, it wasn't Google specifically.  What I meant to write is -- I miswrote that.  I meant to write that Google and G Suite as being one entity.  I didn't mean -- I didn't mean Google or G Suite separately.

Q      Was this one call that you placed to G Suite or was there several calls?

A      Just one in 2016 and one in 2017.

Q      The one in 2016, was there anything else to that phone call beside them telling you to contact the host of the website?

A      No, that was pretty much it.

Q      Why did you call them in 2017?

A      Just to see if anything changed.  I wanted to know why after I thought it was taken down and then it came back up, and I wanted to find out what else can be done.

Q      How did you know that the listing

Page 23

WILLIE CHU

came back up?

A    Because AnnaMarie contacted me again and told me that she -- she had the link removed. However, it came back.

Q    Did you ever confirm for yourself that WorthPoint removed the listing --

A    I did not.

Q    In 2017, you did not check if it was on WorthPoint's web site; is that correct?

A    Correct.

Q    Miss Trombetta is your only source of knowledge that the listing came back?

A    Yes.  I have no reason to believe that she was making things up.

MS. FARMER:  Understood.

Q    You contacted G Suite in 2017.

What did they respond to you with?

A    Pretty much the same thing.  Either the web site administrator did it incorrectly or -- or it's just, I don't know.  It's just -- it's one of these things that I can't figure out.  But you basically have to contact the website administrator.

Q    Did you discuss at any point with G

SA1107

Page 24

WILLIE CHU

Suite the fact that Google spiders or crawls website and records cached versions of websites?

A     I'm sorry.  Can you repeat that?

MS. FARMER:  Can you read back my question?

(Record read as requested.)

A     I don't really know anything about that, as far as cached, caching.

Q     Do you know that sometimes it may be possible to access a version of the website that Google recorded, even when the page itself is down?

A     Are you suggesting that maybe it was not refreshed or the cache was not deleted?  Is that what you're saying?

MS. FARMER:  Mr. Chu, I am so sorry.  I can only ask questions.  I cannot suggest anything.

Q     I'm asking you whether or not you know that sometimes you can access a saved version of a website that Google may --

A     No, I'm not aware of that.

MS. FARMER:  Mr. Chu, over here in the next-to-last paragraph in

Page 25

WILLIE CHU

Exhibit 1 you say that "In 2017, I was surprised when AnnaMarie contacted me again. I thought she had the eBay link removed."

I wanted to clarify with you.

Q       The link that we just looked at, it was on WorthPoint's website; correct?

A       Correct. Yes.

Q       What did you mean by the eBay link?

A       I thought she had sent me a screen shot of that as well, I guess. I can't remember it. It's kind of vague. But I assume that meant the painting that was sold on eBay.

Q       You believe that you were sent two links, one to eBay and one to WorthPoint; is that right?

A       Yeah, it's -- from what I can recall, yeah.

Q       When you were contacting G Suite, were you looking to get the eBay link removed or the WorthPoint link removed?

A       Either.

Q       After you received the advice from G Suite that it's necessary to contact the host,

Page 26

WILLIE CHU

did you yourself do anything about contacting any of the hosts?

A    I did not.

Q    Did Miss Trombetta describe to you what did she do specifically to contact the hosts, if anything?

A    I believe she said that she tried or she was in contact with the administrator several times.  They were not very helpful or they didn't reach out immediately.  So, it was a back-and-forth thing.  I don't really remember what the final resolution was.

Q    The administrator for which company did Miss Trombetta mention to you?

Was it eBay?

A    I believe she was talking about WorthPoint.

Q    Do you know whether or not she contacted Estate Auctions?

A    I don't recall.

Q    Has Miss Trombetta ever told you the title of the painting that she found on the Internet?

A    Yeah.  If you look at the listing

Page 27

WILLIE CHU

that I was looking at, it was the Man with Red Umbrella.

Q    I'm showing you that listing again.

A    Yes.

Q    Did Miss Trombetta ever discuss with you that when she searched for the title of this listing on Google, there were several results that were coming up that --

A    I don't know if she said she was searching for this particular item. But she mentioned to me that when she Googled her name that came up, you know, pretty -- pretty early up on the pages.

Q    Did you discuss --

THE WITNESS:  Go ahead.  I'm sorry.

MS. FARMER:  Finish your answer.

A    I was just going to say that, you know, she was pretty upset that Google had this up there and it's not even her painting, and she was just trying to get it removed because basically everything about it is false.

MS. FARMER:  Let me ask you this. You just said that everything about

Page 28

WILLIE CHU

it is false. I just need to confirm.

Q    Besides the date and the fact that Miss Trombetta's name is attributed to it, is there anything else that you know to be false about this listing?

A    I mean, I would have to really look into this again. Do you want me to read every line and point it out?

Q    Do you recall anything specifically that was false about this listing besides --

A    Well, yeah. Yes. Firstly, it's not her signature. It never showed the painting. It says it was done in 1972 and, as I said before, she wasn't painting in 1972.

Q    Do you know anything else to be wrong about this listing?

A    I don't -- I can't see any. I have to read every line, you mean? Well, it says something about "Please be patient. There are 12 photos to be," I can't read it, "to be located in this auction." I don't know if that means, are they referring to 12 more paintings by AnnaMarie Trombetta or just in general 12

**SA1112**

Page 29

WILLIE CHU

photos.  So, that was vague.  Everything is kind of vague too and, you know.

