# 25-817-CV

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

————————— ➤◄ —————————

ANNAMARIE TROMBETTA, ARTIST,

*Plaintiff-Appellant,*

*v.*

NORB NOVOCIN, MARIE NOVOCIN,
ESTATE AUCTIONS, INC., WORTHPOINT CORPORATION,

*Defendants-Appellees,*

WILLIAM SEIPPEL, WORTHPOINT.COM,
JASON PACKER, EMPLOYEE AT WORTHPOINT CORPORATION,

*Defendants.*

—————————

*On Appeal from the United States District Court
for the Southern District of New York*

---

## SUPPLEMENTAL APPENDIX
## VOLUME 6 OF 12
## Pages SA1136 to SA1381

---

WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP
*Attorneys for Defendant-Appellee
WorthPoint Corporation*
150 East 42nd Street, 23rd Floor
New York, New York 10017
212-490-3000



## Table of Contents

**Page**

### Volume 1

Proposed Amended Complaint, dated January 17, 2020,
with Exhibits .................................................................................. SA1

Plaintiff's Response in Opposition to Defendant's Motion to
Dismiss Amended Complaint, dated February 21, 2020,
with Exhibits .................................................................................. SA64

Opinion and Order of the Honorable Sarah L. Cave,
dated March 19, 2020 .................................................................... SA112

Protective Order of the Honorable Sarah L. Cave,
so-ordered on February 16, 2022 .................................................. SA126

Order of the Honorable Sarah L. Cave,
so-ordered on December 8, 2022 .................................................. SA130

Order of the Honorable Sarah L. Cave,
so-ordered on December 20, 2022 ................................................ SA131

Memorandum by Plaintiff in Support of Motion
for Leave to File a Proposed Amended Complaint,
dated December 23, 2022 .............................................................. SA134

Proposed Second Amended Complaint,
dated December 23, 2022 .............................................................. SA216

Exhibits to Memorandum by Plaintiff in Support of Motion
for Leave to File a Proposed Amended Complaint ....................... SA237

Order of the Honorable Sarah L. Cave,
dated December 29, 2022 .............................................................. SA264

Order of the Honorable Sarah L. Cave,
dated February 2, 2023 .................................................................. SA266

**Table of Contents**
**(Continued)**

**Page**

Defendant WorthPoint Corporation's Omnibus Motion
   *in Limine* Concerning Experts, dated April 10, 2023 .................... SA268

Declaration of Jana S. Farmer in Support of Defendant's
   Motion *in Limine*, dated April 7, 2023 ......................................... SA270

**Volume 2**

Exhibit A to Farmer Declaration -
Documented Communications from WorthPoint's
Counsel to Plaintiff ..................................................................... SA273

Exhibit B to Farmer Declaration -
Expert Affidavit of Patrick O'Leary,
sworn to December 5, 2022, with Exhibits ............................. SA298

Exhibit C to Farmer Declaration -
Expert Disclosure and Expert Report of
Joseph V. Scelsa, dated February 16, 2023,
with Exhibits ......................................................................... SA327

Exhibit D to Farmer Declaration -
Transcript of Proceedings held before the
Honorable Sarah L. Cave on November 23, 2022 ................. SA390

Notice of Motion by Defendant WorthPoint Corporation
   for Summary Judgment, dated April 17, 2023 ............................. SA458

Declaration of Jana S. Farmer in Support of Defendant's
   Motion for Summary Judgment, dated April 17, 2023 ................. SA460

**Volume 3**

Exhibit A to Farmer Declaration -
Deposition Testimony of Annamarie Trombetta,
taken August 30, 2022 ........................................................... SA465
*(cont'd in Vol 4)*

ii

**Table of Contents**
(Continued)

Page

**Volume 5**

Exhibit B to Farmer Declaration -
Deposition Testimony of Norb Novocin,
taken September 21, 2022 ....................................................... SA837

Exhibit C to Farmer Declaration -
Redacted Deposition Testimony of Willie Chu,
taken October 7, 2022 ........................................................... SA1084

**Volume 6**

Exhibit D to Farmer Declaration -
Redacted Deposition Testimony of Vanessa Koi-Ploski,
taken October 17, 2022, with Cover Letter ........................... SA1136

Exhibit E to Farmer Declaration -
Redacted Defendant WorthPoint Corporation's
Expert Disclosure Pursuant to FRCP Rule 26(a)(2)
of Jessie Stricchiola, dated January 19, 2023,
with Report and Exhibits ....................................................... SA1237

Exhibit F to Farmer Declaration -
Redacted Declaration of Jason Packer,
dated January 19, 2023, with Exhibits .................................. SA1280

Exhibit G to Farmer Declaration -
Declaration of William H. Seippel,
dated April 17, 2023, with Exhibits ...................................... SA1303

Exhibit H to Farmer Declaration -
Expert Affidavit of Patrick O'Leary,
sworn to December 5, 2022, with Exhibits ........................... SA1349

**Volume 7**

Exhibit I to Farmer Declaration -
Deposition Testimony of Patrick O'Leary,
taken February 28, 2023 ....................................................... SA1382

iii

**Table of Contents**
**(Continued)**

**Page**

Exhibit J to Farmer Declaration -
Google Search Results, dated March 15, 2017 ..................... SA1654

Exhibit K to Farmer Declaration -
Screenshots of the WorthPoint Report ................................. SA1655

**Volume 8**

Exhibit L to Farmer Declaration -
Defendant WorthPoint's First Request for Production,
dated February 25, 2022 ......................................................... SA1661

Exhibit M to Farmer Declaration -
Plaintiff's Response to WorthPoint's First
Request for Production, dated April 22, 2022 ....................... SA1674

Exhibit N to Farmer Declaration -
WorthPoint's Post-Deposition Demands to Plaintiff,
dated October 6, 2022 ............................................................ SA1691

Exhibit O to Farmer Declaration -
Plaintiff's Response to WorthPoint's Post-Deposition
Demands, dated October 20, 2022, with Attachments .......... SA1701

Exhibit P to Farmer Declaration -
Deposition Testimony of Scott Goodwillie,
taken October 6, 2022, with Cover Letter ............................. SA1800

Rule 56.1 Statement of Material Facts by Defendant
WorthPoint, dated April 17, 2023 ................................. SA1884

Letter from Jana S. Farmer to the Honorable Sarah L. Cave,
dated May 9, 2023 ......................................................... SA1896

Exhibit A to Letter -
Email from Adam Bialek to Annamarie Trombetta,
dated January 18, 2022 ......................................................... SA1901

**Table of Contents**
**(Continued)**

**Page**

Exhibit B to Letter -
WorthPoint's First Set of Interrogatories,
dated February 25, 2022 ........................................................ SA1903

Exhibit C to Letter -
Plaintiff's Third Response to WorthPoint's
Interrogatories, dated June 27, 2022 ..................................... SA1916

Exhibit D to Letter -
Various Email Correspondence,
dated July 19, 2022 through August 8, 2022 ......................... SA1926

Exhibit E to Letter -
Various Email Correspondence,
dated September 9, 2022 to September 12, 2022 ................... SA1935

Exhibit F to Letter -
Email from Annamarie Trombetta to Nicole Haimson,
*et al*., dated September 15, 2022 .......................................... SA1939

Exhibit G to Letter -
Various Email Correspondence,
dated September 15, 2022 to September 28, 2022 ................. SA1940

**Volume 9**

Exhibit H to Letter -
Post-Deadline Court Submissions
Regarding Expert Disclosure Issues ...................................... SA1943

Exhibit I to Letter -
Redacted Documents Relating to Dr. Joseph Scelsa's
Opinions and Qualifications .................................................. SA1952

Exhibit J to Letter -
Redacted Expert Report of Gayle Skluzacek,
dated February 21, 2023, with Attachments .......................... SA2016

**Table of Contents**
**(Continued)**

                                                                   **Page**

Plaintiff's Opposition Response to Defendant WorthPoint's
    Motion to Preclude and Proffer Plaintiff's Expert Witnesses,
    dated May 19, 2023 ........................................................  SA2051

Defendant WorthPoint's Response to Plaintiff's (Trombetta's)
    First Set of Notice to Admit for Defendants [Sic] WorthPoint
    Corporation, dated April 8, 2022  ..................................  SA2069

WorthPoint' s Responses and Objections to Plaintiff's
    Request for the Production of Documents and Photos,
    dated April 8, 2022 ........................................................  SA2087

Defendant Worth Point's Responses and Objections to
    Plaintiff's Request for the First Set of Interrogatories for
    Defendants WorthPoint Corporation, dated April 8, 2022 ...........  SA2115

Defendant Worth Point Corp.'s Response to Plaintiff's
    Second Request for Admissions, dated July 13, 2022  .................  SA2132

Defendant WorthPoint Corp.'s Answers to Plaintiff's
    Second Set of Interrogatories for Defendant WorthPoint
    Corporation, dated July 1, 2022 ....................................  SA2146

Defendant WorthPoint Corp.'s Answers to Plaintiff's
    Second Request for Production of Documents,
    dated July 1, 2022 ........................................................  SA2157

Defendant WorthPoint Corp.'s Responses to Plaintiff's
    Third Request for Interrogatories, dated August 15, 2022 ...........  SA2167

Defendant WorthPoint Corp.'s Responses and Objections
    to Plaintiff's Third Request For Production of Documents,
    dated August 15, 2022 ..................................................  SA2182

Defendant WorthPoint Corp.'s Responses and Objections
    to Plaintiff's Fourth Request For Production of Documents,
    dated October 11, 2022 ................................................  SA2194

vi

**Table of Contents**
**(Continued)**

**Page**

**Volume 10**

Exhibits to Plaintiff's Opposition Response to Defendant
WorthPoint's Motion to Preclude and Proffer Plaintiff's
Expert Witnesses ............................................................. SA2208

Exhibits to Plaintiff's Opposition Response to Defendant
WorthPoint's Motion to Preclude and Proffer Plaintiff's
Expert Witnesses ............................................................. SA2241

Declaration of Jana S. Farmer in Opposition to Plaintiff's
Various Motions *in Limine* and Motions to Proffer,
dated May 30, 2023 ........................................................ SA2264

    Exhibit A to Farmer Declaration -
    First Initial Disclosure of Defendant WorthPoint
    Corporation Pursuant to FRCP 26(A)(1),
    dated February 25, 2022 ........................................... SA2267

