# 25-817-CV

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

❯❯❮❮

ANNAMARIE TROMBETTA, ARTIST,

*Plaintiff-Appellant,*

*v.*

NORB NOVOCIN, MARIE NOVOCIN,
ESTATE AUCTIONS, INC., WORTHPOINT CORPORATION,

*Defendants-Appellees,*

WILLIAM SEIPPEL, WORTHPOINT.COM,
JASON PACKER, EMPLOYEE AT WORTHPOINT CORPORATION,

*Defendants.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York*

## SUPPLEMENTAL APPENDIX
## VOLUME 7 OF 12
## Pages SA1382 to SA1660

WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP
*Attorneys for Defendant-Appellee
WorthPoint Corporation*
150 East 42nd Street, 23rd Floor
New York, New York 10017
212-490-3000

 (212) 719-0990
appeals@phpny.com

## Table of Contents

**Page**

### Volume 1

Proposed Amended Complaint, dated January 17, 2020,
with Exhibits .................................................................. SA1

Plaintiff's Response in Opposition to Defendant's Motion to
Dismiss Amended Complaint, dated February 21, 2020,
with Exhibits .................................................................. SA64

Opinion and Order of the Honorable Sarah L. Cave,
dated March 19, 2020 .................................................... SA112

Protective Order of the Honorable Sarah L. Cave,
so-ordered on February 16, 2022 .................................. SA126

Order of the Honorable Sarah L. Cave,
so-ordered on December 8, 2022 .................................. SA130

Order of the Honorable Sarah L. Cave,
so-ordered on December 20, 2022 ................................ SA131

Memorandum by Plaintiff in Support of Motion
for Leave to File a Proposed Amended Complaint,
dated December 23, 2022 ............................................. SA134

Proposed Second Amended Complaint,
dated December 23, 2022 ............................................. SA216

Exhibits to Memorandum by Plaintiff in Support of Motion
for Leave to File a Proposed Amended Complaint ....... SA237

Order of the Honorable Sarah L. Cave,
dated December 29, 2022 ............................................. SA264

Order of the Honorable Sarah L. Cave,
dated February 2, 2023 ................................................ SA266

**Table of Contents**
**(Continued)**

**Page**

Defendant WorthPoint Corporation's Omnibus Motion
*in Limine* Concerning Experts, dated April 10, 2023 ..................... SA268

Declaration of Jana S. Farmer in Support of Defendant's
Motion *in Limine*, dated April 7, 2023 ......................................... SA270

**Volume 2**

Exhibit A to Farmer Declaration -
Documented Communications from WorthPoint's
Counsel to Plaintiff .................................................................... SA273

Exhibit B to Farmer Declaration -
Expert Affidavit of Patrick O'Leary,
sworn to December 5, 2022, with Exhibits ............................ SA298

Exhibit C to Farmer Declaration -
Expert Disclosure and Expert Report of
Joseph V. Scelsa, dated February 16, 2023,
with Exhibits ........................................................................ SA327

Exhibit D to Farmer Declaration -
Transcript of Proceedings held before the
Honorable Sarah L. Cave on November 23, 2022 ................. SA390

Notice of Motion by Defendant WorthPoint Corporation
for Summary Judgment, dated April 17, 2023 ............................. SA458

Declaration of Jana S. Farmer in Support of Defendant's
Motion for Summary Judgment, dated April 17, 2023 ................. SA460

**Volume 3**

Exhibit A to Farmer Declaration -
Deposition Testimony of Annamarie Trombetta,
taken August 30, 2022 ........................................................... SA465
*(cont'd in Vol 4)*

**Table of Contents**
**(Continued)**

**Page**

**Volume 5**

Exhibit B to Farmer Declaration -
Deposition Testimony of Norb Novocin,
taken September 21, 2022 ...................................................... SA837

Exhibit C to Farmer Declaration -
Redacted Deposition Testimony of Willie Chu,
taken October 7, 2022 ........................................................... SA1084

**Volume 6**

Exhibit D to Farmer Declaration -
Redacted Deposition Testimony of Vanessa Koi-Ploski,
taken October 17, 2022, with Cover Letter ........................... SA1136

Exhibit E to Farmer Declaration -
Redacted Defendant WorthPoint Corporation's
Expert Disclosure Pursuant to FRCP Rule 26(a)(2)
of Jessie Stricchiola, dated January 19, 2023,
with Report and Exhibits ....................................................... SA1237

Exhibit F to Farmer Declaration -
Redacted Declaration of Jason Packer,
dated January 19, 2023, with Exhibits .................................. SA1280

Exhibit G to Farmer Declaration -
Declaration of William H. Seippel,
dated April 17, 2023, with Exhibits ...................................... SA1303

Exhibit H to Farmer Declaration -
Expert Affidavit of Patrick O'Leary,
sworn to December 5, 2022, with Exhibits ........................... SA1349

**Volume 7**

Exhibit I to Farmer Declaration -
Deposition Testimony of Patrick O'Leary,
taken February 28, 2023 ....................................................... SA1382

iii

**Table of Contents**
**(Continued)**

**Page**

Exhibit J to Farmer Declaration -
Google Search Results, dated March 15, 2017 ..................... SA1654

Exhibit K to Farmer Declaration -
Screenshots of the WorthPoint Report ................................. SA1655

**Volume 8**

Exhibit L to Farmer Declaration -
Defendant WorthPoint's First Request for Production,
dated February 25, 2022 ........................................................ SA1661

Exhibit M to Farmer Declaration -
Plaintiff's Response to WorthPoint's First
Request for Production, dated April 22, 2022 ....................... SA1674

Exhibit N to Farmer Declaration -
WorthPoint's Post-Deposition Demands to Plaintiff,
dated October 6, 2022 ........................................................... SA1691

Exhibit O to Farmer Declaration -
Plaintiff's Response to WorthPoint's Post-Deposition
Demands, dated October 20, 2022, with Attachments .......... SA1701

Exhibit P to Farmer Declaration -
Deposition Testimony of Scott Goodwillie,
taken October 6, 2022, with Cover Letter ............................ SA1800

Rule 56.1 Statement of Material Facts by Defendant
WorthPoint, dated April 17, 2023 ................................. SA1884

Letter from Jana S. Farmer to the Honorable Sarah L. Cave,
dated May 9, 2023 ........................................................ SA1896

Exhibit A to Letter -
Email from Adam Bialek to Annamarie Trombetta,
dated January 18, 2022 ......................................................... SA1901

iv

**Table of Contents**
**(Continued)**

**Page**

Exhibit B to Letter -
WorthPoint's First Set of Interrogatories,
dated February 25, 2022 ........................................................ SA1903

Exhibit C to Letter -
Plaintiff's Third Response to WorthPoint's
Interrogatories, dated June 27, 2022 .................................... SA1916

Exhibit D to Letter -
Various Email Correspondence,
dated July 19, 2022 through August 8, 2022 ......................... SA1926

Exhibit E to Letter -
Various Email Correspondence,
dated September 9, 2022 to September 12, 2022 ................... SA1935

Exhibit F to Letter -
Email from Annamarie Trombetta to Nicole Haimson,
*et al*., dated September 15, 2022 .......................................... SA1939

Exhibit G to Letter -
Various Email Correspondence,
dated September 15, 2022 to September 28, 2022 ................. SA1940

**Volume 9**

Exhibit H to Letter -
Post-Deadline Court Submissions
Regarding Expert Disclosure Issues ...................................... SA1943

Exhibit I to Letter -
Redacted Documents Relating to Dr. Joseph Scelsa's
Opinions and Qualifications .................................................. SA1952

Exhibit J to Letter -
Redacted Expert Report of Gayle Skluzacek,
dated February 21, 2023, with Attachments .......................... SA2016

**Table of Contents**
**(Continued)**

**Page**

Plaintiff's Opposition Response to Defendant WorthPoint's
    Motion to Preclude and Proffer Plaintiff's Expert Witnesses,
    dated May 19, 2023 ........................................................................ SA2051

Defendant WorthPoint's Response to Plaintiff's (Trombetta's)
    First Set of Notice to Admit for Defendants [Sic] WorthPoint
    Corporation, dated April 8, 2022 .................................................. SA2069

WorthPoint' s Responses and Objections to Plaintiff's
    Request for the Production of Documents and Photos,
    dated April 8, 2022 ........................................................................ SA2087

Defendant Worth Point's Responses and Objections to
    Plaintiff's Request for the First Set of Interrogatories for
    Defendants WorthPoint Corporation, dated April 8, 2022 ........... SA2115

Defendant Worth Point Corp.'s Response to Plaintiff's
    Second Request for Admissions, dated July 13, 2022 .................. SA2132

Defendant WorthPoint Corp.'s Answers to Plaintiff's
    Second Set of Interrogatories for Defendant WorthPoint
    Corporation, dated July 1, 2022 ................................................... SA2146

Defendant WorthPoint Corp.'s Answers to Plaintiff's
    Second Request for Production of Documents,
    dated July 1, 2022 ........................................................................ SA2157

Defendant WorthPoint Corp.'s Responses to Plaintiff's
    Third Request for Interrogatories, dated August 15, 2022 ........... SA2167

Defendant WorthPoint Corp.'s Responses and Objections
    to Plaintiff's Third Request For Production of Documents,
    dated August 15, 2022 .................................................................. SA2182

Defendant WorthPoint Corp.'s Responses and Objections
    to Plaintiff's Fourth Request For Production of Documents,
    dated October 11, 2022 ................................................................ SA2194

**Table of Contents**
**(Continued)**

**Page**

**Volume 10**

Exhibits to Plaintiff's Opposition Response to Defendant
  WorthPoint's Motion to Preclude and Proffer Plaintiff's
  Expert Witnesses ............................................................ SA2208

Exhibits to Plaintiff's Opposition Response to Defendant
  WorthPoint's Motion to Preclude and Proffer Plaintiff's
  Expert Witnesses ............................................................ SA2241

Declaration of Jana S. Farmer in Opposition to Plaintiff's
  Various Motions *in Limine* and Motions to Proffer,
  dated May 30, 2023 ........................................................ SA2264

    Exhibit A to Farmer Declaration -
    First Initial Disclosure of Defendant WorthPoint
    Corporation Pursuant to FRCP 26(A)(1),
    dated February 25, 2022 ........................................... SA2267

    Exhibit B to Farmer Declaration -
    Redacted Declaration of Jason Packer,
    dated January 19, 2023, with Exhibits ................................. SA2273

    Exhibit C to Farmer Declaration -
    Redacted Defendant WorthPoint Corporation's
    Expert Disclosure Pursuant to FRCP Rule 26(a)(2) of
    Jessie Stricchiola, dated January 19, 2023, with Exhibits ..... SA2296

    Exhibit D to Farmer Declaration -
    Email from Jana S. Farmer to Annamarie Trombetta,
    *et al*., dated October 11, 2022 ............................................. SA2339

Plaintiff's Response to Defendants Estate Auctions Inc. and
  Norb and Marie Novocin's Motion for Summary Judgment,
  dated May 30, 2023 ........................................................ SA2340

Exhibits 1-12 of Plaintiff's Response to Defendants
  Estate Auctions Inc. and Norb and Marie Novocin's
  Motion for Summary Judgment ................................................. SA2372

**Table of Contents**
**(Continued)**

**Page**

Exhibits 13-21 of Plaintiff's Response to Defendants
    Estate Auctions Inc. and Norb and Marie Novocin's
    Motion for Summary Judgment ...................................................... SA2410

Exhibits 22-35 of Plaintiff's Response to Defendants
    Estate Auctions Inc. and Norb and Marie Novocin's
    Motion for Summary Judgment ...................................................... SA2445

**Volume 11**

Exhibits 36-38 of Plaintiff's Response to Defendants
    Estate Auctions Inc. Motion for Summary Judgment .................. SA2482

Exhibit 41 of Plaintiff's Response to Defendants
    Estate Auctions Inc. and Norb and Marie Novocin's
    Motion for Summary Judgment ...................................................... SA2525

Exhibits 39-41 of Plaintiff's Response to Defendants
    Estate Auctions Inc. Motion for Summary Judgement ................ SA2547

Letter from Annamarie Trombetta to the Honorable
    Sarah L. Cave, dated June 1, 2023 .............................................. SA2582

        Exhibit 1 to Letter -
        Various Email Correspondence between Annamarie
        Trombetta and Art Appraiser Gayle Skluzacek ..................... SA2584

        Exhibit 2 to Letter -
        Various Email Correspondence between
        Annamarie Trombetta and Dr. Joseph Scelsa ........................ SA2596

        Exhibit 3 to Letter -
        Plaintiff's Communication with Defendants
        for Witnesses ......................................................................... SA2618

        Exhibit 4 to Letter -
        Problems and Delays Caused by WorthPoint Defendants ..... SA2632

**Table of Contents**
**(Continued)**

**Page**

Exhibit 5 to Letter -
Plaintiff's Illness Beginning December 7, 2022
into Late January 2023 ........................................... SA2673

Exhibit 6 to Letter -
WorthPoint Attorneys 2023 Emailing Plaintiff
Requesting Expert Witness Depositions ............................... SA2676

Exhibit 7 to Letter -
Ebay Phone Call Transcript .................................... SA2682

Exhibit 8 to Letter -
List and Number by Month February to
December 2022 Plaintiff's Problems with Defendants ......... SA2708

Plaintiff's Response to Defendant WorthPoint Corporation's
Motion for Summary Judgment, dated June 7, 2023 ................... SA2721

**Volume 12**

Exhibits 1-9 to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2759

Exhibit 10 to Plaintiff's Response to Defendant WorthPoint
Corporation's Motion for Summary Judgment ........................... SA2792

Exhibits 12-18D to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2822

Exhibits 19A-24 to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2857

Exhibits 25A-27 to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2888

Exhibits 28-30D to Plaintiff's Response to Defendant
WorthPoint Corporation's Motion for Summary Judgment ......... SA2922

**Table of Contents**
**(Continued)**

                                                                    **Page**

Letter from Jana S. Farmer to the Honorable Sarah L. Cave,
    dated June 8, 2023 .......................................................... SA2947

Opinion and Order of the Honorable Sarah L. Cave,
    dated June 22, 2023 ...................................................... SA2949

Order of the Honorable Laura Taylor Swain, dated July 5, 2023 ....... SA2966

x

**SA1382**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

ANNAMARIE TROMBETTA,

PLAINTIFF,

-against-          Case No.:

18-cv-00993-RA-SLC

NORB NOVOCIN, MARIE NOVOCIN, ESTATE

AUCTIONS, INC., AND WORTHPOINT CORPORATION,

DEFENDANTS.

----------------------------------------X

DATE: February 28, 2023

TIME: 11:12 A.M

VIRTUAL DEPOSITION of a

non-party witness, PATRICK O'LEARY, taken

by the Defendant, pursuant to a Notice and

to the Federal Rules of Civil Procedure,

held remotely, at the above date and time,

before Nathan Davis, a Notary Public of the

State of New York.

THIS PAGE INTENTIONALLY LEFT BLANK

Page 2

A P P E A R A N C E S:

ANNAMARIE TROMBETTA
   Plaintiff Pro Se
   175 East 96th Street, Apartment 12R
   New York, New York, 10128
   Atrombettaart@gmail.com

DUFF LAW, PLLC
   Attorneys for the Defendants
   NORB NOVOCIN, MARIE NOVOCIN, ESTATE
   AUCTIONS, INC.
   43-10 Crescent Street, Suite 1217
   Queens, New York 11101
   BY: ANDERSON JOSIAH DUFF, ESQ.
   Ajd@hoganduff.com


WILSON ELSER MOSKOWITZ EDELMAN &
DICKER, LLP
   Attorneys for the Defendant
   WORTHPOINT CORPORATION
   150 East 42nd Street
   New York, New York 10017
   BY: JANA SLAVINA FARMER, ESQ.
          -and-
        ADAM R. BIALEK, ESQ.
   File #: 19701.00006
   Jana.farmer@wilsonelser.com
   Adam.Bialek@wilsonelser.com


ALSO PRESENT:
   ROBERT SCHMIDT

              *         *         *

Page 3

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*    *    *    *

**SA1385**

Page 4

P. O'LEARY

PATRICK O'LEARY, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MS. FARMER:

THE COURT REPORTER:  Please state your name for the record.

A.    Patrick Michael O'Leary.

THE COURT REPORTER:  What is your address?

A.    My address is ███████████ ████████████████████████████████.

Q.    Good morning, Mr. O'Leary.

A.    Good morning.

Q.    My name is Jana Farmer.  I'm an attorney representing Defendant WorthPoint in connection with this matter.  Also present is attorney Anderson Duff, who represents Co-Defendants Norb and Marie Novocin and Estate Auctions, Inc.  He also has the right to ask you questions today.

We are here today because you are designated as an expert witness in

Page 5

P. O'LEARY

connection with a matter by Plaintiff AnnaMarie Trombetta.

Do you understand that?

A.    Yes.

Q.    I'm going to ask you today a series of questions concerning your involvement in this matter.  Before we begin, we need to go over some ground rules.

Have you ever been deposed before?

A.    Yes.

Q.    How many times, approximately?

A.    I've lost count.

Q.    More than 100?

A.    I wouldn't say more than 100.

Q.    More than 50?

A.    30.

Q.    Any of those depositions in New York State?

A.    Say again, I'm sorry?

Q.    Were any of these depositions taken in New York State?

A.    No, no -- well, it depends.  I

Page 6

                        P. O'LEARY
mean, you know, I was here, but it's for like, cases in other places.  So how do you define that?  It wasn't for a New York State court, if that --

Q.    Okay.  Well, let's ask if any of these deposition were under New York State or federal procedures.

A.    Yes.

Q.    Were any of these depositions taken of you as an expert witness?

A.    Yes.

Q.    And how many expert depositions have you given before?

A.    Probably in the 20s.

Q.    So I'm just going to remind you some of the ground rules; I'm sure you remember them well from the number of deposition you've done.

But please respond to all questions verbally, as the court reporter cannot take down nods or shakes of the head.

Please let me or Mr. Duff finish our questions before beginning to

Page 7

                    P. O'LEARY

respond, and we will wait until you finish

your answer before asking the next

question, because otherwise, the record

will be very choppy.

          If at any point you do not

understand the question, please let us know

and we will be happy to rephrase it.

          If you answer that question, we

will assume that you understood it; is that

fair?

     A.    Fair enough.

     Q.    If you need to take break for

any reason, please let us know.  One

exception is, please answer the pending

question before taking the break.

          That okay?

     A.    That's fine.

     Q.    Sorry to ask you this, but it's

just a foundation question.

          Is there anything that prevents

you from thinking clearly and testifying

truthfully today?

     A.    No.

     Q.    Mr. O'Leary, is it correct that

Page 8

P. O'LEARY

you were retained by Ms. Trombetta in connection with this matter, as an expert?

A.   Yes.

Q.   Is there an engagement letter that describes the scope of work you were asked to perform?

A.   No.

Q.   How did Ms. Trombetta engage you; was it by email, phone call, something else?

A.   I think she just queried for experts on the internet, and then came across my CV at patrickoleary.com -- or at expertwitness.com, which is my own company -- and reached out to me.

Q.   Thank you.

How did she reach out to you?

A.   By phone.

Q.   When you had that first phone call with Ms. Trombetta, did you take notes?

A.   No.  It was pretty much just a -- I think it was almost a two- to three-hour conversation, but it was all

Page 9

P. O'LEARY

verbal.

Q.   It was a three-hour conversation and you took no notes?

Just to confirm.

A.   No, you -- you know the drill. You have to do a conflict check and all of that stuff; a lot of that was the overhead, the procedural stuff.  Then getting into, you know, what about the case, where it was, and then am I able to help her in her case.

Q.   After that first conversation, have you had subsequent phone conversations with Ms. Trombetta?

A.   Yes.

Q.   How many have you had?

A.   We've had quite a number of conversations.  If I had to put a number to it -- oh gosh, let me see, let me think. Hang on.  I think I made some notes, actually, to that effect.  Probably 20 to 30 conversations over the last six months.

Q.   Mr. O'Leary, you just mentioned that you kept notes to the effect as far as

Page 10

P. O'LEARY

how many conversations you had with Ms. Trombetta.

These notes, can you please describe them?

A.    It would say in such and such a month, you know, how many calls I might have made or something like that.

It was just quick scratch notes, you know, that I would have made.  I obviously threw it out, because it wasn't significant.

Q.    Is Ms. Trombetta compensating you for your services as an expert?

A.    She is being -- she's a pro se. Her cash flow is limited, so she pays me with what she can.

Q.    Did you keep records of how long did you spend working on this case for Ms. Trombetta?

A.    Round about, you know.  I tend to -- my billing's a little different than most experts; I don't bill to every minute and second.

For example, if there's

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 11 of 272

Page 11

P. O'LEARY

something I can directly help someone with in a case, you know, I keep track of that; if it's something that's just, you know, general banter or discussion, or just brainstorming, I probably don't bill for that.

If there's something I have to go out and learn -- you know, if it's something I have to learn and I'll never need it again -- I bill for that.  And if it's something I have to go out and learn and -- what do you call it -- I will use it again, I typically don't bill for that.

Q.    How many hours of time have you recorded as having spent on Ms. Trombetta's case, to date?

A.    Since August, I conceivably could have had, oh, I don't know, 50 to a 100, maybe more.  I don't know; I can't really quantify that directly for you.

Q.    Do you have any records that would help you quantify how much time you spent on Ms. Trombetta's case?

A.    No, because this thing's been

Page 12

                    P. O'LEARY
kind of all over the place.  I have some
rough estimates, you know?
          I generally deal with certified
mandates.  Getting ready for this, I
actually put a lot of hours in.  Getting
the subpoena -- not the subpoena, excuse
me -- getting the affidavit back in
December, there was a significant number of
hours.  Let's see.  Then there was an email
that had to get cracked open; that took a
little bit of time to actually do that.
Then I actually sent you all an email on
December 2nd, you know; we had to work
through that.  So around those times there
were bursts of time.
          But generally, I usually round
down my hours.  I think Ms. Trombetta will
tell you, I'm pretty generous with my time.
     Q.    Mr. O'Leary, how much did
Ms. Trombetta pay you, so far, for this
case?
     A.    It's somewhere less than
$1,000.
     Q.    Do you have records confirming

Page 13

P. O'LEARY

what payments Ms. Trombetta has paid to you?

A.    I have some checks, but they have not been cashed.

Q.    Are you planning to cash these checks?

A.    That usually is what I would do, yes.

Q.    Are you anticipating that you will be paid more for this case, by Ms. Trombetta?

A.    That's -- yes, of course.

Q.    Do you have any time that was billed but not yet paid for?

A.    Yeah, because there's been a lot of hours put into getting ready for this deposition.

As I said earlier, you know, dealing with the affidavit on December 5th, dealing with the email that was sent to you all on December 2nd, just general discussion and bantering back and forth, you know, discussing the case, explaining things, learning the case.

Case 1:18-cv-00993-LTS-SLC   Document 425-9   Filed 04/17/23   Page 14 of 272

Page 14

P. O'LEARY

In my case, I had to learn some of the details, because this seemed to be going on a heck of a long time.  And then, in my case, actually explain stuff to her.

Q.    So Mr. O'Leary, can you quantify for us, in any way you can, how much time is still outstanding to be paid for, or maybe to which services are still outstanding to be paid for?

A.    Everything's hourly as an expert.  So you know, there's probably, like I said, 50 to 100 hours that's outstanding that -- there could be more than 100 hours; I'd actually have to sit down and actually detail it, and actually think through how much it is.

This thing's been kind of rush, rush, rush, hurry up and wait.  You guys wanted something, she wanted -- you know.

I was just more focused on dealing with the problem at hand than to be, you know, a bean counter.

Q.    So as far as the majority of the time that you spent for this case, you

Page 15

P. O'LEARY

have not yet been paid for it; is that right?

A.    That's correct.

Q.    For about the $1,000 that Ms. Trombetta did pay you for, what did she compensate you for with that payment?

A.    She gets back to task-related issues.  But at the end of the day, it always -- you know, as an expert, it's your time that you get paid for.

Q.    Right.  So what did you do with your time for the time that she did pay you for; what specific tasks?

A.    It would have been for like, working on the affidavit December 5th, working on getting the email over to you on December 2nd would have been -- you know, all the stuff related to this case as things came up, getting ready for today, these are all the different things that had to get done.

But I wouldn't say it was directly earmarked for one specific task; I have to think about it as hours, because

Page 16

P. O'LEARY

that's just the model that an expert uses.

Q.    So if you think about this as hours, the $1,000, how many hours of your time does that represent?

A.    Well, my hourly rate is $375.

Q.    So is it fair to say that Ms. Trombetta paid you for slightly more than two hours of your time so far?

A.    Thereabouts, yeah, I guess.

Q.    And she still has to pay you for 50 to 100 -- maybe more -- hours, correct?

A.    That's the way the model works in the industry.

Q.    But do you expect to be paid for 50 to 100 or more hours of your time, by Ms. Trombetta?

A.    You know, I like her; I like you.  But I'm in this to pay bills and to make money, so no, I expect to be paid.

Q.    Thank you, Mr. O'Leary.

And I appreciate you like me and Ms. Trombetta, but I just want to confirm, are you anticipating to be paid

**SA1398**

Page 17

P. O'LEARY

$375 an hour times 50 to 100 hours by Ms. Trombetta?

I just want to know that specific --

A.    That's the idea.  There's a lot of other things I can do with my time than sitting here in a deposition.

Q.    Now, you said at some point you need to sit down and figure out exactly how much you're going to bill Ms. Trombetta; is that correct?

A.    Yes, yes.

I mean, she probably wants things itemized.  You know, to me, I just kind of keep track of things in man-days, man-day, person-days, which are usually eight-hour blocks.

Like December 1st through 5th, there was a lot of hours because of the crunch to get the affidavit done and the other activities that had to be done.  But then, for example, in January there was very few hours, if any.

Q.    My question to you is, when you

Page 18

P. O'LEARY

sit down looking to figure out what you will bill Ms. Trombetta, what records, if any, would you consult in order to come up with your bill?

A.    I would just roll back, in the form of a timeline, all the activities that have taken place, and break it down.

From August, September, October, November, a lot of it was just learning about the case, discussing the case, you know; there weren't many man-days during that timeframe.

I don't know.  Let's say two -- maybe two to three man-days in a month might have had happened, you know, because she was actually having to deal with other issues in the case.

But then, for example, in the first five days of December, you know, I probably put in ten hours, you know, each day, for those first five -- those five days, you know, so that affidavit could go out the door.

(Court reporter asks for

Page 19

P. O'LEARY

clarification.)

Q.    Mr. O'Leary, if it makes you comfortable, please continue using man-days.  We are not offended.

So my question to you is, if you are going to be composing an invoice to Ms. Trombetta, are you going to reconstruct what you've done from August up until now from memory, or will you be consulting any records?

A.    It's going to be a hybrid, okay?  Because some of it, if there wasn't something that I was actually documenting and doing that, you know, it's going to be X number of hours.

But in those cases, I always round down to the client's benefit.  I significantly round down to the client's benefit.

Q.    So it would be a hybrid:  Both from memory and consulting documents.

Which documents will you consult?

A.    Okay.  The affidavit of

Page 20

P. O'LEARY

December 5th.  The email that went out the door on -- to you all, with that EML file, on December 2nd.  Let's see.  Preparing for this documentation would be quite a bit.

If you recall, you got an email from me at 5:00 A.M. this morning.  You know, that's when I decided to test the connection, so we didn't have it at the last minute.

So from yesterday morning from 8:00, 9:00 in the morning, all the way through to now, I've been kind of just going over documents, going over evidence, going over Bates-stamp issues -- excuse me -- documents, and preparing for today.

Q.    Would there be any other records you would consult in preparing an invoice for Ms. Trombetta?

A.    There might be some emails that I have to refer to, if there was something significant in an email that went back and forth, if she sent me things in email, or I sent her stuff in email.

Generally, I don't keep copies,

Page 21

P. O'LEARY

I don't keep versions of an affidavit or a declaration or a report; I keep overwriting the same one.  So if something says "version five," there's only that version; there isn't one, two, three and four.

That's just a practice I've been doing for 20 years.

Q.    As you sit here today, do you remember whether or not you exchanged emails with Ms. Trombetta?

A.    Yeah, of course I exchanged emails with her at some point in time, over time.

MS. FARMER:  So we will call for the production of copies of all emails that you have exchanged with Ms. Trombetta.  We'll be happy to follow up in writing.

THE WITNESS:  Okay, no worries.

MS. FARMER:  Thank you.

Q.    Besides the document that you mentioned before, with the December 5th affidavit, the December 2nd email to us all, documents you reviewed in preparation

Page 22

P. O'LEARY

for today's deposition, and emails with Ms. Trombetta, would you be consulting any other documents when you would be preparing an invoice for Ms. Trombetta?

A.    Yes.  I mean, like, if I print -- if she sent me a piece of evidence, okay, something that was Bates-stamped that she sent to me, and I go print that out, that, I will then use, okay?

So there's been a lot of evidence going back and forth in this case, so all of that would probably be used if I felt that it was fruitful.

Q.    And besides what we already mentioned, and any Bates-stamped evidence, would there be any other documents that you would consult in preparing your invoice to Ms. Trombetta?

A.    There might be stuff on web pages -- websites -- that might have been referenced or looked at.  Maybe I went and looked at something on Google, maybe I looked at something on your client's

Page 23

P. O'LEARY

websites, maybe I looked at something on some of the other art sites, or maybe I looked at something on maybe eBay or whatever.  So it would be a lot of other documents that I may refer to.

Q.    How do you print out or otherwise capture any of the websites up until now?

A.    Yeah, I've got some documents that have been printed out.  And if you want them, you can have them.

MS. FARMER:  Yes, I do want them.  We call for the production of any materials that you have referenced in your work for Ms. Trombetta on this file.

So if you printed a website, please produce that; if you screenshotted or otherwise saved the web page, please produce that.

Also, to the extent that if you have records of man-hours or person-hours that you have spent on the case, please produce that.  And

Page 24

P. O'LEARY

also, the checks that you received from Ms. Trombetta.

We will be happy to follow up in writing.

THE WITNESS:  Okay.  All right.

Q.    In 20, 30 conversations that you had with Ms. Trombetta in the last six months, in general, what did you discuss with her?

A.    It could have been a range, whatever was the hot topic going on in the case.  So if it was something going on back when you were all doing discovery, we might have had discussion about discovery, you know; if it was something around early December, while the end of November you all had a conference, maybe we would have discussed that; in early December, it would have been maybe discussing the issues of discovery -- compliance issues of discovery that were addressed in the affidavit, you know?

Then there would have been -- your folks generated two reports -- I'm

Page 25

P. O'LEARY

sorry, excuse me, one declaration, one report; that's been looked at.  You sent me a subpoena; that got looked at.

Q.    Mr. O'Leary, in several of your answers recently you used the word "maybe."  For example, "I maybe looked," "I may have discussed."  In this proceeding, we need to be precise and not guess, so if you are guessing, I would ask you to please not guess.  If you remember something specifically or know something specifically, if I may ask you to please not use "maybe."

So when you just outlined the discussions that you maybe had with Ms. Trombetta, do you remember having these discussions, or are you guessing you may have had them?

A.    These things would have come up in the discussions.  She was --

Q.    Do you remember having these discussions?

A.    Yeah.  I mean, she would have had -- now, I mean, if something wasn't

Page 26

P. O'LEARY

considered -- I mean, you might think of something -- you go look at something, and then you decide it's not fruitful for the purpose of what you're working on at that moment, so that's why it's a maybe.

Q.   Okay.  Well, thank you for clarifying that.

But do you appreciate the need, in a legal proceeding, to be precise, and not guessing?

A.   Of course, yes.

Q.   Okay, great.  So let's try to not guess from now on.

Did Ms. Trombetta provide you with documents?

A.   Yes.

Q.   How did she provide you with documents; by email, by mail, something else?

A.   Email.

Q.   Did they come as attachments, did she send you a link to a drive somewhere, something else?

A.   Mostly attachments, but there

Page 27

P. O'LEARY

were certainly links sent for me.

Q.   Did you print out or save all of the documents that Ms. Trombetta provided to you?

A.   Yes.  But if documents were sent to me maybe multiple times, I may not have those saved.  I'm not saying I don't. They may not be saved because there would be duplicates.

But no, if she sent me documents through email, I mean, I would have them saved.

MS. FARMER:  Thank you.

I would call for production of all documents that Ms. Trombetta provided to you in connection with this case.

THE WITNESS:  Okay.

At the end of all this, you'll give a list of all of these calls, correct?

MS. FARMER:  We'll be happy to follow up on our post-deposition requests for production.

Page 28

P. O'LEARY

THE WITNESS:  No worries.
 Good.

Q.    Have you ever met Ms. Trombetta
in person?

A.    Let's see.  Have I met her --
yeah, at one time I met her in person.

Q.    Where did that meeting take
place?

A.    I was in the City, and since
she lives in the City, you know, let's just
meet for a period of time.

Q.    Where did you meet?

A.    Oh gosh, I don't know.  It was
someplace in Manhattan; I don't remember
the name of the place.

Q.    Was it some third-party
location?

A.    Yeah, yeah.

Q.    Was it an office, a restaurant,
some other location?

A.    I think it was just a
restaurant.

Q.    What was discussed during that
meeting?

Page 29

P. O'LEARY

A.    Whatever was the hot topic that moment that we talked; whatever was --

The pressing moment of the case would have been discussed, and then maybe, perhaps, where the case might have been going, how I would fit in, how I could help other experts, how she can piece the puzzle together, her legal strategy.

Q.    Did you say "her legal strategy"?

A.    Yes.

I mean, she is a litigant; has a legal strategy; you have a legal strategy.  You know, maybe how I might be a part of that might have been discussed.

Q.    Were you advising Ms. Trombetta on her legal strategy?

A.    I was advising her on business and technology things, items, as an expert.

I'm not a lawyer, so I was not giving her legal advice.

Q.    How long was that meeting in person?

A.    90 minutes, an hour.  I don't

**SA1411**

Page 30

P. O'LEARY

know.  Somewhere in that range.

Q.    When did you first meet Ms. Trombetta?

And by "meet," I don't mean just meet in person, but also like, first interacted with her.

A.    Sometime in August; middle of August, if I recall.

Q.    And that's August of 2022?

A.    Yes.

Q.    Do you have a personal relationship with Ms. Trombetta outside of your services as an expert in this matter?

A.    No.

Q.    Did you inspect her Yahoo inbox as part of your work in connection with this matter?

A.    Yes.

Q.    How did you do that; in person, remotely, somehow else?

A.    They gave me her user name, password, and access code, and I got in.

Q.    So I take it that was remote, you were not together in person when you

**SA1412**

Page 31

P. O'LEARY

inspected her Yahoo inbox, correct?

A.   No, I didn't need to be in person for something like that.

Q.   Did you ever review the court docket in connection with the matter of Trombetta versus Novocin?

A.   I'm sorry, review the case docket?

Q.   Court documents, correct?

A.   Court documents, like on PACER?

Q.   Like on PACER.

A.   Correct.

Q.   What have you reviewed on that docket?

A.   I have a PACER account that I use for any case that I work on.

So mostly, I would have gone and queried the case, and I would have gone into the history -- the history document -- I would dump them in chronological order with the docket text checked.

In the beginning of a case, you know, when you're doing a conflict check, I'll actually view some of the other links

Page 32

P. O'LEARY

to see who was involved in this thing, to make sure there's no conflict issues.

Q.    Presently, I believe there are over 370 docket entries on PACER for this case.

Have you actually reviewed the link -- the documents underlying the links for each of those, or not yet?

A.    I wouldn't even know how many there were that contained documents.

You know, if there were some of them that I needed to go look at, I did, absolutely; you know, if there wasn't, there was no need to.

Maybe she was able to go get it through her resources, and then maybe she sent it to me.  More than likely, that's probably what happened.

Q.    Is it fair to say to say that you reviewed some but not necessarily all of the filing in the court docket for the filing in this matter?

A.    We're talking about pacer.gov now, correct?

Page 33

P. O'LEARY

Q.   Well, let's broaden that to the extent that Ms. Trombetta may have sent you documents, and to the extent you have access to the docket from systems other than PACER.

A.   Yeah, if she felt I needed a document, through her own cognitive reasoning she would have gone in and gotten it.

She used -- I think -- I don't remember the other system she uses. "Docket something," I think she called it.

Then she would have, you know, downloaded a document and sent it to me.

In some cases she might have given me the docket number, and then I would have gone in with my own account.

Q.   As you sit here today, do you know whether or not you have actually seen every single docket that was filed in this matter, or just some of them?

A.   Probably -- I don't want to say some; I don't want to say all.  So we'll probably put it in the range of "most."

Page 34

P. O'LEARY

How's that?

Q.    Whatever is true; whatever you are comfortable with.

Mr. O'Leary, have you been served with a subpoena in this matter?

A.    Yes.

MS. FARMER:  I'm going to ask the court reporter to mark this document as Exhibit A in this matter.

The way we will do it, since it's a remote proceeding, is I will email all of the marked exhibits to the court reporter and all parties after the conclusion of this deposition.

But Exhibit A is going to be a subpoena to testify in a deposition in a civil action directed at Patrick Michael O'Leary.

(Whereupon, a subpoena for Mr. O'Leary was marked as Defendants' Exhibit A for identification as of this date by the Reporter.)

Q.    Mr. O'Leary, I am showing you

Page 35

P. O'LEARY

what has been marked as Defendants'

Exhibit A, of today's date.  I'm going to

scroll to show you this is a three-page

document.  This is the last page and I'm

going back to the first page.

A.     Okay.

Q.     Is this the subpoena that you

received in this action?

A.     Scroll down a little bit.

Q.     Sure.  This good?

A.     Yeah, that looks like the

subpoena I received.

Q.     Did you receive a $40 check

with that subpoena?

A.     Yeah.

Q.     Do you understand that that

check is a fee that is required to pay any

witness in New York State, as opposed to a

fee you would expect to receive as

compensation for your services in

connection with this deposition?

A.     Okay.  So you're saying that's

a fee in addition to any expert fees?

Q.     I'm asking you a question,

Page 36

P. O'LEARY

so -- I'm not making a statement; I'm asking you a question.

Do you understand that this is a fee that is required to be provided to any deponent in New York State?

A.    I wasn't directly aware of that.  I just -- it was assumed that that's what you wanted to pay me for this deposition.

Q.    But you have received the $40 check, correct?

A.    It's sitting here on the desk. Yes.

Q.    Prior to this moment, have you reviewed that subpoena?

A.    Yes.

Q.    Did you see this section where it says "production," and it's checked?

A.    Yes.

Q.    And it has a request for production?

A.    Yes.

Q.    Have you done anything to prepare documents responsive to this

Page 37

P. O'LEARY

request for the production, until this moment?

A.    Well, first, you referenced the report, but I actually did an affidavit. But we went to split hairs there.

If there was something that you already had, and it would be redundant to send to you, I skipped over that, logically, in my mind.

Everything else as it pertains to the report came from Bates-stamped documents, which you had. It came from emails that was your evidence, your client's evidence; it came from there.

In the EML file, when I cracked that thing open and got that, that was actually used, you know, so that created the December 2nd email back to you. Since I sent you an email, there was no point in sending you that.

You know, Ms. Trombetta might have sent me something that I might have used in it, and I maybe would have relied on. Since it was your evidence to begin

Page 38

P. O'LEARY

with, that was skipped over.

You know, if it was relied on, and it was already in play, and available to the parties, there was no point to just keep sending paper to everybody.

Q.   Have you, in fact, sent any documents to us in response to our request to produce your entire file?

A.   Ms. Trombetta handled that, I believe, this morning.

MS. FARMER:  Please mark this email from AnnaMarie Trombetta, of February 28th, 2023, at 7:52 A.M., directed to Farmer, Jana S., with copied attachment to Patrick Michael O'Leary, Adam Bialek, Anderson Duff, and John Cahill, as Defendants' Exhibit B in this matter.

(Whereupon, an email chain was marked as Defendants' Exhibit B for identification as of this date by the Reporter.)

Q.   Mr. O'Leary, I'm showing you what has been marked as Defendants'

Page 39

P. O'LEARY

Exhibit B in this matter.  It is an email.
I'm going to scroll to the bottom of the
email to show you the entire document.
This is the bottom.  I'm going to return to
the top of the email.

I'm also going to point out to
you that this email has five PDF
attachments.  If you like, I can also open
each of the attachments and show them to
you.

My question is, are you
familiar with in email?

A.    Yes.  This is the email I
mentioned before.

Q.    Is this the email that you
mentioned when you were talking that
Ms. Trombetta -- when you testified that
Ms. Trombetta provided us with a copy of
your file?

A.    Yes.

Q.    Did you review the attachments
to this document today?

A.    Yes, I looked over it.

Q.    Other than Bates-stamped

Page 40

P. O'LEARY

documents that you were referring to as not being provided to us because we have them, does this represent the entirety of your expert file for this matter?

A.   It covers quite a bit; I'm not going to commit to saying it's my entire file, all my notes.  But I mean, you called for documents; we'll get those to you.

Q.   So this is not your entire file, even if we exempt the Bates-stamped documents; is that correct?

A.   No.  I'm sure there's more documents here that you would consider to be "in my file."  And you called for them, and we will send them to you.

Q.   If you look at the attachments to this email, do you see that the top attachment in the second column reads "30 Exhibits Plaintiff's December 5, 2022, letter follow-up to November 23, 2022, WorthPoint Defendants 30 pages PDF, (1).pdf, seven megabytes"?

A.   Yeah, correct.

Q.   Do you see, at the bottom of

Page 41

P. O'LEARY

the first column there is an attachment
with an absolutely same name?

A.   Yes.

Q.   Having reviewed this email and
attachments prior to today's deposition, do
you believe there was a mistake, and that
this attachment was inadvertently attached
twice?

A.   That appears to be the case.

Q.   Do you know what document is
supposed to be attached instead of the
second attachment of 30 Exhibits
Plaintiff's?

A.   I'm not sure at this moment.

There might have been another
document that might have been a mistake.
And if there is a mistake, we'll gladly
correct it for you.

Q.   Do you see how Ms. Trombetta
says, in her email, "attached are five
files," and under number 5 it says "5 is
WorthPoint's WP 132--133--134"; you see
that?

A.   Yes.

Page 42

P. O'LEARY

Q.    What do you understand this "WorthPoint WP 132--133--134" to be?

A.    I believe -- that's an email dialogue between Mr. Seippel and Mr. Packer, I believe.

Q.    Mr. O'Leary, what do you understand these numbers "WP 132, et cetera," to refer to?

A.    That would be the email that that would probably be -- I think that's the Bates stamp.

Q.    So is it correct that you intended to provide the Defendants with some Bates-stamped documents, but not necessarily all of them?

A.    In that case, that was something that I believe Ms. Trombetta figured would be coming up today, and so she wanted you to have that to comply.

Q.    So the documents that are attached to this email, was the selection made by you or by Ms. Trombetta?

A.    I believe it was just a combination of our discussions as we

Page 43

                    P. O'LEARY

discuss things in the case in the last day

or two.  And then it was like, okay, I need

this, they need this, and we just went back

and forth.

          She prepared the list, and

that's why she sent this email to you.

     Q.    But you had input in what

attachments she was going to send us,

correct?

     A.    This number with 51, yes, okay?

It would be these WorthPoint emails.

     Q.    Mr. O'Leary, that's not my

question.

          My question is, did you have

input in what attachments Ms. Trombetta

sent to us in response to our demand for a

copy of your file?

     A.    In discussing where we were in

the case, these things came up, and then

yes, I may have had input.  You know, it

was just something we went back and forth

on it and, okay, this is what they need.

     Q.    Mr. O'Leary, again, you're

saying you "may have" had input, and just

Page 44

P. O'LEARY

because we are lawyers, we need to confirm with you exactly.

Did you have input or did you not have input in selection of materials that Ms. Trombetta produced to us as your file?

A.    Yes, I believe I had input.

I don't know why we're splitting hairs on this.

Q.    It's just because you're using the words "may have" or "maybe"; that's why I'm following up on that.

A.    She may have said, you know, that we need to turn this over; I may have said it, you know?

I mean, we didn't keep track here on a chalkboard who said what; we just, you know, we went through and we figured out what you need, you know?

Q.    Besides this email from Ms. Trombetta, at 7:52 A.M., on February 28th, 2023, are you aware of any other documents being sent to Defendants representing the contents of your file?

Page 45

P. O'LEARY

A.    Can you drop this window down for a quick second, please?

Q.    Absolutely.

A.    I believe there's another document on Google URL removal that has to be -- that would have to be included in that last.  So there was another email there, I believe.

Q.    Why was this document not included in the email of 7:52 A.M. this morning, do you know?

A.    Well, how many emails -- did you just get one email from us?

Q.    By counsel, we got one email.

This is the email that we're discussing of 7:52 A.M., of this morning; I'm talking about emails with respect to producing documents from your file.

A.    Right, okay.  All right.  The five that you got, okay, are what I believe she sent over.

And I'm just basically saying, you know, when I look at it, we might have missed one document:  The Google -- how to

**Page 46**

P. O'LEARY

remove URLs from Google.

Q.    Was there any conscious decision on your part to not produce any documents to Defendant that were part of your file, besides the Bates-stamped documents that you already testified about?

A.    I was reviewing materials so that I could answer questions rather than trying to flip through the documents and prepare emails and attachments, and so Ms. Trombetta offered to handle that so we can be more efficient, and be able to, you know, get on the deposition.

If you recall, I did have a technology issue, so we had to -- I had to tend to that, to make sure that I could get connected so we could do this deposition today, so she handled getting the documents out to you.  It was just best use of resources and efforts with our respective time.

Q.    Out of your discussion with Ms. Trombetta, did she provide you with the expert disclosure deadlines that the Court

Page 47

P. O'LEARY

has proposed in this case?

A.    That came up in discussions.

Q.    What do you understand the expert deposition deadline in this case to currently be?

A.    We'd have to look at the scheduling order; I don't remember the exact dates.

Q.    Were you advised by Ms. Trombetta that all expert discovery must end by March 1st, 2023?

A.    Yes, I do remember seeing a March 1st date.  Either she mentioned it or I saw it in a document on the docket.

Q.    What have you done prior to today's deposition to prepare for your deposition?

You already mentioned you spent many hours, but I'm asking you now, specifically, what did you do?

A.    What I usually do in these situations is when I turn in a report or like, an affidavit, one of the things I will do is --

Page 48

P. O'LEARY

The affidavit was turned in in December -- on December 5th, right? So now, December 5th to January 5th to February 5th, you know, now we're in the -- we're talking what, ten weeks have gone by?

So what I end up usually doing is I look at an affidavit, and my review process, I almost like, reconstruct it. So I logically go through it in detail, almost as if I was rewriting it, but not quite that detail.

And then I could do a check on myself to make sure I agree with the same opinions, so that if something comes along that was changed, or some new information came along since it was submitted, that I could correct it in the deposition. So I do that.

You know, I went through, you know, I guessed on what kind of questions I thought you'd ask, so I looked at various documents to, you know, see what kind of questions you'd be asking, what kind of topics would come up today. So I go

Page 49

P. O'LEARY

research that.

Let's say I looked at your, you know, that fake ad thing you all have out there, you know, on WorthPoint, all right? I looked at that; I looked at all the issues with that. I looked at the WorthPoint email. I looked at -- let's see. I looked at the various declarations, I looked at the expert report, I looked at the Jason Packer declaration. Let's see.

Of course, I just told you I went through my own report here. There was some discussion initiated by Ms. Trombetta and Mr. Seippel, which then turned into a discussion with Jason Packer; I looked at that. I looked at --

Oh, I did spend a time going through your expert declarations, your -- Jason Packer's declaration, which I have a lot of issues with. And I'll be able to completely dispel that today, because their opinions are 100 percent wrong. So we'll deal with that today.

And then your expert Jessie

Page 50

P. O'LEARY

Stricchiola, she relied on Jason Packer,
and --

Q.    Let me stop you right there.

I didn't ask you about what
Jason relied on; I asked you about what you
specifically did or looked for before
preparing for the deposition.  We can deal
with the other topics later.

A.    All right.  Those two documents
had to get looked at in detail, so that got
looked at; that ad that's up on the
WorthPoint site, the alleged -- the
painting, the 1972 painting, that was
looked at; as I said, the WorthPoint
emails; I looked at --

Q.    Just to clarify, did you
actually look at the physical copy of the
alleged painting or at the document
depicting that painting?

A.    No.  I did not have the
physical painting in my hand; you know
that.

Q.    That's why I'm clarifying it:
The painting.

**SA1432**

Page 51

P. O'LEARY

A.    No, I looked at the document regarding the painting.  Let's see, I told you I looked at the reports, the declaration.  Let's see.

I'm looking up for you.  Give me a few seconds.

Q.    Sure.  Take your time.

A.    How things in there, in the report, in their declarations, tie back to some issues in the case.  So I, you know, wanted -- found some issues there that had to be addressed.  So I was researching that and understanding that, getting my presentation, how that would be answered today.

The issue with the search engine, the caching that gets talked about. The eBay sales receipts, as far as that happened.

But that's covered a lot in my affidavit.  Let's see.

SMTP header files, SMTP protocol messages, raw email messages that got looked at.  The Estate Auctions, Inc.

Page 52

P. O'LEARY

SMTP header file that's completely incorrect, that got looked at.

You know, the Defendants claimed that they removed the documents on February 4th, there's all kind of issues with that; that got looked at.  The issue about the signature, the name on the painting, there's issues with that, and that got looked at.  The images of the back of the canvass were examined. Ms. Trombetta's bio on Ask Art from the Wayback Machine, in 2015, was looked at. Let's see.  Ms. Trombetta's efforts to get this URL removed before this election, that was looked at.  All the nonsense she had to go through and all the excuses that she got had to be looked at.

Then it flipped into litigation.  Then what she had to do was the litigation.  And the runaround she got there, that got looked at.  The issues with your client's compliance, issues with discovery that got looked at.

And obviously, those issues are

Page 53

P. O'LEARY

what birthed the affidavit with the -- you know, initiated the affidavit that had to be done.

Let's see.  Declarations of William Seippel.  Yahoo links -- excuse me, Google queries, Google links, more SMTP header files, that got looked at.

So there was quite a bit done.

Q.    How much time exactly did you spend preparing for the deposition today?

A.    Started working on it yesterday morning.

Q.    When?

A.    Started working on it yesterday morning.

Q.    At what time?

A.    I'm sorry?

Q.    At what time?

A.    I don't know.  We'll just go around the figure 9:00, 10:00.  And pretty much -- of course, you take some breaks throughout the day and stuff like that, but pretty much late into the night.

And then, as things started

Case 1:18-cv-00993-LTS-SLC   Document 425-9   Filed 04/17/23   Page 54 of 272

Page 54

P. O'LEARY

to -- as I started to see more and more issues came to light, I continued to work on it.

Then about 5:00 in the morning I was like, you know, let me make sure this -- that I can get into this deposition through their -- your Veritext solution.  I didn't want to do that at the last minute, so I went and did that.  I did have to spend an hour or so, two hours, working through that.

And then, you know, to solve that problem, as I told the court reporter, I had to background the software to a previous version to make it work on a Mac. So I got all that working.

Then as the morning approached, just some other -- look at other documents, just refreshing my memory, look at things that I think may or may not come up.  You know, you're in the driver's seat, so it depends on what questions you asked.

Q.    How much time did you prepare for the deposition this morning, in exact

Page 55

P. O'LEARY

number of hours?

A.    Well, I went all the way through.

Q.    So from 5:00 in the morning until 11:00 in the morning, you were working on preparing for the deposition, with no breaks?

A.    So if we take -- say we call it 10:00 yesterday morning to 11:00 A.M., that would be what, 25 hours?  Minus two, call it 23.  Minus a few breaks, call it 20.

How's that?

Q.    Well, did you work from 10:00 A.M. last night all the way through?

A.    Yes.

Q.    Did you sleep?

A.    No.

Q.    Did you keep time records?

A.    That's a pretty good time record.  10:00 A.M. to 10:00 A.M., 25 hours minus a few breaks, minus a few hours for the tech issue.  There you go.

Q.    Did you keep written time records?

Page 56

P. O'LEARY

A.    No.

Q.    Mr. O'Leary, you noted a bunch of tasks that you've done in preparation for today's deposition.

Do you have any records to tell you how long did each task take you?

A.    No, because -- all these things are commingled together, okay?  Things in the declarations and your client's expert report tie back to things in the WorthPoint emails, they tie back to Mr. Seippel's -- it ties back to Mr. Seippel's and Ms. Trombetta's discussions, it ties back to the two -- the affidavit -- excuse me, declaration and your report tied together.

So no, I did not keep my reports on every little documents, okay?  Everything is commingled and things are kind of attached together in various forms.

So I would go from various things.  As I did my research, I was like ah-hah, I need to look at that.  Oh, how does that tie to this?  Then I go pull up a document, look at that, then I would go

Page 57

P. O'LEARY

back to another document.

So no, I'm not going to waste time doing that. My objective today was to look at these various components so that I could, you know, effectively answer some questions today for yourself and Ms. Trombetta. And Mr. Duff, if he's going to jump in there.

Q. Have you spoken to anyone concerning this deposition?

A. It would only be Ms. Trombetta.

Q. Did you meet in person or speak on the phone concerning this deposition, with Ms. Trombetta?

A. On the phone.

Q. For how long?

A. Oh, we probably had four to eight conversations in the last week.

Q. How long did those conversations take, total?

A. I don't know, I don't know. They could have been 15 to 30 minutes; they might have been an hour and a half. You know, we got on, we discussed our visits,

Page 58

P. O'LEARY

we got off the phone.

Q.   Do you have any recollection of any particular conversation taking up to an hour and a half?

A.   No.  No, I don't, because that was not my focus; my focus was to discuss the issues at hand, ask questions, answer questions.  I'd have questions for her, she might have questions for me.  We go back and forth on it and discuss it, and see how it ties into things.  You know, I didn't spend time, you know, with, you know, an hourglass, timing phone calls.

Q.   What, specifically, was discussed?

A.   Like I said before, all these things and how they all tie together was discussed.  So it could have been these declarations.  It could have been the email dialogues with Ms. Trombetta going back and forth.  With Will Seippel, it could have been Will Seippel going back and forth with Jason Packer.  It could have been how Jason Packer and Ms. Stricchiola interacted, your

Page 59

P. O'LEARY

expert Jessie Stricchiola, how they interacted.  It could have been stuff on, you know, the issues that -- regarding URL removal.  It could have been the ad on the WorthPoint site, various components on the WorthPoint site, whether it's the name, photos, bio, or various things.

So, you know, it was really -- you know, it was a very interactive set of discussions.

Q.   What did Ms. Trombetta say to you?

MS. TROMBETTA:  As a pro se litigant, I have to object.  We're hashing over the same things.

The amount of money that I have paid Mr. O'Leary thus far is very minimal.

We're not getting to the issues, and if that's your objective, I need to request that all the information that Mr. O'Leary keeps repeating gets addressed in questions, please.

Page 60

P. O'LEARY

He has told you many times repeating all the things that we have discussed.

Can we please go forward? Number one.

And number two, we're coming up on an hour and a half. Is there any other opportunity for a break anytime soon?

A.    Yeah, that would be good. Let's take a break.

MS. FARMER:  I will address Ms. Trombetta's objection and we will take a break.

Ms. Trombetta, your objection is noted.

And actually, there's an open question, so I ask Mr. O'Leary to answer the open question before we take a break, also.

Ms. Trombetta, your objection is noted. As you have communicated, we will comply with our obligations pursuant to the court order and the

**SA1442**

Page 61

P. O'LEARY

federal rules of civil procedure as far as the expert's compensation.

This deposition is at the direction of WorthPoint and not Ms. Trombetta, so Ms. Trombetta, while we'll note your objection, you do not direct how I will be conducting this deposition.

Q.    Mr. Patrick O'Leary, please answer the question.

What did Mrs. Trombetta say, actually?

Then we can take a break.

MS. TROMBETTA:  I do have a right to object, Ms. Farmer.  I just want to make that noted.

MS. FARMER:  I know.

MS. TROMBETTA:  Thank you.

Q.    Mr. O'Leary, please answer the question.

A.    If I was looking at something and I might have had -- maybe I had a question.  How did this tie back to something before there was litigation,

Page 62

P. O'LEARY

maybe.  Don't hold me to that; I'm giving you a hypothetical.  How did this tie back to here; how did this happen?

And it could have been a whole array of stuff that was discussed.  It was a very fluid, interactive set of discussions, you know.  We -- our discussions on the phone are quite lively, so we'll leave it at that.

MS. FARMER:  Okay.  We will now take a break.

How long a break are you requesting, Ms. Trombetta?

MS. TROMBETTA:  Thank you.  How about ten minutes?

Because what I'd like to do, since it was my error -- the document that's missing is from Documents 323, filed on December 5th, and what is the 2016 February original message.  It's quite long.

It was my mistake; I'd like to rectify it.  So, ten minutes, please?

A.    And I'd like -- I do have to go

**SA1444**

Page 63

P. O'LEARY

to the bathroom and stuff, but I would like to get a few minutes' break also.

Q.   Okay, I would like the exact time the parties are ready to be back on the record, please.

A.   Well, she's asking for ten minutes, so --

Q.   How much more time do you need in the breakout room, Mr. O'Leary?

A.   AnnaMarie, can we do the breakout room in under ten minutes?

MS. TROMBETTA:  No.

A.   Okay.  How much time do you think?

MS. TROMBETTA:  Talking to you, add another five.

A.   Okay.

MS. TROMBETTA:  I need to go to another computer to download and do what I need to do, because my -- as I mentioned many times to the attorneys, my personal computer is on its last leg, or toe.  It's on its last toe, okay, to be lighthearted.

**SA1445**

Page 64

P. O'LEARY

A.    May I suggest that we go with 15?  Just pop us into a breakout room and then just go take care of what you need to do, I'll do what I need to do, and then we'll scoot back here.

MS. FARMER:  Nathan, please state the official time that we're starting the break.

THE COURT REPORTER:  The time is 12:26 P.M.

MS. FARMER:  We'll be back on the record at 12:41, please.  Thank you.

(Whereupon, a 21-minute recess was taken from 12:26 P.M. to 12:47 P.M.)

THE COURT REPORTER:  The time is 12:47 P.M.

MS. FARMER:  Thank you, Ms. Trombetta, I have received your email.

MS. TROMBETTA:  And everyone else?

MR. DUFF:  Yes.

Page 65

P. O'LEARY

MS. TROMBETTA:  Thank you.

Q.    Mr. O'Leary, have you received the email that Ms. Trombetta sent this afternoon, February 28th, 2023, at 12:24 P.M.?

A.    I'm moving some windows around because of the deposition.  Give me some seconds, please.  Yes, I have it.

Q.    Was this the document that you were earlier referring to as Ms. Trombetta had forgotten to send us, that was part of your file?

A.    I'm sorry?

MS. FARMER:  Actually, you know what?  Strike that.

I'm going to first mark the document as an exhibit.

Nathan, I ask that you please mark this email of February 28th, 2023, at 12:44 P.M. sent by AnnaMarie Trombetta to Jana Farmer, copied to Patrick Michael O'Leary, Adam Bialek, Anderson Duff, and John Cahill, titled "Re: VeriText Hangs on MacOS

**SA1447**

Page 66

P. O'LEARY

Ventura 13.1 on M1 Mac mini."  Let's mark that as Exhibit C, of today's date.

        (Whereupon, an email was marked as Defendants' Exhibit C for identification as of this date by the Reporter.)

    A.    Okay, hang on one second please, okay?

    Q.    Yes.  I'm sorry, who said that?

    A.    I did, Patrick.  Okay.

    Q.    Mr. O'Leary, I'm showing you what has been marked as Defendants' Exhibit C, of today's date, which is an email from AnnaMarie Trombetta, on today's date, at 12:44 P.M.

        Are you copied on this email, sir?

    A.    Yes.

    Q.    Do you see that this email has an attachment?

    A.    Read the name of the attachment, please.

    Q.    "Exhibit #7 EXPERT

Page 67

P. O'LEARY

WITNESSrawplaintext-2016-0220.txts (five megabytes.)"

A.    Yep, got it.

Q.    I'm going to show you the entirety of that email exchange.

Mr. O'Leary, would you like me to open that attachment and show that to you?

A.    Sure, go ahead.

Q.    This is the attachment.  I'm going to scroll to the bottom.  If you would like me to scroll slower or faster, let me know.  The attachment is very long, contains mostly code, so I'm going to speed it up.

Is there any part of this attachment you would like to review in any closer detail?

A.    No, you're good, that's good.

Q.    Okay.  I'm going to close out the attachment.  You still have the email on the screen.

My question to you is -- this is Defendants' Exhibit A, of today's date.

Page 68

P. O'LEARY

Does this email and the attachment represent the document that you earlier testified that you and Ms. Trombetta forgot to include to your email to the Defendants, but that was part of your file?

A.    Yes.  Ms. Trombetta addressed that just before the break, and she said -- she acknowledged she didn't send that.  So that's the document there.

Q.    So besides this document, which is Defendants' Exhibit C, and this document was previously marked as Plaintiff's Exhibit B, which is Ms. Trombetta's email of February 28, 2023, of 7:52 A.M., is the entirety of the production of your file for this matter to the Defendants to date?

A.    Other than what we discussed earlier at the deposition, and you called for, yes.

Q.    A few minutes ago we took a break.  Before the break, you requested to have a private room with Ms. Trombetta in this Zoom session.

Page 69

P. O'LEARY

Did you, in fact, have a meeting with Ms. Trombetta during the break?

A. A very short break, but yes.

Q. What did you discuss with Ms. Trombetta during the break?

A. She let me know that -- she went into more detail as far as the thing that she left out, and she had to run upstairs and take care of it.

Q. What, specifically, did she say when she went into more detail?

A. She was going to run upstairs to some other computer, and she was going to download something and she was going to email it out to everybody.

Q. What did you say to Ms. Trombetta?

A. "It sounds like a plan."

Q. Was that discussion the reason why you requested the breakout session with Ms. Trombetta?

A. No. Just any time I do depositions I tend to -- you know, because

Page 70

P. O'LEARY

we have this high technology, if we can do a breakout room, I usually just do it on every break.  This way, if there's a question that needs to be discussed.  If not, no big chase.  We smile at each other.

Q.    Now, back to your discussions with Ms. Trombetta during the four to eight telephone conversations prior to this deposition.  I asked you before, what she said to you during these conversations, and you said to me that your discussions were very fluid and interactive.

Do you recall anything specific that Ms. Trombetta said to you?

A.    No, I don't.

You know, we're really, really getting a little ridiculous, if I may be so forward with you, you know?

Ms. Trombetta, from my understanding of this thing, has been absolutely cooperative, and she has tried to get you everything you've asked for, and she's bent over backwards to do this for you, you know?  And I'm just --

Page 71

P. O'LEARY

MS. FARMER:  I'll strike as nonresponsive.

Q.    Mr. O'Leary, I must ask you to listen to my questions and only answer my questions.

My question to you is, specifically, do you recall anything specific that Ms. Trombetta said to you during this week, prior to the deposition, when you had four to eight conversation with her by phone?

A.    No, I don't have any detailed recollection.  No.

Q.    And do you specifically recall what you said to Ms. Trombetta during these four to eight conversations last week?

A.    No, I don't have direct recollection.

Q.    Besides Ms. Trombetta and the email to all attorneys on December 2nd, that you already mentioned, did you correspond with anybody in connection with this matter?

A.    No, I don't recall doing so.

**SA1453**

Page 72

P. O'LEARY

Q.    You previously had referenced a December 5th, 2022 affidavit.

Do you recall that?

A.    Yes.

Q.    Is this the only affidavit that you have prepared in connection with this matter?

A.    Yes.

Q.    Besides this affidavit, have you generated any other declaration, certifications, reports, or any other written products of an expert?

A.    No.

Q.    And I believe, but I would like to confirm with you, that you mentioned earlier that you don't do drafts, you just rework the same document when you're working on the report, correct?

A.    I just keep saving over the same document.

Q.    Earlier, when I asked you what you did in connection with the preparation for this deposition, you mentioned reviewing an expert report of Jessie

Case 1:18-cv-00993-LTS-SLC   Document 425-9   Filed 04/17/23   Page 73 of 272

Page 73

P. O'LEARY

Stricchiola and a declaration of Jason Packer.

Do you recall that testimony?

A.     I'm sorry, repeat your question please.

Q.     Before the break I asked you about the specific things you've done to prepare for this deposition.

Do you recall that?

A.     Yes.

Q.     Do you recall you telling me that in preparation for today's deposition, you have reviewed the expert report of Jessie Stricchiola and the declaration of Jason Packer; do you recall that testimony?

A.     Yes.

Q.     Do you recall the dates of these documents:  The Stricchiola report and the Packer declaration?

A.     They were I believe done in January.

Q.     And that's, in fact, more than a month after your December 5th, 2022, affidavit, correct?

**SA1455**

Page 74

                    P. O'LEARY

A.     Okay, yes.

Q.     Did you review again the materials that came with a notice of subpoena that was served on you?

A.     Yes.

Q.     Were you asked in those materials to review anything in connection with the report of Jessie Stricchiola?

A.     Yes, I reviewed Jesse Stricchiola's report.

Q.     That's not what I'm asking.

Were you asked in any of the subpoenaed materials to review the report of Jessie Stricchiola?

A.     I'm sorry, maybe it's your accent or something.  You're going to have to say it again, I'm sorry.

MS. FARMER:  Sure.

Nathan, would you mind reading back the question?  That should relieve any accent issues.

(Whereupon, the referred-to question was read back by the Reporter.)

Page 75

P. O'LEARY

A.    The only thing I received in the subpoena you served on me, you attached my report to it -- my affidavit to it, excuse me.  I'm talking about the one you served on me personally.

And for clarification, the date of the report I said was in January, it's January 19th.

Q.    Thank you for the clarification.

MS. FARMER:  Nathan, can you please mark this document titled Notice of Deposition of Patrick O'Leary as Defendants' Exhibit D, of today's date?

(Whereupon, Notice of Deposition of Patrick O'Leary was marked as Defendants' Exhibit D for identification as of this date by the Reporter.)

Q.    Mr. O'Leary, I'm showing you what has been marked as Defendants' Exhibit D, of today's date.  That's a 37-page document.  I'm going to scroll from

Page 76

P. O'LEARY

the front page to the back page to show you the entire document.

A.    Sure.  Wait, wait.  Slow down.

Q.    Would you like me to go back?

A.    Okay.  Give me a second.  Hold on.

Q.    Am I going slow enough, Mr. O'Leary?

A.    Hang on one second.  Okay.

Q.    This is the last page.

I'm now going to go to the front page of this document.

A.    Okay.

Q.    Mr. O'Leary, my question to you is, have you received this document together with the subpoena that was served on you in this matter?

A.    Yes.  I'm seeing it here.

Q.    And have you reviewed this document prior to today?

A.    Yes, I saw that already.  Yes.

Q.    Did you see this paragraph on the bottom of page 1, that says that "You are hereby advised that WorthPoint will be

Page 77

P. O'LEARY

inquiring into the matters related to the matters filed by Plaintiff and the cross-action, which are annexed hereto as Exhibit A"?

A.    Okay, yes.

Q.    And did you also review Exhibit A, titled Additional Matters of Examination?

A.    Yes, I have it.  Yes.

Q.    Does Exhibit A mention in any way the report of Jessie Stricchiola?

A.    Not directly.

Q.    Does it mention it indirectly?

A.    Well, because of the claims, and all the errors and, you know, as far as how this thing has been so many wrong details that have been flying around in this case, you know, you have to then -- I asked to see what the expert testified to.

There was an issue in -- the expert referenced my affidavit as being done on Christmas, when it was really done on December 5th, so that raised an issue. Then the expert made reference --

Page 78

P. O'LEARY

MS. FARMER:  Move to strike as nonresponsive.

Q.    Mr. O'Leary, I'm asking you if this document -- Exhibit A, Additional Matters of Examination -- mentions Jessie Stricchiola's report directly or indirectly.  It's a yes-or-no question.

A.    No, it's not directly in this document.

Q.    How about the declaration of Jason Packer; is that mentioned directly among the matters of examination in this document?

A.    No, it's not.

Q.    Somebody has a phone ringing.

A.    Sorry, let me turn the volume down.  Okay.

Q.    So why did you review the materials produced by Ms. Stricchiola and Mr. Packer in preparation for today, Mr. O'Leary, when you were not asked to do that?

A.    What you are asking there, okay, ties into many of the other

Page 79

P. O'LEARY

documents.

Like, for example, you know, when you talk about, in the report, you've got issues of fraudulent URLs, you've got issues of the various documents being incorrect.  There were so many details that were incorrect here.

And so I then had to go back to Will Seippel and Jason Packer's discussion, I had to go back to Ms. Trombetta's discussion with Mr. Seippel.  Well, those issues connect into Jason Packer's declaration, and Jason Packer's declaration ties into Ms. Stricchiola's report.

Q.    Are you attempting, Mr. O'Leary, to offer rebuttal testimony to Ms. Stricchiola's expert report via this deposition?

A.    No.  You're going to -- in your questions here, okay, and the questions that will come up here, there is a connection that would be made.  And some of my analyses will probably tie into these other documents, which will then tie back

Page 80

P. O'LEARY

to those two documents.

Q.    So your answer is no, you are not attempting to offer rebuttal testimony, correct?

A.    No.  If I -- in answering your questions, if I refer to something, or an error that's in one of those documents, I'm certainly going to do it.  And I'm --

Q.    Mr. O'Leary, you're not answering my question.

My question is a yes-or-no question:  Are you here to offer rebuttal testimony or not?

A.    No.  It's your deposition, your -- this is what you want to discuss.

In my answers, I may refer to something they said in their reports.  I'm sorry if you don't like that, but I may bring up stuff in their declarations or their reports in my answers, sorry.

Q.    So yes or no, are you offering rebuttal testimony here today?

A.    Yes, I will be offering rebuttal testimony.

Page 81

P. O'LEARY

Q.   And just to confirm, other than the December 5th, 2022 affidavit, you have not produced any rebuttal report, correct?

A.   Yes, that's correct.

Q.   Besides the material that we discussed at length this morning, have you referenced any additional material that you haven't told us about today?

A.   I believe I -- in general form, I covered it.  My answers were pretty general this morning, so I think I got it covered.

Q.   How much time, exactly, did you spend reviewing the Stricchiola report and the Packer declaration before today?

A.   I don't recall.

Q.   Can you estimate?

A.   No, I really can't.  Because it could be in the document, there could be another document.

I explained this to you this morning.  We're going round and round, expecting a different result, a different answer.

Page 82

P. O'LEARY

I went back and forth between different documents.  That's it.  I didn't keep track of when I read one paragraph, you know, paragraph 19 of someone's declaration, and then have it tie into something else, you know?  I went back and forth, and that's the way the analysis was done.

Q.    So you don't know?

A.    I don't -- I'm not going to say I don't know; I'm going to say I don't recall.

Q.    Well, if you say you don't recall, I'm going to ask you if there are any records that would help you refresh your recollection as far as how much time did you spend --

A.    No.  There is tangible, quantitative records that we could rely upon.

Q.    Mr. O'Leary, I'm still on Defendants' Exhibit D, which is, again, that 37-page document, Notice of Deposition.  I'm going to scroll down to

Page 83

P. O'LEARY

the section of the document that contains Plaintiff's expert affidavit and the following pages.

You see that?

A.    Yes.

Q.    Would you like me to scroll through the document one more time, or you're good?

A.    No, we're good.

Q.    Is this the December 5th, 2022 --

A.    I'm sorry, I take that back.  I do want you to scroll through, please.

Q.    Sure.  Let me know if you want me to go slower or faster.

A.    I'd like you to go fast, down to like, page 10, please.

Q.    I don't see paginations.

So I'm on page 14 previously.

Do you want me to go up?

A.    Hang on a second.  I'll tell you where you need to go.

I'd like you to go down to where it says "timeline."

Page 84

P. O'LEARY

Q.    Is it further, here?

A.    That's it.

I would like you to go up one page, please.

Q.    Okay.

A.    All right.  That page was not in my report.

Q.    That page was not in your report.  Okay.

Do you see the documents have a Bates stamp Plaintiff00798?

A.    99.  Yes, I see that.

Q.    Yes.  Do you know the significance of Bates stamps?

A.    Yes.

Q.    So when you see a Bates stamp Plaintiff00799, what does it tell you?

A.    As a document is submitted, you put a unique document on each page.

Q.    Does it appear to be a document that would be generated by a plaintiff in a case?

A.    Right.  So the plaintiff will be AnnaMarie Trombetta in this case,

**SA1466**

Page 85

P. O'LEARY

000798, 99, 80, et cetera, and then it might be WP, might be them, maybe EAI would be for Estate Auctions, Inc., et cetera.

Q.   So the page you just referenced as not being yours, do you see it has a Bates stamp at the bottom; it says "Plaintiff000799"?

A.   Yes.

Q.   And if I go to the prior page in this document, the prior page says, in the bottom, "Plaintiff000798."

Do you see that?

A.   Yes.

Q.   And if I go to the page after the one you flagged, the one that says "timeline," that's Plaintiff000800.

You see that?

A.   Yes.

Q.   So do these pages appear to be consecutively Bates-stamp numbered?

A.   Yes.

Q.   So based on what we just observed, does it appear that Plaintiff seems to have inserted this page inside

Page 86

P. O'LEARY

your report, and then consecutively numbered them with Bates stamps?

MS. TROMBETTA:  Objection. Those Bates stamps are not me; I believe it was Ms. Highman (sic). I'm almost positive because it's not a paper, or the "Plaintiff000749" is handwritten.

MS. FARMER:  I don't know any Ms. Highman.

Do you mean Ms. Haimson?

MS. TROMBETTA:  Haimson, Nicole Haimson, yes.

Q.    Mr. O'Leary, do you believe that this document that's Bates-stamped 000799, whoever put that in, should not be part of this report?

A.    That is correct.

Q.    Having reviewed the documents you received with a subpoena, is there any other page that should not be part of your report?

A.    It's not a report; it's an affidavit.

Page 87

P. O'LEARY

Q.    Affidavit.

A.    No.  I am on the other screen. I'm actually looking at my report now, so that's why I had you go slow at certain points.

No, I think we're in good shape.  I think that was the page --

Q.    As you sit here today, do you know who put that page inside your report, as far as your document goes?

A.    No, I do not.

Q.    Does this page render your affidavit inaccurate in any way, shape, or form?

A.    No.

Q.    Mr. O'Leary, I'm now showing you one of the pages in your report that is Bates-stamped Plaintiff000719.

Do you see that?

A.    Yes.

Q.    Do you see how it says, in the caption, "Trombetta versus Novocain"?

A.    Yes.

Q.    Is that a typo, or you provided

**Page 88**

P. O'LEARY

it with a caption spelled like this?

A.   No.  No, that's an error because it should be "C-I-N," but the spell-check made it "Novocain."

MS. TROMBETTA:  I have to agree.  I'm sorry, but it happens to me all the time.

Q.   Mr. O'Leary, did you prepare this affidavit by yourself?

A.   Yes.

Q.   Did anybody else help you type it?

A.   No.

Q.   Did Ms. Trombetta assist you in preparing it?

A.   Other than when I called for a document or something like that, she would have sent it to me.

Q.   And she did not provide any content or conclusions in the report, did she?

A.   Absolutely not.

Q.   In this paragraph that starts with, "Being duly sworn," you say that --

Page 89

P. O'LEARY

you declare under oath that you have "been retained as an expert by the Plaintiff to render my expert opinions in this matter."

So did Ms. Trombetta indicate to you what she thought your expert opinions should be?

A.   It was to assist her with business and technology issues for liability and damages, as she felt that she needed my assistance.

Q.   But she did not tell you specifically what she wanted you to say as an expert, did she?

A.   No, absolutely not.

Q.   You say here, in this yellow box, "I have 35 years of relevant and recent experience with internet activities."

My question is, what would you consider relevant experience in connection with this case?

A.   Reviewing the SMTP headers, reviewing emails, reviewing various exhibits, the email dialogues, the

Page 90

                    P. O'LEARY

SMTP headers, looking at images, looking at
web pages, how web pages are handled, how
they're organized, how they're --

    Q.    Mr. O'Leary, let me stop you
again, because I asked you about your
experience and you are telling me about
your document review for this case.

         So what's in your 35 years of
relevant and recent experience with
internet services that's relevant to this
case?

    A.    Okay.  Well, on the internet,
you move emails, emails done with the SMTP
protocol, right?  So Ms. Trombetta wanted
to see original SMTP raw data, so I
helped -- I opined on that.

    Q.    To answer the question I'm
posing to you, are you saying that you have
35 years of experience with SMTP data?

    A.    In my 35 years I have to use
SMTP data and raw emails at all different
levels, on this case, other cases, when I
ran an internet service provider, when I
ran the largest dating site in the world,

**Page 91**

P. O'LEARY

all right?  I had to deal with that because of the level of traffic, of the number of people, millions of people hitting our site every day.

Q.   Besides your experience in SMTP, what other relevant experience do you have for this case?

A.   How web pages are structured, how HTML is structured, how web pages are put together, what's the structure of the HTTP protocol, what's the structure of the HTTPS protocol, all that stuff, so that you can look at a web page, being able to determine if something is just HTML or it is HTML that's part of an SMTP message. All that had to be looked at.

You know, you're asking about, you know, what part of the law do you use in your business.  I mean, you're going a little ridiculous in this question.

Q.   I'm asking you, sir, about the content of your report.  So in your own words, please explain to me --

MS. TROMBETTA:  Not a report.

Page 92

P. O'LEARY

Objection.  It's an affidavit.

MS. FARMER:  Strike that.

Q.    Mr. O'Leary, in your own words, please explain to me what you meant by, "I have 35 years of relevant and recent experience with internet activities."

What did you mean by "relevant and recent"?

A.    There was an issue with how data is stored in search engines, how data gets into search engines like Google; I've had to deal with that.  I've done SEO, I've organized websites so I can get them onto the front page of Google.

You know, if a web page is in Google and it needs to come down.  For example, on the directory that I own, if somebody comes to me and they say, "I want you to remove all my content, I want my CD off your expert witness website," all right?  So I have to know, okay, how to actually do that.

Because they want it down and they want it down now.  They don't want it

Page 93

P. O'LEARY

down, you know, by the clock timeframe that you all use; they want it down today.

So I would have to know how to bring down a URL and take it out of a directory and take it out of Google inside of hours or days, because I didn't have room to play games like you all did, like your clients did, all right?

MS. FARMER:  Move to strike as nonresponsive.

A.    No "move to strike" nonsense, okay, all right?

I had to be able to understand, okay, how to deal with content that had to be removed from a website, and then subsequently, how the content had to be removed from Google, Yahoo, Infoseek, Lycos, all the different search engines over the past 35 years.  So I had to be able to know what did I have to do inside my web network, inside my network, what had to be done on the web server, what had to be done on the web pages, and then what I had to do with Google, so that I can pull a

Page 94

P. O'LEARY

page down literally in a day.  And there would be no nonsense, it wouldn't be on my website, it wouldn't be on Google.

Just as -- and that's one of the reasons Ms. Trombetta sought after me, that's why she contacted me, because she had nothing but the runaround from you folks about getting a simple URL from your WorthPoint website.  And you jerked her around --

MS. FARMER:  Move to strike as nonresponsive.

A.   You can do that if you want.

MS. TROMBETTA:  Objection to strike.

A.   All right.  I had to be able to handle that, okay?  She got the runaround on this, so I had to be able to --

Q.   Mr. O'Leary, I am not asking about your opinion about this case; I'm asking you about your background.

A.   That's right.

Q.   Please answer my question, and not deciding what you want to have a

Page 95

P. O'LEARY

monologue on.  I have asked you solely about your relevant experience.

A.    So I'm giving it to you --

Q.    Your experience that you mentioned in your affidavit.

A.    You asked for what's relevant, so I'm giving it to you, okay?

If somebody comes to me on my network, unrelated to art, okay, and is an expert witness, and they want to have their content pulled down, they don't want to hear, "Oh, gee, we'll get to it," you know, and then a year later it's still not done, okay?  They don't want to hear, "Oh, we'll pull it down in six months."  They don't want to hear that it's stuck in search engine history or search engine cache. They want it down now, so I get it and I pull it down now.  I take the steps necessary so that the content comes down within hours to days.  No games.  I get job done for my clients.

MS. FARMER:  Again, move to strike --

Page 96

P. O'LEARY

A.    No, no, there's no "move to strike"; that is absolutely relevant to this case.

Q.    That was not my question, however.

A.    Well --

Q.    Mr. O'Leary, are you ready to move on with the deposition or are you going to continue with a monologue?

There's no question --

A.    I take offense to you calling it a monologue when I'm giving you -- citing an example that's exactly related to this case.  So don't insult me --

Q.    I'm not asking you --

A.    Don't insult me and call it a monologue.  The example I just cited is exactly related to this case.

Q.    Please answer my question, and do not give me information, in response to my questions, I have not asked about.  That is my instruction.

Are you ready to proceed?

A.    Yes.

Page 97

P. O'LEARY

MS. TROMBETTA:  Objection.  You asked him what his 35 years of experience included, Ms. Farmer.  You asked him what his experiences did include.  I'll repeat it again:  He gave you a well-described answer.

A.   You just don't like the answer, Ms. Farmer.  And that's tough nooggies, okay?

MS. FARMER:  Ms. Trombetta, you will not characterize --

A.   Don't do a monologue, we're not --

(Cross-talk.)

THE COURT REPORTER:  Stop.

A.   We're not going to play the move-to-strike game, okay?  As Ms. Trombetta pointed out, I gave you a well-detailed example of how it's relevant to my career, and what I've done, okay?

When I ran matchmaker.com, with more traffic than a website would only -- than WorthPoint would dream about, okay, okay, and people found a match, and when

Page 98

P. O'LEARY

people found a match, you know, usually, the other person didn't like them on the website, so both people would want their content pulled down.  So we would take the steps to actually remove that content off the website, off the network, and out of the search engines.

That's yet another example relating to this case.  And I'm an expert on that.

Now, don't give me this monologue crap, okay?

Those are two examples that tie directly into this case, so that, I think, falls -- wait for it, wait for it -- relevant.  I think that's relevant, Ms. Farmer.

Now, stop playing games with me.

Q.   Mr. O'Leary, please understand that I have the right to move to strike. The judge will make the decisions on the motion --

A.   Yeah, yeah, yeah --

Page 99

P. O'LEARY

Q.      -- not me and not you.

Let me remind you to please answer the questions that I ask.

MS. FARMER:  Ms. Trombetta, please refrain from obstructing the deposition.

Now, may I proceed with my next question?

A.      Please do.

Q.      What knowledge and personal experience regarding the subjects that you were retained about, Mr. O'Leary, do you have that you believe the jurors do not have?

A.      Okay.  Your typical juror is not going to know how content needs to be pulled down off the internet -- just like I tried to cite, that you were objecting to -- how is it stored in the servers, how does it build web pages, how does it get, you know, how it might be cached, how it dealt with Google.

So all that stuff has to be explained to a juror, and that's -- you

Case 1:18-cv-00993-LTS-SLC   Document 425-9   Filed 04/17/23   Page 100 of 272

Page 100

P. O'LEARY

know, I have experience, I have expertise, scientific, technical, specialized knowledge, skill, training, education, and personal experience beyond the common knowledge and outside the executive function of the trier, that qualifies me to render expert opinions on this litigation matter.  It's right there in plain, simple English.

So with the level that I built on the internet -- built a company that sold for $45 million, all right -- I didn't blow smoke at people for that kind of company of that size.  And if I did, trust me, I have the knowledge.

I ran an entire data center, I had my own network, I had every kind of Cisco router equipment available, every type of web server, every type of software that was used to do this, e-commerce, and how it all ties back to what the juror may need to know.

And I cite the two examples that are exactly related this to case, that

Page 101

P. O'LEARY

I will gladly explain to the jury in detail.

And by the end of my testimony, every juror in that juror box will fully understand that this URL that Ms. Trombetta tried to get you to pull down, without litigation, could have been done within a number of days.  And I will absolutely make sure, before I get off that witness stand, every juror and every judge will fully understand how this could have been done in a matter of hours or days.

MS. FARMER:  Okay.  Again, I move to strike as nonresponsive.

A.    Oh, baloney.

Q.    Which positions in your background have given you the experience that you believe you have that the jurors do not have; was it match -- what did you say, "Match" what?

A.    Matchmaker.com.

Q.    -- matchmaker.com or anything else?

A.    Every one of my positions that

Page 102

P. O'LEARY

I've held since college.  In the 35 years I've been a programmer, I've done everything from literally sitting in a cubicle being a programmer, all the way up to being the CEO of the company.

Q.    And the college you're referring to is the 1987 degree in electrical engineering from NYU Polytechnic Institute, of Brooklyn; is that what you're referring to?

A.    Yes.  But you conveniently skipped over computer science in your description.  Computer science, also.

Q.    Is that the college degree you're referring to?

A.    I have the electrical engineering degree and I also have an MBA.

Q.    In 1987, was Google around back then?

A.    Google may not have been -- '87, most people didn't know what the internet was.  Internet became popular in the early '90s, so you're trying to split hairs on four years.  In 1992, the HTTP

Page 103

P. O'LEARY

protocol became publicly available.  That's when it became -- when the RFC, request for comments, was released to the public and the first websites started to come up was 1992.  It hit the commercial mainstream by 1995, all right, which is still 16 plus five, is 21 years before Ms. Trombetta tried to get you to remove that silly URL off of your website.

MS. FARMER:  Again, move to strike as nonresponsive.

A.    Here we go.

Q.    Do you have any specific experience with working with Google?

A.    Yes.

Q.    Please describe your experience.

A.    Well, with both matchmaker and expertwitness, you have to -- you might buy advertising to drive traffic into your website, but you'll also end up driving traffic organically.  So at matchmaker we were the largest Yahoo advertiser, but that only equated to 22 percent of the traffic.

Page 104

P. O'LEARY

The other traffic came in organically.

Q.    You just said "Yahoo."

Did you meant to say "Google"?

A.    In 1995, it was Yahoo; Google became popular in 1997, 1998 timeframe, all right?

But, you know, to come up on Infoseek, Lycos, Yahoo, all the other search engines that work off the same principles of search engine optimization.

So our traffic came in organically.  So people would find us by doing searches.  They might go to Yahoo, Infoseek, Northern Light, or one of the other search engines that were essentially just the same as Google in the day.

So we're not going to split hairs because Google became the dominant force in later years.  It's irrelevant, okay?  In the early days, as this was being built, there were many, many other companies that were providing the exact same service as Google, and you had to provide the same technique.

**SA1486**

Page 105

P. O'LEARY

And in those days, if I wanted to remove a URL, I'd have to go to Infoseek, I'd have to go to Lycos, I'd have to go to Yahoo, I'd have to get URLs removed.

You know, as things converged and things merged together, that's when Google became Google, and one or two others became the dominant force. But in the early days there might have been six large companies that we had to deal with.

So today Ms. Trombetta just asked you to remove it from Google, for gosh sakes. When I had a like situation, I had to go to six engines to deal with this. And I did not play games. I got it done on six search engines; you guys can't even do it on one.

MS. FARMER: Again, move to strike the narrative section as nonresponsive.

Q.    Mr. O'Leary, again, I would ask you to refrain from you telling us what you think our client did or didn't do.

Page 106

P. O'LEARY

A.    I'm not --

(Cross-talk.)

THE COURT REPORTER:   Hold on.

A.    I'm telling you what I know.

Q.    I'm asking you about Google; you didn't tell me about Google.

A.    Okay.

Q.    So please tell me about your experience with Google.

A.    Okay.  Starting in 1998/1999, we had to start dealing with Google.  By 2000, which is still 16 years before the issue with this lawsuit, okay, I started -- things started to converge, and I would start having to optimize pages that would work for Google.  The tricky part was that page optimization had to be done for Google and the others at the time.  As things converged more and more, you just had to focus on Google.

Q.    And that was part of your work for matchmaker?

A.    Matchmaker and expertwitness.  Matchmaker was sold, then I acquired

Page 107

                    P. O'LEARY

expertwitness.com.

Q.     And have you actually served as an expert witness on behalf of Google?

A.     Yes, actually, I have.

Q.     What was the nature of that engagement?

A.     It had to do with -- it's a good thing you brought that up because I probably would have forgotten about it.

It had to do with their social media platform called Google Circles, and they were trying to build out a social media platform that was a lot like Facebook, a lot like the early social media platforms, Myspace, Facebook, Twitter, and so forth.  And, you know, what I served with them was to help them deal with some intellectual property issues.

Q.     Besides this case, have you served as an expert witness in any case that involved removing content or pages from any search engines such as Google?

A.     I'd have to look at my CV to give you more detail on that.  But I can

Page 108

P. O'LEARY

certainly do that for you.

Q.     Okay.  I'm going to refer you to the end of this document, Defendants' Exhibit D, which --

A.     Okay, go ahead.

Q.     Starting on page 30, it says, "Plaintiff's expert CV."

A.     Mm-hmm.

Q.     And this is the document.  I can scroll through or magnify; let me know what you want me to do.

A.     Okay, we're on my CV.  Go ahead.

Q.     So you said you would need to look at your CV to see if there's any cases that I asked you about concerning removal of pages or content from search engines.

Is there any particular part of this CV that would help you to answer my questions?

A.     I'd actually have to give you -- we'd actually go to expertwitness.com.  And we would actually go to my CV on expertwitness.com, and

Page 109

P. O'LEARY

there, that's where I have all the cases listed.

MS. FARMER:  I would call for the production of your list of cases from expertwitness.com because there's no way we can mark a web page that can shift.  So I'm simply going to ask you to produce a list of your case.

A.    No worries.

Q.    Just to confirm, as you sit here today, you can't specifically remember any particular case, right; you need to refer to a document?

A.    There was case in 2015 that had to do -- it had to do with like, credit cards and other documents.  And stuff was indexed into Google and, you know, there was an issue, a dispute between the two parties, and they had to pull documents out.

So even if I don't have an expert witness case, the work that I did with matchmaker and expertwitness.com in

**SA1491**

Page 110

P. O'LEARY

the last 35 years is orders of magnitude more interaction with Google than any expert witness case will ever have.

Q. Mr. O'Leary, I feel like you feel compelled to justify your expertise. I'm simply asking you questions, so please just answer my questions. We will get through this faster if you just focus on my questions, okay?

Do you have any specific expertise with eBay?

A. Yes, I do. I've actually been using eBay. I purchased a whole lot of equipment on eBay for cryptocurrency, so that's recent and relevant, okay?

And I sold a bunch of stuff on eBay myself.

Q. Have you ever spoken to anybody working for eBay?

A. Very likely, sure.

Q. Do you still have a specific recollection of having spoken to eBay?

A. No, not off the top of my head.

Q. Do you have any experience

Page 111

P. O'LEARY

interacting with eBay over and above what an average juror would have?

A.    Yes.

Q.    And what would that be?

A.    What it takes to put products into eBay, you know, if you're going to sell them, if you're actually -- you're a buyer, you want to buy products on eBay, how can you do things to make sure you win the bid?

So I've worked with software to actually, you know, be someone that, when I wanted -- when I wanted a product, and I wanted to get the lowest possible bid on a product and win it, I had software I could use that would actually make sure I won the bid.  That would be one example.

When I was selling stuff, how should I put it into eBay, and what price, so it sells the quickest, but at the same time, I can maximize my greatest profit.

Q.    Do you maintain that you are an expert in eBay?

A.    I have specialized experience

Page 112

P. O'LEARY

that's greater than the general function of the trier, that being the juror in this case.  So yes, I would be able to explain stuff to a juror regarding eBay.

Q.    Were you retained in this matter by Ms. Trombetta to opine on any issues related to eBay?

A.    Many of the issues regarding the discovery compliance issues had to do with email receipts, as I pointed out, as that was covered in my affidavit.

Q.    That's a question?

A.    So yes, I had to deal with eBay issues.

Q.    Do you have any training in art?

A.    I can do stuff digitally.

So like, for example, I'm building a website and graphics and things like that.  Like, for example, the expertwitness logo, I did that.  If you go for expertwitness.com, you'll see the logo. I did that.  I designed a lot of matchmaker.com logos, web pages.

**SA1494**

Page 113

P. O'LEARY

Background, drops, and stuff like that were used.

And like that, just so we're clear, that has to be built in such a way that it was SEO-optimized so it would work well with Google. So that was two-way -- a double-edged sword.

Q. I just asked you about your training and experience.

So do you have any training in art?

A. I've taken graphics classes over the last 35 years. I've taken, you know, online, I would learn how to do things, you know, with CSS, so I could build web pages. I took classes and training classes on cascaded style sheets, how to use Photoshop, if I'm going to build an image or something like that, I did training on that. I did training on HTML, you know, HTML documents, how to build web pages. I've done things with JavaScript that's used within web pages. JavaScript can be used to manipulate the art on a

Page 114

P. O'LEARY

page.  I would do -- I've done things like that.  Built the logos, built images, built web pages, did HTML.

I'm not an artist like Ms. Trombetta, you know, as she would call herself, but I can do graphic design, which is in the field of art.

Q.   Just to confirm, do you have any training in painting?

A.   No, not painting.  No.

Q.   How about experience; have you ever painted yourself?

A.   I painted a lot of houses.

Q.   You never painted any visual artworks?

A.   Nothing deliberately.

Q.   Do you have any training in the art industry?

A.   Define "training."

Q.   Have you taken any courses or courses of study in the art industry?

A.   Okay.  Are we talking about college courses?

Q.   Let's start with college

Page 115

P. O'LEARY

courses.

Have you taken any college courses pertaining to the art industry?

A.    No, I don't have any college credits in the art industry.

Q.    How about certificates; do you have any certificates in anything related to the art industry?

A.    No.

Q.    Have you taken any courses in painting?

MS. TROMBETTA:  Asked and answered.

A.    No.

Q.    Have you taken any course in art history?

A.    I don't know why we're going down this path.  Ms. Trombetta did not engage me for the purpose of painting a canvass; she engaged me for dealing with technology and business issues as it pertains to this case regarding the liability and the damages in this case.

Q.    That's all I'm trying to

Page 116

P. O'LEARY

establish.  I'm trying to confirm that this is what you are being retained for, let's say, as an expert, Mr. O'Leary.

So as far as art history, do you have any courses in art history or training?

A.    No.  That's not relevant to my role in this engagement.

Q.    How about art appraisal or evaluation; any experience or background in that?

A.    No.  That's not --

Q.    Okay.  Just to confirm.  This is why I'm asking you.

Have you yourself ever been involved in any art transactions; buying, selling, loaning art, anything like that?

A.    I don't have any recollection at this time.

Q.    Have you ever sold any paintings on eBay?

A.    I don't recall.

Q.    Have you ever been a member of WorthPoint?

Page 117

P. O'LEARY

A.   No.

Q.   Have you ever used WorthPoint database for art research purposes?

A.   No.

Q.   In your report you stated -- you said you are presently working on your JD law degree.

What stage of your law degree are you on?

A.   I'm on the early stages, first few classes.  I believe, the research class.  I'm working on contracts and civil procedure.

Q.   And that's part of Novus Law School?

A.   Yes.

Q.   That type of online law school?

A.   Yes.

Q.   Have you ever communicated with anyone at WorthPoint corporation, not including attorneys?

A.   No.

Q.   Have you ever visited the WorthPoint.com website?

Page 118

P. O'LEARY

A.    Yes.

Q.    When was the first time that you visited the WorthPoint.com website?

A.    Probably early on in the engagement, because I had to do a conflict check.

Q.    And early on in the engagement is, again, somewhere in August of 2022, correct?

A.    Yes.

Q.    When you visited the WorthPoint website, have you observed the listing that we are all here about, concerning the painting that was attributed to Ms. Trombetta at the time you visited?

A.    I'm sorry, repeat your question.

MS. FARMER:  Nathan, can you please read it back?

(Whereupon, the referred-to question was read back by the Reporter.)

A.    The painting that's in dispute here, I reviewed through evidence

Page 119

P. O'LEARY

documents.  So no, I did not view that actually on -- actually --

Q.    Have you ever communicated with the Defendants Novocin or Estate Auctions, Inc. in this matter?

Again, attorneys excluded.

A.    No.

Q.    Have you ever communicated with Ms. Trombetta's witness, Vanessa Ploski?

A.    No.

Q.    How about Scott Goodwillie?

A.    No, I don't believe.  No.

Q.    Have you ever communicated with Mr. Willy Chu, Mr. O'Leary?

A.    No.

Q.    Have you ever communicated with any other experts that Ms. Trombetta has retained or is planning to retain in connection with this matter?

A.    No.

Q.    Have you ever communicated with eBay about this case?

A.    No.

Q.    Have you ever communicated with

Page 120

P. O'LEARY

Google about this case?

A.    When you say "communicated," you mean communicated with a human being, a person?

Q.    Yes.  I'm not talking about going to a Google website; I'm talking about emailing Google, faxing Google, sending mail to Google, calling them, speaking to them in person, or any other form of communication.

A.    As it pertains to this lawsuit, no.

Q.    This December 5th, 2022 affidavit that you wrote, is that the culmination of your review and analysis for this matter?

A.    It's the affidavit regarding the discovery compliance issues that had to be addressed at the end of -- mostly, at the end of, from like, Halloween on -- so it would be like, the end of October into November -- and had to be produced and delivered by December 5th.

Q.    But you did not include

Case 1:18-cv-00993-LTS-SLC   Document 425-9   Filed 04/17/23   Page 121 of 272

Page 121

P. O'LEARY

anything else in your expert disclosure, did you?

A.    My expert affidavit?

Q.    Your expert disclosure, the overall universe of disclosures that were made to Defendant in this case.

A.    I'm sorry, ask your question again.  I'm sorry.

Q.    Besides the December 5th, 2022 affidavit, you didn't include anything else in your expert disclosure in this case?

A.    No.  This affidavit is what I produced, and has been turned in.

Q.    From your review of materials in this case, that Ms. Trombetta supplied, do you have a general understanding of the transactions and occurrence that led Ms. Trombetta to file a lawsuit?

A.    Yes.

Q.    And do you understand that there is more than one Defendant in this matter?

A.    Yes.

Q.    Do you understand that it is

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 122 of 272

Page 122

P. O'LEARY

alleged that one of the Defendants sold -- or at least one party sold a painting on eBay?

A.    That's my understanding, yes.

Q.    Which Defendant or Defendants do you understand to have sold the painting on eBay?

A.    I believe it's Estate Auctions, Inc.

Q.    And what do you understand what was Defendant WorthPoint's alleged role in this lawsuit?

A.    They track sales of art.  So when it got sold to Estate Auctions, Inc., on eBay, they would -- their job would be to track it, track its sale.

Q.    So do you understand that WorthPoint did not sell the subject painting on eBay?

A.    Well, let's make sure we say "sell" versus "allegedly sell," so...

Q.    Sure, we can use "allegedly."

A.    So -- no, it's my -- it's my understanding that WorthPoint did not sell

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 123 of 272

Page 123

P. O'LEARY

the painting.

Q.    So the sum and substance of your December 5th, 2022 report involves the issue of the document production concerning that email from eBay; is that correct?

A.    Yes.

Q.    So just to confirm, since we confirmed earlier that it is not alleged that WorthPoint sold anything on eBay, that portion of your report discussing the eBay email compliance applies to Defendant Estate Auctions, correct?

A.    No, I can't say I agree.

Because Adam Bialek did a quick swipe of the mouse and sent Ms. Trombetta a whole bunch of emails, a whole bunch of HTML, around the time you were all having a conference with the judge.  And so once he sent that, I had to actually address that issue.

And that's done in the -- down here in the -- I believe it's the 23rd -- November 23rd email that Mr. Bialek sent.

Q.    Did you also see Mr. Bialek

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 124 of 272

Page 124

P. O'LEARY

stating that he sent that as a courtesy?

A.    That would be something Ms. Trombetta -- I wasn't involved in that. I was asked to address that HTML to be sent over.

Q.    Looking at your report, Mr. O'Leary -- this is, again, Exhibit D, I am on page 16 of the PDF, and this is Plaintiff's Bates-stamped Plaintiff000794. I'm just going to show you the highlighted part.

The third highlight of four reads -- actually, the first highlight reads "Adam Bialek."  Underneath that is "11/23/2022."

That was the email we were discussing, correct?

A.    Yes.

Q.    Now, the third highlight says, "Here is the source information from the email that I was able to capture, being sent as courtesy."

Do you see that?

A.    Yes.

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 125 of 272

Page 125

P. O'LEARY

Q.     Do you believe that Mr. Bialek was under any obligation to send that email to anybody?

A.     One of the issues Ms. Trombetta was having, she wanted the -- she wanted the SMTP, the complete raw data, SMTP data protocol sent to her regarding this email. And she wanted it, you know, from wherever it needed to come from, so she wanted it from Estate Auctions, Inc. and she wanted it had from WorthPoint.

Q.     Do you know Mr. Bialek personally?

A.     I mean, I'm not going to split hairs with you whether this was courtesy or this or whatever.  That's between them and Ms. Trombetta.

Q.     Do you know Mr. Bialek personally?

A.     No.

Q.     Is your knowledge as far as what Mr. Bialek was or was not obligated to do solely from what Ms. Trombetta told you?

A.     No.  Actually, I believe that

Page 126

P. O'LEARY

was a court order that was in place, and Mr. -- it was ordered that, basically, they had to turn things over, the parties had to turn these emails -- this email in question over. In the raw format, in the SMTP raw format.

Q. Have you seen this order personally?

A. I believe I did, at some point in time, yes.

Q. Do you recall this order ordering Mr. Bialek or WorthPoint's attorney to produce anything with respect to an eBay document?

A. Ms. Trombetta made the request, saying, "I want this email, I've been trying to get it for a quite a long period of time, I want the SMTP raw data from there."

And she put that in discovery.

Q. Mr. O'Leary, I'm asking you about what you recall the court order saying or not saying. If you don't recall, that's fine. It's not a memory test.

Case 1:18-cv-00993-LTS-SLC   Document 425-9   Filed 04/17/23   Page 127 of 272

Page 127

P. O'LEARY

A.    Yeah, it's -- I don't recall right now.

Q.    Okay, thank you.

Now, are you aware of the claims that Ms. Trombetta is making in this lawsuit?

A.    Yes, I'm reasonably familiar.

Q.    And which of the claims is this email relevant to?

A.    This email pertains to this alleged sale.  And she's trying to find out about this painting, was this painting sold.  That ties back to the URL link.

The painting that's -- that was allegedly sold has her name all over it, so her name is being fraudulently used from her perspective.  It's being fraudulently used to market this painting, or to have marketed this painting.

And she's saying, that's -- "I didn't paint this painting.  I would have been nine years old at the time that this painting was made in 1972, painted 1972, I would have been nine years old."

Page 128

P. O'LEARY

And what she's saying is, "This is hurting my business, it's damaging me."

It's affecting her ability to market herself as an artist in New York City.

Q.   Is that -- to your understanding, is it Ms. Trombetta's position that this sale of this painting on eBay never happened?

A.   Well, it's not clear, since there's been so many games played with this email, as I pointed out in my affidavit.  I mean, there's one painting in question here, and we got three different instances of this email receipt, all on different dates.  So it's not clear.

She just asked for a simple one copy, one painting, one SMTP raw data.

Q.   Okay.  So based on your analysis in this action, what do these emails reviewed prove to you?

A.   What it proves to me is it doesn't make any sense that there's multiple copies of one email, all right?

**SA1510**

Page 129

P. O'LEARY

So when it came from Mr. Bialek, where he basically did a swipe of the HTML and sent it -- as a courtesy or otherwise, it's irrelevant; I don't care about that -- that produces one version of it.

Then you got -- I believe it's Estate Auctions, Inc. sent over an EML file.  So when we look at the EML file, that produces exactly what Mr. Bialek produced, right?

But then prior to that, earlier, if you go down and look at my timeline, you'll see that Estate Auctions, Inc. sent over two other copies of the same alleged email.

So on April 27, 2022, okay, she gets one copy of this email receipt.  Then what, April to November, that would be seven months later -- a round figure, thereabouts -- she gets another one.  Then you got Mr. Bialek's version of it.  Then you got one that came in from Estate Auctions, Inc., I believe, from the EML

**SA1511**

Page 130

P. O'LEARY

file.

So what I pointed out here in the affidavit is, we're talking about one painting, okay, one alleged sale.  And what we've got here is that -- you know, we've got three different copies of a receipt.  Clearly, people were playing games with this.

And I took this information, and that's what I did on page -- on page 9 of basically the header -- page 9 -- where I basically took the HTML file, I put it on my expertwitness server, then I took the one that Mr. Bialek sent and put it on there.

Q.    Can you please give me what was the title of page 9?

Because again, this report does not have -- I see there's some sort of pagination at the very bottom.  It's partially cut off.  This one doesn't have any pages.

A.    Stop, stop, stop.

Q.    This one?

Page 131

P. O'LEARY

A.    Right there.

Q.    "Timeline"?

A.    That's the timeline there, all right, that I was referring to before.

Then if you scroll up -- hang on one second.  I'll tell you how many pages so we can deal with this quickly.  So go one, two, three, go up four pages.

Q.    A page starting with, "I'm returning to the first email"?

A.    Okay.  So right there I put the two -- I put the HTML from the two documents onto the next word so you can click on it.  And that's where I'm able to show that they were the same.

But then I was able to get the HTML that came on -- I was able to get the HTML that came in from the Estate Auctions, Inc. earlier in the discovery.  And that's when I put them all out there, and that's when I lined up the timeline, to show you how they were different, the dates they came in, and what was going on here.

Now, again, this isn't rocket

Page 132

P. O'LEARY

science.  How do you have one painting, three emails?

Obviously, there's something nefarious going on here.  You don't have to be an art expert to know there's something nefarious going on here.

Because this is an email -- this is my area of expertise when we get into SMTP, Henderson protocols, and HTML.

All the stuff I've done for the last 35 years directly pertains to what we have here, the email, the SMTP headers, the HTML, and how it formulates, taking that information, being able to put it into two files on the web server, so people could see it, and they can quickly realize there were games going on here.

There was so much misinformation going on, it was kind of crazy.

Q.    To sum up, you received three different versions of an email from Estate Auctions, Inc., and you received one version from Mr. Bialek, correct?

**SA1514**

Page 133

P. O'LEARY

A.    I believe -- yes, that's correct.

Q.    Mr. Bialek did not provide you with three different versions, did he?

A.    He provided that one at the time they were having the conference.

Q.    And again, he said that he was -- this was being sent as a courtesy.

And that's his language, right; not yours or Ms. Trombetta?

A.    That's not for me -- that was for him and Ms. Trombetta.  That was not my job to determine please and thank you's; my job was to look at the --

Q.    Okay.  Were you at the court conference we were referencing, the November 23 --

A.    No.

Q.    As you sit here today, are you claiming that painting was definitively not sold on eBay?

A.    It's up in the air because we can't get it -- we can't get a straight -- okay, we can't get a straight answer from

**SA1515**

Page 134

P. O'LEARY

them.

I'm glad you brought that up.

We actually -- there is one other thing.  Estate Auctions, Inc. turned over another file, okay, that was white letters on black background.

Now, in all my years of doing this stuff, okay, there would have been no reason to turn over a document that was completely cut off.

If you look at this thing -- it's EAI75 -- excuse me, 74.  Hang on a second.  73 through 78 and 79.

So you got this document that Estate Auctions, Inc. turned over, that was an attempt at the SMTP protocol headers, but it's all cut off on one side. Then when you scroll down all the way to the bottom, to the last portion of it, it's incomplete.  I mean, it's cut off at the bottom where you don't have the rest of the protocol data, the components that complete the SMTP protocol format.

And I put that in the report,

Page 135

P. O'LEARY

okay -- hang on, wait for it, wait for it, okay -- a simple mail transfer protocol, SMTP overview.

So here's an example where I took a very complicated protocol and I boiled it down to one page, so that nontechnical lawyers could understand it. And jurors, if this affidavit was given to the jurors.

This one document takes stuff that would -- is very complicated and very detailed and -- forgive me, I'm not trying to offend anybody, okay? And I don't mean this in a condescending way, but it dumbs it down, simplifies it.

Maybe I should use that word, "simplifies it," so that people can look at this and say, "Okay, these are the components that make up the protocol. And here's the header," which we call the envelope, "here's the ASCII text, here's the HTML, this is the protocol body."

So Estate Auctions, Inc. and EAI70 -- the numbers I just gave you --

Page 136

P. O'LEARY

they turn over this white letters on black background, and the whole left side is cut off and the bottom of the document is not complete.  So it's like, you know, what's up with that; what kind of games are being played there?

And yet, we have that version in the mix here.

Q.   So when you said in your report that "something nefarious is obviously going on here by the Defendants," what you're referring to is the multiple versions of the email, correct?

A.   Yeah.  You can't produce one copy of the silly email.

Q.   Yes?

A.   Yes.

Q.   Anything else that you are referring to as "something nefarious is obviously going on"?

A.   For some reason they can't delete a URL, which should take minutes to hours to delete.

Q.   Have you determined the reason,

Page 137

P. O'LEARY

as reflected in this December 5th, 2022, affidavit?

A.    Again, I did not do a report; this was an affidavit to address the discovery issues.

Q.    Now, you also stated, in your report conclusions --

A.    Okay.

Q.    -- "it seems the Defendants are not being truthful, thus, any reasonable person would likely conclude that they are concealing something."

Again, is this in reference to the emails or something else?

A.    You have the emails, as we pointed out in this affidavit.

Q.    Okay.

A.    But then --

Q.    I'm only asking about the affidavit.

Is there anything else in this sentence of the affidavit that you're referring to here?

A.    That sentence, as it pertains,

Page 138

P. O'LEARY

at the time it was written, was in regards to the affidavit.

But other things come along that basically opened up a Pandora's Box. Because, you know, falsus in uno, falsus in omnibus, okay?

When you see this, you start to see other things.  When you see the kind of games that were played here, I started to look for other things.  Other things were able to be found.

Q.    By the way, do you know that Ms. Trombetta contacted the buyer of this painting?

A.    We may have talked -- she -- she may have -- we may have talked about it.  I don't necessarily have the recollection if she did, or what she discussed.

Q.    So knowing that, do you dispute that the painting was sold on eBay?

A.    But was it sold with that receipt?

That's the problem.

Page 139

                    P. O'LEARY

Q.    Let me get to the receipt. Let's get to -- eBay steps.

You're not disputing that painting was sold on eBay, since Ms. Trombetta contacted the buyer?

MS. TROMBETTA:  Objection. Alleged buyer.

MS. FARMER:  Objection noted.

You may answer.

A.    Because it's not exactly clear, I can't give you a direct answer on that because, you know, you have this alleged buyer out there, and it may not have been purchased through eBay.

And if you -- if the Defendants -- both yours and the others -- had just produced one silly HT -- I'm sorry, SMTP raw data format that she's been asking for for four years, this all would have been resolved years ago.

Q.    Let's go back to terminology.

We've been calling your December 5th, 2022 document an affidavit.

Just to confirm, besides the

Page 140

                    P. O'LEARY
affidavit, you have not produced any
reports, correct?

    A.    That's correct.

    Q.    Have you -- in your experience
as an expert witness in federal court, have
you ever produced Rule 26 disclosures?

    A.    Define "Rule 26."

          I'm not a lawyer so I'm going
to have you do that.

    Q.    It would be a document that
says "Rule 26 expert disclosure" in the
title.

    A.    Yes, I've had to turn over, you
know, affidavits, reports, and then all the
other stuff that would go with this in many
of my other cases.

    Q.    And did any of those documents
that you referenced have a title of "Rule
26 disclosure" or something to that --

          MS. TROMBETTA:  Objection.
       Objection.  He just said earlier he's
       in law school; he's not a lawyer.

          MS. FARMER:  Your objection is
       noted, Ms. Trombetta.  I'm asking him

Page 141

P. O'LEARY

about his experience as an expert in 20 cases.

A.    I would be working with a lawyer and they would be handling those legal details.

Q.    In this case, did you produce a Rule 26 disclosure?

A.    I'm not a lawyer; I'm not going to answer that question for you, sorry.

Q.    In your mind, is there a difference between an affidavit and report of an expert?

A.    Affidavits usually hone in and focus on one particular issue.  We're trying to deal with this issue.  In this case it was an affidavit because we were trying to deal with the discovery issues.

Reports generally are going to be a little bit more broad and cover probably more topics, more than likely.

Q.    Going back to your affidavit, Mr. O'Leary, you see you have a sentence, in the middle of the page Bates-stamped Plaintiffs000805, that reads, "From a

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 142 of 272

Page 142

P. O'LEARY

qualitative and logical high-level view, it is clear that Ms. Trombetta did not create this painting, as she would have been nine years old in 1972."

Do you see that?

A.    Yes.

Q.    Is that your opinion in this case?

A.    Yes.

Q.    What's the basis for this opinion?

A.    When you look at the painting in question, okay -- well, in 1972, she would have been nine years old, all right? She would have been born in 1963, so 1972, she would have been nine years old.

The painting says it was painted in 1972, on the end, all right? And in the title it says 1972, all right, that the painting was painted. So it's kind of -- from a qualitative standpoint, a nine-year-old didn't make this painting, all right?

Q.    Is it your expert opinion that

Page 143

P. O'LEARY

nine-year-olds cannot make oil paintings?

MS. TROMBETTA:  Objection.

A.    Yeah, really.  Well, okay.
This thing is four feet tall by 17 inches
wide, right?  If you look at this
fraudulent ad, okay, it's four feet, four
and a half feet, or something like that,
tall.

A nine-year-old would be how
tall; three feet going on four feet?

If it's up on an easel, she
would have to be up on a chair painting
this thing.

So come on, stop.  That didn't
happen; she didn't paint this painting.
You're being ridiculous.

Go ahead, move to strike as
nonresponsive; let's have it.

Q.    Please answer the question.

MS. FARMER:  Nathan, please
read back my question.

A.    I don't think it's likely that
a nine-year-old painted this painting.

Q.    And that's your expert opinion

Page 144

P. O'LEARY

in this case?

A.    I'm going to repeat.  From a qualitative stand point, all the other things taken into account -- the fact that she would have been nine years old, okay -- and from a logical, high-level view, it is clear that Ms. Trombetta did not create this painting.

Then if you go look at the painting, you have to open up some of the other elements about the painting.  There's all kinds of issues in the painting regarding her name, all right?  You know, on the front of it it says "A. Trombetta," all right?

Q.    Mr. O'Leary, do you recall I asked you about your art expertise and you asked how it's relevant?  This is how it's relevant.

I'm asking you, is it your expert opinion in this case that Ms. Trombetta did not paint this --

A.    Okay, I'm going to give you --

Q.    -- or are you making this as a

Page 145

P. O'LEARY

logical statement that any juror would also be able to make, because you don't claim a specialized expertise in this area?

So that's the question:  Are you claiming that this statement is true in your expert opinion or in the layman's opinion?

A.   I would put it in both categories.

Q.   Okay.  You're claiming to be an expert in paintings for nine-year-olds or lack thereof, correct?

A.   I don't need to be an art expert to be able to look at some of the defects that are in this painting that are absolutely ridiculous.

Q.   Okay.  So what can you add to the juror's understanding that they would not otherwise understand about nine-year-olds and paintings?

A.   Okay.  Well, I would point out to the jurors -- see, the jurors are just going to look at the painting and just see a painting, right?  But what I will do is I

Page 146

P. O'LEARY

will point out differences in the name, I will point out the subtle differences on this painting as it pertained -- as it pertains --

So like, for example, on the front of the canvas it's got "A. Trombetta" on the bottom of the document, in black, all right?  Inside the bio in two or three places it says "AnnaMarie Trombetta," in one place it says "AnnaMarie Trombett," on the back of the things it says "Anna Maria Trombetta."  Her name is not Anna Maria. The names, multiple times, in the ads, there's multiple variations, the segment says -- as I said, "A. Trombetta."

Then I would point out issues with the photo.  The ad says there's 12 photos, but there's only one on the ad that showed up on your website.

Then you got an issue when you zoom in on your signature, it says, "Copywrited and licensed to WorthPoint." Ms. Trombetta didn't do any of that.

Then you got the date of birth

Page 147

P. O'LEARY

of 1963, you know?

And then you got the epitaph by itself.  I'm sure she's still living.

So in '72 she would have been nine years old.  The bio came out of Ask Art, and then Ask Art has its own copyright of bios, if you go look at the Ask Art website.  It was graded in 1972; it was gifted in 1977.

I mean, I could go on and on about this thing.  I mean, it's all kind of issues in this painting, and I would point this out to the jurors.

And once I showed the jurors, and gave them a trained eye -- see, an expert witness' job is to basically -- and that's why we have a magnifying glass on our website, all right, to give people a trained eye to know what to look for. That's the specialized knowledge:  To hone in and see things.

And then I would show the jurors these variations and all these defects, and then they would be able to --

Page 148

P. O'LEARY

any juror would then, after that level of training -- give them that level of a trained eye, they would then be able to see that Ms. Trombetta did not paint this painting, and it's completely a fraudulent ad.

Q.   Mr. O'Leary, are you an expert in Ms. Trombetta's oeuvre?

A.   Am I an expert in Ms. Trombetta's what?

Q.   Oeuvre.  That's a term of art used in the art industry.

Are you familiar with that: Oeuvre?  That's the body of work by an artist.

A.   On a very high level, I'm familiar with some of the stuff that she paints.

Q.   Are you an expert in her work?

A.   No.  I never claimed to be an art expert in her work.

Q.   Are you claiming to be an expert in artistic practices of signing paintings?

Page 149

P. O'LEARY

A.     This isn't about a providence issue of signing a painting and all that. You're looking at the painting --

Oh, and I'm glad you brought that up.  On the back of the thing, on the back of the thing, on the easel, is where -- I just want to be very clear, that's where it points out the issue with the name, where it says "Anna Maria Trombetta."  So that's on the back of it. I wanted to make sure I was clear about that.

I'm not going to go down that path with you, all right?  You don't need to be an expert to be able to look at a signature, both on the front on the back, and the variations, how it shows up in the bio and stuff like that.  The judge will let me opine and testify, and bring that information to the jurors' attention.

Q.     Well, the judge will decide that.

But I'm asking you a yes-or-no question:  Are you claiming an expertise or

Page 150

                    P. O'LEARY
not, whether or not a judge would allow you
to do something?

    A.    I would be able to look at the
defects of the painting and point them
out --

    Q.    You're not answering my
question.

         Are you claiming expertise in
the artistic signing of paintings; are you
or are you not?  A yes-or-no question.

    A.    No, I'm not an expert in
signing artistic paintings, but I can see
the differences.

    Q.    Now, are you an expert in the
art industry, and what's acceptable and not
acceptable in the art industry?

         MS. TROMBETTA:  Asked and
    answered, Ms. Farmer.

         And I might actually make a
    suggestion for a break -- it's been
    almost an hour and a half -- just for
    everyone's wellbeing.

         MS. FARMER:  We can take a
    break again after Mr. O'Leary answers

Page 151

P. O'LEARY

the question.

A.    Okay.  Repeat your question.

MS. FARMER:  Nathan, please read back the question.

(Whereupon, the referred-to question was read back by the Reporter.)

A.    No, I never claimed -- I never claimed to be an art expert, so no.

MS. FARMER:  Thank you.  We can take a break.

How long a break would you like?

THE WITNESS:  How about 15 again?

MS. FARMER:  That's fine.

Nathan, the time is?

THE WITNESS:  Does anyone else need more time?

MS. FARMER:  We just need to state the time for the record before we take a break, please.

THE COURT REPORTER:  The time is 2:30.

Page 152

P. O'LEARY

MS. FARMER:  Thank you.  We will be back at 2:45.  Thank you.

(Whereupon, a recess was taken from 2:45 P.M. to 2:56 P.M.)

MS. FARMER:  Nathan, would you please state for the record the time that we are back on?

THE COURT REPORTER:  The time is 2:56.

Q.    Mr. O'Leary, during this break, have you met with Ms. Trombetta?

A.    No, I was taking care of a dog.

You went to expertwitness.com, it looks like.

MS. FARMER:  Yes, we did.

I'm going to ask Nathan to please mark this document as Defendants' Exhibit E, of today's date.  It's a PDF created from a capture of a website, patrickoleary.com/internet-expert-witness-litigation-experience.

By counsel, this document was provided to me by Attorney Anderson

Page 153

                        P. O'LEARY

Duff.

         Mr. Duff, is that correct?

         MR. DUFF:  That is correct.

         It was generated -- turned into

a PDF today, from that website.

         MS. FARMER:  And you did that

yourself, correct?

         MR. DUFF:  I did that

personally, yes.

         (Whereupon, Mr. O'Leary's CV

from patrickoleary.com was marked as

Defendants' Exhibit E for

identification as of this date by the

Reporter.)

    Q.    So Mr. O'Leary, I'm showing you

a four-page document that has just been

marked as Defendants' Exhibit E.  I will

scroll to the bottom of it.  Let me know if

you want me to zoom in, stop, or anything

else.  That's the bottom of the document.

    A.    Yep.

    Q.    Mr. O'Leary, do you recognize

what this document is?

    A.    It's my online CV at

Page 154

P. O'LEARY

expertwitness.com.

Q.    And is this CV up to date?

A.    If it's not, we'll make it up-to-date today, so...

Q.    Well, it looks like the last engagement that you reference here is dated 2012, for Google.

Is that the most up-to-date one?

A.    There was something in 2015 then there was another engagement -- there's two more engagements.  And then at the same time this was going on, there was another engagement in Texas.

MS. FARMER:  We already called for production of your full list of testimony as an expert.  So we'll just ask for the updated list, since this one looks like it needs to be updated.

Again, we'll follow up in writing.

Q.    Mr. O'Leary, prior to the break I asked you about your expertise in the art

Page 155

P. O'LEARY

industry, and you said you don't have any. I'm now referring to this paragraph in your report -- in your affidavit -- that starts, "Regarding damages."

Do you see this paragraph?

A.    Yes.

Q.    And it looks like, in the third line, or second and third line, you say that, "We need to consider that this unauthorized fraudulent transaction happened ten years ago, in 2012, when such acceptance by the art industry did not exist," and you talk about eBay.

So what's your basis for saying what is and was not acceptable in the art industry?

A.    Well, the internet has been an ever-expanding environment, has been growing more and more since I got involved in, you know, 1992.  So the basis for this is, over time, okay, today, the internet comes at us and is involved in our lives, it's on our phone, we're using it right now for the purposes of this deposition.  The

**SA1537**

Page 156

P. O'LEARY

electronic aspect of the internet comes at us ubiquitously, 24 by 7.  And it's been ever-expanding since it's got to this point.

So what that there is is -- I can probably generalize that statement, and say such acceptance by most industries did not exist, all right?

You don't have to say just the art industry did not exist; you can say most industries did not exist.

Because in 1995, I'm probably the only one in this room who even realized what the internet was, where it was going, and what it is today.

I'm not saying you didn't know; I'm not blowing smoke at you, all right?

But -- then in 2000, more and more people came on.  Then 2005, 2010.  By around 2010, the legal industry started really grasping it.  Most other mainstream industries started to latch on to the internet by 2010, 2015 timeframe, all right?

Page 157

P. O'LEARY

So an industry like the art industry would have basically done things probably what I would call "old school," okay? They would have done things more through the top-tier galleries; they would have done stuff through maybe books and magazines and so forth, okay? And over time it evolved to becoming ubiquitous -- electronic.

So, you know, that statement there, such acceptance by the art industry, I can put the auto industry, I could put the legal industry in that spot. We can put a blank line there and, say, "Fill in the blank right there," all right?

But I put the word "art" because that's what is at issue in this lawsuit, okay, is a piece of art, all right? And so that's where we have that issue there, okay?

So regarding damages, while eBay in 2022 may be far more acceptable by the business mainstream, we need to consider that this unauthorized fraudulent

Case 1:18-cv-00993-LTS-SLC   Document 425-9   Filed 04/17/23   Page 158 of 272

Page 158

P. O'LEARY

transaction occurred ten years ago, in 2012, when such acceptance by the blank industry did not exist.  Because if the transaction was a stolen car, we would put "auto," so because it's a piece of art, we're going to put "the art industry" there, okay?

You know, industries as a whole started grasping on to the internet and using it because of how efficient it is. So that's why I'm able to make that statement.

Q.   So that's from your expertise as an internet expert, correct?

A.    As an internet expert, as a business expert, as someone with an electrical engineering degree, a computer science degree, and an MBA, and someone who's working on their JD, and someone that's been an expert witness for 22 years, and someone owns that expertwitness.com, someone that built the largest dating portal.

So, you know, I have a very

Page 159

P. O'LEARY

different optic to look at this kind of stuff than you do, or probably anyone else in this room, in this lawsuit. So that's why I have the ability to have that specialized skill, that training, that experience that I can provide details, exclusive function to the trier. I have the ability to do that, and I'm confident the judge will agree with me.

Q. Has any court ever refused to accept you as an expert?

A. No.

Q. Did Ms. Trombetta provide you with a copy of a transcript of the deposition of Norb Novocin in this matter?

A. No, I don't believe I saw that deposition.

Q. How about Maureen Novocin?

A. No, I don't believe I saw that.

Q. Do you have an understanding that Mr. Novocin admitted to selling this painting on eBay?

A. Just because he says it doesn't mean it happened.

Page 160

P. O'LEARY

Q.    Do you have an understanding that Mr. Novocin admitted that it was he who attributed or put the name "AnnaMarie Trombetta" on that eBay listing at issue?

A.    What I do know is it was begin -- it was done by Estate Auctions, Inc., and that man is that person.  So yes, it would be -- I could say that -- I could make a reasonable inference to that effect.

Q.    As opposed to WorthPoint.

WorthPoint did not create that listing, to your knowledge, right?

On eBay, I'm talking about.

A.    No, no.  We know that; we resolved that a long time ago.

Q.    Do you have an understanding that Mr. Novocin admitted that it was he that put some portion, or even the entirety, or a portion of Ms. Trombetta's biography in that eBay listing; do you have an understanding for that?

A.    No, not directly, no, I don't, you know.

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 161 of 272

Page 161

P. O'LEARY

But again, we know that based on the admission he's made, based on eBay -- the alleged eBay -- if indeed he did do it -- because I'm not -- don't infer that I'm saying he did do it or he didn't do it, okay?

I have a problem with the whole eBay, that we can't even get past this email issue, all right? So I'm not convinced that it actually happened on eBay. I'm not --

Just because the guy says it, so what? Big deal. There's been so many other misrepresented facts or details in this case, let's add another one to the pile. So no, I'm not accepting that, okay?

He may have, he may he not have; maybe he did, maybe he didn't; maybe he's telling the truth, maybe he did not. I don't care.

Q.    But the point is it's not WorthPoint selling this painting on eBay; it's not WorthPoint that's putting the buying fee in the eBay listing, correct?

Page 162

P. O'LEARY

A.    But see, as far as it pertains to WorthPoint -- but Ms. Trombetta's name is still getting damaged because it was on WorthPoint, okay?

Q.    That's not my question.  I'm specifically focusing on that eBay listing, and I want to confirm your understanding.

WorthPoint is not involved with that eBay listing; is that right; is that --

A.    I think we resolved that a long time ago.  Allegedly.  Don't infer that I'm saying it happened.  But by that explanation, you could say that.

Q.    In this paragraph of your report that starts with "hence," "Hence, compounded with the quantitative alteration shown above, something nefarious has taken place in this dispute that supports Ms. Trombetta's liability and damages claims."

Now, so my question to you, Mr. O'Leary, is, besides this December 5th, 2020 affidavit, you have not produced any

**SA1544**

Page 163

P. O'LEARY

written material concerning Ms. Trombetta's liability or damage claims; is that right?

A.    No.  We have this affidavit.

Q.    Now, to go back to the time you spent during this deposition, you mentioned to us that you have not slept since about 10:00 A.M. yesterday; is that correct?

A.    Yes.

Q.    You have not slept, correct?

A.    No, no.  I -- but I do that -- that's the life of -- an entrepreneur does that.

Q.    When did you last sleep?

A.    Where are we now, 2:00?  Ten, eight.  30 hours ago.

Q.    So during the 23 hours that you testified you spent preparing for this deposition, have you taken any meal breaks?

A.    Had a protein bar, which gives me --

Q.    You took a meal break.

How long was that?  It only takes a few seconds to eat a protein bar.

MS. TROMBETTA:  Objection.

Page 164

P. O'LEARY

What does this have to do with the case, Ms. Farmer?

MS. FARMER:  Your objection is noted.  I'm not here to answer your questions, Ms. Trombetta.

Q.    Mr. O'Leary, have you showered in the past 24 hours when you were preparing for the deposition?

A.    Yes, I did.

Q.    How long did that take?

A.    Ten minutes.

Q.    Other than eating and showering, have you taken any other breaks during the 23 hours that you said you were preparing for the deposition?

A.    I might have taken five, ten minutes here, 15 minutes there, okay?  But over the course of -- but, if you remember, when I said the 23 hours, I said let's knock it down to 20, okay, to cover all kinds of breaks.

Q.    So if we knock it down to 20, how about taking care of your dog?

You were taking care of your

Page 165

P. O'LEARY

dog just about an hour ago.  Did you take care of your dog in this time?

A.    Yes, they've all been fed.  They're quite healthy.

Q.    Are we accounting for that when we subtract three hours and --

A.    Yeah.  Three hours I can get a lot of stuff done, spread out.

THE WITNESS:  Hey Titan, come here, jump up here.  Say hello.

MS. FARMER:  Mr. Duff, are you planning to ask any questions?

MR. DUFF:  What kind of dog is that?

THE WITNESS:  Titan is a -- he's kind of like a mix of everything.  We thought he was going to be a mastiff, but he kind of looks like a shepherd.

MR. DUFF:  He looks great.

Yes, Jana, I do have a couple of questions.

MS. FARMER:  I'm sorry, Anderson.  One more.

Page 166

P. O'LEARY

Q.    Mr. O'Leary, did you work on any other matters in the past 24 hours, besides Ms. Trombetta?

A.    No, no.

MS. FARMER:  All right.  I'll pass the Witness to Mr. Duff with the reservation of right to follow up.

Nathan, can you please have the time for the record?

THE COURT REPORTER:  The time is 3:13.

MR. DUFF:  Thank you, Nathan.

MS. FARMER:  Thank you.

Mr. Duff, your witness.

MR. DUFF:  Thank you.

Jana, if you could go up in Exhibit D to page 19 of 37, which at the bottom is Bates-stamped Plaintiff000797.

Yes, that is correct.

MS. FARMER:  Should I magnify it?

MR. DUFF:  Sure.  The important thing is Mr. O'Leary can see it.  I

Page 167

P. O'LEARY

have it enlarged in the PDF version on my computer.

A.    EAI -- what, what does that say, 58?  That's correct.

MR. DUFF:  That's correct, yes.

EXAMINATION BY

MR. DUFF:

Q.    All right.  Thank you very much, Mr. O'Leary, for your time today.  I just want to ask about -- these orange or yellow arrows, you placed these on this document, correct?

A.    I annotated this document, that's correct.

Q.    So the first yellow arrow I want to ask about is the yellow arrow that says "date" and "April 2022," which is at the top right of the document.

A.    Yes.

Q.    What does that date mean in this document?

A.    That would be the date that this piece of evidence would have been printed out.

Page 168

P. O'LEARY

Q.    So that was the date when this PDF was created -- when this document was created or printed out?  Excuse me.

A.    Printed out, created, yeah.

I mean, that --

Q.    So that's not the date of an email address; that's just the date on which the email was printed out or saved as a PDF?

A.    No.  The date is on the email, down on the left-hand side there.

Q.    Thank you.  So the next three I would like to ask about, "are the yellow bars present," there's another one on the left -- another arrow on the left that says "eBay logo is missing," and then another arrow underneath that says "image alt field is present."

A.    Mm-hmm.

Q.    What do those three arrows, what are they referring to?

Let's do it one at a time.

What does "yellow bars present" mean?

Page 169

P. O'LEARY

A.    Okay.  You'd get a better understanding of that issue if you go look at -- if you scroll down to the timeline.

Q.    Uh-huh.

A.    You can see --

Q.    Okay, sure.

A.    So we can -- okay.  So when you look at that, right, you see the yellow bar is present, then you'll see yellow bar is missing, okay?

Q.    So the yellow bar is not present in the document that is stamped "EAI60"; is that correct?

A.    Yellow bars missing in 60; yellow bars present in 58.

Q.    Great.  So then the next arrow says "eBay" -- and this is back at EAI58, which you can see in the timeline there the yellow arrow says "eBay logo is missing."

What does that mean in this context?

A.    At the same time, move your eyes up and down to EA60 and EA58, and you can see there's a logo with 60; there's not

Page 170

P. O'LEARY

one in 58.

Q.    Got it.  And then "image alt field," what's an image alt field?

A.    An image alt field is -- okay, in HTML, all right, the tag is "IMG" for image.  Then you're going to put a field in there called "source."  That's going to point at the actual image, JPEG, GIF file, et cetera, the actual image file.

The alt tag is used for like, when you mouse over things, okay?  You mouse over things, or if the image can't be loaded over or something like that, it will actually put what's in that alt tab in place of the image, so you have an idea that something was there.  And that's used for people who might have a handicap for accessibility things, people that are blind, et cetera.

Q.    Got you.  The next yellow arrow I want to talk about is present on EAI58, and it's in the bottom right.  It says, "Document is cut off."

What does that mean?

Page 171

P. O'LEARY

A.    EA58, when you put it there, for whatever reason, when it was sent to Ms. Trombetta, okay -- or was it turned over in discovery, I should say, okay -- for whatever reason, it was cut off.

I mean, how do you have a half of a "5"?

Q.    So everything to the right of that would have been cut off when it was sent to print?

A.    When it was created, okay?  But whether that was to print or to paper or whatever, it's cut off.

Q.    Everything to the right would have been cut off?

A.    Yeah.  You can put 5 and a zero, I believe.

Q.    So right above that you have a yellow arrow, in EAI58, that says, "Account link is missing," right?

A.    Yes.

Q.    Can we scroll down to EAI60, or if -- Mr. O'Leary, if you can see it in the timeline, can you tell me where in relation

**SA1553**

Page 172

P. O'LEARY

to the sale price, which is cut off in EAI58, where in relationship to that is the account link present?

A.    Well, looking at 60, you see where it says, "Account length"?

Q.    Yep.

A.    So in this case it would say, "Go to my eBay," all right?

Q.    Right --

A.    And then -- go ahead.

Q.    No, go ahead, go ahead.

A.    All right.  So then up here it says, "Account link is missing," right?

Q.    Right.

A.    There should be an account link there, and it's not.

Q.    Because it was cut off, right?

A.    Yeah.  I believe that's -- yes, yes, it's --

Q.    So that's an error that's created either when this email was turned into a PDF or when it was printed.  Okay, thank you.

A.    Woah, woah, woah.  I can't give

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 173 of 272

Page 173

P. O'LEARY

you an affirmative answer on that.  I'm not --

Q.    Okay.  Fair enough.

How do you access your email?

A.    Me?

Q.    Yes.

A.    On my phone, on a browser.

Q.    You go to a -- so do you use a desktop client ever?

A.    Yeah, I sometimes use Thunderbird; I've used Outlook.

Q.    You've used Outlook.

Is that Outlook for Windows or Outlook for Mac?

A.    No, I don't use it on a Mac; I'd be using it on Windows.

Q.    Have you ever printed an email from Outlook to PDF?

A.    I'm sure that in 35 years I've done that.

Q.    Are you familiar with the security features that the desktop client Outlook on Mac provides?

A.    We were talking about Windows.

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 174 of 272

Page 174

                    P. O'LEARY
          What do you want to talk about?
     Q.    I want to talk about Mac.
     A.    Okay.  The desktop --
          Say your question again, I'm
sorry.
     Q.    Are you familiar with the
security settings that the desktop version
of Outlook for Mac provides?
     A.    I'm reasonably familiar, yes.
     Q.    And are you aware that the
desktop client for Macs gives you the
option to never automatically download
images in an email?
     A.    Okay, yes.
     Q.    And so if you had that setting
in your desktop client, and you opened an
email, what would happen if you tried to
print an email that had images that weren't
downloaded?
     A.    You'd probably get the alt tag.
     Q.    Are you familiar with the
printing options in the desktop client of
Outlook for Mac when you are printing an
email?

Page 175

P. O'LEARY

A.    I'm reasonably familiar.

Q.    What would happen if, in the message options, you clicked only a box that says "email addresses in message header"; what would happen to the resulting PDF or piece of paper?

A.    All right.  So essentially, let's use -- if I can use myself as an example, all right?

Q.    Sure, sure.

A.    The email address I use in this litigation is patrick@expertwitness.com.

Q.    Okay.

A.    So what would happen is a lot of times when people send me emails, they see Patrick M. O'Leary, Patrick Michael O'Leary in there.

Q.    Okay.

A.    But if you hit that option it's going to give you my name and the email address.  And in some clients you may be able to just take out the name and just put in the email address.  And it is --

Q.    Sure, okay.

**SA1557**

Page 176

P. O'LEARY

A.    Let me explain, please.

In the SMTP protocol, you put your email inside of angle brackets. That's part of the SMTP protocol, all right?  Then you put name.

So when the client sees a name followed by something in angle brackets, it knows to use the email address.  But it will display --

Q.    Got you.

A.    -- that name.  So when you toggle that stuff off, it would determine what it's going to display.

Q.    So if you had email addresses in message header untoggled, would the email address show up?

A.    Intuitively, you would think not.  But I've seen things where it's not -- you know, it may not be honored, there could be another setting that will actually put them back in, there could be a security issue where you're required to put them back in, there could be an administrator override that's on the entire

Page 177

P. O'LEARY

operation for all users --

Q.    Okay --

A.    -- that puts that in, takes it out.

So you can't generalize like you're trying to do, sorry.

Q.    I'm not trying to generalize; I'm just asking -- and thank you for the detailed response.

So you're saying there are situations where the actual email address would not appear when you went to print the email?

A.    Yeah.  It's right there.

Q.    Thank you.  That's great.

In the desktop client of Mac, when you go to print an email there is an option to toggle on or off, it says, "Picture in message body."

So are you familiar with what toggling that option on and off would do?

A.    Pictures in message body is this?

Q.    Yes, sir.

Page 178

P. O'LEARY

A.    Intuitively, if you had an inline message, it would probably either filter it out entirely or might put the alt tag in there.

Q.    Okay, thank you.

And then there is also -- in the desktop client of Mac for Outlook, or Outlook for Mac, there's another option when you go to print an email, that says "message backgrounds," that you can toggle on or off.

What would toggling that on or off do?

A.    Message backgrounds?

Q.    Yes, sir.

A.    Generally, that would be probably the background color of the message body, perhaps.

And, you know, you can turn that off if you had to, like if you were using a dark theme, perhaps.

Q.    So like, the yellow bar that does not appear in EAI60?

A.    No, no, no, you're winging it

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 179 of 272

Page 179

P. O'LEARY

there.  Because that's done with CSS.

Q.    Actually, I'm not winging it because that's literally what happens.

Okay.  There's one more print option when you print --

A.    You're telling me that's -- that can be done with CSS, what's being done there.

Q.    Okay, maybe it can.  I'm just letting you know what happens.  But thank you.

There's one last option I want to talk about in the Outlook desktop client for Mac.

When you go to print an email and the option is "date and time printed," and you can toggle that on and off, what does that option do?

A.    It would probably -- I believe it would turn off the thing that you first asked me about.

Q.    So in EAI58, where it says "April 27th, '22," that would be toggled by that option?

Page 180

P. O'LEARY

A.    Yes.  It would be silly to toggle the date off in the actual header.

Q.    All right.  Thank you.

Can you use an EML file to read the SMTP data of that email?

A.    Yeah.  That's how you got the third image that was sent to your --

You're Mr. Duff, right?

Q.    I am, yes, sir.  Thank you.

A.    I believe you sent over an EML file.

Q.    If you had the EML file, then you could generate or view the SMTP data, correct?

A.    Yes.

Q.    When did your involvement with matchmaker.com end?

A.    We sold to Lycos in August of -- I should say July 31st was the last day I owned it, in 2000.

Q.    And I'm in the wrong business, wrong line of work here.

Have you managed a website other than expertwitness.com since then?

Page 181

P. O'LEARY

A.    Well, I owned an ISP after that, so I owned many different websites with people.

Q.    What was the name of that ISP?

A.    It's on my CV; it's always 24 by 7.

MR. DUFF:  Okay.  Thank you. All right.  Thank you.

That's all I have, Jana.

Thank you very much for your time, Mr. O'Leary.

MS. FARMER:  Sorry, I was muted.

So Nathan, the time is?

THE COURT REPORTER:  The time is 3:29.

MS. FARMER:  I'm going to reserve the right to re-depose Mr. O'Leary based upon the failure to provide the complete expert file, and with that, I don't have any further questions.

Nathan, and the time is now?

THE COURT REPORTER:  It's still

Page 182

P. O'LEARY

3:29.

Mr. Duff, do you need to order a copy of the transcript?

MR. Duff:  Yes, we do need to order a copy of the transcript.

MS. FARMER:  Have a good day, everyone.

MR. Duff:  Thank you very much.

MS. TROMBETTA:  Are we finished?

THE WITNESS:  Woah, woah, woah.

MS. TROMBETTA:  Aren't I allowed to question?

MS. FARMER:  Well, if you want to pay for the transcript and Mr. O'Leary's time, you're welcome.

MS. TROMBETTA:  Well, in the other deposition I was allowed to cross-examine.

MR. BIALEK:  You are.  You're entitled to cross-examine, but you need to understand that we are no longer paying for Mr. O'Leary's time or the transcript for your part of

Page 183

P. O'LEARY

the deposition.  I mean, we'll order it, but we're not going to be providing that.  If you're going to want the transcript, you're going to need to order it.

MS. FARMER:  In addition, Mr. O'Leary is your witness.  So you would not be cross-examining your own witness; that would be improper.  You can only direct-examine your witness.

MS. TROMBETTA:  So correct me if I'm wrong.  I was allowed, when Vanessa Ploski gave testimony, to ask questions.  Mr. Bialek pointed that out.

MR. BIALEK:  You're allowed to ask questions; no one's saying you can't ask questions.  We just want you to understand that from this point forward, you're paying, not us.

Do you understand that?

MS. TROMBETTA:  Again, I need to clarify why in the past I wasn't paying, and why in the present I am

Page 184

P. O'LEARY

financially liable at this point.

What's the difference?

Please --

MR. BIALEK: Okay. So the difference is you asked us to pay for the time of your expert. We've paid for the time of your expert. We didn't pay for the time of Ms. Ploski, okay? So from this point forward, you are paying for the time of your expert.

MS. TROMBETTA: Got it.

MR. BIALEK: As to the transcript, if you want the transcript, you're going to order the transcript, that's fine. Nathan can continue to transcribe this.

Now, the question is, since you have not noticed Mr. O'Leary, your questions need to be limited solely to the issues that were raised by Ms. Farmer or Mr. Duff on their direct examinations.

MS. TROMBETTA: Will do. I'm

**SA1566**

Page 185

P. O'LEARY

going to take a green light and go for it.

EXAMINATION BY

MS. TROMBETTA:

Q.    Mr. O'Leary, based on Mr. Duff's question --

MR. BIALEK:  Hold on.

Are we still on the record, Nathan?

THE COURT REPORTER:  Yes.

MR. BIALEK:  Okay.

Q.    Based on the last question regarding the toggling to remove certain items from an email, would that affect the content of the original raw message; if you were toggling out visuals, would it affect it?

A.    No, no.

Q.    No?

A.    That's the whole point of the SMTP.  That's why you were asking for it, so you didn't have to deal with that gymnastics, that nonsense.

Q.    So again, to further clarify,

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 186 of 272

Page 186

P. O'LEARY

if something was visually removed, or if the text was removed in an email, or cut off, would the raw message reflect that deletion or that text deletion, visual or text?

A.    No.  In the raw data, your data would be there.

Q.    Got it.  No further questions on that particular issue.

Now, regarding the January 14th, 2017 WP 134 specifically, that I emailed this morning --

MS. FARMER:  Objection.  I did not ask questions about that document; you're not allowed to proceed.

MS. TROMBETTA:  It was brought up by you --

MS. FARMER:  No, it wasn't.

MS. TROMBETTA:  Yes.  I put that in the email and you read it you aloud to everyone.  So technically, it is put into today's case via --

MS. FARMER:  No, I did not ask

Page 187

P. O'LEARY

questions about that.

You can only follow up on my questions, Ms. Trombetta.

MS. TROMBETTA:  Well, that makes it simpler.

Q.    The last and final thing I need to bring to the Court's attention -- the attorney's attention, the attorney's attention --

MS. FARMER:  The Court is not present here, Ms. Trombetta.

MS. TROMBETTA:  Well, in time I want it duly documented --

MS. FARMER:  This is not a time or place to document what you would like to bring to the Court.  If you want to ask questions, ask questions, please.

MS. TROMBETTA:  I am attempting to do that.

Q.    I will note that Mr. O'Leary's retainer is dated December 15th, and it is in my discovery as the last number, 891, 000891.

Page 188

P. O'LEARY

Mr. O'Leary, did I send you an email in December stating that I had due discovery, fact discovery, I had due a letter to the Court, I had due an amended complaint, on December 19th, yes or no?

A.    Yes, you did.

MS. FARMER:  Again, this is not what I have asked, Ms. Trombetta, so --

MS. TROMBETTA:  Well, you --

MS. FARMER:  You're going outside the scope of the direct. Please stop.

MS. TROMBETTA:  No, I'm not, Ms. Farmer.

I don't want to argue with you. You did bring up the fact whether I had engaged Mr. O'Leary.

There is a letter, there are four attorneys, I am one pro se litigant, and at the same time, in December, there were three demands that needed immediate attention aside from the fact that the expert witness

Page 189

P. O'LEARY

reports were due.  Mr. O'Leary --

MS. FARMER:  I will allow you limited latitude, but please, only with this line of questioning --

MS. TROMBETTA:  Thank you.

Q.    Mr. O'Leary --

MS. FARMER:  If you answer outside the scope of my direct, I will continue to object.

Q.    Mr. O'Leary, when I agreed to doing the affidavit, did I bring up the charges for that?  Yes or no.

A.    Yes.

Q.    When we agreed to do the affidavit, did I mention the expert witness report as well?

A.    Yeah.

Q.    When I asked about producing the expert witness report, did you phone me about that?

A.    Yes.  Well, we talked about it, yes.

MS. FARMER:  Objection. Leading your own witness.

Page 190

P. O'LEARY

Q.    When you answered the phone, did I state I was taking a nap because I had the flu?

MS. FARMER:  Objection. Leading.

Q.    What did I state when you called me about the expert witness report, please?

A.    I'm reaching here.  I believe you said you were sick, you weren't feeling well, or you had the flu or something.  I did not -- but you did mention some issue of being under the weather of some sort.

MS. TROMBETTA:  Thank you.

Let me just review my notes.

Q.    Okay, since we did discuss the raw message, EAI, I think it's 73 to 79, is it characteristic -- do most raw messages have a black background --

A.    No.

Q.    -- in general?

A.    No.

Q.    Is the -- in your opinion, is the original message complete?

**SA1572**

Page 191

P. O'LEARY

A.    No.

Q.    One more second and I believe I'm done.

On page 8 of your affidavit, it says, by Mr. Bialek, that, "As a courtesy, we don't go there.  The source -- we are sending you the source information."

Can you explain what "source information" is?

A.    The source information that he referred to was the HTML of the -- essentially, the body making up the email, okay?

So what I -- I have to explain. So you got the SMTP protocol, okay?  And I want to draw your attention up here to the previous page.

Q.    On page 7, the SMTP?

A.    Yes.

Q.    I'm on it.

A.    There I say, on the top box, as a teaching note, "The SMTP protocol will include the name, value, variable pairs, including, but not limited to, vendor's

Page 192

P. O'LEARY

email, date, receiver's email address, et cetera."

I show a general visual layout. If you look there where it says "email message," you got the header, you got the body, and you have attachments, right?  And a very high-level, that first diagram, I try to break all that down in order to make it real simple.

Then if you scroll down, you see the SMTP header.

Q.    Mm-hmm.

A.    Okay.  We also call that the envelope, right?

Then you see where it says "SMTP protocol body," right; you see that?

Q.    Yes.

A.    And over there, look to the right, it says "ASCII text and HTML."

MR. BIALEK:  Excuse me, are you referring to a specific document?  Because the transcript is not going to read properly without a reference to -- "look here, look there, look

**SA1574**

Page 193

P. O'LEARY

everywhere else."

MS. TROMBETTA:  Thank you, Mr. Bialek.

Q.    What page is that --

A.    Page 7 of --

Q.    Yes, page 7.

A.    Right.  But for his concern, just put the Bates stamp in the record.

Q.    I don't have the Bates stamp right in front of me; Ms. Farmer does.

So page 7 --

A.    Okay.

Q.    So again, just to clarify, my question -- thank you.  My question is --

MS. FARMER:  This is page 7?

MS. TROMBETTA:  Page 7, page 7.

MS. FARMER:  Page 7 of what?

MS. TROMBETTA:  Of the affidavit -- I'm telling you:  The affidavit by Mr. O'Leary.

MS. FARMER:  Okay.  This is page 4, 5, 6, I assume this is 7.

MS. TROMBETTA:  Right there.

Q.    Right there, right there.

**SA1575**

Page 194

                    P. O'LEARY

What is it, 793?  If you slide it up we can get the Bates stamp.  793?

A.    Okay.  So let me get back to -- thank you, Mr. Bialek, for getting that all straightened out.

So in 793, page 7 of the affidavit, you'll see at the left-hand side it says "SMTP protocol header," right?  And we call that the envelope.

Then if you slide down on page 7 -- when I say "slide down" -- excuse me, when you bring your eyes down on this same page -- same Bates page, okay -- you see "SMTP protocol body," right?

Now, on the same page, move your eyes over to the right.  It will say "ASCII text and HTML."

All right.  That's done so that when this email gets sent to different types of email clients -- maybe it's a browser, maybe it's Outlook, maybe it's something that's text-based, maybe it's something that's command line driven, like on a Unix machine, whatever -- what happens

Page 195

P. O'LEARY

is if the client is unable to display the
HTML, it will display the ASCII text.

But in today's day and age,
most clients can handle HTML.

So where you see HTML -- you
see all the that HTML there?  That's the
HTML source.  If you roll your eyes through
there, you'll see it says the exact same
thing than what's above it, okay?

So I think when Mr. Bialek sent
this over and he referenced "source," it
would have been the HTML source, a small
piece of the entire -- it would only be
maybe one quarter to one third of actually
the entire protocol that you were asking
for.

Q.    So to clarify, it's a segment?

A.    Yes, it would be -- that's a
good layperson word:  A segment.

Q.    I think that is all I needed to
question you about.

As far as the raw message is
concerned, whatever is being typed,
whatever is being deleted within the

**SA1577**

Page 196

P. O'LEARY

message during its composure, is that the same when the message is sent, or is it like your affidavits, where they're in a state of transition?  So to -- let me rephrase it.

A.    Yeah, please do.

Q.    In another way, when one is toggling and composing and putting in images or take images out --

A.    I call that manipulating.

Q.    Okay.  Well, for the sake of clarity, once you are composing an email and once you send the email, is the email that is sent in a fixed format; meaning it has been crystalized like a diamond; it cannot be cut into different facets?

A.    Right.  Okay.  So what you're trying to get at is, if they -- if they play some toggling gymnastics here, and it turns -- that's only the view when you look at it in a certain client.  And what Mr. Duff was talking about was like on a Mac in Outlook, and so forth like that, right, as what you see.

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 197 of 272

Page 197

P. O'LEARY

But even if you turn stuff on and off, when you put stuff into the message and you -- and at the time you press "send" and it constructs the SMTP protocol stack -- it's what we call the protocol stack, which is going to be the protocol header, the protocol body -- it's going to put all the components in.

The toggling is irrelevant at that point. The toggling is only for the presentation to the person's eye that's looking at that client.

Because what happens is when you hit "send," you don't know where it's going. You don't know, at the time that you hit "send," that it's going to a client, and what functions and features the other client on the other end and the other reader's going to have. Maybe they only have text-only; maybe they have HTML capabilities, so --

Q.    So --

A.    -- going to put it back in the complete format, with the text and the HTML

Case 1:18-cv-00993-LTS-SLC   Document 425-9   Filed 04/17/23   Page 198 of 272

Page 198

P. O'LEARY

and all the attachments in the proper form, and then send it.

Q.    So basically, the raw message is the soul of the email that is -- well, I don't know if --

A.    I think what you're grasping at is the sole authority.

Q.    Sole authority.

Authenticating nomenclature, "raw message" is indeed the map?

A.    Right.

Q.    Which has all the destinations used to envelope that email?

A.    Right.  Let me -- if I may give an example.  Is that okay?  All right.

Around the time that this case -- or just before this case really got busy, okay, relative to me, okay, I did another case on SMTP, a short little case on an SMTP issue with emails.

What had happened is a police officer used a police -- a police department email server to send an email, right, but then he denied he sent an email.

Page 199

P. O'LEARY

I was able to send from -- because I had access to the SMTP data, I was able to validate -- excuse me -- that he did send the email from the police department server.

Q.    Duly noted, duly noted.

A.    So is that -- the SMTP is the thing.  So when you want to authenticate something and validate something else real and valid, you go back to the SMTP, the simple mail transport protocol, all right?

Q.    Otherwise, also known as -- please confirm -- because the platform of Outlook calls it the "source information," the email platform Yahoo calls it the "raw message," and as my data in the December 5th filing with the Court will confirm, I submitted Mr. Bialek's email to me in an original message.  So for Gmail, the nomenclature, the name is "original." So --

MS. FARMER:  Objection. Leading.

MS. TROMBETTA:  No.  I'm

**SA1581**

Page 200

P. O'LEARY

explaining, actually.

MS. FARMER:  You're explaining to the expert what his opinion should be?

A.    Let me --

Q.    I am just clarifying for the record that -- whether it's called a raw message by Yahoo, whether it's called a source information by Outlook, which is an email server, or the email server Gmail, which is called the original message, all those different names are the same reference to the SMTP; is that correct?

A.    Yes, yes.  I mean --

MS. TROMBETTA:  That's it.  I'm done.  I'm done.  Thank you.

MS. FARMER:  Nathan, what is the time, please?

THE COURT REPORTER:  The time is 3:50 P.M.

MS. FARMER:  I have a follow-up question, Mr. O'Leary.

EXAMINATION BY

MS. FARMER:

Page 201

P. O'LEARY

Q.    Now that you heard Ms. Trombetta's questions, do you recall earlier testifying that you did not have an engagement letter?

MS. TROMBETTA:  Yes, there is an engagement.

MS. FARMER:  Are you testifying, Ms. Trombetta, now?

MS. TROMBETTA:  Why not?

MS. FARMER:  Well, this is a deposition of your expert, so please refrain from testifying.

MR. BIALEK:  And let's swear her in if she's going to testify.

MS. FARMER:  Indeed.

Q.    Mr. O'Leary?

A.    Are you guys done bickering?

Q.    Answer the question, please, sir.

A.    I answered "no."

Q.    What did you say?

A.    I answered "no."

Q.    How do you reconcile your testimony this morning when you said you do

**SA1583**

Page 202

P. O'LEARY

not have a retainer letter to what you just heard Ms. Trombetta testify?

A.    Well, she's saying she has an engagement letter, so, you know, why don't you -- I think what you should do is --

Maybe she was too busy, maybe she was too busy dealing with it, I don't know.  She's been running ragged, she's all by herself.  You've got 1,000 lawyers available; she's one person.  Maybe she was too busy, maybe she didn't get it to me.

Q.    So you're saying you have not seen it?

A.    That's correct.

MS. FARMER:  Thank you.  I have no further questions.

Mr. Duff?

MR. DUFF:  No further questions.

MS. FARMER:  Thank you.  Then we are done for today.

Nathan, and the time is?

THE COURT REPORTER:  3:51 P.M.

(Whereupon, at 3:51 P.M., the

**SA1584**

Case 1:18-cv-00993-LTS-SLC    Document 425-9    Filed 04/17/23    Page 203 of 272

**Page 203**

P. O'LEARY

Examination of this witness was

concluded.)

°          °          °          °

**SA1585**

Page 204

P. O'LEARY

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_____

PATRICK O'LEARY

Subscribed and sworn to before me this _____ day of _____ 20___.

_____

NOTARY PUBLIC

**SA1586**

Page 205

P. O'LEARY

E X H I B I T S

DEFENDANT EXHIBITS

| EXHIBIT LETTER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT A | Subpoena of Mr. O'Leary | 34 |
| EXHIBIT B | Email from AnnaMarie Trombetta, of February 28th, 2023, at 7:52 A.M., directed to Farmer, Jana S., with copied attachment to Patrick Michael O'Leary, Adam Bialek, Anderson Duff, and John Cahill | 38 |
| EXHIBIT C | Email of February 28th, 2023, at 12:44 P.M., sent by AnnaMarie Trombetta to Jana Farmer, copied to Patrick Michael O'Leary, Adam Bialek, Anderson Duff, and John Cahill, titled "Re: VeriText Hangs on MacOS Ventura 13.1 on | |

```
                                              Page 206
            P.  O'LEARY
              M1 Mac mini"                      66
EXHIBIT D     Notice of Deposition of
              Patrick O'Leary                   75
EXHIBIT E     Patrick O'Leary's CV from
              patrickoleary.com                153




              I  N  D  E  X


EXAMINATION BY                               PAGE
MS.  FARMER                             4,  200
MR.  DUFF                                    167
MS.  TROMBETTA                               185



  INFORMATION AND/OR DOCUMENTS REQUESTED
INFORMATION AND/OR DOCUMENTS            PAGE
All emails that Mr. O'Leary
exchanged with Ms. Trombetta             21
Any materials Mr. O'Leary may have
referenced in his work for
Ms. Trombetta on this file,
```

SA1588

Page 207

P. O'LEARY

including websites, screenshots,

or otherwise saved web pages          22

Records of man-hours or person-hours

Mr. O'Leary spent on the case         23

The checks that Mr. O'Leary

received from Ms. Trombetta           23

All documents that Ms. Trombetta

provided to Mr. O'Leary in

connection with this case             27

List of cases from

expertwitness.com                     109

Updated list of Mr. O'Leary's

expert testimony                      154


  QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

Page 208

P. O'LEARY

C E R T I F I C A T E

STATE OF NEW YORK        )

                         :  SS.:

COUNTY OF WESTCHESTER    )


I, NATHAN DAVIS, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of March 2023.

NATHAN DAVIS

**SA1590**

Page 209

**ERRATA SHEET**
**VERITEXT/NEW YORK REPORTING, LLC**

CASE NAME: Trombetta, AnnaMarie v. Norb Novocin, Marie Novocin, Estate Auctions, Inc., Et Al
DATE OF DEPOSITION: 2/28/2023
NAME OF DEPONENT: Patrick O'Leary

PAGE    LINE (S)        CHANGE                      REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

_____
Patrick O'Leary

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____        _____
(NOTARY PUBLIC)                MY COMMISSION EXPIRES:

**SA1591**

**[& - 26]**　　　　　　　　　　　　　　　　　　　　　　Page 1

**&**

**&**　2:14 3:17

**0**

**000798**　85:2
**000799**　86:17
**000891**　187:25
**00993**　1:6

**1**

**1**　3:17 40:23
　76:24
**1,000**　12:24
　15:5 16:4
　202:10
**10**　83:18
**100**　5:16,17
　11:20 14:13,15
　16:12,17 17:2
　49:23
**10017**　2:16
**10128**　2:5
**109**　207:12
**10:00**　53:21
　55:10,15,21,21
　163:8
**11/23/2022**
　124:16
**11101**　2:10
**11717**　4:14
**11:00**　55:6,10
**11:12**　1:13
**12**　146:18
**1217**　2:10
**12:24**　65:6

**12:26**　64:11,16
**12:41**　64:13
**12:44**　65:21
　66:17 205:18
**12r**　2:5
**13.1**　66:2
　205:25
**132**　41:23 42:3
　42:8
**133**　41:23 42:3
**134**　41:23 42:3
　186:12
**14**　83:20
**14th**　186:12
**15**　57:23 64:3
　151:15 164:18
**150**　2:16
**153**　206:6
**154**　207:14
**15th**　187:23
　208:21
**16**　103:7
　106:13 124:9
**167**　206:15
**17**　143:5
**175**　2:5
**18**　1:6
**185**　206:16
**19**　82:5 166:18
**1963**　142:16
　147:2
**19701.00006**
　2:18
**1972**　50:14
　127:24,24

**142**:5,14,16,19
　142:20 147:9
**1977**　147:10
**1987**　102:8,19
**1992**　102:25
　103:6 155:21
**1995**　103:7
　104:5 156:13
**1997**　104:6
**1998**　104:6
**1998/1999**
　106:11
**19th**　75:9 188:6
**1st**　17:19 47:12
　47:14

**2**

**2/28/2023**
　209:3
**20**　9:22 21:8
　24:7 55:12
　141:3 164:21
　164:23 204:19
　209:22
**200**　206:14
**2000**　106:13
　156:19 180:21
**2005**　156:20
**2010**　156:20,21
　156:24
**2012**　154:8
　155:12 158:3
**2015**　52:13
　109:16 154:11
　156:24

**2016**　62:21
**2016-0220.txts**
　67:2
**2017**　186:12
**2020**　162:25
**2022**　30:10
　40:20,21 72:3
　73:24 81:3
　83:12 118:9
　120:14 121:10
　123:4 129:18
　137:2 139:24
　157:23 167:18
**2023**　1:12
　38:14 44:23
　47:12 65:5,21
　68:16 205:11
　205:18 208:21
**20s**　6:15
**21**　64:15 103:8
　206:22
**22**　103:25
　158:21 179:24
　207:3
**23**　40:21 55:12
　133:18 163:17
　164:15,20
　207:5,7
**23rd**　123:23,24
**24**　156:3 164:8
　166:3 181:7
**24408**　208:24
**25**　55:11,21
**26**　140:7,8,12
　140:20 141:8

**[27 - above]**                                                                                      Page 2

**27**  129:18 207:10
**27th**  179:24
**28**  1:12 68:16
**28th**  38:14 44:23 65:5,20 205:10,17
**2:00**  163:15
**2:30**  151:25
**2:45**  152:3,5
**2:56**  152:5,10
**2nd**  12:14 13:22 15:18 20:4 21:24 37:19 71:21

**3**

**30**  3:16 5:19 9:23 24:7 40:19,22 41:13 57:23 108:7 163:16
**31**  4:13
**31st**  180:20
**323**  62:19
**34**  205:8
**35**  89:17 90:9 90:20,21 92:6 93:20 97:3 102:2 110:2 113:14 132:12 173:20
**37**  75:25 82:24 166:18
**370**  32:5

**375**  16:6 17:2
**38**  205:16
**3:13**  166:12
**3:29**  181:17 182:2
**3:50**  200:21
**3:51**  202:24,25

**4**

**4**  193:23 206:14
**40**  35:14 36:11
**42nd**  2:16
**43-10**  2:10
**45**  100:13
**4th**  52:6

**5**

**5**  40:20 41:22 41:22 171:8,17 193:23
**50**  5:18 11:19 14:13 16:12,17 17:2
**51**  43:11
**58**  167:5 169:16 170:2
**5:00**  20:7 54:5 55:5
**5th**  13:20 15:16 17:19 20:2 21:23 48:3,4,4 48:5 62:20 72:3 73:24 77:24 81:3 83:11 120:14

120:24 121:10 123:4 137:2 139:24 162:24 199:18

**6**

**6**  193:23
**60**  169:15,25 172:5
**66**  206:2

**7**

**7**  66:25 156:3 181:7 191:19 193:6,7,12,16 193:17,17,18 193:23 194:7 194:12
**72**  147:5
**73**  134:14 190:18
**74**  134:13
**75**  206:4
**78**  134:14
**79**  134:14 190:18
**793**  194:2,3,7
**7:52**  38:14 44:22 45:11,17 68:16 205:11

**8**

**8**  191:5
**80**  85:2
**87**  102:22
**891**  187:24

**8:00**  20:12

**9**

**9**  130:11,12,18
**90**  29:25
**90s**  102:24
**96th**  2:5
**99**  84:13 85:2
**9:00**  20:12 53:21

**a**

**a.m**  1:13
**a.m.**  20:7 38:14 44:22 45:11,17 55:10,15,21,21 68:16 163:8 205:11
**ability**  128:4 159:5,9
**able**  9:11 32:16 46:13 49:21 91:14 93:14,21 94:17,19 112:4 124:22 131:15 131:17,18 132:15 138:12 145:3,15 147:25 148:4 149:16 150:4 158:12 175:23 199:2,3
**above**  1:20 111:2 162:19 171:19 195:10 204:6

**[absolutely - affidavit]**                                    Page 3

absolutely
  32:14 41:3
  45:4 70:22
  88:23 89:15
  96:3 101:9
  145:17
accent  74:17,22
accept  159:12
acceptable
  150:16,17
  155:16 157:23
acceptance
  155:13 156:8
  157:12 158:3
accepting
  161:17
access  30:23
  33:5 173:5
  199:3
accessibility
  170:19
account  31:16
  33:18 144:5
  171:20 172:4,6
  172:14,16
accounting
  165:6
acknowledged
  68:10
acquired
  106:25
action  34:19
  35:9 77:4
  128:21 208:17

activities  17:22
  18:7 89:19
  92:7
actual  170:9,10
  177:12 180:3
actually  9:22
  12:6,12,13
  14:5,15,16,16
  18:17 19:14
  31:25 32:7
  33:20 37:5,18
  50:18 60:18
  61:13 65:15
  87:4 92:23
  98:6 107:3,5
  108:22,23,24
  110:13 111:8
  111:13,17
  119:3,3 123:20
  124:14 125:25
  134:4 150:20
  161:11 170:15
  176:22 179:3
  195:15 200:2
ad  49:4 50:12
  59:5 143:7
  146:18,19
  148:7
adam  2:18
  38:17 65:23
  123:15 124:15
  205:15,22
adam.bialek
  2:19

add  63:17
  145:18 161:16
addition  35:24
  183:7
additional  77:8
  78:5 81:8
address  4:12,13
  60:13 123:20
  124:5 137:5
  168:8 175:12
  175:22,24
  176:9,17
  177:12 192:2
addressed
  24:22 51:13
  59:24 68:8
  120:20
addresses
  175:5 176:15
administer
  3:11
administrator
  176:25
admission
  161:3
admitted
  159:22 160:3
  160:19
ads  146:14
advertiser
  103:24
advertising
  103:21
advice  29:22

advised  47:10
  76:25
advising  29:17
  29:19
affect  185:15
  185:17
affecting  128:4
affidavit  12:8
  13:20 15:16
  17:21 18:23
  19:25 21:2,24
  24:22 37:5
  47:24 48:2,8
  51:22 53:2,3
  56:15 72:3,6
  72:10 73:25
  75:4 77:22
  81:3 83:3
  86:25 87:2,14
  88:10 92:2
  95:6 112:12
  120:15,18
  121:4,11,13
  128:13 130:4
  135:9 137:3,5
  137:17,21,23
  138:3 139:24
  140:2 141:12
  141:17,22
  155:4 162:25
  163:4 189:12
  189:16 191:5
  193:20,21
  194:8

[affidavits - art]                                                                    Page 4

**affidavits**
140:15 141:14
196:4
**affirmative**
173:2
**afternoon** 65:5
**age** 195:4
**ago** 68:22
139:21 155:12
158:2 160:17
162:13 163:16
165:2
**agree** 48:14
88:7 123:14
159:10
**agreed** 3:5,20
189:11,15
**ah** 56:23
**ahead** 67:10
108:6,14
143:18 172:11
172:12,12
**air** 133:23
**ajd** 2:11
**al** 209:2
**alleged** 50:13
50:19 122:2,12
123:9 127:12
129:17 130:5
139:8,13 161:4
**allegedly**
122:22,23
127:16 162:13
**allow** 150:2
189:3

**allowed** 182:14
182:19 183:13
183:17 186:16
**aloud** 186:23
**alt** 168:18
170:3,4,5,11,15
174:21 178:4
**alteration**
162:18
**amended** 188:5
**amount** 59:17
**analyses** 79:24
**analysis** 82:8
120:16 128:21
**anderson** 2:11
4:20 38:17
65:24 152:25
165:25 205:15
205:22
**angle** 176:4,8
**anna** 146:12,13
149:10
**annamarie** 1:3
2:4 5:3 38:13
63:11 65:21
66:16 84:25
146:10,11
160:4 205:9,19
209:2
**annexed** 77:4
**annotated**
167:14
**answer** 7:3,9
7:15 46:9 57:6
58:8 60:20

61:11,20 71:5
80:3 81:25
90:18 94:24
96:20 97:7,8
99:4 108:20
110:8 133:25
139:10,12
141:10 143:20
164:5 173:2
189:8 201:19
**answered**
51:15 115:14
150:19 190:2
201:21,23
**answering** 80:6
80:11 150:7
**answers** 25:6
80:17,21 81:11
150:25
**anticipating**
13:10 16:25
**anybody** 71:23
88:12 110:19
125:4 135:14
**anytime** 60:9
**apartment** 2:5
**appear** 84:21
85:20,24
177:13 178:24
**appears** 41:10
**applies** 123:12
**appraisal**
116:10
**appreciate**
16:23 26:9

**approached**
54:18
**approximately**
5:14
**april** 129:18,20
167:18 179:24
**area** 132:9
145:4
**argue** 188:17
**array** 62:6
**arrow** 167:16
167:17 168:16
168:18 169:17
169:20 170:21
171:20
**arrows** 167:12
168:21
**art** 23:3 52:12
95:10 112:17
113:12,25
114:8,19,22
115:4,6,9,17
116:5,6,10,17
116:18 117:4
122:14 132:6
144:18 145:14
147:7,7,8
148:12,13,22
150:16,17
151:10 154:25
155:13,16
156:11 157:2
157:12,17,19
158:6,7

**[artist - back]**                                                    Page 5

**artist**  114:5
128:5 148:16
**artistic**  148:24
150:10,13
**artworks**
114:16
**ascii**  135:22
192:20 194:18
195:3
**aside**  188:24
**asked**  8:7 50:6
54:23 70:10,23
72:22 73:7
74:7,13 77:20
78:22 90:6
95:2,7 96:22
97:3,5 105:14
108:17 113:9
115:13 124:5
128:18 144:18
144:19 150:18
154:25 179:22
184:6 188:9
189:19
**asking**  7:3
35:25 36:3
47:20 48:24
63:7 74:12
78:4,24 91:18
91:22 94:20,22
96:16 106:6
110:7 116:15
126:22 137:20
139:20 140:25
144:21 149:24

177:9 185:22
195:16
**asks**  18:25
**aspect**  156:2
**assist**  88:15
89:8
**assistance**
89:11
**assume**  7:10
193:23
**assumed**  36:8
**atrombettaart**
2:6
**attached**  41:8
41:12,21 42:22
56:20 75:3
**attachment**
38:16 40:19
41:2,8,13
66:22,24 67:8
67:11,14,18,22
68:3 205:13
**attachments**
26:22,25 39:9
39:10,22 40:17
41:6 43:9,16
46:11 192:7
198:2
**attempt**  134:17
**attempting**
79:16 80:4
187:20
**attention**
149:21 187:8,9
187:10 188:24

191:17
**attorney**  4:18
4:20 126:14
152:25
**attorney's**
187:9,9
**attorneys**  2:8
2:15 63:23
71:21 117:22
119:7 188:21
**attributed**
118:15 160:4
**auctions**  1:8
2:9 4:22 51:25
85:4 119:6
122:10,15
123:13 125:11
129:9,16,25
131:20 132:24
134:5,16
135:24 160:8
209:2
**august**  11:18
18:9 19:9 30:8
30:9,10 118:9
180:19
**authenticate**
199:9
**authenticating**
198:10
**authority**  198:8
198:9
**authorized**
3:11

**auto**  157:13
158:6
**automatically**
174:13
**available**  38:4
100:19 103:2
202:11
**average**  111:3
**aware**  36:7
44:23 127:5
174:11

**b**

**b**  38:19,21 39:2
68:15 205:2,9
**back**  12:8
13:23 15:8
18:6 20:22
22:13 24:13
35:6 37:19
43:4,22 51:10
52:10 56:11,12
56:13,14 57:2
58:10,21,23
61:24 62:3
63:5 64:6,12
70:7 74:21,24
76:2,5 79:9,11
79:25 82:2,7
83:13 100:22
102:19 118:20
118:22 127:14
139:22 141:22
143:22 146:12
149:6,7,11,17
151:5,7 152:3

SA1596

**[back - bottom]**

Page 6

152:8 163:5 169:18 176:22 176:24 194:4 197:24 199:11

**background** 54:15 94:22 101:18 113:2 116:11 134:7 136:3 178:18 190:20

**backgrounds** 178:11,15

**backwards** 70:24

**baloney** 101:16

**banter** 11:5

**bantering** 13:23

**bar** 163:20,24 169:9,10,12 178:23

**bars** 168:15,24 169:15,16

**based** 85:23 128:20 161:2,3 181:20 185:6 185:13 194:23

**basically** 45:23 126:3 129:3 130:12,13 138:5 147:17 157:3 198:4

**basis** 142:11 155:15,21

**bates** 20:15 22:9,17 37:12 39:25 40:11 42:12,15 46:6 84:12,15,17 85:7,21 86:3,5 86:16 87:19 124:10 141:24 166:19 193:9 193:10 194:3 194:14

**bathroom** 63:2

**bean** 14:23

**becoming** 157:9

**beginning** 6:25 31:23

**behalf** 107:4

**believe** 32:4 38:11 41:7 42:4,6,18,24 44:8 45:5,9,21 72:15 73:21 81:10 86:6,15 99:14 101:19 117:12 119:13 122:9 123:23 125:2,25 126:10 129:8 129:25 133:2 159:17,20 171:18 172:19 179:20 180:11 190:10 191:3

**benefit** 19:18 19:20

**bent** 70:24

**best** 46:20

**better** 169:2

**beyond** 100:5

**bialek** 2:18 38:17 65:23 123:15,24,25 124:15 125:2 125:13,19,23 126:13 129:3 129:11 130:15 132:25 133:4 182:21 183:15 183:17 184:5 184:14 185:8 185:12 191:6 192:21 193:4 194:5 195:11 201:14 205:15 205:22

**bialek's** 129:23 199:19

**bickering** 201:18

**bid** 111:11,15 111:18

**big** 70:6 161:14

**bill** 10:23 11:6 11:11,14 17:11 18:3,5

**billed** 13:15

**billing's** 10:22

**bills** 16:20

**bio** 52:12 59:8 146:9 147:6 149:19

**biography** 160:22

**bios** 147:8

**birth** 146:25

**birthed** 53:2

**bit** 12:12 20:5 35:10 40:6 53:9 141:20

**black** 134:7 136:2 146:8 190:20

**blank** 157:15 157:16 158:3

**blind** 170:20

**blocks** 17:18

**blood** 208:17

**blow** 100:14

**blowing** 156:18

**body** 135:23 148:15 177:20 177:23 178:19 191:13 192:7 192:17 194:15 197:8

**boiled** 135:7

**books** 157:7

**born** 142:16

**bottom** 39:3,5 40:25 67:12 76:24 85:7,12 130:21 134:20

**[bottom - case]**                                    Page 7

134:22 136:4
146:8 153:19
153:21 166:19
170:23
**box**  89:17
101:5 138:5
175:4 191:22
**brackets**  176:4
176:8
**brainstorming**
11:6
**break**  7:13,16
18:8 60:9,12
60:15,21 61:14
62:12,13 63:3
64:9 68:9,23
68:23 69:4,5,7
70:4 73:7
150:21,25
151:12,13,23
152:11 154:24
163:22 192:9
**breakout**  63:10
63:12 64:3
69:22 70:3
**breaks**  53:22
55:8,12,22
163:19 164:14
164:22
**brentwood**
4:14
**bring**  80:20
93:5 149:20
187:8,17
188:18 189:12

194:13
**broad**  141:20
**broaden**  33:2
**brooklyn**
102:10
**brought**  107:9
134:3 149:5
186:18
**browser**  173:8
194:22
**build**  99:21
107:13 113:17
113:19,22
**building**
112:20
**built**  100:11,12
104:22 113:5
114:3,3,3
158:23
**bunch**  56:3
110:17 123:17
123:17
**bursts**  12:16
**business**  29:19
89:9 91:20
115:22 128:3
157:24 158:17
180:22
**busy**  198:19
202:7,8,12
**buy**  103:20
111:9
**buyer**  111:9
138:14 139:6,8
139:14

**buying**  116:17
161:25

**c**

**c**  2:2 4:2 66:3,6
66:15 68:13
88:4 204:2
205:17 208:2,2
**cache**  95:18
**cached**  99:22
**caching**  51:18
**cahill**  38:18
65:24 205:16
205:23
**call**  8:10,21
11:13 21:15
23:14 27:15
55:9,11,12
96:17 109:4
114:6 135:21
157:4 192:14
194:10 196:11
197:6
**called**  4:2 33:13
40:8,15 68:20
88:17 107:12
154:16 170:8
190:8 200:8,9
200:12
**calling**  96:12
120:9 139:23
**calls**  10:7 27:21
58:14 199:15
199:16
**canvas**  146:7

**canvass**  52:11
115:21
**capabilities**
197:22
**caption**  87:23
88:2
**capture**  23:8
124:22 152:21
**car**  158:5
**cards**  109:18
**care**  64:4 69:11
129:5 152:13
161:21 164:24
164:25 165:3
**career**  97:21
**cascaded**
113:18
**case**  1:6 9:10
9:12 10:19
11:3,17,24
12:22 13:11,24
13:25 14:2,5
14:25 15:19
18:11,12,18
22:13 23:25
24:13 27:18
29:4,6 31:8,17
31:19,23 32:6
41:10 42:17
43:2,20 47:2,5
51:11 77:19
84:23,25 89:22
90:8,12,23
91:8 94:21
96:4,15,19

**[case - combination]**                                                Page 8

98:10,15
100:25 107:20
107:21 109:10
109:14,16,24
110:4 112:4
115:23,24
119:23 120:2
121:7,12,16
141:7,17 142:9
144:2,22
161:16 164:3
172:8 186:24
198:18,18,20
198:20 207:5
207:10 209:2
**cases**  6:3 19:17
33:16 90:23
108:16 109:2,5
140:17 141:3
207:11
**cash**  10:16 13:6
**cashed**  13:5
**categories**
145:10
**cd**  92:20
**center**  100:17
**ceo**  102:6
**certain**  87:5
185:14 196:22
**certainly**  27:2
80:9 108:2
**certificates**
115:7,8
**certification**
3:8

**certifications**
72:12
**certified**  12:4
**certify**  204:4,8
208:10,15
**cetera**  42:9
85:2,4 170:10
170:20 192:3
**chain**  38:20
**chair**  143:13
**chalkboard**
44:18
**change**  209:5
**changed**  48:16
**characteristic**
190:19
**characterize**
97:12
**charges**  189:13
**chase**  70:6
**check**  9:7 31:24
35:14,18 36:12
48:13 88:5
118:7
**checked**  31:22
36:19
**checks**  13:4,7
24:2 207:6
**choppy**  7:5
**christmas**
77:23
**chronological**
31:21
**chu**  119:15

**circles**  107:12
**cisco**  100:19
**cite**  99:19
100:24
**cited**  96:18
**citing**  96:14
**city**  28:10,11
128:6
**civil**  1:19 34:19
61:2 117:13
**claim**  145:3
**claimed**  52:5
148:21 151:9
151:10
**claiming**
133:21 145:6
145:11 148:23
149:25 150:9
**claims**  77:15
127:6,9 162:22
163:3
**clarification**
19:2 75:7,11
**clarify**  50:17
183:24 185:25
193:14 195:18
**clarifying**  26:8
50:24 200:7
**clarity**  196:13
**class**  117:13
**classes**  113:13
113:17,18
117:12
**clear**  113:5
128:11,17

139:11 142:3
144:8 149:8,12
**clearly**  7:22
130:8
**click**  131:15
**clicked**  175:4
**client**  105:25
173:10,23
174:12,17,23
176:7 177:17
178:8 179:14
195:2 196:22
197:13,18,19
**client's**  19:18
19:19 22:25
37:15 52:23
56:10
**clients**  93:9
95:23 175:22
194:21 195:5
**clock**  93:2
**close**  67:21
**closer**  67:19
**code**  30:23
67:15
**cognitive**  33:8
**college**  102:2,7
102:15 114:24
114:25 115:3,5
**color**  178:18
**column**  40:19
41:2
**combination**
42:25

**SA1599**

**[come - considered]**                                      Page 9

**come**  18:4
   25:20 26:22
   48:25 54:21
   79:22 92:17
   103:5 104:8
   125:10 138:4
   143:15 165:10
**comes**  48:15
   92:19 95:9,21
   155:23 156:2
**comfortable**
   19:4 34:4
**coming**  42:19
   60:7
**command**
   194:24
**comments**
   103:4
**commerce**
   100:21
**commercial**
   103:6
**commingled**
   56:9,19
**commission**
   209:25
**commit**  40:7
**common**  100:5
**communicated**
   60:23 117:20
   119:4,9,14,17
   119:22,25
   120:3,4
**communication**
   120:11

**companies**
   104:23 105:12
**company**  8:16
   100:12,15
   102:6
**compelled**
   110:6
**compensate**
   15:7
**compensating**
   10:13
**compensation**
   35:21 61:3
**complaint**
   188:6
**complete**  125:7
   134:23 136:5
   181:21 190:25
   197:25
**completely**
   49:22 52:2
   134:11 148:6
**compliance**
   24:21 52:23
   112:10 120:19
   123:12
**complicated**
   135:6,12
**comply**  42:20
   60:24
**components**
   57:5 59:6
   134:23 135:20
   197:9

**composing**
   19:7 196:9,13
**composure**
   196:2
**compounded**
   162:18
**computer**
   63:20,23 69:15
   102:13,14
   158:18 167:3
**concealing**
   137:13
**conceivably**
   11:18
**concern**  193:8
**concerned**
   195:24
**concerning**  5:7
   57:11,14
   108:17 118:14
   123:5 163:2
**conclude**
   137:12
**concluded**
   203:3
**conclusion**
   34:15
**conclusions**
   88:21 137:8
**condescending**
   135:15
**conducting**
   61:9
**conference**
   24:18 123:19

   133:7,17
**confident**  159:9
**confirm**  9:5
   16:25 44:2
   72:16 81:2
   109:12 114:9
   116:2,14 123:8
   139:25 162:8
   199:14,19
**confirmed**
   123:9
**confirming**
   12:25
**conflict**  9:7
   31:24 32:3
   118:6
**connect**  79:13
**connected**
   46:18
**connection**
   4:19 5:2 8:3
   20:9 27:17
   30:17 31:6
   35:22 71:23
   72:7,23 74:8
   79:23 89:21
   119:20 207:10
**conscious**  46:3
**consecutively**
   85:21 86:2
**consider**  40:14
   89:21 155:10
   157:25
**considered**
   26:2

**[constructs - credit]**                                        Page 10

**constructs**
  197:5
**consult**  18:4
  19:24 20:18
  22:19
**consulting**
  19:10,22 22:3
**contacted**  94:7
  138:14 139:6
**contained**
  32:11
**contains**  67:15
  83:2
**content**  88:21
  91:23 92:20
  93:15,17 95:12
  95:21 98:5,6
  99:17 107:22
  108:18 185:16
**contents**  44:25
**context**  169:22
**continue**  19:4
  96:10 184:18
  189:10
**continued**  54:3
**contracts**
  117:13
**conveniently**
  102:12
**converge**
  106:15
**converged**
  105:7 106:20
**conversation**
  8:25 9:4,13

58:4 71:11
**conversations**
  9:14,19,23
  10:2 24:7
  57:19,21 70:9
  70:11 71:17
**convinced**
  161:11
**cooperative**
  70:22
**copied**  38:16
  65:22 66:18
  205:13,20
**copies**  20:25
  21:16 128:25
  129:16 130:7
**copy**  3:14,17
  39:19 43:18
  50:18 128:19
  129:19 136:16
  159:15 182:4,6
**copyright**
  147:7
**copywrited**
  146:23
**corporation**
  1:8 2:15
  117:21
**correct**  7:25
  15:4 16:13
  17:12 27:22
  31:2,10,13
  32:25 36:12
  40:12,24 41:19
  42:13 43:10

48:18 72:19
  73:25 80:5
  81:4,5 86:19
  118:10 123:6
  123:13 124:18
  132:25 133:3
  136:14 140:3,4
  145:13 153:3,4
  153:8 158:15
  161:25 163:8
  163:10 166:21
  167:5,6,13,15
  169:14 180:15
  183:12 200:14
  202:15 204:9
**correspond**
  71:23
**counsel**  3:6,17
  45:15 152:24
**count**  5:15
**counter**  14:23
**county**  208:5
**couple**  165:22
**course**  13:13
  21:12 26:12
  49:12 53:22
  115:16 164:19
**courses**  114:21
  114:22,24
  115:2,4,11
  116:6
**court**  1:2 3:13
  4:8,11 6:5,21
  18:25 31:5,10
  31:11 32:22

34:9,14 46:25
  54:14 60:25
  64:10,18 97:16
  106:4 126:2,23
  133:16 140:6
  151:24 152:9
  159:11 166:11
  181:16,25
  185:11 187:11
  187:17 188:5
  199:18 200:20
  202:24
**court's**  187:8
**courtesy**  124:2
  124:23 125:16
  129:4 133:9
  191:6
**cover**  141:20
  164:21
**covered**  51:21
  81:11,13
  112:12
**covers**  40:6
**cracked**  12:11
  37:16
**crap**  98:13
**crazy**  132:21
**create**  142:3
  144:8 160:13
**created**  37:18
  152:20 168:3,4
  168:5 171:12
  172:22
**credit**  109:17

**[credits - defects]**                                          Page 11

**credits** 115:6
**crescent** 2:10
**cross** 77:4
  97:15 106:3
  182:20,22
  183:9
**crunch** 17:21
**cryptocurrency**
  110:15
**crystalized**
  196:16
**css** 113:16
  179:2,8
**cubicle** 102:5
**culmination**
  120:16
**currently** 47:6
**cut** 130:22
  134:11,18,21
  136:3 170:24
  171:6,10,14,16
  172:2,18 186:3
  196:17
**cv** 1:6 8:14
  107:24 108:8
  108:13,16,20
  108:25 153:11
  153:25 154:3
  181:6 206:5

**d**

**d** 3:2 75:15,19
  75:24 82:23
  108:5 124:8
  166:18 204:2
  206:3,11

**damage** 163:3
**damaged** 162:4
**damages** 89:10
  115:24 155:5
  157:22 162:21
**damaging**
  128:3
**dark** 178:22
**data** 90:16,20
  90:22 92:11,11
  100:17 125:7,7
  126:19 128:19
  134:23 139:19
  180:6,14 186:7
  186:7 199:3,17
**database** 117:4
**date** 1:12,20
  11:17 34:24
  35:3 38:22
  47:14 66:4,7
  66:15,17 67:25
  68:18 75:7,16
  75:20,24
  146:25 152:20
  153:14 154:3,5
  154:9 167:18
  167:21,23
  168:2,7,8,11
  179:17 180:3
  192:2 209:3
**dated** 154:7
  187:23
**dates** 47:9
  73:18 128:17
  131:23

**dating** 90:25
  158:23
**davis** 1:21
  208:8,25
**day** 15:9 17:17
  18:22 43:2
  53:23 91:5
  94:2 104:17
  180:21 182:7
  195:4 204:19
  208:21 209:22
**days** 3:16 17:16
  17:17 18:12,15
  18:20,23 19:5
  93:7 95:22
  101:9,13
  104:21 105:2
  105:11
**deadline** 47:5
**deadlines** 46:25
**deal** 12:4 18:17
  49:24 50:8
  91:2 92:13
  93:15 105:12
  105:16 107:18
  112:14 131:8
  141:16,18
  161:14 185:23
**dealing** 13:20
  13:21 14:22
  106:12 115:21
  202:8
**dealt** 99:23
**december** 12:9
  12:14 13:20,22

  15:16,18 17:19
  18:20 20:2,4
  21:23,24 24:17
  24:19 37:19
  40:20 48:3,3,4
  62:20 71:21
  72:3 73:24
  77:24 81:3
  83:11 120:14
  120:24 121:10
  123:4 137:2
  139:24 162:24
  187:23 188:3,6
  188:23 199:18
**decide** 26:4
  149:22
**decided** 20:8
**deciding** 94:25
**decision** 46:4
**decisions** 98:23
**declaration**
  21:3 25:2
  49:11,20 51:5
  56:16 72:11
  73:2,15,20
  78:11 79:14,14
  81:16 82:6
**declarations**
  49:9,19 51:10
  53:5 56:10
  58:20 80:20
**declare** 89:2
**defects** 145:16
  147:25 150:5

**[defendant - directed]**                                                    Page 12

**defendant**  1:18 2:15 4:18 46:5 121:7,22 122:6 122:12 123:12 205:4
**defendants**  1:9 2:8 4:21 34:22 35:2 38:18,21 38:25 40:22 42:14 44:24 52:4 66:6,14 67:25 68:6,13 68:18 75:15,19 75:23 82:23 108:4 119:5 122:2,6 136:12 137:10 139:17 152:19 153:13 153:18
**define**  6:4 114:20 140:8
**definitively** 133:21
**degree**  102:8 102:15,18 117:8,9 158:18 158:19
**delete**  136:23 136:24
**deleted**  195:25
**deletion**  186:5 186:5
**deliberately** 114:17

**delivered** 120:24
**demand**  43:17
**demands** 188:23
**denied**  198:25
**department** 198:24 199:5
**depends**  5:25 54:23
**depicting**  50:20
**deponent**  36:6 209:3
**depose**  181:19
**deposed**  5:11
**deposition**  1:16 3:8,9,14 6:7,19 13:18 17:8 22:2 27:24 34:16,18 35:22 36:10 41:6 46:14,18 47:5 47:17,18 48:18 50:8 53:11 54:7,25 55:7 56:5 57:11,14 61:4,9 65:8 68:20 70:10 71:10 72:24 73:9,13 75:14 75:18 79:19 80:15 82:25 96:9 99:7 155:25 159:16 159:18 163:6

163:19 164:9 164:16 182:19 183:2 201:12 206:3 209:3
**depositions** 5:20,23 6:10 6:13 69:25
**describe**  10:5 103:17
**described**  97:7
**describes**  8:6
**description** 102:14 205:7
**design**  114:7
**designated** 4:25
**designed** 112:24
**desk**  36:13
**desktop**  173:10 173:23 174:4,8 174:12,17,23 177:17 178:8 179:14
**destinations** 198:13
**detail**  14:16 48:10,12 50:11 67:19 69:9,13 101:3 107:25
**detailed**  71:13 97:20 135:13 177:10
**details**  14:3 77:18 79:7

141:6 159:7 161:15
**determine** 91:15 133:14 176:13
**determined** 136:25
**diagram**  192:8
**dialogue**  42:5
**dialogues**  58:21 89:25
**diamond** 196:16
**dicker**  2:14
**difference** 141:12 184:3,6
**differences** 146:2,3 150:14
**different**  10:22 15:21 81:24,24 82:3 90:22 93:19 128:15 128:16 130:7 131:23 132:23 133:5 159:2 181:3 194:20 196:17 200:13
**digitally**  112:18
**direct**  61:8 71:18 139:12 183:11 184:24 188:13 189:9
**directed**  34:19 38:15 205:11

**[direction - downloaded]**

**direction**  61:5
**directly**  11:2,21
   15:24 36:7
   77:13 78:7,9
   78:12 98:15
   132:12 160:24
**directory**  92:18
   93:6
**disclosure**
   46:25 121:2,5
   121:12 140:12
   140:20 141:8
**disclosures**
   121:6 140:7
**discovery**
   24:14,15,21,21
   47:11 52:24
   112:10 120:19
   126:21 131:20
   137:6 141:18
   171:5 187:24
   188:4,4
**discuss**  24:9
   43:2 58:7,11
   69:6 80:16
   190:17
**discussed**  24:19
   25:8 28:24
   29:5,16 57:25
   58:16,19 60:4
   62:6 68:19
   70:5 81:7
   138:20
**discussing**
   13:24 18:11

24:20 43:19
45:17 123:11
124:18
**discussion**  11:5
   13:23 24:15
   46:23 49:14,16
   69:21 79:10,12
**discussions**
   25:16,18,21,23
   42:25 47:3
   56:14 59:11
   62:8,9 70:7,12
**dispel**  49:22
**display**  176:10
   176:14 195:2,3
**dispute**  109:20
   118:24 138:21
   162:20
**disputing**  139:4
**district**  1:2,2
**docket**  31:6,9
   31:15,22 32:5
   32:22 33:5,13
   33:17,21 47:15
**document**
   21:22 31:20
   33:8,15 34:10
   35:5 39:4,23
   41:11,17 45:6
   45:10,25 47:15
   50:19 51:2
   56:25 57:2
   62:18 65:10,18
   68:3,11,12,13
   72:18,21 75:13

75:25 76:3,13
76:16,21 78:5
78:10,14 81:20
81:21 82:24
83:2,8 84:19
84:20,21 85:11
86:16 87:11
88:18 90:8
108:4,10
109:15 123:5
126:15 134:10
134:15 135:11
136:4 139:24
140:11 146:8
152:18,24
153:17,21,24
167:13,14,19
167:22 168:3
169:13 170:24
186:16 187:16
192:22
**documentation**
   20:5
**documented**
   187:14
**documenting**
   19:14
**documents**
   19:22,23 20:14
   20:16 21:25
   22:4,18 23:6
   23:10 26:16,19
   27:4,6,12,16
   31:10,11 32:8
   32:11 33:4

36:25 37:13
38:8 40:2,9,12
40:14 42:15,21
44:24 45:19
46:5,7,10,19
48:23 50:10
52:5 54:19
56:18 62:19
73:19 79:2,6
79:25 80:2,8
82:3 84:11
86:20 109:18
109:21 113:22
119:2 131:14
140:18 206:19
206:20 207:8
**dog**  152:13
   164:24 165:2,3
   165:14
**doing**  19:15
   21:8 24:14
   31:24 48:7
   57:4 71:25
   104:14 134:8
   189:12
**dominant**
   104:19 105:10
**door**  18:24
   20:3
**double**  113:8
**download**
   63:20 69:16
   174:13
**downloaded**
   33:15 174:20

**[drafts - email]**                                                  Page 14

**drafts** 72:17
**draw** 191:17
**dream** 97:24
**drill** 9:6
**drive** 26:23
  103:21
**driven** 194:24
**driver's** 54:22
**driving** 103:22
**drop** 45:2
**drops** 113:2
**due** 188:3,4,5
  189:2
**duff** 2:8,11
  4:20 6:24
  38:17 57:8
  64:25 65:24
  153:2,3,4,9
  165:12,14,21
  166:7,13,15,16
  166:24 167:6,8
  180:9 181:8
  182:3,5,9
  184:23 196:23
  202:18,19
  205:16,22
  206:15
**duff's** 185:7
**duly** 4:3 88:25
  187:14 199:7,7
  204:5 208:12
**dumbs** 135:15
**dump** 31:21
**duplicates**
  27:10

**e**

**e** 2:2,2 3:2,2 4:2
  100:21 152:19
  153:13,18
  204:2 205:2
  206:5,11 208:2
  208:2
**ea58** 169:24
  171:2
**ea60** 169:24
**eai** 85:3 167:4
  190:18
**eai58** 169:18
  170:22 171:20
  172:3 179:23
**eai60** 169:14
  171:23 178:24
**eai70** 135:25
**eai75** 134:13
**earlier** 13:19
  65:11 68:4,20
  72:17,22 123:9
  129:14 131:20
  140:22 201:4
**early** 24:16,19
  102:24 104:21
  105:11 107:15
  117:11 118:5,8
**earmarked**
  15:24
**easel** 143:12
  149:7
**east** 2:5,16
**eat** 163:24

**eating** 164:13
**ebay** 23:4
  51:19 110:12
  110:14,15,18
  110:20,23
  111:2,7,9,20,24
  112:5,8,14
  116:22 119:23
  122:4,8,16,20
  123:6,10,11
  126:15 128:10
  133:22 138:22
  139:3,5,15
  155:14 157:23
  159:23 160:5
  160:15,22
  161:4,4,9,12,23
  161:25 162:7
  162:10 168:17
  169:18,20
  172:9
**edelman** 2:14
**edged** 113:8
**education**
  100:4
**effect** 3:12,15
  9:22,25 160:11
**effectively** 57:6
**efficient** 46:13
  158:11
**efforts** 46:21
  52:14
**eight** 17:18
  57:19 70:8
  71:11,17

  163:16
**either** 47:14
  172:22 178:3
**election** 52:15
**electrical** 102:9
  102:17 158:18
**electronic**
  156:2 157:10
**elements**
  144:12
**elser** 2:14
**email** 8:10
  12:10,13 13:21
  15:17 20:2,6
  20:22,23,24
  21:24 26:19,21
  27:12 34:13
  37:19,20 38:13
  38:20 39:2,4,6
  39:8,13,14,16
  40:18 41:5,21
  42:4,10,22
  43:7 44:21
  45:8,11,14,15
  45:16 49:8
  51:24 58:20
  64:22 65:4,20
  66:5,16,18,21
  67:6,22 68:2,6
  68:15 69:17
  71:21 89:25
  112:11 123:6
  123:12,24
  124:17,22
  125:3,8 126:5

**[email - examination]**                                    Page 15

126:17 127:10
127:11 128:13
128:16,25
129:17,19
131:11 132:8
132:13,23
136:14,16
161:10 168:8,9
168:11 172:22
173:5,18
174:14,18,19
174:25 175:5
175:12,21,24
176:4,9,15,17
177:12,14,18
178:10 179:16
180:6 185:15
186:3,22 188:3
191:13 192:2,2
192:5 194:20
194:21 196:13
196:14,14
198:5,14,24,24
198:25 199:5
199:16,19
200:11,11
205:9,17
**emailed**  186:13
**emailing**  120:8
**emails**  20:20
21:11,13,17
22:2 37:14
43:12 45:13,18
46:11 50:16
56:12 89:24

90:14,14,22
123:17 126:5
128:22 132:3
137:15,16
175:16 198:21
206:21
**eml**  20:3 37:16
129:9,10,25
180:5,11,13
**engage**  8:9
115:20
**engaged**  115:21
188:19
**engagement**
8:5 107:7
116:9 118:6,8
154:7,12,15
201:5,7 202:5
**engagements**
154:13
**engine**  51:18
95:18,18
104:11
**engineering**
102:9,18
158:18
**engines**  92:11
92:12 93:19
98:8 104:10,16
105:16,18
107:23 108:18
**english**  100:10
**enlarged**  167:2
**entire**  38:9 39:4
40:7,10 76:3

100:17 176:25
195:14,16
**entirely**  178:4
**entirety**  40:4
67:6 68:17
160:21
**entitled**  182:22
**entrepreneur**
163:12
**entries**  32:5
**envelope**
135:22 192:15
194:10 198:14
**environment**
155:19
**epitaph**  147:3
**equated**  103:25
**equipment**
100:19 110:15
**errata**  209:1
**error**  62:18
80:8 88:3
172:21
**errors**  77:16
**esq**  2:11,17,18
**essentially**
104:16 175:8
191:13
**establish**  116:2
**estate**  1:8 2:9
4:22 51:25
85:4 119:5
122:9,15
123:13 125:11
129:9,15,24

131:19 132:23
134:5,16
135:24 160:7
209:2
**estimate**  81:18
**estimates**  12:3
**et**  42:9 85:2,4
170:10,20
192:2 209:2
**evaluation**
116:11
**everybody**  38:6
69:17
**everyone's**
150:23
**everything's**
14:11
**evidence**  20:14
22:8,13,17
37:14,15,25
118:25 167:24
**evolved**  157:9
**exact**  47:9
54:25 63:4
104:23 195:9
**exactly**  17:10
44:3 53:10
81:14 96:14,19
100:25 129:11
139:11
**examination**
4:6 77:9 78:6
78:13 167:7
185:4 200:24
203:2 206:13

**[examination - explain]**                                      Page 16

208:11,13
**examinations**
184:24
**examine**
182:20,22
183:11
**examined**  4:5
52:11
**examining**
183:9
**example**  10:25
17:23 18:19
25:7 79:3
92:18 96:14,18
97:20 98:9
111:18 112:19
112:21 135:5
146:6 175:10
198:16
**examples**  98:14
100:24
**except**  3:21
**exception**  7:15
**exchange**  67:6
**exchanged**
21:10,12,17
206:22
**excluded**  119:7
**exclusive**  159:8
**excuse**  12:7
20:15 25:2
53:6 56:15
75:5 134:13
168:4 192:21
194:12 199:4

**excuses**  52:17
**executive**  100:6
**exempt**  40:11
**exhibit**  34:10
34:17,23 35:3
38:19,21 39:2
65:18 66:3,6
66:15,25 67:25
68:13,15 75:15
75:19,24 77:5
77:8,11 78:5
82:23 108:5
124:8 152:19
153:13,18
166:18 205:6,6
205:8,9,17
206:3,5
**exhibits**  34:13
40:20 41:13
89:25 205:4
**exist**  155:14
156:9,11,12
158:4
**expanding**
155:19 156:4
**expect**  16:16,21
35:20
**expecting**
81:24
**experience**
89:18,21 90:7
90:10,20 91:6
91:7 92:7 95:3
95:5 97:4
99:12 100:2,5

101:18 103:15
103:18 106:10
110:25 111:25
113:10 114:12
116:11 140:5
141:2 152:23
159:7
**experiences**
97:5
**expert**  4:25
6:11,13 8:3
10:14 14:12
15:10 16:2
29:20 30:14
35:24 40:5
46:25 47:5,11
49:10,19,25
56:10 59:2
66:25 72:13,25
73:14 77:20,22
77:25 79:18
83:3 89:3,4,6
89:14 92:21
95:11 98:10
100:8 107:4,21
108:8 109:24
110:4 111:24
116:4 121:2,4
121:5,12 132:6
140:6,12 141:2
141:13 142:25
143:25 144:22
145:7,12,15
147:17 148:8
148:10,20,22

148:24 149:16
150:12,15
151:10 152:23
154:18 158:15
158:16,17,21
159:12 181:21
184:7,8,12
188:25 189:16
189:20 190:8
200:4 201:12
207:14
**expert's**  61:3
**expertise**  100:2
110:6,12 132:9
144:18 145:4
149:25 150:9
154:25 158:14
**experts**  8:13
10:23 29:8
119:18
**expertwitness**
103:20 106:24
112:22 130:14
**expertwitnes...**
8:15 108:25
109:6,25
112:23 152:14
158:22 180:25
207:12
**expertwitnes...**
107:2 108:24
154:2 175:13
**expires**  209:25
**explain**  14:5
91:24 92:5

**[explain - filter]**                                                    Page 17

101:2 112:4
176:2 191:9,15
**explained**
81:22 99:25
**explaining**
13:24 200:2,3
**explanation**
162:15
**extent**  23:22
33:3,4
**eye**  147:16,20
148:4 197:12
**eyes**  169:24
194:13,17
195:8

**f**

**f**  3:2 208:2
**facebook**
107:15,16
**facets**  196:17
**fact**  38:7 69:2
73:23 144:5
188:4,18,25
**facts**  161:15
**failure**  181:20
**fair**  7:11,12
16:7 32:20
173:4
**fake**  49:4
**falls**  98:16
**falsus**  138:6,6
**familiar**  39:13
127:8 148:14
148:18 173:22
174:7,10,22

175:2 177:21
**far**  9:25 12:21
14:24 16:9
51:19 59:18
61:3 69:9
77:16 82:17
87:11 116:5
125:22 157:23
162:2 195:23
**farmer**  2:17 4:7
4:17 21:15,21
23:13 27:14,23
34:8 38:12,15
60:13 61:16,18
62:11 64:7,12
64:20 65:15,22
71:2 74:19
75:12 78:2
86:10 92:3
93:10 94:12
95:24 97:4,9
97:11 98:18
99:5 101:14
103:11 105:20
109:4 118:19
139:9 140:24
143:21 150:19
150:24 151:4
151:11,17,21
152:2,6,16
153:7 154:16
164:3,4 165:12
165:24 166:6
166:14,22
181:13,18

182:7,15 183:7
184:23 186:14
186:20,25
187:11,15
188:8,12,16
189:3,8,24
190:5 193:11
193:16,18,22
199:23 200:3
200:18,22,25
201:8,11,16
202:16,21
205:12,20
206:14
**fast**  83:17
**faster**  67:13
83:16 110:9
**faxing**  120:8
**features**  173:23
197:18
**february**  1:12
38:14 44:23
48:5 52:6
62:21 65:5,20
68:16 205:10
205:17
**fed**  165:4
**federal**  1:19 6:8
61:2 140:6
**fee**  35:18,20,24
36:5 161:25
**feel**  110:5,6
**feeling**  190:11
**fees**  35:24

**feet**  143:5,7,8
143:11,11
**felt**  22:15 33:7
89:10
**field**  114:8
168:18 170:4,4
170:5,7
**figure**  17:10
18:2 53:21
129:21
**figured**  42:19
44:20
**file**  2:18 20:3
23:17 37:16
38:9 39:20
40:5,8,11,15
43:18 44:7,25
45:19 46:6
52:2 65:13
68:7,17 121:19
129:10,10
130:2,13 134:6
170:9,10 180:5
180:12,13
181:21 206:25
**filed**  33:21
62:20 77:3
**files**  41:22
51:23 53:8
132:16
**filing**  3:7 32:22
32:23 199:18
**fill**  157:15
**filter**  178:4

**[final - generated]**

Page 18

**final**  187:7
**financially**  184:2
**find**  104:13  127:12
**fine**  7:18  126:25 151:17  184:17
**finish**  6:25 7:2
**finished**  182:11
**first**  4:3 8:20  9:13 18:20,22  30:3,6 35:6  37:4 41:2  65:17 103:5  117:11 118:3  124:14 131:11  167:16 179:21  192:8 204:5
**fit**  29:7
**five**  18:20,22  18:22 21:5  39:8 41:21  45:21 63:17  67:2 103:8  164:17
**fixed**  196:15
**flagged**  85:16
**flip**  46:10
**flipped**  52:19
**flow**  10:16
**flu**  190:4,12
**fluid**  62:7  70:13

**flying**  77:18
**focus**  58:7,7  106:21 110:9  141:15
**focused**  14:21
**focusing**  162:7
**folks**  24:25  94:9
**follow**  21:19  24:4 27:24  40:21 154:22  166:8 187:3  200:22
**followed**  176:8
**following**  44:13  83:4
**follows**  4:5
**force**  3:15  104:20 105:10
**foregoing**  204:8
**forgive**  135:13
**forgot**  68:5
**forgotten**  65:12  107:10
**form**  3:21 18:7  81:10 87:15  120:11 198:2
**format**  126:6,7  134:24 139:19  196:15 197:25
**forms**  56:20
**formulates**  132:14

**forth**  13:23  20:23 22:13  43:5,22 58:11  58:22,23 82:2  82:8 107:17  157:8 196:24  208:12
**forward**  60:5  70:19 183:21  184:11
**found**  51:12  97:25 98:2  138:12
**foundation**  7:20
**four**  21:6 57:18  70:8 71:11,17  102:25 124:13  131:9 139:20  143:5,7,7,11  153:17 188:21
**fraudulent**  79:5 143:7  148:6 155:11  157:25
**fraudulently**  127:17,18
**front**  76:2,13  92:15 144:15  146:7 149:17  193:11
**fruitful**  22:15  26:4
**full**  154:17

**fully**  101:5,11
**function**  100:7  112:2 159:8
**functions**  197:18
**further**  3:20  84:2 181:22  185:25 186:9  202:17,19  204:8 208:15

**g**

**galleries**  157:6
**game**  97:18
**games**  93:8  95:22 98:19  105:17 128:12  130:8 132:18  136:6 138:10
**gee**  95:13
**general**  11:5  13:22 24:9  81:10,12 112:2  121:17 190:22  192:4
**generalize**  156:7 177:6,8
**generally**  12:4  12:17 20:25  141:19 178:17
**generate**  180:14
**generated**  24:25 72:11  84:22 153:5

**[generous - grasping]**                                   Page 19

| | | | |
|---|---|---|---|
| **generous** 12:19 | **go** 5:9 11:9,12 | 29:7 34:8,17 | **good** 4:15,16 |
| **getting** 9:9 12:5 | 18:23 22:9 | 35:3,6 39:3,5,7 | 28:3 35:11 |
| 12:6,8 13:17 | 26:3 32:13,16 | 40:7 43:9 | 55:20 60:11 |
| 15:17,20 46:19 | 48:10,25 52:17 | 49:18 57:3,8 | 67:20,20 83:9 |
| 51:14 59:20 | 53:20 55:23 | 58:21,23 65:17 | 83:10 87:7 |
| 70:18 94:9 | 56:21,24,25 | 67:5,12,15,21 | 107:9 182:7 |
| 162:4 194:5 | 58:10 60:5 | 69:14,15,16 | 195:20 |
| **gif** 170:9 | 62:25 63:19 | 74:17 75:25 | **goodwillie** |
| **gifted** 147:10 | 64:2,4 67:10 | 76:8,12 79:20 | 119:12 |
| **give** 27:21 51:6 | 76:5,12 79:9 | 80:9 81:23 | **google** 22:24 |
| 65:8 76:6 | 79:11 83:16,17 | 82:11,12,15,25 | 45:6,25 46:2 |
| 96:21 98:12 | 83:21,23,24 | 91:20 96:10 | 53:7,7 92:12 |
| 107:25 108:22 | 84:4 85:10,15 | 97:17 99:17 | 92:15,17 93:6 |
| 130:17 139:12 | 87:5 103:13 | 104:18 108:3 | 93:18,25 94:4 |
| 144:24 147:19 | 104:14 105:3,4 | 109:8 111:7 | 99:23 102:19 |
| 148:3 172:25 | 105:5,16 108:6 | 113:19 115:18 | 102:21 103:15 |
| 175:21 198:15 | 108:13,23,25 | 120:7 124:11 | 104:4,5,17,19 |
| **given** 6:14 | 112:22 129:14 | 125:15 131:24 | 104:24 105:9,9 |
| 33:17 101:18 | 131:9,9 139:22 | 132:5,7,18,20 | 105:14 106:6,7 |
| 135:9 204:10 | 140:16 143:18 | 136:12,21 | 106:10,12,17 |
| 208:14 | 144:10 147:8 | 140:9 141:9,19 | 106:18,21 |
| **gives** 163:20 | 147:11 149:14 | 141:22 143:11 | 107:4,12,23 |
| 174:12 | 163:5 166:17 | 144:3,24 | 109:19 110:3 |
| **giving** 29:22 | 169:3 172:9,11 | 145:24 149:14 | 113:7 120:2,7 |
| 62:2 95:4,8 | 172:12,12 | 152:17 154:14 | 120:8,8,9 |
| 96:13 | 173:9 177:18 | 156:15 158:7 | 154:8 |
| **glad** 134:3 | 178:10 179:16 | 165:18 170:7,8 | **gosh** 9:20 28:14 |
| 149:5 | 185:2 191:7 | 175:21 176:14 | 105:15 |
| **gladly** 41:18 | 199:11 | 181:18 183:3,4 | **gotten** 33:9 |
| 101:2 | **goes** 87:11 | 183:5 184:16 | **graded** 147:9 |
| **glass** 147:18 | **going** 5:6 6:16 | 185:2 188:12 | **graphic** 114:7 |
| **gmail** 199:20 | 14:4 17:11 | 192:23 197:7,9 | **graphics** |
| 200:11 | 19:7,8,12,15 | 197:16,17,20 | 112:20 113:13 |
| **gmail.com** 2:6 | 20:14,14,15 | 197:24 201:15 | **grasping** |
| | 22:13 24:12,13 | | 156:22 158:10 |

**[grasping - hours]**                                                      Page 20

198:7
**great** 26:13
165:21 169:17
177:16
**greater** 112:2
**greatest** 111:22
**green** 185:2
**ground** 5:9
6:17
**growing** 155:20
**guess** 16:10
25:9,11 26:14
**guessed** 48:21
**guessing** 25:10
25:18 26:11
**guy** 161:13
**guys** 14:19
105:18 201:18
**gymnastics**
185:24 196:20

**h**

**h** 205:2
**hah** 56:23
**haimson** 86:12
86:13,14
**hairs** 37:6
44:10 102:25
104:19 125:16
**half** 57:24 58:5
60:8 143:8
150:22 171:7
**halloween**
120:21
**hand** 14:22
50:22 58:8

168:12 194:8
208:21
**handicap**
170:18
**handle** 46:12
94:18 195:5
**handled** 38:10
46:19 90:3
**handling** 141:5
**handwritten**
86:9
**hang** 9:21 66:9
76:10 83:22
131:6 134:13
135:2
**hangs** 65:25
205:24
**happen** 62:4
143:16 174:18
175:3,6,15
**happened**
18:16 32:19
51:20 128:10
155:12 159:25
161:11 162:14
198:22
**happens** 88:7
179:4,11
194:25 197:14
**happy** 7:8
21:18 24:4
27:23
**hashing** 59:16
**head** 6:23
110:24

**header** 51:23
52:2 53:8
130:12 135:21
175:6 176:16
180:3 192:6,12
194:9 197:8
**headers** 89:23
90:2 132:13
134:18
**healthy** 165:5
**hear** 95:13,15
95:17
**heard** 201:2
202:3
**heck** 14:4
**held** 1:20 102:2
**hello** 165:11
**help** 9:11 11:2
11:23 29:7
82:16 88:12
107:18 108:20
**helped** 90:17
**henderson**
132:10
**hereinbefore**
204:11 208:12
**hereto** 77:4
**hereunto**
208:20
**hey** 165:10
**high** 70:2 142:2
144:7 148:17
192:8
**highlight**
124:13,14,20

**highlighted**
124:11
**highman** 86:6
86:11
**history** 31:20
31:20 95:18
115:17 116:5,6
**hit** 103:6
175:20 197:15
197:17
**hitting** 91:4
**hmm** 108:9
168:20 192:13
**hoganduff.com**
2:11
**hold** 62:2 76:6
106:4 185:8
**hone** 141:14
147:21
**honored**
176:20
**hot** 24:12 29:2
**hour** 8:25 9:3
17:2,18 29:25
54:11 57:24
58:5 60:8
150:22 165:2
**hourglass**
58:14
**hourly** 14:11
16:6
**hours** 11:15
12:6,10,18
13:17 14:13,15
15:25 16:4,4,9

**[hours - interaction]**                                                    Page 21

16:12,17 17:2
17:20,24 18:21
19:16 23:23,24
47:20 54:11
55:2,11,21,22
93:7 95:22
101:13 136:24
163:16,17
164:8,15,20
165:7,8 166:3
207:4,4
**houses**  114:14
**how's**  34:2
  55:13
**ht**  139:18
**html**  91:10,15
  91:16 113:21
  113:22 114:4
  123:18 124:5
  129:4 130:13
  131:13,18,19
  132:10,14
  135:23 170:6
  191:12 192:20
  194:18 195:3,5
  195:6,7,8,13
  197:21,25
**http**  91:12
  102:25
**https**  91:13
**huh**  169:5
**human**  120:4
**hurry**  14:19
**hurting**  128:3

**hybrid**  19:12
  19:21
**hypothetical**
  62:3

**i**

**idea**  17:6
  170:16
**identification**
  34:23 38:22
  66:7 75:20
  153:14
**image**  113:20
  168:18 170:3,4
  170:5,7,9,10,13
  170:16 180:8
**images**  52:10
  90:2 114:3
  174:14,19
  196:10,10
**img**  170:6
**immediate**
  188:24
**important**
  166:24
**improper**
  183:10
**inaccurate**
  87:14
**inadvertently**
  41:8
**inbox**  30:16
  31:2
**inches**  143:5
**include**  68:5
  97:6 120:25

121:11 191:24
**included**  45:7
  45:11 97:4
**including**
  117:22 191:25
  207:2
**incomplete**
  134:21
**incorrect**  52:3
  79:7,8
**indexed**  109:19
**indicate**  89:5
**indirectly**
  77:14 78:8
**industries**
  156:8,12,23
  158:9
**industry**  16:15
  114:19,22
  115:4,6,9
  148:13 150:16
  150:17 155:2
  155:13,17
  156:11,21
  157:2,3,12,13
  157:14 158:4,7
**infer**  161:5
  162:13
**inference**
  160:10
**information**
  48:16 59:23
  96:21 124:21
  130:10 132:15
  149:21 191:8

191:10,11
  199:15 200:10
  206:19,20
**infoseek**  93:18
  104:9,15 105:4
**initiated**  49:14
  53:3
**inline**  178:3
**input**  43:8,16
  43:21,25 44:4
  44:5,8
**inquiring**  77:2
**inserted**  85:25
**inside**  85:25
  87:10 93:6,21
  93:22 146:9
  176:4
**inspect**  30:16
**inspected**  31:2
**instances**
  128:15
**institute**  102:10
**instruction**
  96:23
**insult**  96:15,17
**intellectual**
  107:19
**intended**  42:14
**interacted**  30:7
  58:25 59:3
**interacting**
  111:2
**interaction**
  110:3

**[interactive - know]**                                    Page 22

**interactive**
  59:10 62:7
  70:13
**interested**
  208:18
**internet**  8:13
  89:18 90:11,13
  90:24 92:7
  99:18 100:12
  102:23,23
  152:22 155:18
  155:22 156:2
  156:15,24
  158:10,15,16
**intuitively**
  176:18 178:2
**invoice**  19:7
  20:19 22:5,19
**involved**  32:2
  107:22 116:17
  124:4 155:20
  155:23 162:9
**involvement**
  5:8 180:17
**involves**  123:4
**irrelevant**
  104:20 129:5
  197:10
**isp**  181:2,5
**issue**  46:16
  51:17 52:7
  55:23 77:21,24
  92:10 106:14
  109:20 123:5
  123:21 141:15

  141:16 146:21
  149:3,9 157:18
  157:21 160:5
  161:10 169:3
  176:23 186:10
  190:13 198:21
**issues**  15:9
  18:18 20:15
  24:20,21 32:3
  49:7,21 51:11
  51:12 52:6,9
  52:22,23,25
  54:3 58:8 59:4
  59:21 74:22
  79:5,6,13 89:9
  107:19 112:8,9
  112:10,15
  115:22 120:19
  125:5 137:6
  141:18 144:13
  146:17 147:13
  184:22
**itemized**  17:15
**items**  29:20
  185:15

**j**

**jana**  2:17 4:17
  38:15 65:22
  165:22 166:17
  181:10 205:12
  205:20
**jana.farmer**
  2:19
**january**  17:23
  48:4 73:22

  75:8,9 186:12
**jason**  49:11,16
  49:20 50:2,6
  58:24,24 73:2
  73:16 78:12
  79:10,13,14
**javascript**
  113:23,24
**jd**  117:8 158:20
**jerked**  94:10
**jesse**  74:10
**jessie**  49:25
  59:2 72:25
  73:15 74:9,15
  77:12 78:6
**job**  95:22
  122:16 133:14
  133:15 147:17
**john**  38:18
  65:24 205:16
  205:23
**josiah**  2:11
**jpeg**  170:9
**judge**  3:13
  98:23 101:11
  123:19 149:19
  149:22 150:2
  159:10
**july**  180:20
**jump**  57:9
  165:11
**juror**  99:16,25
  100:22 101:5,5
  101:11 111:3
  112:3,5 145:2

  148:2
**juror's**  145:19
**jurors**  99:14
  101:19 135:9
  135:10 145:23
  145:23 147:14
  147:15,24
  149:21
**jury**  101:2
**justify**  110:6

**k**

**k**  4:2
**keep**  10:18 11:3
  17:16 20:25
  21:2,3 38:6
  44:17 55:19,24
  56:17 72:20
  82:4
**keeps**  59:23
**kept**  9:25
**kind**  12:2 14:18
  17:16 20:13
  48:21,23,24
  52:6 56:20
  100:14,18
  132:20 136:6
  138:9 142:22
  147:12 159:2
  165:14,17,19
**kinds**  144:13
  164:22
**knock**  164:21
  164:23
**know**  6:2 7:7
  7:14 9:6,10

**[know - lighthearted]**                                    Page 23

10:7,10,21
11:3,4,9,19,20
12:3,14 13:19
13:24 14:12,20
14:23 15:10,18
16:19 17:4,15
18:12,14,16,20
18:21,23 19:15
20:8 24:16,23
25:12 28:11,14
29:15 30:2
31:24 32:10,12
32:14 33:14,20
37:18,22 38:3
41:11 43:21
44:9,14,16,19
44:20 45:12,24
46:14 48:5,20
48:21,23 49:4
49:5 50:22
51:11 52:4
53:3,20 54:6
54:13,22 57:6
57:22,22,25
58:12,13,13
59:4,9,10
61:18 62:8
65:15 67:14
69:8,25 70:17
70:19,25 77:16
77:19 79:3
82:5,7,10,12
83:15 84:14
86:10 87:10
91:18,19 92:16

92:22 93:2,4
93:21 95:13
98:2 99:17,22
100:2,23
102:22 104:8
105:7 106:5
107:17 108:11
109:19 111:7
111:13 113:15
113:16,22
114:6 115:18
125:9,13,19
130:6 132:6
136:5 138:6,13
139:13 140:15
144:14 147:2
147:20 153:19
155:21 156:17
157:11 158:9
158:25 160:6
160:16,25
161:2 176:20
178:20 179:11
197:15,16
198:6 202:5,9
**knowing**
138:21
**knowledge**
99:11 100:4,6
100:16 125:22
147:21 160:14
**known** 199:13
**knows** 176:9

**l**

**l** 3:2,2 4:2
204:2
**lack** 145:13
**lane** 4:13
**language**
133:10
**large** 105:11
**largest** 90:25
103:24 158:23
**latch** 156:23
**late** 53:24
**latitude** 189:4
**law** 2:8 91:19
117:8,9,15,18
140:23
**lawsuit** 106:14
120:12 121:19
122:13 127:7
157:19 159:4
**lawyer** 29:21
140:9,23 141:5
141:9
**lawyers** 44:2
135:8 202:10
**layman's** 145:7
**layout** 192:4
**layperson**
195:20
**leading** 189:25
190:6 199:24
**learn** 11:9,10
11:12 14:2
113:15

**learning** 13:25
18:11
**leave** 62:10
**led** 121:18
**left** 69:10 136:3
168:12,16,16
194:8
**leg** 63:24
**legal** 26:10
29:9,10,14,14
29:18,22 141:6
156:21 157:14
**length** 81:7
172:6
**letter** 8:5 40:21
188:5,20 201:5
202:2,5 205:7
**letters** 134:7
136:2
**letting** 179:11
**level** 91:3
100:11 142:2
144:7 148:2,3
148:17 192:8
**levels** 90:23
**liability** 89:10
115:24 162:21
163:3
**liable** 184:2
**licensed** 146:23
**life** 163:12
**light** 54:3
104:15 185:2
**lighthearted**
63:25

**[likely - magazines]**                                          Page 24

**likely** 32:18 110:21 137:12 141:21 143:23
**limited** 10:16 184:21 189:4 191:25
**line** 155:9,9 157:15 180:23 189:5 194:24 207:18 209:5
**lined** 131:22
**link** 26:23 32:8 127:14 171:21 172:4,14,16
**links** 27:2 31:25 32:8 53:6,7
**list** 27:21 43:6 109:5,9 154:17 154:19 207:11 207:13
**listed** 109:3
**listen** 71:5
**listing** 118:13 160:5,14,22 161:25 162:7 162:10
**literally** 94:2 102:4 179:4
**litigant** 29:13 59:15 188:22
**litigation** 52:20 52:21 61:25 100:8 101:8 152:23 175:13

**little** 10:22 12:12 35:10 56:18 70:18 91:21 141:20 198:20
**lively** 62:9
**lives** 28:11 155:23
**living** 147:4
**llc** 209:1
**llp** 2:14
**loaded** 170:14
**loaning** 116:18
**location** 28:18 28:21
**logical** 142:2 144:7 145:2
**logically** 37:10 48:10
**logo** 112:22,23 168:17 169:20 169:25
**logos** 112:25 114:3
**long** 10:19 14:4 29:23 56:7 57:17,20 62:13 62:22 67:14 126:18 151:13 160:17 162:12 163:23 164:11
**longer** 182:24
**look** 26:3 32:13 40:17 45:24 47:7 48:8

50:18 54:19,20 56:23,25 57:5 91:14 107:24 108:16 129:10 129:14 133:15 134:12 135:18 138:11 142:13 143:6 144:10 145:15,24 147:8,20 149:16 150:4 159:2 169:3,9 192:5,19,25,25 192:25 196:21
**looked** 22:23 22:24,25 23:2 23:4 25:3,4,7 39:24 48:22 49:3,6,6,7,8,9 49:10,10,16,17 50:7,11,12,15 50:16 51:2,4 51:25 52:3,7 52:10,13,16,18 52:22,24 53:8 91:17
**looking** 18:2 51:6 61:22 87:4 90:2,2 124:7 149:4 172:5 197:13
**looks** 35:12 152:15 154:6 154:20 155:8 165:19,21

**lost** 5:15
**lot** 9:8 12:6 13:17 17:6,20 18:10 22:12 23:5 49:21 51:21 107:14 107:15 110:14 112:24 114:14 165:9 175:15
**lowest** 111:15
**lycos** 93:19 104:9 105:4 180:19

## m

**m** 175:17
**m1** 66:2 206:2
**mac** 54:16 66:2 173:15,16,24 174:3,9,24 177:17 178:8,9 179:15 196:24 206:2
**machine** 52:13 194:25
**macos** 65:25 205:25
**macs** 174:12
**made** 9:21 10:8 10:10 42:23 77:25 79:23 88:5 121:7 126:16 127:24 161:3
**magazines** 157:8

**[magnify - megabytes]**                                                    Page 25

**magnify**  108:11
  166:22
**magnifying**
  147:18
**magnitude**
  110:2
**mail**  26:19
  120:9 135:3
  199:12
**mainstream**
  103:6 156:22
  157:24
**maintain**
  111:23
**majority**  14:24
**make**  16:21
  32:3 46:17
  48:14 54:6,16
  61:17 98:23
  101:9 111:10
  111:17 122:21
  128:24 135:20
  142:23 143:2
  145:3 149:12
  150:20 154:4
  158:12 160:10
  192:9
**makes**  19:3
  187:6
**making**  36:2
  127:6 144:25
  191:13
**man**  17:16,17
  18:12,15 19:5
  23:23 160:8

207:4
**managed**
  180:24
**mandates**  12:5
**manhattan**
  28:15
**manipulate**
  113:25
**manipulating**
  196:11
**map**  198:11
**march**  47:12,14
  208:21
**maria**  146:12
  146:13 149:10
**marie**  1:8 2:9
  4:21 209:2
**mark**  34:9
  38:12 65:17,20
  66:3 75:13
  109:7 152:18
**marked**  34:13
  34:22 35:2
  38:21,25 66:5
  66:14 68:14
  75:19,23
  153:12,18
  207:17
**market**  127:19
  128:5
**marketed**
  127:20
**marriage**
  208:17

**mastiff**  165:19
**match**  97:25
  98:2 101:20,21
**matchmaker**
  103:19,23
  106:23,24,25
  109:25
**matchmaker....**
  97:22 101:23
  112:25 180:18
**matchmaker....**
  101:22
**material**  81:6,8
  163:2
**materials**  23:15
  44:5 46:8 74:4
  74:8,14 78:20
  121:15 206:23
**matter**  4:19 5:2
  5:8 8:3 30:14
  30:18 31:6
  32:23 33:22
  34:6,10 38:19
  39:2 40:5
  68:18 71:24
  72:8 76:18
  89:4 100:9
  101:13 112:7
  119:6,20
  120:17 121:23
  159:16 208:19
**matters**  77:2,3
  77:8 78:6,13
  166:3

**maureen**
  159:19
**maximize**
  111:22
**mba**  102:18
  158:19
**meal**  163:19,22
**mean**  6:2 17:14
  22:6 25:24,25
  26:2 27:12
  29:13 30:5
  40:8 44:17
  86:12 91:20
  92:8 120:4
  125:15 128:14
  134:21 135:14
  147:11,12
  159:25 167:21
  168:6,25
  169:21 170:25
  171:7 183:2
  200:15
**meaning**
  196:15
**meant**  92:5
  104:4
**media**  107:12
  107:14,15
**meet**  28:12,13
  30:3,5,6 57:13
**meeting**  28:8
  28:25 29:23
  69:3
**megabytes**
  40:23 67:3

[member - nathan]                                                          Page 26

**member**  116:24
**memory**  19:10
    19:22 54:20
    126:25
**mention**  77:11
    77:14 189:16
    190:13
**mentioned**  9:24
    21:23 22:17
    39:15,17 47:14
    47:19 63:22
    71:22 72:16,24
    78:12 95:6
    163:6
**mentions**  78:6
**merged**  105:8
**message**  62:21
    91:16 175:4,5
    176:16 177:20
    177:23 178:3
    178:11,15,19
    185:16 186:4
    190:18,25
    192:6 195:23
    196:2,3 197:4
    198:4,11
    199:17,20
    200:9,12
**messages**  51:24
    51:24 190:19
**met**  28:4,6,7
    152:12
**michael**  4:10
    34:20 38:16
    65:23 175:17

205:14,21
**middle**  30:8
    141:24
**million**  100:13
**millions**  91:4
**mind**  37:10
    74:20 141:11
**mini**  66:2 206:2
**minimal**  59:19
**minus**  55:11,12
    55:22,22
**minute**  10:23
    20:10 54:9
    64:15
**minutes**  29:25
    57:23 62:16,24
    63:3,8,12
    68:22 136:23
    164:12,18,18
**misinformation**
    132:20
**misrepresented**
    161:15
**missed**  45:25
**missing**  62:19
    168:17 169:11
    169:15,20
    171:21 172:14
**mistake**  41:7
    41:17,18 62:23
**mix**  136:9
    165:17
**mm**  108:9
    168:20 192:13

**model**  16:2,14
**moment**  26:6
    29:3,4 36:15
    37:3 41:15
**money**  16:21
    59:17
**monologue**
    95:2 96:10,13
    96:18 97:13
    98:13
**month**  10:7
    18:15 73:24
**months**  9:23
    24:9 95:16
    129:21
**morning**  4:15
    4:16 20:7,11
    20:12 38:11
    45:12,17 53:13
    53:16 54:5,18
    54:25 55:5,6
    55:10 81:7,12
    81:23 186:13
    201:25
**moskowitz**
    2:14
**motion**  98:24
**mouse**  123:16
    170:12,13
**move**  78:2
    90:14 93:10,12
    94:12 95:24
    96:2,9 97:18
    98:22 101:15
    103:11 105:20

143:18 169:23
    194:16
**moving**  65:7
**multiple**  27:7
    128:25 136:13
    146:14,15
**muted**  181:14
**myspace**
    107:16

**n**

**n**  2:2 3:2 88:4
    204:2 206:11
**name**  4:9,17
    28:16 30:22
    41:3 52:8 59:7
    66:23 127:16
    127:17 144:14
    146:2,13
    149:10 160:4
    162:3 175:21
    175:23 176:6,7
    176:12 181:5
    191:24 199:21
    209:2,3
**names**  146:14
    200:13
**nap**  190:3
**narrative**
    105:21
**nathan**  1:21
    64:7 65:19
    74:20 75:12
    118:19 143:21
    151:4,18 152:6
    152:17 166:9

**[nathan - o'leary]**                                       Page 27

166:13 181:15 181:24 184:17 185:10 200:18 202:23 208:8 208:25

**nature** 107:6

**necessarily** 32:21 42:16 138:18

**necessary** 95:21

**need** 5:9 7:13 11:11 17:10 25:8 26:9 31:3 32:15 43:3,4 43:23 44:2,15 44:20 56:23 59:22 63:9,19 63:21 64:4,5 83:23 100:23 108:15 109:14 145:14 149:15 151:20,21 155:10 157:24 182:3,5,23 183:6,23 184:21 187:7

**needed** 32:13 33:7 89:11 125:10 188:24 195:21

**needs** 70:5 92:17 99:17 154:20

**nefarious** 132:5 132:7 136:11 136:20 162:19

**network** 93:22 93:22 95:10 98:7 100:18

**never** 11:10 114:15 128:10 148:21 151:9,9 174:13

**new** 1:2,22 2:5 2:5,10,16,16 4:4,14 5:21,24 6:4,7 35:19 36:6 48:16 128:5 208:4,9 209:1

**nicole** 86:13

**night** 53:24 55:15

**nine** 127:23,25 142:4,15,17,23 143:2,10,24 144:6 145:12 145:21 147:6

**nods** 6:22

**nomenclature** 198:10 199:21

**non** 1:17

**nonresponsive** 71:3 78:3 93:11 94:13 101:15 103:12 105:22 143:19

**nonsense** 52:16 93:12 94:3 185:24

**nontechnical** 135:8

**nooggies** 97:9

**norb** 1:8 2:9 4:21 159:16 209:2

**north** 4:14

**northern** 104:15

**notary** 1:21 4:4 204:22 208:8 209:25

**note** 61:7 187:22 191:23

**noted** 56:3 60:17,23 61:17 139:9 140:25 164:5 199:7,7

**notes** 8:22 9:4 9:21,25 10:4 10:10 40:8 190:16

**notice** 1:18 74:4 75:14,17 82:24 206:3

**noticed** 184:20

**november** 18:10 24:17 40:21 120:23 123:24 129:20 133:18

**novocain** 87:23 88:5

**novocin** 1:8,8 2:9,9 4:22 31:7 119:5 159:16 159:19,22 160:3,19 209:2 209:2

**novus** 117:15

**number** 6:18 9:18,19 12:9 19:16 33:17 41:22 43:11 55:2 60:6,7 91:3 101:9 187:24

**numbered** 85:21 86:3

**numbers** 42:8 135:25

**nyu** 102:9

**o**

**o** 3:2 4:2 204:2

**o'leary** 1:17 4:1 4:10,15 5:1 6:1 7:1,25 8:1 9:1 9:24 10:1 11:1 12:1,20 13:1 14:1,6 15:1 16:1,22 17:1 18:1 19:1,3 20:1 21:1 22:1 23:1 24:1 25:1 25:5 26:1 27:1 28:1 29:1 30:1

**[o'leary - offended]**                                           Page 28

| | | | |
|---|---|---|---|
| 31:1 32:1 33:1 | 101:1 102:1 | 169:1 170:1 | 86:4 92:2 |
| 34:1,5,20,22,25 | 103:1 104:1 | 171:1,24 172:1 | 94:15 97:2 |
| 35:1 36:1 37:1 | 105:1,23 106:1 | 173:1 174:1 | 139:7,9 140:21 |
| 38:1,17,24 | 107:1 108:1 | 175:1,17,18 | 140:22,24 |
| 39:1 40:1 41:1 | 109:1 110:1,5 | 176:1 177:1 | 143:3 163:25 |
| 42:1,7 43:1,13 | 111:1 112:1 | 178:1 179:1 | 164:4 186:14 |
| 43:24 44:1 | 113:1 114:1 | 180:1 181:1,12 | 189:24 190:5 |
| 45:1 46:1 47:1 | 115:1 116:1,4 | 181:20 182:1 | 199:23 |
| 48:1 49:1 50:1 | 117:1 118:1 | 183:1,8 184:1 | **objections**  3:21 |
| 51:1 52:1 53:1 | 119:1,15 120:1 | 184:20 185:1,6 | **objective**  57:4 |
| 54:1 55:1 56:1 | 121:1 122:1 | 186:1 187:1 | 59:21 |
| 56:3 57:1 58:1 | 123:1 124:1,8 | 188:1,2,19 | **obligated** |
| 59:1,18,23 | 125:1 126:1,22 | 189:1,2,7,11 | 125:23 |
| 60:1,19 61:1 | 127:1 128:1 | 190:1 191:1 | **obligation** |
| 61:10,20 62:1 | 129:1 130:1 | 192:1 193:1,21 | 125:3 |
| 63:1,10 64:1 | 131:1 132:1 | 194:1 195:1 | **obligations** |
| 65:1,3,23 66:1 | 133:1 134:1 | 196:1 197:1 | 60:24 |
| 66:13 67:1,7 | 135:1 136:1 | 198:1 199:1 | **observed**  85:24 |
| 68:1 69:1 70:1 | 137:1 138:1 | 200:1,23 201:1 | 118:13 |
| 71:1,4 72:1 | 139:1 140:1 | 201:17 202:1 | **obstructing** |
| 73:1 74:1 75:1 | 141:1,23 142:1 | 203:1 204:1,15 | 99:6 |
| 75:15,18,22 | 143:1 144:1,17 | 205:1,8,14,21 | **obviously** |
| 76:1,9,15 77:1 | 145:1 146:1 | 206:1,4,21,23 | 10:11 52:25 |
| 78:1,4,22 79:1 | 147:1 148:1,8 | 207:1,5,6,9 | 132:4 136:11 |
| 79:17 80:1,10 | 149:1 150:1,25 | 208:1 209:3,21 | 136:21 |
| 81:1 82:1,22 | 151:1 152:1,11 | **o'leary's** | **occurred**  158:2 |
| 83:1 84:1 85:1 | 153:1,16,23 | 153:11 182:17 | **occurrence** |
| 86:1,15 87:1 | 154:1,24 155:1 | 182:24 187:22 | 121:18 |
| 87:17 88:1,9 | 156:1 157:1 | 206:5 207:13 | **october**  18:10 |
| 89:1 90:1,5 | 158:1 159:1 | **oath**  3:12 89:2 | 120:22 |
| 91:1 92:1,4 | 160:1 161:1 | **object**  59:15 | **oeuvre**  148:9 |
| 93:1 94:1,20 | 162:1,24 163:1 | 61:16 189:10 | 148:12,15 |
| 95:1 96:1,8 | 164:1,7 165:1 | **objecting**  99:19 | **offend**  135:14 |
| 97:1 98:1,21 | 166:1,2,25 | **objection**  60:14 | **offended**  19:5 |
| 99:1,13 100:1 | 167:1,10 168:1 | 60:16,22 61:7 | |

**[offense - original]**                                                      Page 29

**offense** 96:12
**offer** 79:17
  80:4,13
**offered** 46:12
**offering** 80:22
  80:24
**office** 28:20
**officer** 198:23
**official** 64:8
**oh** 9:20 11:19
  28:14 49:18
  56:23 57:18
  95:13,15
  101:16 149:5
**oil** 143:2
**okay** 6:6 7:17
  19:13,25 21:20
  22:8,11 24:6
  26:7,13 27:19
  35:7,23 43:3
  43:11,23 45:20
  45:21 56:9,18
  62:11 63:4,14
  63:18,25 66:9
  66:10,12 67:21
  74:2 76:6,10
  76:14 77:6
  78:18,25 79:21
  84:6,10 90:13
  92:22 93:13,15
  94:18 95:8,10
  95:15 97:10,18
  97:21,24,25
  98:13 99:16
  101:14 104:21

106:8,11,14
108:3,6,13
110:10,16
114:23 116:14
127:4 128:20
129:18 130:5
131:12 133:16
133:25 134:6,9
135:2,3,14,19
137:9,18 138:7
142:14 143:4,7
144:6,24
145:11,18,22
151:3 155:22
157:5,8,19,21
158:8 161:7,17
162:5 164:18
164:21 169:2,7
169:8,11 170:5
170:12 171:4,5
171:12 172:23
173:4 174:4,15
175:14,19,25
177:3 178:6
179:5,10 181:8
184:5,10
185:12 190:17
191:14,16
192:14 193:13
193:22 194:4
194:14 195:10
196:12,18
198:16,19,19
**old** 127:23,25
  142:5,15,17,23

143:10,24
144:6 147:6
157:4
**olds** 143:2
145:12,21
**omnibus** 138:7
**once** 123:19
147:15 196:13
196:14
**one's** 183:18
**online** 113:15
117:18 153:25
**open** 12:11
37:17 39:9
60:18,20 67:8
144:11
**opened** 138:5
174:17
**operation**
177:2
**opine** 112:7
149:20
**opined** 90:17
**opinion** 94:21
142:8,12,25
143:25 144:22
145:7,8 190:24
200:4
**opinions** 48:15
49:23 89:4,7
100:8
**opportunity**
60:9
**opposed** 35:19
160:12

**optic** 159:2
**optimization**
104:11 106:18
**optimize**
106:16
**optimized**
113:6
**option** 174:13
175:20 177:19
177:22 178:9
179:6,13,17,19
179:25
**options** 174:23
175:4
**orange** 167:11
**order** 18:4
31:21 47:8
60:25 126:2,8
126:12,23
182:3,6 183:2
183:6 184:16
192:9
**ordered** 126:3
**ordering**
126:13
**orders** 110:2
**organically**
103:23 104:2
104:13
**organized** 90:4
92:14
**original** 3:9,17
62:21 90:16
185:16 190:25
199:20,21

**[original - page]**                                          Page 30

200:12
**outcome**
  208:18
**outlined**  25:15
**outlook**  173:12
  173:13,14,15
  173:19,24
  174:9,24 178:8
  178:9 179:14
  194:22 196:24
  199:15 200:10
**outside**  30:13
  100:6 188:13
  189:9
**outstanding**
  14:8,10,14
**overall**  121:6
**overhead**  9:8
**override**
  176:25
**overview**  135:4
**overwriting**
  21:3
**own**  8:15 33:8
  33:18 49:13
  91:23 92:4,18
  100:18 147:7
  183:9 189:25
**owned**  180:21
  181:2,3
**owns**  158:22

**p**

**p**  2:2,2 3:2 4:1
  4:2 5:1 6:1 7:1
  8:1 9:1 10:1

11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1

110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1

180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1
**p.m.**  64:11,16
  64:17,19 65:6
  65:21 66:17
  152:5,5 200:21
  202:24,25
  205:18
**pacer**  31:11,12
  31:16 32:5
  33:6
**pacer.gov**
  32:24
**packer**  42:6
  49:11,16 50:2
  58:24,25 73:3
  73:16,20 78:12
  78:21 81:16
**packer's**  49:20
  79:10,13,14
**page**  23:21
  35:4,5,6 75:25

**[page - pdf]**                                                                Page 31

76:2,2,11,13,24
82:24 83:18,20
84:5,7,9,20
85:5,10,11,15
85:25 86:22
87:8,10,13
91:14 92:15,16
94:2 106:18
108:7 109:7
114:2 124:9
130:11,11,12
130:18 131:10
135:7 141:24
153:17 166:18
191:5,18,19
193:5,6,7,12,16
193:17,17,18
193:23 194:7
194:12,14,14
194:16 205:6
206:13,20
207:18 209:5
**pages**  22:22
40:22 83:4
85:20 87:18
90:3,3 91:9,10
93:24 99:21
106:16 107:22
108:18 112:25
113:17,23,24
114:4 130:23
131:8,9 207:3
**pagination**
130:21

**paginations**
83:19
**paid**  13:2,11,15
14:8,10 15:2
15:11 16:8,16
16:21,25 59:18
184:7
**paint**  127:22
143:16 144:23
148:5
**painted**  114:13
114:14,15
127:24 142:19
142:21 143:24
**painting**  50:14
50:14,19,20,22
50:25 51:3
52:9 114:10,11
115:12,20
118:15,24
122:3,7,20
123:2 127:13
127:13,15,19
127:20,22,24
128:9,14,19
130:5 132:2
133:21 138:15
138:22 139:5
142:4,13,18,21
142:23 143:13
143:16,24
144:9,11,12,13
145:16,24,25
146:4 147:13
148:6 149:3,4

150:5 159:23
161:23
**paintings**
116:22 143:2
145:12,21
148:25 150:10
150:13
**paints**  148:19
**pairs**  191:24
**pandora's**
138:5
**paper**  38:6 86:8
171:13 175:7
**par**  4:13
**paragraph**
76:23 82:4,5
88:24 155:3,6
162:16
**part**  29:16
30:17 46:4,5
65:12 67:17
68:6 86:18,22
91:16,19
106:17,22
108:19 117:15
124:12 176:5
182:25
**partially**
130:22
**particular**  58:4
108:19 109:14
141:15 186:10
**parties**  3:7
34:14 38:5
63:5 109:21

126:4 208:16
**party**  1:17
28:17 122:3
**pass**  166:7
**password**
30:23
**past**  93:20
161:9 164:8
166:3 183:24
**path**  115:19
149:15
**patrick**  1:17
4:10 34:19
38:16 61:10
65:23 66:12
75:14,18
175:13,17,17
204:15 205:14
205:21 206:4,5
209:3,21
**patrickoleary...**
8:14 152:22
153:12 206:6
**pay**  12:21 15:6
15:13 16:11,20
35:18 36:9
182:16 184:6,9
**paying**  182:24
183:21,25
184:11
**payment**  15:7
**payments**  13:2
**pays**  10:16
**pdf**  39:8 40:22
40:23 124:9

**[pdf - please]**                                                Page 32

152:20 153:6
167:2 168:3,10
172:23 173:19
175:7
**pending** 7:15
**people** 91:4,4
97:25 98:2,4
100:14 102:22
104:13 130:8
132:16 135:18
147:19 156:20
170:18,19
175:16 181:4
**percent** 49:23
103:25
**perform** 8:7
**period** 28:12
126:18
**person** 17:17
23:24 28:5,7
29:24 30:6,20
30:25 31:4
57:13 98:3
120:5,10
137:12 160:9
202:11 207:4
**person's**
197:12
**personal** 30:12
63:23 99:11
100:5
**personally** 75:6
125:14,20
126:9 153:10

**perspective**
127:18
**pertained**
146:4
**pertaining**
115:4
**pertains** 37:11
115:23 120:12
127:11 132:12
137:25 146:5
162:2
**phone** 8:10,19
8:20 9:14
57:14,16 58:2
58:14 62:9
71:12 78:16
155:24 173:8
189:20 190:2
**photo** 146:18
**photos** 59:8
146:19
**photoshop**
113:19
**physical** 50:18
50:22
**picture** 177:20
**pictures** 177:23
**piece** 22:7 29:8
157:19 158:6
167:24 175:7
195:14
**pile** 161:17
**place** 12:2 18:8
28:9,16 126:2
146:11 162:20

170:16 187:16
204:11
**placed** 167:12
**places** 6:3
146:10
**plain** 100:9
**plaintiff** 1:4 2:4
5:2 77:3 84:22
84:24 85:24
89:3
**plaintiff's**
40:20 41:14
68:14 83:3
108:8 124:10
**plaintiff0007...**
87:19
**plaintiff0007...**
86:8
**plaintiff0007...**
124:10
**plaintiff0007...**
166:20
**plaintiff0007...**
85:12
**plaintiff0007...**
85:8
**plaintiff0008...**
85:17
**plaintiff00798**
84:12
**plaintiff00799**
84:18
**plaintiffs000...**
141:25

**plan** 69:20
**planning** 13:6
119:19 165:13
**platform**
107:12,14
199:14,16
**platforms**
107:16
**play** 38:4 93:8
97:17 105:17
196:20
**played** 128:12
136:7 138:10
**playing** 98:19
130:8
**please** 4:8 6:20
6:24 7:7,14,15
10:4 19:4
23:19,21,25
25:10,13 38:12
45:3 59:25
60:5 61:10,20
62:24 63:6
64:7,13 65:9
65:19 66:10,24
73:6 75:13
83:14,18 84:5
91:24 92:5
94:24 96:20
98:21 99:3,6
99:10 103:17
106:9 110:7
118:20 130:17
133:14 143:20
143:21 151:4

**[please - proceeding]**                                              Page 33

151:23 152:7
152:18 166:9
176:2 184:4
187:19 188:14
189:4 190:9
196:7 199:14
200:19 201:12
201:19
**pllc** 2:8
**ploski** 119:10
  183:14 184:10
**plus** 103:7
**point** 7:6 17:9
  21:13 37:20
  38:5 39:7
  126:10 144:4
  145:22 146:2,3
  146:17 147:13
  150:5 156:5
  161:22 170:9
  183:21 184:2
  184:10 185:21
  197:11
**pointed** 97:19
  112:11 128:13
  130:3 137:17
  183:15
**points** 87:6
  149:9
**police** 198:22
  198:23,23
  199:5
**polytechnic**
  102:9

**pop** 64:3
**popular** 102:23
  104:6
**portal** 158:24
**portion** 123:11
  134:20 160:20
  160:21
**posing** 90:19
**position** 128:9
**positions**
  101:17,25
**positive** 86:7
**possible** 111:15
**post** 27:24
**practice** 21:7
**practices**
  148:24
**precise** 25:9
  26:10
**preparation**
  21:25 56:4
  72:23 73:13
  78:21
**prepare** 36:25
  46:11 47:17
  54:24 73:9
  88:9
**prepared** 43:6
  72:7
**preparing** 20:4
  20:16,18 22:4
  22:19 50:8
  53:11 55:7
  88:16 163:18
  164:9,16

**present** 2:22
  4:20 168:15,19
  168:24 169:10
  169:13,16
  170:22 172:4
  183:25 187:12
**presentation**
  51:15 197:12
**presently** 32:4
  117:7
**press** 197:5
**pressing** 29:4
**pretty** 8:23
  12:19 53:21,24
  55:20 81:11
**prevents** 7:21
**previous** 54:16
  191:18
**previously**
  68:14 72:2
  83:20
**price** 111:20
  172:2
**principles**
  104:11
**print** 22:7,10
  23:7 27:3
  171:11,13
  174:19 177:13
  177:18 178:10
  179:5,6,16
**printed** 23:11
  23:18 167:25
  168:4,5,9
  172:23 173:18

179:17
**printing** 174:23
  174:24
**prior** 36:15
  41:6 47:16
  70:9 71:10
  76:21 85:10,11
  129:13 154:24
**private** 68:24
**pro** 2:4 10:15
  59:14 188:21
**probably** 6:15
  9:22 11:6
  14:12 17:14
  18:21 22:14
  32:19 33:23,25
  42:11 57:18
  79:24 107:10
  118:5 141:21
  156:7,13 157:4
  159:3 174:21
  178:3,18
  179:20
**problem** 14:22
  54:14 138:25
  161:8
**procedural** 9:9
**procedure** 1:19
  61:2 117:14
**procedures** 6:8
**proceed** 96:24
  99:8 186:17
**proceeding**
  25:8 26:10
  34:12

**[process - question]**                                    Page 34

**process** 48:9
**produce** 23:19
  23:21,25 38:9
  46:4 109:9
  126:14 136:15
  141:7
**produced** 44:6
  78:20 81:4
  120:23 121:14
  129:12 139:18
  140:2,7 162:25
**produces** 129:6
  129:11
**producing**
  45:19 189:19
**product** 111:14
  111:16
**production**
  21:16 23:14
  27:15,25 36:19
  36:22 37:2
  68:17 109:5
  123:5 154:17
**products** 72:13
  111:6,9
**profit** 111:22
**programmer**
  102:3,5
**proper** 198:2
**properly**
  192:24
**property**
  107:19
**proposed** 47:2

**protein** 163:20
  163:24
**protocol** 51:24
  90:15 91:12,13
  103:2 125:8
  134:17,23,24
  135:3,6,20,23
  176:3,5 191:16
  191:23 192:17
  194:9,15
  195:16 197:6,7
  197:8,8 199:12
**protocols**
  132:10
**prove** 128:22
**proves** 128:23
**provide** 26:15
  26:18 42:14
  46:24 88:20
  104:25 133:4
  159:7,14
  181:21
**provided** 27:5
  27:17 36:5
  39:19 40:3
  87:25 133:6
  152:25 207:9
**providence**
  149:2
**provider** 90:24
**provides**
  173:24 174:9
**providing**
  104:23 183:4

**public** 1:21 4:4
  103:4 204:22
  208:8 209:25
**publicly** 103:2
**pull** 56:24
  93:25 95:16,20
  101:7 109:21
**pulled** 95:12
  98:5 99:18
**purchased**
  110:14 139:15
**purpose** 26:5
  115:20
**purposes** 117:4
  155:25
**pursuant** 1:18
  60:25
**put** 9:19 12:6
  13:17 18:21
  33:25 84:20
  86:17 87:10
  91:11 111:6,20
  126:21 130:13
  130:15 131:12
  131:13,21
  132:15 134:25
  145:9 157:13
  157:13,15,17
  158:5,7 160:4
  160:20 170:7
  170:15 171:2
  171:17 175:23
  176:3,6,22,23
  178:4 186:21
  186:24 193:9

  197:3,9,24
**puts** 177:4
**putting** 161:24
  196:9
**puzzle** 29:8

**q**

**qualifies** 100:7
**qualitative**
  142:2,22 144:4
**quantify** 11:21
  11:23 14:7
**quantitative**
  82:20 162:18
**quarter** 195:15
**queens** 2:10
**queried** 8:12
  31:19
**queries** 53:7
**question** 7:4,7
  7:9,16,20
  17:25 19:6
  35:25 36:3
  39:12 43:14,15
  60:19,20 61:11
  61:21,24 67:24
  70:5 71:7 73:5
  74:21,24 76:15
  78:8 80:11,12
  80:13 89:20
  90:18 91:21
  94:24 96:5,11
  96:20 99:9
  112:13 118:18
  118:22 121:8
  126:5 128:14

**[question - recollection]**                                    Page 35

141:10 142:14
143:20,22
145:5 149:25
150:8,11 151:2
151:3,5,7
162:6,23 174:5
182:14 184:19
185:7,13
193:15,15
195:22 200:23
201:19 207:18
**questioning**
189:5
**questions** 4:23
5:7 6:21,25
46:9 48:21,24
54:23 57:7
58:8,9,9,10
59:25 71:5,6
79:21,21 80:7
96:22 99:4
108:21 110:7,8
110:10 164:6
165:13,23
181:23 183:15
183:18,19
184:21 186:9
186:15 187:2,4
187:18,18
201:3 202:17
202:20 207:17
**quick** 10:9 45:3
123:15
**quickest**
111:21

**quickly** 131:8
132:17
**quite** 9:18 20:5
40:6 48:11
53:9 62:9,22
126:18 165:5

**r**

**r** 2:2,18 3:2 4:2
4:2 204:2
208:2
**ra** 1:6
**ragged** 202:9
**raised** 77:24
184:22
**ran** 90:24,25
97:22 100:17
**range** 24:11
30:2 33:25
**rate** 16:6
**rather** 46:9
**raw** 51:24
90:16,22 125:7
126:6,6,19
128:19 139:19
185:16 186:4,7
190:18,19
195:23 198:4
198:11 199:16
200:8
**reach** 8:18
**reached** 8:16
**reaching**
190:10
**read** 66:23
74:24 82:4

118:20,22
143:22 151:5,7
180:5 186:22
192:24
**reader's** 197:20
**reading** 74:20
**reads** 40:19
124:14,15
141:25
**ready** 12:5
13:17 15:20
63:5 96:8,24
**real** 192:10
199:10
**realize** 132:17
**realized** 156:14
**really** 11:21
59:9 70:17,17
77:23 81:19
143:4 156:22
198:18
**reason** 7:14
69:21 134:10
136:22,25
171:3,6 209:5
**reasonable**
137:11 160:10
**reasonably**
127:8 174:10
175:2
**reasoning** 33:9
**reasons** 94:6
**rebuttal** 79:17
80:4,13,23,25
81:4

**recall** 20:6 30:9
46:15 70:14
71:8,15,25
72:4 73:4,10
73:12,16,18
81:17 82:13,15
116:23 126:12
126:23,24
127:2 144:17
201:3
**receipt** 128:16
129:19 130:7
138:24 139:2
**receipts** 51:19
112:11
**receive** 35:14
35:20
**received** 24:2
35:9,13 36:11
64:21 65:3
75:2 76:16
86:21 132:22
132:24 207:7
**receiver's**
192:2
**recent** 89:18
90:10 92:6,9
110:16
**recently** 25:6
**recess** 64:15
152:4
**recognize**
153:23
**recollection**
58:3 71:14,19

**[recollection - reporter]**                                                    Page 36

82:17 110:23
116:19 138:19
**reconcile**
  201:24
**reconstruct**
  19:8 48:9
**record**  4:9 7:4
  55:21 63:6
  64:13 151:22
  152:7 166:10
  185:9 193:9
  200:8 208:13
**recorded**  11:16
**records**  10:18
  11:22 12:25
  18:3 19:11
  20:18 23:23
  55:19,25 56:6
  82:16,20 207:4
**rectify**  62:24
**redundant**  37:8
**refer**  20:21
  23:6 42:9 80:7
  80:17 108:3
  109:15
**reference**  77:25
  137:14 154:7
  192:24 200:14
**referenced**
  22:23 23:16
  37:4 72:2
  77:22 81:8
  85:5 140:19
  195:12 206:24

**referencing**
  133:17
**referred**  74:23
  118:21 151:6
  191:12
**referring**  40:2
  65:11 102:8,11
  102:16 131:5
  136:13,20
  137:24 155:3
  168:22 192:22
**reflect**  186:4
**reflected**  137:2
**refrain**  99:6
  105:24 201:13
**refresh**  82:16
**refreshing**
  54:20
**refused**  159:11
**regarding**  51:3
  59:4 99:12
  112:5,9 115:23
  120:18 125:8
  144:14 155:5
  157:22 185:14
  186:11
**regards**  138:2
**related**  15:8,19
  77:2 96:14,19
  100:25 112:8
  115:8 208:16
**relating**  98:10
**relation**  171:25
**relationship**
  30:13 172:3

**relative**  198:19
**released**  103:4
**relevant**  89:17
  89:21 90:10,11
  91:7 92:6,8
  95:3,7 96:3
  97:20 98:17,17
  110:16 116:8
  127:10 144:19
  144:20
**relied**  37:24
  38:3 50:2,6
**relieve**  74:22
**rely**  82:20
**remember**  6:18
  21:10 25:11,17
  25:22 28:15
  33:12 47:8,13
  109:13 164:20
**remind**  6:16
  99:3
**remote**  30:24
  34:12
**remotely**  1:20
  30:21
**removal**  45:6
  59:5 108:17
**remove**  46:2
  92:20 98:6
  103:9 105:3,14
  185:14
**removed**  52:5
  52:15 93:16,18
  105:6 186:2,3

**removing**
  107:22
**render**  87:13
  89:4 100:8
**repeat**  73:5
  97:6 118:17
  144:3 151:3
**repeating**
  59:24 60:3
**rephrase**  7:8
  196:6
**report**  21:3
  25:3 37:5,12
  47:23 49:10,13
  51:10 56:11,16
  72:19,25 73:14
  73:19 74:9,11
  74:14 75:4,8
  77:12 78:7
  79:4,15,18
  81:4,15 84:8
  84:10 86:2,18
  86:23,24 87:4
  87:10,18 88:21
  91:23,25 117:6
  123:4,11 124:7
  130:19 134:25
  136:10 137:4,8
  141:12 155:4
  162:17 189:17
  189:20 190:8
**reporter**  4:8,11
  6:21 18:25
  34:9,14,24
  38:23 54:14

**[reporter - role]**                                             Page 37

64:10,18 66:8
74:25 75:21
97:16 106:4
118:23 151:8
151:24 152:9
153:15 166:11
181:16,25
185:11 200:20
202:24
**reporting**
209:1
**reports**  24:25
51:4 56:18
72:12 80:18,21
140:3,15
141:19 189:2
**represent**  16:5
40:4 68:3
**representing**
4:18 44:25
**represents**  4:21
**request**  36:21
37:2 38:8
59:22 103:3
126:16
**requested**
68:23 69:22
206:19
**requesting**
62:14
**requests**  27:25
**required**  35:18
36:5 176:23
**research**  49:2
56:22 117:4,12

**researching**
51:13
**reservation**
166:8
**reserve**  181:19
**reserved**  3:22
**resolved**
139:21 160:17
162:12
**resources**
32:17 46:21
**respect**  45:18
126:14
**respective**  3:6
46:21
**respond**  6:20
7:2
**response**  38:8
43:17 96:21
177:10
**responsive**
36:25
**rest**  134:22
**restaurant**
28:20,23
**result**  81:24
**resulting**  175:6
**retain**  119:19
**retained**  8:2
89:3 99:13
112:6 116:3
119:19
**retainer**  187:23
202:2

**return**  39:5
**returning**
131:11
**review**  31:5,8
39:22 48:8
67:18 74:3,8
74:14 77:7
78:19 90:8
120:16 121:15
190:16
**reviewed**  21:25
31:14 32:7,21
36:16 41:5
73:14 74:10
76:20 86:20
118:25 128:22
**reviewing**  46:8
72:25 81:15
89:23,24,24
**rework**  72:18
**rewriting**  48:11
**rfc**  103:3
**ridiculous**
70:18 91:21
143:17 145:17
**right**  4:23 15:3
15:12 24:6
45:20,20 48:3
49:5 50:4,10
61:16 84:7,24
90:15 91:2
92:22 93:9,13
94:17,23 98:22
100:9,13 103:7
104:7 109:14

127:3 128:25
129:12 131:2,5
131:12 133:10
142:15,19,20
142:24 143:6
144:14,16
145:25 146:9
147:19 149:15
155:24 156:9
156:18,25
157:16,16,20
160:14 161:10
162:10 163:3
166:6,8 167:9
167:19 169:9
170:6,23 171:9
171:15,19,21
172:9,10,13,14
172:15,18
175:8,10 176:6
177:15 180:4,9
181:9,19 192:7
192:15,17,20
193:8,11,24,25
193:25 194:9
194:15,17,19
196:18,25
198:12,15,16
198:25 199:12
**ringing**  78:16
**robert**  2:23
**rocket**  131:25
**role**  116:9
122:12

**[roll - see]**                                                          Page 38

**roll** 18:6 195:8
**room** 63:10,12
  64:3 68:24
  70:3 93:8
  156:14 159:4
**rough** 12:3
**round** 10:21
  12:17 19:18,19
  81:23,23
  129:21
**router** 100:19
**rule** 140:7,8,12
  140:19 141:8
**rules** 1:19 5:10
  6:17 61:2
**rulings** 207:17
**run** 69:10,14
**runaround**
  52:21 94:8,18
**running** 202:9
**rush** 14:18,19
  14:19

**s**

**s** 2:2 3:2,2
  38:15 205:2,12
  209:5
**sake** 196:12
**sakes** 105:15
**sale** 122:17
  127:12 128:9
  130:5 172:2
**sales** 51:19
  122:14
**save** 27:3

**saved** 23:20
  27:8,9,13
  168:9 207:3
**saving** 72:20
**saw** 47:15
  76:22 159:17
  159:20
**saying** 27:8
  35:23 40:7
  43:25 45:23
  90:19 126:17
  126:24,24
  127:21 128:2
  155:15 156:17
  161:6 162:14
  177:11 183:18
  202:4,13
**says** 21:4 36:19
  41:21,22 76:24
  83:25 85:7,11
  85:16 87:22
  108:7 124:20
  140:12 142:18
  142:20 144:15
  146:10,11,12
  146:16,18,22
  149:10 159:24
  161:13 167:18
  168:16,18
  169:18,20
  170:23 171:20
  172:6,14 175:5
  177:19 178:10
  179:23 191:6
  192:5,16,20

  194:9 195:9
**scheduling**
  47:8
**schmidt** 2:23
**school** 117:16
  117:18 140:23
  157:4
**science** 102:13
  102:14 132:2
  158:19
**scientific** 100:3
**scoot** 64:6
**scope** 8:6
  188:13 189:9
**scott** 119:12
**scratch** 10:9
**screen** 67:23
  87:3
**screenshots**
  207:2
**screenshotted**
  23:20
**scroll** 35:4,10
  39:3 67:12,13
  75:25 82:25
  83:7,14 108:11
  131:6 134:19
  153:19 169:4
  171:23 192:11
**se** 2:4 10:15
  59:14 188:21
**sealing** 3:7
**search** 51:17
  92:11,12 93:19
  95:17,18 98:8

  104:10,11,16
  105:18 107:23
  108:18
**searches**
  104:14
**seat** 54:22
**second** 10:24
  40:19 41:13
  45:3 66:9 76:6
  76:10 83:22
  131:7 134:14
  155:9 191:3
**seconds** 51:7
  65:9 163:24
**section** 36:18
  83:2 105:21
**security** 173:23
  174:8 176:23
**see** 9:20 12:10
  20:4 28:6 32:2
  36:18 40:18,25
  41:20,23 48:23
  49:9,11 51:3,5
  51:22 52:14
  53:5 54:2
  58:11 66:21
  76:23 77:20
  83:5,19 84:11
  84:13,17 85:6
  85:13,18 87:20
  87:22 90:16
  108:16 112:23
  123:25 124:24
  129:15 130:20
  132:17 138:8,9

**[see - signed]**                                                                 Page 39

138:9 141:23
142:6 145:23
145:24 147:16
147:22 148:4
150:13 155:6
162:2 166:25
169:6,9,10,19
169:25 171:24
172:5 175:17
192:12,16,17
194:8,15 195:6
195:7,9 196:25
**seeing** 47:13
  76:19
**seemed** 14:3
**seems** 85:25
  137:10
**seen** 33:20
  126:8 176:19
  202:14
**sees** 176:7
**segment** 146:15
  195:18,20
**seippel** 42:5
  49:15 53:6
  58:22,23 79:10
  79:12
**seippel's** 56:12
  56:13
**selection** 42:22
  44:5
**sell** 111:8
  122:19,22,22
  122:25

**selling** 111:19
  116:18 159:22
  161:23
**sells** 111:21
**send** 26:23 37:9
  40:16 43:9
  65:12 68:10
  125:3 175:16
  188:2 196:14
  197:5,15,17
  198:3,24 199:2
  199:4
**sending** 37:21
  38:6 120:9
  191:8
**sense** 128:24
**sent** 12:13
  13:21 20:23,24
  22:7,9 25:3
  27:2,7,11
  32:18 33:3,15
  37:20,23 38:7
  43:7,17 44:24
  45:22 65:4,21
  88:19 123:16
  123:20,24
  124:2,5,23
  125:8 129:4,9
  129:16 130:15
  133:9 171:3,11
  180:8,11
  194:20 195:11
  196:3,15
  198:25 205:18

**sentence**
  137:23,25
  141:23
**seo** 92:13 113:6
**september** 18:9
**series** 5:7
**served** 34:6
  74:5 75:3,6
  76:17 107:3,17
  107:21
**server** 93:23
  100:20 130:14
  132:16 198:24
  199:6 200:11
  200:11
**servers** 99:20
**service** 3:16
  90:24 104:24
**services** 10:14
  14:9 30:14
  35:21 90:11
**session** 68:25
  69:22
**set** 59:10 62:7
  208:12,21
**setting** 174:16
  176:21
**settings** 174:8
**seven** 40:23
  129:21
**several** 25:5
**shakes** 6:22
**shape** 87:8,14
**sheet** 209:1

**sheets** 113:18
**shepherd**
  165:20
**shift** 109:8
**short** 69:5
  198:20
**show** 35:4 39:4
  39:10 67:5,8
  76:2 124:11
  131:16,23
  147:23 176:17
  192:4
**showed** 146:20
  147:15
**showered**
  164:7
**showering**
  164:14
**showing** 34:25
  38:24 66:13
  75:22 87:17
  153:16
**shown** 162:19
**shows** 149:18
**sic** 86:6
**sick** 190:11
**side** 134:18
  136:3 168:12
  194:8
**signature** 52:8
  146:22 149:17
  208:24
**signed** 3:10,12
  3:15

**SA1630**

**[significance - specific]**                        Page 40

significance
 84:15
significant
 10:12 12:9
 20:22
significantly
 19:19
signing 148:24
 149:3 150:10
 150:13
silly 103:9
 136:16 139:18
 180:2
simple 94:9
 100:9 128:18
 135:3 192:10
 199:12
simpler 187:6
simplifies
 135:16,18
simply 109:8
 110:7
single 33:21
sir 66:19 91:22
 177:25 178:16
 180:10 201:20
sit 14:15 17:10
 18:2 21:9
 33:19 87:9
 109:12 133:20
site 50:13 59:6
 59:7 90:25
 91:4
sites 23:3

sitting 17:8
 36:13 102:4
situation
 105:15
situations
 47:23 177:12
six 9:23 24:8
 95:16 105:11
 105:16,18
size 100:15
skill 100:4
 159:6
skipped 37:9
 38:2 102:13
slavina 2:17
slc 1:6
sleep 55:17
 163:14
slept 163:7,10
slide 194:2,11
 194:12
slightly 16:8
slow 76:4,8
 87:5
slower 67:13
 83:16
small 195:13
smile 70:6
smoke 100:14
 156:18
smtp 51:23,23
 52:2 53:7
 89:23 90:2,14
 90:16,20,22
 91:7,16 125:7

125:7 126:6,19
128:19 132:10
132:13 134:17
134:24 135:4
139:19 176:3,5
180:6,14
185:22 191:16
191:19,23
192:12,17
194:9,15 197:5
198:20,21
199:3,8,11
200:14
social 107:11
 107:13,15
software 54:15
 100:20 111:12
 111:16
sold 100:13
 106:25 110:17
 116:21 122:2,3
 122:7,15
 123:10 127:14
 127:16 133:22
 138:22,23
 139:5 180:19
sole 198:8,9
solely 95:2
 125:24 184:21
solution 54:8
solve 54:13
somebody
 78:16 92:19
 95:9

someone's 82:5
someplace
 28:15
soon 60:10
sorry 5:22 7:19
 25:2 31:8
 53:18 65:14
 66:11 73:5
 74:16,18 78:17
 80:19,21 83:13
 88:7 118:17
 121:8,9 139:19
 141:10 165:24
 174:6 177:7
 181:13
sort 130:20
 190:14
sought 94:6
soul 198:5
sounds 69:20
source 124:21
 170:8 191:7,8
 191:9,11 195:8
 195:12,13
 199:15 200:10
southern 1:2
speak 57:13
speaking
 120:10
specialized
 100:3 111:25
 145:4 147:21
 159:6
specific 15:14
 15:24 17:5

**SA1631**

**[specific - subjects]**                                                 Page 41

70:14 71:9 73:8 103:14 110:11,22 192:22

**specifically** 25:12,13 47:21 50:7 58:15 69:12 71:8,15 89:13 109:13 162:7 186:12

**specified** 204:11

**speed** 67:15

**spell** 88:5

**spelled** 88:2

**spend** 10:19 49:18 53:11 54:11 58:13 81:15 82:18

**spent** 11:16,24 14:25 23:24 47:19 163:6,18 207:5

**split** 37:6 102:24 104:18 125:15

**splitting** 44:10

**spoken** 57:10 110:19,23

**spot** 157:14

**spread** 165:9

**ss** 208:4

**stack** 197:6,7

**stage** 117:9

**stages** 117:11

**stamp** 20:15 42:12 84:12,17 85:7,21 193:9 193:10 194:3

**stamped** 22:9 22:17 37:12 39:25 40:11 42:15 46:6 86:16 87:19 124:10 141:24 166:19 169:13

**stamps** 84:15 86:3,5

**stand** 101:10 144:4

**standpoint** 142:22

**start** 106:12,16 114:25 138:8

**started** 53:12 53:15,25 54:2 103:5 106:14 106:15 138:10 156:21,23 158:10

**starting** 64:9 106:11 108:7 131:10

**starts** 88:24 155:4 162:17

**state** 1:22 4:4,9 5:21,24 6:5,8 35:19 36:6 64:8 151:22

152:7 190:3,7 196:5 208:4,9

**stated** 117:6 137:7

**statement** 36:2 145:2,6 156:7 157:11 158:13

**states** 1:2

**stating** 124:2 188:3

**steps** 95:20 98:6 139:3

**stipulated** 3:5 3:20

**stolen** 158:5

**stop** 50:4 90:5 97:16 98:19 130:24,24,24 143:15 153:20 188:14

**stored** 92:11 99:20

**straight** 133:24 133:25

**straightened** 194:6

**strategy** 29:9 29:11,14,15,18

**street** 2:5,10,16

**stricchiola** 50:2 58:25 59:2 73:2,15,19 74:9,15 77:12 78:20 81:15

**stricchiola's** 74:11 78:7 79:15,18

**strike** 65:16 71:2 78:2 92:3 93:10,12 94:12 94:16 95:25 96:3 97:18 98:22 101:15 103:12 105:21 143:18

**structure** 91:11 91:12

**structured** 91:9 91:10

**stuck** 95:17

**study** 114:22

**stuff** 9:8,9 14:5 15:19 20:24 22:21 53:23 59:3 62:6 63:2 80:20 91:13 99:24 109:18 110:17 111:19 112:5,18 113:2 132:11 134:9 135:11 140:16 148:18 149:19 157:7 159:3 165:9 176:13 197:2,3

**style** 113:18

**subject** 122:19

**subjects** 99:12

**[submitted - terminology]**                    Page 42

**submitted**
   48:17 84:19
   199:19
**subpoena**  12:7
   12:7 25:4 34:6
   34:18,21 35:8
   35:13,15 36:16
   74:5 75:3
   76:17 86:21
   205:8
**subpoenaed**
   74:14
**subscribed**
   204:18 209:22
**subsequent**
   9:14
**subsequently**
   93:17
**substance**
   123:3
**subtle**  146:3
**subtract**  165:7
**suggest**  64:2
**suggestion**
   150:21
**suite**  2:10
**sum**  123:3
   132:22
**supplied**
   121:16
**supports**
   162:20
**supposed**  41:12
**sure**  6:17 32:3
   35:11 40:13

41:15 46:17
48:14 51:8
54:6 67:10
74:19 76:4
83:15 101:10
110:21 111:10
111:17 122:21
122:23 147:4
149:12 166:24
169:7 173:20
175:11,11,25
**swear**  201:14
**swipe**  123:16
   129:3
**sword**  113:8
**sworn**  3:10 4:3
   88:25 204:5,18
   208:12 209:22
**system**  33:12
**systems**  33:5

**t**

**t**  3:2,2 4:2
   204:2 205:2
   208:2,2
**tab**  170:15
**tag**  170:6,11
   174:21 178:5
**take**  6:22 7:13
   8:21 28:8
   30:24 51:8
   53:22 55:9
   56:7 57:21
   60:12,15,21
   61:14 62:12
   64:4 69:11

83:13 93:5,6
95:20 96:12
98:5 136:23
150:24 151:12
151:23 164:11
165:2 175:23
185:2 196:10
**taken**  1:17 5:24
   6:11 18:8
   64:16 113:13
   113:14 114:21
   115:3,11,16
   144:5 152:4
   162:19 163:19
   164:14,17
**takes**  111:6
   135:11 163:24
   177:4
**talk**  79:4 97:15
   106:3 155:14
   170:22 174:2,3
   179:14
**talked**  29:3
   51:18 138:16
   138:17 189:22
**talking**  32:24
   39:17 45:18
   48:6 63:16
   75:5 114:23
   120:6,7 130:4
   160:15 173:25
   196:23
**tall**  143:5,9,11
**tangible**  82:19

**task**  15:8,24
   56:7
**tasks**  15:14
   56:4
**teaching**
   191:23
**tech**  55:23
**technical**  100:3
**technically**
   186:23
**technique**
   104:25
**technology**
   29:20 46:16
   70:2 89:9
   115:22
**telephone**  70:9
**tell**  12:19 56:6
   83:22 84:18
   89:12 106:7,9
   131:7 171:25
**telling**  73:12
   90:7 105:24
   106:5 161:20
   179:7 193:20
**ten**  18:21 48:6
   62:16,24 63:7
   63:12 155:12
   158:2 163:15
   164:12,18
**tend**  10:21
   46:17 69:25
**term**  148:12
**terminology**
   139:22

**[test - time]** Page 43

**test** 20:8 126:25

**testified** 4:5 39:18 46:7 68:4 77:20 163:18

**testify** 34:18 149:20 201:15 202:3 204:5

**testifying** 7:22 201:4,9,13

**testimony** 73:4 73:16 79:17 80:4,14,23,25 101:4 154:18 183:14 201:25 204:6,10 207:14 208:14

**texas** 154:15

**text** 31:22 135:22 186:3,5 186:6 192:20 194:18,23 195:3 197:21 197:25

**thank** 8:17 16:22 21:21 26:7 27:14 61:19 62:15 64:13,20 65:2 75:10 127:4 133:14 151:11 152:2,3 166:13 166:14,16 167:9 168:13

172:24 177:9 177:16 178:6 179:11 180:4 180:10 181:8,9 181:11 182:9 189:6 190:15 193:3,15 194:5 200:17 202:16 202:21

**theme** 178:22

**thereabouts** 16:10 129:22

**thereof** 145:13

**thing** 32:2 37:17 49:4 69:9 70:21 75:2 77:17 107:9 134:5,12 143:5,14 147:12 149:6,7 166:25 179:21 187:7 195:10 199:9

**thing's** 11:25 14:18

**things** 13:25 15:20,21 17:7 17:15,16 20:23 25:20 29:20 43:2,20 47:24 51:9 53:25 54:20 56:8,9 56:11,19,22 58:12,18 59:8 59:16 60:3

73:8 105:7,8 106:15,19 111:10 112:20 113:16,23 114:2 126:4 138:4,9,11,11 144:5 146:12 147:22 157:3,5 170:12,13,19 176:19

**think** 8:12,24 9:20,21 12:18 14:17 15:25 16:3 26:2 28:22 33:11,13 42:11 54:21 63:15 81:12 87:7,8 98:15 98:17 105:25 143:23 162:12 176:18 190:18 195:11,21 198:7 202:6

**thinking** 7:22

**third** 28:17 124:13,20 155:8,9 180:8 195:15

**thought** 48:22 89:6 165:18

**three** 8:25 9:3 18:15 21:6 35:4 128:15 130:7 131:9 132:3,22 133:5

143:11 146:9 165:7,8 168:13 168:21 188:23

**threw** 10:11

**thunderbird** 173:12

**tie** 51:10 56:11 56:12,24 58:18 61:24 62:3 79:24,25 82:6 98:14

**tied** 56:16

**tier** 157:6

**ties** 56:13,14 58:12 78:25 79:15 100:22 127:14

**time** 1:13,20 3:22 11:15,23 12:12,16,19 13:14 14:4,8 14:25 15:11,13 15:13 16:5,9 16:17 17:7 21:13,14 28:7 28:12 46:22 49:18 51:8 53:10,17,19 54:24 55:19,20 55:24 57:4 58:13 63:5,9 63:14 64:8,10 64:18 69:24 81:14 82:17 83:8 88:8

**[time - trier]**                                                                                                    Page 44

106:19 111:22
116:20 118:3
118:16 123:18
126:11,19
127:23 133:7
138:2 151:18
151:20,22,24
152:7,9 154:14
155:22 157:9
160:17 162:13
163:5 165:3
166:10,11
167:10 168:23
169:23 179:17
181:12,15,16
181:24 182:17
182:24 184:7,8
184:9,11
187:13,15
188:22 197:4
197:16 198:17
200:19,20
202:23 204:10
**timeframe**
18:13 93:2
104:6 156:24
**timeline**  18:7
83:25 85:17
129:15 131:3,4
131:22 169:4
169:19 171:25
**times**  5:14
12:15 17:2
27:7 60:2
63:22 146:14

175:16
**timing**  58:14
**titan**  165:10,16
**title**  130:18
140:13,19
142:20
**titled**  65:25
75:13 77:8
205:23
**today**  4:23,24
5:6 7:23 15:20
20:16 21:9
33:19 39:23
42:19 46:19
48:25 49:22,24
51:16 53:11
57:4,7 76:21
78:21 80:23
81:9,16 87:9
93:3 105:13
109:13 133:20
153:6 154:5
155:22 156:16
167:10 202:22
**today's**  22:2
35:3 41:6
47:17 56:5
66:3,15,16
67:25 73:13
75:16,24
152:19 186:24
195:4
**toe**  63:24,25
**together**  29:9
30:25 56:9,16

56:20 58:18
76:17 91:11
105:8
**toggle**  176:13
177:19 178:11
179:18 180:3
**toggled**  179:24
**toggling**  177:22
178:13 185:14
185:17 196:9
196:20 197:10
197:11
**told**  49:12 51:3
54:14 60:2
81:9 125:24
**took**  9:4 12:11
68:22 113:17
130:10,13,14
135:6 163:22
**top**  39:6 40:18
110:24 157:6
167:19 191:22
**topic**  24:12
29:2
**topics**  48:25
50:9 141:21
**total**  57:21
**tough**  97:9
**track**  11:3
17:16 44:17
82:4 122:14,17
122:17
**traffic**  91:3
97:23 103:21
103:23,25

104:2,12
**trained**  147:16
147:20 148:4
**training**  100:4
112:16 113:10
113:11,18,21
113:21 114:10
114:18,20
116:7 148:3
159:6
**transaction**
155:11 158:2,5
**transactions**
116:17 121:18
**transcribe**
184:18
**transcript**
159:15 182:4,6
182:16,25
183:5 184:15
184:16,17
192:23 204:9,9
**transfer**  135:3
**transition**
196:5
**transport**
199:12
**trial**  3:22
**tricky**  106:17
**tried**  70:22
99:19 101:7
103:9 174:18
**trier**  100:7
112:3 159:8

**[trombett - ubiquitously]**                                    Page 45

**trombett**
  146:11
**trombetta**  1:3
  2:4 5:3 8:2,9
  8:21 9:15 10:3
  10:13,20 12:18
  12:21 13:2,12
  15:6 16:8,18
  16:24 17:3,11
  18:3 19:8
  20:19 21:11,18
  22:3,5,20
  23:17 24:3,8
  25:17 26:15
  27:4,16 28:4
  29:17 30:4,13
  31:7 33:3
  37:22 38:10,13
  39:18,19 41:20
  42:18,23 43:16
  44:6,22 46:12
  46:24 47:11
  49:14 57:8,12
  57:15 58:21
  59:12,14 60:16
  60:22 61:6,6
  61:12,15,19
  62:14,15 63:13
  63:16,19 64:21
  64:23 65:2,4
  65:11,22 66:16
  68:5,8,24 69:3
  69:7,19,23
  70:8,15,20
  71:9,16,20

84:25 86:4,13
87:23 88:6,15
89:5 90:15
91:25 94:6,15
97:2,11,19
99:5 101:6
103:8 105:13
112:7 114:6
115:13,19
118:16 119:18
121:16,19
123:16 124:4
125:5,18,24
126:16 127:6
133:11,13
138:14 139:6,7
140:21,25
142:3 143:3
144:8,15,23
146:7,10,13,16
146:24 148:5
149:11 150:18
152:12 159:14
160:5 163:25
164:6 166:4
171:4 182:10
182:13,18
183:12,23
184:13,25
185:5 186:18
186:21 187:4,5
187:12,13,20
188:9,11,15
189:6 190:15
193:3,17,19,24

199:25 200:16
201:6,9,10
202:3 205:10
205:19 206:16
206:22,25
207:7,8 209:2
**trombetta's**
  11:16,24 52:12
  52:14 56:14
  60:14 68:15
  79:11 119:10
  128:8 148:9,11
  160:21 162:3
  162:21 163:2
  201:3
**true**  34:3 145:6
  204:9 208:13
**trust**  100:15
**truth**  161:20
  204:5
**truthful**  137:11
**truthfully**  7:23
**try**  26:13 192:9
**trying**  46:10
  102:24 107:13
  115:25 116:2
  126:18 127:12
  135:13 141:16
  141:18 177:7,8
  196:19
**turn**  44:15
  47:23 78:17
  126:4,5 134:10
  136:2 140:14
  178:20 179:21

197:2
**turned**  48:2
  49:15 121:14
  134:5,16 153:5
  171:4 172:22
**turns**  196:21
**twice**  41:9
**twitter**  107:16
**two**  8:24 16:9
  18:14,15 21:6
  24:25 43:3
  50:10 54:11
  55:11 56:15
  60:7 80:2
  98:14 100:24
  105:9 109:20
  113:7 129:16
  131:9,13,13
  132:15 146:9
  154:13
**type**  88:12
  100:20,20
  117:18
**typed**  195:24
**types**  194:21
**typical**  99:16
**typically**  11:14
**typo**  87:25

**u**

**u**  3:2
**ubiquitous**
  157:9
**ubiquitously**
  156:3

**[uh - want]**                                                                    Page 46

uh  169:5
unable  195:2
unauthorized
  155:11 157:25
under  6:7
  41:22 63:12
  89:2 125:3
  190:14
underlying
  32:8
underneath
  124:15 168:18
understand  5:4
  7:7 35:17 36:4
  42:2,8 47:4
  93:14 98:21
  101:6,12
  121:21,25
  122:7,11,18
  135:8 145:20
  182:23 183:20
  183:22
understanding
  51:14 70:21
  121:17 122:5
  122:25 128:8
  145:19 159:21
  160:2,18,23
  162:8 169:3
understood
  7:10
unique  84:20
united  1:2
universe  121:6

unix  194:25
uno  138:6
unrelated
  95:10
unsigned  3:14
untoggled
  176:16
updated  154:19
  154:21 207:13
upstairs  69:11
  69:14
url  45:6 52:15
  59:4 93:5 94:9
  101:6 103:9
  105:3 127:14
  136:23
urls  46:2 79:5
  105:5
use  11:13 22:10
  25:14 31:17
  46:20 90:21
  91:19 93:3
  111:17 113:19
  122:23 135:17
  173:9,11,16
  175:9,9,12
  176:9 180:5
used  3:14 22:14
  25:6 33:11
  37:18,24
  100:21 113:3
  113:24,25
  117:3 127:17
  127:19 148:13
  170:11,17

173:12,13
  198:14,23
user  30:22
users  177:2
uses  16:2 33:12
using  19:4
  44:11 110:14
  155:24 158:11
  173:17 178:22
usually  12:17
  13:8 17:17
  47:22 48:7
  70:3 98:2
  141:14

**v**

v  209:2
valid  199:11
validate  199:4
  199:10
value  191:24
vanessa  119:10
  183:14
variable  191:24
variations
  146:15 147:24
  149:18
various  48:22
  49:9 56:20,21
  57:5 59:6,8
  79:6 89:24
vendor's
  191:25
ventura  66:2
  205:25

verbal  9:2
verbally  6:21
veritext  54:8
  65:25 205:24
  209:1
version  21:5,5
  54:16 129:6,23
  132:25 136:8
  167:2 174:8
versions  21:2
  132:23 133:5
  136:14
versus  31:7
  87:23 122:22
view  31:25
  119:2 142:2
  144:7 180:14
  196:21
virtual  1:16
visited  117:24
  118:4,12,16
visits  57:25
visual  114:15
  186:5 192:4
visually  186:2
visuals  185:17
volume  78:17

**w**

wait  7:2 14:19
  76:4,4 98:16
  98:16 135:2,2
waived  3:9
want  16:24
  17:4 23:12,13
  33:23,24 54:9

**[want - working]**                                    Page 47

61:17 80:16
83:14,15,21
92:19,20,24,25
92:25 93:3
94:14,25 95:11
95:12,15,17,19
98:4 108:12
111:9 126:17
126:19 149:8
153:20 162:8
167:11,17
170:22 174:2,3
179:13 182:15
183:5,19
184:15 187:14
187:18 188:17
191:17 199:9
**wanted** 14:20
14:20 36:9
42:20 51:12
89:13 90:15
105:2 111:14
111:14,15
125:6,6,9,10,11
149:12
**wants** 17:14
**waste** 57:3
**way** 14:7 16:14
20:12 34:11
55:3,15 70:4
77:12 82:8
87:14 102:5
109:7 113:5,7
134:19 135:15
138:13 196:8

208:18
**wayback** 52:13
**we've** 9:18
130:6,6 139:23
184:7
**weather** 190:14
**web** 22:21
23:21 90:3,3
91:9,10,14
92:16 93:22,23
93:24 99:21
100:20 109:7
112:25 113:17
113:22,24
114:4 132:16
207:3
**website** 23:18
92:21 93:16
94:4,10 97:23
98:4,7 103:10
103:22 112:20
117:25 118:4
118:13 120:7
146:20 147:9
147:19 152:21
153:6 180:24
**websites** 22:22
23:2,8 92:14
103:5 181:3
207:2
**week** 57:19
71:10,17
**weeks** 48:6
**welcome**
182:17

**wellbeing**
150:23
**went** 20:2,22
22:23 37:6
43:4,22 44:19
48:20 49:13
54:10 55:3
69:9,13 82:2,7
152:14 177:13
**westchester**
208:5
**whereof** 208:20
**white** 134:6
136:2
**wide** 143:6
**william** 53:6
**willy** 119:15
**wilson** 2:14
**wilsonelser.c...**
2:19,19
**win** 111:10,16
**window** 45:2
**windows** 65:7
173:14,17,25
**winging** 178:25
179:3
**witness** 1:17
3:10,16,18 4:3
4:25 6:11
21:20 24:6
27:19 28:2
35:19 92:21
95:11 101:10
107:4,21
109:24 110:4

119:10 140:6
147:17 151:15
151:19 152:23
158:21 165:10
165:16 166:7
166:15 182:12
183:8,10,11
188:25 189:16
189:20,25
190:8 203:2
208:11,14,20
**witnessrawpl...**
67:2
**woah** 172:25
172:25,25
182:12,12,12
**won** 111:17
**word** 25:6
131:14 135:17
157:17 195:20
**words** 44:12
91:24 92:4
**work** 8:6 12:14
23:16 30:17
31:17 54:3,16
55:14 104:10
106:17,22
109:24 113:6
148:15,20,22
166:2 180:23
206:24
**worked** 111:12
**working** 10:19
15:16,17 26:5
53:12,15 54:11

**[working - zoom]**                                                    Page 48

54:17 55:7 72:19 103:15 110:20 117:7 117:13 141:4 158:20
**works** 16:14
**world** 90:25
**worries** 21:20 28:2 109:11
**worthpoint** 1:8 2:15 4:18 40:22 42:3 43:12 49:5,8 50:13,15 56:11 59:6,7 61:5 76:25 94:10 97:24 116:25 117:3,21 118:12 122:19 122:25 123:10 125:12 146:23 160:12,13 161:23,24 162:3,5,9
**worthpoint's** 41:23 122:12 126:13
**worthpoint.c...** 117:25 118:4
**wp** 41:23 42:3 42:8 85:3 186:12
**writing** 21:19 24:5 154:23

**written** 55:24 72:13 138:2 163:2
**wrong** 49:23 77:17 180:22 180:23 183:13
**wrote** 120:15

**x**

**x** 1:3,10 19:16 205:2 206:11

**y**

**y** 4:2
**yahoo** 30:16 31:2 53:6 93:18 103:24 104:3,5,9,14 105:5 199:16 200:9
**yeah** 13:16 16:10 21:12 23:10 25:24 28:7,19,19 33:7 35:12,16 40:24 60:11 98:25,25,25 127:2 136:15 143:4 165:8 168:5 171:17 172:19 173:11 177:15 180:7 189:18 196:7
**year** 95:14 142:23 143:2 143:10,24

145:12,21
**years** 21:8 89:17 90:9,20 90:21 92:6 93:20 97:3 102:2,25 103:8 104:20 106:13 110:2 113:14 127:23,25 132:12 134:8 139:20,21 142:5,15,17 144:6 147:6 155:12 158:2 158:21 173:20
**yellow** 89:16 167:12,16,17 168:14,24 169:9,10,12,15 169:16,20 170:21 171:20 178:23
**yep** 67:4 153:22 172:7
**yesterday** 20:11 53:12,15 55:10 163:8
**york** 1:2,22 2:5 2:5,10,16,16 4:4,14 5:21,24 6:4,7 35:19 36:6 128:5 208:4,9 209:1
**you's** 133:14

**z**

**zero** 171:18
**zoom** 68:25 146:22 153:20

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**SA1641**

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_____ District of _____

| | |
|---|---|
| _____ <br> *Plaintiff* <br> v. <br> _____ <br> *Defendant* | ) <br> ) <br> )    Civil Action No. <br> ) <br> ) <br> ) |

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: 

_____
*(Name of person to whom this subpoena is directed)*

❏ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Date and Time: |
|---|---|
| | |

The deposition will be recorded by this method: _____

❏ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

|  *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ <br> *Signature of Clerk or Deputy Clerk* | _____ <br> *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

**EXHIBIT**
A, 2/28/23

**SA1642**

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

     I received this subpoena for *(name of individual and title, if any)* _____
on *(date)* _____ .

     ❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

     ❒ I returned the subpoena unexecuted because: _____

_____ .

     Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

     $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

     I declare under penalty of perjury that this information is true.

Date: _____

                                    _____
                                             *Server's signature*

                                    _____
                                           *Printed name and title*

                                    _____
                                           *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SA1644**

## Subject: Re: VeriText Hangs on MacOS Ventura 13.1 on M1 Mac mini

 **Annamarie Trombetta** <atrombettaart@gmail.com>
to Farmer, Jana S., Patrick Michael O'Leary, Bialek, Adam, Anderson Duff, Cahill, John

You are viewing an attached message. Gmail can't verify the authenticity of attached messages.

**[EXTERNAL EMAIL]**

To All Parties,

Attached are FIVE  files.

1_Three are from the **December 5, 2022  Public Docket  322**
**Exhibit #10** is Mr. O'Leary's Affidavit

2_Exhibit #7  is WorthPoint Request for  the Feb. 20, 2016  Raw/Original Message Plaintiff Annamarie Trombetta's
him that I am not the artist who painted 1972 oil painting Man With Red Umbrella  **December 5, 2022  Public Doc**

3_30   Exhibits is also from   **December 5, 2022  Public Docket  322**

4_The next is  Estate Auctions Inc.  Attorney Anderson Duff's Alleged Original Message

5_is WorthPoint's WP 132--133 --134  Dated Jan. 4, 2017 to Jan. 5. 2017

Please confirm Receipt of Mr. O' Leary's File sent to Attorneys



On Tue, Feb 28, 2023 at 7:27 AM Farmer, Jana S. <Jana.Farmer@wilsonelser.com> wrote:

Mr. O'Leary,

The court reporter vendor Veritext will be in touch shortly to troubleshoot your access issues and provide trainin

We still have not received a copy of your file. Please advise.

**EXHIBIT**

**B, 2/28/23**

**SA1645**

## Subject: Re: VeriText Hangs on MacOS Ventura 13.1 on M1 Mac mini



**Annamarie Trombetta** <atrombettaart@gmail.com>
to Farmer, Jana S., Patrick Michael O'Leary, Bialek, Adam, Anderson Duff, Cahill, John

You are viewing an attached message. Gmail can't verify the authenticity of attached messages.

**[EXTERNAL EMAIL]**

Apologies to All Parties

Attached is Exhibit #7  The Raw message from First email from Plaintiff to WorthPoint CEO  Will Seippel Dated Fe

This attachment is in Doc, 322 filed on Dec. 5, 2022

On Tue, Feb 28, 2023 at 8:55 AM Farmer, Jana S. <Jana.Farmer@wilsonelser.com> wrote:

Ms. Trombetta and Mr. O'Leary,

We received five (5) PDF documents. Kindly confirm whether all these represent the contents of Mr. O'Leary
the entire file.

We note the absence of correspondence between Ms. Trombetta and Mr. O'Leary; and between Mr. O'Leary
witness to this action, which was previously demanded and court-ordered to be produced. To the extent the
please produce it as soon as possible before the deposition. For the avoidance of any doubt, we are NOT see
yesterday's or this morning's emails with Mr. O'Leary, but rather looking for correspondence with plaintiff an

Mr. O'Leary, Veritext sent you a test link for Zoom. Please advise status – did the test link work for you?

Jana S. Farmer
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
1133 Westchester Avenue
White Plains, NY 10604
914.872.7247 (Direct)
914.552.9644 (Cell)
914.323.7000 (Main)
914.323.7001 (Fax)
jana.farmer@wilsonelser.com

**EXHIBIT**

C, 2/28/23

SA1646

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANNAMARIE TROMBETTA

                    Plaintiff,                Civil Case No. 18-cv-00993-RA-SLC

        -against-

NORB NOVOCIN, MARIE NOVOCIN, ESTATE
AUCTIONS, INC., AND WORTHPOINT CORPORATION,

                    Defendants.

---

### NOTICE OF DEPOSITION OF PATRICK M. O'LEARY

---

**PLEASE TAKE NOTICE** that, Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendant WorthPoint Corporation (hereinafter "WorthPoint") by and through its attorneys, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, will take the deposition upon oral examination of Patrick Michael O'Leary on the **28th day of February, 2023 at 11:00 a.m., VIA REMOTE VIDEO TECHNOLOGY,** or at any recessed or adjourned date thereafter. The deposition will be conducted before an officer authorized by law to administer oaths for the purposes set forth in the Federal Rules of Civil Procedure.

Failure to comply with this Subpoena is punishable as a contempt of court and may make you liable to the person on whose behalf this Subpoena was issued for penalty and all damages sustained by reason of your failure to comply.

You are hereby advised that WorthPoint will be inquiring into the matters related to the Complaint filed by Plaintiff and the cross-claim, which are annexed hereto as **Exhibit "A"**. In addition, you are hereby advised that WorthPoint will be inquiring into your Expert Report for this matter as well as your Curriculum Vitae, which are annexed hereto as **Exhibit "B"**.

275718384v.1

<div style="border:2px solid #000; background:#ffcc00; display:inline-block; padding:4px;">

**EXHIBIT**

 D, 2/28/23 

</div>

**UPON RECEIPT OF THIS NOTICE, PLEASE IMMEDIATELY CONTACT THE UNDERSIGNED VIA TELEPHONE OR EMAIL TO CONFIRM AVAILABILITY AND TO OBTAIN THE LOGIN-IN INFORMATION FOR THIS REMOTE DEPOSITION.**

Dated this 14th day of February, 2023.

                                        WILSON ELSER MOSKOWITZ EDELMAN &
                                        DICKER, LLP

                        BY:        _____

                                        Adam R. Bialek
                                        150 East 42nd Street
                                        New York, New York 10017
                                        Telephone: (212) 915-5143
                                        Fax: (212) 490-3038
                                        Adam.Bialek@wilsonelser.com

                                        Jana Slavina Farmer
                                        1133 Westchester Avenue
                                        White Plains, New York 10604
                                        Telephone: (914) 872-7247
                                        Fax: (914) 323-7001
                                        Jana.Farmer@wilsonelser.com

                                        Attorneys for Defendant
                                        *WorthPoint Corporation*
                                        Our File No. 19701.00006

TO:      Anderson Josiah Duff
         Hogan Duff, LLP
         Attorneys for Defendants
         *Norb Novocin, Marie*
         *Novocin, and Estate Auctions, Inc.*
         43-10 Crescent St., Ste. 1217
         Long Island City, New York 11101
         Telephone: (646) 450-3607

         Annamarie Trombetta
         *Plaintiff Pro Se*
         175 East 96th Street, Apt. 12R
         New York, New York, 10128

2

Telephone: (212) 427-5990

**SA1649**

## INSTRUCTIONS AND DEFINITIONS

The following terms as used in this Notice shall have the following meanings:

A. "**All**", "**Any**" or "**Each**" shall each be construed as encompassing any and all;

B. **"Agreements"** shall mean and include any oral or written (in pen, typed, printed or electronic) arrangement between two or more parties;

C. "**And**" or "**Or**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside the scope;

D. **"Artwork"** means the artwork described as 1972 oil painting entitled "Man with Red Umbrella", which Plaintiff claims was misattributed to her by the Defendants;

E. **"AskArt"** means online research database, available at www.askart.com;

F. "**Communication**" means any and all oral or written contact between two or more persons including, without limitation, any meetings, conferences, face-to-face conversations, telephone, teleconference, video conference, voice mail, audio recording, video recording, mails, electronic transmissions, electronic mail (email), text messaging, WhatsApp messaging, social media messaging, instant messaging (IM), facsimile or any other forms of oral or written communications by any other medium;

G. The "**Complaint**" means the "Second Amended Complaint" filed by Plaintiff in the above-captioned matter in the United States District Court for the Southern District of New York on or about December 27, 2022 (Docket Number #348-1), which was deemed by the Court to be the Operative Complaint by Orders of the Court, dated January 5, 2023 (Docket Number #357) and dated February 2, 2023 (Docket Number #366);

H. "**Concerning**" means relating to, referring to, reflecting, describing, evidencing, interpreting, consisting of, pertaining to, regarding, or constituting, in whole or in part, directly or indirectly, the matter identified;

I. **"Document"** includes all written, graphic matter, handwriting, typewriting, audio or video tape recordings, however produced or reproduced, of every kind and description, including but not limited to, the original and each copy thereof which is non-identical by reason of any mark, change, or other cause or reason whatsoever, of all correspondence, records, reports, memoranda, notes, facsimiles, messages and message books, email, text messages, WhatsApp or other electronic messages, social media messages, telephone logs, memoranda of telephone

4

conversations, publications, books, brochures, booklets, manuals, flyers, leaflets, contracts, memoranda of agreement, books of account, ledgers, journals, working papers, records or summaries of personal interviews or conversations, appointment calendars, diaries, receipts, invoices, billing statements, files, tapes, discs, drives, data cards, films, data processing files and all other computer-readable records or programs, including any and all drafts or non-identical copies thereof. Documents in electronic or digital form stored in any format, discs, drives, data, cards, data processing files and other computer-readable records or programs must be produced in reasonably usable form (e.g., by printing or "downloading" such documents onto paper). In addition, all electronic documents must be produced in native electronic format on a DVD or CD or other common, easily- readable storage device, or through a secure online delivery system that is secure and contains no malicious code or code designed to record actions of the recipient or send information back to the sender. (The word "writing" may be used synonymously herein in place of "document.");

J.  **"EAI Defendants"** means Defendants Norb Novocin, Marie Novocin, Estate Auctions, Inc, their representatives and agents;

K.  When used in reference to a person, the term **"identify"** shall mean to state the full name and job title of such person and, in the event such person is currently not an employee of Plaintiff, such person's last known residence address and telephone number;

L.  When used in reference to a Document, the term **"identify"** shall mean to state the date the Document bears, if any, its author(s), location, and a brief description of its form (e.g., memorandum, e-mail, letter, etc.) and contents, as well as the identity of the person(s) known to have possession, custody, or control over the Document;

M.  **"Lawsuit"** means the above-referenced case, styled as *Annamarie Trombetta v. Norb Novocin, Marie Novocin, Estate Auctions, Inc. and WorthPoint Corporation*, Case No. 18-cv-00993-RA-SLC (S.D.N.Y.);

N.  **"Plaintiff's Biography"** means Plaintiff's biography, as it appears or previously appeared on her website during all relevant times and in which Plaintiff claims copyright;

O.  The terms **"relate to," "relates to," "relating to," and "related to"** shall mean and include: refer, reflect, discuss, show, constitute or be in any way logically or factually connected with the matter discussed;

P.  **"Plaintiff"** means and refers to, Plaintiff Annamarie Trombetta, as identified in the Complaint, and any and all persons acting on behalf of Plaintiff, including without limitation, Plaintiff's current or former business and/or creative partners, associates, independent contractors, interns, draftsmen, managers, agents, vendors, partners, successors, predecessors, affiliates, attorneys acting in concert,

5

**SA1651**

representatives, and all other persons acting or purporting to act with, for, or on her behalf, including but not limited to collaborators, consultants, accountants, financial advisors, advisors, attorneys, or any person acting in an advisory or consulting capacity, unless specifically stated otherwise; and

Q. **"WorthPoint"** means Defendant WorthPoint Corporation and any of their current or former business and/or creative partners, directors, officers, independent contractors, affiliates, predecessors, successors, parents, subsidiaries, partners, advisers, associates, employees, managers, agents, servants, representatives, corporate alter egos and all other persons acting or purporting to act with, for, or on its behalf, including but not limited to consultants, advisors, attorneys, or any person acting in an advisory or consulting capacity, unless specifically stated otherwise.

**SA1652**

**EXHIBIT A**

**ADDITIONAL MATTERS OF EXAMINATION**

1. Your relationship with Plaintiff, including how you know Plaintiff.

2. Any correspondence and communications in connection with the Lawsuit, including but not limited to communications that you had with Plaintiff, representatives of any of the Defendants, or any of the witnesses disclosed in this Lawsuit.

3. The basis of the findings and conclusions set forth in your December 5, 2022 report, including specifically but not limited to:

> (a) Your basis for stating that "It seems the Defendants are not being truthful, thus any reasonable person would likely conclude that they are concealing something."

> (b) Your basis for stating that "something nefarious has undoubtedly taken place in this dispute that support Ms. Trombetta's liability and damages claims."

> (c) Your basis for stating that the transaction on eBay in 2022 involving the Painting was an "unauthorized fraudulent transaction".

4. Your training, experience and expertise in the "Art Industry", a term used in your December 5, 2022 report, including but not limited to coursework in art, assignments or engagements related to art, prior expert retentions related to art, experience with eBay sales of art.

5. The basis for your opinions as to what was or was not acceptable in the "Art Industry" in 2012 as well as at any other time relevant to the Lawsuit and the Complaint;

6. The basis for your statement that Plaintiff is a "top-tier artist";

7. Your knowledge of Plaintiff's career, markets, artworks, valuation of her artworks, achievements, accolades, or similar recognition, as well as all sources of your knowledge thereof.

8. Your personal knowledge and/or involvement with any of the matters alleged in the Complaint.

9. Your experience accessing and/or using worthpoint.com website.

10. The content of your file pertaining to the Lawsuit, Plaintiff and your engagement by Plaintiff.

7

**EXHIBIT B**

Plaintiff 000062  A



1972 original Oil Painting Man With Red Umbrella Signed Annamarie Trombetta   🔍

All

6 results (0.60 seconds)

**Original Oil Paintings - UGallery.com**
www.ugallery.com/Buy-Original-Art ▾
Original Art. Top Emerging Artists. Expertly Curated — Free Shipping!
Happy Clients Worldwide · Custom Packaging · New Art Released Weekly
Most Popular Artists · The Showroom · New Arrivals · Staff Favorites

**1972 Original Oil Painting Man With Red Umbrella Signed**   .
www.worthpoint.com › Worthopedia™ ▾
1972 Original Oil Painting Man With Red Umbrella Signed Annamarie Trombetta
yqz. Sold for. Start Free Trial or Sign In to see what it's worth. Item Category

**Marilyn Monroe 1988 Vintage Michael Ochs Archive Chanel ...**
www.worthpoint.com › Worthopedia™ ▾
These posters are original from 1988 not remakes. .. 1972 Original Oil Painting Man
With Red Umbrella Signed Annamarie Trombe; Mustangs" Frank Rowland

**THOMAS KINKADE -KINCAID - WorthPoint**
www.worthpoint.com › Worthopedia™ ▾
Sold for. Start Free Trial or Sign In to see what it's worth.   1972 Original Oil Painting
Man With Red Umbrella Signed Annamarie Trombe   Handmade New

**Annamarie Trombetta - Artist Info**
www.trombettaart.com/info.html ▾
2001 -Richmondtown Historic Museum S.I. NY "Plein Air Paintings of Staten
representation may be. Annamarie Trombetta is enough of an artist to realize that
Missing: 1972 oil man red umbrella

**Central Park's Plein Air Past | OutdoorPainter**
www.outdoorpainter.com/central-park-s-plein-air-past/ ▾
So it's perfectly natural that plein air painting would go on in those choice   "The
Destructive Dance of 'Sandy,'" by Annamarie Trombetta   "Central Park Clockwork
Made of Multicolored Apps " by Annamarie Trombetta. oil and mixed media
Missing: 1972 man red umbrella

**Painting Central - artist Annamarie Trombetta on Vimeo**

vimeo.com › salent krieger - Videos
Nov 6, 2012
Artist Annamarie Trombetta a NYC based painter working in
Central Park. A profile of Annamarie as an artist
Missing: 1972 oil man red umbrella

**Annamarie Trombetta, Artist Interviewed by June Middleton ...**

https://www.youtube.com/watch?v=ufEQ3D3UWmg
Apr 29, 2015 - Uploaded by JuneMindingBusiness
Annamarie Trombetta, an artist who's art has been exhibited
around the world, has created works in oil
Missing: 1972 painting man red umbrella

**Staten Island native's passionate love affair with Central ...**
www.silive.com/entertainment/   /annamarie_trom   ▾
Jan 12, 2015 - Paintings, prints, drawings and photos by Annamarie Trombetta
resident is showing 80 works — etchings, oil paintings, watercolors, pastels.

https://www.google.com/?gws_rd=ssl#q=1972+original+Oil+Painting+Man+With+Red+Umbrella+Signed+Annamarie+Trombetta

Page 1 of 2

PENGAD 800-631-6989

DEFENDANT'S
EXHIBIT
25
8/30/22



Plaintiff000144

# SA1656

## WorthPoint

| Search | | All Categories | ⬍ |

Search

Sign In
Start Free Trial

Toggle navigation

- News & Resources
  - Articles
  - Videos & Podcast
  - Site Updates
- Value It
  - Worthopedia™ Price Guide
- Research It
  - WorthPoint Marks
  - WorthPoint Library
- Buy & Sell
  - Worthpoint Reseller Program
  - Become a Reseller
  - Classifieds

×Close **Sign In**

Username/Email: ⓘ
Enter username/email

Password:
Enter Password

I've forgotten my password
Remember Me: ☐

Plaintiff000157

# SA1657

nal Oil Painting Man With Red Umbrella Signed Annamarie Trombetta yqz (12/01/2012)    1/14/16, 8:42 AM







ebay
Raw data from eBay
under sublicense



Worthopedia™
price guide

*Items in the Worthopedia are obtained exclusively from licensors and partners solely for our members' research needs.*
If this item contains incorrect or inappropriate information please underline contact us here to flag it for review.

If you are the originator/copyright holder of this photo/item and would prefer it be excluded from our community, contact us here for removal.

- Home > Worthopedia™ > 1972 Original Oil Painting Man With Red Umbrella Signed Annamarie Trombetta yqz

## 1972 Original Oil Painting Man With Red Umbrella Signed Annamarie Trombetta yqz

- Sold for: Start Free Trial or Sign In to see what it's worth.
- Item Category: -
- Source: eBay
- Sold Date: Dec 01,2012
- Channel: Online Auction

Welcome to EstateAuctionsInc! We are one of the Top Sellers of Antiques, Collectibles and Quirky items on eBay. We have been selling since 1998 and ALL of our auctions start at .99 cents. We are proud to announce that we maintain a "FIVE STAR Detailed Seller Rating" and our staff strives for 100% customer satisfaction, our 100% feedback rating will vouch for that. We work with consigners from Coast-To-Coast and work hard to make sure we have top quality items. We are "Your Quality Zone" - search "YQZ" to see our other listings our !

---

>>>>> UP IN THIS AUCTION <<<<< 1972 Original Oil Painting Man With Red Umbrella Signed Annamarie Trombetta New York Listed Artist - Shabby Chic Condition

- DESCRIPTION - Please be patient there are 12 photos to be loaded in this auction. Up in this auction is a wonderful and delightful oil on canvas painting of a man (I guess it could be a woman) with a red umbrella. This is by Annamarie Trombette. It is signed on the bottom, but on the back it has written in red on the stretcher, Annamarie Trombetta "Gifted" 1977, "Painted" 1972. To our eyes it looks like it is after the style of Andre Kohn. It is quite large being approx. 48 1/2" tall and 17 1/2" wide. We are calling it shabby chic condition as it has a tear in the canvas, about 5/8" long just to the left of the man's knees, but still such a great painting. For those not familiar with Trombetta, here is information about her from off AskArt as they got it from her website: Annamarie Trombetta (1963 - ) Lived/Active: New York The nature of an artist's life, creativity and

Plaintiff000158

1972 Original Oil Painting Man With Red Umbrella Signed Annamarie Trombetta yqz (12/01/2012)                                    8/1/15, 8:46 PM

website: Annamarie Trombetta (1963 - ) Lived/Active: New York The nature of an artist's life, creativity and growth may be synonymously expressed in the image of an archetypal tree. Beginning with the earthly descendent roots the artist like the tree branches out into its surrounding environmental and celestial world. Both ascend and descend, widening their girth of consciousness while producing visual imagery, weathering each season of change. Thus, I believe it is the nature of the artist and of nature itself to regenerate and manifest. All of the imagery in this catalog was either created en plein air or from the subject directly. My journey to becoming an artist began many years ago. The consanguineous roots of my Italian family tree provided me with an innate constitution for my artistic profession. When I was a tiny seed of contemplative thought, my artistic nature began to sprout interest while gazing up at the ceiling paintings in a neighborhood church named Regina Pacis, meaning Queen of Peace. The church located in Brooklyn, NY features ceiling paintings, sculptures, marble interiors, and incorporates architectural elements for the façade and the belfry that are of Italianate design. Before the age of three I was able to surmise that the church in the ceiling painting was indeed the church I was in. The visual stimulation was a form of education. It fostered my sense of perception which became my strongest mode for acquiring knowledge. As the years unfurled, my family moved to Staten Island. At this time it was a scenic field of luminosity, lush vegetation and a harbor view complete with sail boats and small yachts. A few years after we moved my tree of life was in jeopardy of loosing a limb. What appeared to be a swollen leg was indeed a cancerous tumor. It was an almost fatal or perhaps even a fated occurrence in my life. The struggle to survive the experience was lightened by my imagination and by my artistic ability to create. I seriously thought I would go into medicine but the posters and paintings in the hospital and doctor's office held my attention more intensely. I began my formal training at The Brooklyn Museum School of Art while I was in high school. The exposure to various forms of art inspired me to expand my horizons and in the early Eighties I traveled on a summer tour to Europe. The tour comprised of six countries; Germany, Austria, France, Italy, Switzerland and England. Viewing so many different cities and cultures in a concentrated period of time...

**Similar Items**

No Image available

- Oil painting, original oil painting impressionism

No image available

- original oil painting on canvas

Plaintiff000159

evpa; overflow: hidden; text-align: right; line-height: 11px; m-
3px; font-size: 0pt;"><span class=3D"link-enhancr-element link-
icw-by link-enhancr-mobile-no-resize" style=3D"ve
size: 9px; line-height: 11px; color: #999999; -mos-text-size-sd=
-ns-text-size-adjust: none; -webkit-text-size-adjust:none; text-
inone;">Preview by Yahoo</span></div></td></tr><tr><td colspan=
=3D"link-enhancr-element" style=3D"height: 9px; background-colo=
font-size: 0pt; border-collapse: collapse;"><div class=3D"link-=
ent" style=3D"height: 9px; background-color: #ffffff; font-size=
v></td></tr><tr class=3D"link-enhancr-element"><td class=3D"lin=
ement" colspan=3D"7" style=3D"height: 1px; background-color: #e=
size: 1px; border-collapse: collapse;"><div class=3D"link-enhan=
style=3D"height: 1px; background-color: #e5e5e5; font-size: 1px=
t:0px"> </td></tr></tbody></table></div><div dir=3D"
iv310293437yui_3_16_0_1_1438514161681_3822" class=3D"" style=
ily: 'lucida console', sans-serif; font-size: 13px;"><a rel=3D"
ape=3D"rect" id=3D"yiv310293437yui_3_16_0_1_1438514161681_8641=
blank" href=3D"http://www.worthpoint.com/worthpedia/1972-orig=
ting-man-red-48924172" class=3D"">1972 Original Oil Painting M=
Umbrella Signed Annamarie Trombetta yqz (12/01/2012)</a><br cle=
id=3D"yui_3_16_0_1_1439310268455_11083" class=3D""></div><div c=
=3D"yiv310293437enhancrCard_1" style=3D"font-size: 13px; font-=
gia, Times, 'Times New Roman', serif; margin-top: 5px; margin-b=
><table class=3D"" id=3D"yiv310293437yui_3_16_0_1_1438514161681=
spacing=3D"0" cellpadding=3D"0" border=3D"0" style=3D"display: =
: 450px;"><tbody id=3D"yiv310293437yui_3_16_0_1_1438514161681_=
3D"" style=3D"width: 450px;"><tr class=3D"" id=3D"yui_3_16_0_1_=
9_4682"><td colspan=3D"7" rowspan=3D"1" class=3D"" id=3D"yui_3_=
30306209_4681" style=3D"min-height: 1px; background-color: rgb(=
9); font-size: 1px; border-collapse: collapse;"><div class=3D""=
_16_0_1_1439320306209_4680" style=3D"min-height: 1px; line-heig=
bspi</div></td></tr><tr class=3D"" id=3D"yiv310293437yui_3_16_=
61681_8966"><td colspan=3D"1" rowspan=3D"5" class=3D"" id=3D"yu=
4393102684SS_11092" style=3D"width: 1px; background-color: rgb(=
9); font-size: 1pt; border-collapse: collapse;"><div class=3D""=
_16_0_1_1439310268455_11094" style=3D"width: 1px; font-size: 1p=
div></td><td colspan=3D"1" rowspan=3D"5" class=3D"" id=3D"yui_3=
310268455_11096" style=3D"width: 14px; font-size: 0pt; border-c=
lapse;"><div class=3D"" id=3D"yui_3_16_0_1_1439310268455_11098"=
dth: 14px; font-size: 14pt;"> </div></td><td colspan=3D"2"=
1" class=3D"" id=3D"yui_3_16_0_1_1439310268455_11100" style=3D"=
6px; font-size: 0pt; border-collapse: collapse;"><div class=2D"=
3_16_0_1_1439310268455_11102" style=3D"min-height: 6px; font-si=
bsp;</div></td><td colspan=3D"1" rowspan=3D"5" class=3D"" id=3D"=
37yui_3_16_0_1_1438514161681_8967" style=3D"width: 20px; font-s=
rder-collapse: collapse;"><div class=3D"" id=3D"yiv310293437yu=
438514161681_8966" style=3D"width: 20px; font-size: 20pt;"><nbe=
><td colspan=3D"1" rowspan=3D"5" class=3D"" width=3D"1" id=3D"y=
1439310268455_11106" style=3D"width: 1px; background-color: rgb=
3_16_0_1_1439310268455_11108" style=3D"width: 1px; font-size: 1=
/div></td></tr><tr id=3D"yiv310293437yui_3_16_0_1_163651416168=
a=3D""><td colspan=3D"2" rowspan=3D"1" class=3D"" id=3D"yiv3102=
16_0_1_1438514161681_8663" style=3D"width: 414px; vertical-alig=
<div class=3D"" id=3D"yiv310293437yui_3_16_0_1_1438514161681_8=
B"line-height: 16.5px; width: 414px;"><div class=3D"" id=3D"yiv=
i_3_16_0_1_1438514161681_8661" style=3D"word-wrap: break-word;"=
=3D"" id=3D"yui_3_16_0_1_1439310268455_11114"></span><span clas=
"yui_3_16_0_1_1439310268455_11116"></span><a rel=3D"nofollow" o=
" class=3D"" id=3D"yiv310293437yui_3_16_0_1_1438514161681_8666=
_blank" href=3D"http://www.worthpoint.com/worthpedia/1972-orig=
nting-man-red-48924172" style=3D"color: rgb(6, 0, 0); line-heig=
nt-size: 10px; display: block;"><span class=3D"" id=3D"yiv31029=
6_0_1_1438514161681_8667" style=3D"margin: 0px 0px 3px; line-he=
max-height: 43px; overflow: hidden; display: inline-block;">197=
ll Painting Man With Red Umbrella Signed Annamarie Trombetta yq=
2)</span></a><div class=3D"" id=3D"yiv310293437yui_3_16_0_1_14=
8660" style=3D"line-height: 20px; color: rgb(153, 153, 153); ma=
px; overflow: hidden;">Welcome to EstateAuctionsInc! We are one=
Sellers of Antiques, Collectibles and Quirky items on eBay. We =
lling since 1998 and ALL of our auctions start at .99 cents. We=
m 1537357</div></div></div></td></tr><tr id=3D"yui_3_16_0_1_143=
052" class=3D""><td colspan=3D"2" rowspan=3D"1" class=3D"" id=
_0_1_1439320306209_4351" style=3D"min-height: 6px; font-size: 0=
ollapse: collapse;"><div class=3D"" id=3D"yui_3_16_0_1_14393203=
style=3D"min-height: 6px; font-size: 6pt;"></div></td></tr><tr =
16_0_1_1439320306209_4686" class=3D""><td colspan=3D"1" rowspan=
=3D"" id=3D"yui_3_16_0_1_1439320306209_4685" style=3D"vertical-=
e; font-family: Arial, "Helvetica Neue", Helvetica, sans-serif;=
=3D"" id=3D"yui_3_16_0_1_1439320306209_4684" style=3D"font-size=
el=3D"nofollow" shape=3D"rect" class=3D"" target=3D"_blank" hre=
www.worthpoint.com/worthpedia/1972-original-oil-painting-man-r=
id=3D"yui_3_16_0_1_1439320306209_4683" style=3D"color: black;"=
=3D"" id=3D"yiv310293437yui_3_16_0_1_1438514161681_8658" style=
inline-block; line-height: 11px; max-width: 314px; min-width: =
iow: hidden; max-height: 13px;"><span class=3D"" id=3D"yui_3_16=
268455_11129" style=3D"vertical-align: middle; font-size: 9pm; =
53, 153, 153);">View on <span class=3D"" id=3D"yui_3_16_0_=
455_11131" style=3D"font-weight: bold;">www.worthpoint.com</spa=
pan></a></div></td><td colspan=3D"1" rowspan=3D"1" class=3D"" i=
6_9_1_1439318268455_11133" style=3D"vertical-align: middle; wid=



Case: 25-817, 07/17/2026, DktEntry: 86.1, Page 290 of 291

SA1659

Plaintiff000160

Case: 25-817, 07/17/2026, DktEntry: 86.1, Page 291 of 291

SA1660



1972 Original Oil Painting Man With Red Umbrella Signed Annamarie Trombetta yqz (12/01/2012)

© Copyrighted work licensed by WorthPoint

Plaintiff000163