Q    Do you mean that the text of the description is vague?

A    Yeah.  I mean, if you look at this, down here it says "The painting is quite large, 48 and a half inches tall," and I can't read the width.  But that's pretty tall for a nine-year old.  She obviously didn't paint it.

Q    Assuming this was misattributed to Miss Trombetta, why do you think that the size is wrong?

You're only assuming that it was because it would have been painted by a nine-year old; right?

A    Yes.

Q    So, as far as we know, if the artist was not correct, everything else could be correct; is that right?

A    I can't testify to that because, like I said, I have to look at every line.  So, unless we go over every line, I mean, I don't know.

Q    Do you know whether or not

**SA1113**

Page 30

WILLIE CHU

WorthPoint composed this listing?

A    Do I know what about WorthPoint?

Q    Do you know if WorthPoint composed this listing?

A    I have no idea who -- I have no idea who.

Q    Do you know who sold this painting?

A    Well, it says here eBay.

Q    Do you know if there was somebody who used eBay tools to sell this painting on eBay?

A    I guess I don't know.

Q    Do you know who bought this painting?

A    I have no idea.

Q    Have you ever been to Miss Trombetta's website?

A    Yes.

Q    Do you know that it contains a biography?

A    Yes.

Q    Have you ever read it?

A    Yeah, not recently.  But, yeah, I've read it.

Page 31

WILLIE CHU

Q        Do you know whether or not Miss Trombetta copyrighted her biography?

A        If she what?

Q        Did she register and copyright her biography?

A        I don't know.  Is that necessary? Does one copyright their biographies?

MS. FARMER:  I apologize.  I cannot answer any questions because of how this proceeding works.  I can only ask questions.

THE WITNESS:  So, what are you asking me then?

Q        Did you know whether or not Miss Trombetta registered copyrighting her biography?

A        I don't know.

Q        In fact, I judge from your reaction that you have not heard of people registering copyrighting their biographies before; is that right?

A        That's my understanding, yes.

Q        Do you know whether or not the text of this listing contained a biography from Miss Trombetta's website?

Page 32

WILLIE CHU

A    I mean, it's hard for me to say unless I go line by line comparing both biographies.  I mean, we're talking about a lot of text here.

Q    But you haven't done such a comparison before; correct?

A    Correct.

Q    As you sit here today, you don't know if this listing contains her entire biography or doesn't; correct?

A    Correct, other than whatever false information that's on there.

Q    Beside the fact that it was attributed to Miss Trombetta, I ask you again, is there anything else that you know that is demonstratively false in this listing?

A    And I will say again that unless I go line by line comparing her biography, I can't tell you that.

Q    Do you know whether or not Miss Trombetta lost any income, as a result of this listing being on eBay?

A    Yeah.  Yes.  As a matter of fact, she was telling me she was about to sell a

Page 33

WILLIE CHU

painting and because of this posting she lost the sale, and I know she sells her paintings for anywhere between five and $20,000. So, for eBay to sell something for $180 and saying that she painted it is an insult.

Q     How do you know that she sells her paintings between 5,000 and 20,000?

A     Because I've been -- I've been to some of her shows, galleries. She gets commissions and, you know, you get to see a listing of her paintings with the prices on it.

Q     Do you know how many painting does she sell in an average year?

A     I don't know offhand.

Q     Do you know what's her total income in an average year?

A     I have no idea. It's personal business. I don't ask her those questions.

Q     The price for the painting that you just used, $180, do you know that from Miss Trombetta telling you that --

A     No, I'm pretty sure it was on the eBay listing.

Q     That other link that you received?

**SA1117**

Page 34

WILLIE CHU

A       Yeah.

Q       Did you know if it was sold for that price or if it was a first-bidding number or something else?

A       As far as I know, it said sold.  So, I'm assuming that's what it means.  Besides the fact it's not even her painting.  So, I think that's what this whole case is about; isn't it?

MS. FARMER:  I'm sorry.  I can't answer any questions.  I'm only here to ask questions.

Q       Mr. Chu, do you know about that painting that she said to you that she didn't sell, what was the title of that painting?

A       I don't recall.  I think it was Wisteria or something.

Q       How much did she want to charge for that painting; do you know?

A       I don't know.  I don't -- I don't really ask her questions like that.

Q       Do you know if she ultimately sold it to somebody else?

A       I don't know, actually.

Q       Other than the Wisteria painting

Page 35

WILLIE CHU

sale falling through, are you aware of any other sales that she may have lost, as a result of this listing being on the Internet?

A    I'm not aware. But I know she's been consumed with this lawsuit for the past seven or eight years.

Q    Are you aware of any opportunities that she might have lost that are attributable to this listing being on the Internet?

A    She hasn't told me specifically.

Q    Have you ever learned how much income, if any, she may have lost, as a result of this listing being on the Internet?

A    That's not for me to say because I don't know what her income is, you know. We're asking personal questions here which I don't have privy to that information.

MS. FARMER:  I understand.

Q    Did you ever come to know whether or not Miss Trombetta sought any medical treatment, as a result of this listing being on the Internet?