    Exhibit B to Farmer Declaration -
    Redacted Declaration of Jason Packer,
    dated January 19, 2023, with Exhibits ................... SA2273

    Exhibit C to Farmer Declaration -
    Redacted Defendant WorthPoint Corporation's
    Expert Disclosure Pursuant to FRCP Rule 26(a)(2) of
    Jessie Stricchiola, dated January 19, 2023, with Exhibits ..... SA2296

    Exhibit D to Farmer Declaration -
    Email from Jana S. Farmer to Annamarie Trombetta,
    *et al*., dated October 11, 2022 .............................. SA2339

Plaintiff's Response to Defendants Estate Auctions Inc. and
Norb and Marie Novocin's Motion for Summary Judgment,
dated May 30, 2023 ........................................................ SA2340

Exhibits 1-12 of Plaintiff's Response to Defendants
Estate Auctions Inc. and Norb and Marie Novocin's
Motion for Summary Judgment .................................... SA2372

**Table of Contents**
**(Continued)**

**Page**

Exhibits 13-21 of Plaintiff's Response to Defendants
    Estate Auctions Inc. and Norb and Marie Novocin's
    Motion for Summary Judgment ...................................................... SA2410

Exhibits 22-35 of Plaintiff's Response to Defendants
    Estate Auctions Inc. and Norb and Marie Novocin's
    Motion for Summary Judgment ...................................................... SA2445

**Volume 11**

Exhibits 36-38 of Plaintiff's Response to Defendants
    Estate Auctions Inc. Motion for Summary Judgment .................. SA2482

Exhibit 41 of Plaintiff's Response to Defendants
    Estate Auctions Inc. and Norb and Marie Novocin's
    Motion for Summary Judgment ...................................................... SA2525

Exhibits 39-41 of Plaintiff's Response to Defendants
    Estate Auctions Inc. Motion for Summary Judgement ................ SA2547

Letter from Annamarie Trombetta to the Honorable
    Sarah L. Cave, dated June 1, 2023 ............................................... SA2582

        Exhibit 1 to Letter -
        Various Email Correspondence between Annamarie
        Trombetta and Art Appraiser Gayle Skluzacek ..................... SA2584

        Exhibit 2 to Letter -
        Various Email Correspondence between
        Annamarie Trombetta and Dr. Joseph Scelsa ........................ SA2596

        Exhibit 3 to Letter -
        Plaintiff's Communication with Defendants
        for Witnesses ......................................................................... SA2618

        Exhibit 4 to Letter -
        Problems and Delays Caused by WorthPoint Defendants ..... SA2632

**Table of Contents**
**(Continued)**

**Page**

Exhibit 5 to Letter -
Plaintiff's Illness Beginning December 7, 2022
into Late January 2023 ........................................................... SA2673

Exhibit 6 to Letter -
WorthPoint Attorneys 2023 Emailing Plaintiff
Requesting Expert Witness Depositions ............................... SA2676

Exhibit 7 to Letter -
Ebay Phone Call Transcript .................................................... SA2682

Exhibit 8 to Letter -
List and Number by Month February to
December 2022 Plaintiff's Problems with Defendants ......... SA2708

Plaintiff's Response to Defendant WorthPoint Corporation's
Motion for Summary Judgment, dated June 7, 2023 ................... SA2721

## Volume 12

Exhibits 1-9 to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2759

Exhibit 10 to Plaintiff's Response to Defendant WorthPoint
Corporation's Motion for Summary Judgment ........................... SA2792

Exhibits 12-18D to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2822

Exhibits 19A-24 to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2857

Exhibits 25A-27 to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2888

Exhibits 28-30D to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2922

**Table of Contents**
**(Continued)**

**Page**

Letter from Jana S. Farmer to the Honorable Sarah L. Cave,
    dated June 8, 2023 ......................................................................... SA2947

Opinion and Order of the Honorable Sarah L. Cave,
    dated June 22, 2023 ...................................................................... SA2949

Order of the Honorable Laura Taylor Swain, dated July 5, 2023 ....... SA2966

**SA1136**



November 2, 2022

Jana Farmer<br>914.872.7247 (direct)<br>Jana.Farmer@wilsonelser.com

**<u>Certified Return Receipt</u>**
Vanessa Koi-Ploski
80 North Midland Avenue
Nyack, New York 10960

Re:      Trombetta vs. Norb Novocin et al
         <u>Our file No.: 19701.6</u>

Dear Ms. Ploski:

Enclosed please find an original and one copy of your deposition taken on October 17, 2022 relative to the above captioned matter. Kindly review the <u>original copy</u> transcript, sign where indicated on page 96 and have your signature notarized.

If you wish to make any corrections, please make the corrections on the attached Errata Sheet (page 2 of this letter) indicating the page and line number and the correction to be made. Please sign the Errata sheet as well and have your signature notarized. When the transcript and Errata sheet noting the corrections have been signed and notarized, please return the original transcript to our office at your earliest convenience.

Please take notice that failing to return the signed transcript within sixty (60) days will permit use of this deposition in motion practice and at trial as if signed pursuant to CPLR 3116(a).

Should you have any questions or concerns about this matter, please do not hesitate to contact the undersigned

Wilson Elser Moskowitz Edelman & Dicker LLP
*Jana Slavina Farmer*
Jana Slavina Farmer
JSF:ab
Enclosure

1133 Westchester Avenue  •  White Plains, NY 10604  •  p 914.323.7000  •  f 914.323.7001

Albany • Baltimore • Boston • Chicago • Connecticut • Dallas • Denver • Garden City • Houston • Kentucky • Las Vegas • London • Los Angeles • Miami
Milwaukee • New Jersey • New York • Orlando • Philadelphia • San Diego • San Francisco • Virginia • Washington, DC • West Palm Beach • White Plains
Affiliates: Berlin • Cologne • Frankfurt • Munich • Paris
**wilsonelser.com**

277069032v.1

THIS PAGE INTENTIONALLY LEFT BLANK

**SA1137**

WILSON ELSER
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

- 2 -

Re:    Annamarie Trombetta vs. Norb Novocin et al
       Our file No.: 19701.6

_____The following corrections, additions or deletions were noted on the transcript of the testimony which I gave in the above-captioned matter, held on DATE: October 17, 2022

| PAGE | LINE | SHOULD READ |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

The reason for the above revisions is that my present recollection of the aforementioned facts is more accurate than it was on the date of my deposition.

Sworn to before me this
_____ day of _____, 2022

                                              _____
                                              Vanessa Koi-Ploski

_____
Notary Public

277069032v.1

Certified Original

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
ANNAMARIE TROMBETTA,

                              PLAINTIFF,

           -against-          Case No.:
                              18-cv-0993-RA-HBP

NORB NOVOCIN, MARIE NOVOCIN, ESTATE
AUCTIONS INC., WILLIAM SIEPPEL and
WORTHPOINT CORPORATION,

                              DEFENDANTS.
-------------------------------------------X

                    DATE: October 17, 2022
                    TIME: 9:20 A.M

                    VIRTUAL DEPOSITION of a
Non-Party Witness, VANESSA KOI-PLOSKI,
taken by the Plaintiffs, pursuant to a
subpoena and to the Federal Rules of Civil
Procedure, held at the above date and time,
before Nathan Davis, a Notary Public of the
State of New York.

                    Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

Case 1:18-cv-00993-LTS-SLC    Document 425-4    Filed 04/17/23    Page 4 of 101

Page 2

APPEARANCES:

ANNAMARIE TROMBETTA
PRO SE
   175 EAST 96TH STREET, Apartment 12R
   NEW YORK, NEW YORK 10128


DUFF LAW PLLC
   Attorneys for the Defendants
   NORB NOVOCIN, MARIE NOVOCIN and
   ESTATE AUCTIONS INC.
   244 Fifth Avenue, Suite 2230
   New York, New York 11101
   BY: ANDERSON DUFF, ESQ.
   ajd@hoganduff.com

WILSON ELSER MOSKOWITZ EDELMAN &
DICKER, LLP
   Attorneys for the Defendant
   WORTHPOINT CORPORATION
   150 East 42nd Street, 23rd Floor
   New York, New York 10017
   BY: NICOLE HAIMSON, ESQ.
   nicole.haimson@wilsonelser.com
        - and -
        ADAM BIALEK, ESQ.

ALSO PRESENT:
   ROBERT SCHMIDT - WORTHPOINT CORPORATION

           *          *          *

Page 3

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

\*       \*       \*       \*

Page 4

V. KOI-PLOSKI

VANESSA KOI-PLOSKI, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MS. HAIMSON:

THE COURT REPORTER: Please state your name for the record.

A.    Vanessa Koi-Ploski.

THE COURT REPORTER: What is your address?

Redaction

Q.    Good morning, Ms. Ploski.  My name is Nicole Haimson and I'm with the law firm of Wilson Elser, and I represent one of the defendants, WorthPoint Corporation, in this lawsuit.

MS. HAIMSON: Just to make a record, we attempted to reach Mr. Duff, Counsel for the EIA defendants, as we'll call them, State Auctions Inc., Norb Novocin and Marie

Page 5

V. KOI-PLOSKI

Novocin.  We were unable to reach him.  We attempted both via telephone and email, and hopefully he'll be able to join us.

Q.    I just figure let's go over a couple of ground rules.  In terms of your responses, I ask that they be verbal rather than shaking or nodding of your head.  Does the that make sense?

A.    Yes.

Q.    And I'll give you plenty of time to answer the questions that I asked. I would ask that we just try not to speak over one another.  For purposes of establishing a clean transcript, let's try to speak one at a time.  Okay?

A.    Yes.

Q.    If you need a break at any point, please let me know.  And also, please indicate if you don't understand a question that I've asked, or due to technology, sometimes things get lost in translation.  If you answer my question, I'm going to assume you understood it.

Page 6

V. KOI-PLOSKI

Fair enough?

A.    Yes.

Q.    Do you understand that your answers today are being recorded by a stenographer and you must speak loud enough and clear enough so a transcript can be made of today's proceeding?