A    Not that I know of.  I don't think so.

**SA1119**

Page 36

WILLIE CHU

MS. FARMER:  I'm going to pass on the questioning to Mr. Duff now.

THE WITNESS:  Okay.

MR. DUFF:  Mr. Chu, I have no questions for you.  Thank you for appearing here, today.  We appreciate it.

MS. FARMER:  Mr. Chu, I actually have one last question.

Is there anything that I haven't asked you today that you do want to share with us about this lawsuit?

THE WITNESS:  No, not really.  I just -- just that she's a wonderful artist, and she deserves better than to be defamed by this sort of listings.  That's all.

MS. FARMER:  Thank you for your time, today.

(Continued on next page to include jurat.)

Page 37

WILLIE CHU

THE WITNESS:  Can I go now?

MS. FARMER:  Yes.  Yes, you can.

MR. DUFF:  I do want a copy of this transcript.

(Whereupon, at 12:47 P.M., these proceedings were concluded.)

--------------------------------

WILLIE CHU
WILLIAM

Subscribed and sworn to

before me on this ____3rd____ day

of _____January_____, ~~2022~~. 2023

_____

NOTARY PUBLIC

MADALINA LUNGU
Notary Public - State of New York
NO. 01LU6265884
Qualified in Richmond County
My Commission Expires Jul 23, 2024

Page 38

WILLIE CHU

I N D E X

| WITNESS | EXAMINATION BY | PAGE | LINE |
|---------|----------------|------|------|
| WILLIE CHU | MS. FARMER | 4 | 24 |

INDEX TO DEFENDANT'S EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE | LINE |
|---------|-------------|------|------|
| Exhibit 1 | Letter | 10 | 4 |

Page 39

WILLIE CHU

CERTIFICATION

I, ANITA M. CUMMO, a notary public in and for the State of New York, do hereby certify:

THAT the witness whose testimony is hereby before set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness. I further certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN witness whereof, I have hereunto set my hand this 24th day of October, 2022.

*Anita M. Cummo*

ANITA M. CUMMO

Page 40

ERRATA SHEET

VERITEXT/NEW YORK REPORTING, LLC

1-800-727-6376

330 Old Country Road          7 Times Square

Mineola, New York             New York, New York

Name of Case: Trombetta v Novocin, et al

Date of Deposition: 10/7/2022

Name of Deponent: Willie Chu

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

_____

WILLIE CHU

SUBSCRIBED AND SWORN TO BEFORE

ME THIS ____DAY OF_____, 2022.

_____        _____

NOTARY PUBLIC                      COMMISSION EXPIRES

**SA1124**

[& - basically]                                                                                  Page 1

**&**

& 2:8

**0**

000144 15:4
000305 10:14
00993 1:5

**1**

1 9:21 10:2
  21:16 25:2 38:8
1-800-727-6376
  40:3
10 38:8
10/7/2022 40:6
10128 2:5
10301 5:5
10604 2:9
11101 2:16
1133 2:9
12 28:22,24,25
1217 2:15
12:05 1:11
12:47 37:6
12r 2:4
13th 15:8,13,23
175 2:4
18 1:5
180 33:5,21
19701.00006
  2:11
1972 13:17,18
  16:11 28:15,16

**2**

20 11:19
20,000 33:4,8
200 19:21

2015 15:23
2016 7:25 8:15
  8:21 9:5,12
  11:13 12:9 13:6
  16:3,23 18:3,5
  22:15,16
2017 7:25 8:15
  11:14 22:15,20
  23:9,17 25:2
2022 1:11 14:19
  37:12 39:15
  40:23
21st 14:19
24 38:4
24th 39:15

**3**

330 40:4

**4**

4 38:4,8
40 5:9
43-10 2:15
45 1:15
48 29:8
4940 39:17

**5**

5,000 33:8

**6**

6 14:17

**7**

7 1:11 40:4

**9**

92 5:4
96th 2:4

**a**

absolutely 14:15
access 24:11,21
accurate 11:15
acquaintance
  12:3
action 39:11
actual 14:5
adam 2:11
address 5:3,15
  5:16
administrator
  7:18 21:9 23:20
  23:24 26:9,14
advice 21:6
  25:24
afternoon 4:5
ago 11:20
agreed 3:2,7,11
ahead 27:16
al 40:6
anderson 2:17
  4:9
anita 1:17 4:13
  39:4,18
annamarie 1:3
  2:4 11:15 21:18
  23:3 25:3 28:25
answer 8:7
  27:18 31:10
  34:11
anybody 20:13
apartment 2:4
apologize 31:9
appearing 36:7
appreciate 36:8
artist 11:14
  12:14 29:18

36:16
artistic 12:15
artwork 18:21
asked 36:12
asking 24:20
  31:14 35:17
assist 21:12
assume 25:13
assuming 29:11
  29:14 34:7
attorney 4:10
attorneys 2:8,14
attributable
  35:9
attributed 28:5
  32:15
auction 28:23
auctions 1:7
  2:15 4:11 20:7
  20:10,14 26:20
august 15:8,12
  15:23
avenue 2:9 5:4
average 12:5
  33:14,17
aware 24:23
  35:2,5,8