A.    Yes.

Q.    Have you ever been deposed before?

A.    No.

Q.    Did you review any documents prior to coming here today?

A.    Yes.

Q.    And what documents were those?

A.    I reviewed the letter that I submitted on behalf of Anna Marie Trombetta.

Q.    That was a letter dated March 4th, 2022; is that correct?

A.    That's correct.

Q.    Did you meet or speak with anyone to prepare for today's deposition?

A.    I spoke to Annamarie.

Page 7

V. KOI-PLOSKI

Q.     When did you guys talk?

A.     Yesterday.

Q.     What method of communication was that?  Was that over the phone or email?

A.     Phone.

Q.     What did you guys talk about?

A.     We talked about what to probably expect would happen today.

Q.     What did she say to you and what did you say to her?

A.     She said that you would probably be asking me questions about the letter that I submitted, and that's it.  We just went through line by line.

Q.     When you say you went through line by line, did she tell you specifically how to testify?

A.     No.  Just -- we -- I was trying to figure out what you wanted to ask me about.  That's all.

Q.     Did you speak with your husband at all about today's deposition?

A.     Just that I had to have him

Page 8

V. KOI-PLOSKI

cover for me while I did this.

Q.    Cover for you where?

A.    Work.

Q.    How long have you resided at the Midland address?

A.    We've been here since 2002.

Q.    Who do you live with?

A.    My husband and my son.

Q.    What's your husband's name?

A.    Andrew Ploski.

MS. TROMBETTA:    That's in the letter.

Q.    Just to go over a few procedural questions, can you confirm that you received your statutory fee of $40 to attend this deposition?

A.    I saw a check there, yeah.

Q.    So yes, you received it?

A.    Yes.

Q.    Are you familiar with an attorney named Jana Farmer?

A.    No.  Oh.  Is that the person that emailed me about the deposition?

Q.    Yes, I'll submit for the record

Page 9

V. KOI-PLOSKI

that Ms. Farmer is with my law firm, Wilson Elser.  Are you familiar with that firm?

A.    Only as far as she sent the deposition.

Q.    She sent what deposition?

A.    To appear here.

Q.    During any communication with Ms. Farmer, did she in any way try to influence you to testify in any particular way?

A.    No.

Q.    She simply emailed you about scheduling your deposition, right?

A.    Correct.

Q.    What is the highest level of education that you've completed?

A.    I have a bachelor's of fine arts.

Q.    And where did you earn that from?

A.    Parsons School of Design.

Q.    What year did you get that degree?

A.    1982.

Page 10

V. KOI-PLOSKI

Q.    Is your degree in communication arts or fine arts?

A.    Communication arts.

Q.    What is that exactly?

A.    Graphic design.

Q.    What do you do for a living, ma'am?

A.    I design corporate identities, printed communications, and websites.  I also do some social media.

Q.    Are you presently employed?

A.    Yes.

Q.    Where are you employed?

A.    Self-employed.

Q.    What's the name of the company you work for?

A.    Mosaic Design Group.

Q.    And what are your roles and responsibilities there?

A.    Creative director.

Q.    What's your husband's role there?

A.    He's the owner, art director.

Q.    Does the company provide the

SA1148

Page 11

V. KOI-PLOSKI

same services that you previously mentioned, designing corporate IDs, websites and social media?

A.    Yes.

Q.    How long have you been employed at Mosaic Design Group?

A.    It's over 20 years.

Q.    Where were you employed prior to that?

A.    Self-employed.

Q.    Was that under a corporate entity as well?

A.    It was a -- no, it wasn't a corporation.

Q.    At some point were you employed by Desantis graphic communications?

A.    That was me.  My former name was Vanessa Desantis.

Q.    Just to clarify, your maiden name is Koi, correct, K-O-I?

A.    Correct.

Q.    What were your roles and responsibilities at Desantis Graphic Communications?

Page 12

V. KOI-PLOSKI

A.    Same as here.

Q.    How long did you work at Desantis Graphic Communications?

A.    From 1984 to the time it came under Mosaic Design Group.

Q.    How do you know Ms. Trombetta?

A.    She was a friend of my husband's in college.  And they continued to be friends.

Q.    What college did your husband go to?

A.    Parsons School of Design.

Q.    When did you first meet Ms. Trombetta?

A.    Probably -- I believe I first met her 2001 or 2002.

Q.    When did your husband and Ms. Trombetta graduate from Parsons?

A.    I think they graduated four years after I did.

Q.    So about 1986?

A.    Correct.

Q.    You said that your husband is friends with Ms. Trombetta; is that

Page 13

V. KOI-PLOSKI

correct?

A.    Yes, we're both friends with Ms. Trombetta.

Q.    How often do you guys talk?

A.    It varies.  Sometimes we can go months without speaking to each other and sometimes we speak more often than that.

Q.    What do you guys typically talk about?

A.    Anything.

Q.    Do you often socialize together, physically go out together?

A.    We haven't seen much of each other since before the pandemic, but we did get together around Christmas time last year, last January.

Q.    And do you participate in the art market?

A.    Can you explain what you mean by art market, please?

Q.    Do you or your husband purchase art or buy art, are you collectors?

A.    No.

Q.    What about selling any art,

Page 14

V. KOI-PLOSKI

have you or your husband done that?

A.    No.

Q.    Have you represented any artists or has your husband done so?

A.    No.

Q.    Do you and your husband attend art shows?

A.    No, not -- art shows?  I think my husband has in the past.  We've gone to galleries.  That's about it.

Q.    Do you have any knowledge or training about how postings on the internet might impact the value of an artist's, like, representation or artwork?

A.    Well, not in a professional manner.

Q.    What do you mean by that?

A.    Well, whenever I go to purchase anything, I'll do some research on whatever I can find on that item, just like anybody would.

Q.    But you guys don't collect art, you and your husband, right?

A.    That's correct.

Page 15

V. KOI-PLOSKI

Q. So you haven't had any formal training or education on valuing artwork, right?

A. That's correct.

Q. Are you familiar with a website called askart.com?

A. I came across it.

Q. Where did you come across it?

A. I don't know. I'm just familiar that it exists.

Q. Do you know what the purpose is of that website?

A. I believe it is to do research on artists or artwork.

Q. Do you have any knowledge as to whether artists' biographies are ever posted on that website?

A. I don't remember. I think so.

Q. Do you have any knowledge how an artist's biography on that website might impact the value of an artist's name, reputation, or artwork?

A. In what can capacity are you asking this question?

Page 16

V. KOI-PLOSKI

Q.    If you don't --

A.    Is it a guess or --

Q.    If you don't know, that's perfectly fine to say. I'm asking if you have any personal knowledge if an artist's personal representation might be affected by being on that website.

A.    Before I buy a piece of art, if there are prices attached to that artist's art, it would tell me whether the price that I was asked to pay is within the realm of, you know, its value.

Q.    Let me rephrase the question. I'm not talking about price being posted. I'm asking if you have any understanding about how an artist's biography being on askart.com might impact that artist?

A.    It would show that artist's credibility, yes.

Q.    So in your opinion it would show credibility?

A.    Correct.

Q.    How familiar are you with Ms. Trombetta's artwork?

Page 17

V. KOI-PLOSKI

A.    I'm fairly familiar.

Q.    How many of her pieces have you seen?

A.    I've viewed her website and seen what's on there.  I've also seen artwork at her home.

Q.    Do you frequently go to Ms. Trombetta's home, especially before the pandemic occurred?

A.    Not frequently.  Maybe once a year.

Q.    How many of Ms. Trombetta's works were paintings that you've seen in person?

A.    I don't know what percentage are paintings versus etchings or drawings.

Q.    Are you familiar with her signature?

A.    Yes.

Q.    Can you describe it for me?

A.    It's -- she does a --

MS. TROMBETTA:  Objection.

Objection.  I don't want details about my signature on the record.

Page 18

V. KOI-PLOSKI

This is what this whole case is all about.

MR. HAIMSON: Ms. Trombetta, Ms. Ploski is testifying to her personal observation. She's -- I'm entitled to ask questions about that. This is a private deposition. It's -- this is not a public record at this point in time. I'm asking her about her personal observations. This is perfectly, you know, a perfectly normal question.

MS. TROMBETTA: Will it be un-public?

MR. HAIMSON: If you're concerned about testimony being included in motions that go in the public record, we can discuss that before it's put in connection with a motion or anything like that.

MS. TROMBETTA: It is a concern.

MR. HAIMSON: What is the concern exactly?

Page 19

V. KOI-PLOSKI

MS. TROMBETTA: It is a concern on my work. I don't have it visible online.

MR. HAIMSON: Okay. We can address it being made public at a later point, that's no problem. Right now I'm just asking Ms. Ploski to testify about what she's seen and her personal observations.

Nathan, could you read back my question to Ms. Ploski.

(Whereupon, the referred-to question was read back by the Reporter.)

Q.    Go ahead, Ms. Ploski.

A.    This whole thing is a matter of Annamarie Trombetta being misrepresented online. And you -- I'm not satisfied that you've answered her concern about whether or not my --

Q.    Ms. Ploski --

A.    -- will be available to a party that has nothing do with this.

Q.    Are you refusing to answer my

**SA1157**

Page 20

V. KOI-PLOSKI

question then?

A.    I'm expressing my concern.

Q.    Your concern is noted.  Can you please answer the question?

A.    She has a delicate signature, and she tends to have a little triangle that she tends to put with her signature.

Q.    I'm sorry, can you repeat?  She has a delicate signature?

A.    Yes, she has a delicate signature and she has a triangle, kind of a logo that she puts with her signature.

MS. TROMBETTA:  Which are now going to change.

MR. HAIMSON:  Ms. Trombetta, again, for the record, this is a private deposition.  No one is putting this on a public record if that is your concern.  We can stipulate not to put details of your signature on any public forum, that's not a problem --

MS. TROMBETTA:  Thank you, thank you.

Page 21

V. KOI-PLOSKI

MR. HAIMSON: That's not why I'm asking the question. I'm just simply trying to ascertain how familiar Ms. Ploski is with your artwork and the details about your artwork. That's the only reason why I'm asking, okay?

MS. TROMBETTA: I understand that, but certain information can be unintentionally made public, and that's what occurred last week. Please proceed.