**b**

back 6:10 7:23
  7:24 16:3 18:6
  21:16 22:23
  23:2,5,13 24:5
  26:12
basically 7:9
  21:7 23:23
  27:23

[bates - date]                                                                Page 2

| | | | |
|---|---|---|---|
| bates 10:13,15 15:4 | calls 22:14 | college 6:22 | contacting 7:21 8:16 25:20 26:2 |
| begins 21:17 | capacity 7:6 | come 14:4 35:20 | contained 31:24 |
| believe 21:3 23:14 25:15 26:8,17 | case 7:20 8:13 9:11,16 34:9 40:6 | coming 27:9 commission 40:24 | contains 30:20 32:10 |
| best 21:15 | certain 7:14 | commissions 33:11 | continued 36:21 |
| better 36:16 | certification 3:5 39:2 | common 9:6 | convenient 14:21 |
| bialek 2:11 | certify 39:5,9 | companies 8:17 | copied 13:11 |
| bidding 34:4 | chance 10:22 | company 7:11 7:18 8:2 18:20 26:14 | copy 9:17,18 10:25 37:4 |
| big 14:14 | change 40:8 | | |
| biographies 31:8 31:20 32:4 | changed 22:21 | comparing 32:3 32:19 | copyright 31:5,8 |
| biography 13:10 30:21 31:3,6,16 31:24 32:11,19 | charge 34:18 | comparison 32:7 | copyrighted 31:3 |
| | check 23:9 | composed 30:2,4 | copyrighting 31:16,20 |
| | chu 1:13 4:1,6 5:1,2,6,12,12 6:1 6:20 7:1 8:1 9:1 9:14 10:1,4 11:1 11:3 12:1 13:1 14:1,20 15:1,25 16:1 17:1 18:1 18:13 19:1 20:1 21:1 22:1 23:1 24:1,17,24 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 34:13 35:1 36:1 36:5,9 37:1,9 38:1,4 39:1 40:7 40:20 | computer 5:21 5:23 6:20 | corporation 1:7 2:8 4:7 18:14 |
| blocked 6:9 | | computers 7:7 | correct 7:10 9:2 9:3,12 17:3 21:25 23:10,11 25:8,9 29:19,20 32:7,8,11,12 |
| blood 39:10 | | concluded 37:7 | |
| blown 17:12 | | confirm 9:9,10 23:6 28:3 | |
| bottom 11:4 | | connection 9:11 9:15 | counsel 3:3 |
| bought 12:25 30:14 | | consultant 21:11 | country 40:4 |
| briefly 5:19 | | consulted 21:14 | courses 6:23 |
| business 5:16,17 5:19 8:4 18:13 33:19 | | consumed 35:6 | court 1:2 3:15 4:14 9:19 15:20 4:14 9:19 15:20 |
| | | contact 7:17 8:5 8:9,25 11:23 21:8 22:18 23:23 25:25 26:6,9 | crawls 24:2 |
| **c** | | | crescent 2:15 |
| c 2:2 4:2 | city 2:16 | | cummo 1:17 4:13 39:4,18 |
| cache 24:15 | civil 1:15 | | |
| cached 24:3,9 | clarify 25:6 | contacted 7:25 8:14 9:8,11 11:14 12:10 13:5 21:19 22:3 23:3,17 25:4 26:20 | cv 1:5 |
| caching 24:9 | click 14:6 | | |
| calendar 15:11 | client 21:11 | | **d** |
| call 21:21 22:4,5 22:13,17,20 | collector 12:19 | | d 38:2 |
| called 10:14 21:3 21:4,23,24 | | | date 9:22 10:3 15:8 19:14 |

[date - give]                                                                Page 3

21:17 28:4 40:6
day  37:11 39:15
  40:23
defamed  36:17
defendant  2:8
  4:8
defendant's  9:21
  9:25 38:6
defendants  1:8
  1:14 2:14 4:12
degrees  6:22
deleted  24:15
demonstratively
  32:17
deponent  40:7
deposition  1:13
  3:5,12 14:11,18
  15:18 40:6
describe  5:18
  26:5
description  20:6
  29:5 38:7
deserves  36:16
designated  4:18
dicker  2:8
different  8:12
  17:2,7,9,10
discuss  23:25
  27:6,15
discussion  4:21
district  1:2,2
document  11:4
  15:3,25 16:6,16
  17:11 19:3,16,19
  19:23
documents
  10:18

doing  21:13
duff  2:14,17 4:9
  6:15 36:3,5 37:4
duly  4:2 39:7

e

e  2:2,2 4:2 8:5
  13:23 22:4 38:2
early  27:13
east  2:4
ebay  19:4,14
  25:5,10,14,16,21
  26:16 30:9,11,12
  32:23 33:4,24
edelman  2:8
effect  3:14
eight  35:7
either  23:19
  25:23 39:10
else's  14:10
elser  2:8
engine  7:4,9,12
  8:21
entire  32:10
entity  22:11
errata  40:2
esq  2:10,11,17
estate  1:7 2:14
  4:11 20:7,10,14
  26:20
estimate  6:13
et  40:6
examination
  4:23 38:3
examined  4:4
exhibit  9:21,25
  14:9,17 21:16
  25:2 38:7,8