Q. Ms. Ploski, does Ms. Trombetta's signature on her artwork include her name as well?

A. Yes.

Q. Do you know what form that takes?

A. Can you rephrase your question?

Q. Sure, is it her full name, for example?

A. Yes.

Q. And what is Ms. Trombetta's full name, to your knowledge?

Page 22

V. KOI-PLOSKI

A.    Annamarie Trombetta.

Q.    And Annamarie is one word?

A.    Yes.

Q.    To your knowledge, has Ms. Trombetta's signature changed over time or has it always been the same?

A.    I have no knowledge of that.

Q.    Do you know whether she's ever signed her work Anna Maria Trombetta?

A.    Never.

Q.    Have you seen every work that Ms. Trombetta's ever created?

A.    I have not seen every work that she's ever created, but I know she's very particular about her name.

Q.    So in your opinion, it's unlikely that she signed it like that, correct?

A.    Correct.

Q.    But you can't say with certainty because you've never seen every piece of art she's created, right?

A.    You're phrasing the basis. I'm telling you with certainty that she would

Page 23

V. KOI-PLOSKI

never, ever separate her name Anna and Marie and would never call herself Maria. This is very important to her.

Q.   You didn't know Ms. Trombetta in 1992, correct?

A.   No.

Q.   Of the artwork of hers that you've seen, do you know when that artwork was created?

A.   No.

Q.   Do you know whether you've seen work going back to the 1990s?

A.   When she was a child?

Q.   It's just a yes or no question, ma'am.   Do you know whether you've seen any work that Ms. Trombetta created in the 1990s?

A.   No.

Q.   No, you don't know or no, you have not seen it?

A.   I have never dated anything, asked her when did you do this or when did you do that.

Q.   Safe to say you haven't seen

**SA1161**

Page 24

V. KOI-PLOSKI

any signatures from the 1990s, correct?

A.    No, that's not safe to say.

Q.    Is it possible that you have not?

A.    I doubt that because she's lost work, so I would imagine that she created a portion of it in the 1990s.

Q.    Do you know how long Ms. Trombetta's been creating artwork for?

A.    She's been an artist all of, you know, since she's been in college.

Q.    Do you know whether she created any artwork as a child, as you put it?

A.    No.

Q.    No, you don't know?

A.    I don't understand the question.  I mean I -- did you make drawings when you were a child?

Q.    This is my deposition, ma'am. I'm going to be a asking the questions. I'm just asking if you know whether Ms. Trombetta created any artwork when she was a child?

A.    No.

Page 25

V. KOI-PLOSKI

Q.   No, she did not create it --

A.   I did not know Ms. Trombetta when she was a child so I can't answer what she did when she was a child.

Q.   Have you ever attended of Plaintiff's art shows or exhibitions?

A.   No.

Q.   Have you read any reviews or critiques about her artwork?

A.   I'm not sure.

Q.   Do you have any knowledge of Ms. Trombetta reputation in the art community?

A.   Yes.

Q.   Tell me about that.

A.   Her work is respected.  I've seen interviews with her on local television programs.  My husband did go to her exhibitions as a guest, and he was very impressed with the feedback that people had on her work.  And I've seen her work.  I mean, her work is beautiful.

Q.   For the record, I agree.  So let's parse that out a little bit.  You say

Page 26

V. KOI-PLOSKI

that her work is respected.  Can you tell me what you mean by that?

A.    She's an actual artist.  I mean, she's not doing this for hobby.  She has had exhibitions, she's had reviews, she's had attention paid to her.

Q.    When you say she's had reviews, I think you testified a moment ago that you haven't read or --

A.    I testified that I looked at her website.

Q.    Are there reviews contained on her website?

A.    There are -- as far as I remember, there are comments about her work on her website.

Q.    You said she has also been interviewed by some local TV shows; is that right?

A.    Yes.

Q.    Do you know which programs those were?

A.    No.

Q.    Did you personally see those

Page 27

V. KOI-PLOSKI

interviews or you just know about them?

A.    I've seen them on the internet.

Q.    Do you know when those interviews were?

A.    No.  I don't even remember that I viewed them, but I just know that I had.

Q.    You said your husband went to one of her exhibitions as a guest, right?

A.    Yes.

Q.    Do you know when that was?

A.    It would have been sometime before the pandemic, but I can't pinpoint what that was.

Q.    And do you know the name of that exhibition?

A.    No.

THE COURT REPORTER:  Off the record.

(Whereupon, an off-the-record discussion was held.)

(Whereupon, Anderson Duff joined the Zoom teleconference.)

Q.    Ms. Ploski, do you know whether Ms. Trombetta sold any artwork at the

Case 1:18-cv-00993-LTS-SLC    Document 425-4    Filed 04/17/23    Page 30 of 101

Page 28

V. KOI-PLOSKI

exhibition that your husband attended?

A.    No.   He just went there to say hello to her.   I don't know anything that happened though.

Q.    Returning to her signature on her artwork for a second.   Can you tell me of the works that you've seen in person, where is the work typically signed?

A.    To the best of my recollection, it's the bottom right.

Q.    Would that be on the front of the work or the back?

A.    The front.

Q.    To your recollection, what color is the signature typically in?

A.    I can't say.   What I have is seen as on etchings, I know it's in pencil.

Q.    Do you specifically recall having seen any of her paintings that contain signatures?

A.    Vaguely.

Q.    And you're not sure where those paintings were signed?

A.    No.

Page 29

V. KOI-PLOSKI

Q.    Would you describe Ms. Trombetta's artwork as having a large following?

A.    I don't know what her following is.

Q.    Have you ever seen any appraisal values of her artwork?

A.    No, I have not seen appraisals.

Q.    And you have not performed any appraisals yourself, right?

A.    No, I have not.

Q.    To your knowledge, has Ms. Trombetta's work ever been featured in any art galleries?

A.    Yes.

Q.    Which galleries are those?

A.    I don't know.

Q.    To your knowledge, has Ms. Trombetta ever been represented by a gallery?

A.    I believe so.

Q.    Do you know which gallery that was?

A.    I do not.

Page 30

V. KOI-PLOSKI

Q.    Do you know when that was?

A.    I do not.

Q.    Do you know whether Ms. Trombetta has ever sold any of her paintings?

A.    Say that again, I'm sorry.

Q.    Do you know if Ms. Trombetta sold any of her paintings?

A.    Yes.

Q.    Which paintings has she sold?

A.    I don't know.

Q.    How do you know she sold them?

A.    Because she is a professional artist that makes a living by selling paintings and drawings and etchings.

Q.    Do you know at what price point those paintings were sold?

A.    I do know generally a range that she sells her work for.

Q.    What is this range, ma'am?

A.    From the -- anywhere from several hundred to thousands of dollars.

Q.    How do you know that range, how are you familiar with that?

Page 31

V. KOI-PLOSKI

A.    Because we like her work and we would like to be able to own some pieces ourselves.

Q.    Have you ever had discussions with Ms. Trombetta about what those paintings sold for?  Is that how you know that?

A.    Yes.

Q.    What did you say to her and what did she say to you?

A.    I can't remember exactly what was said.  I just know that I -- I know that the range that her paintings go for because I find her work interesting.

Q.    During your discussions with Ms. Trombetta about what her artwork costs, did she indicate what factors drive that cost?  So for example, size, material, anything like that?

A.    No, we didn't get into that.

Q.    You said she makes a living off of selling her artwork; is that right?

A.    Correct.

Q.    Do you know what she makes per

Page 32

V. KOI-PLOSKI

year, what her income is?

A.    No.

Q.    Do you know how many sales she makes per year?

A.    No.

Q.    Just to clarify, you don't know which paintings she sold by name, correct?

A.    Correct.

Q.    Are you familiar with whether Ms. Trombetta has written a biography?

A.    Yes.

Q.    How are you so familiar with that?

A.    Because when she had initially written her autobiography, it was for a catalogue that was going to be printed. And she read it to me and she asked my opinion.

Q.    So Ms. Trombetta read the autobiography to you and asked your opinion?

A.    Yes.

Q.    Did you ever read the biography at that point?

**SA1170**

Page 33

V. KOI-PLOSKI

A.   I tried to.

Q.   What do you mean by that?

A.   Her handwriting was hard to read.

Q.   And when did this take place?

A.   In 2003.

Q.   Was this at a social visit with Ms. Trombetta?

A.   Yes.

Q.   For what purpose did she read the biography to you?

A.   To get my opinion.

Q.   What did she want your opinion about, to your knowledge or understanding?

A.   Just how it sounded, if it read well, if it sounded professional.

Q.   And so at that time the biography was handwritten; is that right?

A.   Yes.

Q.   And you had trouble reading it, so she read it to you; is that correct?

A.   Yeah, she wrote it -- it was like kind of a lot of scribbles on it, you know, things crossed out, rewritten, that

SA1171

Page 34

V. KOI-PLOSKI

sort of thing. She writes very small, my eyes aren't really great, so.

Q. And to your recollection, where was this written?

A. It was like an artist book.

Q. Sort of the size of an average sketchbook or smaller?

A. Yeah, it was -- yeah. Around the size of a sketchbook.

Q. Did you make any copies of Ms. Trombetta's biography that day?

A. No, I did not.

Q. Did you make any edits to her biography?

A. I did not make any edits.

Q. What was your feedback after she read it to you?

A. I thought it was really long. I thought it was very poetic. It was not what I would particularly hear in a biography. It was kind of flowery.

Q. Was your husband present for this as well?

A. No.

Page 35

V. KOI-PLOSKI

Q.    But to your knowledge, your husband on the day in 2003 was not present for the reading of Ms. Trombetta's biography?

A.    He wasn't.  He had to take care of something and so I was with Annamarie Trombetta, and while we waited for him, she showed me her biography and asked my opinion.

Q.    Do you know if Ms. Trombetta's biography was ever posted to her website?

A.    Yes.

Q.    How do you know that?

A.    Because I saw it on her website, was surprised that she used the whole thing, and I remembered, you know, what she had initially written.  It was to the best of my memory the same I had read.

Q.    When was the first time you saw the biography on Ms. Trombetta's website?

A.    Years ago.

Q.    Can you approximate for me when that was?

A.    No.

Page 36

V. KOI-PLOSKI

Q.    You say you were surprised she used the whole thing.  What do you mean by that?

A.    It's long.  You know, I don't typically see biographies that are that long on websites.

Q.    Do you know whether the biography that she posted on her website was the same language as the biography you listened to?

A.    It sounded the same.  I can't say that it was word for word exactly the same because I never made copies of the original.

Q.    How many times have you been to Ms. Trombetta's website?

A.    I don't know.  Maybe a dozen.

Q.    And for what purpose?

A.    Just to see what she's doing.

Q.    Is that website trombettaart.com?

A.    Yes.

Q.    On the occasions when you visited the website, did you ever take any

Page 37

V. KOI-PLOSKI

screenshots of what you were looking at?