exhibits  38:6
experience  7:2
  7:21 8:16
expires  40:24
explain  21:20

f

fact  13:14 18:23
  24:2 28:4 31:18
  32:14,24 34:8
falling  35:2
false  7:16 27:23
  28:2,6,12 32:12
  32:17
familiar  12:15
familiarize
  10:23
far  5:23 7:15
  17:19 24:9
  29:18 34:6
farmer  2:10 4:5
  4:6,23 6:3,11
  8:11 9:14 10:4,8
  10:13 11:9 14:8
  14:15 15:2,10,16
  16:8 18:8,22
  23:16 24:5,17,24
  27:18,24 31:9
  34:10 35:19
  36:2,9,19 37:3
  38:4
fast  18:9,10
federal  1:15
fee  5:9
figure  23:22
file  2:11
filing  3:4

final  26:13
find  9:4 21:5
  22:24
finish  15:19
  18:11 27:18
first  4:2 9:10
  10:10 11:17
  12:2,9 13:21
  19:11 20:6 34:4
firstly  9:6 28:13
five  33:4
follow  11:10
follows  4:4
force  3:14
form  3:8 7:8
forth  26:12 39:7
found  12:11 13:7
  26:23
friend  12:4
  21:12,13
front  11:2
full  4:24 5:12
  14:24 17:24
further  3:7,11
  39:9

g

g  8:4,14,17 9:8
  9:11 21:4,19
  22:11,12,14
  23:17,25 25:20
  25:24
galleries  33:10
general  28:25
gentleman  20:20
gifted  13:3
give  14:16 21:6

[given - listing]                                           Page 4

given  39:9

go   9:7 10:8
    15:11 18:6
    27:16 29:23
    32:3,19 37:2
god  5:25 11:19
going  4:15 6:8
    9:17 14:8 15:22
    18:9 21:16
    27:19 36:2
good  4:5 10:6
    12:4 14:23
google  7:2,8,9,21
    8:2,3,16,20 21:5
    21:19 22:3,6,8
    22:10,12 24:2,12
    24:22 27:8,20
googled  27:12
guess  18:21 21:5
    25:12 30:13

**h**

h  4:2
half  29:8
hand  16:21
    39:15
handwriting
    17:6
hard  32:2
hear  8:8
heard  31:19
held  1:16 4:21
helped  21:14
helpful  26:10
hereto  3:4
hereunto  39:14
hogan  2:14

home  5:3,17
host  7:17 8:10
    8:25 22:18
    25:25
hosts  26:3,7
hour  6:14
hundred  10:9

**i**

idea  30:6,6,16
    33:18
identification
    10:2
illness  6:7
image  16:19,21
    17:11,12,17
images  17:14
immediately
    26:11
inaccurate  16:17
inches  29:8
include  36:22
income  32:22
    33:16 35:13,16
incorrect  13:12
    16:9
incorrectly
    23:20
independently
    17:20
index  1:5 38:6
indicated  19:20
information
    7:16,19,22 13:10
    13:12 16:9
    32:13 35:18
insult  33:6

interact  7:7
interaction  8:19
interested  39:12
internet  12:11
    26:24 35:4,10,14
    35:23
involving  8:13
island  2:16 5:4
item  27:11
items  7:14

**j**

jana  2:10 4:6
january  7:24
    8:15,15 9:12
    11:13 12:9 13:6
    16:23 18:3,5
josiah  2:17
judge  31:18
jurat  36:22

**k**

keep  10:17 12:2
kind  13:8,9
    25:13 29:2
knew  8:7,23 21:8
know  8:6 11:19
    12:7 13:17,18
    15:14 17:2,25
    18:19,25 19:8
    20:10,16,20
    21:14 22:22,25
    23:21 24:8,10,21
    26:19 27:10,13
    27:20 28:6,17,23
    29:3,18,24,25
    30:3,4,8,10,13
    30:14,20 31:2,7
    31:15,17,23

32:10,16,21 33:3
33:7,11,13,15,16
33:21 34:3,6,13
34:19,20,22,24
35:5,16,16,20,24
knowledge  23:13

**l**

l  4:2,2
large  10:5 29:7
lawsuit  35:6
    36:13
learned  35:12
left  16:21
legal  5:13
letter  7:23 9:15
    9:19,24 10:11,20
    10:23 11:6,12
    21:16 38:8
line  20:6 21:22
    28:10,20 29:22
    29:23 32:3,3,19
    32:19 38:3,7
    40:8
link  13:25 14:6
    16:2 23:4 25:5,7
    25:10,21,22
    33:25
links  25:16
listing  14:2
    17:22 19:9,10
    20:3,23 21:7
    22:25 23:7,13
    26:25 27:4,8
    28:7,12,18 30:2
    30:5 31:24
    32:10,17,23
    33:12,24 35:4,10

[listing - painting]                                                    Page 5

35:14,22
listings  36:18
litigation  10:17
little  14:22
llc  40:2
llp  2:8,14
located  28:23
long  2:16 5:24
  6:8,17 13:13
look  10:23 17:21
  18:6 26:25 28:8
  29:6,22
looked  13:8 16:6
  25:7
looking  17:25
  19:9 25:21 27:2
looks  15:6 17:9
  17:10
lost  32:22 33:2
  35:3,9,13
lot  32:4