A.    No.

Q.    Have you ever heard of anyone copyrighting a biography?

A.    You know, I design websites for a living, and the websites are copyrighted, so anything on the web side is also copyrighted.

Q.    Let me rephrase the question. I'm specifically asking about whether someone can register a biography with the US copyright office.

A.    I am not an expert on copyright law.

Q.    So you have no knowledge as to whether someone can do that, correct?

A.    Correct.

Q.    Do you know whether Ms. Trombetta copyrighted her biography we're discussing?

A.    I know that she copyrighted her website.

Q.    How do you know that?

A.    Because I saw it on her

Page 38

V. KOI-PLOSKI

website.

Q.    What did you see?

A.    Pardon me?

Q.    What did you see on her website?

A.    That she has a copyright line on her website.

Q.    Do you know whether Ms. Trombetta has ever licensed her biography to anyone else?

A.    No.

Q.    No, you don't know or no, she has not?

A.    I have no knowledge of that.

Q.    Ms. Ploski, what's your understanding of what this lawsuit is about?

A.    Annamarie Trombetta had seen that her name came up on the internet connected to a piece of artwork that she did not produce. She had asked that this work be taken down and that her connection to it be removed. And I know that she had a frustrating time of getting that done.

**SA1176**

Page 39

V. KOI-PLOSKI

After a year, it was still up on the internet, so she felt that her representation was damaged by the presence of that artwork that was inferior to anything that she would create and just misrepresented her in general.

Q.    How is it you gained that understanding of what this lawsuit is about?

A.    She's been very, very stressed about this whole ordeal.  She had at the time when it was online, she asked my opinion on how can I get this removed.  She asked me to also go online and see what I found.  And I suggested that she contact -- I believe it was WorthPoint to ask them to take it down.

Q.    So I want to go through and parse out a little what you said.  The first thing you said when I asked you what this lawsuit was about, you told me Annamarie Trombetta's name connected to a piece of artwork she did not produce; is that correct?

Case 1:18-cv-00993-LTS-SLC    Document 425-4    Filed 04/17/23    Page 42 of 101

Page 40

V. KOI-PLOSKI

A. Correct.

Q. How do you know that Ms. Trombetta did not produce that artwork?

A. Well, for one thing, the artwork I believe said that it was created in 1972. Ms. Trombetta I believe was born in 1963. The artwork is also not anything like the style of Annamarie's artwork.

Q. So have you seen the artwork that we're talking about?

A. Yes.

Q. When did you see that artwork?

A. I don't remember when I first saw it.

MR. HAIMSON: Nathan, I just want to go off the record a second.

(Whereupon, an off-the-record discussion was held.)

Q. Ms. Ploski, the posting that you referred to, the painting from 1972, was it titled Man with Red Umbrella?

A. Yes.

Q. And you've personally gone a website and seen that painting?

Case 1:18-cv-00993-LTS-SLC   Document 425-4   Filed 04/17/23   Page 43 of 101

Page 41

V. KOI-PLOSKI

A.    Yes.

Q.    When did you do that?

A.    It was around the time that she found it. I think. I don't know. I really don't know exactly when I saw it. I know that there was a problem on the site with loading photos so you couldn't, like, see what the artwork looked like. But I've seen it since.

Q.    When did you see it? You said you've seen it since. When did you see --

A.    I just know that I've seen it. I can't pinpoint when exactly I saw it.

Q.    Did you make any copies of what you saw?

A.    No.

Q.    Can you describe the painting for me?

A.    It's a man walking, holding an umbrella.

Q.    I think you testified that it was inferior to anything that she would have created; is that correct?

A.    Yes.

**SA1179**

Page 42

V. KOI-PLOSKI

Q.    What did you mean by that?

A.    It looked -- it didn't look like it was, in my opinion, created by a professional artist.

Q.    And why is that?

A.    It's just an opinion.

Q.    I understand it's your opinion. I'm asking if you can try to describe why that's your opinion.

A.    No, I can't.

Q.    Did it look unfinished in some way for example?

A.    No.

Q.    In your opinion, does Ms. Trombetta's artwork have a style to it?

A.    Yes.

Q.    Can you describe that style for me?

A.    Her work is -- it's realistic. However, it's not super -- it's not super realistic. Its definitely comes from a point of view. Most of her work is out doors. She does -- primarily the work that I've seen has been either still lifes or

Page 43

V. KOI-PLOSKI

Central Park.

Q.    Ms. Trombetta has told you she did not create this painting?

A.    Yes.

Q.    When did she tell you that?

A.    From the time she was alarmed to have discovered that there was a posting on the internet called a Man with Red Umbrella which she never herself had created.

Q.    You testified that she had asked that this work be taken down from the internet; is that right?

A.    Correct.

Q.    Can you tell me about that?

A.    I know that she contacted various entities, eBay, WorthPoint, Google, just trying to do whatever she can to have it removed.

Q.    How do you know that?

A.    Because she talked to me about it.

Q.    What did she say to you and what did you say to her?

Page 44

V. KOI-PLOSKI

A.    She said that -- I don't know exactly who she contacted first or what exactly she said. I know that it was somewhere around 2015 or 2016 that this first appeared on the internet.

Q.    What did he tell you about her efforts to have it taken down?

A.    She was very, very frustrated. And I know that it eventually did come down after a few months, and then it reappeared on the internet again. I think it came down -- I think it was down -- to the best of her knowledge, it was down for about four months and then it reappeared again. But I don't know if she was checking on it all the time. So I don't think she even knows how long it was on.

Q.    Ms. Ploski, so is everything you know about this lawsuit things that Ms. Trombetta has told you?

A.    No.

Q.    What have you personally observed yourself that supports any of her allegations?

Page 45

V. KOI-PLOSKI

A.    When she saw the listing on the internet, she asked me to look at it as well.

Q.    And that was in 2015 you said?

A.    Yes.  2016.

Q.    Your communications with Ms. Trombetta, were those in writing regarding this issue?

A.    No.

Q.    Were they over the phone?

A.    Yeah.

Q.    Do you know what website you went to when you say you saw the listing?

A.    I remember doing a search for her on Google and also going to the WorthPoint website.

Q.    Did you make any copies of what you saw on that day?

A.    No.

Q.    You say the posting came down and then reappeared; is that correct?

A.    Yes.

Q.    Again, are you basing --

A.    I did not actually myself see

Page 46

V. KOI-PLOSKI

that the posting came down.  She told me that it came down and I believed her.

Q.    When you say you went on WorthPoint's website, was that before or after the artwork came down?

A.    When I went on WorthPoint website, it was up on the website.  I just looked at WorthPoint's website yesterday and I did not see it there.

Q.    On how many occasions have you been to WorthPoint's website?

A.    I don't know.

Q.    More than once?

A.    Yes.

Q.    More than twice?

A.    Probably.

Q.    And for what reason were you visiting WorthPoint's website?

A.    Trying to have Annamarie Trombetta feel like she had a friend in all of this.

Q.    When's the last time you've seen what you saw is this posting on WorthPoint's website?

Page 47

V. KOI-PLOSKI

A.    I can't say exactly.  I don't know.

Q.    Years ago?

A.    Yes.

Q.    More than three years ago?

A.    Yes.

Q.    More than four years ago?

A.    I think so.

MS. TROMBETTA:  Ms. Haimson, we both have to do work, so how much longer is this going to take?  It's been an hour and a half.

MS. HAIMSON:  I understand, Ms. Trombetta, but I still have some questions I want to ask.  I'm going to take my time doing so.

MS. TROMBETTA:  But I have things to do and --

MR. DUFF:  This is a lawsuit that you started, Ms. Trombetta.

MR. HAIMSON:  This is a lawsuit that you started --

MS. TROMBETTA:  I didn't start putting fake things on the internet,

Page 48

V. KOI-PLOSKI

so can we move it along, please.

MR. HAIMSON: Ms. Trombetta, I -- we subpoenaed Ms. Ploski to be here today. If you need to go dip out to do whatever you want, you can do that. I have the right to ask her questions that I think are relevant to this lawsuit and to defend my client as I see fit. And so if you --

MS. TROMBETTA: And I have to defend my witness as I see fit.

MR. HAIMSON: You don't represent Ms. Ploski. She's a non-party witness, and she's voluntarily agreed to be here pursuant to a --

MS. TROMBETTA: But I'm a pro se litigant, I'm just communicating with you that it's been quite some time. Both of us need to step lively. Just to let you know. Okay?

MR. HAIMSON: Great. We started a little bit late today

Page 49

V. KOI-PLOSKI

because we were waiting for Mr. Duff, and as a courtesy to him, I wanted to make sure he had the opportunity to join. I will take the time that I need to ask questions that I need to ask to defend my client appropriately. If you have an issue with it, you can raise it with the court. But as Mr. Duff said --

MS. TROMBETTA: I can't raise with it with the court right now.

MR. HAIMSON: Okay. Are you asking to terminate the deposition, is that what you're asking?

MS. TROMBETTA: I'm just stating that myself as well as Ms. Ploski have work to do.

MR. DUFF: Ms. Trombetta, this objection is taking quite a while. Can we wrap this up real quick so we can get back to the deposition?

MS. TROMBETTA: I have repeated three times the same thing.

MR. HAIMSON: Can we proceed,

Page 50

V. KOI-PLOSKI

please?

MS. TROMBETTA: Did I say anything?

MR. HAIMSON: Okay.

Q. Ms. Ploski, what knowledge do you have about, if any, about the painting Man with Red Umbrella being sold on eBay?

A. I think that the painting sold on eBay for like a hundred something dollars.

Q. And what's that knowledge based upon?

A. What Annamarie told me. I think one time when I visited her she had shown me something, the posting --

Q. What did she show you?

A. A picture of -- I actually don't remember how I know.

Q. Have you ever seen the eBay posting?

A. I never saw the eBay posting, no.

Q. Ms. Ploski, have you ever had a subscription to WorthPoint?

Page 51

V. KOI-PLOSKI

A.    I have not had a subscription to WorthPoint.

Q.    Are you aware that you need a subscription to access certain information on WorthPoint's website?

A.    Yes, I think you need a subscription to see the prices.

Q.    When you say you accessed WorthPoint's website, was that via a link or PDF?

A.    I just went to WorthPoint.com.

Q.    And what did you search?

A.    I searched for Annamarie's name.

Q.    To your recollection, did the listing include -- on WorthPoint's website include a copy of Ms. Trombetta's biography?