**m**

m  1:17 39:4,18
mackintosh  6:2
mad  15:22
magnify  10:5
  11:10
magnifying  15:7
mail  13:23 22:4
mails  8:5
making  23:15
man  27:2
marie  1:6 20:18
mark  9:21
marked  9:24
  14:10

market  12:18
marriage  39:10
matter  4:8 13:14
  21:11 32:24
  39:13
mean  13:12 19:6
  21:13 22:11,12
  25:10 28:8,20
  29:4,6,23 32:2,4
means  15:5
  18:24 28:24
  34:7
meant  22:9,10
  25:14
medical  35:21
medication  6:7
meet  11:17,21
mention  26:15
mentioned  1:16
  8:23 9:15,24
  12:13 16:5
  27:12
met  12:2
mind  11:9
mine  12:4
mineola  40:4
misattributed
  29:11
misleading
  13:10
miswrote  22:10
month  12:6,8
moskowitz  2:8

**n**

n  2:2 38:2
name  4:6,24
  5:13 17:5 20:20

27:12 28:5 40:6
  40:7
nature  5:18
necessary  25:25
  31:7
need  15:18 18:24
  28:2
needed  8:24
never  17:24
  28:14
new  1:2,17 2:5,5
  2:9,16 4:3 5:5
  39:5 40:2,4,4,4
nine  13:18 16:14
  29:9,16
non  1:13
nonparty  4:17
norb  1:6 14:17
  20:16
notary  1:17 3:13
  4:3 37:14 39:4
  40:24
novocin  1:6,6
  2:14 4:11 20:16
  20:18 40:6
novocin's  14:18
number  34:4
numbering
  10:16

**o**

objections  3:8
obviously  19:15
  29:10
october  1:11
  39:15
offhand  33:15

oh  5:25 11:19
okay  6:19 19:2
  36:4
old  13:19 29:10
  29:16 40:4
once  12:7 20:23
opinion  17:8
opportunities
  35:8
optimization  7:4
  7:13
order  8:24
outcome  39:12
owner  8:9,25

**p**

p  2:2,2
p.m.  1:11 37:6
page  10:10 15:3
  24:12 36:21
  38:3,7 40:8
pages  10:18
  27:14
paid  5:10
paint  13:16
  29:10
painted  29:15
  33:6
painting  12:11
  13:7,15,17,20,22
  16:11 17:15,24
  19:9,10 25:14
  26:23 27:21
  28:14,16 29:7
  30:8,11,15 33:2
  33:13,20 34:8,14
  34:15,19,25

[paintings - resolution]                                                          Page 6

| | | | |
|---|---|---|---|
| paintings  16:25 28:24 33:3,8,12 | possible  6:13 18:10 24:11 | purchased  12:22 12:24 | 28:11 34:16 received  5:6,9 |
| paragraph  21:17 24:25 | posted  7:14 posting  33:2 | purposes  9:20 pursuant  1:14 | 25:24 33:25 record  4:22,25 |
| part  21:5 | posts  7:19 | **q** | 14:11 19:17 24:7 39:8 |
| particular  6:25 20:3 27:11 | preparing  11:6 present  5:3 | question  3:9 6:4 8:11 16:15 24:6 | recorded  24:12 |
| parties  3:4 39:11 | pretty  22:19 23:19 27:13,13 | 36:10 | records  24:3 red  27:2 |
| party  1:13 pass  36:2 | 27:20 29:9 33:23 | questioning  6:15 36:3 | referral  11:22 referring  16:19 |
| patient  28:21 patron  12:20,21 | prevent  6:5 | questions  6:16 18:12 24:18 | 18:3 28:24 refreshed  24:15 |
| pauls  5:4 pdf  14:5 | previously  14:10 price  19:20,24 | 31:10,12 33:19 34:11,12,21 | register  31:5 registered  31:16 |
| people  8:5 10:19 31:19 | 33:20 34:4 prices  33:12 | 35:17 36:6 quickly  6:12 | registering 31:19 |
| percent  10:9 person  13:23 | prior  7:20 8:18 8:19,21 16:23 | quite  29:7 | related  8:3 39:10 |
| personal  33:18 35:17 | privy  35:18 pro  2:4 | **r** | relevant  15:15 remember  16:16 |
| phone  13:22,24 22:4,5,17 | problem  12:10 procedure  1:15 | r  2:2,11 ra  1:5 | 18:25 25:12 26:12 |
| photograph 16:20 | proceeding  1:10 31:11 | reach  26:11 reaction  31:18 | remind  15:17 remove  7:16,21 |
| photography 5:20 | proceedings 37:7 | read  14:16,25 24:5,7 28:9,20 | 8:9 9:7 21:6 removed  8:7,24 |
| photos  28:22 29:2 | produce  10:19 produced  10:20 | 28:22 29:8 30:23,25 | 23:5,7 25:5,21 25:22 27:22 |
| place  1:16 | 15:5 | readily  9:7 reading  19:22 | repeat  24:4 |
| placed  22:13 plains  2:9 | profession  5:24 professional  7:6 | realize  7:14 really  24:8 26:12 | reporter  4:14 9:19,25 15:20 |
| plaintiff  1:4 2:4 10:20 15:4 | promise  18:8 provide  6:21 | 28:8 34:21 36:14 | reporting  40:2 represent  4:7 |
| plaintiff's  10:14 please  4:24 | provided  8:4 public  1:17 3:13 | reason  23:14 40:8 | 15:12,23 requested  24:7 |
| 21:20 28:21 point  17:15 | 4:3 37:14 39:4 40:24 | recall  11:6 17:19 19:21,22,23,25 | reserved  3:9 resolution  26:13 |
| 23:25 28:10 | | 25:19 26:21 | |