MS. HAIMSON:  Ms. Trombetta, I'm going to ask that you stop nodding your head --

MS. TROMBETTA:  I'm shaking my foot.

MS. HAIMSON:  I understand, but

Page 52

V. KOI-PLOSKI

it looks like you're nodding, and Ms.
Ploski can see you, and I would like
her to answer independently without
any coercion by you.  Thank you.

A.    I'm actually just looking at
you.  I'm not aware of anything --

MS. TROMBETTA:  I uncrossed my
feet.

Q.    Ms. Ploski, to your
recollection, did the listing that you say
you saw on WorthPoint's website, did it
include a copy of Plaintiff's biography?

A.    Yes.

Q.    You specifically recall seeing
the biography?

A.    Yes.

Q.    Is that the same biography that
you've seen on her website?

A.    It was truncated.

Q.    What do you mean by that?

A.    It was cut off.

Q.    How much of it were you able to
see?

A.    I don't know what percentage.

**SA1190**

Page 53

V. KOI-PLOSKI

A good amount. Enough to recognize it.

Q. As you sit here today, do you know if this listing for the sale of this painting, Man with Red Umbrella, is it still available on eBay?

A. I have not looked for it, so I have no idea.

Q. Have you ever been on eBay's website and seen this posting?

A. No.

Q. Did you have any knowledge of whether this listing was removed from eBay?

A. I only snow what I've been told.

Q. I'm asking about your personal knowledge. Do you have any personal knowledge as to whether this listing was removed?

A. No.

Q. Did you ever assist Plaintiff in contacting eBay about the sale and about this posting?

A. No.

Q. Do you know what WorthPoint

Page 54

V. KOI-PLOSKI

Corporation does, what kind of business it is?

A.    I believe if gathers information about art and artists and charges a subscription to --

Q.    And -- sorry, go ahead. I didn't mean to interrupt you. Go ahead.

A.    It charges a subscription for people to get more detailed information.

Q.    And how is it that you know that?

A.    From looking at the website.

Q.    To your knowledge, have you ever spoken to anyone from WorthPoint?

A.    No.

Q.    You may have already answered this, but at any point have you ever went on WorthPoint's website, did you ever make a copy of what you saw?

A.    No.

Q.    Any information that you've seen on WorthPoint's website, do you know where that information came from?

A.    No.

**SA1192**

Page 55

V. KOI-PLOSKI

Q.    When's the last time you went on WorthPoint's website?

A.    Yesterday.

Q.    And you say there was no posting about Plaintiff available; is that correct?

A.    Yesterday I went on WorthPoint's website and I actually looked up a different artist.

Q.    I'm sorry, can you say again?

A.    When I went on WorthPoint yesterday, I went to look up a different artist.

Q.    When's the last time that you looked up Plaintiff, Ms. Trombetta, on WorthPoint's website?

A.    I can't recall.

Q.    That was not yesterday?

A.    Correct.

Q.    Ms. Ploski, do you keep a file related to this lawsuit?

A.    No.

Q.    As you sit here today, do you know if there are any postings about

Page 56

V. KOI-PLOSKI

Plaintiff on WorthPoint's website?

A.    No.

Q.    No, you don't know?

A.    I don't know.

Q.    Do you know at some point whether WorthPoint removed the listing involving information regarding Ms. Trombetta?

A.    It's my understanding that the Man With Red Umbrella attributed to Annamarie Trombetta was removed.

Q.    Do you know when it was removed?

A.    I believe it was removed in 2017.

Q.    And again, that's based on things that Ms. Trombetta has told you, correct?

A.    Yes.

Q.    Not based on something that you personally witnessed, right?

A.    I did not go and check to see whether it was, in fact, removed.

Q.    You've Googled Plaintiff,

Page 57

V. KOI-PLOSKI

right?

A.    Yes.

Q.    When's the last time you did that?

A.    I can't recall.

Q.    Was it recently?

A.    It was probably within this year.

Q.    And for what reason did you Google Ms. Trombetta?

A.    Because every time I've spoken to her about it over the last -- more than -- for years now, she has been at wit's end with this case dragging on.  And as her friend, I'm concerned about her and what this is doing to her.  So that is why I searched for her on the internet.

Q.    How is being concerned about her related to Googling her?

A.    Because this whole case has to do with inaccurate information being posted about her and her work on the internet.  So I did a search for her on the internet.

Q.    You're trying to see if there's

Page 58

V. KOI-PLOSKI

anything on the internet that would remain that you want to talk to her about?

A.    Correct.

Q.    Have you found anything like that?

A.    I pointed her to a website called Wayback.

Q.    And what is Wayback to your knowledge?

A.    You can get screenshots of things that are posted on the internet at various points in time.

Q.    Why did you refer her to Wayback?

A.    Because she is involved in a lawsuit having to do with things that were on the internet, and that's one thing that I use when I do research on something that used to be on an internet website.

Q.    Did you ever assist Ms. Trombetta with contacting Google about --

A.    No.

Q.    -- about anything related to Man with Red Umbrella?

SA1196

Page 59

V. KOI-PLOSKI

A.    No.

Q.    Have you been on Wayback?

A.    Yes.

Q.    And have you typed in Plaintiff's website?

A.    Yes.

Q.    And what did you see?

A.    It's very close to what the website looks like now.

Q.    Are you familiar with a company called Estate Auctions Inc?

A.    No.

Q.    You familiar with someone named Norb Novocin?

A.    I've heard the name.

Q.    To your knowledge, have you ever had any communications with Mr. Novocin?

A.    No.

Q.    Are you familiar with someone named Marie Novocin?

A.    No.

Q.    Did you ever assist Plaintiff with contacting Estate Auctions or the

SA1197

Page 60

V. KOI-PLOSKI

Novocins regarding Man with Red Umbrella?

A.    No.

Q.    Do you have any written communications at all with plaintiff about anything related to this lawsuit?

A.    Just that I should be expecting to be served with a subpoena.

Q.    You said you guys are friends, right?

A.    Yes.

Q.    Do you have her cell phone number in your phone?

A.    Yes.

Q.    Do you guys have text messages about any of those things, about the internet postings, about her artwork, anything like that?

A.    I don't think I've -- I can't recall ever texting Annamarie Trombetta, only calling. I don't even know if the number I have is her cell phone or her landline.

Q.    To your knowledge, you've never exchanged text messages with Ms. Trombetta?

**SA1198**

Page 61

V. KOI-PLOSKI

A.    No.

Q.    Do you have Ms. Trombetta's personal email address?

A.    Yes.

Q.    And what is that email address, to your knowledge?

A.    I can't say off the top of my head.

Q.    Have you ever discussed Man with Red Umbrella?

A.    In email?

Q.    Yes.

A.    No.

Q.    Via email or any other written form of communication, have you ever discussed the sale of her artwork?

A.    No.

Q.    Have you ever discussed the posting that you say you saw on WorthPoint via any written communications?

A.    No.

Q.    Everything was oral or over the phone?

A.    Yes, we have long

Page 62

V. KOI-PLOSKI

conversations.

Q.    Same regarding Ms. Trombetta's biography.  Are there any written communications that you guys have exchanged discussing that topic?

A.    Written communications.  Yeah. She asked me to provide a letter about when I first saw what she had written for her biography, and I sent her a letter.

Q.    When she asked you to do so, was that communication oral or was it written?

A.    I typed it out and sent it to her.  I emailed it to her.

MS. HAIMSON:  Not to beat a dead horse, but we would call for production of any written communications that you had with Ms. Trombetta regarding her biography, her artwork, the internet postings at issue, and anything related to this lawsuit.  And I'll send you a formal written communication to that effect.

Page 63

V. KOI-PLOSKI

A.    Okay.

Q.    Ms. Ploski, are you able to see my screen?

A.    Yes.

Q.    I'm going to show you what I'll mark as Exhibit 1.  Please review and let me know when you've completed looking at it.

(Whereupon, a typewritten letter was marked as Defendant's Exhibit 1 for identification as of this date by the Reporter.)

A.    Okay.

Q.    Are you familiar with this document, ma'am?

A.    Yes.

Q.    And what is this?

A.    This is the letter that I provided having to do with my knowledge of her biography.

Q.    Why did you write this letter?

A.    Because she felt that she was being questioned about whether or not she had actually written her own biography.

**SA1201**

Page 64

V. KOI-PLOSKI

And, you know, I said to her, you know, and then I was -- I saw her when you had your first draft of it so, you know, I'll testify to that.

Q.      This is the letter you reviewed just yesterday, right?

A.      Yes.

Q.      Is there any information on here about you seeing a posting on WorthPoint's website?

A.      No.

Q.      Didn't feel that was important to mention?

A.      That wasn't what I was being asked about.

Q.      What specifically did she say you were being asked about?

A.      About the -- about her having written her own biography.

Q.      The biography that you say you saw at least in part on WorthPoint's website, right?

A.      Correct.

Q.      So you didn't think it was

Page 65

V. KOI-PLOSKI

important that you personally saw the biography on WorthPoint's website?

A.    No.

Q.    Did Ms. Trombetta tell you what to put in this letter?

A.    No.  She asked me what I was willing to -- if I was willing to write a letter having to do with when she wrote her biography.  So that's what we did.

Q.    And when she asked that, what did you say in response?

A.    I said of course.

Q.    Did your husband help you write this letter?

A.    No.

Q.    Turning your attention to the third paragraph that begins with "I found her biography."  Can you see that?

A.    Yes.

Q.    You said "we did not offer any substantive edits, we only commented on a couple grammatical concerns."  Do you see that?

A.    Yes.

SA1203

Page 66

V. KOI-PLOSKI

Q.    I think you testified before that your husband was not available and didn't help -- and wasn't present when you listened to Ms. Trombetta's biography.

A.    Right.

Q.    Who's the "we" that you're referring to?

A.    I'm referring to the whole discussion that -- I did discuss what Annamarie had written for her biography, and that my concern was that it was very wordy.  But I didn't offer any, you know, exact changes other than some things that sounded a little awkward to me.  And my husband had no comment whatsoever.

Q.    In the first paragraph you say "my husband and I during the summer of -- during the early summer of 2003 proofread her biography that she had handwritten in her sketchbook."  Do you see that?