[respect - system]                                                          Page 7

| | | | |
|---|---|---|---|
| respect 6:20 7:3 | seeing 16:16 | signed 3:12,14 | spoken 20:2,13 |
| respective 3:3 | seen 16:24 17:14 | simultaneously | square 40:4 |
| respond 23:18 | seitel 20:21 | 21:18 | st 5:4 |
| result 32:22 35:3 | self 6:24 | sir 12:18 | stamp 10:15 |
| 35:13,22 | sell 18:21 30:11 | sit 18:19 32:9 | 15:4 |
| results 27:8 | 32:25 33:5,14 | site 23:10,20 | stamped 10:13 |
| retain 21:10 | 34:15 | size 29:12 | start 13:20 |
| right 17:13 | sells 33:3,7 | sketchy 13:8 | state 1:17 4:3,24 |
| 25:17 29:16,20 | sense 9:6 | 16:6 | 39:5 |
| 31:21 | sent 16:3 17:18 | slc 1:5 | staten 5:4 |
| road 40:4 | 19:11,20 25:11 | slightly 8:12 | states 1:2 |
| rule 1:15 | 25:15 | smaller 14:14,22 | stipulated 3:2,7 |
| rules 1:15 | sentence 21:18 | sold 19:10,14,14 | 3:11 |
| **s** | separately 21:19 | 19:15 25:14 | stipulations 3:1 |
| | 21:23 22:12 | 30:8 34:3,6,22 | street 2:4,15 |
| s 2:2,10 | september 14:18 | somebody 14:10 | submitted 7:23 |
| sale 19:9,17 33:3 | services 6:21 | 30:10 34:23 | 7:24 |
| 35:2 | set 39:7,14 | sorry 6:3 24:4 | subpoena 5:7,10 |
| sales 35:3 | seven 35:7 | 24:18 27:17 | subscribed |
| saved 24:21 | shape 7:8 | 34:10 | 18:16 37:10 |
| saw 20:23 | share 9:18 13:25 | sort 6:21 7:21 | 40:22 |
| saying 24:16 | 36:13 | 36:17 | suggest 24:19 |
| 33:5 | sheet 40:2 | sought 35:21 | suggesting 24:14 |
| says 19:4,13 | shot 14:7 15:7 | source 19:4,14 | suite 2:15 8:4,14 |
| 20:5 28:15,20 | 25:12 | 23:12 | 8:17 9:8,11 21:4 |
| 29:7 30:9 | show 9:18 14:9 | southern 1:2 | 21:19 22:11,12 |
| screen 9:18 14:7 | 15:10 | speak 12:5 | 22:14 23:17 |
| 15:7 25:11 | showed 13:15 | speaking 15:19 | 24:2 25:20,25 |
| se 2:4 | 17:24 28:14 | specific 13:13 | supposed 17:25 |
| sealing 3:4 | showing 15:2 | specifically 8:2 | sure 33:23 |
| search 7:4,9,12 | 27:4 | 22:6,9 26:6 | surprised 25:3 |
| 8:20 | shows 33:10 | 28:11 35:11 | sworn 3:14 4:3 |
| searched 27:7 | side 16:21 | specified 13:16 | 37:10 39:7 |
| searching 27:11 | sign 17:4 | 16:10 | 40:22 |
| second 14:16 | signature 11:3 | spells 17:5 | system 10:16 |
| see 10:7 19:3 | 16:18,20,24 | spiders 24:2 | |
| 20:5,8 22:21 | 17:12 28:14 | spoke 13:21 | |
| 28:19 33:11 | 39:17 | 20:23 | |