A.    Yes.

Q.    Did your husband proofread it with you or not?

A.    No.

SA1204

Page 67

V. KOI-PLOSKI

Q. Why does it say that in your letter?

A. Because that's how I was thinking about the day. She came to visit us at our home in Nyack and she brought her sketchbook with her. I -- I know that he saw it at some point. He was in and out. But he wasn't really paying attention to what we were doing. So he had nothing to say about it. I don't know how much of it he heard or didn't hear, but he definitely wasn't paying attention.

Q. Somewhere in your letter do you mention -- you say "proofread." Do you mention that she was orating it to you or reading it to you?

A. No.

Q. Do you think that was important to mention?

A. No. I did try to read it.

Q. But you weren't able too do so because there were some scribbles --

A. It was too cumbersome, and so she said let me just read it to you, and

Page 68

V. KOI-PLOSKI

she read it to me.

Q.    Turning your attention to the fourth paragraph that starts with "Annamarie." You said "Annamarie informed us that the biography would be included in her soon to be produced catalogue for an upcoming exhibition."

Have you ever seen a printed catalogue of Ms. Trombetta's artwork?

A.    No.

Q.    Do you have any knowledge of whether Man with Red Umbrella is featured in any catalogs Ms. Trombetta produced?

MS. TROMBETTA:    I didn't do it. Why should it be in a catalogue? And this is the catalogue right here.

MR. HAIMSON:    Ms. Trombetta, please do not answer the questions that I'm asking of the witness. This is not your opportunity to speak. You've already been deposed. You can file anything you'd like with the court. Do not coerce -- the witness is going to answer the questions as

Page 69

V. KOI-PLOSKI

she sees fit. Please do not interrupt. Thank you.

MR. BIALEK: And please don't yell at my colleague. It's unprofessional.

MS. TROMBETTA: This is unprofessional, to keep people on going over and over. Many of the questions that Ms. Haimson has asked have already been asked.

MS. HAIMSON: My last name is Haimson.

MS. TROMBETTA: Haimson, right --

MR. HAIMSON: I have the right to ask the witness any questions that I deem to be relevant. The scope of discovery in federal court is very broad. Please do not interrupt. Let's just get this finished, okay?

Q. Ms. Ploski, do you know whether any catalogues that Ms. Trombetta has ever put forth included a painting titled Man with Red Umbrella?

**SA1207**

Page 70

V. KOI-PLOSKI

A.    Absolutely not.

Q.    You don't know or absolutely not, they don't include it?

A.    They would -- why would her catalogue include someone else's work?

Q.    You haven't seen any of her printed catalogs, correct?

A.    I have not.

Q.    Your letter mentions a 150th anniversary of Central Park.  Do you see that?

A.    Yes.

Q.    Do you know whether that exhibition happened?

A.    I -- it was so long ago I can't remember.  I guess it did.  I would only be guessing though.

Q.    Well, you included it in your letter, right?

A.    Right, because I thought it was really impressive, so I remembered that it was for the 150th anniversary.

Q.    But you don't know whether that exhibition actually took place?

**SA1208**

Page 71

V. KOI-PLOSKI

A.    I had no reason to believe that it didn't.

Q.    Do you know if Mrs. Trombetta sold any artwork at this exhibition?

A.    No.

Q.    No, you don't know?

A.    I do not know.

Q.    Your letter also mentions a solo exhibition -- I'm sorry.  Let me take a step back.  This 150th anniversary of Central Park, approximately when would that exhibition have been?

A.    I think it was to happen a few months after I had seen her biography. Probably in the fall I think.

Q.    So you think approximately fall of 2003?

A.    Yes.

Q.    The exhibition at the Staten Island Museum, do you know whether that took place?

A.    I have -- I just know that it was an upcoming exhibition.  I don't know if it ever happened.

Page 72

V. KOI-PLOSKI

Q.   Did she sell any work from that show?

A.   I have no idea.

Q.   You didn't attend either show, correct?

A.   No.

Q.   Did your husband?

A.   I don't think so.

Q.   Turning your attention to the fifth paragraph.  You say "to the best of my memory, the biography we proofread in 2003 is the same that remains posted on this page of her website," and you attach a link.  Do you see that?

A.   Yes.

Q.   So on March 4th, 2022, did you access Ms. Trombetta's website?

A.   Probably, yes, I had to have, if I put the link there.

Q.   Did you make any copies, screenshots, or print what you saw on that day?

A.   No.

Q.   Mrs. Ploski, do you have a

Page 73

V. KOI-PLOSKI

photographic memory?

A.    No.

Q.    When's the first time you saw Plaintiff's biography on her website?

A.    I don't know.  Probably a decade ago at least.

Q.    Is it possible that the biography that you saw on Plaintiff's website in March of 2002 had differing language from the one that you say you saw a decade ago?

A.    I never made any screenshots or anything to see if any words were changed, if that's what you mean.

Q.    So it's possible that some of the wording had been changed?

A.    I have no idea.

Q.    Turning your attention to the last paragraph, more or less, I think it's the seventh paragraph.  You say "lastly, in our opinion, it is indeed a moral imperative to extend our time and this letter for Annamarie Trombetta who has had to endure such scrutiny, chaos and a great

SA1211

Page 74

V. KOI-PLOSKI

loss of time due to a fraudulent and harmful internet post."

Do you see that?

A.    Yes.

Q.    I just want to clarify.  You again refer to plural.  Who's the "are" if your husband is not involved with it?

A.    You know, it's -- Annamarie Trombetta was originally my husband's friend, and over the years I've become closer with her.  But I always -- when I think of Annamarie, it's always the three of us, so it's a plural there.  He is well aware of what's been going on with her because he's spent hours with her as she's been really upset just trying to, like, calm her down and, you know, just to, you know, give her strength as a friend.  So we're very much involved with Annamarie on a personal level.

Q.    Has your husband been involved in any communications with eBay, WorthPoint, Estate Auctions Inc or Google?

A.    No.

Page 75

V. KOI-PLOSKI

Q.      What do you mean when you say Ms. Trombetta has endured scrutiny?

A.      This lawsuit has been dragging on for a very long time, and it is my understanding that you've been papering her to death where she has to respond to all sorts of nonsense that has nothing to do with the main reason why this whole thing was started in the first place.  So she's had to devote a lot of her time and energy to this, which I think is totally ridiculous.

Q.      What do you mean when you say Ms. Trombetta's endured chaos?  Same instance?

A.      Yeah.

Q.      Same for loss of time, "great loss of time"?

A.      Yes.

Q.      To your knowledge, have any galleries opted not to work with Ms. Trombetta due to the eBay posting or the reposting on WorthPoint's website that we've been discussing?

**SA1213**

Page 76

V. KOI-PLOSKI

A.     There's no way to know that.

Q.     Why is that?

A.     Because if someone takes a look at an artist and forms an opinion and desides not to engage with that artist, how would you even know, how would you even know that happened.

Q.     To your knowledge, have any galleries told Ms. Trombetta that they weren't going to work with her because of any issue with works being posted on the internet?

A.     Not to my knowledge.

Q.     You said that the attorneys have been peppering Ms. Trombetta, right?

A.     I don't think I used the word peppering.  I don't know what you mean by that.

MR. HAIMSON:  Nathan, can you read back the answer asking her about the scrutiny --

(Whereupon, the referred-to answer was read back by the Reporter.)

SA1214

Page 77

V. KOI-PLOSKI

Q.     Ms. Ploski, what has Ms. Trombetta told you about how the attorneys have conducted themselves during this lawsuit, throughout this lawsuit?

A.     She's told me that the attorneys have been very combative, that she has had to spend a considerable amount of time answering whatever the attorneys put forth, that there has been a lot of time devoted to things that were outside of the main issue of her having to wait almost a year, maybe more than a year for a -- to have the removal of a cheap piece of art that was made in her name take place, that she has had to defend the writing of her own biography, that she wrote it herself, that it -- just that this whole thing has really dragged on much longer than it should.

Q.     Has Ms. Trombetta specifically told you that any of the attorneys that she's dealt with have done anything unethical?

A.     I don't think that she ever

SA1215

Page 78

V. KOI-PLOSKI

used the word unethical.

Q.   What words has she used?

A.   I really can't remember exactly what words she used.

Q.   Did she ever say that any of the attorneys ever tried to intimidate or coerce any of the witnesses?

A.   She did not say that to me.

Q.   To your knowledge, has Ms. Trombetta lost any art sales due to any postings on the internet?

A.   Yes.

Q.   Tell me about that.

A.   There was a woman who was interested in purchasing a painting of hers.  I think there was something -- "wisteria" was in the title.  And the woman became aware of this posting that was on WorthPoint, and it caused her concern, and she pulled out of the sale.

Q.   Do you know what the listing price for that artwork was?

A.   I know that it was in the thousands.

SA1216

Page 79

V. KOI-PLOSKI

Q.    And how do you know that?

A.    Because Annamarie told me.

Q.    Do you know whether the work was ever subsequently sold?

A.    No.

Q.    No, you don't know?

A.    I do not know.

Q.    Do you know whether any other sales -- do you know if Ms. Trombetta has allegedly lost any art sales due to any internet postings?

A.    I know that posting was up for at least a year, and so there's no way for me to know who else saw it and decided not to purchase from her.

Q.    You say when you want to buy something you look on the internet, right?

A.    If I want to buy something I compare prices on the internet, yes.

Q.    So wouldn't going on the internet actually be a good way to establish whether you can purchase a piece of artwork and what if might cost?

A.    Yes.

SA1217

Page 80

V. KOI-PLOSKI

Q.    You haven't talked to any galleries or any potential buyers of Ms. Trombetta's artwork, right?

A.    No.

Q.    To your knowledge, did Ms. Trombetta undergo any medical treatment as a result of any postings on the internet?

A.    I know that she had mentioned some pain that she had experienced years before was giving her an issue.

Q.    Can you be more specific?

A.    You know, I'm not sure exactly. I think it had to do with her arm or her shoulder. And I discussed with her, you know, ways that maybe she could reduce her stress, that maybe that was causing -- maybe it was exacerbating her pain.

Q.    Do you know whether she received any medical treatment for any pain she was having in her shoulder?

A.    Did you say when?

Q.    In general, do you know whether, as a result of any postings on the internet, she received any medical

Page 81

V. KOI-PLOSKI

treatment for pain in her shoulder?

A.    Yeah, she said she went for physical therapy.

Q.    Do you know how often she was going?

A.    No.

Q.    And is that an injury that she had prior -- the shoulder injury, is that something she had prior to anything being posted on the internet?