[take - willie]                                                    Page 8

| t | | | |
|---|---|---|---|
| take 6:9 | times 26:10 40:4 | truthfully 6:6 | want 18:22 28:9 |
| taken 1:14 22:22 | title 14:16 26:23 | trying 7:16 | 34:18 36:12 |
| talking 26:17 | 27:7 34:15 | 27:22 | 37:4 |
| 32:4 | today 4:16,17 | two 25:15 | wanted 8:6,8 |
| tall 29:8,9 | 6:6 9:20 18:19 | **u** | 11:10 22:22,23 |
| taught 6:24 | 32:9 36:7,12,20 | u 4:2 | 25:6 |
| tell 18:24 32:20 | today's 9:22 | ultimately 34:22 | way 7:8 39:12 |
| telling 19:23 | 21:17 | umbrella 27:3 | web 23:10,20 |
| 22:17 32:25 | told 23:4 26:22 | understand 6:11 | website 8:10,25 |
| 33:22 | 35:11 | 19:16 35:19 | 9:2 13:9,15 16:2 |
| ten 5:25 | tools 30:11 | understanding | 17:21 21:9 |
| testified 4:4 | top 19:13 | 31:22 | 22:18 23:24 |
| testify 29:21 | total 33:16 | understood | 24:3,11,22 25:8 |
| testifying 6:6 | track 10:17 | 23:16 | 30:18 31:25 |
| testimony 39:6,9 | training 6:21 | united 1:2 | websites 5:21 |
| text 29:4 31:23 | transcript 37:5 | unwanted 7:16 | 24:3 |
| 32:5 | 39:8 | upset 27:20 | welcome 20:6 |
| thank 36:6,19 | treatment 35:21 | use 10:16 | westchester 2:9 |
| thing 14:24 | trial 3:10 | **v** | whereof 39:14 |
| 23:19 26:12 | tried 26:8 | v 40:6 | white 2:9 |
| things 16:10 | trombetta 1:3 | vague 25:13 29:2 | width 29:9 |
| 23:15,22 | 2:4 4:19 8:14 | 29:3,5 | william 5:12 |
| think 7:24 13:11 | 10:19 11:15,18 | various 10:18 | 20:21 |
| 13:14 14:7 | 12:13 13:5,21 | veritext 4:14 | willie 1:13 4:1 |
| 17:23 29:12 | 15:6 16:3,12 | 40:2 | 5:1,2 6:1 7:1 8:1 |
| 34:8,16 35:24 | 17:5,18 19:11,19 | version 24:11,22 | 9:1 10:1 11:1 |
| third 21:17 | 19:23 20:24 | versions 24:3 | 12:1 13:1 14:1 |
| thought 16:5 | 21:10,21 23:12 | video 11:23,24 | 15:1 16:1 17:1 |
| 22:22 25:4,11 | 26:5,15,22 27:6 | videography | 18:1 19:1 20:1 |
| thursday 15:8 | 28:25 29:12 | 5:20 | 21:1 22:1 23:1 |
| 15:24 | 31:3,16 32:15,22 | virtual 1:10 | 24:1 25:1 26:1 |
| time 1:16 3:10 | 33:22 35:21 | visually 10:22 | 27:1 28:1 29:1 |
| 6:9 8:4 9:23 | 40:6 | **w** | 30:1 31:1 32:1 |
| 12:9 13:13 | trombetta's 13:2 | w 4:2 | 33:1 34:1 35:1 |
| 17:23 18:2 | 16:24 28:5 | wait 15:18 | 36:1 37:1,9 38:1 |
| 21:24 36:20 | 30:18 31:25 | waived 3:6 | 38:4 39:1 40:7 |
| | true 7:15 39:8 | | 40:20 |

[wilson - york]                                                    Page 9

| | |
|---|---|
| wilson 2:8 | **y** |
| windows 6:2 | |
| wisteria 34:17 | yeah 5:22 14:25 |
| 34:25 | 17:9 19:18 |
| witness 4:18 | 25:18,19 26:25 |
| 6:19 10:6 14:13 | 28:13 29:6 |
| 15:9,14 18:23 | 30:24,24 32:24 |
| 19:2 27:16 | 34:2 |
| 31:13 36:4,14 | year 15:9,11 |
| 37:2 38:3 39:6,9 | 29:9,16 33:14,17 |
| 39:14 | years 5:25 11:20 |
| witnesses 4:20 | 13:19 35:7 |
| 6:18 | york 1:2,18 2:5,5 |
| wonderful 36:15 | 2:9,16 4:4 5:5 |
| work 5:21,23 | 39:5 40:2,4,4,4 |
| 6:10 12:16 13:4 | |
| working 7:2,7 | |
| works 12:23 | |
| 13:2 31:11 | |
| worthpoint 1:7 | |
| 2:8 4:7 13:15 | |
| 18:14 19:11 | |
| 20:2 23:7 25:16 | |
| 25:22 26:18 | |
| 30:2,3,4 | |
| worthpoint's | |
| 23:10 25:8 | |
| worthpoint.com | |
| 18:17 | |
| worthpoint.co... | |
| 17:21 | |
| write 22:9,10 | |
| wrong 28:18 | |
| 29:13 | |
| **x** | |
| x 1:3,9 38:2 | |

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

**SA1133**

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:   THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.   PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.



**WILSON ELSER**
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

Re:    Annamarie Trombetta vs. Norb Novocin et al
       Our file No.: 19701.6

_____The following corrections, additions or deletions were noted on the transcript of the testimony which I gave in the above-captioned matter, held on DATE: October 7, 2022

| PAGE | LINE | SHOULD READ |
|------|------|-------------|
| 11 | 15 | Annamarie - small m  incorrect |
| 18 | 7 | I may have gone back again. |
| 21 | 18 | Annamarie  small m  incorrect |
| 23 | 11 | I possibly checked in 2017 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

The reason for the above revisions is that my present recollection of the aforementioned facts is more accurate than it was on the date of my deposition.

Sworn to before me this
3rd day of \_\_\_January, 2022 2023

_____
Notary Public

Willie Chu
WILLIAM CHU

MADALINA LUNGU
Notary Public - State of New York
NO. 01LU6265884
Qualified in Richmond County
My Commission Expires Jul 23, 2024

276891156v.1