A.    Yes.

Q.    Do you know how she sustained that injury?

A.    Yes.

Q.    And how did that happen?

A.    She was in the Staten Island Ferry accident.

Q.    When was that?

A.    I don't remember what year that was.

Q.    Do you know whether any doctors has said that stress is exacerbating injuries that she had due to internet postings?

Page 82

V. KOI-PLOSKI

A.    No.

Q.    This is something that you're speculating?

A.    Yes.  Because I myself have, you know, certain muscle and joint issues, and I know that when I'm under stress or I am not sleeping well, that those things can be more difficult due to inflammation or whatever.

Q.    But you're not a doctor, right Ms. Ploski?

A.    No, I can only speak from my own experience.

Q.    Do you know how often Ms. Trombetta was going to physical therapy, has been going to physical therapy?

A.    No.

Q.    Do you know whether she's still receiving any physical therapy?

A.    No.

Q.    No, you don't know?

A.    I do not know.

Q.    Did she ever mention post-traumatic brain injuries relating to

**SA1220**

Page 83

V. KOI-PLOSKI

internet postings?

A.    No.

Q.    Has she complained to you about any other illnesses that she's had as a result of Man with Red Umbrella, for the sake of brevity?

A.    No.

Q.    Do you know whether Ms. Trombetta's ever been involved in any other lawsuits?

A.    Yes.

Q.    Tell me about those.

A.    She was involved in a lawsuit having to do with a Staten Island Ferry accident.

Q.    And how do you know about that?

A.    Because she's my friend.

Q.    Do you know how long a lawsuit or case is supposed to take?

A.    It depends on the case.

Q.    I think you mentioned a little while ago that Ms. Trombetta had frustration over the main issue of the case not being addressed; is that what you said?

**SA1221**

Page 84

V. KOI-PLOSKI

A.    Yes.

Q.    What did you mean by that?

A.    It seemed she had to get into issues of copyright and be put on the defensive about whether her biography was, in fact, written by her. Which just seemed silly to me. It -- yeah.

Q.    Are you aware that she's suing for copyright infringement and that is the central issue in this case?

A.    Well, her work is hers. I mean, she wrote her biography, and how that would be questioned is silly to me, yes.

Q.    Okay. But I think you said that the main issue of the case wasn't being addressed. Are you aware that copyright infringement is actually the central issue in this case?

A.    The central issue is that her work was misrepresented on the internet, that there was a piece of artwork that was not hers with a price attributed to it that hurt her reputation, and that her biography she wrote was connected to that piece of

Page 85

V. KOI-PLOSKI

work.  And then she tried to remove it.  If that been taken down at the time when she made everyone aware of it, we wouldn't be here right now.

Q.   Ms. Ploski --

A.   I'm sorry.  As far as I know, that's the true issue of the case.

Q.   Ms. Ploski, do you have any legal training?

A.   No.

Q.   You also testified earlier this morning that without a subscription to WorthPoint you were unable to see the price that a painting sold for, right?

A.   Right.

Q.   So when you went on WorthPoint's website and you saw the Man with Red Umbrella posting, did you see how much it sold for?

A.   No.

Q.   To your knowledge, why did the buyer of wisteria decline to purchase it, the potential buyer?

A.   To my knowledge, she saw the

Page 86

V. KOI-PLOSKI

WorthPoint listing. I don't know whether or not she was a subscriber of WorthPoint, she saw the price, but she saw that it was something that had been sold on eBay, and quality artwork is not something you would expect to find sold on eBay.

Q. So without a subscription, if you're accessing WorthPoint's website, how could a posting on WorthPoint with no subscription actually impact any potential future sales?

A. You would see that, you know, it shows artwork. And if that artwork looks of a poor quality, then it would reflect poorly on that artist. Also that it was listing something that was just being sold on eBay. But I can't attest to what was going through the mind of this woman or even whether or not she was a subscriber or whether anyone she knew was a subscriber.

MR. HAIMSON: Let's go off the record a second.

(Whereupon, an off-the-record

**SA1224**

Page 87

V. KOI-PLOSKI

discussion was held.)

Q.    Just a couple of follow-up questions for you, Mrs. Ploski.

Did Ms. Trombetta ever tell you whether she investigated Wayback, as you called it?

A.    Yes.

Q.    And what did she tell you about that?

A.    I think she thought it was helpful.  I don't know exactly what she found, but --

Q.    To your knowledge, is Wayback the same as archive.org or is it different?

A.    Yes, it's the same thing.

Q.    Did she tell you how she found it helpful?

A.    No.

Q.    Just to reconfirm, you didn't print out, make any copies, or take any screenshots when you personally accessed archive.org, correct?

A.    I don't believe so.

MR. HAIMSON:    To the extent

SA1225

Page 88

V. KOI-PLOSKI

that you did, I'm going to also call for production of any screenshots or anything like that. I'll put a formal demand in writing for any websites that you accessed, including WorthPoint, Plaintiff's website, Wayback or archive.org.

Q.    Lastly, the only thing I wanted to address was -- I think you said that it reflects poorly on an artist's reputation when their paintings are sold on eBay; is that correct?

A.    Yes.

Q.    Do you consider Rembrandt to be a quality painter?

A.    Yes.

Q.    Are you aware that Rembrandt paintings have been sold on eBay?

A.    No.

Q.    You don't have any training in art evaluation, right?

A.    No.

Q.    And you don't participate in the art market really, right?

Page 89

V. KOI-PLOSKI

A.    Nope.

MR. HAIMSON:  That's all I have.  Mr. Duff, do you want to ask any questions?

MR. DUFF:  I have four questions I think.

EXAMINATION BY

MR. DUFF:

Q.    Thank you very much, Ms. Koi-Ploski, we appreciate you being here. You said earlier -- you testified that through your conversations with Ms. Trombetta you were aware that the attorneys had a been papering her -- I forgot the exact phrase, but essentially filing lots of documents that she had to respond to; is that correct?

A.    Yes.

Q.    Would it surprise you to learn that, in fact, the vast majority of the filings in this case have come from Ms. Trombetta?

A.    No.

Q.    Would it surprise you to learn

Page 90

V. KOI-PLOSKI

that, in fact, just on the 14th of this month, the court issued an order stating that the defendants no longer needed to respond to Plaintiff's filings because there had been so many of them, unless the court directed us to do that?

A.    No.

Q.    Are you aware that in addition to this case, Ms. Trombetta has intervened in my client's bankruptcy proceeding in another court in another state?

A.    I know nothing of that.

Q.    And since the centerpiece of this case, as you said, is that a piece of artwork had been misattributed to Ms. Trombetta and that had damaged her reputation, would it surprise you to learn that in her filings with the court, Ms. Trombetta has at multiple times accused me of being a convicted felon when I am not?

A.    No.    I've never even heard your name.    I don't know how you're a party to this.

MR. DUFF:    That's all I have.

**SA1228**

Page 91

V. KOI-PLOSKI

Thank you very much for your time.

MR. HAIMSON:  Nathan, just follow-up question for Ms. Ploski.

EXAMINATION BY

MR. HAIMSON:

Q.    Ms. Ploski, have you been able to see Ms. Trombetta throughout your deposition this morning?

A.    Have I been able to see her?  I see all -- the tiny little -- I have a laptop so I can see tiny photos of everybody.  I can see her when she's the one talking.

MR. HAIMSON:  Okay.  I'd just like to put a quick objection on the record to the fact that during several questions that I asked this morning, Ms. Trombetta seemed to be shaking her head either yes or no, and to the extent that that was an attempt to coach Ms. Ploski in any way, we obviously object to any conduct like that.

A.    I would like to say that I

Page 92

V. KOI-PLOSKI

never noticed Ms. Trombetta nodding or

gesturing or coaching in any way.

Q.    Okay, that's good to hear.

MR. DUFF:  We join that

objection as well.  Thank you very

much, Ms. Ploski.

MS. HAIMSON:  We can go off --

MR. BIALEK:  Before we do, Ms.

Trombetta, do you have any questions

for Mrs. Ploski?

MS. TROMBETTA:  Do I have any

questions for Ms. Ploski?

MR. BIALEK:  Yes.  You've been

invited to cross examine and ask

questions.  I just want to make sure

you understand you have the

opportunity to ask this witness

questions if you'd like.

MS. TROMBETTA:  Give me a

moment.  I think my questions are

more for you in reference to the

deposition.  I think Ms. Ploski has

given any great deal of her time.  I

appreciate her being her.  And --

Page 93

V. KOI-PLOSKI

MR. BIALEK:  I just want to be clear that you are given an opportunity to ask questions.

MS. TROMBETTA:  Yeah, okay.

MR. BIALEK:  And if you're waiving the right, that's fine --

MS. TROMBETTA:  I need to ask --

MR. BIALEK:  -- we can go off the record.

MS. TROMBETTA:  I need to ask Ms. Ploski if at any time she thought or she looked at me and believed that I was coaching her during this deposition.  I had mentioned that I was shaking my leg -- not shake my leg, but my legs were crossed and Ms. Haimson said I was shaking my head.  These are -- I want to ask Ms. Ploski directly, you asked her, now I'm asking her.

MR. BIALEK:  Okay, so you do want to ask questions of the witness.  So Nathan, we now turn over the

Page 94

V. KOI-PLOSKI

examination --

MS. TROMBETTA: That is the only question. Do you feel that --

MR. BIALEK: Don't ask me, ask Ms. Ploski.

MS. TROMBETTA: I'm looking right at her.

A. We can't tell who --

MS. TROMBETTA: Exactly. This is my point. This is my point.

A. Okay, ask your question.

EXAMINATION BY

MS. TROMBETTA:

Q. My question is during the deposition this morning, did you notice any head shaking or any -- I do have a tendency to move around, that I will admit. But did you find anything within the structure of the Zoom session to be of influence in any way, shape or form?

A. No. I was only paying attention to the person that was speaking to me, so no.

MS. TROMBETTA: So I don't have

**SA1232**

Page 95

V. KOI-PLOSKI

any other questions.

(Whereupon, an off-the-record discussion was held.)

MR. DUFF:  I would like to indicate that I will order a copy of the transcript.

MR. HAIMSON:  The parties have conferred and would like to use the standard stipulations with the exception of the stipulation that filing and sealing be waived.  That stipulation should be removed.

(Whereupon, at 12:04 P.M., the Examination of this witness was concluded.)

o            o            o            o